**No. 23-40605**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Texas Medical Association; Tyler Regional Hospital, LLC.; Doctor Adam Corley,
Plaintiffs – Appellees/Cross-Appellants,

v.

United States Department of Health and Human Services; Office of Personnel
Management; United States Department of Labor; United States Department of
Treasury; Xavier Becerra, Secretary, U.S. Department of Health and Human
Services, in his official capacity; Kiran Ahuja, in her official capacity as the
Director of the Office of Personnel Management; Janet Yellen, Secretary, U.S.
Department of Treasury, in her official capacity; Julie A. Su, Acting Secretary,
U.S. Department of Labor, in her official capacity,
Defendants – Appellants/Cross-Appellees.

LifeNet, Inc.; Air Methods Corp.; Rocky Mountain Holdings, LLC; East Texas Air
One, LLC,
Plaintiffs – Appellees/Cross-Appellants,

v.

United States Department of Health and Human Services; Office of Personnel
Management; United States Department of Labor; United States Department of
Treasury; Xavier Becerra, Secretary, U.S. Department of Health and Human
Services, in his official capacity; Kiran Ahuja, in her official capacity as the
Director of the Office of Personnel Management; Janet Yellen, Secretary, U.S.
Department of Treasury, in her official capacity; Julie A. Su, Acting Secretary,
U.S. Department of Labor, in her official capacity,
Defendants – Appellants/Cross-Appellees.

*On Appeal from the United States District Court for the Eastern District of Texas
District Court No. 6:22-CV-450-JDK*

**BRIEF OF AMERICA'S HEALTH INSURANCE PLANS
AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS**

Michael Spector
Thomas M. Palumbo
AMERICA'S HEALTH INSURANCE PLANS
601 Pennsylvania Ave. NW
South Building, Suite 500
Washington, DC 20004

Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 900
Washington, DC 20001
Tel.: 202-868-6915
Fax: 202-609-8410
Email: hhunt@deutschhunt.com

*Counsel for* Amicus Curiae

## CERTIFICATE OF INTERESTED PARTIES

*Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 23-40605

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Texas Medical Association
Tyler Regional Hospital, LLC
East Texas Health System, LLC
AHS East Texas Health System, LLC
University of Texas Health Sciences
    Center at Tyler
Dr. Adam Corley

*TMA Plaintiffs – Appellees/Cross-Appellants and Their Affiliated Entities*

LifeNet, Inc.
Air Methods Corp.
Rocky Mountain Holdings, LLC
East Texas Air One, LLC
AHS East Texas Health System, LLC

*Air Ambulance Plaintiffs – Appellees/Cross-Appellants and Their Affiliated Entities*

Eric D. McArthur
Brenna Jenny
Jaime L.M. Jones
Penny Packer Reid
Jillian Stonecipher
(Sidley Austin LLP)

*Counsel for TMA Plaintiffs – Appellees/Cross-Appellants*

Steven Shepard
James Craig Smyser
(Susman Godfrey LLP)

David Alan King
Joshua Arters
(Polsinelli, P.C.)

*Counsel for Air Ambulance Plaintiffs – Appellees/Cross-Appellants*

U.S. Department of Health and Human Services
Xavier Becerra, Secretary, U.S. Department
   of Health and Human Services
U.S. Department of the Treasury
Janet Yellen, Secretary, U.S. Department of Treasury
U.S. Department of Labor
Julie A. Su, Acting Secretary, U.S. Department of Labor
U.S. Office of Personnel Management
Kiran Ahuja
*Defendants-Appellants*

Leif Eric Overvold
Anna L. Deffebach
Joshua M. Salzman
Kevin B. Soter
(U.S. Department of
   Justice)

*Counsel for*
*Defendants-*
*Appellants*

America's Health Insurance Plans, Inc.

*Amicus Curiae on this Brief*

Hyland Hunt
Ruthanne M. Deutsch
(Deutsch Hunt PLLC)

Michael Sector
Thomas M. Palumbo
(America's Health Insurance Plans)

*Counsel for Amicus Curiae on this Brief*

Under Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), America's Health Insurance Plans, Inc. states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

s/Hyland Hunt
Hyland Hunt

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ......................................................i

TABLE OF CONTENTS........................................................................ iii

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF INTEREST OF *AMICUS CURIAE*..............................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................3

ARGUMENT ........................................................................................5

I.   The No Surprises Act Aims to Remedy Market Dysfunction Where Patients Cannot Choose Providers..........................................................................5

II.   QPA-Based Payments Calculated per the Challenged Rules Are Widely Accepted by Providers as Reflecting Reasonable, Market-Based Rates..................7

III.  The District Court's Decision Imposes Unnecessary and Unworkable Administrative Burdens while Reducing the QPA's Market Fidelity.....................11

    A.   The Rule Properly Excludes Value-Based Adjustments..........................11

        1.   *Background.*....................................................................11

        2.   *The rules reasonably address value-based adjustments.* .................15

        3.   *The district court's one-sided mandate to include the "highest possible" payment in the QPA defies market reality.*.......................16

        4.   *The district court's rewrite erodes stability and predictability for patients.* .......................................................................18

    B.   The QPA Rightly Excludes Post-Hoc Single Case Agreements..............20

    C.   The QPA Methodology Reasonably Reflects Real-World Contracting. ..........................................................................23

        1.   *The QPA properly reflects all negotiated network rates, regardless of how often a claim has been paid at that rate.* ............23

        2.   *The rule reasonably does not require the calculation of separate QPAs where it is contrary to contracting practice and makes no material difference.*........................................................24

IV.  QPA Calculations Are Subject to Extensive Scrutiny and Transparency. .......27

CONCLUSION ....................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Gill v. Whitford*, 138 S. Ct. 1916 (2018)..................................................25

*Legacy Cmty. Health Servs. v. Smith*, 881 F.3d 358 (5th Cir. 2018).......................27

**Statutes**

42 U.S.C.
      § 300gg-111 ................................................... 6, 7, 15, 19, 27
      § 300gg-112 ..............................................................21
      § 300gg-131 ...............................................................6

**Regulations**

45 C.F.R.
      § 149.130 ...............................................................21
      § 149.140 ...............................................................28

86 Fed. Reg. 36,872 (July 13, 2021).......................... 5, 7, 15, 16, 19, 20, 21, 25, 26

86 Fed. Reg. 55,980 (Oct. 7, 2021)...........................................................6

87 Fed. Reg. 52,618 (Aug. 26, 2022) ......................................................28

88 Fed. Reg. 75,744 (Nov. 3, 2023)..........................................................9

**Other Authorities**

Loren Adler et al., *High air ambulance charges concentrated in private equity-owned carriers*, Brookings Inst. (Oct. 13, 2020) .................................................20

America's Health Insurance Plans & Blue Cross Blue Shield Ass'n, *No Surprises Act Continues to Prevent More than 1 Million Surprise Bills Per Month, While Provider Networks Grow* (Jan. 2024)....................................................8

Blue Cross Blue Shield of Michigan, *Physician Group Incentive Program*...........12

Erin C. Fuse Brown et al., *The Unfinished Business of Air Ambulance Bills*, Health Affairs Forefront (Mar. 26, 2021) .......................................................................20

Ctrs. for Medicare & Medicaid Servs., *Federal Independent Dispute Resolution Process—Status Update* (Apr. 27, 2023) ..............................................................8

Ctrs. for Medicare & Medicaid Servs., *Initial Report on the Independent Dispute Resolution (IDR) Process, April 15-September 30, 2022* (Dec. 2022) ...............10

Ctrs. for Medicare & Medicaid Servs., *Partial Report on the Independent Dispute Resolution (IDR) Process: October 1 – December 31, 2022* (Apr. 27, 2023).....10

Zack Cooper et al., *Surprise! Out-of-Network Billing for Emergency Care in the United States*, 128 J. Pol. Econ. 362 (2020).........................................................20

Health Care Payment Learning & Action Network, *APM Measurement Effort* (2021).......................................................................................................................15

Corinne Lewis et al., *Value-Based Care: What It Is, and Why It's Needed*, Commonwealth Fund (Feb. 7, 2023).....................................................................12

Anne M. Lockner, *The Healthcare Industry's Shift from Fee-for-Service to Value-Based Reimbursement*, Bloomberg Law (Sept. 26, 2018) ...................................11

MGMA, *Patient Access and Value-Based Outcomes Amid the Great Attrition* (2022)......................................................................................................................13

*Understanding the Value-Based Reimbursement Model Landscape*, Revcycle Intelligence (Dec. 11, 2023) ......................................................................... 12, 13

U.S. Dep't of Labor, *Annual Report on Self-Insured Group Health Plans* (Mar. 2023).......................................................................................................................26

U.S. Dep't of Labor, *FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* (Aug. 19, 2022) ...................25

v

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

America's Health Insurance Plans, Inc. (AHIP) is the national trade association representing the health insurance community. AHIP advocates for public policies that expand access to affordable health care coverage to all Americans through a competitive marketplace that fosters choice, quality, and innovation. AHIP's members have extensive experience working with nearly all health care stakeholders to ensure that patients have affordable access to needed medical services and treatments. That experience gives AHIP broad first-hand knowledge and a deep understanding of how the nation's health care and health insurance systems work.

AHIP's members strive to reach agreements with health care providers to offer Americans affordable quality networks that provide them with choices for their medical care. Networks are a common feature of nearly all health plans. They offer patients peace of mind that their financial responsibility will be limited to either a flat copayment or a coinsurance amount based on a negotiated rate. For certain specialties, however, network agreements may not be in place—particularly when patients are unable to choose a provider, like emergency care or air ambulance

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than *amicus*, its members, or its counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2), (4).

services. Those specialties frequently attract private equity investors given their business model of remaining out-of-network as a means of extracting higher reimbursement rates. In these situations, health insurance providers endeavored to negotiate reasonable out-of-network payments after treatment to protect patients from surprise medical bills. Despite those efforts, Americans all too often still faced surprise medical bills from providers who failed to agree to reasonable market-based payments.

Congress, after significant debate, ultimately arrived at a bipartisan solution to protect patients from out-of-network payment disputes and problematic surprise bills. Congress's solution, the No Surprises Act, establishes a system to compensate providers fairly at market rates, while providing stability and predictability for patients. The cornerstone of the No Surprises Act is the Qualifying Payment Amount (QPA)—a key measure designed to approximate what the parties would have reasonably agreed to, under competitive market conditions, had they reached a network agreement in advance.

Given the QPA's central purpose and functions under the Act, the Departments' implementing rules aim to ensure that it accurately reflects negotiated market rates. AHIP agrees with the Departments' legal arguments that the challenged rules are consistent with the Act and fall well within the Departments' discretion. In light of its members' experience with health care contracting, AHIP

writes separately to emphasize how the rules enhance the market fidelity of the QPA, consistent with Congress's intent.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As the cornerstone of the No Surprises Act, Congress intended the QPA to approximate, as closely as possible, negotiated market rates. This point is undisputed. The Act delegated to the Departments the authority to develop a methodology to do so, also undisputed. Experience proves their success.

The widespread acceptance of QPA-based payments demonstrates the QPA's accuracy. Data show that patients were protected from over 13 million surprise medical bills in 2023. The vast majority of providers who might have sent surprise bills before passage of the Act now instead accept payments based on QPAs calculated under the Departments' methodology, underscoring that the QPA is a reasonable market rate. Only a narrow subset of providers in a handful of specialties generates the lion's share of payment disputes, reflecting their business models' reliance on the excessive out-of-network payments formerly generated by leveraging surprise bills. This disputative minority does not reflect industry-wide opposition to the reasonableness of the QPA. Moreover, when questions or issues arise with QPA calculations, the Departments have an array of processes in place to validate the QPA's accuracy or otherwise correct course.

3

In contrast to the Departments' reasonable and proven methodology, the district court's decision—driven by plaintiffs hard-pressed to show actual injury—divorces the QPA from market reality and undermines the QPA's accuracy and intended function. The government has appealed the district court's rewrite of certain provisions, which would both distort the QPA and create significant and costly administrative burdens, including:

- Requiring value-based bonuses (but not penalties) to be added to per-service QPA rates, which defies contracting reality and will drive up patient cost-sharing;

- Requiring the QPA to include ad hoc agreements resolving pre-Act payment disputes—agreements where health insurance providers paid post-treatment supracompetitive charges to protect patients from surprise bills—even though doing so will carry forward the very market distortion Congress sought to mitigate; and

- Excluding from the QPA rates agreed in arms-length negotiations based on how frequently services have been provided at those rates, even though the rates are valid and highly probative of reasonable market rates.

The upshot of these holdings and the district court's overly broad vacatur is a QPA that is now more variable, less comprehensible, and unwieldly to calculate

and administer. This disserves Congress's intent to deliver predictable health care expenses with minimal administrative costs.

## ARGUMENT

### I.   The No Surprises Act Aims to Remedy Market Dysfunction Where Patients Cannot Choose Providers.

Congress made clear in the No Surprises Act that a central function of the QPA is to match market and contracting reality, so that when patients are unable to choose providers, their costs are nonetheless based on reasonable market rates akin to what would have been negotiated. Yet the district court never even tried to assess how well the Departments' methodology furthered that core statutory goal. Instead, the district court dissected and struck down isolated provisions through a myopic misreading of the statute. The result is a QPA far removed from the realities of health care contracting. This erosion of the QPA's market fidelity disserves patients and thwarts Congress's objective to mitigate significant market dysfunction.

Before the Act, providers without network agreements—most commonly air ambulance providers, emergency care providers, and providers assigned to patients by hospitals (like anesthesiologists and pathologists)—often sent surprise bills to patients for any part of their unilaterally set billed charge beyond the amount paid by the patient's health plan. 86 Fed. Reg. 36,872, 36,874 (July 13, 2021). By leveraging such "balance bills," they were often able to obtain significantly higher payments than other medical specialties. *See* Gov. Br. 6-8.

5

Relying on the QPA, the Act sought to protect patients from these unpredictable and potentially financially ruinous out-of-network costs. The QPA is designed to "reflect standard market rates arrived at through typical contract negotiations." 86 Fed. Reg. 55,980, 55,996 (Oct. 7, 2021). It is typically the median in-network rate. ROA.13200; *see* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). In short, the QPA is designed to reflect a fair negotiated rate, even for health care services where negotiations are less likely to occur due to market dysfunction.

This lynchpin measure protects patients by generally limiting their cost-sharing to a percentage of the QPA, and barring any balance bills. *E.g.*, 42 U.S.C. §§ 300gg-111(a)(1)(C), (3)(H), 300gg-131. So long as the QPA is implemented as intended—*i.e.*, consistently with negotiated contract rates—this means that patients' cost-sharing is materially the same whether they receive care in- or out-of-network, enhancing cost stability and predictability.

As for providers, when case-specific disputes about compensation arise due to the lack of a network agreement, the Act establishes Independent Dispute Resolution (IDR) as a streamlined arbitration process to conclusively resolve such disputes. IDR entities must, at a minimum, consider the QPA when making payment determinations. *Id.* § 300gg-111(c).[2]

---

[2] Plaintiffs have also challenged the Departments' rules implementing IDR. *See Tex. Med. Ass'n v. U.S. Dep't of Health & Human Servs*, No. 23-40217 (5th Cir.). AHIP

For the Act to work as Congress intended, the QPA methodology must embody "the statutory intent of ensuring that the QPA reflects market rates under typical contract negotiations." 86 Fed. Reg. at 36,889. Given the complexity and variety of medical contracting, Congress expressly delegated rulemaking authority to the Departments to establish "the methodology … to determine the [QPA]." 42 U.S.C. § 300gg-111(a)(2)(B)(i).

Despite this express delegation, the district court rewrote the QPA methodology piecemeal, based on illusory conflicts with statutory snippets. The district court erred in both the particulars and in gross, as experience under the Act shows the Departments' methodology works.

## II. QPA-Based Payments Calculated per the Challenged Rules Are Widely Accepted by Providers as Reflecting Reasonable, Market-Based Rates.

The drumbeat of the plaintiffs' claims is that the challenged rules artificially deflate the QPA below market levels. *See, e.g.*, ROA.13206, ROA.13210, ROA.13212. Under Plaintiffs' theory, one would expect to see widespread rejection of QPA-based payments. But experience shows the opposite. An AHIP analysis indicates that payment for nearly all out-of-network services is resolved without challenge, most of the time via medical providers' acceptance of payments at or around the QPA, with no need for IDR. A minority of providers in a narrow range

---

filed an amicus brief in that case explaining how the IDR rules help the system operate as Congress intended to encourage voluntary resolution of payment disputes.

of specialties—those that relied the most on surprise billing before the Act—generates the bulk of IDR disputes.

Throughout 2023, patients were protected by the Act from receiving surprise medical bills that otherwise could have resulted from about 13.5 million claims. America's Health Insurance Plans & Blue Cross Blue Shield Ass'n (BCBSA), *No Surprises Act Continues to Prevent More than 1 Million Surprise Bills Per Month, While Provider Networks Grow* (Jan. 2024), http://tinyurl.com/4majdzam (finding more than 10 million claims were subject to the Act's protections between January 1 and September 30, 2023). Per AHIP/BCBSA research, for more than three-quarters of items or services covered by the Act and not subject to state dispute resolution processes, initial payments for those services—generally centering around the QPA—were accepted without any dispute. *See id.* Of the 24% that enter open negotiations, nearly three in four (73%) are resolved by settlement. *Id.* Thus, fewer than 7% of out-of-network claims subject to the Act even enter IDR. *Id.*

Fewer still are actually resolved by IDR. Government data show that, setting aside ineligible disputes, about 37% of IDR disputes through March 2023 were resolved or closed without a decision (including because they settled) leaving only 4% of eligible disputes resolved by IDR. Ctrs. for Medicare & Medicaid Servs., *Federal [IDR] Process—Status Update*, at 1-2 (Apr. 27, 2023), https://tinyurl.com/2dp48eyd. As depicted in the below graphic, when

AHIP/BCBSA and government data are combined, the upshot is that about 96% of out-of-network claims subject to the Act are resolved voluntarily in QPA-centered negotiations, consistent with congressional design.



Though 4% of claims being resolved by IDR may seem small, it is still far more than Congress intended. Over 489,000 IDR proceedings were initiated between mid-April 2022 and June 2023, including nearly fourteen times the disputes projected for the first year. 88 Fed. Reg. 75,744, 75,753 (Nov. 3, 2023). Closer examination of that volume, moreover, reveals concentrated exploitation of the IDR system by a handful of providers—particularly air ambulance services and

emergency care practices.

For air ambulance services, a mere three providers (out of more than 60) generated about three quarters of IDR proceedings. Ctrs. for Medicare & Medicaid Servs., *Initial Report on the [IDR] Process, April 15-September 30, 2022*, at 26 (Dec. 2022), https://tinyurl.com/mtp7kd3k (IDR Report); Ctrs. for Medicare & Medicaid Servs., *Partial Report on the [IDR] Process: October 1 – December 31, 2022*, at 26 (Apr. 27, 2023), https://tinyurl.com/mrx7sk66 (IDR Fourth Quarter Report). For all other claims, the lion's share (over 80%) of IDR disputes involved emergency services, with over half of all IDR disputes relating to just five emergency department visit codes. IDR Report, at 19; IDR Fourth Quarter Report, at 23. What's more, a single entity initiated about one third of the total non-air-ambulance disputes. IDR Report, at 16; IDR Fourth Quarter Report, at 17. The disputes are, moreover, concentrated in very few States, with providers in Texas, Florida, and Georgia generating nearly half of IDR disputes. IDR Report, at 12-13; IDR Fourth Quarter Report, at 11.

Aside from these IDR disputes centered in a few specialties that appear to have built their business models around surprise billing, there is widespread acceptance of payments around the QPA. This strongly suggests that the Departments' now-vacated rules yielded a QPA that accurately reflected reasonable market rates, supporting patients and providers alike.

**III.    The District Court's Decision Imposes Unnecessary and Unworkable Administrative Burdens while Reducing the QPA's Market Fidelity.**

The district court flyspecked the Departments' QPA methodology by identifying purported conflicts with fragments of statutory text. This analysis missed the forest for the trees. The conflicts are illusory, and the government's choices are well within Congress's express delegation of authority to develop a QPA methodology. *See* Gov. Br. 26-27. Moreover, the practical implications of the district court's ruling underscore how its grab bag of atextual holdings distorts the QPA. In each context where the district court displaced the Departments' well-reasoned judgment, the district court's rewrite makes the QPA less accurate, and bogs down the calculation process with unnecessary and costly procedures. None of the district court's rulings are required by the statute, and all frustrate Congress's goal of protecting patients through reasonable and predictable out-of-network rates and minimal administrative costs.

**A. The Rule Properly Excludes Value-Based Adjustments.**

*1. Background.*

Health care contracting is complex. Fee-for-service payments remain the dominant underlying approach, but many alternative payment models exist. *See* Anne M. Lockner, *The Healthcare Industry's Shift from Fee-for-Service to Value-Based Reimbursement*, Bloomberg Law (Sept. 26, 2018), https://tinyurl.com/5n6wd26t. In these alternative models, health insurance

providers go beyond setting specific fees for specific medical services and partner with medical providers to achieve goals related to the "results [physicians] deliver for their patients, such as the quality, equity, and cost of care." *See* Corinne Lewis et al., *Value-Based Care: What It Is, and Why It's Needed*, Commonwealth Fund (Feb. 7, 2023), https://tinyurl.com/48dxak6a.

Alternative payment models aim to reward (or disincentivize) system-wide results. Three common forms of alternative payment models are:

***Pay-for-performance contracts*** provide a retrospective bonus or penalty linked to quality of outcomes. *Understanding the Value-Based Reimbursement Model Landscape*, Revcycle Intelligence (Dec. 11, 2023), https://tinyurl.com/yr76k7ny (*Understanding Value-Based*). Such programs are typically customized for each practice group, rewarding performance of the entire practice, not individual-provider or single-service outcomes. *See, e.g.*, Blue Cross Blue Shield of Michigan, *Physician Group Incentive Program*, https://tinyurl.com/2rzxd2tv.

Although varying in details, a common thread in alternative payment models is that retrospective value adjustments (up or down) are not tied to a specific service delivered to a specific patient. Rather, they depend on a provider group's or facility's overall performance over an extended timeframe, covering multiple patients, and multiple encounters. *See Understanding Value-Based*, *supra*. For example, a

practice group (or facility) might receive a bonus or pay a penalty based on how many hospital re-admissions that facility's patients experienced, or how many of that group's patients experienced post-operative infections. *See* MGMA, *Patient Access and Value-Based Outcomes Amid the Great Attrition*, at 3 (2022), https://tinyurl.com/y6ufbjwp (listing common quality measures).

*A shared savings model* is another form of value-based model. There, provider compensation generally hinges on the quality and efficiency of care across a group of patients. A benchmark of projected total costs is derived from historical data. Actual costs are then aggregated over a year—for a provider's entire patient population—and compared to the benchmark. Providers who avoid unnecessary costs through more efficient care delivery or improved patient outcomes share in the savings that their better care generates. *Understanding Value-Based*, *supra.* If the contract provides for two-sided value arrangements, providers whose costs exceed the benchmark are responsible for paying a portion of those excess costs. *See id.*

Here, payments are made (or penalties incurred) based on a total-cost-of-care budget covering many services and many patients. Indeed, shared savings payments are not per-service add-ons, but made on account of services that are *not* provided— because quality care obviated the need for patients to receive them.

*Bundled payment arrangements*—another variety of value-based model— also show how such innovative payment schemes differ from the traditional fee-for-

13

service approach. With bundled payments, rather than pay separately for each service provided to treat a given illness, a single, fixed, prospective payment goes to a group of network providers based on a defined set of expected services. For example, in the case of a breast cancer diagnosis, the bundled payment might cover oncology, radiation, surgical, and post-surgical services for a period spanning the initial cancer diagnosis through a certain number of days post-surgery.

This flat-fee prospective payment does not change based on the actual services furnished or costs incurred. Instead, providers are rewarded if they are efficient and coordinate or innovate to improve outcomes. If costs exceed the benchmark, providers absorb the financial loss; if costs are below the benchmark, they retain a portion of the savings. Because payment is prospective, providers never even submit fee-for-service claims. So while typical fee-for-service claims may be budget inputs for the benchmark flat fee, various clinical, actuarial, and other factors then preclude any reliable comparison to individual per-service rates.

Alternative payment models continue to evolve, and this handful of non-exhaustive examples shows why it is simply wrong (and practically distorting) to characterize value-based adjustments as add-ons (or subtractions) to service-specific rates. Value-based adjustments hinge not on a specific negotiated fee for a specific service, but on quality-of-care outcomes premised on long-term relationships

14

between insurance providers and physicians, spanning multiple services, providers, and patients.

### 2. *The rules reasonably address value-based adjustments.*

Congress sensibly steered clear of this complexity. Although tasking the Departments with accounting for non-fee-for-service payments, Congress declined to micromanage. 42 U.S.C. § 300gg-111(a)(2)(B). The Departments reasonably implemented Congress's broad directive by requiring health insurance providers to use the "underlying fee schedule rate" or similar "derived amount," while excluding retrospective quality bonuses and penalties or similar value-based adjustments. *See* Gov. Br. 28-30; 86 Fed. Reg. at 36,893-94.

This approach matches contracting reality. Although retrospective value-based adjustments themselves are not tied to particular services, most value-based payment models typically rely, in part, on a per-service component. *See* Health Care Payment Learning & Action Network, *APM Measurement Effort*, at 2 (2021), https://tinyurl.com/uu3csy8j (survey estimating more than 96% of commercial payments are either straight fee-for-service or built on fee-for-service architecture). Any distinct per-service fee is typically paid based on when a service was furnished. Whether or not the model contemplates provider per-service payments, that per-service rate also generally forms the basis for calculating patients' cost-sharing. But periodic upward retrospective adjustments for providers who meet quality metrics

or who furnish cost-effective care—or downward adjustments for those who fail to meet those targets—are neither tied to a particular service, nor included in patients' cost-sharing.

Defining the QPA by only the per-service amount, and excluding value-based adjustments, thus best serves the QPA's market-rate objective for two main reasons. First, the per-service "fee" component of alternative payments is the contracted per-service rate that reflects the overall market value for a given service. Performance adjustments are tied to overall quality of care, meant to encourage longer-term cost savings and reward positive outcomes. They say nothing about the market value of a particular service. Second, it is essential to match the QPA to the contracted rate that health insurance providers use for patient cost-sharing, and that rate excludes retrospective value adjustments. 86 Fed. Reg. at 36,894.

### 3. *The district court's one-sided mandate to include the "highest possible" payment in the QPA defies market reality.*

Ignoring the critical fact that value-based adjustments are not per-service add-ons, the district court rewrote the QPA methodology to include the highest possible value-based bonuses in the QPA (regardless of whether or how often those bonuses are paid)—but *not* any potential penalties. The district court's rewrite thus creates a QPA that treats all out-of-network providers as if they are the very best-performing in-network providers. This one-way ratchet cannot be justified by the statute's use of the phrase "total maximum payment," which refers to the total per-service

payment (including both cost-sharing and the portion paid by the health plan), not to non-service-specific quality adjustments. Gov. Br. 38-39. It also contravenes market reality and will inexorably drive up patients' costs, contrary to congressional intent.

Adding the maximum possible aggregate bonus under a value-based contract to all its per-service rates will distort the QPA. Take for example a shared savings contract for a group of surgical providers, including anesthesiologists—a specialty historically likely to be out-of-network. Suppose the provider group could receive a 5% to 10% bonus if their coordinated care reduced readmissions and other complications, and thus reduced costs for their entire patient population compared to the benchmark. If instead post-surgery complications caused excessive costs, they could absorb a 5% loss. Potentially, by the district court's logic, the QPA input for anesthesiology services from that contract would not simply be the underlying per-service amount for an anesthesiologist, but that amount *plus* 10%, regardless of how often providers achieve the highest bonus level and how little anesthesiologist services may contribute to the overall savings, while ignoring the possibility of a 5% penalty, too. Bottom line: including non-service-specific value-based adjustments (and only the positive ones, at that) will artificially inflate the QPA and move it further from, not closer to, actual market-based service-specific rates.

**4. *The district court's rewrite erodes stability and predictability for patients.***

The district court's approach will also harm patients. For starters, vacatur of the value-based arrangement provision requires a wholesale change to the QPA methodology. Because value-based payments are fundamentally not per-service rates, they do not readily translate to the billing codes for which QPAs are calculated. Under the district court's approach, health insurance providers would have to develop an entirely new methodology—one never used in the standard contracting process the QPA is meant to mirror—to account for widely varied value-based adjustments in myriad per-service QPAs. Forcing a value-based model to fit in a QPA framework is akin to trying to hammer a square peg into a round hole. And even for the payment models which might allow allocating certain adjustments to per-service billing codes, the process will require manual review of the terms of countless different alternative payment contracts. This all redounds to the detriment of patients.

Why? First, attempting to map non-service-based value-based adjustments onto the service-based QPA is extraordinarily costly. These purely administrative costs—ultimately borne by patients—will be incurred only to calculate QPAs that ultimately do not accurately reflect market rates. Moreover, because there is no uniform way to account for this complexity, the district court's decision will also result in QPAs that vary substantially from plan to plan and for different types of

services and providers, based on artificial factors that have no relation to market rates. Consistent, predictable QPA calculations—as the Departments' rules foster—lead to fewer disputes. Under the district court's unrealistic rewrite, QPAs will be costlier to calculate, and both more variable and less accurate, giving rise to more IDR proceedings, which in turn generate more costs.

Worse still, the district court's approach breaks the link Congress intended between in-network and out-of-network cost-sharing. *See* 42 U.S.C. § 300gg-111(a)(1)(C). The Departments' decision to harmonize in-network and out-of-network cost-sharing ensured (as Congress intended) that patients' cost-sharing was consistent, whether they receive services in- or out-of-network. 86 Fed. Reg. at 36,894. As the Departments found, and no one disputes, value-based payments (or penalties) are not generally included when calculating in-network cost-sharing. For instance, if a patient's cost-sharing requires paying 20% of the cost of a service, the 20% cost-share is calculated based only on the per-service rate, excluding any multi-service performance bonus that provider may receive (which could be determined much later). But if (upward-only) value-based adjustments must be included in the QPA, that same patient's 20% cost-sharing obligation will necessarily be higher when the service is out-of-network than in-network. This will cause patients' out-of-pocket costs to go up under the Act, not down, which is flatly contrary to the Act's design.

19

### B. The QPA Rightly Excludes Post-Hoc Single Case Agreements.

Before the Act, leveraging surprise bills to drive up payments was especially common for services where patients were least able to choose their providers ahead of time: emergency and air ambulance services. Substantial private equity investment in those fields correlated to aggressive surprise billing and skyrocketing charges. *See* Loren Adler et al., *High air ambulance charges concentrated in private equity-owned carriers*, Brookings Inst. (Oct. 13, 2020), https://tinyurl.com/3dbyn523; Zack Cooper et al., *Surprise! Out-of-Network Billing for Emergency Care in the United States*, 128 J. Pol. Econ. 3626, 3629, 3631 (2020).

In particular, "avoidance of insurance network participation combined with aggressive collection" was "a business strategy of some providers of air ambulance services" before the Act. 86 Fed. Reg. at 36,923. Under that strategy, charges soared, nearly tripling over ten years. Erin C. Fuse Brown et al., *The Unfinished Business of Air Ambulance Bills*, Health Affairs Forefront (Mar. 26, 2021), https://tinyurl.com/yxbzfpb7.

To protect plan beneficiaries, health insurance providers "place[d] a high value on preventing enrollee surprise bills." *Id*. As a result, health insurance providers often agreed, *after* a service was provided, to pay providers' full billed charges—not because they were reasonable market rates, but to avoid saddling their beneficiaries with surprise bills and to prevent debt collection suits. *See* 86 Fed. Reg.

at 36,923. One study of data from 2014 to 2017 concluded that health plans paid full (and exorbitant) billed charges for about half of out-of-network air ambulance transports. *Id.*

These ad hoc post-service agreements between health plans and providers served to resolve specific payment disputes under surprise-billing threat. 86 Fed. Reg. at 36,889. But such "single case agreements" are nothing like network contracts, where health insurance providers and medical providers reach advance agreement about reasonable market rates. *Id.* The Departments thus sensibly excluded from the QPA "ad hoc arrangement[s] with a nonparticipating provider" that cover "a specific … beneficiary … in unique circumstances." *Id.*

Only air ambulance providers challenged this aspect of the rule, but the district court's broad vacatur applies across the board. *See* ROA.13227-28.[3] Here again, that

---

[3] The district court vacated a second rule challenged only by air ambulance plaintiffs. *See* ROA.13223-25. The Act requires health insurance providers to make initial payments (or denials) within 30 days. 42 U.S.C. § 300gg-112(a)(3)(A). The rule specifies that the 30-day period begins "on the date the plan or issuer receives the information necessary to decide a claim." 45 C.F.R. § 149.130(b)(4)(i). This reasonably aligns with the industry's common understanding of a "bill" and avoids perverse incentives. Plans frequently receive claims from air ambulance providers that lack information essential for payment decisions. If such claims must be decided within 30 days, even if missing information, they are more likely to be denied, causing needless worry for patients. The district court's vacatur results from yet again placing insupportable weight on a statutory snippet, without considering the Act as a whole. The statutory term "bill" does not mandate that any demand for payment be treated as a "bill," despite lacking necessary information. *See* Gov. Br. 41-45.

21

vacatur takes the QPA farther from reasonable, negotiated market rates, with a one-way ratchet that harms patients by unnecessarily driving up costs.

Because single case agreements are ad hoc arrangements, they often involve lump sum payments for an array of different services. That is, they often do not specify rates for each service covered by what is, effectively, a settlement of a payment dispute. Moreover, records of such one-off agreements are not stored with negotiated rates in health insurance provider systems. The district court's mandate that such agreements be included in the QPA thus requires a detailed manual review of archived agreements from five years ago (as the QPA is based on contracted rates in 2019). Like the district court's value-based adjustment error, including one-off settlements will do nothing to bring the QPA in line with ex ante negotiated market rates, and distort it further from market reality.

Even worse, the district court would allow the surprise bills that the "No Surprises Act" aimed to abolish to instead serve as a primary input to the QPA, especially for air ambulance services where such one-off agreements were common. Far from protecting patients from unpredictable and uncontrolled health care costs, the district court's methodology would incorporate, and lock in, the market dysfunction from the very balance-billing that Congress prohibited. *See* Gov. Br. 35.

### C. The QPA Methodology Reasonably Reflects Real-World Contracting.

#### *1. The QPA properly reflects all negotiated network rates, regardless of how often a claim has been paid at that rate.*

Under the Departments' rules, the QPA includes all negotiated rates recognized in verifiable contracts. Those rates should and do count. Rates contracted for within a network agreement are the result of competitive bargaining in the marketplace, regardless of whether a provider happened to provide that service in some prior (unspecified) time period. The district court disagreed, holding the statute requires services to be or to have been "provided" for a rate to count. ROA.13208. As the government explains, however, the statutory text refers to rates "recognized" within the corners of prospectively negotiated contracts, not rates paid over a specified period. Gov. Br. 27-29.

The district court's analysis hinged on an atextual policy concern that if a given rate has not been paid (in some unspecified timeframe), a provider must not perform that service and therefore was likely to agree to a below-market rate. *See* ROA.13206. But even for services performed infrequently, providers have every incentive to negotiate reasonable rates. Moreover, if rate differentials exist between providers who often perform a service and those who don't, the Departments have already addressed that issue. Separate QPAs must be calculated whenever there is a material difference in the median rate between a specialty that regularly bills for a service and all others. U.S. Dep't of Labor, *FAQs About Affordable Care Act and*

*Consolidated Appropriations Act, 2021 Implementation Part 55*, at 16-17 (Aug. 19, 2022), http://tinyurl.com/3j67zunu. The Departments' methodology thus resolves any concern about artificially deflated rates.

The district court's artificial exclusion of negotiated rates from the QPA will, yet again, only magnify the burden of calculating the QPA while decreasing its market fidelity by narrowing the scope of agreed market rates that can be considered. The district court does not explain what it means for a service to be "provided"—paid in the prior year? By that health plan or by any health plan? Reasonably expected to be provided within the year for which the contract is negotiated?

This approach is utterly unworkable. Health insurance providers have no crystal ball to know which services a physician will provide in the future, or what they provided before working together. Once again, the district court's rewrite dictates a costly manual review to achieve at *best* zero effect on the market fidelity of the QPA—given that the Departments' per-specialty rule already accounts for situations where service frequency makes a material difference to rates.

### 2. *The rule reasonably does not require the calculation of separate QPAs where it is contrary to contracting practice and makes no material difference.*

The district court reached two other holdings that likewise impose substantial costs with zero benefit in terms of making QPA calculations more accurate. First, the district court held that separate QPAs must be calculated for each specialty, even

24

when it makes no market difference. ROA.13209-11. Second, the district court rejected a rule permitting third-party administrators to calculate a QPA for all self-funded plans that it administers, in lieu of sponsor-by-sponsor QPAs (*i.e.*, employer-by-employer). ROA.13214-16. The government appeals the district court's remedial decision to vacate these provisions, Gov. Br. 18 n.8, with good reason. Not only must a "remedy … be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018)—making the district court's remedy vastly overbroad—but there should be no remedy at all, because plaintiffs cannot establish any injury from these two challenged rules.

Both rules reflect common contracting practices that cause no harm to medical providers while avoiding substantial administrative costs that would ultimately be borne by patients.

Health insurance providers do not always "vary contracted rates by provider specialty," 86 Fed. Reg. at 36,891, because specialty is sometimes immaterial. For example, the same fee schedule often applies for inpatient consultations by surgeons, regardless of surgical specialty (thoracic, neurological, and so on). Before the vacatur, the Departments' rules ensured that per-specialty rates were calculated when it made a material difference, but not otherwise. Providers' interests are not impaired by the failure to calculate additional, per-specialty QPAs that, by definition, make no material difference. Yet the vacatur would nonetheless require

25

calculation of a no-difference specialty-by-specialty QPA for each service, multiplying the cost of an already burdensome process without increasing the market fidelity of the QPA.

Medical providers' interests are similarly unaffected by the calculation of QPAs based on rates aggregated by third-party administrators. Because third-party administrators generally handle the contracting process on behalf of employers and other plan sponsors, *see* 86 Fed. Reg. at 36,890, the rule sensibly permits QPAs to be calculated at the administrator level, rather than sponsor-by-sponsor. Plaintiffs proffered no evidence, only speculation, that this rule results in lower QPAs or otherwise impairs providers' interests, and the district court rested plaintiffs' standing on a bare procedural injury. *See* ROA.13216.

In contrast to this lack of harm under the Departments' rule, the district court's vacatur would impose immense administrative costs by exponentially multiplying the number of QPAs that must be calculated. In 2020, there were approximately 37,900 self-funded plan sponsors in the United States. U.S. Dep't of Labor, *Annual Report on Self-Insured Group Health Plans*, at 3 (Mar. 2023), http://tinyurl.com/2vv3tbek. Given that QPAs must be calculated separately for every region and service and—under the district court's vacatur—for even immaterial differences in specialty, the vacatur requires literally billions of additional QPAs to be calculated.

26

Given the mismatch between zero harm under the challenged rules and immense burden under the vacatur, the Court could comfortably hold that plaintiffs lack standing to bring these claims, *see Legacy Cmty. Health Servs. v. Smith*, 881 F.3d 358, 366 n.2 (5th Cir. 2018) (addressing standing *sua sponte*). Alternatively, the Court has ample grounds to curtail the district court's overbroad remedy. *See* Gov. Br. 48-49.

## IV.    QPA Calculations Are Subject to Extensive Scrutiny and Transparency.

The accuracy and reliability of the QPA calculation matters for patients—millions of plan enrollees for whom health insurance providers must determine cost-sharing. Health insurance providers—required to perform tens of millions of QPA calculations—did so responsibly from the get-go, using data validation and cross-check tools to ensure that their QPA calculations reflected legitimate negotiated network rates. Not only for compliance, including predictable patient cost-sharing amounts,  but also because establishing reasonable QPA rates that medical providers will accept is essential to avoid wasteful, costly IDR proceedings.

These QPA calculations are subject to intense scrutiny, including regulatory audits and an administrative process for provider complaints. *See* 42 U.S.C. § 300gg-111(a)(2)(A). The Departments—to whom Congress assigned the responsibility to audit QPA calculations—are paying close attention and issuing clarifying guidance as needed. Since the initial rules were issued, the Departments

have added a new disclosure requirement and explained that they are "continuing to consider comments … about whether additional disclosures related to the QPA calculation methodology should be required." 87 Fed. Reg. 52,618, 52,626 (Aug. 26, 2022).

Nothing indicates that more disclosures are needed for medical providers to police the QPA in the Departments' stead. The district court rightly held that the Departments' disclosure rule was "the result of reasoned decision-making" and "balance[d] transparency for providers and administrability for insurers." ROA.13217-19.

As the district court recognized here, "granting Plaintiffs' wish list" of additional disclosures would allow the Court to wrongly "substitute its own policy judgment for that of the agency." ROA.13220. Plaintiffs sought disclosure of every single aspect of health insurance providers' business—every rate they have negotiated with every provider, for every provider specialty; how often every rate has been paid; and details of their value-based contracts. *See* ROA.13219. All this with no pay-off because the existing disclosure requirements more than suffice. When making initial payments for out-of-network services, health insurance providers must provide the QPA and certify that it was calculated in accordance with the rules. 45 C.F.R. § 149.140(d)(1)(i), (iii). Given the extensive rules, this certification already says plenty about how the QPA was calculated. The only reason

to demand disclosure of every rate would be to double check whether the QPA is the median, which the certification already indicates, and the Departments' audits will confirm.

Market incentives, the rules, the audit program, and the QPA certifications all work to ensure that the QPA is rightly tied to market-based realities, given its lynchpin role in the Act.

\*    \*    \*

The district court rightly rejected Plaintiffs' complaints about disclosures as undue judicial intrusions into the policy sphere, yet its substantive modifications to the QPA methodology do just that. And these judge-made policy changes take the QPA farther away from market reality and generate additional (and unnecessary) administrative burdens for an already resource-intensive process. There is no reason to disturb the Departments' well-founded choices made within Congress's express grant of rulemaking authority to develop QPA methodology. The Act is working as Congress intended. Patients are being protected from surprise bills; providers are being fairly compensated at a QPA that reflects market rates, largely without disputes; and the Departments have an array of processes in place to verify QPA accuracy. Affirming the district court's piecemeal dismantling of this process, in disregard of congressional intent, will serve only to revive some of the very problems that Congress meant to solve.

29

## CONCLUSION

The judgment of the district court should be reversed insofar as it vacated portions of the challenged rules, and otherwise affirmed.

January 19, 2024                                    Respectfully submitted,

                                                    s/Hyland Hunt
Michael Spector                                       Hyland Hunt
Thomas M. Palumbo                                     Ruthanne M. Deutsch
AMERICA'S HEALTH INSURANCE PLANS                      DEUTSCH HUNT PLLC
601 Pennsylvania Ave. NW                              300 New Jersey Ave. NW, Suite 900
South Building, Suite 500                             Washington, DC 20001
Washington, DC 20004                                  Tel.: 202-868-6915
                                                      Fax: 202-609-8410
                                                      Email: hhunt@deutschhunt.com

*Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

The foregoing brief is in 14-point Times New Roman proportional font and contains 6,318 words, and thus complies with the type-volume limitation set forth in Rules 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure.


s/Hyland Hunt
Hyland Hunt

January 19, 2024

## CERTIFICATE OF SERVICE

I hereby certify that, on January 19, 2024, I served the foregoing brief upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.


s/Hyland Hunt
Hyland Hunt