**No. 23-40605**

# In the United States Court of Appeals for the Fifth Circuit

Texas Medical Association; Tyler Regional Hospital, L.L.C.; Dr. Adam Corley,
*Plaintiffs–Appellees / Cross-Appellants*,

v.

United States Department of Health and Human Services; Office of Personnel Management; United States Department of Labor; United States Department of Treasury; Xavier Becerra, Secretary, U.S. Department of Health and Human Services, in his official capacity; Kiran Ahuja, in her official capacity as the Director of the Office of Personnel Management; Janet Yellen, Secretary, U.S. Department of Treasury, in her official capacity; Julie A. Su, Acting Secretary, U.S. Department of Labor, in her official capacity,
*Defendants–Appellants / Cross-Appellees*.

LifeNet, Incorporated; Air Methods Corporation; Rocky Mountain Holdings, L.L.C.; East Texas Air One, L.L.C.,
*Plaintiffs–Appellees / Cross-Appellants*,

v.

United States Department of Health and Human Services; Office of Personnel Management; United States Department of Labor; United States Department of Treasury; Xavier Becerra, Secretary, U.S. Department of Health and Human Services, in his official capacity; Kiran Ahuja, in her official capacity as the Director of the Office of Personnel Management; Janet Yellen, Secretary, U.S. Department of Treasury, in her official capacity; Julie A. Su, Acting Secretary, U.S. Department of Labor, in her official capacity,
*Defendants–Appellants / Cross-Appellees*.

On Appeal from the United States District Court for the Eastern District of Texas

**BRIEF OF THE LEUKEMIA & LYMPHOMA SOCIETY AND NINE OTHER PATIENT AND CONSUMER ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS/CROSS-APPELLEES**

Joseph J. Wardenski
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
(347) 227-2500

*Counsel for Amici Curiae*

# SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

*Texas Medical Association et al. v. United States Department of Health and Human Services et al.* (No. 23-40605)

The undersigned counsel for *Amici Curiae* certifies that the following listed persons and entities, in addition to those listed in the briefs of the parties and other *amici curiae,* have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

### *Amici Curiae on this Brief*
The Leukemia & Lymphoma Society
The ALS Association
Cancer*Care*
Epilepsy Foundation
Families USA Action
Hemophilia Federation of America
The Mended Hearts, Inc.
National Multiple Sclerosis Society
National Patient Advocate Foundation
U.S. PIRG

### *Counsel for Amici Curiae on this Brief*
Joseph J. Wardenski
WARDENSKI P.C.

The ten *Amici Curiae* organizations on this brief are non-profit organizations that have no parent corporations. No publicly traded corporation has any ownership interest in any of the *Amici Curiae* on this brief.

Dated: January 19, 2024          /s/ Joseph J. Wardenski
                                 Joseph J. Wardenski
                                 *Counsel for Amici Curiae on this Brief*

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS .......... i

TABLE OF AUTHORITIES .................................................................. iii

INTEREST OF *AMICI CURIAE* ................................................ 1

SUMMARY OF ARGUMENT ........................................................ 8

ARGUMENT ................................................................................ 12

    I.    BEFORE THE NO SURPRISES ACT, SURPRISE
        MEDICAL BILLS IMPOSED STAGGERING FINANCIAL
        BURDENS ON PATIENTS AND CONSUMERS. ..................... 12

        A.    Surprise Medical Bills for Hospital-Based Care and Air
               Ambulance Services by Out-of-Network Providers
               Harmed Millions of Patients and their Families. ................ 13

        B.    Surprise Billing Increased Health Insurance
               Premiums and Overall Health Care Costs for Privately
               Insured Individuals. ............................................................ 18

   II.    CONGRESS INTENDED TO PROTECT PATIENTS
        FROM SURPRISE MEDICAL BILLS AND ESCALATING
        HEALTH CARE COSTS. ....................................................... 19

        A.    The Bipartisan Precursor Proposals to the No
               Surprises Act All Intended to Reduce Out-of-Pocket
               Costs for Patients and to Reduce Overall Health
               Expenses. ............................................................................ 20

        B.    The No Surprises Act Shared the Earlier Bills' Cost-
               Reduction Goals. ................................................................ 23

        C.    In Passing the No Surprises Act, Congress Embraced
               the Core Principle That Surprise Billing Protections
               Should Keep Patients' Out-of-Pocket Costs Down. .............. 25

  III.  THE CHALLENGED QPA METHODOLOGY FURTHERS
        CONGRESS'S GOAL OF PROTECTING CONSUMERS
        FROM HIGH OUT-OF-POCKET COSTS. ................................ 26

CONCLUSION ............................................................................ 29

# TABLE OF AUTHORITIES

**STATUTES**

No Surprises Act of the 2021 Consolidated Appropriations Act,
Pub. L. No. 116-260, 134 Stat. 1182 ...................................................... 6

42 U.S.C. § 300gg-111 ...................................................................................... 6

42 U.S.C. § 300gg-111(a)(2)(B)(i) ................................................................. 10

42 U.S.C. § 300gg-111(a)(1)(C)(iii) ............................................................... 27

42 U.S.C. § 300gg-111(a)(3)(H) ..................................................................... 27

**RULES**

*Requirements Related to Surprise Billing: Part I*, 86 Fed. Reg. 36,872
(July 13, 2021) ..................................................................................... 7

**LEGISLATIVE MATERIALS**

H. Energy & Commerce Comm., *Pallone & Walden on Committee
Passage of No Surprises Act* (July 17, 2019) ...................................... 21

H. Educ. & Labor Comm., *Committee Advances Bipartisan Solution
to Ban Surprise Billing* (Feb. 11, 2020) ............................................. 23

H. Educ. & Labor Comm., *Section-by-Section: The Ban
Surprise Billing Act (H.R. 5800)* (Feb. 11, 2020) .............................. 23

H. Ways & Means Comm., *Ways and Means Committee
Surprise Medical Billing Plan* (Dec. 11, 2019) .................................. 22

H.R. Rep. No. 116-615, pt. 1 (2020) ......................................... 12, 13, 15

S. Comm. on Health, Educ., Labor & Pensions, *Congressional
Committee Leaders Announce Surprise Billing Agreement*
(Dec. 11, 2020) ..................................................................................... 24

S. Comm. on Health, Educ., Labor & Pensions, *How to Reduce Health Care Costs: Understanding the Cost of Health Care in America: Hearing of the S. Comm. on Health, Educ., Labor & Pensions*, 115th Cong. 832 (June 27, 2018)......................................20

S. Comm. on Health, Educ., Labor & Pensions, *Senate Health Committee Leaders Introduce Bipartisan Legislation to Reduce Health Care Costs* (June 19, 2019) ....................................21

**OTHER AUTHORITIES**

Loren Adler *et al.*, *Understanding the No Surprises Act,* U.S.C.-Brookings Schaeffer on Health Policy (Feb. 4, 2021).......................27

Loren Adler *et al.*, *High air ambulance charges concentrated in private equity-owned carriers,* Brookings Inst. (Oct. 13, 2020)..........16

Anna Almendrala, *The Air Ambulance Billed More Than The Lung Transplant Surgeon*, NPR (Nov. 6, 2019) .........................................15

ALS Association *et al.*, *Surprise Medical Billing Principles* (Feb. 2020) ..................................................................................6, 25

Julie Appleby, *The case of the $489,000 air ambulance ride*, NPR (Mar. 25, 2022) .................................................................................15

Ge Bai *et al.*, *Air Ambulances With Sky-High Charges*, 38 Health Affairs (July 2019) (Abstract).............................................................16

Bd. of Governors of Fed. Reserve Sys., *Economic Well-Being of U.S. Households in 2020* (May 2021). .......................................................13

Rachel Bluth, *In Combating Surprise Bills, Lawmakers Miss Sky-High Air Ambulance Costs*, KFF Health News (June 14, 2019)........15

Debra Bozzi *et al.*, Health Care Cost Inst., *ESI Enrollees Paid $853 on Average Out-of-Pocket for Health Care in 2020, But Some People Paid Over Four Times as Much* (Dec. 20, 2022) ................27-28

Christina Caron, *Families Fight Back Against Surprise Air Ambulance Bills*, N.Y. Times (Apr. 17, 2020) ....................................15

Karan R. Chhabra *et al.*, *Out-of-Network Bills for Privately Insured Patients Undergoing Elective Surgery with In-Network Primary Surgeons and Facilities*, 323 J. Am. Med. Ass'n 538 (2020) ..............17

Jen Christensen, *Sky-high prices for air ambulances hurt those they are helping*, CNN (Nov. 26, 2018) .....................................................15

Kao-Ping Chua *et al.*, *Prevalence and Magnitude of Potential Surprise Bills for Childbirth*, JAMA Health F. 1 (July 2, 2021) .......18

Cong. Budget Off., *Estimate for Divisions O Through FF H.R. 133, Consolidated Appropriations Act, 2021 Public Law 116-260 Enacted on December 27, 2020* (Jan. 14, 2021) ..................................24

Cong. Budget Off., *H.R. 2328, Reauthorizing and Extending America's Community Health Act* (Sept. 18, 2019) ......................21, 24

Cong. Budget Off., *H.R. 5800, the Ban Surprise Billing Act, as ordered reported by the House Committee on Education and Labor on February 11, 2020, Estimated Budgetary Effects* (Feb. 13, 2020) ...................................................................23, 24, 25

Cong. Budget Off., *H.R. 5826, the Consumer Protections Against Surprise Medical Bills Act of 2020, as Introduced on February 10, 2020, Estimated Budgetary Effects* (Feb. 11, 2020) ...................................................................22, 24, 25

Cong. Budget Off., *S.1895, Lower Health Care Costs Act* (July 16, 2019) ...............................................................................21, 24

Zack Cooper *et al.*, *Out-Of-Network Billing And Negotiated Payments For Hospital-Based Physicians*, 39 Health Affairs 24 (2020) ...............................................................18

Erin Duffy *et al.*, *Policies to address surprise billing can affect health insurance premiums*, 26 Am. J. Managed Care 401 (2020) ....19

Erin Duffy *et al.*, Brookings Inst., *Surprise medical bills increase costs for everyone, not just for the people who get them* (Oct. 2, 2020) ...................................................................................18

Fair Health, Inc., *Air Ambulance Services in the United States: A Study of Private and Medicare Claims* (Sept. 28, 2021) ................16

Matthew Fielder *et al.*, *Recommendations for Implementing the No Surprises Act*, U.S.C.-Brookings Schaeffer on Health Policy (Mar. 16, 2021) ................................................................27

Christopher Garmon & Benjamin Chartock, *One In Five Inpatient Emergency Department Cases May Lead To Surprise Bills*, 36 Health Affairs 177 (2017) ............................................14

John Hargraves & Aaron Bloschichak, *Air Ambulances – 10 Year Trends in Costs and Use*, Health Care Cost Inst. (Nov. 7, 2019).......16

Kaiser Family Found. *et al.*, *Employer Health Benefits: 2022 Annual Survey* 115 (2022) ........................................28

Sarah Kliff, *A $52,112 Air Ambulance Ride: Coronavirus Patients Battle Surprise Bills*, N.Y. Times (Oct. 13, 2020) ..............................15

Raymond Kluender *et al.*, *Medical Debt in the US, 2009-2020*, 326 J. Am. Med. Ass'n 250 (2021) ......................................13

Alison Kodjak, *Taken For A Ride: M.D. Injured In ATV Crash Gets $56,603 Bill For Air Ambulance Trip*, NPR (Sept. 25, 2018).............15

Letter from Families USA *et al.* to House Speaker Pelosi and House Minority Leader McCarthy (July 10, 2019) ...........................25

Letter from Sen. Murray & Rep. Pallone to Hon. Xavier Becerra, Sec'y of Health & Human Servs. (Jan. 7, 2022) ................................20

Letter from Jon Godfread, Comm'r, N.D. Ins. Dep't, *et al.* to Hon. Bobby Scott *et al.* (Nov. 7, 2019)................................17

Celia Llopis-Jepsen, *A Kansan's $50k Medical Bill Shows That You Don't Always Owe What You're Charged*, KCUR (May 26, 2020)......15

Lunna Lopes *et al.*, Kaiser Family Found., *Data Note: Public Worries About And Experience With Surprise Medical Bills* (Feb. 28, 2020) ................................................................5

Karen Pollitz *et al.*, *An examination of surprise medical bills and proposals to protect consumers from them*, Peterson-KFF Health System Tracker (Feb. 10, 2020).......... 13, 14, 17

Karen Pollitz *et al.*, *Surprise bills vary by diagnosis and type of admission*, Peterson-KFF Health Sys. Tracker (Dec. 9, 2019) ..........13

Karen Pollitz *et al.*, *US Statistics on Surprise Medical Billing*, 323 J. Am. Med. Ass'n 498 (2020) ........................................................5

Reps. Frank Pallone Jr. & Greg Walden, *It's time for Congress to protect patients from surprise medical bills*, The Hill (Nov. 21, 2019).....................................................................................22

Ryan J. Rosso *et al.*, Cong. Research Serv., *Surprise Billing in Private Health Insurance: Overview and Federal Policy Considerations* (Dec. 12, 2019) ..........................................................26

U.S. Dep't of Health & Hum. Servs., Office of Health Policy, *Evidence on Surprise Billing: Protecting Consumers with the No Surprises Act* (Nov. 22, 2021) ...........................................................26

# INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* The Leukemia & Lymphoma Society, The ALS Association, Cancer*Care*, Epilepsy Foundation, Families USA Action, Hemophilia Federation of America, The Mended Hearts, Inc., National Multiple Sclerosis Society, National Patient Advocate Foundation, and U.S. PIRG (collectively, "*Amici*"),[2] are patient and consumer advocacy organizations that represent or work on behalf of millions of patients and consumers across the country, including those facing serious, acute, and chronic health conditions.

The Leukemia & Lymphoma Society ("LLS") is the world's largest voluntary health agency dedicated to fighting blood cancer and ensuring that the more than 1.3 million blood cancer patients and survivors in the United States have access to the care they need. LLS's mission is to cure leukemia, lymphoma, Hodgkin's disease, and myeloma, and to improve the quality of life of patients and their families. LLS advances that mission by advocating that blood cancer patients have sustainable

---

[1] All parties have consented to the filing of this brief.

[2] Under Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici* certify that no party's counsel authored this brief in whole or in part, that no party or party's counsel contributed money intended to fund the preparation or submission of the brief, and that no person (other than *Amici*, their members, and their counsel) contributed money intended to fund the preparation or submission of the brief.

access to quality, affordable, coordinated health care, regardless of the source of their coverage.

The ALS Association is the only national nonprofit organization fighting ALS on every front. The mission of The ALS Association is to discover treatments and a cure for ALS, and to serve, advocate for, and empower people affected by ALS to live their lives to the fullest. By leading the way in global research, providing assistance for people with ALS through a nationwide network of chapters, coordinating multidisciplinary care through certified clinical care centers, and fostering government partnerships, The Association builds hope and enhances quality of life while aggressively searching for new treatments and a cure.

Cancer*Care* is the leading national organization providing free, professional support services and information to help people manage the emotional, practical, and financial challenges of cancer.

The Epilepsy Foundation is the leading national and voluntary health organization that speaks on behalf of more than 3.4 million Americans with epilepsy and seizures. Uncontrolled seizures can lead to disability, injury, or death. Epilepsy medications are the most common

use for seizure treatment and is a cost-effective treatment for controlling and/or reducing seizures. So, making access to quality, affordable, physician-directed care, and effective coverage for epilepsy medications is critically vital for people living with epilepsy.

Families USA Action is a 501(c)(4) social welfare organization with the mission of creating a system that delivers the best health and health care for all people in the United States. On behalf of health care consumers, working people, and patients, Families USA Action has led the No Surprises: People Against Unfair Medical Bills campaign since 2019, and has advocated for legislation and rulemaking that fully protect consumers from surprise bills while ensuring health care costs do not inflate overall. The organization's work on these issues emerged from consumers' reports of unaffordable surprise billing, and from reports by consumer advocates of their inability to address these issues in the past.

Hemophilia Federation of America ("HFA") is a community-based, grassroots advocacy organization that assists, educates, and advocates for people with hemophilia, von Willebrand disease, and other rare bleeding disorders. Bleeding disorders are serious, life-long, and

expensive. HFA seeks to ensure that individuals affected by bleeding disorders have timely access to quality medical care, therapies and services, regardless of financial circumstances or place of residence.

The Mended Hearts, Inc. is a community-based, international nonprofit whose mission is to inspire hope and improve the quality of life for heart patients and their families through ongoing peer-to-peer support, education, and advocacy. Cardiovascular disease is the leading cause of death in men and women, and congenital heart disease is the number one birth defect. Patients and their families, across the lifespan, require access to lifelong care, low-cost medications, and affordable health coverage to reduce the burden of disease and improve the quality of life.

The National Multiple Sclerosis Society mobilizes people and resources so that the nearly one million people affected by multiple sclerosis ("MS") can live their best lives while the Society works to stop MS in its tracks, restore what has been lost, and end MS forever.

National Patient Advocate Foundation is the advocacy affiliate of the Patient Advocate Foundation, a national charitable organization that provides direct assistance and support service for patients and

families coping with complex and chronic conditions. The Foundation works to improve equitable health care access and mitigate distressing financial and other burdens these populations often experience.

U.S. PIRG is a not-for-profit organization that advocates for the public interest, working to win concrete results on real problems that affect millions of lives, and standing up for the public against powerful interests when they push the other way. It employs grassroots organizing and direct advocacy for the public on many different issues including healthcare, preserving competition, and protecting consumer welfare.

*Amici* are committed to ensuring that all Americans have a high-quality health care system and access to comprehensive, affordable health insurance to prevent disease, manage health, cure illness, and ensure financial stability. Many patients served by *Amici* are among the one in five Americans who have received a surprise medical bill.[3] Given the impact of surprise bills on those served by *Amici*, many *Amici*

---

[3] *See* Karen Pollitz *et al.*, *US Statistics on Surprise Medical Billing*, 323 J. Am. Med. Ass'n 498 (2020), https://bit.ly/43yx8Tn; Lunna Lopes *et al.*, Kaiser Family Found., *Data Note: Public Worries About And Experience With Surprise Medical Bills* (Feb. 28, 2020) (ROA.4644-45).

joined community principles for surprise billing reforms[4] and worked with Congress to develop the bipartisan, bicameral No Surprises Act of the 2021 Consolidated Appropriations Act (the "No Surprises Act" or the "Act"), Pub. L. No. 116-260, 134 Stat. 1182 (2020) (codified at 42 U.S.C. § 300gg-111). With these community principles as their guide, many *Amici* were heavily engaged throughout the legislative process leading to the Act's passage in December 2021 and the government's subsequent rulemaking to implement the Act.

    *Amici* submit this brief to assist the court in understanding the nature and extent of the harms that surprise billing has caused to patients and consumers—harms that the No Surprises Act was designed to address. The success of the Act in achieving these goals depends on the ability of the federal agencies statutorily charged with implementing the Act—the Departments of Health and Human Services, Labor, and Treasury (the "Departments")—to fulfill their obligation to promulgate implementing regulations that fulfill the

---

[4] *See* ALS Ass'n *et al.*, *Surprise Medical Billing Principles* (Feb. 2020), https://bit.ly/44xLg0f.

statutory purposes of protecting patients from surprise bills and controlling health care costs.

At issue in this case is a key provision of the Act known as the "qualifying payment amount," or "QPA." The QPA is an estimate of the amount an out-of-network provider would have received for a service if they had been in a patient's insurance network. The QPA plays a major role in keeping health care costs down for patients and consumers by, among other things, serving as the benchmark by which patients' cost-sharing responsibilities for out-of-network services are calculated.

Based on *Amici*'s experience advocating for patients and consumers during the legislative and rulemaking processes, *Amici* are uniquely positioned to explain to the Court why the QPA methodology adopted by the Departments in the July 2021 Interim Final Rule, *Requirements Related to Surprise Billing: Part I*, 86 Fed. Reg. 36,872 (July 13, 2021) (ROA.768-881), is consistent with the text of the No Surprises Act and furthers Congress's two primary goals in enacting the Act: (1) protecting patients from the most pervasive types of surprise out-of-network bills; and (2) lowering health care costs overall.

Because the patients and consumers whom *Amici* serve have a strong interest in the outcome of this case, *Amici* submit this brief in support of Defendants–Appellants/Cross-Appellees ("Defendants–Appellants") and reversal of the District Court's decision vacating the challenged QPA methodology.

## SUMMARY OF ARGUMENT

The No Surprises Act, which was passed with bipartisan support by Congress in 2021, is a historic law that ended the scourge of surprise balance billing for hospital-based and air ambulance services. The Act is protecting millions of Americans from the devastating financial consequences of surprise bills that would have once spelled financial ruin. By prohibiting balance billing by out-of-network providers, the Act directly shields patients from the often-catastrophic out-of-pocket expenses resulting from surprise bills and ensures that the benefits to patients who would otherwise have been harmed by surprise bills do not come at the expense of other health care consumers.

Effective implementation of the No Surprises Act is necessary to reduce the financial burden of illness on patients and help contribute to longer, healthier lives. Protecting patients from surprise medical bills is

at the heart of the Act. Through the Act, Congress prohibited out-of-network providers from sending surprise balance bills to patients for hospital-based care and air ambulance services. But the Act goes further: not only does it ban surprise bills in these contexts, but it also incorporates various consumer protections designed for the express purpose of keeping individual and overall health care costs down. The legislative history of the Act demonstrates that Congress intended that the Act would serve to protect consumers by curbing escalating costs associated with out-of-network health care.

An essential provision of the Act is the qualifying payment amount, or QPA. Although patients who unknowingly receive out-of-network care in emergency situations and when receiving hospital-based care can no longer be subjected to potentially devastating surprise bills, many patients remain responsible for certain cost-sharing requirements, including coinsurance payments or payments for services made before a deductible has been satisfied. Thanks to the No Surprises Act, the QPA—which, under the statute, approximates the median in-network payment amount for a service—generally serves as the basis on which a patient's cost-sharing amount is now calculated. The

Departments, in the reasonable exercise of their statutory obligation to

promulgate rules to implement the Act, adopted the QPA methodology

challenged by Plaintiffs–Appellees/Cross-Appellants ("Plaintiffs-

Appellees") in this case. That methodology furthers the Act's central

purpose of controlling health care costs by, *inter alia*, limiting patients'

cost-sharing responsibilities for out-of-network services for which they

might have previously been subjected to a surprise bill. The Act was

designed precisely to control such cost burdens on patients and the

health care system in general. Congress intended for the Act and its

implementing regulations to protect the economic interests of patients

and consumers—not, as Plaintiffs-Appellees would have it, to protect

the financial interests of out-of-network providers.

The Departments—the federal agencies charged by statute with

implementing the No Surprises Act and its key provisions, including

establishing the QPA methodology, 42 U.S.C. § 300gg-111(a)(2)(B)(i)—

acted reasonably and within the bounds of their statutory authority to

devise a QPA methodology that helps control health care costs, as the

No Surprises Act demands.

Congress, in banning surprise bills and adding other consumer protections in the No Surprises Act, plainly intended to reduce individual and overall health care costs. The surprise billing practices curtailed by the No Surprises Act imposed staggering financial burdens on patients and their families and drove up out-of-pocket health care costs and overall health care costs ultimately borne by consumers in the form of higher premiums. The consideration of the QPA is essential to minimizing cost-sharing exposure for consumers and preventing the rise of insurance premiums that would likely result if the Act were not implemented in a way that controls costs, as Congress intended.

Since taking effect in January 2022, the No Surprises Act has already protected millions of patients from surprise bills. Congress carefully crafted the Act to protect patients—and all consumers—from the harms of surprise bills and escalating health care costs in general. Because the QPA methodology adopted by the Departments under their statutory authority furthers these goals, *Amici* agree with Defendants-Appellants that the District Court erred in invalidating and vacating that methodology, and that this Court should reverse.

**ARGUMENT**

## I.  BEFORE THE NO SURPRISES ACT, SURPRISE MEDICAL BILLS IMPOSED STAGGERING FINANCIAL BURDENS ON PATIENTS AND CONSUMERS.

As Congress recognized in passing the No Surprises Act, surprise medical bills can impose "staggering" financial burdens on patients and their families.[5] Before the Act, patients routinely received surprise balance bills, through no fault of their own, when they unknowingly received care from an out-of-network provider. Surprise bills were especially common in emergency situations, where patients often have no way to choose their hospital, physician, or air ambulance provider. But even for non-emergency hospital-based services, patients often received surprise bills when, unbeknownst to them, they received care from out-of-network specialists—such as anesthesiologists or radiologists—during a visit to an in-network hospital. Patients with chronic or serious conditions—including cancer, chronic respiratory

---

[5] *See* H.R. Rep. No. 116-615, pt. 1, at 52 (2020) (ROA.882, 933).

disease, or risk of heart attack—faced an elevated risk of receiving out-of-network bills from hospitals, doctors, and air ambulance providers.[6]

### A. Surprise Medical Bills for Hospital-Based Care and Air Ambulance Services by Out-of-Network Providers Harmed Millions of Patients and their Families.

Prior to the No Surprises Act, surprise bills were common and resulted in significant out-of-pocket costs for patients, as well as higher health insurance premiums for all consumers.[7] These bills added up. Before the Act took effect, Americans owed more than $140 billion dollars in medical debt; unpaid medical bills were the largest driver of that debt.[8] Surprise bills hit low-income consumers the hardest. In 2021, before the Act took effect, over a quarter of adults were unable to pay their monthly bills or were one $400 financial setback away from being unable to pay them in full.[9] The added burden of surprise medical

---

[6] *See* Karen Pollitz *et al.*, *Surprise bills vary by diagnosis and type of admission*, Peterson-KFF Health Sys. Tracker (Dec. 9, 2019) (ROA.5090, 5092); Karen Pollitz *et al.*, *An examination of surprise medical bills and proposals to protect consumers from them*, Peterson-KFF Health System Tracker (Feb. 10, 2020) (ROA.5070, 5072).

[7] *See* H.R. Rep. No. 116-615, pt. 1, *supra* note 5, at 53 (ROA.882, 934) (summarizing surprise billing data and noting that the cost of inflated payment rates from certain specialties "are directly felt through higher out-of-pocket expenses and exorbitant surprise bills for out-of-network care, as well as by all consumers who share in rising overall health care costs through higher premiums").

[8] Raymond Kluender *et al.*, *Medical Debt in the US, 2009-2020*, 326 J. Am. Med. Ass'n 250, 255 (2021), https://bit.ly/3KFqh23.

[9] Bd. of Governors of Fed. Reserve Sys., *Economic Well-Being of U.S. Households in 2020* 4, 33 (May 2021) (ROA.3441-42).

bills—which often totaled hundreds or thousands of dollars—spelled financial ruin for many families.

Before the Act, surprise bills were particularly common in emergency care settings. Many patients received surprise bills when the closest hospital with an emergency room was out-of-network or if the patient was seen by an out-of-network provider at an in-network hospital. One study found that 18 percent of all emergency room visits by patients in large employer plans in 2017 had at least one out-of-network charge that could result in a surprise bill.[10] Another study estimated that one in five inpatient emergency room visits could have resulted in a surprise bill.[11]

Critically ill or injured patients who required emergency transportation by air ambulances were even more likely to face surprise medical bills. While air ambulances often reduce transport time for patients during life-threatening situations and are a critical component of successful treatment for individuals experiencing serious health

---

[10] Pollitz *et al.* (Feb. 10, 2020), *supra* note 6.

[11] Christopher Garmon & Benjamin Chartock, *One In Five Inpatient Emergency Department Cases May Lead To Surprise Bills*, 36 Health Affairs 177, 177-81 (2017) (ROA.4022-26).

events, those individuals generally have no choice over whether to use an air ambulance or who provides that service. Consequently, nearly 70 percent of air ambulance transports are likely to be out-of-network.[12] There are many harrowing stories from patients who have received surprise five-figure bills for out-of-network air ambulance services.[13]

The risk that a patient might receive a surprise bill from an air ambulance provider had also grown over time in the years before the No Surprises Act took effect. The prices charged by air ambulance providers for helicopter and airplane transports—and the resulting out-of-network bills sent to patients—increased significantly in the years

---

[12] *See* H.R. Rep. No. 116-615, pt. 1, *supra* note 5, at 52 (ROA.933).

[13] *See, e.g.*, Julie Appleby, *The case of the $489,000 air ambulance ride*, NPR (Mar. 25, 2022), http://bit.ly/3A34kX5; Jen Christensen, *Sky-high prices for air ambulances hurt those they are helping*, CNN (Nov. 26, 2018), https://cnn.it/3KzcPN8; Christina Caron, *Families Fight Back Against Surprise Air Ambulance Bills*, N.Y. Times (Apr. 17, 2020), https://nyti.ms/3qRBgh6; Anna Almendrala, *The Air Ambulance Billed More Than The Lung Transplant Surgeon*, NPR (Nov. 6, 2019), https://n.pr/3GWrksd; Sarah Kliff, *A $52,112 Air Ambulance Ride: Coronavirus Patients Battle Surprise Bills*, N.Y. Times (Oct. 13, 2020), https://nyti.ms/3Iwrffs; Celia Llopis-Jepsen, *A Kansan's $50k Medical Bill Shows That You Don't Always Owe What You're Charged*, KCUR (May 26, 2020), https://bit.ly/3Isp2Bt; Alison Kodjak, *Taken For A Ride: M.D. Injured In ATV Crash Gets $56,603 Bill For Air Ambulance Trip*, NPR (Sept. 25, 2018), https://n.pr/35g4DBq; Rachel Bluth, *In Combating Surprise Bills, Lawmakers Miss Sky-High Air Ambulance Costs*, KFF Health News (June 14, 2019), https://bit.ly/3fMJC35.

leading up to the Act's passage.[14] According to one study, the use of helicopter ambulances declined by 14.3 percent from 2008 to 2017 while the average price per trip more than doubled, rising 144 percent.[15] Although the use of airplane ambulances remained steady during that nine-year period, the average price increased by 166 percent over that same period.[16]

These significant price increases were partly due to market concentration and greater private equity ownership of air ambulance providers.[17] Indeed, a bipartisan group of 35 state insurance commissioners told Congress that balance billing for air ambulance services had become "a business model to prey on people during their most vulnerable time" by "pass[ing] on massive surprise bills to private

---

[14] *See* Ge Bai *et al.*, *Air Ambulances With Sky-High Charges*, 38 Health Affairs (July 2019) (Abstract), https://bit.ly/33HmVeg; Fair Health, Inc., *Air Ambulance Services in the United States: A Study of Private and Medicare Claims* (Sept. 28, 2021), https://bit.ly/3tYAO2m.

[15] John Hargraves & Aaron Bloschichak, *Air Ambulances – 10 Year Trends in Costs and Use*, Health Care Cost Inst. (Nov. 7, 2019), https://bit.ly/3GXKzSb.

[16] *Id.*

[17] *See* Loren Adler *et al.*, *High air ambulance charges concentrated in private equity-owned carriers*, Brookings Inst. (Oct. 13, 2020) (ROA.5365, 5383-88).

market consumers and expect[ing] them to make up the claimed difference."[18]

Surprise bills also affected patients in non-emergency contexts at in-network hospitals. Among patients in large employer plans, 16 percent of in-network hospital stays in 2017 included at least one out-of-network charge that could have led to a surprise bill.[19] Another study found that 20 percent of all patients who had an elective procedure with an in-network primary surgeon at an in-network facility—such as a hysterectomy, knee replacement, or heart surgery—remained at risk of surprise bills from out-of-network specialists who treated them during those visits.[20] Of these, potential surprise bills averaged more than $1,200 for anesthesiologists and more than $3,600 for surgical assistants.[21] Over 18 percent of families with in-network childbirths in 2019 risked receiving a surprise bill for maternal or newborn care, with

---

[18] Letter from Jon Godfread, Comm'r, N.D. Ins. Dep't, *et al.* to Hon. Bobby Scott *et al.* 2 (Nov. 7, 2019), https://bit.ly/3AkFfau.

[19] Karen Pollitz *et al.* (Feb. 10, 2020), *supra* note 6 (ROA.5074).

[20] Karan R. Chhabra *et al.*, *Out-of-Network Bills for Privately Insured Patients Undergoing Elective Surgery with In-Network Primary Surgeons and Facilities*, 323 J. Am. Med. Ass'n 538, 538-47 (2020) (ROA.2010, 2011-14).

[21] *Id.*

one-third of those families at risk of potential surprise bills exceeding

$2,000.[22]

### B. Surprise Billing Increased Health Insurance Premiums and Overall Health Care Costs for Privately Insured Individuals.

In addition to higher out-of-pocket costs for individual patients,

surprise medical bills increased overall health care costs—which were

passed along to consumers through increased premiums for those with

private health insurance.[23] A 2020 study found that health care

spending for people with employer-based insurance would be reduced by

3.4 percent (about $40 billion annually) if certain hospital-based

specialists—anesthesiologists, pathologists, radiologists, and assistant

surgeons—were unable to send surprise bills to patients.[24] Another

study predicted that because approximately 12 percent of health plan

spending is attributable to ancillary and emergency services—settings

where surprise bills were prevalent—policies to address surprise bills

---

[22] Kao-Ping Chua *et al.*, *Prevalence and Magnitude of Potential Surprise Bills for Childbirth*, JAMA Health F. (July 2, 2021), https://bit.ly/3o7GTpL.

[23] *See* Erin Duffy *et al.*, Brookings Inst., *Surprise medical bills increase costs for everyone, not just for the people who get them* (Oct. 2, 2020), https://brook.gs/3FWoXnQ.

[24] Zack Cooper *et al.*, *Out-Of-Network Billing And Negotiated Payments For Hospital-Based Physicians*, 39 Health Affairs 24, 24, 28, 30-31 (2020) (ROA.3649, 3653, 3655-66).

would reduce premiums by 1 to 5 percent.[25] These studies made clear

that *all* consumers, not just patients who received a surprise bill, paid

the price for this practice through higher health costs and health

insurance premiums.

## II.    CONGRESS INTENDED TO PROTECT PATIENTS FROM SURPRISE MEDICAL BILLS AND ESCALATING HEALTH CARE COSTS.

Protecting patients from surprise medical bills is at the heart of

the No Surprises Act. But the law did more than just protect patients

from these potentially catastrophic out-of-pocket costs associated with

balance billing. The legislative history of the Act, including four major

precursor proposals, highlights Congress's consistent and bipartisan

objectives of protecting patients from surprise bills *and* protecting

consumers from rising health care costs overall. While these proposals

varied, the goal of lowering costs was a unifying feature of all of them,

underscoring Congress's intent that surprise billing protections should

---

[25] Erin L. Duffy *et al.*, *Policies to address surprise billing can affect health insurance premiums*, 26 Am. J. Managed Care 401, 401-04 (2020) (ROA.1987-90).

reduce (or at least not increase) out-of-pocket costs and insurance premiums borne by consumers.[26]

### A. The Bipartisan Precursor Proposals to the No Surprises Act All Intended to Reduce Out-of-Pocket Costs for Patients and to Reduce Overall Health Expenses.

The multi-year, bicameral legislative process leading to Congress's passage of the No Surprises Act—including debate over four major precursor bills, the Lower Health Care Costs Act, No Surprises Act of 2019, Consumer Protections Against Surprise Medical Bills Act, and Ban Surprise Billing Act—consistently focused both on ending surprise bills and reducing health care costs for all consumers.

1. *Lower Health Care Costs Act.* Congressional focus on surprise billing began in earnest in 2018 during hearings held by the U.S. Senate Committee on Health, Education, Labor & Pensions ("Senate HELP Committee") on how to reduce health care costs.[27] These hearings led Committee Chair Lamar Alexander (R-Tenn.) and Ranking Member Patty Murray (D-Wash.) to introduce the Lower Health Care

---

[26] *See* Letter from Sen. Murray & Rep. Pallone to Hon. Xavier Becerra, Sec'y of Health & Human Servs. (Jan. 7, 2022), https://bit.ly/3qTHv45.

[27] *See* S. Comm. on Health, Educ., Labor & Pensions, *How to Reduce Health Care Costs: Understanding the Cost of Health Care in America: Hearing of the S. Comm. on Health, Educ., Labor & Pensions*, 115th Cong. 832 (June 27, 2018), https://bit.ly/33VO9xD.

Costs Act,[28] which the Congressional Budget Office ("CBO") estimated would reduce premiums by just over one percent relative to then-current law.[29]

2. *No Surprises Act of 2019.* At the same time the Senate HELP Committee debated the Lower Health Care Costs Act, the U.S. House of Representatives Committee on Energy and Commerce debated its own proposal, the No Surprises Act of 2019, which was introduced by Committee Chair Frank Pallone, Jr. (D-N.J.) and Ranking Member Greg Walden (R-Ore.) in July 2019.[30] Here too, the CBO estimated that premiums would be about one percent lower than projected to be under then-current law.[31] The bill's sponsors touted the bill's protections against surprise bills and insurance premium savings, citing the CBO's

---

[28] S. Comm. on Health, Educ., Labor & Pensions, *Senate Health Committee Leaders Introduce Bipartisan Legislation to Reduce Health Care Costs* (June 19, 2019), https://bit.ly/33Zg3sA.

[29] Cong. Budget Off., *S.1895, Lower Health Care Costs Act* 3 (July 16, 2019) ("CBO S.1895 Cost Est."), https://www.cbo.gov/system/files/2019-07/s1895_0.pdf.

[30] *See* H. Energy & Commerce Comm., *Pallone & Walden on Committee Passage of No Surprises Act* (July 17, 2019), https://bit.ly/3JOwDxV.

[31] Cong. Budget Off., *H.R. 2328, Reauthorizing and Extending America's Community Health Act* 6 (Sept. 18, 2019) ("CBO H.R. 2328 Est."), https://www.cbo.gov/publication/55640.

estimate of $20 billion in savings to the federal government in the first decade after the bill's enactment.[32]

3. *Consumer Protections Against Surprise Medical Bills Act.* In December 2019, bipartisan leaders of the House Ways and Means Committee—Chair Richard E. Neal (D-Mass.) and Ranking Member Kevin Brady (R-Tex.)—agreed on a strategy to address surprise bills that included an IDR process "[d]esigned to protect against inadvertently raising health care costs."[33] The agreement led to the introduction of the Consumer Protections Against Surprise Medical Bills Act in February 2020. The CBO estimated that this legislation would reduce insurance premiums by between 0.5 and one percent.[34]

4. *Ban Surprise Billing Act.* In February 2020, the House Education and Labor Committee advanced its own bipartisan legislative proposal, the Ban Surprise Billing Act, introduced by Chair

[32] Reps. Frank Pallone Jr. & Greg Walden, *It's time for Congress to protect patients from surprise medical bills*, The Hill (Nov. 21, 2019), https://bit.ly/33E85FF.

[33] H. Ways & Means Comm., *Ways and Means Committee Surprise Medical Billing Plan* (Dec. 11, 2019), https://bit.ly/3yKqXP2.

[34] Cong. Budget Off., *H.R. 5826, the Consumer Protections Against Surprise Medical Bills Act of 2020, as Introduced on February 10, 2020, Estimated Budgetary Effects* (Feb. 11, 2020) ("CBO H.R. 5826 Cost Est."), https://www.cbo.gov/publication/56122.

Robert C. Scott (D-Va.) and Ranking Member Virginia Foxx (R-N.C.).[35]
In a summary of that proposal, the Committee noted that the IDR
process "put[s] in place several commonsense guardrails" to prevent
higher health care costs for consumers.[36] The CBO confirmed that the
Ban Surprise Billing Act would reduce premiums by roughly one
percent.[37]

## B. The No Surprises Act Shared the Earlier Bills' Cost-Reduction Goals.

Congress's commitment to protecting patients from surprise
medical bills and reducing health care costs culminated in a bipartisan,
bicameral compromise that became the version of the No Surprises Act
ultimately enacted as part of the 2021 Consolidated Appropriations Act.
On December 11, 2020, the chairs and ranking members of the Senate
HELP Committee and the House Committees on Energy and
Commerce, Ways and Means, and Education and Labor announced this

---

[35] H. Educ. & Labor Comm., *Committee Advances Bipartisan Solution to Ban Surprise Billing* (Feb. 11, 2020), https://bit.ly/3LwUwep.

[36] H. Educ. & Labor Comm., *Section-by-Section: The Ban Surprise Billing Act (H.R. 5800)* 1-2 (Feb. 11, 2020), https://bit.ly/3llgVke.

[37] Cong. Budget Off., *H.R. 5800, the Ban Surprise Billing Act, as ordered reported by the House Committee on Education and Labor on February 11, 2020, Estimated Budgetary Effects* (Feb. 13, 2020) ("CBO H.R. 5800 Cost Est."), https://www.cbo.gov/publication/56134.

bipartisan agreement.[38] As with the earlier committee bills, lowering

health care costs remained a high priority. [39] The joint statement stated

that, "We have reached a bipartisan, bicameral deal in principle to

protect patients from surprise medical bills and promote fairness in

payment disputes between insurers and providers, *without increasing*

*premiums for patients*."[40] The CBO estimated that the Act would reduce

premiums by between 0.5 and one percent.[41]

    It was no mystery why these bills would reduce premiums. For

each bill, the CBO consistently assumed that premiums would decline

because payments to some providers would be lower than current

average rates.[42] The CBO analyses of these bills reflected the same

conclusion: the average payment rates for both in- and out-of-network

care would move toward the median in-network rate under the

---

[38] S. Comm. on Health, Educ., Labor & Pensions, *Congressional Committee Leaders Announce Surprise Billing Agreement* (Dec. 11, 2020), https://bit.ly/3rSj1Ht.

[39] *Id.* (emphasis added).

[40] *Id.* (emphasis added).

[41] Cong. Budget Off., *Estimate for Divisions O Through FF H.R. 133, Consolidated Appropriations Act, 2021 Public Law 116-260 Enacted on December 27, 2020* (Jan. 14, 2021) ("CBO H.R. 133 Estimate") (ROA.1383).

[42] *See* CBO S.1895 Cost Est., *supra* note 29, at 3; CBO H.R. 2328 Est., *supra* note 31, at 6; *see* CBO H.R. 5826 Cost Est., *supra* note 34; CBO H.R. 5800 Cost Est., *supra* note 37.

proposed laws.[43] Since the median in-network rate tends to be lower than average rates, the CBO estimated that premiums would be reduced by up to one percent in most affected markets in most years.[44]

### C. In Passing the No Surprises Act, Congress Embraced the Core Principle That Surprise Billing Protections Should Keep Patients' Out-of-Pocket Costs Down.

A core principle adopted by coalitions of patient and consumer advocates, including many *Amici*, was that surprise billing protections should "ensure costs are not simply passed along to patients through higher premiums or out-of-pocket costs"[45] and "hold costs down."[46] This dual focus on out-of-pocket costs and premiums is also reflected in the comments that many *Amici* and others made to Congress.[47]

Throughout the legislative process for the No Surprises Act and its predecessor bills, Congress was also focused on reducing patients' out-of-pocket costs by limiting the amount patients paid through cost-sharing (i.e., copayments, coinsurance, payments toward deductibles)

---

[43] *See* CBO H.R. 5826 Cost Est., *supra* note 34; CBO H.R. 5800 Cost Est., *supra* note 37.

[44] *See* CBO H.R. 5826 Cost Est., *supra* note 34; CBO H.R. 5800 Cost Est., *supra* note 37.

[45] ALS Ass'n *et al.*, *supra* note 4, at 2.

[46] Letter from Families USA *et al.* to House Speaker Pelosi and House Minority Leader McCarthy, at 2 (July 10, 2019), https://bit.ly/3tQAra6.

[47] *See, e.g.*, *id.*; Letter from Families USA *et al.*, *supra* note 46.

for individual services. The various proposals did so "by tying consumer cost sharing (in some capacity) to what cost sharing would be had specified services been provided in network."[48]

## III.  THE CHALLENGED QPA METHODOLOGY FURTHERS CONGRESS'S GOAL OF PROTECTING CONSUMERS FROM HIGH OUT-OF-POCKET COSTS.

Based on this history, there is no question that Congress's intent in passing the No Surprises Act was both to protect patients from surprise medical bills and lower health care costs. The qualifying payment amount, or QPA, is a key part of these protections.

The way the QPA is calculated has direct and immediate financial consequences on patients. The No Surprises Act "generally requires that cost-sharing for [out-of-network] services . . . not be greater than what would be charged on an in-network basis."[49] Consistent with this general requirement, the Act establishes that the amount a patient pays for an out-of-network service through cost-sharing (such as through coinsurance or payments made toward a deductible) is based on

---

[48] Ryan J. Rosso *et al.*, Cong. Research Serv., *Surprise Billing in Private Health Insurance: Overview and Federal Policy Considerations*, at 12 (Dec. 12, 2019) (ROA.2137).

[49] U.S. Dep't of Health & Hum. Servs., Office of Health Policy, *Evidence on Surprise Billing: Protecting Consumers with the No Surprises Act* 5 (Nov. 22, 2021), https://bit.ly/3mU5AZ4.

the "recognized amount," which, in most cases, is the same as the QPA.[50] In a nutshell, if the QPA for the service at issue is lower, the patient's cost-sharing portion will be lower; a higher QPA would result in a higher cost-sharing burden for the patient.[51]

Coinsurance and pre-deductible health care payments contribute to substantial out-of-pocket health care costs that can be financially devastating for families, with particularly harmful impacts on Black, Latino, and low-income individuals and households.[52] One study found that, in 2020, the average person on an employer-based health plan had incurred $853 in out-of-pocket costs—more than many households spend in one month on basic monthly living expenses.[53] Worse yet, the average for people with at least one inpatient hospital stay was nearly four times that, at $3,161.[54] Individuals unable to afford these costs

---

[50] 42 U.S.C. §§ 300gg-111(a)(1)(C)(iii), (a)(3)(H).

[51] *See* Loren Adler *et al.*, *Understanding the No Surprises Act*, U.S.C.-Brookings Schaeffer on Health Policy (Feb. 4, 2021) (ROA.1976, 1979); Matthew Fielder *et al.*, *Recommendations for Implementing the No Surprises Act*, U.S.C.-Brookings Schaeffer on Health Policy (Mar. 16, 2021) (ROA.1399, 1405).

[52] Debra Bozzi *et al.*, Health Care Cost Inst., *ESI Enrollees Paid $853 on Average Out-of-Pocket for Health Care in 2020, But Some People Paid Over Four Times as Much* (Dec. 20, 2022), http://bit.ly/3yJPWCe.

[53] *Id.*

[54] *Id.*

often delay or skip necessary care, with detrimental consequences.[55]

The District Court's vacatur of the challenged QPA methodology, if allowed to stand, will almost surely drive up the QPA in many cases and increase already high out-of-pocket costs for patients and their families. If, for example, the QPA factored in bonuses and incentive payments (which bear no relation to the cost of individual services or patients' cost-sharing), the higher resulting QPAs would increase patients' cost-sharing burdens.[56] This would harm many Americans: 78 percent of workers with employer health plans have coinsurance obligations for inpatient hospital admissions, with another 10 percent having both copayment and coinsurance obligations for that inpatient care, in addition to any general annual deductible.[57]

A hypothetical example illustrates the point: Patient A receives care from an out-of-network anesthesiologist during an emergency surgery. Patient A's plan has a 30 percent coinsurance requirement. Under the current QPA methodology, the recognized amount for the

---

[55] *Id.*

[56] *See* Br. for Appellants [Doc. 53], at 40.

[57] Kaiser Family Found. *et al.*, *Employer Health Benefits: 2022 Annual Survey* 115 (2022), https://bit.ly/3JLzzLK.

anesthesiologist's services is $6,000. Patient A would be responsible for $1,800 in coinsurance. At a higher QPA—say, $8,000—Patient A's coinsurance would be $2,400, a $600 increase. In situations like this, the potential windfall to providers would expose patients to greater financial burdens, an outcome that would flip the No Surprises Act on its head.

The District Court's vacatur of the QPA methodology has harmed and will continue to harm the very patients and consumers the No Surprises Act was intended to protect. Contrary to the statute's dual purpose of ending surprise billing and otherwise protecting consumers from rising health care costs associated with out-of-network care, the vacatur of the QPA methodology has exposed patients to higher cost-sharing and, ultimately, higher health insurance premiums. These are precisely the types of burdens that Congress designed the No Surprises Act to prevent and mitigate.

## CONCLUSION

The No Surprises Act has, in the short time since it took effect in 2022, protected millions of patients and consumers from surprise medical bills and associated health care costs. The QPA methodology

adopted by the Departments in the July 2021 Interim Final Rule adheres to the text and purpose of the No Surprises Act. The Departments exercised their statutory authority to develop the QPA methodology and did so in a way that furthers Congress's goals of reducing patients' out-of-pocket health care costs and overall health care expenses. Because the District Court erred in invalidating and vacating the QPA methodology, *Amici* respectfully request that the Court reverse and rule in favor of Defendants-Appellants.

DATED: January 19, 2024      Respectfully submitted,

/s/ Joseph J. Wardenski
Joseph J. Wardenski
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
(347) 913-3311
joe@wardenskilaw.com

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). It contains 5,832 words, calculated using Microsoft Word's word-count feature, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(f).

2.    This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)–(6). It has been prepared using Microsoft Word in a proportionally spaced typeface, Century Schoolbook, with text in 14-point typeface and footnotes in a 12-point typeface.

DATED: January 19, 2024                    /s/ Joseph J. Wardenski
                                           Joseph J. Wardenski

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2024, I served a copy of the foregoing Brief of The Leukemia & Lymphoma Society and Nine Other Patient and Consumer Advocacy Groups as *Amici Curiae* in Support of Defendants-Appellants/Cross-Appellees with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the Court's CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the electronic filing.


Dated: January 19, 2024                    /s/ Joseph J. Wardenski
                                           Joseph J. Wardenski