No. 23-40605

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

_____

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL, L.L.C.;
DOCTOR ADAM CORLEY,

*Plaintiffs-Appellees/Cross-Appellants,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA,
SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES
DEPARTMENT OF THE TREASURY; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF
TREASURY; UNITED STATES DEPARTMENT OF LABOR; JULIE A. SU, ACTING SECRETARY,
U.S. DEPARTMENT OF LABOR; UNITED STATES OFFICE OF PERSONNEL MANAGEMENT;
KIRAN AHUJA,

*Defendants-Appellants/Cross-Appellees.*

_____

LIFENET, INCORPORATED; EAST TEXAS AIR ONE, L.L.C.; ROCKY MOUNTAIN HOLDINGS
L.L.C.; AIR METHODS CORPORATION, L.L.C.,

*Plaintiffs-Appellees/Cross-Appellants,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA,
SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES
DEPARTMENT OF THE TREASURY; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF
TREASURY; UNITED STATES DEPARTMENT OF LABOR; JULIE A. SU, ACTING SECRETARY,
U.S. DEPARTMENT OF LABOR; UNITED STATES OFFICE OF PERSONNEL MANAGEMENT;
KIRAN AHUJA,

*Defendants-Appellants/Cross-Appellees.*

_____

On Appeal from the United States District Court
for the Eastern District of Texas (Kernodle, J.)
Nos. 6:22-cv-450 and 6:22-cv-453

_____

## BRIEF OF APPELLEES/CROSS-APPELLANTS TEXAS MEDICAL ASSOCIATION, TYLER REGIONAL HOSPITAL, AND DR. ADAM CORLEY

COUNSEL LISTED ON INSIDE COVER

ERIC D. MCARTHUR
   *Counsel of Record*
BRENNA E. JENNY
JILLIAN STONECIPHER
CODY M. AKINS
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8011
Email: emcarthur@sidley.com

JAIME L.M. JONES
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-0751
Fax: (312) 853-7036
Email: jaime.jones@sidley.com

***Counsel for Plaintiffs-Appellees/
Cross-Appellants***

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**A.    Plaintiffs-Appellees/Cross-Appellants**

1. Texas Medical Association
2. Tyler Regional Hospital, LLC
3. Doctor Adam Corley
4. LifeNet, Incorporated
5. East Texas Air One, LLC
6. Rocky Mountain Holdings LLC
7. Air Methods Corporation, LLC

**B.    Attorneys for Plaintiffs-Appellees/Cross-Appellants**

1. For Texas Medical Association, Tyler Regional Hospital, LLC, and Doctor Adam Corley:

   Sidley Austin LLP
   Eric D. McArthur
   emcarthur@sidley.com
   Brenna E. Jenny
   bjenny@sidley.com
   Jillian Stonecipher
   jstonecipher@sidley.com
   Madeleine Joseph
   mjoseph@sidley.com
   Cody M. Akins
   cakins@sidley.com
   Sidley Austin LLP
   1501 K Street, NW

Washington, DC 20005
Telephone: (202)736-8000
Facsimile: (202) 736-8111

Jaime L.M. Jones
jaime.jones@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-0751
Facsimile: (312) 853-7036

Penny Packard Reid
preid@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3413
Facsimile: (214) 981-3400

2. For LifeNet, Inc. and East Texas Air One, LLC:

Susman Godfrey LLP
Stephen Shackelford, Jr.
sshackelford@susmangodfrey.com
Steven M. Shepard
sshepard@susmangodfrey.com
James Craig Smyser
csmyser@susmangodfrey.com
Max Isaac Straus
mstraus@susmangodfrey.com
SUSMAN GODFREY LLP
1301 Ave. of the Americas, Fl. 32
New York, NY 10019
Telephone: (212) 336-8340
Facsimile: (212) 336-8340

3. For Air Methods Corporation and Rocky Mountain Holdings, LLC:

> Polsinelli PC
> David A. King
> dking@polsinelli.com
> Joshua D. Arters
> jarters@polsinelli.com
> POLSINELLI PC
> 501 Commerce Street, Suite 1300
> Nashville, TN 37203
> Telephone: (615) 259-1510
> Facsimile: (615) 259-1573

## C.   *Amici Curiae*

1. American Society of Anesthesiologists
2. American College of Emergency Physicians
3. American College of Radiology
4. American Medical Association
5. The Emergency Department Practice Management Association
6. American Benefits Council
7. Business Group on Health
8. Council of Insurance Agents and Brokers
9. DFW Business Group on Health
10. ERISA Industry Committee
11. Houston Business Coalition on Health
12. HR Policy Association
13. National Alliance of Health Care Purchaser Coalitions
14. National Retail Federation
15. Purchaser Business Group on Health
16. Self-Insurance Institute of America
17. Texas Business Group on Health
18. Texas Employers for Affordable Healthcare
19. Leukemia & Lymphoma Society
20. The ALS Association
21. Cancer Support Community

22.    CancerCare
23.    Epilepsy Foundation
24.    Families USA Action
25.    Hemophilia Federation of America
26.    The Mended Hearts, Incorporated
27.    National Multiple Sclerosis Society
28.    National Patient Advocate Foundation
29.    U.S. PIRG
30.    America's Health Insurance Plans, Inc.
31.    Blue Cross Blue Shield Association

**D.    Attorneys for *Amici Curiae***

1. For American Society of Anesthesiologists, American College of
   Emergency Physicians, and American College of Radiology:

   Powers Pyles Sutter & Verville PC
   Ronald S. Connelly
   Ron.Connelly@PowersLaw.com
   Jeremy Lewin
   Leela Baggett
   Fernando Montoya
   Allyn N. Rosenberger
   POWERS PYLES SUTTER & VERVILLE PC
   1501 M Street NW
   Seventh Floor
   Washington, DC 20005
   Telephone: (202) 872-6762
   Facsimile: (202) 785-1756

2. For American Medical Association:

   Akin Gump Strauss Hauer & Feld LLP
   James Tysse
   jtysse@akingump.com
   Kelly M. Cleary
   kcleary@akingump.com
   Kristen E. Loveland

kloveland@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Telephone: (202) 887-4000

3. For The Emergency Department Practice Management Association:

ArentFox Schiff LLP
Jack R. Bierig
jack.bierig@afslaw.com
ARENTFOX SCHIFF LLP
233 South Wacker Drive
Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5511
Facsimile: (312) 258-5600

The Stafford Davis Firm, PC
Catherine Susan Bartles
cbartles@stafforddavisfirm.com
Stafford Davis
sdavis@stafforddavisfirm.com
THE STAFFORD DAVIS FIRM, PC
815 S Broadway Ave
Tyler, TX 75701
Telephone: (903) 593-7000
Facsimile: (903) 705-7369

4. For American Benefits Council, Business Group on Health Council of Insurance Agents and Brokers, DFW Business Group on Health, ERISA Industry Committee, Houston Business Coalition on Health, HR Policy Association, National Alliance of Health Care Purchaser Coalitions, National Retail Federation, Purchaser Business Group on Health, Self-Insurance Institute of America, Texas Business Group on Health, and Texas Employers for Affordable Healthcare:

Groom Law Group
Seth T. Perretta
sperretta@groom.com
Ryan Temme
rtemme@groom.com
Matthew W. Lanahan
mlanahan@groom.com
GROOM LAW GROUP
1701 Pennsylvania Ave NW
Washington, DC 20006
Telephone: (202) 867-0620
Facsimile: (202) 659-4503

5. For Leukemia & Lymphoma Society, The ALS Association Cancer Support Community, CancerCare, Epilepsy Foundation, Families USA Action, Hemophilia Federation of America, The Mended Hearts, Incorporated, National Multiple Sclerosis Society, National Patient Advocate Foundation, and U.S. PIRG:

Wardenski P.C.
Joseph J. Wardenski
joe@wardenskilaw.com
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, New York 10001
Telephone: (347) 913-3311

6. For America's Health Insurance Plans, Inc.:

Deutsch Hunt PLLC
Hyland Hunt
hhunt@deutschhunt.com
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave., Suite 900
Washington, DC 20001
Telephone: (202) 868-6915

Facsimile: (202) 609-8410

America's Health Insurance Plans
Michael Spector
Thomas M. Palumbo
AMERICA'S HEALTH INSURANCE PLANS
601 Pennsylvania Ave. NW
South Building, Suite 500
Washington, DC 20004

7. For Blue Cross Blue Shield Association:

O'Melveny & Myers, L.L.P.
K. Lee Blalack, II
lblalack@omm.com
Andrew R. Hellman
andrewhellman@omm.com
O'MELVENY & MYERS, L.L.P.
1625 Eye Street, N.W.
Washington, DC 20006
Telephone: (202) 383-5300

**E.    Entities with a Financial Interest:**

The following additional persons may have a financial interest in the outcome of the litigation.

1.    Texas Medical Association Library dba TMA Knowledge Center
2.    Texas Medical Association Special Funds Foundation
3.    Texas Medical Association Foundation
4.    TMF Health Quality Institute
5.    Texas Medical Association Alliance
6.    Texas Medical Association Political Action Committee
7.    TMA Practice Management Holdings, LLC
8.    TMA Specialty Services, LLC
9.    PSO Services, LLC
10.    Physicians Benevolent Fund

11.   Improving The Health Of All Texans
12.   TMA Insurance Trust
13.   Texas Medical Liability Trust
14.   Annie Lee Thompson Library Trust Fund
15.   Dr. S. E. Thompson Scholarship Fund
16.   May Owen Irrevocable Trust
17.   East Texas Health System, LLC
18.   AHS East Texas Health System, LLC
19.   The University of Texas Health Sciences Center at Tyler

## F.   Federal Rule of Appellate Procedure 26.1:

1. Texas Medical Association has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2. Tyler Regional Hospital, LLC is part of East Texas Health System, LLC, which is a joint venture between AHS East Texas Health System, LLC (the majority owner) and University of Texas Health Sciences Center at Tyler. No publicly held corporation owns 10% or more of Tyler Regional Hospital, LLC's stock.

3. Doctor Adam Corley is a natural person.

Dated: March 13, 2024

*/s/ Eric D. McArthur*
Eric D. McArthur

## REQUEST FOR ORAL ARGUMENT

Plaintiffs respectfully request oral argument. This case presents important questions regarding the interpretation and implementation of the No Surprises Act, a new federal law governing, among other things, reimbursement disputes between out-of-network healthcare providers and health insurers. The issues involved will benefit from airing at oral argument, during which counsel can address any questions the Court might have. Because the decisional process will be significantly aided by oral argument, it is appropriate here under Fed. R. App. P. 34(a)(2).

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................i

REQUEST FOR ORAL ARGUMENT.......................................................ix

TABLE OF AUTHORITIES..................................................................xii

INTRODUCTION....................................................................................1

JURISDICTIONAL STATEMENT .........................................................5

STATEMENT OF ISSUES......................................................................6

STATEMENT OF THE CASE .................................................................7

     A.    The No Surprises Act .................................................7

     B.    The Independent Dispute Resolution Process........................9

     C.    QPA Definition, Calculation, and Disclosure ......................10

     D.    The July Interim Final Rule ..................................................12

          1.    Including "ghost rates" in QPAs ..................................12

          2.    Excluding incentive payments from QPAs..................14

          3.    Including out-of-specialty rates in QPAs.....................16

          4.    Including other plan sponsors' rates in QPAs.....................................................................17

          5.    QPA disclosures ..........................................................18

     E.    The Decision Below ...............................................................21

     F.    This Appeal ............................................................................24

STANDARD OF REVIEW......................................................................24

SUMMARY OF ARGUMENT ................................................................25

ARGUMENT ................................................................. 29

I.  The Challenged QPA Methodology Rules Conflict With
    The Act. ............................................................. 29

    A.  Including ghost rates violates the Act. ................... 31

    B.  Excluding incentive payments violates the Act. ......... 38

II. The Challenged QPA Methodology Rules Are Arbitrary
    and Capricious ...................................................... 43

    A.  Including ghost rates drives down QPAs and is
        unreasonable. ...................................................... 44

    B.  Excluding incentive payments drives down QPAs
        and is unreasonable. ........................................... 48

III. The Departments' QPA Disclosure Rule Is Neither
     Reasonable Nor Reasonably Explained. ........................ 51

    A.  Meaningful disclosures are necessary. ..................... 52

    B.  The Departments' failure to require meaningful
        disclosures is unreasonable. ................................. 54

IV. The Court Should Affirm The District Court's Vacatur
    Of The Unlawful QPA Methodology Rules And Remand
    The QPA Disclosure Rule For Further Rulemaking. ........... 59

    A.  The APA authorizes vacatur. .................................. 59

    B.  The district court did not abuse its discretion in
        declining to remand without vacatur. ...................... 61

    C.  The district court did not abuse its discretion in
        ordering universal vacatur. .................................. 66

    D.  The Court should remand the QPA disclosure
        rule. ............................................................. 69

CONCLUSION ............................................................ 70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Hippocratic Med. v. FDA*,
    78 F.4th 210 (5th Cir.), *cert. granted*, 143 S. Ct. 537
    (2023) ............................................................................ 60, 62, 67, 68

*Am. Farm Bureau Fed'n v. EPA*,
    559 F.3d 512 (D.C. Cir. 2009) ............................................................ 69

*Biden v. Texas*,
    597 U.S. 785 (2022) ............................................................................ 58

*Cargill v. Garland*,
    57 F.4th 447 (5th Cir.), *cert. granted*, 144 S. Ct. 374 (2023) ........ 61, 66

*Cent. & Sw. Servs., Inc v. EPA*,
    220 F.3d 683 (5th Cir. 2000) .............................................................. 62

*Chamber of Com. of the U.S. v. SEC*,
    88 F.4th 1115 (5th Cir. 2023) ....................................................... 61, 62

*Chem. Mfrs. Ass'n v. EPA*,
    870 F.2d 177 (5th Cir. 1989) .............................................................. 58

*Chevron USA Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ............................................................................ 31

*Cigar Ass'n of Am. v. FDA*,
    964 F.3d 56 (D.C. Cir. 2020) ......................................................... 56, 57

*City of Dallas v. FCC*,
    118 F.3d 393 (5th Cir. 1997) .............................................................. 40

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
    91 F.4th 342 (5th Cir. 2024) .............................................................. 23

*Data Mktg. P'ship, LP v. Dep't of Lab.*,
    45 F.4th 846 (5th Cir. 2022) .................................................... 24, 31, 59

*In re Deepwater Horizon,*
    48 F.4th 378 (5th Cir. 2022) ............................................................ 44

*Dish Network Corp. v. NLRB,*
    953 F.3d 370 (5th Cir. 2020)................................................. 40, 45, 47

*Djie v. Garland,*
    39 F.4th 280 (5th Cir. 2022) ............................................................ 30

*Driftless Area Land Conservancy v. Valcq,*
    16 F.4th 508 (7th Cir. 2021) ............................................................ 67

*Env't Def. Fund, Inc. v. EPA,*
    898 F.2d 183 (D.C. Cir. 1990) ......................................................... 69

*Feds for Med. Freedom v. Biden,*
    63 F.4th 366 (5th Cir.), *vacated on other grounds,*
    144 S. Ct. 480 (2023)........................................................................ 68

*GameFly, Inc. v. Postal Regul. Comm'n,*
    704 F.3d 145 (D.C. Cir. 2013) ......................................................... 56

*Green Valley Special Util. Dist. v. City of Schertz,*
    969 F.3d 460 (5th Cir. 2020)............................................................ 32

*Hibbs v. Winn,*
    542 U.S. 88 (2004)..................................................................... 32, 34

*Judulang v. Holder,*
    565 U.S. 42 (2011).......................................................................... 55

*MCI Telecomms. Corp. v. AT&T,*
    512 U.S. 218 (1994)................................................................... 36, 50

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010)........................................................................ 67

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)............................................................... 50, 56, 58

*Music Choice v. Copyright Royalty Bd.,*
    970 F.3d 418 (D.C. Cir. 2020) ......................................................... 57

*Nat. Res. Def. Council, Inc. v. EPA*,
  859 F.2d 156 (D.C. Cir. 1988) ........................................ 46, 57

*Nielsen v. Preap*,
  139 S. Ct. 954 (2019) .................................................... 32

*Off. of Commc'n of United Church of Christ v. FCC*,
  707 F.2d 1413 (D.C. Cir. 1983) .......................................... 57

*PDK Labs. v. DEA*,
  362 F.3d 786 (D.C. Cir. 2014) ........................................... 36

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ............................................. 40, 45, 47

*Standing Rock Sioux Tribe v. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.C. Cir. 2021) .......................................... 65

*Sw. Elec. Power Co. v. EPA*,
  920 F.3d 999 (5th Cir. 2019) ................................... 31, 44, 56

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
  566 U.S. 560 (2012) ..................................................... 39

*Tate v. Am. Tugs, Inc.*,
  634 F.2d 869 (5th Cir. 1981) ............................................ 68

*Tex. Ass'n of Mfrs. v. Consumer Prod. Safety Comm'n*,
  989 F.3d 368 (5th Cir. 2021) ............................................ 36

*Tex. Med. Ass'n v. HHS*,
  587 F. Supp. 3d 528 (E.D. Tex. 2022) .................................. 2, 9

*Tex. Med. Ass'n v. HHS*,
  654 F. Supp. 3d 575 (E.D. Tex. 2023) .................................. 2, 9

*Tex. Med. Ass'n v. HHS*,
  No. 6:23-cv-59-JDK, 2023 WL 4977746 (E.D. Tex. Aug. 3,
  2023) ................................................................. 9, 65

*Texas v. Biden,*
    20 F.4th 928 (5th Cir. 2021), *rev'd on other grounds,*
    142 S. Ct. 2528 (2022) ................................................................ *passim*

*Texas v. United States,*
    497 F.3d 491 (5th Cir. 2007) ...................................... 26, 44, 48, 54, 55

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) .................................................. 25, 61, 62

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) .............................................................. 69

*Transbrasil S.A. Linhas Aereas v. Dep't of Transp.,*
    791 F.2d 202 (D.C. Cir. 1986) ........................................................... 34

*United States v. Ron Pair Enters., Inc.,*
    489 U.S. 235 (1989) ............................................................................ 37

*United States v. Texas,*
    143 S. Ct. 1964 (2023) ....................................................................... 60

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ...................................................................... 31, 36

*Vonage Holdings Corp. v. FCC,*
    489 F.3d 1232 (D.C. Cir. 2007) ........................................................ 34

*Wages & White Lion Invs., LLC v. FDA,*
    16 F.4th 1130 (5th Cir. 2021) ..................................................... 57, 58

*Wages & White Lion Invs., LLC v. FDA,*
    90 F.4th 357 (5th Cir. 2024) ............................................................. 58

*Yakima Valley Cablevision, Inc. v. FCC,*
    794 F.2d 737 (D.C. Cir. 1986) .......................................................... 57

## Statutes and Regulations

5 U.S.C. § 553(c) ...................................................................................... 36

5 U.S.C. § 705 .......................................................................................... 60

28 U.S.C. § 1291 ...................................................................... 6

28 U.S.C. § 1331 ...................................................................... 5

28 U.S.C. § 2107(b) ................................................................. 5

42 U.S.C. § 300gg-111(a)(1) .................................................... 8

42 U.S.C. § 300gg-111(a)(1)(C)(ii) .......................................... 8

42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I) ...................................... 8

42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II) ..................................... 8

42 U.S.C. § 300gg-111(a)(2)(A)(i)(II) ..................................... 54

42 U.S.C. § 300gg-111(a)(2)(A)(ii)(II) ............................... 54, 55

42 U.S.C. § 300gg-111(a)(2)(B) .............................................. 42

42 U.S.C. § 300gg-111(a)(2)(B)(i) ............................... 11, 36, 43

42 U.S.C. § 300gg-111(a)(2)(B)(ii) ............................. 11, 18, 52

42 U.S.C. § 300gg-111(a)(2)(B)(iv) ............................. 11, 53, 55

42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) ................................. *passim*

42 U.S.C. § 300ff-111(a)(3)(E)(iii)(I) ...................................... 11

42 U.S.C. § 300gg-111(a)(3)(K) ............................................... 8

42 U.S.C. § 300gg-111(b)(1) ................................................... 8

42 U.S.C. § 300gg-111(b)(1)(A) ............................................... 8

42 U.S.C. § 300gg-111(b)(1)(C) ............................................... 8

42 U.S.C. § 300gg-111(c)(1)(A)–(B) ........................................ 8

42 U.S.C. § 300gg-111(c)(2)(A) ............................................. 69

42 U.S.C. § 300gg-111(c)(5) .................................................. 53

42 U.S.C. § 300gg-111(c)(5)(B)(i) ................................................ 64

42 U.S.C. § 300gg-111(c)(5)(C)(i) ................................................ 64

42 U.S.C. § 300gg-111(c)(5)(C)(i)(I) ........................................... 53

Pub. L. No. 116-260, 134 Stat. 1182 (2020). ............................... 7

45 C.F.R. § 149.140(a)–(c) ......................................................... 12

45 C.F.R. § 149.140(a)(8)(iv) .................................................... 17

45 C.F.R. § 149.140(a)(12) ........................................................ 16

45 C.F.R. § 149.140(a)(18) ........................................................ 19

45 C.F.R. § 149.140(b)(2)(iv) ......................................... 14, 30, 38

45 C.F.R. § 149.140(d) .............................................................. 12

45 C.F.R. § 149.140(d)(1) ......................................................... 19

45 C.F.R. § 149.140(d)(1)(ii) ..................................................... 19

45 C.F.R. § 149.140(d)(2) ......................................................... 20

86 Fed. Reg. 36,872 (July 13, 2021) ............................... *passim*

86 Fed. Reg. 55,980 (Oct. 7, 2021) ....................................... 5, 51

87 Fed. Reg. 52,618 (Aug. 26, 2022) ..................... 10, 19, 52, 53

## Rules

Fed. R. App. P. 4(a)(3) ............................................................... 6

## Legislative Materials

Att'y Gen.'s Comm. on Admin. Procedure, *Administrative Procedure in Government Agencies*, S. Doc. No. 77-8 (1st Sess. 1941) ................................................................................ 60

## Scholarly Authorities

Mila Sohini, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121 (2020) .................................................................. 60

## Other Authorities

*Black's Law Dictionary* (3d ed. 1933) ...................................... 59

CMS, *FAQs about Consolidated Appropriations Act, 2021 Implementation Part 62* (Oct. 6, 2023), https://www.cms.gov/files/document/faqs-part-62. pdf.................................................................... 24, 63, 64, 65

CMS, *Federal Independent Dispute Resolution (IDR) Process Guidance for Certified IDR Entities* (Aug. 2022), https://www.cms.gov/files/document/TA-certified-independent-dispute-resolution-entities-August-2022.pdf ............... 64

CMS, *Payment Disputes Between Providers and Health Plans* (Dec. 21, 2023), https://www.cms.gov/nosurprises/help-resolve-payment-disputes/payment-disputes-between-providers-and-health-plans ................................................................ 24, 65

Dep'ts of HHS, Labor & Treasury, *Supplemental Background on Federal Independent Dispute Resolution Public Use Files* (Jan. 1 – June 30, 2023), https://www.cms.gov/files/document/federal-idr-supplemental-background-2023-q1-2023-q2.pdf ............................. 10

Maximum, *Oxford Eng. Dictionary Online* (Sept. 2023 ed.) .................. 38

Total, *Oxford Eng. Dictionary Online* (Sept. 2023 ed.)........................... 38

# INTRODUCTION

Before the No Surprises Act (NSA), when an out-of-network healthcare provider furnished medical care to a patient, the patient's insurer could refuse to pay for the care, or pay whatever amount the insurer unilaterally opted to pay. This sometimes left patients responsible for "balance" bills. Under the NSA, insurers must pay out-of-network providers for emergency and certain other services, so that bills are not passed on to patients. Specifically, insurers must now reimburse out-of-network providers at a rate determined through the NSA's independent dispute resolution process. If insurers and providers cannot reach agreement through the NSA's negotiation process, an arbitrator will determine the amount the insurer must pay after considering a list of factors Congress required the arbitrator to take into account.

One of the factors considered in both the negotiation and arbitration processes under the NSA is a figure called the "qualifying payment amount," or QPA. According to the federal Departments implementing the NSA, the QPA is meant to "reflec[t] market rates under typical contract negotiations." 86 Fed. Reg. 36,872, 36,889 (July 13, 2021) (ROA.785). Congress carefully defined the QPA as the median of specified contracted rates: each rate included in calculating the median must be the "total maximum rate" in an

insurer's contract for an item or service "provided by a provider in the same or similar specialty and provided in the geographic region." Insurers are required to calculate QPAs. And they calculate them once, using rates from contracts in place on January 31, 2019. Each year, QPAs are adjusted only for inflation. Once QPAs are calculated, therefore, they become a data point used in determining provider reimbursement under the NSA forevermore.

The Departments have issued a series of rules implementing the NSA. A number of those rules departed from the NSA's text and have therefore been vacated. The district court found, in a series of cases, that the Departments misconstrued the NSA to advance "their goal of privileging the QPA, tilting arbitrations in favor of insurers, and thereby lowering payments to providers." *Tex. Med. Ass'n v. HHS*, 654 F. Supp. 3d 575, 593 (E.D. Tex. 2023) (*"TMA II"*); *see also Tex. Med. Ass'n v. HHS*, 587 F. Supp. 3d 528, 543 (E.D. Tex. 2022) (*"TMA I"*) (vacating an interim final rule requiring arbitrators to presume the QPA was the correct reimbursement rate).

The Departments furthered this goal by, first, making the QPA more significant in guiding arbitrations than Congress directed in the NSA. This Court is currently considering the Departments' appeal from the district court's decision vacating a second attempt by the Departments to unlawfully

privilege the QPA in the arbitration process. *Tex. Med. Ass'n v. HHS*, No. 23-40217. And, second, the Departments created a methodology for calculating QPAs that departed from the NSA's plain text and systematically drove QPAs down below negotiated market rates. That is the subject of this appeal.

Healthcare providers—the plaintiffs here—challenged four ways in which the Departments' QPA methodology rules violated the NSA. The district court agreed with the provider plaintiffs and vacated all four rules. The Departments appeal the district court's decision with respect to only two of the rules the provider plaintiffs challenged (along with challenging the remedy the district court applied for all four rules). The two rules the Departments still defend are flatly inconsistent with the text of the NSA.

First, the Act mandates that only rates for "provided" items and services factor into QPAs. But, as the Departments do not dispute, they have determined that rates for items and services that are *not* provided must be included in QPA calculations. Second, Congress specified that QPAs must be the "total maximum payment" recognized by the insurer. Yet the Departments have required insurers to "[e]xclude" from rates used to calculate QPAs "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." The Departments' rules cannot be

squared with the Act's plain terms. And they unreasonably depress QPAs below negotiated market rates in a way that undermines what the Departments themselves acknowledge was Congress's objective.

The Departments' primary objection to complying with the Act's text seems to be that Congress did not create a more detailed roadmap for how to determine that a service was "provided" or for how to account for incentive payments. But Congress was not required to be more specific. Congress charged the Departments with establishing a methodology for calculating QPAs that gives effect to the statutory terms. What the Departments did instead, and what they cannot do, is negate Congress's choices.

The Departments' challenges to the district court's decision are, for the most part, not rooted in the NSA's text. Instead, they are driven largely by policy concerns. Of course, those concerns do not permit the Departments, or the Court, to override Congress's judgment. Regardless, the NSA will continue to protect patients from balance bills no matter the outcome of this case. And patients also have an interest on the other side of the scales. As the Departments once recognized, if out-of-network providers are not adequately compensated, that "undercompensation could threaten the viability of these providers," which "could lead to participants, beneficiaries and

enrollees not receiving needed medical care, undermining the goals of the No Surprises Act." 86 Fed. Reg. 55,980, 56,044 (Oct. 7, 2021) (ROA.669). The Departments cannot ignore the balance Congress struck.

Nor can the Departments keep providers in the dark about how insurers calculate their QPAs. Recognizing that transparency about QPA calculations is critical to the NSA's negotiation, arbitration, and complaint processes, Congress directed the Departments to establish meaningful disclosure requirements. But in the same rulemaking that established the unlawful QPA calculation rules, the Departments decided that insurers need only disclose the most rudimentary facts about their QPA calculations. That decision was arbitrary and capricious, both because the Departments' barebones disclosures fail to achieve the NSA's objectives and because they are not the product of the reasoned decisionmaking the law requires.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this Administrative Procedure Act (APA) action under 28 U.S.C. § 1331. The district court entered final judgment on August 24, 2023. ROA.13241–43. The government timely appealed on October 20, 2023. ROA.13244; 28 U.S.C. § 2107(b). Plaintiffs

timely cross-appealed on October 31, 2023. ROA.13518; Fed. R. App. P. 4(a)(3). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

I.A. The NSA defines the QPA as the "median of the contracted rates" for an item or service "that is provided by a provider" and "provided in the [same] geographic region." The first question is whether the Departments may, consistent with the NSA, require insurers, when calculating this median, to include rates for items and services that are *not* provided.

I.B. The NSA's QPA definition also requires insurers, when calculating the median of their "contracted rates," to use the "rate recognized … as the total maximum payment" under the contract for the item or service at issue. The second question is whether the Departments may, consistent with the NSA, require insurers to *exclude* contracted-for incentive payments from the "contracted rates" they use to calculate QPAs.

II. Whether the challenged QPA calculation rules are arbitrary and capricious because they depress QPAs below negotiated market rates, contrary to the Departments' own understanding of Congress's purpose.

III. Whether the Departments' QPA disclosure rule is arbitrary and capricious because it fails to achieve the transparency into insurers' QPA

calculations necessary for the statutory complaint, negotiation, and arbitration processes to function as Congress intended and because the Departments failed to comply with the APA's demands of reasoned decisionmaking.

IV. Whether the district court abused its discretion by vacating rules that violate the NSA and thus cannot be rehabilitated on remand.

## STATEMENT OF THE CASE

### A.    The No Surprises Act

Congress enacted the NSA to address the problem of unanticipated balance billing for certain healthcare services. *See* Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758–890 (2020). Historically, when a patient with health insurance received out-of-network services from a provider, the provider would submit the bill to the patient's group health plan or health insurance issuer. (For simplicity, this brief will refer to such plans and issuers collectively as "insurers.") Because an out-of-network provider does not have a contract with the insurer specifying its rates, the insurer would unilaterally determine how much to pay. The patient could remain liable for the remaining balance.

The NSA prohibits balance billing in certain circumstances and removes patients from reimbursement disputes. It does so by capping patients' liability for emergency services furnished by an out-of-network provider, or

non-emergency services furnished by an out-of-network provider at an in-network facility. *See* 42 U.S.C. § 300gg-111(a)(1), (b)(1). For such services, patients cannot be required to pay more than the cost-sharing amount (*e.g.*, copay, deductible, and coinsurance) that would apply if the services had been furnished by an in-network provider. *Id.* § 300gg-111(a)(1)(C)(ii), (b)(1)(A).

Because the NSA's ban on "balance billing" limits the amount patients can be required to pay, Congress understood that providers would need to look to insurers to cover the fair value of their services. The NSA therefore obligates covered insurers to reimburse providers at an "out-of-network rate." *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D). Unless a state law or All-Payer Model Agreement applies, the "out-of-network" rate is determined through a dispute resolution process between the provider and insurer. *See id.* § 300gg-111(a)(3)(K). Specifically, the Act requires insurers to make an initial payment (or denial of payment) to the provider, *id.* § 300gg-111(a)(1)(C)(iv)(I), (b)(1)(C), then channels disputes about the sufficiency of that payment into a process of negotiation, followed, if necessary, by arbitration before an independent private arbitrator, *id.* § 300gg-111(c)(1)(A)–(B).

The Departments have issued a series of rules implementing the NSA. Those rules have often "tilt[ed] arbitrations in favor of insurers, and thereby

lower[ed] payments to providers." *TMA II*, 654 F. Supp. 3d at 593. Through litigation involving many of the same plaintiffs here, several of the Departments' rules have been vacated because they violated the plain text of the NSA and were issued in violation of the APA's procedures. *See id.* at 594–95; *TMA I*, 587 F. Supp. 3d at 543; *Tex. Med. Ass'n v. HHS*, No. 6:23-cv-59-JDK, 2023 WL 4977746 (E.D. Tex. Aug. 3, 2023) ("*TMA IV*").

### B. The Independent Dispute Resolution Process

The NSA's independent dispute resolution (IDR) process is a "baseball-style" arbitration in which the provider and insurer submit their best and final offers for the reimbursement amount to an independent private arbitrator (called in the NSA a "certified IDR entity"). 42 U.S.C. § 300gg-111(c)(5)(B). The statute prescribes the factors the arbitrator "shall consider" in choosing between the two offers. *Id.* § 300gg-111(c)(5)(C). One of those factors is the QPA "as defined" by the NSA "for the applicable year for items or services that are comparable to the qualified IDR item or service and that are furnished in the same geographic region." *Id.* § 300gg-111(c)(5)(C)(i)(I).

Despite being just one of the statutory factors, the QPA often plays an outsized role in IDR. The problem started with the Departments' initial implementation of IDR, which required arbitrators to elevate the QPA over the

other statutory factors. Those rules have been vacated. But even without the formal effect of the Departments' regulatory efforts to privilege the QPA, the metric continues to play a role in the NSA's dispute resolution process. In practice, insurers often submit the QPA as both their initial payment and their offer in IDR. *See* 87 Fed. Reg. 52,618, 52,625 n.29 (Aug. 26, 2022); Dep'ts of HHS, Labor & Treasury, *Supplemental Background on Federal Independent Dispute Resolution Public Use Files* 4 (Jan. 1 – June 30, 2023).[1]

For the open negotiation and arbitration process to function as Congress intended, it is critical both that insurers calculate their QPAs correctly under the statute and that providers have meaningful information about the basis for insurers' QPA calculations.

## C.    QPA Definition, Calculation, and Disclosure

Congress carefully defined the term QPA. The NSA generally defines "[t]he term 'qualifying payment amount' [to] mea[n]":

> the median of the contracted rates recognized by the plan or issuer, respectively (determined with respect to all such plans of such sponsor or all such coverage offered by such issuer that are offered within the same insurance market …) as the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) under such plans or coverage, respectively,

---

[1] https://www.cms.gov/files/document/federal-idr-supplemental-background-2023-q1-2023-q2.pdf

on January 31, 2019, for the same or a similar item or service
that is provided by a provider in the same or similar specialty
and provided in the geographic region in which the item or ser-
vice is furnished,

with annual inflation adjustments. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).
When an insurer lacks sufficient information to calculate the QPA in this
way, the QPA is determined using an independent database reflecting al-
lowed amounts paid to providers or facilities for services furnished in the
applicable geographic region. *Id.* § 300gg-111(a)(3)(E)(iii)(I).

Congress directed the Departments to promulgate rules establishing
"the methodology" that insurers "shall use to determine the [QPA]." *Id.*
§ 300gg-111(a)(2)(B)(i). Congress further commanded the Departments to es-
tablish through rulemaking "the information" that insurers "shall share"
with providers about their QPA calculations, as well as "a process to receive
complaints of violations" of applicable requirements. *Id.* § 300gg-
111(a)(2)(B)(ii), (iv). The complaint process must allow a provider to make a
complaint to the Departments that an insurer has calculated its QPA in a
manner that does not "satisf[y] the [NSA's] definition" of the QPA. *Id.*
§ 300gg-111(a)(2)(A)(i)(II); *see also id.* § 300gg-111(a)(2)(B)(iv) (Departments
required to "establish" a "process to receive complaints of violations of the
requirements described in subclauses (I) and (II) of subparagraph (A)(i)").

11

**D.    The July Interim Final Rule**

On July 13, 2021, the Departments promulgated the rule at issue here. 86 Fed. Reg. 36,872 (ROA.768). The July Rule is an interim final rule, and the Departments issued it without providing notice or an opportunity for interested parties to comment on the Departments' approach. As relevant here, the July Rule sets forth the methodology for insurers to calculate QPAs, 45 C.F.R. § 149.140(a)–(c); *see* 86 Fed. Reg. at 36,888–98 (ROA.784–94), and the information insurers must disclose to providers about their QPA calculations, 45 C.F.R. § 149.140(d); *see* 86 Fed. Reg. at 36,898–99 (ROA.794–95). This case involves four aspects of the calculation methodology, two of which the Departments have abandoned on appeal, and the disclosure rule.

**1.    Including "ghost rates" in QPAs**

Although the NSA defines the QPA as the "median of the contracted rates" for an item or service "that is *provided* by a *provider*" and "*provided* in the [same] geographic region," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphases added), the Departments have instructed insurers to include in QPA calculations rates for items and services that are *not* provided.

In the July Rule, the Departments did not grapple directly with the statute's "provided" requirement. They stated only that "each contracted rate for a given item or service" should "be treated as a single data point when

12

calculating a median contracted rate … regardless of the number of claims

paid at that contracted rate." 86 Fed. Reg. at 36,889 (ROA.785). They thus

appeared to contemplate that all rates for a service that appear in a contract

qualify for inclusion in the QPA, even if those rates could never be paid be-

cause no provider covered by that contract provides the relevant service.

Then in August 2022, the Departments issued a set of Frequently

Asked Questions (FAQs), in which they made explicit that they interpret the

July Rule to allow insurers to include rates for services that "providers do

not provide." August 2022 FAQs at 17 (ROA.11469). Such rates—known

commonly in the industry as "ghost rates"—appear in contracts, the Depart-

ments explained, because insurers often present providers with form con-

tracts that include a fee schedule for all services covered by the insurer, and

then leave it to providers to negotiate the rates for the services they provide.

*See id.* at 16 (ROA.11468). As a result, the contract may include non-negoti-

ated rates for services that no provider covered by the contract provides. In

neither the July Rule nor the August FAQs did the Departments explain

their choice to include these ghost rates in the QPA calculation, or explain

how including them can be reconciled with the statutory text.

The Departments have, however, recognized how including ghost rates in QPA calculations skews QPAs. In the July Rule, the Departments concluded that Congress intended QPAs to "reflec[t] market rates under typical contract negotiations." 86 Fed. Reg. at 36,889 (ROA.785). Yet in the August FAQs, the Departments admitted that because providers who do not provide a service have little incentive to negotiate the reimbursement rate for that service, ghost rates are generally lower than they would be under a motivated, arms-length negotiation. August 2022 FAQs at 16 (ROA.11468). In practice, ghost rates can be as low as $0. *Id.* (ROA.11468). The Departments stated in the August FAQs that $0 rates must be excluded from QPA calculations. *Id.* at 17 n.29 (ROA.11469). But they did not exclude other rates that are artificially low, if not quite $0, because the provider did not provide the service and so did not negotiate the rate. Including these artificially low rates in QPA calculations drives down the median rate, depressing QPAs.

## 2.  Excluding incentive payments from QPAs

Although Congress specified that QPAs must be calculated using the "total maximum payment" recognized by the insurer, 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), the July Rule requires insurers to "[e]xclude" from rates used to calculate QPAs "risk sharing, bonus, penalty, or other incentive-

based or retrospective payments or payment adjustments," 45 C.F.R. § 149.140(b)(2)(iv). The Departments offered no textual basis for excluding these payments from the "total maximum payment." Instead, they said that excluding such payments is "consistent with how cost sharing is typically calculated for in-network items and services, where the cost-sharing amount is customarily determined at or near the time an item or service is furnished, and is not subject to adjustment based on changes in the amount ultimately paid to the provider or facility as a result of any incentives or reconciliation process." 86 Fed. Reg. at 36,894 (ROA.790). The Departments did not explain why, under the statute, typical calculation of cost-sharing obligations is relevant to calculating the "total maximum payment" under a contract.

Here too, the Departments' decision to depart from the statutory text reduces QPAs below typical contracted rates. As the Departments noted, insurers and providers sometimes agree that payments to providers will be "reconciled retrospectively to account for utilization, value adjustments, or other weighting factors that can affect the final payment." *Id.* (ROA.790). In these arrangements, the provider typically accepts a *lower* fixed rate as partial compensation for services, with the expectation that it will earn at least some—often significant—additional, incentive-based payments. The

Departments' decision to exclude these bonuses and incentive-based payment adjustments from QPA calculations therefore tends to depress QPAs.

### 3.    Including out-of-specialty rates in QPAs

The July Rule defined the statutory phrase "the same or similar specialty," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), to mean "the practice specialty of a provider, *as identified by the plan or issuer consistent with the plan's or issuer's usual business practice*," 45 C.F.R. § 149.140(a)(12) (emphasis added). Under this rule, the Departments explained, insurers are "required to calculate median contracted rates separately by provider specialty *only* where the plan or issuer otherwise varies its contracted rates based on provider specialty." 86 Fed. Reg. at 36,891 (ROA.787) (emphasis added). In other words, an insurer need not distinguish contracted rates by specialty unless it "purposefully" varies rates by specialty or its "contracting process unintentionally results in" "material[ly] differen[t]" median rates across specialties. August 2022 FAQs at 16–17 (ROA.11469). In all other cases, said the Departments, insurers are "not required to calculate median contracted rates separately for each provider specialty when determining the QPA" and thus may include out-of-specialty rates in QPA calculations. *Id.* (ROA.11469).

The Departments "considered," but rejected, requiring insurers to calculate median contracted rates "for every provider specialty." 86 Fed. Reg. at 36,891 (ROA.787). They instead opted for the July Rule's approach to provide insurers "flexibility"; to reduce the "burden" of calculating the QPA; and to "minimiz[e]" instances in which insurers would have fewer than three "contracted rates" and therefore would have to calculate the QPA using independent databases, which the Departments deemed a "limited" "alternative" to using contracted rates. *Id.* at 36,888, 36,891 (ROA.784, 787). The Departments did not explain how these goals could override the statute's clear command that QPAs must always be based solely on in-specialty rates.

### 4.   Including other plan sponsors' rates in QPAs

The July Rule permits self-insured group health plans, "at the option of the plan sponsor," to calculate QPAs using rates from the contracts of "all self-insured group health plans *administered by the same entity* (including a third-party administrator contracted by the plan)." 45 C.F.R. § 149.140(a)(8)(iv) (emphasis added). Thus, when a plan sponsor (*e.g.*, an individual's employer) uses a third-party administrator, as is common, the July Rule permits the sponsor to include in its QPA calculation the contracted rates of *other* sponsors that use the same administrator. *See* 86 Fed.

17

Reg. at 36,890 (ROA.786). The Departments permitted this despite the NSA's requirement that QPAs must be "determined with respect to all such plans *of such sponsor*." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). The Departments again offered no textual justification for their decision, justifying their choice instead based on the "reduce[d] … burden" on sponsors and a desire to reduce instances in which the sponsor has insufficient data (*i.e.*, fewer than three "contracted rates") and must therefore calculate the QPA using an independent database. 86 Fed. Reg. at 36,890 (ROA.786).

### 5.    QPA disclosures

The July Rule also addressed the NSA's command to the Departments to establish through rulemaking the "information" that an insurer "shall share with the nonparticipating provider or nonparticipating facility" when determining a QPA. 42 U.S.C. § 300gg-111(a)(2)(B)(ii). The Departments "recognize[d]" that providers "need transparency regarding how the QPA was determined." 86 Fed. Reg. at 36,898 (ROA.794). Specifically, they acknowledged that understanding how the QPA was calculated is "important in informing the negotiation process," and that in order to "decide whether to initiate the IDR process and what offer to submit," providers "must know not only the value of the QPA, but also certain information on

18

how it was calculated." *Id.* (ROA.794). The Departments thus claimed that the disclosures mandated by the rule sought "to ensure transparent and meaningful disclosure about the calculation of the QPA." *Id.* (ROA.794).

Nonetheless, with the aim of "minimizing administrative burdens on plans and issuers," *id.* (ROA.794), the Departments required insurers to provide only minimal information about their QPA calculations. Under the July Rule, when an insurer sends a provider an initial payment or notice of denial of payment, the only information the insurer must provide is: (1) the QPA as determined by the insurer; (2) a statement certifying that the QPA applies and "was determined in compliance with" the methodology in the July Rule; and (3) instructions for how to initiate open negotiation and IDR. 45 C.F.R. § 149.140(d)(1).[2] At a provider's request, the insurer must also provide (1) a statement of whether the QPA included contracted rates that were not on a fee-for-service basis and whether the QPA for those items or services was determined using underlying fee schedule rates or a derived amount; (2) if the insurer used an eligible database to determine the QPA, information to identify which database was used; (3) if a related service code was used to

---

[2] A subsequent rule requires additional limited disclosures when the insurer decides to "[d]owncode" the billed service code. 45 C.F.R. § 149.140(a)(18), (d)(1)(ii); *see* 87 Fed. Reg. at 52,633–34.

determine the QPA for a new service code, information to identify the related service code; and (4) if applicable, a statement that the insurer's contracted rates include risk-sharing, bonus, or other incentive-based or retrospective payments or payment adjustments for covered items and services that were excluded for purposes of calculating the QPA. *Id.* § 149.140(d)(2).

Insurers are not required to disclose any additional information that would allow providers to assess whether the QPA was correctly calculated or to provide relevant information about the QPA to an arbitrator in the IDR process. Insurers need not disclose even the most basic information, such as the number of contracted rates used to determine the QPA, how often those rates were actually charged, the characteristics of the providers who agreed to those rates, or the amount of the excluded incentive payments.

The Departments did not explain how the minimal disclosures their rule requires provide the "transparency" that they themselves recognized is "need[ed]" to achieve the NSA's purposes. 86 Fed. Reg. at 36,898 (ROA.794). Nor did they consider the complaint process at all. While the August FAQs urge providers to "submit a complaint" if they have "concerns" about an insurer's "compliance" with the QPA calculation rules, August 2022 FAQs at 16 (ROA.11468), the Departments did not explain *how* providers could

discover concerns or support a complaint about a QPA calculation without access to information about insurers' calculations.

### E.    The Decision Below

Plaintiffs Texas Medical Association, Tyler Regional Hospital, and Dr. Adam Corley sued the Departments under the APA, claiming that these provisions of the July Rule violated the NSA's unambiguous terms and were arbitrary and capricious because they artificially deflate QPAs. ROA.13203.

The district court agreed that the challenged QPA calculation rules "violate the plain text of the [NSA]." ROA.13198. First, the court held that including ghost rates in QPA calculations is unlawful. The July Rule, as interpreted by the Departments, "allows insurers to include contracted rates for items or services that are not provided, never have been provided, and never will be provided," which is inconsistent with the NSA's terms. ROA.13208. Second, the court concluded that the July Rule's treatment of provider specialties "deviate[d] from the plain text of the Act by allowing insurers to include out-of-specialty rates in calculating the QPA in some instances." ROA.13210. Third, the court determined that the exclusion of bonus payments from contracted rates "conflicts" with the NSA's mandate that insurers use the "maximum payment" a provider could receive for an item or

service under its contract with the insurer. ROA.13212. Finally, the court held that permitting group health plans to include contracted rates from other plan sponsors that share the same administrator unlawfully "allow[ed] these self-insured plan sponsors to do what the Act prohibits." ROA.13215.[3]

The district court rejected plaintiffs' challenge to the QPA disclosure rule. ROA.13217–20. The court reasoned that because the NSA gives the Departments discretion to initiate an investigation upon receiving a complaint, it did not matter that the limited disclosures required by the July Rule would hamper providers' ability to identify and support complaints about improperly calculated QPAs. ROA.13219. The court also stated that the Departments recognized the need for transparency and "required a host of disclosures, but they stopped short of granting Plaintiffs their wish list because it would not be administrable." ROA.13219 (citations omitted).

As to the proper remedy, the district court vacated the unlawful QPA calculation rules, rejecting the Departments' plea for remand without vacatur. ROA.13234–37. The court explained that "[t]here is … nothing the Departments can do on remand to rehabilitate or justify the challenged portions

---

[3] Because the court held that the challenged QPA calculation rules conflicted with the NSA's plain text, it did not reach plaintiffs' argument that the rules were also arbitrary and capricious. ROA.13216 n.5.

of the Rule" because they "conflict with the unambiguous terms of the Act." ROA.13236. It also noted that beyond a single "conclusory sentence," the Departments had "offer[ed] nothing to demonstrate" that vacatur would cause "undue disruption." ROA.13236. The court went on to explain that no disruption was necessary because the Departments could "exercise their enforcement discretion to allow insurers to continue using their existing QPAs [for calculating patient cost-sharing] until new QPAs are calculated consistent with the Act," while "offers of payment and IDR proceedings" could "continue in the absence of properly calculated QPAs." ROA.13236.[4]

The district court's prediction proved right. Shortly after the decision, the Departments exercised their enforcement discretion to allow insurers to continue using their existing QPAs for purposes of patient cost-sharing for items and services furnished before May 1, 2024, with the possibility of

---

[4] The district court also rejected the Departments' arguments that plaintiffs lacked standing. ROA.13210–11, 13215–16. The Departments do not renew those arguments on appeal. Certain of the Departments' amici do, including as to issues the Departments have abandoned on appeal. But their arguments are misplaced for the reasons explained by the district court. The challenged rules depress QPAs, which are used as a data point in determining providers' reimbursement in the IDR process, thereby inflicting both procedural and financial injury on plaintiffs. *See, e.g.*, *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 349 (5th Cir. 2024) ("[D]eprivation of a procedural right designed to protect a concrete interest is sufficient to establish standing.").

"additional time" if necessary. CMS, *FAQs about Consolidated Appropriations Act, 2021 Implementation Part 62* at 5 (Oct. 6, 2023) (October 2023 FAQs).[5] And after a pause in IDR proceedings prompted by the *TMA IV* decision issued a few weeks earlier, IDR proceedings resumed, CMS, *Payment Disputes Between Providers and Health Plans* (Dec. 21, 2023),[6] with insurers allowed to continue submitting their existing QPAs, which arbitrators may "consider … in light of" the district court's decision. October 2023 FAQs at 7.

## F.    This Appeal

The Departments appeal the district court's decision with respect to certain of the QPA calculation rules, and plaintiffs cross-appeal the district court's decision upholding the QPA disclosure rule. In their opening brief, the Departments abandon their appeal of the same-specialty rule and the third-party-administrator rule "except to the extent that the district court awarded the remedy of universal vacatur." Br. 18 n.8.

## STANDARD OF REVIEW

This Court reviews the district court's decision on summary judgment de novo, *Data Mktg. P'ship, LP v. Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir.

---

[5] https://www.cms.gov/files/document/faqs-part-62.pdf

[6] https://www.cms.gov/nosurprises/help-resolve-payment-disputes/payment-disputes-between-providers-and-health-plans

2022), and the district court's decision to vacate the challenged rules for abuse of discretion, *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022).

## SUMMARY OF ARGUMENT

The Court should affirm the district court's vacatur of the challenged QPA methodology rules, which conflict with the NSA's plain terms and unreasonably depress the QPA, and remand the arbitrary-and-capricious disclosure rule to the Departments for further rulemaking.

I.    The July Rule's inclusion of ghost rates and exclusion of contracted incentive payments contravene the plain text of the NSA.

A.    The NSA requires each QPA to be derived from "contracted rates" for only those items and services that are "*provided* by a provider" and "*provided* in the geographic region." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphases added). The July Rule, as interpreted by the Departments, violates this command by instructing insurers to include rates for items and services that are not provided by any provider covered by the contract at issue. Neither the "ordinary practice in the insurance market" nor the possibility that insurers would have to "look beyond their contracts," Br. 28–29, justifies reading "provided" out of the NSA entirely, as the Departments' rule does.

B.    The NSA also requires that each contracted rate that enters the QPA calculation be based on "the *total maximum* payment … under such plans or coverage." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). The July Rule, however, directs insurers to subtract incentive payments from contracted rates, creating an unlawful regulatory exception to the NSA's unqualified command. The Departments' chief justification on appeal—that such payments are "rarely tied to specific" items and services, Br. 39—is an impermissible post hoc rationalization that in any event cannot support the Departments' categorical exclusion of incentive payments.

II.    Even if these QPA methodology rules were not foreclosed by the NSA, they are unlawful because they are arbitrary and capricious.

As the Departments themselves recognized, Congress intended QPAs to reflect one measure of typical negotiated market rates. The July Rule, however, mandates a QPA calculation methodology that consistently depresses QPAs well below market rates. Including non-negotiated rates for services a provider does not provide and excluding negotiated incentive payments undermines the very purpose the Departments agree Congress intended the QPA calculation methodology to achieve. That is not rational analysis. *See Texas v. United States*, 497 F.3d 491, 506 (5th Cir. 2007).

The Departments' justifications for the challenged rules are inadequate. As to ghost rates, the Departments did not even acknowledge the NSA's requirement to include only contracted rates for items and services that are "provided," let alone explain how incorporating ghost rates into QPAs could possibly comport with that command. As to incentive payments, the Departments' only rationale for excluding them—that they are typically excluded when calculating patient cost-sharing—ignores both the statutory text and the fact that QPAs are relevant under the NSA not just to patient cost-sharing, but also to provider reimbursement. And as to both ghost rates and incentive payments, the Departments' goal of reducing burdens on insurers cannot justify ignoring the NSA's plain terms and deflating QPAs.

III.    The QPA disclosure rule is arbitrary and capricious because it does not reasonably implement the NSA and is not the product of reasoned decisionmaking. Meaningful disclosure of information about insurers' QPA calculations is critical to the NSA's complaint, negotiation, and arbitration processes. The Departments' decision to require insurers to make essentially no meaningful disclosures is substantively unreasonable because it all but nullifies the NSA's process for lodging complaints regarding QPA calculations; hampers the effectiveness of the NSA's negotiation and arbitration

processes; and conflicts with the Departments' own understanding of the NSA's purposes. And the rule is procedurally unreasonable because the Departments failed to consider the rule's effectiveness in achieving the NSA's (and the Departments' own) objectives, or any alternative approaches.

IV.    The district court properly vacated the Departments' unlawful rules, and the disclosure rule should be remanded for further rulemaking.

The text, structure, and history of the APA show that it authorizes vacatur as a remedy. The Departments' contrary argument is foreclosed by binding Circuit precedent. So too is their argument that the district court abused its discretion in declining to remand without vacatur. The unlawful QPA methodology rules cannot be rehabilitated on remand because they conflict with the NSA's plain text, which by itself forecloses remand without vacatur. And the Departments have not shown that vacatur caused, or needed to cause, any significant disruption in light of the Departments' ability to exercise enforcement discretion and to allow IDR to proceed as it is currently.

Nor is party-specific relief warranted. To the extent the Departments want party-specific vacatur, their request is nonsensical; vacatur operates on the rule, not the parties. To the extent the Departments instead want a

party-specific injunction, that extraordinary relief is not warranted and would be unwieldy, effectively creating two sets of QPAs nationwide.

Finally, the Court should remand the QPA disclosure rule for further rulemaking. Where, as here, an agency rule is unlawful because it does not go far enough, remand without vacatur is appropriate.

## **ARGUMENT**

## I.   **The Challenged QPA Methodology Rules Conflict With The Act.**

The Departments no longer defend two QPA methodology rules they defended in the district court. The Departments do not argue that insurers may calculate QPAs by specialty "*only*" in certain circumstances, 86 Fed. Reg. at 36,891 (ROA.787), when the Act mandates that the QPA is *always* the median of rates for services provided by "provider[s] in the same or similar specialty," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). And the Departments no longer assert that health plans can calculate QPAs using rates from the contracts of *other* sponsors, when the Act specifies that QPAs be "determined with respect to … plans *of such sponsor*," *id.* (emphasis added).

The QPA methodology rules the Departments continue to defend are equally incompatible with the Act's text. First, the Act mandates that only rates for "provided" items and services factor into QPAs. *Id.* But, as the

Departments do not dispute, they have determined that rates for items and services that are *not* provided by any provider covered by the contract must be included in QPA calculations. *See* August 2022 FAQs at 17 (ROA.11469). Second, Congress specified that QPAs must be the "total maximum payment" recognized by the insurer. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Yet the July Rule requires insurers to "[e]xclude" from rates used to calculate QPAs "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 45 C.F.R. § 149.140(b)(2)(iv). In both respects, the Departments' methodology conflicts with the Act's plain text.

It is no answer for the Departments to say that they do not know what it means for items and services to be "provided" under the NSA, or that they have not yet come up with a way to calculate the "total maximum payment" for an item or service when a contract includes incentive payments. The Departments must give effect to the words of Congress. They cannot choose to take a different path. *See Djie v. Garland*, 39 F.4th 280, 285 (5th Cir. 2022) ("When a regulation attempts to override statutory text, the regulation loses every time—regulations can't punch holes in the rules Congress has laid

down."). And even if Congress had not been clear, the Departments' rules would still fail, because they are arbitrary, capricious, and unreasonable.[7]

## A.    Including ghost rates violates the Act.

Under the NSA's plain text, a rate included in a QPA calculation must be a rate recognized in the contract for an item or service "that is *provided* by a provider in the same or similar specialty and *provided* in the geographic region." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphases added). Yet the Departments have "acknowledged that the July Rule allows insurers to include rates for services that 'providers do not provide' in calculating the QPA." ROA.13202 (quoting August 2022 FAQs at 17 (ROA.11469)). "This interpretation is unlawful." ROA.13208. The Departments "may not rewrite clear statutory terms." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

---

[7] The Departments have not asked the Court to defer to their interpretation under *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). They have thus forfeited any such deference. *See Texas v. Biden*, 20 F.4th 928, 960–61 (5th Cir. 2021) ("*MPP*"), *rev'd on other grounds*, 142 S. Ct. 2528 (2022); *see Data Mktg. P'Ship, LP v. Dep't of Lab.*, 45 F.4th 846, 856 n.2 (5th Cir. 2022). Regardless, to the extent *Chevron* applies, the Departments' rules fail at step one because "the intent of Congress is clear." *Chevron*, 467 U.S. at 842. And they fail at step two for the same reasons the rules are arbitrary and capricious. *See infra*, Part II; *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1028–29 (5th Cir. 2019) (describing how "analysis under the two standards proceeds similarly").

"To 'provide' ordinarily means 'to make available,' 'furnish,' or 'to supply something needed or desired.'" ROA.13207 (quoting *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 476 (5th Cir. 2020)); *see Green Valley*, 969 F.3d at 476 n.29 ("To 'provide' ordinarily means 'to make available,' to 'furnish,' to 'supply,' or to 'equip.'"). The July Rule and the August FAQs reflect no effort by the Departments to interpret or give effect to the word "provided." Instead, "[t]he Departments' interpretation" simply "allows insurers to include contracted rates for items or services that are not provided, never have been provided, and never will be provided." ROA.13208.

The Departments do not dispute that their reading of the Act requires insurers to include rates for items and services that are not "provided" in any sense of the word. That concession is fatal. "Whatever 'is provided' means … it cannot justify including rates for items or services that are not provided and never will be provided." ROA.13208. "To rule otherwise would read out of the statute the term 'provided' altogether." ROA.13208. That, courts cannot do. "[E]very word and every provision" in a statute "is to be given effect." *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012)); *see also Hibbs v. Winn*, 542 U.S. 88, 101 (2004). The NSA is clear. The Departments cannot

allow rates for items and services that are not "provided" by any provider covered by the contract to be included in QPA calculations.

The Departments try to justify their failure to give any effect to the term "provided" by looking to a different statutory term: "contracted rate." They say that by using that term, Congress focused on the "contracted rates" that appear in contracts, without regard to whether those rates were for items or services that are "provided." *See* Br. 30. But Congress did not say that *every* "contracted rat[e] recognized by the plan or issuer" should be included in the QPA. While the Act starts with "contracted rates," it goes on to exclude some of those rates. Rates in contracts with providers who are not in the "same or similar specialty" or not in the "geographic region," for example, must be excluded from the "contracted rates" used to calculate the QPA. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). And so must rates for items or services that are not "provided" at all. *Id.* In other words, for an item or service to be "provided by a provider in the same or similar specialty and provided in the geographic region," the item or service must, at a minimum, be "provided."

The Departments say that these clauses—limiting the rates to those for items and services "provided by a provider in the same or similar specialty and provided in the geographic region"—only "limit the rates

considered … to the rates of providers in the same or similar specialty and the geographic region." Br. 30. Again, the Departments selectively read "provided" out of the Act. Congress did not say that included rates must be those "*of* providers in the same or similar specialty and the geographic region." *Id.* (emphasis added). Nor did Congress permit inclusion of rates for all services "provided *for*" in the contract. Congress said "provided by" and "provided in."

The word "provided" also cannot be collapsed into the term "recognized." If rates recognized in a contract for services go into QPA calculations whether or not those services are provided by any provider covered by that contract, the NSA "would not need" the word "provided." *Hibbs*, 542 U.S. at 101. The term "recognized," "alone, would do all the necessary work." *Id.* The NSA does not say that the QPA is the "median of the contracted rates recognized … for the same or similar item or service that is *recognized in a contract with* a provider in the same or similar specialty" or "*recognized* in the geographic region." Congress chose a different term, with its own independent meaning. "[W]here different terms are used in a single piece of legislation, the court must presume that Congress intended the terms to have different meanings." *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1240 (D.C. Cir. 2007); *Transbrasil S.A. Linhas Aereas v. Dep't of Transp.*, 791 F.2d 202,

205 (D.C. Cir. 1986) (rejecting agency's view that Congress gave "two quite different words in the same section" "identical meanings").

It is true, as the Departments say, that the NSA limits the contracted rates included in QPA calculations to those recognized on January 31, 2019. Br. 29. But that does not mean that the NSA does not also include a "provided" limitation. Congress undisputedly mandated that the rates that factor into QPA calculations be rates recognized on January 31, 2019. That limitation identifies which contracts count. *See* 86 Fed. Reg. at 36,895 (ROA.791) (stating that QPAs are generally "based on January 31, 2019 contracted rates"). But identifying the relevant contracts is only the first step. Rates must be "recognized" on that date, but they also must be for items or services that are "provided" by providers covered by the contract.

Finally, the Departments say that "provided" cannot mean "provided" because the Act does not specify that rates included in QPA calculations must have been paid any minimum number of times or prescribe a window of time during which the item or service must have been provided. Br. 28–29. Certainly, there may be a range of reasonable ways to implement the "provided" requirement. Congress left it to the Departments to "establish through rulemaking" a "methodology" implementing the requirement. 42

35

U.S.C. § 300gg-111(a)(2)(B)(i). The Departments' task included establishing a method for assessing whether an item or service is "provided." In promulgating new rules, the Departments can consider setting a timeframe during which a provider must have provided the item or service. If the Departments proceed through notice-and-comment rulemaking (as they did not in issuing the July Rule), they will have the benefit of "data, views, or arguments" from providers and insurers to inform the methodology. 5 U.S.C. § 553(c). What the Departments cannot do is what they did here: fail to give any independent meaning or effect to the term "provided" at all. *See PDK Labs. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2014); *Util. Air*, 573 U.S. at 326; *Tex. Ass'n of Mfrs. v. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 387 (5th Cir. 2021).

Without support for their view in the text of the Act, the Departments turn to policy. In particular, the Departments point to the burden on insurers of determining whether an item or service was provided. *See* Br. 29–30 (expressing concern that "health plans must look beyond their contracts, potentially digging through troves of data to determine whether a provider had provided or would provide in the future a given item or service"). Concerns about burdens on insurers cannot justify rewriting the statutory text. "[S]uch considerations address themselves to Congress, not to the courts." *MCI*

*Telecomms. Corp. v. AT&T*, 512 U.S. 218, 234 (1994); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).

Even if this were a proper venue for evaluating the reasonableness of Congress's choices, it was reasonable for Congress to exclude rates that providers nominally agreed to in form contracts for items and services they do not provide. Under the NSA, the 2019 contracted rates that are included in QPA calculations will factor into what providers are paid every year, adjusting only for inflation. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (providing for QPAs to be calculated and then adjusted annually based on the consumer price index). Ensuring that ghost rates are identified and excluded is important to getting these permanent reference points right. Congress therefore had a good reason for requiring insurers to expend the effort and resources necessary to identify and exclude these rates.

Regardless, the burden on insurers of including only rates for provided items and services is likely to be low. As the amicus briefs in this case confirm, insurers are able to access large amounts of information about what items and services providers have provided with minimal effort. *See, e.g.*, Br. of Amicus Curiae Blue Cross Blue Shield Ass'n, at 9–10 & n.5 (Dkt. 60) (discussing insurer's access to a commercial dataset including claims data for

150 million individuals, and assessing which providers provided services in one-year and four-year periods). In issuing a new rule, the Departments can assess and balance the burdens and interests at play in establishing a methodology that gives effect to the Act's "provided" requirement.

## B. Excluding incentive payments violates the Act.

Under the NSA, the rate included in QPA calculations must be the "total maximum payment" recognized by the insurer. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Yet the July Rule requires insurers to "[e]xclude" from rates used to calculate QPAs "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments" under the relevant contract. 45 C.F.R. § 149.140(b)(2)(iv). That is unlawful.

"Total" means "[c]onstituting or comprising a whole; whole, entire." Total, *Oxford Eng. Dictionary Online* (Sept. 2023 ed.). And "maximum" means the "highest value or extreme limit," the "greatest value which a variable or function takes," or the "highest possible magnitude or quantity of something which is attained, attainable, or customary." Maximum, *Oxford Eng. Dictionary Online* (Sept. 2023 ed.). The "Act thus plainly requires insurers to calculate QPAs using the 'entire,' 'highest possible' payment that a provider could receive for an item or service under the contracted rate." ROA.13212;

*see Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."). The Departments' rule is facially inconsistent with that command.

In excluding incentive payments, the Departments did not even address the statutory text, let alone explain how their decision was consistent with Congress's command to use the "total maximum payment." Instead, they reasoned that excluding incentive payments was "consistent with how cost sharing is typically calculated for in-network items and services, where the cost-sharing amount is customarily determined at or near the time an item or service is furnished, and is not subject to adjustment based on changes in the amount ultimately paid to the provider or facility as a result of any incentives." 86 Fed. Reg. at 36,894 (ROA.790). The Departments claim that they "thus incorporated established industry practice that has long been used in calculating patient cost-sharing amounts." Br. 40.

But Congress did not instruct the Departments to look to "how cost sharing is typically calculated" in creating a QPA methodology. Instead, Congress specified in plain language what rate is used to calculate QPAs. That QPAs play a role in determining cost-sharing in some circumstances does not undo the clear language Congress chose. The only case the Departments

cite—*City of Dallas v. FCC*, 118 F.3d 393 (5th Cir. 1997)—does not say otherwise. It says that "when a statute uses a technical term, we must assume that Congress intended it to have the meaning ascribed to it by the industry under regulation." *Id.* at 395. Here, however, Congress did not use a technical industry term. It created a new statutory term—"qualifying payment amount"—and required that it be calculated based on the "total maximum payment" for the item or service at issue. The Court must therefore look to the "normal, ordinary, and common meaning" of those terms. *Id.* at 397.

The Departments now argue that incentive payments should not be included because they "are rarely tied to specific contracted rates for particular items and services" and "are more often paid as an annual lump-sum." Br. 39. But the Departments did not make that argument in the rule and thus may not rely on it here. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Dish Network Corp. v. NLRB*, 953 F.3d 370, 379–80 (5th Cir. 2020).

In any event, "rarely" is not "never," and the Departments do not explain why incentive payments that *are* tied to specific items and services do not factor into QPAs. Providers and insurers can and do structure contracts in ways that tie a bonus to a particular item or service. For example, an insurer may incentivize providers to administer a particular vaccine to its

insureds by agreeing to pay a bonus of X amount per vaccine administered if the provider administers at least Y vaccines to its insureds. The X amount is tied to a particular item—an individual vaccine—even though it is only paid once a minimum number of vaccines are administered. Or, a provider may receive a productivity bonus; if the provider performs a particular service X times, she will get a bonus of Y amount. Dividing Y by X gives a per-service bonus amount that can be added to the base rate to derive the total maximum payment the contract recognizes for the service. Indeed, insurers have themselves explained that some incentive payments "cannot be separately parsed" from other amounts and therefore urged the Departments not to require their exclusion from QPAs. ROA.5917. The Departments have no argument for why such payments do not fit squarely within the "total maximum payment" on which the NSA says QPA calculations must be based.[8]

In any event, payments need not be directly linked to a particular item or service to be included in the "total maximum payment" for an item or service. Congress ordered that the Departments "shall take into account

---

[8] The Departments note that their rule "also excluded penalties that could lower the provider's compensation." Br. 38. The statute required them to do so. The QPA must be calculated using the "total maximum payment," and the "total maximum payment" is the rate paid when all incentives are paid and no penalty is assessed. *See* ROA.13213–14.

payments that … are *not* on a fee-for-service basis" in establishing the QPA methodology. 42 U.S.C. § 300gg-111(a)(2)(B) (emphasis added). The Departments failed to do so for non-fee-for-service incentive payments.

The Departments took *some* non-fee-for-service payments into account in the July Rule. They recognized that there are "many types of alternative reimbursement models … that are not standard fee-for-service arrangements" and decided that rates under contracts in which no part of a payment is fee-for-service should be included in QPA calculations. 86 Fed. Reg. at 36,893 (ROA.789). The Departments therefore came up with a method to "convert … non-fee-for-service contracts into fee-for-service arrangements for purposes of calculating the median contracted rate." *Id.* (ROA.789).

But not all contracts are purely fee-for-service or not fee-for-service. Some take a hybrid approach in which a portion of the rate paid to the provider is fee-for-service and the remainder of the rate consists of incentive payments. The Departments chose not to "take into account payments that … are not on a fee-for-service basis" in hybrid contracts, instead ordering insurers to exclude all such payments. This was inconsistent with the NSA's text. The Departments were required to account for incentive payments in QPA calculations both because Congress told them to treat the total

42

maximum payment under each contract as the recognized rate and because Congress was clear that the Departments "shall take into account" non-fee-for-service payments in establishing the QPA methodology.

The Departments again paint their failure to address an important aspect of the problem before them as a failure of plaintiffs. Br. 39 ("Neither plaintiffs nor the district court have shown how it would be possible to calculate the impact of bonus and incentive payments on the rate for a particular item or service when the provider and plan have agreed to rates established on a fee-for service model."). But it was the Departments' job, not plaintiffs', to implement the NSA consistent with Congress's directions. 42 U.S.C. § 300gg-111(a)(2)(B)(i). The Departments did not even attempt to develop a methodology that ensured the rates included in QPAs reflect the "total maximum payment" under a contract. The NSA requires them to do so.

## II. The Challenged QPA Methodology Rules Are Arbitrary and Capricious.

Even if the challenged rules were not expressly foreclosed by the NSA, they are unlawful because they do not reasonably construe the NSA, do not

"reasonably effectuate Congress's intent," *Texas*, 497 F.3d at 506, and are arbitrary and capricious, *see Sw. Elec. Power Co.*, 920 F.3d at 1028–29.[9]

## A.    Including ghost rates drives down QPAs and is unreasonable.

First, the Departments' inclusion of ghost rates drives down QPAs. The Departments have determined that Congress intended QPAs to "reflec[t] market rates under typical contract negotiations." 86 Fed. Reg. at 36,889 (ROA.785). Yet they adopted an interpretation of the July Rule that they recognize ensures that QPAs do *not* reflect negotiated market rates. August 2022 FAQs at 16 (ROA.11468) (noting that providers who do not provide a given item or service have little incentive to negotiate the reimbursement rate for that item or service). It was unreasonable for the Departments to create a methodology that undermines the very purpose they believe Congress intended the methodology to achieve. *See Texas*, 497 F.3d at 506.

The Departments now claim that including ghost rates will not drive down QPAs because the NSA's separate requirement to include only rates of

---

[9] Although the district court did not reach plaintiffs' arbitrary-and-capricious challenge to the methodology rules, ROA.13216 n.5, this Court can "affirm on any basis supported by the record," *In re Deepwater Horizon*, 48 F.4th 378, 385 (5th Cir. 2022); *see also supra* at 31 n.7 (noting overlap between arbitrary-and-capricious arguments and statutory issues).

providers in the "same or similar specialty" excludes non-negotiated rates. Br. 30–31. The Departments cannot rely on this reasoning—which they raised for the first time in this litigation—to justify their position. *See Chenery*, 318 U.S. at 87; *Dish Network*, 953 F.3d at 379–80. The Departments are also wrong. Their "same or similar specialty" rules themselves violated the NSA and drove down QPAs. ROA.13209–11. The district court vacated those rules, but the Departments have not yet replaced them. It is impossible to say how broadly or narrowly the Departments will define "same or similar specialty," and thus unclear how often providers in a particular "specialty" agreed to rates for services they do not provide.

Regardless, the "same or similar specialty" requirement does not address the separate problem Congress addressed by requiring that services be "provided." Not all specialists within a particular specialty provide identical services. For example, some heart surgeons provide more commonly needed procedures, while others are able to perform rarer and more complex procedures. Surgeons who do not perform a more complex procedure may agree to a lower rate for the procedure, understanding that they will not provide it. Ten heart surgeons who do not perform a rare and complex procedure may agree to a $1,000 rate for the procedure, while the three providers who do

perform that procedure negotiate a $1,500 rate. Because a median is the middle of a range, not an average, the QPA under the Departments' approach will be $1,000—the ghost rate for a service not provided—rather than the $1,500 negotiated rate for provided services. Including ghost rates thus leads to artificially depressed QPAs in ways that even a rule faithfully implementing the "same or similar specialty" requirement would not address. The Departments' failure to address how ghost rates depress QPAs below negotiated market rates was itself arbitrary and capricious.

Second, the Departments made no effort to defend their decision to include ghost rates in QPA calculations. Agencies always have an obligation to provide an adequate explanation for their actions. Yet the Departments failed to even acknowledge the statutory text stating that QPAs are the median of rates for an item or service that is "provided," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), much less explain how incorporating ghost rates into QPAs could "compor[t] with" that statutory command, *Texas v. Biden*, 20 F.4th 928, 992 (5th Cir. 2021) ("*MPP*") (finding agency action arbitrary and capricious for failure to explain action's consistency with statute), *rev'd on other grounds*, 142 S. Ct. 2528 (2022); *Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 209–10 (D.C. Cir. 1988) (agencies must "come to grips with the obvious

ramifications of [their] approach and address them in a reasoned fashion"). The Departments' decision to exclude only $0 rates merely highlights the unreasonableness of including all the other non-negotiated ghost rates.

The Departments now assert that they "determined that [the QPA] analysis should be based on the rates appearing on the face of a health plan's contracts, such that plans would not need to look beyond those contracts," and that this is consistent with the NSA's objective of reflecting negotiated rates because "[a]t the time the contracts are negotiated, neither a provider nor a plan can know for certain how many times a particular service will be provided, or a particular contracted rate paid." Br. 27–28. The Departments determined no such thing. Neither the July Rule nor the August FAQs include this reasoning, so the Departments cannot rely on it here. *See Chenery*, 318 U.S. at 87; *Dish Network*, 953 F.3d at 379–80.

Regardless, the Departments are wrong again. As the Departments recognized in the August FAQs, insurers often present providers with form contracts that include "rates established by plans or issuers for service codes that … are not utilized" by the provider and that the provider therefore "ha[s] little incentive to negotiate fair reimbursement rates for." August 2022 FAQs at 16 (ROA.11468); *see also* ROA.185 (noting that insurers offer most

providers the same fee schedule for all services, and then providers negotiate increased reimbursement rates for services they provide); ROA.197 (same); ROA.204–05 (same). In other words, it is not unusual for providers to know, "[a]t the time the contracts are negotiated," that they do not and will not provide a service included in the contract. They may not even be qualified to provide it. Including the resulting non-negotiated rates in the QPA calculation is precisely the problem Congress's "provided" requirement prevents.

## B.  Excluding incentive payments drives down QPAs and is unreasonable.

Excluding incentive payments also keeps QPAs from "reflect[ing] market rates under typical contract negotiations." 86 Fed. Reg. at 36,889 (ROA.785). In a "typical contract negotiation," a provider would demand higher fixed per-service rates if the provider understood that it would not be reimbursed based on "risk sharing, bonus, or penalty, and other incentive-based and retrospective payments or payment adjustments." *Id.* at 36,894 (ROA.790). The Departments ignored this market reality, instead pretending that incentive payments did not matter to the providers who negotiated for them, and that those providers would have agreed to forgo those payments without demanding higher fixed per-service rates in return. This is not a rational analysis. *See Texas*, 497 F.3d at 506.

Incentive payments are an important component of negotiated market compensation. They "can total 10 to 15 percent of total payments" under some contracts, and "the underlying fee schedule amount is adjusted downward to reflect the potential for an incentive." ROA.2805. The Departments departed from the statute and acted unreasonably in excluding these payments despite recognizing that the QPA should "accoun[t] for a range of different contractual arrangements," including those in which fees are not directly tied to items or services. 86 Fed. Reg. at 36,893 (ROA.789).

The only rationale the Departments gave in the July Rule for excluding incentive payments was also unreasonable. The Departments said that the reason for the rule was that patient cost-sharing is typically determined at the time an item or service is provided, so the patient's cost-sharing is generally not affected by later adjustments. *Id.* at 36,894 (ROA.790). And, under the NSA, patients' cost-sharing requirements are sometimes determined as a percentage of the QPA. *Id.* (ROA.790). This rationale is incomplete at best, and the Departments fail to explain how it justifies their choice. The QPA is not *only* used to determine patients' cost-sharing obligations in certain circumstances. It also plays a role in determining provider compensation, and when it excludes elements of compensation, it depresses QPAs below fair

market rates. At a minimum, the Departments entirely failed to consider this important aspect of the problem. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

It is not enough, as the Departments now argue, that the rule requires insurers to disclose to providers, upon request, whether they excluded incentive payments in calculating a QPA. *See* Br. 41. Disclosures relating to the QPA calculation do not change what goes into the QPA calculation itself. And the disclosures the Departments chose to require do not tell providers how many rates in a QPA calculation excluded incentive payments, or what the total maximum payment was under the contract when incentive payments are included. Providers cannot determine total maximum rates using this information and cannot correct deflated QPAs. Likewise, it is not enough that the statute directs arbitrators to consider the provider's "quality and outcomes measurements." *See id.* (citing 42 U.S.C. § 300gg-111(c)(5)(C)(ii)). Not all incentive payments are quality- or outcome-based. In all events, that information is no substitute for a properly calculated QPA.

To the extent the Departments are raising a policy concern—that calculating QPAs consistent with the NSA's text will result in higher patient cost-sharing—that is a concern better directed to Congress. *See MCI*

*Telecomms. Corp.*, 512 U.S. at 234. Congress engaged in its own careful balancing of the interests at stake and provided a detailed definition of the QPA.

One of the interests Congress considered is providers' need to be adequately compensated for the essential services they provide. As the Departments once recognized, if out-of-network providers are not adequately compensated for their services, that "undercompensation could threaten the viability of these providers," which "could lead to participants, beneficiaries and enrollees not receiving needed medical care, undermining the goals of the No Surprises Act." 86 Fed. Reg. at 56,044 (ROA.669). The Departments' failure to follow Congress's commands has led to the predicted result: providers are routinely undercompensated, which "threaten[s] serious harm to patients and to the provision of healthcare in this country," ROA.288, and has exacerbated the "crisis in the emergency medical delivery system and the availability of emergency medical physicians," ROA.353. The Departments cannot, and should not, undo Congress's balancing.

## III. The Departments' QPA Disclosure Rule Is Neither Reasonable Nor Reasonably Explained.

The Departments' regulations relating to the information about the QPA that insurers must disclose are also unreasonable. The NSA mandates that the Departments issue rules establishing the information insurers

"shall share with the nonparticipating provider or nonparticipating facility" when determining the QPA. 42 U.S.C. § 300gg-111(a)(2)(B)(ii). These disclosures serve several crucial purposes under the statute. But the barebones disclosures the Departments decided to require are insufficient to serve any of those purposes. And the Departments failed to even consider whether they were sufficient, let alone to reasonably explain their decision.

## A.     Meaningful disclosures are necessary.

Meaningful disclosures are crucial to two processes required by the NSA. First, information about how the QPA was calculated plays an important role in every stage of the dispute resolution process between providers and insurers. As the Departments recognized, providers are ill equipped to assess "whether to initiate the [arbitration] process" in the first place absent "transparency regarding how the QPA was determined." 86 Fed. Reg. at 36,898 (ROA.794). Informational symmetry at this initial stage will lead the parties to settle more disputes during open negotiation, furthering the NSA's goal of "increas[ing] efficiencies in how disputes are handled and ultimately lead[ing] to lower administrative costs associated with health care." 87 Fed. Reg. at 52,634. Even if a provider ultimately decides to initiate arbitration, it must be able to intelligently decide "what offer to submit"; there

52

too, the Departments acknowledged that "transparency" about how the QPA was calculated is necessary. 86 Fed. Reg. at 36,898 (ROA.794).

Providers also need meaningful insight into the QPA to effectively advocate before the arbitrator, especially when (as is common) the insurer offers the QPA. *See* 87 Fed. Reg. at 52,625 n.29. After all, Congress created an adversarial arbitration process, *see* 42 U.S.C. § 300gg-111(c)(5), and required the arbitrator to consider the QPA "as defined in" the Act, *id.* § 300gg-111(c)(5)(C)(i)(I). Without meaningful disclosures, providers cannot explain—and arbitrators cannot evaluate—even the most basic features of the submitted QPA: How many contracted rates were used by the insurer to calculate the QPA? How often were those rates actually paid? What types of providers agreed to those rates? *See* 86 Fed. Reg. at 36,898 (ROA.794). From beginning to end, meaningful disclosures about the QPA calculation are essential to the dispute resolution scheme Congress established.

Second, disclosure of information about the QPA calculation is the foundation of the NSA's complaint system. Congress directed the Departments to set up a "process to receive complaints" that insurers "violat[ed]" the requirement to calculate QPAs in accordance with the NSA's terms. 42 U.S.C. § 300gg-111(a)(2)(B)(iv); *see also id.* § 300gg-111(a)(2)(A)(i)(II). The

Departments may audit an insurer based on such a complaint. *Id.* § 300gg-111(a)(2)(A)(ii)(II). But to be able to submit a complaint, providers must have enough information to intelligently assess whether an insurer's QPA "satisfies the definition" of QPA in the NSA. *Id.* § 300gg-111(a)(2)(A)(i)(II).

### B. The Departments' failure to require meaningful disclosures is unreasonable.

The Departments acted unreasonably in requiring that insurers make essentially no meaningful disclosures regarding their QPA calculations. The disclosure rule is arbitrary and capricious for at least five reasons.

First, the disclosure rule effectively dooms the NSA's complaint process. Congress envisioned that providers would be able to use the complaint process to notify the Departments that an insurer's QPA may not "satisf[y] the definition" of QPA in the NSA. *Id.* Under the Departments' disclosure rule, however, those circumstances are nearly a null set. A provider cannot craft a cogent complaint armed only with the insurer's promise that the QPA was correctly computed and a perfunctory checklist that offers no insight into the underlying calculation. This Court has held that agency rules gutting a statutory process are unreasonable. *See Texas*, 497 F.3d at 506–09 (agency regulation making tribal-state compact unnecessary unless State waived sovereign immunity was "an unreasonable interpretation of Congress's

54

intent"). As in *Texas*, the Departments' limp disclosure rule "clearly violate[s]" Congress's intent to have a functioning QPA complaint system.

The district court sidestepped the rule's effect on the complaint process by noting that the Departments are "not required" to begin an audit upon receiving a complaint. ROA.13219. That is true, *see* 42 U.S.C. § 300gg-111(a)(2)(A)(ii)(II), but it does not follow that Congress "would have sanctioned" a scheme in which complaints are nigh impossible to submit in the first instance. *Texas*, 497 F.3d at 506. Whether the Departments choose to act on them or not, the NSA contemplates that the Departments will "receive complaints of violations" by insurers in their QPA calculations. 42 U.S.C. § 300gg-111(a)(2)(B)(iv). The Departments' disclosure rule all but destroys that expectancy, making the statutory complaint process illusory.

Second, the disclosure rule conflicts with the purposes of the NSA's dispute resolution process. Agency rules must, at minimum, further "the purposes" of the underlying statute or the "appropriate operation" of the statutory scheme. *Judulang v. Holder*, 565 U.S. 42, 55 (2011). The Departments' disclosure rule frustrates both. The NSA's text and structure demonstrate Congress's goal to reduce transaction costs through informed negotiation and to increase accuracy of payment determinations through adversarial

arbitration informed by properly calculated QPAs—goals that will all be hampered by the Departments' decision to keep the QPA calculation a black box. A rule that so impedes a statute's goals is unreasonable. *See id.* at 58; *Cigar Ass'n of Am. v. FDA*, 964 F.3d 56, 61–62 (D.C. Cir. 2020) (invalidating action that likely would not have the impact Congress mandated).

Third, even setting the NSA's aims aside, it was patently unreasonable for the Departments to issue regulations that do not do what even *the Departments* believe they must do: give providers the "transparency" necessary to assess "whether to initiate the [arbitration] process" or "what offer to submit." 86 Fed. Reg. at 36,898 (ROA.794). The Departments cannot rationally say that its rule must achieve a particular goal "while, in the same breath," taking action that does nothing to achieve it. *Sw. Elec. Power Co.*, 920 F.3d at 1016. The APA prohibits such "paradoxical" agency action. *Id.*; *see GameFly, Inc. v. Postal Regul. Comm'n*, 704 F.3d 145, 149 (D.C. Cir. 2013).

Fourth, in all events, the Departments' paltry explanation of the disclosure rule alone makes the rule arbitrary and capricious. For one thing, the Departments "entirely failed to consider" whether their rule would provide the necessary transparency. *State Farm*, 463 U.S. at 43. "[I]t is difficult to imagine a more important 'aspect of the problem' than whether the

[regulation] will actually" accomplish its intended goal. *Cigar Ass'n*, 964 F.3d at 62. At most, the preamble includes a bare assertion that the disclosure rule would provide the necessary transparency for IDR. *See* 86 Fed. Reg. at 36,898 (ROA.794). That is not enough: "an agency's ipse dixit cannot substitute for reasoned decisionmaking." *Music Choice v. Copyright Royalty Bd.*, 970 F.3d 418, 429 (D.C. Cir. 2020); *see MPP*, 20 F.4th at 993; *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1137 (5th Cir. 2021) ("*Wages I*"). And the Departments entirely ignored the statutory complaint process, never asking how requiring so few disclosures would affect access to that process or its workability. *See Nat. Res. Def. Council, Inc.*, 859 F.2d at 209–10.

Fifth, the APA also required the Departments to consider alternatives to their minimalist approach. *See, e.g.*, *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 & n.36 (D.C. Cir. 1986) ("The failure of an agency to consider obvious alternatives has led uniformly to reversal."). Instead of adopting a rule that achieved minimal transparency, the Departments could have promulgated one that achieved maximum transparency—by requiring insurers to disclose everything (or virtually everything) underlying their calculations. Or the Departments could have found a middle ground. *See Off. of Comm'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1439–40 (D.C.

Cir. 1983) (chiding agency for failing to consider intermediate alternative). Yet they said nothing about any alternative path. That silence is fatal. Where multiple options are plainly evident and encompassed by the statute, failure to consider alternatives is arbitrary and capricious. *See, e.g.*, *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 264 (5th Cir. 1989).

It does not matter that the NSA "gives the Departments wide latitude in issuing a disclosure rule." ROA.13217. The Supreme Court's "most significant case ever to elucidate the arbitrary-and-capricious standard," *Wages & White Lion Invs., LLC v. FDA*, 90 F.4th 357, 371–72 (5th Cir. 2024) (en banc), concluded that agency action taken under a similarly capacious delegation was arbitrary and capricious, *see State Farm*, 463 U.S. at 33–34. Whether the delegation is broad or narrow, courts "must ensure that 'the agency has acted within a zone of reasonableness.'" *Wages I*, 16 F.4th at 1136. While the NSA gives the Departments discretion to craft an appropriate disclosure rule, that discretion is not unbounded. Under the APA, the Departments' "exercise of discretion within th[e] statutory framework must be reasonable and reasonably explained." *Biden v. Texas*, 597 U.S. 785, 806–07 (2022). The Departments' disclosure rule is neither, and is thus unlawful.

**IV.  The Court Should Affirm The District Court's Vacatur Of The Unlawful QPA Methodology Rules And Remand The QPA Disclosure Rule For Further Rulemaking.**

As to the remedy, the Departments argue that the district court's vacatur was erroneous for three reasons. First, the APA does not authorize vacatur at all. Br. 47. Second, even if it does, the district court should have remanded without vacatur here. Br. 48–49. Third, any remedy should have been limited to plaintiffs. Br. 49–50. Each argument fails.

**A.  The APA authorizes vacatur.**

As the Departments recognize, binding precedent forecloses their first argument. Br. 47 (acknowledging that "this Court's precedents identify vacatur as an available remedy for a successful APA challenge to a regulation"). Section 706 of the APA "empowers and commands courts to 'set aside' unlawful agency actions," and thus authorizes a "district court's vacatur [to] rende[r] the [challenged agency action] void." *MPP*, 20 F.4th at 957; *see also Data Mktg. P'ship*, 45 F.4th at 856 n.2 (holding that this portion of *MPP* "remains binding"); *id.* at 859 ("Under prevailing precedent, § 706 … 'empowers courts to "set aside"—*i.e.*, formally nullify and revoke—an unlawful agency action.'" (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950 (2018)).

That binding precedent flows from the APA's text, structure, and history. When the APA was enacted in 1946, as today, "set aside" meant "to cancel, annul, or revoke." *Black's Law Dictionary* 1612 (3d ed. 1933). A neighboring provision of the APA authorizes an interim remedy that—like the final remedy of vacatur—acts on the rule and prevents its effectiveness. *See* 5 U.S.C. § 705 (authorizing a court to "postpone the effective date of an agency action … pending conclusion of the review proceedings"); *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 254 (5th Cir.) ("a stay" under § 705 "is the temporary form of vacatur"), *cert. granted*, 144 S. Ct. 537 (2023). Vacatur, moreover, was a common and well-understood remedy in the "appellate review model that supplied the rubric for judicial review of administrative action in the pre-APA period and that was then incorporated into the APA." Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1133 (2020); *see also* Att'y Gen.'s Comm. on Admin. Procedure, *Administrative Procedure in Government Agencies*, S. Doc. No. 77-8, at 117 (1st Sess. 1941) (explaining that a "judgment adverse to a regulation results in setting it aside").

In short, "[t]houghtful arguments and scholarship exist on both sides of the debate." *United States v. Texas*, 143 S. Ct. 1964, 1985 (2023) (Gorsuch, J., concurring in the judgment). But this Court has already taken a side—

and it is not the Departments'. At this late date, the sea change in administrative law the Departments are seeking must come, if at all, from the Supreme Court or from this Court sitting en banc.

### B. The district court did not abuse its discretion in declining to remand without vacatur.

The Departments' plea for remand without vacatur likewise runs into a wall of contrary precedent. "[B]y default, remand *with* vacatur is the appropriate remedy." *MPP*, 20 F.4th at 1000; *accord Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir.) (en banc) ("[V]acatur of an agency action is the default rule in this Circuit."), *cert. granted*, 144 S. Ct. 374 (2023). "Departing from that default rule is justifiable only in 'rare cases' satisfying two conditions." *Chamber of Com. of the U.S. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023). "*First*, there must be a 'serious possibility' that the agency will be able to correct the rule's defects on remand." *Id.* "*Second*, vacating the challenged action would produce 'disruptive consequences.'" *Id.* The district court held that neither condition was met here. ROA.13236–37. That ruling was correct, and certainly was not an abuse of discretion. *See Texas*, 50 F.4th at 529.

As to the first prong, the Departments do not even try to explain how they could correct the rules' flaws on remand. *See* ROA.13236 ("[T]he Departments never contest the 'seriousness of the deficiencies' prong."). Nor

61

could they. The rules "conflict with the unambiguous terms of the Act," so there is "nothing the Departments can do on remand to rehabilitate or justify the challenged portions of the Rule as written." ROA.13236. Remand without vacatur is "therefore inappropriate." *Chamber of Com.*, 88 F.4th at 1118 ("Remand without vacatur is … inappropriate for agency action suffering from one or more serious procedural or substantive deficiencies."); *Texas*, 50 F.4th at 529 ("There is no possibility that DHS could obviate these conflicts on remand."). Tellingly, the Departments cite no case of this Court ordering remand without vacatur when the agency's action conflicted with the governing statute. *Cf. Cent. & Sw. Servs., Inc v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (remanding so agency could "justify" its decision). Given the "fundamental substantive defects" in the vacated rules, *Chamber of Com.*, 88 F.4th at 1118 n.2 (citation omitted), and the Departments' forfeiture of any argument on the first prong, this Court's inquiry need proceed no further.[10]

---

[10] If this Court affirms on the alternative ground that the rules are arbitrary and capricious, the result is the same. The Departments' complete failure to grapple with how their rules artificially depress QPAs, contrary to the Departments' own insistence that QPAs should approximate fair market rates, raises "serious doubt over the substantive correctness" of the rules and the Departments' ability to rehabilitate them on remand. *Chamber of Com.*, 88 F.4th at 1118 n.2; *see also All. for Hippocratic Med.*, 78 F.4th at 255 (remand without vacatur inappropriate where "[t]he

But if the Court reaches them, the Departments arguments on the second prong fare no better. Apart from "conclusory" assertions, "the Departments offer[ed] nothing [below] to demonstrate undue disruption." ROA.13236. As the district court explained, "for patient cost-sharing, the Departments can exercise their enforcement discretion to allow insurers to continue using their existing QPAs until new QPAs are calculated consistent with the Act." ROA.13236. "As for offers of payment and IDR proceedings, the Departments fail[ed] to explain why those cannot continue in the absence of properly calculated QPAs—or why a temporary pause in the proceedings would be more disruptive than continuing with unlawfully calculated QPAs." ROA.13236. The Departments do not even address the district court's reasoning, let alone identify any flaw in it reflecting an abuse of discretion.

In fact, the Departments have proceeded precisely as the district court suggested. For patient cost-sharing, the Departments have allowed insurers to temporarily continue using their existing QPAs. October 2023 FAQs at 6. Likewise, for IDR proceedings, the Departments have allowed insurers to

---

record does not tend to show that [the agency] would have arrived at the same decision if it had considered" all important factors).

continue submitting their existing QPAs, which "IDR entities can consider … in light of the *TMA III* decision." *Id.* at 7.

Arbitrators are thus free to ask insurers whether the submitted QPA was affected by the vacated rules and, if so, to discount the weight they give to it accordingly. *See id.*; 42 U.S.C. § 300gg-111(c)(5)(B)(i). After all, the statute commands arbitrators to consider the QPA "as defined in" the statute, 42 U.S.C. § 300gg-111(c)(5)(C)(i), and a QPA affected by the Departments' unlawful rules is not the QPA "as defined in" the statute. Arbitrators may therefore disregard it and decide the dispute based on the other information before them. *See* CMS, *Federal Independent Dispute Resolution (IDR) Process Guidance for Certified IDR Entities* at 19 (Aug. 2022) (explaining that if a party fails to submit required information, the arbitrator "should resolve the dispute based on the information that *has* been submitted");[11] August 2022 FAQs at 24 (ROA.11476) ("Failure by either party to supply information that is required to be submitted to the certified IDR entity (for example, failure to provide the QPA) may lead to a finding by the certified IDR entity that does not take into consideration the absent information … .").

---

[11] https://www.cms.gov/files/document/TA-certified-independent-dispute-resolution-entities-August-2022.pdf

The Departments assert that vacatur has "introduce[d] significant disruption and uncertainty," Br. 48–49, but they offer no specifics. They claim that the district court's vacatur "led to a significant pause" in IDR proceedings. Br. 48. In fact, however, the "pause" began the day after the district court's earlier decision (on August 3) in *TMA IV*, which vacated the Departments' administrative fee and "batching" rules. *See* 2023 WL 4977746, at *15; CMS, *Payment Disputes Between Providers and Health Plans*, *supra*. The Departments do not explain whether or for how long the *TMA III* decision issued three weeks later (on August 24) prolonged the "pause."

Nor do they explain why any suspension of IDR proceedings was needed in the first place. Nothing stopped the Departments from issuing guidance the very next day instructing arbitrators to continue deciding cases based on the information before them, as the district court suggested they could and as they eventually did. *See* October 2023 FAQs at 7. In all events, IDR proceedings have resumed, so any temporary disruption owing to the district court's vacatur is not a basis for reinstating the vacated rules *now*. *See Standing Rock Sioux Tribe v. Army Corps of Eng'rs*, 985 F.3d 1032, 1053 (D.C. Cir. 2021) (assessing disruption in light of post-vacatur developments).

65

The Departments also fret about the cost of "[r]equiring health plans … to engage in multiple rounds of [QPA] calculations." Br. 49. But remanding without vacatur would not change the fact that insurers will eventually have to recalculate QPAs after the Departments issue new rules that comply with the statute. The Departments have only themselves to blame for that. And insurers will not have to engage in an additional round of recalculation unless the Departments cease exercising enforcement discretion before compliant QPAs can be calculated. The Departments cite no authority for the proposition that an unnecessary disruption of their own creation is grounds for avoiding vacatur. *See MPP*, 20 F.4th at 1001, 1003 (rejecting "self-inflicted" "harms" as justifying a denial of injunctive relief or vacatur).

### C. The district court did not abuse its discretion in ordering universal vacatur.

The district court also did not abuse its discretion in declining to limit relief to the parties. *See Cargill*, 57 F.3d at 472 ("[T]he district court is well-placed to answer the [remedial-scope] question."). As the district court explained, "the ordinary result of setting aside unlawful rules under the APA is that the rules are vacated—not that their application to the individual petitioners is proscribed." ROA.13235 (cleaned up).

The Departments do not explain what form of party-specific "[e]quitable relief" they want. Br. 50. To the extent they want vacatur "only with respect to the plaintiffs," *id.*, their request is nonsensical. This Court has already held that, consistent with the text of § 706(2), vacatur operates on the rule, not the parties. *See MPP*, 20 F.4th at 957 ("[T]he district court's vacatur rendered the June 1 Termination Decision *void*." (emphasis added));[12] *see also Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021) (contrasting an injunction, which "operates on the enjoined officials," with vacatur, which "unwinds the challenged agency action").

Perhaps, then, the Departments want this Court to reverse the district court's vacatur and instead issue a party-specific *injunction*. But the Supreme Court has been clear that the "extraordinary relief of an injunction" is not warranted when "a less drastic remedy"—including "partial or complete vacatur"—is available. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010); *see All. for Hippocratic Med.*, 78 F.4th at 254. Moreover,

---

[12] By "void," the *MPP* Court necessarily meant "void in all applications," not "void as applied to the plaintiffs." The Court held that an agency memo rescinding an already vacated agency action had "*zero* legal effect" because the vacated action was already void. 20 F.4th at 957. If the vacated action had been void only as applied to the plaintiffs, the rescission would have had legal effect by rescinding the action's other applications, and the Court's mootness conclusion would not have followed.

it is unclear what a party-specific injunction would even look like here. Plaintiffs do not seek to prevent the Departments from enforcing their unlawful QPA methodology rules against *plaintiffs*. Rather, plaintiffs want insurers—third parties not before the Court—to recalculate their QPAs in compliance with the statute so that the QPAs submitted in the IDR process are properly calculated. A mandatory injunction requiring the Departments to compel insurers to recalculate QPAs would be a drastic remedy indeed. *See All. For Hippocratic Med.*, 78 F.4th at 254 ("vacatur does not order the defendant to do anything" and "so does not carry the same threat of contempt"); *cf. Tate v. Am. Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir. 1981) ("Only in rare instances is the issuance of a mandatory preliminary injunction proper.").

Party-specific relief would also be confusing and unwieldy. *See Feds for Med. Freedom v. Biden*, 63 F.4th 366, 388 (5th Cir.) (en banc) (affirming universal injunction where limited relief would "prove unwieldy and would only cause more confusion"), *vacated on other grounds*, 144 S. Ct. 480 (2023). If the Departments had their way, they would have to issue two sets of QPA methodology rules, one compliant with the statute and the other not; and insurers would have to calculate two sets of QPAs (of which there are millions), one for use in IDR proceedings with plaintiffs and one for use in IDR

proceedings with everyone else. That would not only be cumbersome and costly for everyone involved. It would conflict with Congress's instruction to establish "one" IDR process for all participants. 42 U.S.C. § 300gg-111(c)(2)(A); *cf. Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015) (affirming universal injunction in light of need for uniformity).

### D.    The Court should remand the QPA disclosure rule.

Finally, the Court should remand the Departments' disclosure rule without vacatur. Although, as discussed above, vacatur is the default remedy for an unlawful rule, here that remedy would not fit the wrong. The problem with the Departments' disclosure rule is not that the disclosures it requires are unlawful, but that the rule did not go far enough. Plaintiffs of course want more disclosures about QPA calculations, not fewer. And vacating the rule would mean that insurers would have no disclosure obligations until the Departments promulgate a replacement rule. So the Court should leave the current disclosure rule in place on remand. *See Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 528 (D.C. Cir. 2009) ("[V]acating a standard because it may be insufficiently protective would sacrifice such protection as it now provides, making the best an enemy of the good."); *Env't Def. Fund, Inc. v. EPA*,

898 F.2d 183, 190 (D.C. Cir. 1990) (declining to vacate rule when doing so

"would at least temporarily defeat [the challenger's] purpose").

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's

vacatur of the challenged QPA methodology rules and remand the QPA dis-

closure rule to the Departments for further rulemaking.

Respectfully submitted,

Dated: March 13, 2024

*/s/ Eric D. McArthur*
ERIC D. MCARTHUR
   *Counsel of Record*
BRENNA E. JENNY
JILLIAN STONECIPHER
CODY M. AKINS
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8011
Email: emcarthur@sidley.com

JAIME L.M. JONES
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-0751
Fax: (312) 853-7036
Email: jaime.jones@sidley.com

***Counsel for Plaintiffs-Appel-
lees/Cross-Appellants***

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2024, a copy of the above and fore-going was electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Eric D. McArthur*
Eric D. McArthur

# CERTIFICATE OF COMPLIANCE

This document complies with this Rule 28.1 of the Federal Rules of Appellate Procedure because it contains 14,892 words, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and Fifth Circuit Rule 32.2.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.

Dated: March 13, 2024            */s/ Eric D. McArthur*
                                 Eric D. McArthur