No. 23-40605

## UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

**Texas Medical Association et al.,**
*Plaintiffs-Appellees,*
*v.*
**U.S. Department of Health and Human Services, et al.,**
*Defendants–Appellants.*

**LifeNet, Incorporated et al.,**
*Plaintiffs-Appellees,*
*v.*
**U.S. Department of Health and Human Services, et al.,**
*Defendants-Appellants.*

Appeal from the United States District Court for the
Eastern District of Texas

**Amici Curiae Brief of the American Society of Anesthesiologists, the American College of Emergency Physicians, and the American College of Radiology**

JEREMY LEWIN
**BARNES & THORNBURG LLP**
ONE N. WACKER DRIVE, SUITE 4400
CHICAGO, IL 60606-2833
312.214.8833
JEREMY.LEWIN@BTLAW.COM

AARON D. LINDSTROM
**BARNES & THORNBURG LLP**
171 MONROE AVE. NW, SUITE 1000
GRAND RAPIDS, MI 49503-2694
616.742.3931
AARON.LINDSTROM@BTLAW.COM

*Attorneys for Amici Curiae,*
*THE AMERICAN SOCIETY OF ANESTHESIOLOGISTS,*
*THE AMERICAN COLLEGE OF EMERGENCY PHYSICIANS, AND*
*THE AMERICAN COLLEGE OF RADIOLOGY*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Rule 28.2 of the Fifth Circuit Rules, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees:**
> Texas Medical Association
> Tyler Regional Hospital, LLC
> Dr. Adam Corley
> LifeNet, Incorporated
> Air Methods Corporation
> Rocky Mountain Holdings, LLC
> East Texas Air One, LLC

**Attorneys for Plaintiffs-Appellees:**
> Sidley Austin LLP
> Eric Dean McArthur
> Cody Matthew Akins
> Brenna Jenny
> Jaime L.M. Jones
> Penny Packard Reid
> Jillian Stonecipher
>
> Susman Godfrey LLP
> Stephen Shackleford, Jr.
> Steven M. Shepard
> James Craig Smyser

Polsinelli, P.C.
David Alan King
Joshua Arters

**Defendants-Appellants:**

United States Department of Health and Human Services
Office of Personnel Management
Department of Labor
Department of the Treasury
Xavier Becerra, Secretary, U.S. Department of Health and Human
    Services
Kiran Ahuja, Director of the Office of Personnel Management
Janet Yellen, Secretary, U.S. Department of Treasury,
Julie A. Su, Acting Secretary, U.S. Department of Labor

**Attorneys for Defendants-Appellants:**

Civil Division, U.S. Department of Justice
Leif Eric Overvold
Anna L. Deffebach
Joshua Mark Salzman
Kevin Benjamin Soter

**Amici curiae:**

America's Health Insurance Plans
Blue Cross Blue Shield Association
Leukemia & Lymphoma Society
ALS Association
CancerCare
Epilepsy Foundation
Families USA Action
Hemophilia Federation of America
The Mended Hearts, Incorporated
National Multiple Sclerosis Society
National Patient Advocate Foundation
U.S. PIRG

**Attorneys for amicus curiae:**
> Deutsch Hunt PLLC
> Hyland Hunt
> O'Melveny & Myers, L.L.P.
> Kenneth Lee Blalack, II
> Andrew Robert Hellman
>
> Wardenski P.C.
> Joseph J Wardenski
>
> Barnes & Thornburg LLP
> Jeremy Lewin
> Aaron D. Lindstrom

Dated: March 20, 2024                    */s/ Aaron  D. Lindstrom*

# Table of Contents

**Page**

Statement of amici curiae ........................................................ 1

Introduction ............................................................................ 2

Background ............................................................................. 5

    A.    The No Surprises Act ........................................... 5

    B.    The Act's independent dispute resolution process .............. 6

    C.    The Departments publish the July rule under the No Surprises Act. ................................................................. 9

    D.    The district court vacates portions of the July rule and related regulations. ........................................................... 11

Argument ............................................................................. 12

I.    The QPA does not reflect the fair market value of out-of-network items and services. ........................................... 14

II.    The July rule incentivizes insurers to lower in-network rates, ultimately narrowing provider networks. ........................ 23

III.    The July rule will result in under-compensation of care, which may incentivize the consolidation of practices, undermining market competition. ............................... 26

IV.    Market disruptions and narrower provider networks stemming from the July rule will harm patients in underserved areas struggling with accessibility. ........................ 29

Conclusion ........................................................................... 32

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*United Tchrs. Assocs. Ins. Co. v. MacKeen & Bailey Inc.*,
    99 F.3d 645 (5th Cir. 1996)....................................................20

## STATUTES

Cal. Health & Safety Code § 1371.31......................................................28

No Surprises Act, Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 2757-890
    (2020) (codified at 42 U.S.C. §§ 300gg-111, 300gg-131 to 132; 29
    U.S.C. § 1185e; 26 U.S.C. § 9816)................................................ passim

## OTHER AUTHORITIES

Avalere Health, *PCP Contracting Practices and Qualified Payment
    Amount Calculation Under the No Surprises Act* (Aug. 2, 2022) .......22

Erin L. Duffy, *Influence of Out-of-Network Payment Standards on
    Insurer-Provider Bargaining: California's Experience*, 25 Am. J.
    Managed Care e243 (2019) ...........................................................29, 30

*FAQs about Affordable Care Act and Consolidated Appropriations Act,
    2021 Implementation Part 55* (Aug. 19, 2022) .............................10, 11

H.R. Rep. No. 116-615, pt. 1 (2020) ........................................................8

Simon F. Haeder, *Inadequate in the Best of Times: Reevaluating
    Provider Networks in Light of the Coronavirus Pandemic*, 12 World
    Med. & Health Pol'y 282 (2020)...........................................................31

## REGULATIONS

45 C.F.R. § 149.140(a)(1).........................................................................10

45 C.F.R. § 156.230 .................................................................................33

*Requirements Related to Surprise Billing; Part I*,
    86 Fed. Reg. 36,872 (July 13, 2021)............................................ passim

## STATEMENT OF AMICI CURIAE

The American Society of Anesthesiologists, the American College of Emergency Physicians, and the American College of Radiology (collectively, "*Amici*") are voluntary, national professional associations that advocate for the interests of their respective members, including on matters concerning adequate and fair reimbursement for items and services provided out-of-network.

The American Society of Anesthesiologists is a professional association comprised of approximately 57,000 physician anesthesiologists and others involved in the medical specialty of anesthesiology, critical care, and pain medicine. The American College of Emergency Physicians is a professional association comprised of approximately 38,000 emergency physicians, residents, and medical students. The American College of Radiology is a professional association comprised of approximately 40,000 diagnostic radiologists, radiation oncologists, interventional radiologists, nuclear medicine physicians, and medical physicists.

*Amici* submit this brief on behalf of their members who provide patient-care items and services impacted by the No Surprises Act. All of the parties have consented to the filing of this brief.

## INTRODUCTION

In July 2021, the federal agencies who are appellants in this case—the Department of Health and Human Services, the Department of Labor, the Department of the Treasury, and the Office of Personnel Management—published an interim final rule under the No Surprises Act to implement the Act's independent dispute resolution (IDR) process. *Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36,872 (July 13, 2021). Specifically, the July rule adopted a methodology for calculating the qualified payment amount (QPA), which is one of the factors used in the IDR process. While the Departments agree that this amount is supposed to reflect the median rate the insurer would have paid if the service had been provided by an in-network provider, the methodology adopted by the Departments conflicts with the text of the No Surprises Act and leads to inaccurate rates for the QPA.

*Amici* submit this brief to explain to the Court how the July rule unlawfully depresses both in-network and out-of-network rates for physician services, which will force many physician practices to consolidate and which will harm patient care by narrowing provider networks, particularly in underserved communities.

The No Surprises Act addresses two interrelated problems with the private health insurance market. First, insurers demand low payment rates as a condition of physicians participating in their networks, a demand that forces many physicians to stay out-of-network to remain economically viable. Second, patients who unknowingly receive certain care from out-of-network providers were responsible for amounts not paid by their insurance companies, which is known as "surprise billing." No Surprises Act, Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 2757-890 (2020) (codified at 42 U.S.C. §§ 300gg-111, 300gg-131 to 132; 29 U.S.C. § 1185e; 26 U.S.C. § 9816). *Amici* support Congress's reforms, which, if properly implemented, will ensure fair reimbursement to providers and facilities and protect patient access to medical care.

3

Unfortunately, the Departments—HHS, the Department of Labor, the Department of Treasury, and the Office of Personnel Management—have shifted the balance that Congress struck in protecting both patients and providers into a system that favors the economic interests of private insurers and that will harm patients and providers. The July rule adopts a calculation methodology that conflicts with the statute's provisions about the qualifying payment amount, which is determined solely by the insurer and does not reflect the fair market value of physician services. For example, the QPA is the median of the contracted rates negotiated by the insurer, yet the methodology adopted by the Departments ignores the frequency with which those contracted rates are actually applied. Instead, the Departments' methodology treats each contract as a single data point, regardless of how many times that rate is reflected in an actual claim. Additionally, the Departments' QPA methodology excludes bonuses and incentive payments, even though Congress instructed that contracted rates must be the total *maximum* payment, without exclusions or exceptions.

The Departments' methodology from the July rule and their other guidance will depress payments for the anesthesiology, radiology, and

4

emergency services of *Amici*'s members by empowering insurers to lower in-network rates, which, in turn, will depress out-of-network rates. This under-compensation of care will threaten the viability of smaller and independent physician practices, and the inevitable result will be the consolidation or closure of these practices. This will lead to fewer services in rural and other underserved communities, which ultimately will harm the care of patients in those areas struggling with accessibility to quality treatment.

For these reasons, and the reasons in the appellees' briefs, the Court should affirm the district court's judgment invalidating the final rule's provisions that unlawfully favor the QPA (and incorrectly calculate the QPA) when determining out-of-network payments.

## BACKGROUND

### A.    The No Surprises Act

The No Surprises Act establishes protections against surprise billing for patients (i.e., for participants, beneficiaries, and enrollees) covered by insurers through group health plans and group and individual health insurance. Specifically, the Act addresses surprise billing when patients receive (1) emergency services provided by an out-of-network provider or out-of-network emergency facility, or (2) non-

emergency services from an out-of-network provider furnished during a visit at an in-network health care facility. 42 U.S.C. §§ 300gg-111, 300gg-131 to 132.

The Act also creates a framework for determining fair payment for the provision of certain out-of-network items and services. *Id.* § 300gg-111(c). The Act mandates that insurers reimburse out-of-network providers at an "out-of-network rate," minus the cost-sharing requirements of the patients. *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D). If the provider disagrees with the insurer's initial payment determination, then the provider can initiate a 30-day open negotiation with the insurer to determine the amount of payment for the out-of-network item or service. *Id.* § 300gg-111(a)(1)(C)(iv)(I), (a)(3)(K)(ii), (c)(1)(A). If the parties cannot agree on the amount for the out-of-network item or service, either party may initiate an IDR process. *Id.* § 300gg-111(c)(1)(B).

## B.    The Act's independent dispute resolution process

Under the Act's IDR process, an independent arbitrator—referred to as the IDR entity—determines appropriate payments for out-of-network health care items and services. *Id.* § 300gg-111(c)(5). Using

6

what is often called baseball-style arbitration, the IDR entity selects one of the offers submitted by the parties to be the payment amount. *Id.* § 300gg-111(c)(5)(A)(i).

Congress dictated specific factors that the IDR entity "shall consider" when determining which of the offers to select. *Id.* § 300gg-111(c)(5)(C)(i). These factors include:

- the qualifying payment amount (QPA) for the item or service, § 300gg-111(c)(5)(C)(i)(I);

- the level of training and experience of the provider or facility and the quality and outcomes measurements of the provider or facility, § 300gg-111(c)(5)(C)(ii)(I);

- the market share held by the nonparticipating provider or facility, § 300gg-111(c)(5)(C)(ii)(II);

- the acuity of the patient or the complexity of furnishing the item or service, § 300gg-111(c)(5)(C)(ii)(III).

- the teaching status, case mix, and scope of services of the nonparticipating facility, § 300gg-111(c)(5)(C)(ii)(IV).

- demonstrations of good-faith efforts (or lack of good-faith efforts) made by the nonparticipating provider or nonparticipating facility or the plan or issuer to enter into network agreements, § 300gg-111(c)(5)(C)(ii)(V),

- information requested by the IDR entity, § 300gg-111(c)(5)(B)(i)(II), and

- information submitted by the parties to the IDR entity, § 300gg-111(c)(5)(B)(ii).

*See also id.* § 300gg-111(c)(5)(C)(i)(II).

As to the first factor, Congress established the methodology for calculating the qualifying payment amount to ensure that the QPA "is a market-based price" and "reflects negotiations between providers and insurers in a local health care market." H.R. Rep. No. 116-615, pt. 1, at 57 (2020). Congress defined the QPA for an item or service furnished during 2022 as:

> [T]he median of the *contracted rates recognized* by the plan or issuer, respectively . . . as the *total maximum payment* (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) under such plans or coverage, respectively, on January 31, 2019, for the same or a similar item or service *that is provided by a provider in the same or similar specialty* and provided in the geographic region in which the item or service is furnished [as adjusted by inflation]. [42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added).]

Congress also listed specific factors that the IDR entity "shall not consider," including usual and customary charges; the reimbursement rate for such items and services payable by a public payer (e.g., by Medicare, Medicaid, the Children's Health Insurance Program, TRICARE, or the United States Department of Veterans Affairs); or the amount that the out-of-network provider would have billed for the item

or service had the No Surprises Act not applied. *Id.* § 300gg-111(c)(5)(D).

## C. The Departments publish the July rule under the No Surprises Act.

In July 2021, the Departments published an interim final rule to implement certain provisions of the No Surprises Act. Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872 (July 13, 2021); 45 C.F.R. § 149.140. As relevant here, the July 2021 rule established a methodology for calculating the qualifying payment amount. When publishing the rule, the Departments acknowledged that Congress intended to "ensur[e] that the QPA reflects market rates under typical contract negotiations." 86 Fed. Reg. at 36,889.

The July rule defines "contracted rate" to mean "the total amount (including cost sharing) that a group health plan or health insurance issuer has contractually agreed to pay a participating provider, facility, or provider of air ambulance services for covered items and services, whether directly or indirectly, including through a third-party administrator or pharmacy benefit manager." 86 Fed. Reg. 36,889; 45 C.F.R. § 149.140(a)(1). This definition looks only at whether the rate

appears in a contract; it does not require the rate to be for a service that is actually provided by the provider.

The Departments confirmed, in FAQs they later published, that the definition does not require that the contracted rate be for a service or item that is actually provided. Dep't's, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* (Aug. 19, 2022). In these FAQs, the Departments noted stakeholder concerns about "certain contractual arrangements in which providers accept contracted rates established by plans or issuers for service codes that they are not likely to bill or that are not utilized by their specific provider specialty," "with some even accept[ing] $0 as their rate for codes they do not utilize." *Id.* at 16; *id.* at 17 (including in calculations rates for providers who "do not provide" the particular service). But while the Departments said that in their view, "$0 does not represent a contracted rate," they did not say that other artificially low rates that providers do not use would be excluded from determining the median contracted rate for the QPA calculation.

Relatedly, the Departments decided in the July rule that "each contracted rate for a given item or service" would "be treated as a single

data point when calculating a median contracted rate," further
explaining that "the rate negotiated under a contract constitutes a
single contracted rate regardless of the number of claims paid at that
contracted rate." 86 Fed. Reg. 36,889. Under this approach, if one
contract covered 1,000 claims at one rate, and two other contracts each
covered 10 claims at another rate, then the Departments would consider
the rate set by the second and third contracts to be the median
contracted rate.

Further, in the July rule the Departments concluded "that plans
and issuers should be required to calculate median contracted rates
separately by provider specialty *only* where the plan or issuer otherwise
varies its contracted rates based on provider specialty." 86 Fed. Reg.
36,891.

### D.  The district court vacates portions of the July rule and related regulations.

Addressing cross-motions for summary judgment, the district
court vacated certain portions of the regulations. It held that the QPA
must be calculated "using only rates for items and services that are
actually furnished or supplied by a provider—not those that a provider
has not furnished or never supplied," such as "ghost rates."

(ROA.13207.) It held that the guidance in the FAQs stating that insurers needed to calculate rates by specialty only in certain circumstances conflicts with the statute's requirement that the median of the contracted rates must be for a similar item or service "that is provided by a provider *in the same or similar specialty*." (ROA.13209 (quoting 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) and adding emphasis).) It held that the July rule's exclusion of incentive-based payments conflicted with the statutory requirement of basing contracted rates on "'the total maximum payment . . . under such plan or coverage,' without exclusions or exceptions." (ROA.13212 (quoting 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) and adding ellipsis.)

The district court also ruled on other issues not raised by the parties in this appeal.

## ARGUMENT

While the Departments argue that the QPA is supposed to approximate "the total amount that the provider would have received under the terms of the patient's health plan had the provider been in-network" (Departments' Br. 11), and while they repeatedly warn about the risk of market distortion (*id.* 1, 3, 6, 7, & 23, 24, 35, 36, 37), it is the

Departments' methodology for calculating the QPA that distorts the market. Their methodology excludes rates that should be included (such as rates that include incentives or bonuses) and uses the wrong approach to determining the median rate (by calculating based on the number of contracts, not based on the number of claims).

Under their rules, the QPA fails to reflect the fair market value of items and services furnished by out-of-network providers in the marketplace. These market distortions create a perverse incentive for insurers to significantly reduce their in-network rates or to refuse to enter into network agreements with providers or facilities. If more providers or facilities are forced out-of-network due to the final rule, patients will lose access to in-network care. In addition, the final rule will undermine the ability of providers and facilities to be reimbursed fairly for their out-of-network services, which will, in turn, threaten their ability to operate in the marketplace. If this occurs, small, independent practices may have no other choice but to consolidate or to cease operating. Patients will lose access to care, particularly in underserved areas.

**I.    The QPA does not reflect the fair market value of out-of-network items and services.**

Under the methodology adopted by the Departments, the QPA does not accurately represent the fair, market-based payment rates for out-of-network services. (*See* Declaration of Dr. Nicola, No. 6:22-cv-372 (E.D. Tex.), Doc. 53-2; Declaration of Dr. Young, No. 6:22-cv-372, Doc. 53-3; Declaration of Dr. Raley, No. 6:22-cv-372, Doc. 53-4.) The July rule leads to artificially low QPA calculations in at least two distinct ways.

*First*, the Departments' QPA methodology excludes a number of arrangements under which providers and insurers agree to rates. Under their regulation, the definition of "contracted rate" excludes single case agreements, letters of agreement, or other similar arrangements between a provider and an insurer to supplement the network of the plan or coverage for a specific patient in unique circumstances. 45 C.F.R. § 149.140(a)(1). Further, in calculating the median contracted rate, an insurer must "[e]xclude risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments. *Id.* § 149.140(b)(2)(iv).

These exclusions result in QPAs that are lower than the full payment amount for the applicable item or service. Each of the *Amici*

explained this problem to the Departments in comment letters. *See* Am.
Coll. of Emergency Physicians Letter[1] at 14–15; Am. Soc'y of
Anesthesiologists Letter[2] at 3; Am. Coll. of Radiology Letter[3] at 2. Given
that the QPA thus focuses on just a subset of the market for the
relevant services and excludes payment adjustments, it under-values
the payment amounts that would present fair, market-based values.

One of the Departments' insurance-industry amici—America's
Health Insurance Plans—argues that bonuses and incentive payments
should not be included when calculating "the total maximum payment,"
42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), because "it is simply wrong (and
practically distorting) to characterize value-based adjustments *as add-
ons (or subtractions)* to service-specific rates." (AHIP Amicus Br. 14
(emphasis added).) But another of the insurance-industry amici—Blue
Cross Blue Shield—directly contradicts that point, recognizing that a
number of value-based adjustments do exactly that: "The most
straightforward alternative payment models start from traditional fee-

---

[1] https://www.regulations.gov/comment/CMS-2021-0117-5695.

[2] https://www.regulations.gov/comment/CMS-2021-0117-7410.

[3] https://www.regulations.gov/comment/CMS-2021-0117-7239.

for-service payments, *then add or subtract*." (Blue Cross Amicus Br. 19 (emphasis added); *see also* AHIP Br. 14 (acknowledging that it bases its argument on a "handful of non-exhaustive examples" of alternative payment models).)

As Blue Cross explains, there are at least three subcategories that fall within this approach of simply adding or subtracting from a standard fee-for-service model based on the quality and value of the service. In the first subcategory, "[s]ome models make additional payments to providers for infrastructure investments that can improve the quality of patient care, such as payments designated for staffing a care coordination nurse or upgrading to electronic health records." (Blue Cross Amicus Br. 19 (quotations marks omitted).) The second subcategory is "'pay-for-reporting' models, which 'provide positive or negative incentives to report quality data to the health plan and— preferably—to the public." (*Id.* (some quotation marks omitted).) "A third subcategory of this kind of compensation model rewards providers for good performance on quality metrics, penalizes providers for poor performance, or both." (Blue Cross Amicus Br. 19.) In short, even the Departments' own amici recognize that a number of value-based models

16

are directly linked to the fees for service. In any event, as the district court recognized, the plain meaning of "total maximum payment" includes bonuses. (ROA.13212–14.)

*Second*, the Departments' methodology for calculating the median rate focuses on the median contracted rate *in a contract*, rather than on the median contracted rate recognized *in a claim*. In calculating the median contracted rate, each contract setting out a rate for an item or service is treated as a single data point regardless of the total number of claims paid at that rate. 86 Fed. Reg. at 36,889 ("[T]he rate negotiated under a contract constitutes a single contracted rate regardless of the number of claims paid at that contracted rate."). In other words, if an insurer has a contract with a provider, the rate negotiated with that provider under the contract for a specific service or procedure is treated as a single contracted rate, regardless of the volume of individual claims for that service or procedure recognized and paid at that rate. In effect, the Departments' method for calculating the QPA ignores the frequency of use or applicability of those in-network contracts in the market, which results in a distortion of the true market

value of the out-of-network item or service. Am. Coll. of Emergency Physicians Letter at 11.

Consider, for example, a region with three in-network practice groups. Practice Group A performs a service 1,000 times and has negotiated a contract rate of $550; Practice Group B has a contracted rate of $490 and performs the service only ten times; and Practice Group C performs the service twenty times at a contracted rate of $495. We would expect the QPA to be $550, since more than 97% of the services in this region were paid at that contracted rate. But the Departments' methodology sets the QPA at $495, because that is the middle rate of the three contracts in the region. This result ignores the economic reality of the market (i.e., the contracted rate at which more than 97% of the services in the region were actually paid).

The Departments argue that counting contracts instead of counting claims is appropriate because insurers should not have to look beyond "the face of a health plan's contracts" to determine rates. (Departments' Br. 27.) Relying on "the ordinary practice in the insurance market" where "contracted rates are generally negotiated prospectively," they argue that focusing on contracts instead of claims

18

makes sense because the number of claims cannot be known "for certain" at the time when insurers and providers are negotiating contract rates. (Departments' Br. 27, 28.) But this argument rings hollow in the context of insurance companies, which base their entire business model on their ability to make highly educated estimates about the number of claims that will be asserted under their contracts. The very reason insurance companies rely on actuaries is because "[a]ctuaries use mathematical means to generate *reliable predictions* regarding claims, losses, premiums, and other information in order to determine the appropriate level of reserves." *United Tchrs. Assocs. Ins. Co. v. MacKeen & Bailey Inc.*, 99 F.3d 645, 647 n.4 (5th Cir. 1996) (emphasis added). And insurance companies keep detailed records of the claims they have paid, so they have the ability to provide accurate numbers for the number of claims that were actually paid under the contracts that were in place on January 31, 2019. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (defining "qualifying payment amount" as "the median of the contracted rates recognized by the plan or issuer, respectively . . . as the total maximum payment . . . under such plans or coverage, respectively, on January 31, 2019").

19

Relatedly, the Departments argue that "[t]he fact that Congress chose a single date for calculating the QPA demonstrates that it intended to take a snapshot of the contracts as they existed on that date to calculate the QPA for future use (adjusted for inflation)." (Departments' Br. 29.) But the idea of using a snapshot does not distinguish between counting contracts instead of counting claims. It is equally possible to take a snapshot of claims made under the contracts that existed on that same date, as insurance companies keep records of the number of claims they receive.

In addition to the two examples just provided, a third distortion previously existed under the July rule: ghost rates. Under the Departments' methodology before it was altered by the district court's decision, the Departments included rates for specialty services from providers who rarely or never actually perform those services, resulting in ghost rates that lower the median rates. Under this practice, which was illuminated by an August 2022 study jointly commissioned by *Amici*, insurers include rates for certain specialty services in the contracts of different specialists who rarely or never bill for the service. Avalere Health, *PCP Contracting Practices and Qualified Payment*

*Amount Calculation Under the No Surprises Act* (Aug. 2, 2022).[4] The
study surveyed primary care physicians and found that 68% of the
respondents contract for services they provide fewer than twice a year
and that 57% of respondents contract for services they never provide.
*Id.* at 4. Because these physicians rarely or never bill for the service,
many of them do not negotiate the out-of-specialty rate in their
contracts; instead, they simply accept the low rate offered by the
insurer. *Id.* Because the median contracted rate fails to take into
consideration the volume of the services billed, contracts for low-volume
services artificially reduce the QPA. *See* Am. Coll. of Emergency
Physicians Letter at 11; Am. Soc'y of Anesthesiologists Letter at 3; Am.
Coll. of Radiology Letter at 2.

 The Departments now argue that the issue of ghost rates has been
resolved. They maintain that ghost rates will not be included in QPA
calculations because the district court invalidated the Departments'
regulation that had allowed health plans to calculate QPAs across
provider specialties, instead of calculating them separately by provider

---

 [4] https://www.emergencyphysicians.org/siteassets/emphysicians/
all-pdfs/2022-8-15-avalere-qpa-whitepaper_final.pdf.

specialty, a ruling that the Departments are not challenging.
(Departments' Br. 30–31 & n.10.) They are correct to abandon their
defense of their prior approach. The *Amici* highlight this issue, even
though the Departments now accept that insurers must calculate
separate QPAs for services provided by different specialties, to help the
Court fully understand the market distortions the Departments
previously allowed, yet no longer defend.

As these examples illustrate, the QPA simply does not reflect
actual market conditions. *See* Declaration of Dr. Nicola, No. 6:22-cv-372,
Doc. 53-2; Declaration of Dr. Young, No. 6:22-cv-372, Doc. 53-3;
Declaration of Dr. Raley, No. 6:22-cv-372, Doc. 53-4; Am. Soc'y of
Anesthesiologists Letter at 4. For these reasons, the QPA does not
reflect the true market value of items or services provided out of
network.

Because the final rule will result in out-of-network payments that
hew closely to the QPA, providers will not be fairly reimbursed for their
out-of-network services under the methodology of the July rule.

**II.    The July rule incentivizes insurers to lower in-network rates, ultimately narrowing provider networks.**

Because the July rule distorts the rates included in the QPA calculation, which is tied to the insurer's median in-network rates, the July rule inappropriately creates an incentive for insurers to reduce their in-network rates or to refuse to enter into network agreements with providers.

Many members of Congress recognized this concern when addressing another one of the Departments' rules (the October 2021 interim final rule). In a letter dated November 5, 2021, 152 members of the U.S. House of Representatives criticized the Departments for "making the median in-network rate the default factor considered in the IDR process" and warned that this focus on the QPA "could incentivize insurance companies to set artificially low payment rates." Members of Congress Letter.[5] The members of the U.S. House of Representatives stressed that tying out-of-network payments to the QPA could result in "narrow provider networks . . . jeopardiz[ing] patient access to care—the exact opposite of the goal of the [No Surprises Act]." *Id.* at 2. This

---

[5] https://www.acep.org/globalassets/new-pdfs/advocacy/2021.11.05-no-surprises-act-letter.pdf.

concern is even more true in light of the July rule, which artificially lowers QPA calculations.

The concerns expressed by these 152 members of Congress unfortunately materialized. For instance, Blue Cross Blue Shield of North Carolina sent letters to providers demanding a reduction in contracted rates as a direct result of the Departments' October 2021 interim final rule. Declaration of Dr. Nicola ¶ 15 (stating that Blue Cross Blue Shield of North Carolina's "letter cites" the interim final rule "as justification to 'warrant a significant reduction in (our) contracted rates with Blue Cross NC' and warns of additional rate reductions once the qualifying payment amount is established"); Declaration of Dr. Raley ¶ 18 (noting that Blue Cross Blue Shield of North Carolina's letter states that the "IFR provides 'enough clarity to warrant a significant reduction in [Wake Emergency Physicians, P.A.'s] contracted rate with Blue Cross NC'"). The letters from Blue Cross Blue Shield of North Carolina further state that if providers do not accept the rate reduction in light of the Departments' interim final rule, their contracts will be "quickly terminated." *See* Declaration of Dr. Nicola ¶ 15; Declaration of Dr. Raley ¶ 18.

The July rule is one of the factors leading to these rate reductions, as its calculation methodology decreases QPA amounts and so contributes to the downward pressure on rates. By empowering insurers to reduce in-network contracted rates, it threatens existing contractual arrangements with providers and facilities.

One of the Departments' insurance-industry amici argues that the challenged rules must not be artificially deflating the QPA below market levels because "payment for nearly all out-of-network services is resolved without challenge, most of the time via medical providers' acceptance of payments at or around the QPA, with no need for IDR." AHIP Br. 7. According to AHIP, "about 96% of out-of-network claims subject to the Act are resolved voluntarily in QPA-centered negotiations, consistent with congressional design." AHIP Br. 9. But in a study AHIP itself cites, it admits that "[t]he number of those claims disputed by providers or facilities continues to outpace estimates." America's Health Insurance Plans & Blue Cross Blue Shield Ass'n (BCBSA), *No Surprises Act Continues to Prevent More than 1 Million Surprise Bills Per Month*, While Provider Networks Grow (Jan. 2024), http://tinyurl.com/4majdzam. The AHIP and Blue Cross study admits

that the number of IDR proceedings initiated between mid-April 2022 and June 2023 was "nearly fourteen times" greater than the agencies' original estimate of 17,000 proceedings annually. *Id.* at 1. In fact, "AHIP and BCBSA estimate there were almost 670,000 claims submitted to IDR between January 1st and September 30, 2023 alone, with no indication of having peaked." *Id.* That number for *nine months* in 2023 is *39 times* the *annual* estimate of 17,000 IDR proceedings. And the AHIP study indicates that even these numbers are undercounting the number of disputed claims, because "[a] single dispute . . . could represent a batched dispute of many claims or a group of several claims for a single visit." *Id.* Thus, contrary to AHIP's suggestion that the QPA calculations must be close to fair market rates because few providers are disputing them, AHIP's own study shows that numerous providers are disputing QPA-based claims.

**III.  The July rule will result in under-compensation of care, which may incentivize the consolidation of practices, undermining market competition.**

Because providers will not be fairly reimbursed for their out-of-network services, the July rule will impose serious financial pressures on all providers that render items and services out-of-network. As the

American Medical Association explained in its comment letter on a related interim final rule, the financial strain caused by decreasing the out-of-network rate will disproportionately affect small, independent practices and rural practices that are already reeling financially from the COVID-19 pandemic. *See* Am. Med. Ass'n Letter at 7–9.[6] These practices may have no choice but to sell their practices to larger corporate entities—a phenomenon that occurred in California after the State passed its surprise medical billing law. Cal. Health & Safety Code § 1371.31.

Like the No Surprises Act, California's surprise medical billing law requires insurers to make interim payments to out-of-network providers who could then begin the California IDR process if they felt the rate was inadequate. *See* Cal. Health & Safety Code § 1371.31. But the interim rate was chosen as the "reasonable rate" 98% of the time, essentially functioning as a benchmark rate. Letter from Cal. Med.

---

[6] https://downloads.regulations.gov/CMS-2021-0156-5178/attachment_1.pdf.

Ass'n Letter.[7] Thus, California's IDR process favors rates unilaterally set by insurers.

A RAND corporation study showed that the California law "changed the negotiation dynamics between hospital-based physicians and payers," resulting in leverage shifting "in favor of payers" and incentivizing them to "lower or cancel contracts with rates higher than their average as a means of suppressing [out-of-network] prices." Erin L. Duffy, *Influence of Out-of-Network Payment Standards on Insurer-Provider Bargaining: California's Experience*, 25 Am. J. Managed Care e243 (2019).[8] These drastic changes in negotiating power and lower rates accelerated "consolidation and exclusive contracting with facilities" among hospital-based specialists. *Id.* The California bill was cited by several healthcare stakeholders as the factor that "clearly put [consolidation efforts] over the edge." *Id.*

Routine under-compensation of out-of-network care as a result of the final rule similarly threatens the viability of many smaller and

---

[7] https://downloads.regulations.gov/CMS-2021-0117-7408/attachment_1.pdf.

[8] https://www.ajmc.com/view/influence-of-outofnetwork-payment-standards-on-insurer-provider-bargaining-californias-experience.

independent physician practices and incentivizes the consolidation of practices. This is particularly problematic in underserved areas already struggling with accessibility to care.

## IV.    Market disruptions and narrower provider networks stemming from the July rule will harm patients in underserved areas struggling with accessibility.

In the No Surprises Act, Congress directed the Departments, in setting out geographic areas for this methodology, to take "into account access to items and services in rural and underserved areas . . . ." 42 U.S.C. § 300gg-111. But the Departments' methodology will harm these areas. The July rule will result in fewer provider networks and the consolidation of practices, which will adversely impact patients' access to care. Patients who are unable to access care from in-network providers may delay care, seek care from an in-network provider in the wrong specialty, rely on emergency departments to receive care, or forgo care all together. Simon F. Haeder, *Inadequate in the Best of Times: Reevaluating Provider Networks in Light of the Coronavirus Pandemic*, 12 World Med. & Health Pol'y 282, 284 (2020) (noting how "[t]hese issues raise concerns, even under relatively normal circumstances" but

become "exacerbated" when considering the effects of the COVID-19 pandemic).[9]

Underserved communities that are already struggling with access to care are disproportionally impacted by narrowing provider networks. In the previously referenced letter from 152 members of the U.S. House of Representatives, the Representatives warned that a rule favoring the QPA could "have a broad impact on reimbursement for in-network services, which could exacerbate existing health disparities and patient access issues in rural and urban underserved communities." Members of Congress Letter at 2. Because the Departments' July final rule will result in lower QPA calculations and so lower reimbursements to providers, the Members' concerns regarding access to care remain valid. Members of Congress Letter at 1–2.

Moreover, the July rule's adverse impact on networks is contrary to longstanding efforts by the Departments to preserve or bolster network adequacy. *See, e.g.*, 45 C.F.R. § 156.230 (requiring each qualified health plan issuer that uses a provider network to maintain "a

---

[9] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7436480/pdf/WMH3-12-282.pdf.

network that is sufficient in number and types of providers, including providers that specialize in mental health and substance use disorder services, to ensure that all services will be accessible without unreasonable delay"). If aggressive actions like Blue Cross Blue Shield of North Carolina's become commonplace, Members' fears of insurers providing lower in-network payment rates will be realized and the IDR process will be skewed to under compensate providers consistently. *See* Declaration of Dr. Nicola ¶ 15 (stating that Blue Cross Blue Shield of North Carolina's "letter cites the [interim final rule] as justification to 'warrant a significant reduction in (our) contracted rates with Blue Cross NC' and warns of additional rate reductions once the qualifying payment amount is established"); Declaration of Dr. Raley ¶ 18 (noting that Blue Cross Blue Shield of North Carolina's letter states that the interim final rule "provides 'enough clarity to warrant a significant reduction in [Wake Emergency Physicians, P.A.'s] contracted rate with Blue Cross NC'").

Routine under-compensation will threaten the viability of many smaller and independent physician practices that provide care to underserved areas already struggling with accessibility to care.

Ultimately, losing providers in these areas will significantly harm patients and actively work against the Departments' stated goals. The final rule, therefore, threatens the stability of the nation's already fragile health care system by empowering insurers to cut payments both to in-network and out-of-network providers, leading to decreased access to care.

## CONCLUSION

For these reasons, *Amici* respectfully ask that the Court affirm the decision of the district court.

Respectfully submitted,

Dated:  March 20, 2024

By  */s/ Aaron D. Lindstrom*

JEREMY LEWIN
**BARNES & THORNBURG LLP**
ONE N. WACKER DRIVE, SUITE 4400
CHICAGO, IL 60606-2833
312.214.8833
JEREMY.LEWIN@BTLAW.COM

AARON D. LINDSTROM
**BARNES & THORNBURG LLP**
171 MONROE AVE. NW, SUITE 1000
GRAND RAPIDS, MI 49503-2694
616.742.3931
AARON.LINDSTROM@BTLAW.COM

*ATTORNEYS FOR AMICI CURIAE, THE AMERICAN SOCIETY OF ANESTHESIOLOGISTS, THE AMERICAN COLLEGE OF EMERGENCY PHYSICIANS, AND THE AMERICAN COLLEGE OF RADIOLOGY*

# CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Federal Rules of Appellate Procedure 32 (a)(7)(C) and 29(a)(5) and to Fifth Circuit Rule 29.3, the attached amici curiae brief is proportionately spaced, has a typeface of 14 points or more, and contains 5,686 words.

Dated:  March 20, 2024

**BARNES & THORNBURG LLP**

BY  */s/ Aaron D. Lindstrom*

AARON D. LINDSTROM
**BARNES & THORNBURG LLP**
171 MONROE AVE. NW, SUITE 1000
GRAND RAPIDS, MI 49503-2694
616.742.3931
AARON.LINDSTROM@BTLAW.COM

*ATTORNEYS FOR AMICI CURIAE,*
*THE AMERICAN SOCIETY OF*
*ANESTHESIOLOGISTS, THE AMERICAN*
*COLLEGE OF EMERGENCY PHYSICIANS, AND*
*THE AMERICAN COLLEGE OF RADIOLOGY*

# CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2024, a copy of the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system and by first class mail to

> Ms. Anna L. Deffebach
> U.S. Dept. of Justice – Civil Division
> Federal Programs Branch
> 1100 L Street, N.W.
> Washington, DC  20005

Dated:  March 20, 2024    **BARNES & THORNBURG LLP**

BY  */s/ Aaron D. Lindstrom*

AARON D. LINDSTROM
**BARNES & THORNBURG LLP**
171 MONROE AVE. NW, SUITE 1000
GRAND RAPIDS, MI 49503-2694
616.742.3931
AARON.LINDSTROM@BTLAW.COM

*ATTORNEYS FOR AMICI CURIAE,
THE AMERICAN SOCIETY OF
ANESTHESIOLOGISTS, THE AMERICAN
COLLEGE OF EMERGENCY PHYSICIANS, AND
THE AMERICAN COLLEGE OF RADIOLOGY*