**Case No. 23-40605**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL, L.L.C.;
DOCTOR ADAM CORLEY,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; OFFICE OF
PERSONNEL MANAGEMENT; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES
DEPARTMENT OF TREASURY; XAVIER BECERRA, SEC'Y, U.S. DEP'T OF HEALTH AND
HUMAN SERVS.; KIRAN AHUJA, DIRECTOR, OFFICE OF PERSONNEL MGMT.; JANET
YELLEN, SEC'Y, U.S. DEP'T OF TREASURY; JULIE A. SU, ACTING SEC'Y, U.S. DEP'T OF
LABOR,

*Defendants-Appellants/Cross-Appellees.*


LIFENET, INC.; AIR METHODS CORP.; ROCKY MOUNTAIN HOLDINGS, LLC; EAST TEXAS
AIR ONE, LLC,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; OFFICE OF
PERSONNEL MANAGEMENT; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES
DEPARTMENT OF TREASURY; XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES; KIRAN AHUJA, DIRECTOR OF THE OFFICE OF PERSONNEL
MANAGEMENT; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF TREASURY; JULIE A.
SU, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR,

*Defendants-Appellants/Cross-Appellees.*

On Appeal from the United States District Court, Eastern District of Texas
District Court No. 6:22-CV-450-JDK

**AMICUS CURIAE BRIEF OF THE PHYSICIANS ADVOCACY INSTITUTE,
FIFTEEN STATE MEDICAL ASSOCIATIONS, AND SIX SPECIALTY
MEDICAL SOCIETIES IN SUPPORT OF APPELLEES**

*[counsel listed on inside cover]*

Long X. Do
ATHENE LAW, LLP
5432 Geary Blvd., #200
San Francisco, California 94121
Telephone: (415) 722-5351
Facsimile: (844) 619-8022
E-mail: long@athenelaw.com

Eric D. Chan
ATHENE LAW, LLP
10866 Washington Blvd., #142
Culver City, California 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com

*Attorneys for Amici Curiae Physicians Advocacy Institute, American Association of Neurological Surgeons, Congress of Neurological Surgeons, American Academy of Otolaryngology-Head and Neck Surgery, American Association of Orthopaedic Surgeons, American Osteopathic Association, American Society of Plastic Surgeons, Mississippi State Medical Association, California Medical Association, Connecticut State Medical Society, Florida Medical Association, Medical Association of Georgia, Kentucky Medical Association, Massachusetts Medical Society, Nebraska Medical Association, Medical Society of New Jersey, Medical Society of the State of New York, North Carolina Medical Society, Oregon Medical Association, South Carolina Medical Association, Tennessee Medical Association, Washington State Medical Association*

## CORPORATE DISCLOSURE AND
## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rules of Appellate Procedure 29(a)(4)(A), the following

organizations each is a non-profit organization that has no parent corporation, and

no publicly held corporation owns 10% or more of its stock:

1. Physicians Advocacy Institute
2. American Association of Neurological Surgeons
3. Congress of Neurological Surgeons
4. American Academy of Otolaryngology-Head and Neck Surgery
5. American Association of Orthopaedic Surgeons
6. American Osteopathic Association
7. American Society of Plastic Surgeons
8. Mississippi State Medical Association
9. California Medical Association
10. Connecticut State Medical Society
11. Florida Medical Association
12. Medical Association of Georgia
13. Kentucky Medical Association
14. Massachusetts Medical Society
15. Nebraska Medical Association
16. Medical Society of New Jersey
17. Medical Society of the State of New York
18. North Carolina Medical Society
19. Oregon Medical Association
20. South Carolina Medical Association
21. Tennessee Medical Association
22. Washington State Medical Association

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record

certifies that the following listed persons and entities, in addition to those listed

above and in the briefs of the parties and amici curiae parties, have an interest in

the outcome of this case. These representations are made so that the judges of this

Court may evaluate possible disqualification or recusal.

<u>Amici Curiae Counsel</u>: Long X. Do and Eric. D. Chan of Athene Law, LLP.


*/s/ Long X. Do*

Long X. Do
*Counsel for Amici Curiae*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE AND  SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS........................................................................ i

TABLE OF AUTHORITIES ....................................................................v

INTERESTS OF AMICI CURIAE...........................................................1

INTRODUCTION ...................................................................................3

BACKGROUND ....................................................................................6

ARGUMENT ..........................................................................................7

I.      The July IFR's QPA Methodology Are Inconsistent with and Disserve the Goals of the NSA.................................................7

        A.      Inclusion of Ghost Rates Depresses the QPA and Does not Reflect Negotiated Contracted Rates.................................8

        B.      Exclusion of Incentive Payments Fails to Account for Total Negotiated Compensation...............................................11

II.     The Flaws of the QPA are Compounded with a Lack of Transparency Around How it is Calculated. ...........................12

III.    Elevating a Flawed QPA Emboldens Health Insurer Abuses in the NSA Dispute Resolution Process and in Real World Contract Negotiations...13

        A.      Insurers Are Leveraging a Depressed QPA Under the NSA Dispute Resolution Process. ..........................................13

                1.  Low-Ball Offers in Initial Payment through Open Negotiation. ...13

                2.  Delinquency and Obstruction in IDR Offers and Awards.............15

        B.      A Flawed NSA Dispute Resolution Process Facilitates Further Abuses in the Contract Negotiations. ...............................16

IV.     Implementation of the NSA With a Flawed QPA Methodology and IDR Is Worsening Already Difficult Physician Practice Conditions.......18

A. Artificially Low QPAs Ultimately Harm Patients and Heighten the Problems Inherent in Consolidation of Physician Practices. ....... 18

B. Unfairly Low QPAs Incentivize Insurers to Offer Inadequate Provider Networks. .............................................................................. 22

C. Insurer Profits Continue to Soar While Access and Quality of Care Suffers. ............................................................................................. 24

V. Universal Vacatur is Appropriate. ............................................................ 28

CONCLUSION ............................................................................................................ 28

ATTACHMENT: DETAILED INFORMATION ON AMICI ............................... 30

CERTIFICATE OF COMPLIANCE .................................................................... 40

CERTIFICATE OF SERVICE .............................................................................. 41

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

42 U.S.C. § 300gg-111 ......................................................................4, 11

**Regulations**

45 C.F.R. § 149.140 ........................................................................7, 8, 11

**Other Authorities**

86 Fed. Reg. 36872 ...................................................................................4

86 Fed. Reg. at 36898 .............................................................................12

ABC15.com Staff, "Thousands of BCBSAZ patients out of network at
Dignity Health, Aetna patients also at risk" (Mar. 11, 2024)...........24

America's Health Insurance Plans, "No Surprises Act Continues to
Prevent More than 1 Million Surprises Bills Per Month," (Jan. 26,
2024) ................................................................................................14

Avalere Health, "COVID-19's Impact on Acquisitions of Physician
Practices and Physician Employment 2019-2021," (April 2022). ....19

Elliott S. Fisher *et al.*, "Financial Integration's Impact On Care
Delivery And Payment Reforms: A Survey Of Hospitals And
Physician Practices" HealthAffairs vol. 39, no. 8 (Aug. 2020)........21

Ishira Shrivatsa, "The Impact of the Covid-19 Pandemic on Health
Insurers" Chicago Fed Letter, no. 471 (Fed. Reserve Bank of
Chicago, Sept. 2022)........................................................................25

Jack Hoadley and Kevin Lucia, "Report Shows Dispute Resolution
Process in No Surprises Act Favors Providers," The
Commonwealth Fund (Mar. 1, 2024) ..............................................15

Jakob Emerson, "Big payers ranked by 2022 profit" Beckers
Healthcare (Feb. 9, 2023) ...............................................................26

Jakob Emerson, "Big payers ranked by 2023 profit" Becker's
    Healthcare (Feb. 7, 2024) .................................................................25

Nancy D. Beaulieu, et al., "Organization and Performance of US
    Health Systems" JAMA 2023:329(f):325-335 (Jan. 24/31, 2023)....................20

NORC at the Univ. of Chicago, "The Impact of Practice Acquisitions
    and Employment on Physician Experience and Care Delivery"
    (Nov. 2023) ...........................................................................21

The Physicians Foundation, "2018 Survey of America's Physicians:
    Practice Patterns and Perspectives" (Sept. 2018) ..............................27

Syntellis, "Market Analysis and Monthly Hospital and Physician
    KPIs" (March 2023)...................................................................27

Tina Reed, "Doctors say insurers are ignoring orders to pay surprise
    billing disputes," Axios (Aug. 3, 2023)..........................................16

Tyler Hammel and Noor Ul Ain Adeel, "Most US health insurers
    expected to report YOY revenue, EPS growth for Q4 2023" S&P
    Global Market Intelligence (Jan. 11, 2024) ....................................25

"WellNow Urgent Cares drop in-network Excellus coverage in NY,"
    Democrat & Chronicle (Jan. 19, 2024)............................................24

## INTERESTS OF AMICI CURIAE[1]

Amicus curiae Physicians Advocacy Institute ("PAI") is a not-for-profit organization formed pursuant to a federal district court settlement order in multidistrict class action litigation brought by physicians and state medical associations based on systemic unfair payment practices by the nation's largest for-profit insurers. PAI's mission is to advance fair and transparent payment policies and contractual practices by payors in order to sustain the practice of medicine for the benefit of patients. PAI champions policies to allow physicians to sustain independent medical practices, which are a cornerstone for delivering care in our healthcare system, particularly in underserved and rural areas. For the past decade, physicians have grappled with increasingly complex payment policies by government and private payers. PAI develops free educational resources, tools, and market information to support practices as they navigate these programs and the administrative burdens and costs.

Amici parties on this brief also include the following national specialty medical societies:

1. American Association of Neurological Surgeons

---

[1] All parties have consented to the filing of this brief. Pursuant to FRAP 29(a)(4)(E), amici curiae state that no counsel for a party authored this brief, in whole or in part, and no person other than the parties hereto as amici curiae or their counsel contributed money that was intended to fund the preparation or submission of this brief.

2.  Congress of Neurological Surgeons

3.  American Academy of Otolaryngology-Head and Neck Surgery

4.  American Association of Orthopaedic Surgeons

5.  American Osteopathic Association

6.  American Society of Plastic Surgeons

All such societies are nonprofit organizations that promote research, education, and the highest level of quality care in their respective medical specialties. Collectively comprised of 267,000 members, for decades these organizations have advanced their specialty fields through education, outreach, and advocacy, including advocacy before federal and state courts and legislatures to ensure fair reimbursement to maintain specialty practices in all modes and settings for the benefit of patients.

Finally, amici on this brief include the following state medical associations:

1.  Mississippi State Medical Association

2.  California Medical Association

3.  Connecticut State Medical Society

4.  Florida Medical Association

5.  Medical Association of Georgia

6.  Kentucky Medical Association

7.  Massachusetts Medical Society

8.   Nebraska Medical Association

9.   Medical Society of New Jersey

10.  Medical Society of the State of New York

11.  North Carolina Medical Society

12.  Oregon Medical Association

13.  South Carolina Medical Association

14.  Tennessee Medical Association

15.  Washington State Medical Association

These amici are each nonprofit associations representing physicians at every stage of their careers. Collectively comprising 351,000 members, the amici state medical associations work toward advancing the science and art of medicine by, among other things, helping physicians sustain viable medical practices and challenging unfair payor practices and policies to protect patient access to medical care.

More detail about each amici party (collectively, "Amici" or "Provider Associations") is provided in the Attachment hereto.

## INTRODUCTION

A result of exhaustive negotiations in Congress in which patient, payor, and provider voices were fully heard, the No Surprises Act ("NSA") adopts what is intended to be a balanced approach to protect patients from the financially

devastating consequences of payment disputes between payors and providers, while also making available a formal negotiation process and, failing that, an independent dispute resolution ("IDR") process that would result in fair out-of-network reimbursement. Under the NSA, an important measure for both the negotiation and IDR processes is the "qualifying payment amount" ("QPA"), which is meant to reflect the in-network negotiated contract rate for a given service, and which is to be considered along with other equally important factors (such as a physician's expertise, acuity of the patient, and market position of the provider) in helping insurers and providers resolve disputes over out-of-network claims. *See* 42 U.S.C. §300gg-111(c)(5)(C).

In the two years of implementation since the NSA was enacted, the QPA has gained undue influence and improperly tilted the balance of negotiating powers in favor of insurers both within NSA dispute resolution processes and in the real-world marketplace of insurer-provider contracting. The distortion of the QPA's influence and role was made possible through regulations promulgated by appellants here ("Departments"), the federal agencies and officials responsible for implementing the NSA. At issue before the Court are provisions in the Departments' first interim rule, *Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36872 (July 13, 2021) ("July IFR"), governing the calculation methodology and disclosures around the QPA.

4

The district court correctly concluded that the July IFR's provisions requiring inclusion of "ghost" rates and exclusion of incentive payments from the QPA calculation violated the plain text of the NSA. However, as appellees explain in their briefing, the district court was incorrect in upholding the July IFR's provision permitting insurers to give bare minimum information in their QPA disclosures. By this amicus brief, the Provider Associations focus the Court's attention on the broader, real-world implications and consequences of the July IFR's provisions.

In short, the Departments' July IFR has made the dispute resolution process under the NSA more difficult, costly, and ultimately inaccessible for providers, which may explain why early data shows only 6.5 percent of NSA-eligible claims go through IDR. *See, infra,* footnote 3. While the July IFR disserves and runs directly counter to the NSA's letter and spirit, it also has had widespread negative impact in contract negotiations between providers and insurers. The availability of an artificially depressed QPA, made possible by the July IFR, gives insurers an even greater upper hand than what they already possess. Claiming new "market conditions" under the NSA, insurers are upending decades-long relationships with well-established providers by demanding steep rate discounts (as much as 50 percent reductions). If providers refuse, insurers kick them out of network knowing that they likely could force the providers into the NSA dispute resolution process

where they can often get resolutions below market rates. These abuses of market power harm not only providers, who are struggling to stay in business, much less remain independent, but also have a documented negative impact on quality and access to care.

This Court has an opportunity to course-correct to ensure that the spirit and letter of the NSA are realized. In so doing, as Congress designed, patients will be protected from balance billing while providers can rely on a process that fairly results in just compensation.

## BACKGROUND

Throughout the legislative debates and regulatory rulemaking process for the NSA, organized medical associations, including PAI and the amici organizations here (collectively, "Organized Medicine"), supported policies to hold patients "harmless" from balance billing. Organized Medicine also advocated for broader protections against insurer practices that leave patients with few or difficult to access options for in-network services. These protections include more rigorous network adequacy oversight, transparent and accurate plan and benefit information, especially regarding in-network and out-of-network payment and cost-sharing policies, and accurate provider directories.

Organized Medicine believed that a legitimate and reliable dispute resolution process to resolve out-of-network payment disputes was critical to the NSA scheme.

6

If providers could no longer balance bill, they must have a productive means to pursue fair compensation from insurers. However, a defective dispute resolution process that favored insurers or established a de facto, pre-determined out-of-network rate would ill-serve the NSA's goals. Indeed, insurers had unsuccessfully tried to convince Congress to adopt a payer-determined in-network benchmark rate as the only or primary factor in settling disputes. Congress instead adopted a scheme that considered multiple factors to determine the appropriate payment rate for out-of-network services. By design, the NSA established a dispute resolution process that Organized Medicine believed could get "buy in" by providers. It is critical that the express dictates of the NSA be followed.

## ARGUMENT

### I.     The July IFR's QPA Methodology Are Inconsistent with and Disserve the Goals of the NSA.

The July IFR permits insurers to include ghost rates in the calculation of the QPA – that is, rates for services that providers do not provide but nevertheless appear in a contracted fee schedule. *See* August 2022 FAQs at 17. It additionally directs insurers to "[e]xclude" from rates used to calculate QPAs "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 45 C.F.R. § 149.140(b)(2)(iv). Both provisions of the July IFR are inconsistent with the plain text of the NSA. *See* Brief of Appellees/Cross-

Appellants Texas Medical Association *et al.* at 31-43 [docket 76] ("TMA Br."). As explained below, the July IFR's QPA methodology also violates the policy goals underlying the NSA. Inclusion of ghost rates and exclusion of incentive payments invariably drive the QPA downward, where it becomes artificially low and not a reflection of negotiated in-network contract rates.

### A.  Inclusion of Ghost Rates Depresses the QPA and Does not Reflect Negotiated Contracted Rates.

The Departments betray reality when they claim "[a]t the time the contracts are negotiated, neither a provider nor a plan can know for certain how many times a particular service will be provided." Brief for Appellants at 28 [docket 53] ("Appellants' Br."). Many providers enter into contracts to render services within their medical specialty and are not trained, certified, or equipped to render out-of-specialty services. For instance, infectious disease physicians cannot and will not provide anesthesia services, even if their contract with an insurer includes rates for such services. The Departments are wrong to claim, "[a] provider and a plan may agree to a rate for a service that the provider does not anticipate ever providing but ends up providing several times over the course of the contract [or] a provider may negotiate a rate for a given service in the hope or expectation of providing that service frequently, yet may ultimately do so rarely or never." *Id.*

The Departments also fail to recognize how ghost rates are inserted in provider contracts. Providers do not contemplate and affirmatively accept ghost rates. Rather, insurers often propose a broad fee schedule for multiple services when a provider wishes to join its network. The fee schedule will include rates for services that are beyond the scope of the provider's specialty or capabilities. Providers focus only on the services that they intend to provide to negotiate an acceptable rate. They do not negotiate rates for services they cannot and will not provide, leaving such ghost rates as originally presented in the fee schedule.

The rates for services that providers will provide and which are actively negotiated between the parties will be higher than the original rate in the insurer's default fee schedule. Because ghost rates are not the subject of negotiations, they remain at the default rate offered in the insurer's fee schedule, always at lower levels than would be achieved if the provider actively negotiated them. In other words, ghost rates are not the result of fair market negotiations and thus do not represent negotiated in-network contract rates for a given service. For example, a large multispecialty medical group has reported to PAI that its hospitalist contract with a large health insurer included a ghost rate for anesthesiology services. The same multispecialty group also has anesthesiologists who have a separate contract with the same insurer that includes a negotiated rate for the same anesthesia

9

service. The ghost rate for the anesthesia service in the hospitalist contract is half the negotiated rate for the same service in the anesthesia contract.

The Department's explanation that ghost rates do not present a problem because insurers must exclude out-of-specialty rates in calculating the QPA is insufficient. *See* Appellants Br. at 30-31. Rates for services do not neatly fit within categories by specialists, such that insurers can readily determine whether they should be excluded from a particular QPA calculation. Moreover, ghost rates are not always simply out-of-specialty rates. Some examples include:

- Pediatric practices with fee schedules that include ghost rates for adult wellness visits and other age-specific care;

- Physician practices with fee schedules that include ghost rates for durable medical equipment that the practice does not furnish to its patients; and

- Physician practices with fee schedules that include ghost rates for lab or imaging services, even though they do not provide such testing inhouse.

The exclusion of out-of-specialty ghost rates would not screen out these sorts of ghost rates. Furthermore, there is no guidance or criteria from the Departments that would ensure consistency in how insurers decipher services to be out-of-specialty, leaving it largely up to insurers to unilaterally determine when to include or exclude ghost rates without any meaningful oversight.

**B.    Exclusion of Incentive Payments Fails to Account for Total Negotiated Compensation.**

Congress specified that QPAs must be a measure of the "total maximum payment" recognized by the insurer. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The July IFR, however, requires insurers to "[e]xclude" from rates used to calculate QPAs "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 45 C.F.R. §149.140(b)(2)(iv). This invariably lowers the QPA because a significant portion of what providers receive from insurers as compensation for medical services is not being accounted for. While the Departments do not dispute that their July IFR skews the QPA downward, they fail to adequately explain how this comports with the NSA.

Exclusion of incentive payments gives an incomplete picture of negotiated reimbursement arrangements between providers and insurers. Providers may agree to discounts reflected in a negotiated fee schedule if there are other avenues under the contract to capture reimbursement revenue. But for the possibility of incentive payments, providers would not agree to the discounted fee schedule rates. "Total maximum payment" under a negotiated contract thus must include both the fee schedule rate and all risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments. The failure to incorporate such payments into the QPA calculation misrepresents the true negotiated compensation that providers receive from, and are contractually recognized by, insurers.

11

**II.    The Flaws of the QPA are Compounded with a Lack of Transparency Around How it is Calculated.**

Though it was right to void the July IFR provisions concerning ghost rates and incentive payments, the district court was wrong to uphold the Departments' requirements concerning insurer QPA disclosures. Meaningful disclosures serve multiple purposes and ultimately are vital to furthering the NSA's goal of leveling the playing field in out-of-network payment disputes.

The lack of transparency about how QPAs are calculated prevents many providers from making an informed determination whether to accept an insurer's interim payment, initiate open negotiation, or negotiate for realistic compromise. As the Departments recognized, providers must know how the QPA is calculated to determine whether to go into IDR. *See* 86 Fed. Reg. at 36898.

More detailed information about how a QPA is calculated could also help providers in an IDR to present a realistic offer. Because the QPA must statutorily be provided to the IDR entity, providers necessarily must present an offer as an alternative to the QPA, and doing so persuasively requires additional information be communicated to the IDR arbitrator in order to put the QPA in proper context.

Finally, when the methodology and components of a QPA are laid bare, insurers would be hard pressed to rely upon it to leverage bargaining position in contract negotiations. Transparency over the QPA could mitigate some of the

contract abuses that are founded upon the insurers' demand that providers accept a low contract rate or go out-of-network to face a QPA that may be even lower.

## III.    Elevating a Flawed QPA Emboldens Health Insurer Abuses in the NSA Dispute Resolution Process and in Real World Contract Negotiations.

Physician providers already have a hard time negotiating fair contracts due to unbalanced insurer market power. If the NSA dispute resolution process is largely considered skewed to favor health insurers, it becomes nearly impossible for many providers to engage in meaningful contract negotiations with insurers. Insurers may offer below market rates knowing that physician practices face a Hobbesian choice—accept the low rates in a contract or go out of network where a similar or lower rate is likely to be imposed on the provider through the NSA. Amici are hearing widespread reports of such insurer abuses.

### A.    Insurers Are Leveraging a Depressed QPA Under the NSA Dispute Resolution Process.

#### 1.    Low-Ball Offers in Initial Payment through Open Negotiation.

Early NSA implementation data and reports from physician practices reveal some troubling behavior by insurers in the NSA dispute resolution process.[2]

---

[2] The Centers for Medicare & Medicaid Services ("CMS") has released data from IDR cases in the first two quarters of reporting year 2023. *See* CMS, "Independent Dispute Resolution Reports" online at https://www.cms.gov/nosurprises/policies-and-resources/Reports.

Physician practices report having a difficult time recognizing NSA-eligible claims because insurers are not providing identifying information. Consequently, providers may not be pursuing full reimbursement on many NSA-eligible claims. Physician groups also may not dispute NSA-eligible claims where the amounts at issue are too low to justify the exorbitant cost and time-consuming efforts to pursue claims under the NSA. According to insurer industry estimates,[3] in the first three quarters of 2023, nearly 80 percent of more than 10 million NSA eligible claims did not progress into open negotiation and less than 7 percent went into IDR. This shows that many underpaid NSA-eligible claims are not being pursued.

Physician groups also report refusal of many insurers to participate in good faith in the open negotiation period. One large group has reported to PAI that insurers often do not respond, much less make a higher offer than their initial payment, when open negotiation is initiated. This group reports that only 40 percent of their open negotiation claims involve an insurer response, and only 4 percent involve an offer by the insurer.

---

[3] *See* America's Health Insurance Plans, "No Surprises Act Continues to Prevent More than 1 Million Surprises Bills Per Month," (Jan. 26, 2024), online at *https://www.ahip.org/resources/no-surprises-act-continues-to-prevent-more-than-1-million-surprise-bills-per-month-while-provider-networks-grow* (last visited 3/17/2024).

## 2.    Delinquency and Obstruction in IDR Offers and Awards.

In the IDR process, providers report continued refusal by insurers to move off the interim payment, which is ultimately revealed to be inadequately low. PAI has learned from some physician groups that insurers' IDR offers stay within five percent of their interim payment. And insurers claim their original payment is closest to the QPA as calculated under the July IFR.

IDR arbitrators usually choose the providers' offer over the insurer's QPA-aligned offer. Providers won 72 percent of IDR cases in the first quarter of 2023 and 79 percent in the second quarter.[4] Such success demonstrates that the QPA-aligned offers made by insurers are unreasonably low. But that does not mean that the NSA and its IDR process are ensuring providers get reasonable compensation for out-of-network services. As noted, less than 7 percent of all NSA-eligible claims go into IDR, leaving the vast majority of out-of-network disputed claims paid at an unreasonably low rate.

Furthermore, though providers may prevail in IDR, they continue to face obstacles getting reimbursed. Reports by provider organizations show that 33

---

[4] Jack Hoadley and Kevin Lucia, "Report Shows Dispute Resolution Process in No Surprises Act Favors Providers," The Commonwealth Fund (Mar. 1, 2024), online at https://www.commonwealthfund.org/blog/2024/report-shows-dispute-resolution-process-no-surprises-act-favors-providers (reporting on CMS data on IDR claims for Q1 and Q1 2023) ("Hoadley and Lucia") (last visited 3/17/2024).

percent of all awards adjudicated through IDR were underpaid, and 52 percent were not paid at all.[5]

Finally, providers have reported to PAI that prevailing on and collecting an IDR arbitration award seems to have no effect on ensuring fair compensation in the out-of-network market. Insurers have asserted that they believe IDR awards are "unenforceable" and "not binding,"[6] which means a successful IDR case has little impact on a future interim payments. An insurer that loses an IDR case will continue to pay the same medical group for the same service the same low, QPA-aligned interim payment that had been rejected in an IDR case.

Insurers are treating the NSA's dispute resolution processes – from interim offers through IDR awards – as administrative hurdles that serve to delay or hinder fair reimbursement for out-of-network services. The artificially low QPA that is made possible through the Departments' July IFR fuels this scheme.

### B.     A Flawed NSA Dispute Resolution Process Facilitates Further Abuses in the Contract Negotiations.

Insurers have changed their approach to contract negotiations with providers as a result of the leverage they gained through the NSA's flawed implementation.

------

[5] Tina Reed, "Doctors say insurers are ignoring orders to pay surprise billing disputes," Axios (Aug. 3, 2023) online: https://www.axios.com/2023/08/03/insurers-refusing-pay-surprise-billing (last visited 3/17/24).

[6] *Id.*

Physician practices have reported, soon after the NSA and its implementation were rolled out, insurers who have contracted with them for decades demanded significant rate reductions for the first time. One large, national health insurer demanded a multistate, multispecialty provider reduce rates over a three year period – 17 percent the first year, 35 percent the second year, and 51 percent the third year. This insurer had contracted with the group for many decades and had never before, until the NSA, asked for a rate reduction. The insurer also made clear that refusal to accept the lower rate would result in termination from its network. Another large, national health insurer informed the group that, in light of a "changed market" after the NSA, it intended to renegotiate a decades-old contractual relationship and would seek a 20 percent reduction.

Insurers have asserted that if providers do not accept a lower contract rate, the insurer could walk away and rely on the provider's services on an out-of-network basis. And if the provider refuses to accept the insurer's reimbursement on a particular out-of-network claim, the provider would have to go through the NSA's dispute resolution processes to pursue reimbursement for that one claim. While insurer abuse in contract negotiations was common before the NSA, such abuse has become more brazen and widespread after the NSA.

**IV.    Implementation of the NSA With a Flawed QPA Methodology and IDR Is Worsening Already Difficult Physician Practice Conditions.**

Echoing arguments made by insurers, the Departments make a policy argument not found in the NSA to support their flawed approach in the July IFR. They argue that lower QPAs are good for patients because it results in lower cost sharing that patients must pay. *See* Appellants' Br. at 15. However, as reflected in the balanced approach taken by Congress that includes leveling the bargaining positions of providers and insurers, giving insurers power to drive out-of-network payments downward will further accelerate the already troubling trend of physicians abandoning private practice. In the long run, that is not good for patients as consolidation breeds anticompetitive market behaviors, reduces choice because insurers have little incentive to build robust provider networks, drives prices higher to increase insurer profits, and allows corporate entities to dictate patients' medical care.

**A.    Artificially Low QPAs Ultimately Harm Patients and Heighten the Problems Inherent in Consolidation of Physician Practices.**

Allowing insurers to set artificially low QPAs has marketplace ramifications that go well beyond the obvious financial windfall that insurers reap by paying lowball rates in NSA-governed disputes. The flawed QPA methodology occasioned by the July IFR has eliminated the already-weak incentives insurers had prior to the NSA to pay in-network physicians fairly or sustain robust provider

18

networks. The downward rate pressures exacerbate an ongoing trend of consolidation of physician practices, with deleterious consequences on patient access to quality care.

The pace of corporate entity acquisitions has been astonishing. In 2012, before private equity or other corporations entered the buyers' market for physician practices, only 25 percent of physicians were employed by hospitals or health systems.  Now, corporate entities employ nearly 80 percent of physicians and own nearly 60 percent of physician practices. Avalere researchers have documented the steady pace of this shift towards employment and corporate practice acquisitions, which accelerated sharply due to the impact of the Covid-19 pandemic.[7] Physicians across the country reported being forced to sell their practices after months of no or little revenues during the pandemic.

The practice of negotiating over provider payment rates has become a relic of the competitive marketplace of the past, wherein physicians and insurers would work towards a mutually agreeable rate schedule. Under this prior regime, if agreement could not be reached, the physician practice would lose the benefits of

---

[7] Avalere Health, "COVID-19's Impact on Acquisitions of Physician Practices and Physician Employment 2019-2021," (April 2022), online at https://www.physiciansadvocacyinstitute.org/Portals/0/assets/docs/PAI-Research/PAI%20Avalere%20Physician%20Employment%20Trends%20Study%202019-21%20Final.pdf?ver=ksWkgjKXB_yZfImFdXlvGg%3d%3d (last visited 3-18-2024).

being "in-network" (e.g., patient-steering and certainty of payment). Insurers that offered unreasonably low rates or commercially unappealing contract terms risked inadequate provider networks that could not compete in the marketplace. Those incentives and disincentives kept insurers and providers honest in negotiating fair and reasonable contracts, but they now have been distorted under current market conditions that have been made worse under the NSA implementation. For independent physician practices, there is little to no negotiating over fee schedules, but rather a "take it or leave it" approach whereby insurers dictate payment and other contract terms.

Consolidation undermines competition and drives prices higher. Research shows that corporate acquisitions of practices and practice closures negatively impact cost, choice, access, and quality for patients seeking care:

- **<u>Costs rise</u>** – a 2023 study[8] led by researchers at Harvard and the National Bureau of Economic Research found that prices for services from physicians and hospitals within health systems were significantly higher than the prices of services from independent physicians and hospitals. For example, physician services delivered within health systems cost between 12 percent

---

[8] *See* Nancy D. Beaulieu, et al., "Organization and Performance of US Health Systems" JAMA 2023;329(f):325-335 (Jan. 24/31, 2023) online at https://jamanetwork.com/journals/jama/article-abstract/2800656 (last visited 3-18-2024).

and 26 percent more, compared with independent practices. Researchers found that small differences in quality combined with large differences in cost of care suggests that health systems have not, on average, realized their potential for better care at equal or lower cost.

- **<u>Patient care deteriorates</u>** - In a recent survey[9] of employed physicians by NORC at the University of Chicago, almost 60 percent of physician respondents reported that practice ownership changes have diminished the quality of care they can provide, citing policies that lessen physicians' clinical autonomy and effectiveness. Insurer contract terms and conditions of participation impose administrative hurdles to refer patients to out-of-network specialists, diminish time and communication with patients, and impose pressure to promote lower-cost treatments. Another study determined that larger integrated health systems do not provide higher quality care when compared to independent practices, especially for more complex, high-need patients.[10]

---

[9] *See* NORC at the Univ. of Chicago, "The Impact of Practice Acquisitions and Employment on Physician Experience and Care Delivery" (Nov. 2023) online at https://www.physiciansadvocacyinstitute.org/Portals/0/assets/docs/PAI-Research/NORC-Employed-Physician-Survey-Report-Final.pdf?ver=yInykkKFPb3EZ6JMfQCelA%3d%3d (last visited 3-18-2024)

[10] *See* Elliott S. Fisher *et al.*, "Financial Integration's Impact On Care Delivery And Payment Reforms: A Survey Of Hospitals And Physician Practices" HealthAffairs vol. 39, no. 8 (Aug. 2020) online at https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2019.01813 (last visited 3-18-2024).

- **<u>Vulnerable patients suffer</u>** - Without adequate physician payment and the ability to own and operate small or independent practices, physician supply will decrease and patients in rural and urban areas may be cut off from valuable primary care services and lose critical specialty care services. Rural areas with older, lower-income, and chronically ill individuals are particularly vulnerable to practice closures.

When practices close or physicians leave independent practice to join larger, more hierarchical organizations with a greater emphasis on cost control, patients can lose more than just access to critical care services. Patients also lose valuable patient-physician relationships that are rooted in physician-driven patient-centered care.

### B.     Unfairly Low QPAs Incentivize Insurers to Offer Inadequate Provider Networks.

When patients and health plan sponsors choose a health benefit plan, they expect that plan to offer a sufficient network of participating providers to ensure reasonable access to all covered services. However, insurers utilize a range of tactics to minimize their payment outlays for health care services covered under health plans. One common tactic involves designing limited provider networks (known as "narrow" or "skinny" networks).  Limited networks allow insurers to save by (1) attracting lower-risk beneficiaries, as those with preexisting medical

conditions or higher risks are more likely to seek benefit plans with broader provider networks, and (2) preventing beneficiaries from seeking care from physicians and at hospitals that deliver high-expense services, shifting costly claims "out-of-network" where most of the cost of care is born by the patients and not the insurer.

These narrow network plans are generally offered at commercially attractive lower premiums. Narrow provider networks often limit, sometimes severely, the number and types of contracted physicians and hospitals that beneficiaries can access "in network." This means patients cannot find in-network physicians, specialists, and/or sub-specialists to treat them in a timely manner. Patients often are unaware that their health plan is limited in this manner until they are forced to go "out of network" – with significantly higher cost-sharing and separate, higher deductibles – or forgo necessary care altogether.

A serious ramification of unfairly low QPAs is further deterioration of the provider networks offered by insurers to beneficiaries. If insurers can get away with paying an unfairly low rate to out-of-network providers, they have little incentive to contract with those providers to ensure beneficiaries' "in network" access to covered services. Indeed, as noted above, Amici are aware of numerous instances where insurers, after passage of the NSA and the implementing regulations, have cited a changed marketplace as the basis for terminating network

23

contracts or demanding steep discounts on rates that had been in place for decades. This behavior is problematic because, even with the protections afforded by the NSA for certain unanticipated "out-of-network" medical costs, narrow networks often force patients to seek care from specialists or at facilities that were excluded from the plan's provider network for services that are not governed by the NSA.

On an almost weekly basis, stories appear about how a national insurer has terminated its agreement with a physician or hospital or clinic and how insurers are unwilling to negotiate with physicians tied to rates.[11] While the NSA may be intended to steer patients to in-network care, the reality is that accessing such in-network care is becoming more difficult and inconvenient, if not impracticable.

## C.    Insurer Profits Continue to Soar While Access and Quality of Care Suffers.

During a decade plagued by skyrocketing healthcare costs and constant downward pressure on physician and other healthcare provider payments, insurer

---

[11] *See, e.g.*, ABC15.com Staff, "Thousands of BCBSAZ patients out of network at Dignity Health, Aetna patients also at risk" (Mar. 11, 2024) (large insurer failed to renew contract with hospital system, leaving "tens of thousands of BCBSAZ members who depend on our outpatient services like cancer care or imaging will lose in-network access to these care sites. And the BCBSAZ members admitted to our hospitals will be directed elsewhere, creating an unnecessary burden for families already faced with difficult circumstances") online at https://www.abc15.com/news/local-news/thousands-of-bcbsaz-patients-out-of-network-at-dignity-health-aetna-patients-also-at-risk (last visited 3-18-2024); Emily Barnes, "WellNow Urgent Cares drop in-network Excellus coverage in NY," Democrat & Chronicle (Jan. 19, 2024) online at https://www.democratandchronicle.com/story/news/2024/01/19/wellnow-urgent-cares-drop-excellus-coverage-in-ny-what-you-should-know/72254120007/ (last visited 3-18-2024).

profits have soared to record highs.[12] Quarter after quarter and year after year, insurance revenues as well as profits seem to soar higher, with no end in sight.[13] At the same time, physicians are seeing smaller increases, if any at all, from these same insurers, indicating a shift in the power dynamic where insurers now have all the leverage (and profits) and providers are left with increased costs and very little opportunity to increase revenues.

The COVID-19 pandemic saw physician practices closed for months and hospitals forced to postpone or cancel elective procedures to increase capacity for COVID-19 patients. Although patients and physicians suffered personally and financially during the pandemic, commercial insurers reached their most profitable year since the 2008 financial crisis.[14] The return on policyholder surplus, a measure of the industry's profitability, increased by 22.7% between 2019 and 2020:

---

[12] *See* Jakob Emerson, "Big payers ranked by 2023 profit" Becker's Healthcare (Feb. 7, 2024) online at https://www.beckerspayer.com/payer/big-payers-ranked-by-2023-profit-beckers.html (last visited 3-18-2024).

[13] Tyler Hammel and Noor Ul Ain Adeel, "Most US health insurers expected to report YOY revenue, EPS growth for Q4 2023" S&P Global Market Intelligence (Jan. 11, 2024) online at https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/most-us-health-insurers-expected-to-report-yoy-revenue-eps-growth-for-q4-2023-80014015 (last visited 3-18-2024).

[14] *See* Ishira Shrivatsa, "The Impact of the Covid-19 Pandemic on Health Insurers" Chicago Fed Letter, no. 471 (Fed. Reserve Bank of Chicago, Sept. 2022) online at https://www.chicagofed.org/publications/chicago-fed-letter/2022/471#:~:text=Effect%20of%20the%20pandemic%20on%20profits&text=Ultimately%2C%20the%20gains%20from%20the,income%20between%202019%20and%202020 (last visited 3-18-2024)



The industry's record profitability trend continued after the pandemic.[15] In 2022, UnitedHealth Group made over $20 billion in profits; Cigna made $6.7 billion; Elevance Health made $6 billion; and CVS Health made $4.2 billion. In total, the largest health insurers raked in more than $41 billion of profits in 2022.

Insurers' staggering pandemic and post-pandemic profits stand in stark contrast to the scores of small and rural independent medical practices that were and still are struggling to stay open. Small physician practices are grappling with rising overhead and wage costs that are cutting into practice revenues, making it difficult for physician practices to stay afloat. According to a 2023 report,

---

[15] *See* Jakob Emerson, "Big payers ranked by 2022 profit" Beckers Healthcare (Feb. 9, 2023) online at https://www.beckerspayer.com/payer/big-payers-ranked-by-2022-profit.html (last visited 3-18-2024).

physician expenses have continued to rise with increased patient demand, inflation, and rising employment costs due to a competitive labor market.[16]

The economic impact of COVID-19 on health care continues to reveal itself through reductions in patient volume and revenue and in higher practice costs. According to a nationwide survey of physicians in July and August of 2020, 81 percent of physicians surveyed said revenue was still lower than pre-pandemic levels and the average drop in revenue was 32 percent. Physician burnout remains a prevailing problem, documented by a Physicians Foundation survey, which found that 78 percent of physicians experienced burnout.[17] The pandemic further compounded this issue with increased patient demand and emotional exhaustion.

A flawed dispute resolution system under the NSA could not have come at a worse time. On top of record profits, insurers have gained even greater market power and bargaining advantages. Insurers are leveraging such power to take full advantage of a flawed NSA implementation that does not yield fair reimbursement for out-of-network claims.

---

[16] *See* Syntellis, "Market Analysis and Monthly Hospital and Physician KPIs" (March 2023) online at https://www.syntellis.com/sites/default/files/2023-05/performance_trends_april_hc.1105.05.23.pdf (last visited 3-18-2024).

[17] *See* The Physicians Foundation, "2018 Survey of America's Physicians: Practice Patterns and Perspectives" (Sept. 2018) online at https://physiciansfoundation.org/wp-content/uploads/physicians-survey-results-final-2018.pdf (last visited 3-18-2024).

**V.     Universal Vacatur is Appropriate.**

The district court was correct to order universal vacatur of the provisions of the July IFR requiring inclusion of ghost rates and exclusion of incentive payments. Amici agree that vacatur instead of remand is authorized and appropriate under the Administrative Procedures Act. *See* TMA Br. at 59-66. Vacatur is warranted also because the defects of the July IFR have had and will continue to have widespread negative impact on physician practices throughout the country. Indeed, PAI and its co-amici represent physicians and medical groups spanning the entire country. They have received reports of the types of abuse discussed herein from throughout their constituencies, concerning national insurers who are committing the same types of abuses in multiple states. The flaws of the QPA methodology infect the IDR process and have distorted bargaining powers in favor of insurers throughout the NSA dispute resolution process. Relief, as the district court correctly reasoned, necessarily means voiding the offending portions of the July IFR.

**CONCLUSION**

For the foregoing reasons and the reasons asserted in the appellees' briefs, Amici PAI, the fifteen amici state medical associations, and the six amici specialty medical societies urge the Court to affirm those aspects of the judgment of the district court vacating the July IFR provisions requiring inclusion of ghost rates

and exclusion of incentive payments from QPA calculations. However, the district court should be reversed for upholding the July IFR's requirements concerning insurer disclosure of QPA calculations to out-of-network providers.

Respectfully submitted,

Dated:  March 20, 2024

*/s/ Long X. Do*
Long X. Do

Long X. Do
ATHENE LAW, LLP
5432 Geary Blvd. #200
San Francisco, CA 94121
(415) 722-5351
E-mail: long@athenelaw.com

Eric D. Chan
ATHENE LAW, LLP
10866 Washington Blvd., #142
Culver City, CA 90232-3610
(310) 913-4013
E-mail: eric@athenelaw.com

*Counsel for Amici Curiae Physicians Advocacy Institute et al.*

## ATTACHMENT: DETAILED INFORMATION ON AMICI

A. Description of State Medical Associations

**California Medical Association**: Founded in 1856 "to develop in the highest possible degree, the scientific truths embodied in the profession," the California Medical Association ("CMA") has served as a professional organization representing California physicians for more than 160 years. Throughout its history, CMA has pursued its mission to promote the science and art of medicine, protection of public health and the betterment of the medical profession. CMA contributes significant value to its 50,000 members with comprehensive practice tools, services and support including legislative, legal, regulatory, economic, and social advocacy. CMA works to help reduce administrative burdens in physician practices, support physicians in providing quality care and ensure they thrive amid industry consolidation.

**Connecticut State Medical Society:** Since 1792, the Connecticut State Medical Society ("CSMS") has worked on behalf of physicians and patients in Connecticut. Through the CSMS, physicians stand together regardless of specialty to ensure patients have access to quality care and to make our state the best place to practice medicine and to receive care. CSMS is a respected and powerful voice for the medical profession in Connecticut, representing 4,000 physician members

and patients before the Connecticut General Assembly, state and federal agencies, health plans, licensing boards, the judicial branch, and more.

**Florida Medical Association:** Founded in 1874, the Florida Medical Association ("FMA") is a professional association dedicated to the service and assistance of Doctors of Medicine and Doctors of Osteopathic Medicine in Florida. The FMA represents more than 25,000 members on issues of legislation and regulatory affairs, medical economics and education, public health, and ethical and legal issues. It advocates for physicians and their patients to promote public health, ensure the highest standards of medical practice, and to enhance the quality and availability of health care in the Sunshine State.

**Medical Association of Georgia:** Founded in 1849, the Medical Association of Georgia ("MAG") is the leading advocate for physicians in the state. MAG's mission is to "enhance patient care and the health of the public by advancing the art and science of medicine and by representing physicians and patients in the policy making process." With more than 8,400 members, including physicians in every specialty and practice setting, MAG's membership has increased by more than 35% since 2010.

**Kentucky Medical Association:** Established in 1851, the Kentucky Medical Association ("KMA") is a professional organization for physicians throughout the Commonwealth.  Representing over 6,000 physicians, residents, and medical

students, the KMA works on behalf of physicians and the patients they serve to ensure the delivery of quality, affordable health care. Members of KMA share a mission of commitment to the profession and services to the citizens of the Commonwealth that extends across rural and urban areas. From solo practitioners to academicians to large, multi-specialty groups, KMA is the only state association representing every specialty and type of medical practice in Kentucky.

**Massachusetts Medical Society:** The Massachusetts Medical Society ("MMS") is the statewide professional association for physicians and medical students, supporting 25,000 members. MMS is dedicated to educating and advocating for the physicians of Massachusetts and patients locally and nationally. A leadership voice in health care, the MMS contributes physician and patient perspectives to influence health-related legislation at the state and federal levels, works in support of public health, provides expert advice on physician practice management, and addresses issues of physician well-being. Under the auspices of its NEJM Group, MMS extends its mission globally by advancing medical knowledge from research to patient care through the New England Journal of Medicine and other publications.

**Mississippi State Medical Association:** The Mississippi State Medical Association ("MSMA") is the largest physician advocacy organization in Mississippi, representing nearly 5,000 physicians and medical students. Since

1856, MSMA has been a trusted health policy leader and professional development resource for physicians, representing the unified voice of physicians statewide on state and federal health care issues while providing information needed to navigate health care legislation and regulatory changes.

**Nebraska Medical Association:** The Nebraska Medical Association ("NMA") was founded in 1868 and represents nearly 3,000 active and retired physicians, residents, and medical students from across the state of Nebraska. NMA's mission is "to serve physician members by advocating for the medical profession, for patients and for the health of all Nebraskans."

**Medical Society of the State of New York:** The Medical Society of the State of New York ("MSSNY") is an organization of approximately 30,000 licensed physicians, medical residents, and medical students in New York State. MSSNY is a nonprofit organization committed to representing the medical profession as a whole and advocating health-related rights, responsibilities, and issues. MSSNY strives to promote and maintain high standards in medical education and in the practice of medicine in an effort to ensure that quality medical care is available to the public.

**Medical Society of New Jersey:** Founded in 1766, the Medical Society of New Jersey ("MSNJ") is the oldest professional society in the United States. The organization and members are dedicated to a healthy New Jersey, working to

33

ensure the sanctity of the physician-patient relationship. In representing all medical disciplines, MSNJ advocates for the rights of patients and physicians alike, for the delivery of the highest quality medical care. This allows response to the patients' individual, varied needs, in an ethical and compassionate environment, in order to create a healthy Garden State and healthy citizens. With 9,500 members, MSNJ's mission is "to promote the betterment of the public health and the science and the art of medicine, to enlighten public opinion in regard to the problems of medicine, and to safeguard the rights of practitioners of medicine."

**North Carolina Medical Society:** North Carolina Medical Society ("NCMS") was founded in 1849 to advance medical science and raise the standards for the profession of medicine. Today, with 8,000 members NCMS continues to champion these goals and ideals while representing the interest of physicians and protecting the quality of patient care.

**Oregon Medical Association:** Founded in 1874, the Oregon Medical Association ("OMA") is Oregon's largest professional society engaging in advocacy, policy, community-building, and networking opportunities for 8,000 of Oregon's physicians, medical students, physician assistants, and physician assistant students. OMA's mission is to speak as the unified voice of medicine in Oregon; advocate for a sustainable, equitable, and accessible health care environment; and

energize physicians and physician assistants by building and supporting their community.

**South Carolina Medical Association:** Since 1789, the South Carolina Medical Association ("SCMA") has served as the foremost association of physicians dedicated to pioneering advances in South Carolina's health care. The largest physician organization in the state, SCMA represents more than 6,000 physicians, resident, and medical students and through that representation provides a voice for the medical profession and creates opportunities to improve the health of all South Carolinians. SCMA works to promote the highest quality of medical care through advocacy on the behalf of physicians and patients, continuing medical education, and the promotion of medical and practice management best practices.

**Tennessee Medical Association:** The Tennessee Medical Association ("TMA") advocates for policies, laws and rules that promote health care safety and quality for all Tennesseans and improve the non-clinical aspects of practicing medicine. TMA's mission is to improve the quality of medical practice for physicians and the quality of health care for patients by influencing policies, laws, and rules that affect health care delivery in Tennessee. On behalf of 9,200 members, TMA works to be the most influential advocacy for Tennessee physicians in the relentless pursuit of the best possible health care environment.

**Washington State Medical Association:** The Washington State Medical Association ("WSMA"), established in 1889, is the largest medical professional association in Washington state, representing more than 12,000 physicians, physician assistants, and trainees from all specialties and various practice settings throughout the state. WSMA's mission is to advance strong physician leadership and advocacy to shape the future of medicine and advance quality care for all Washingtonians.

B. Description of Specialty Medical Societies

**American Association of Neurological Surgeons:** Founded in 1931 as the Harvey Cushing Society, the American Association of Neurological Surgeons ("AANS") is a scientific and educational association with more than 13,000 members worldwide. Fellows of the AANS are board-certified by the American Board of Neurological Surgery, the Royal College of Physicians and Surgeons of Canada, or the Mexican Council of Neurological Surgery, A.C. The mission of the AANS is to promote the highest quality of patient care and advance the specialty of neurological surgery, which is the medical specialty concerned with the prevention, diagnosis, treatment and rehabilitation of disorders that affect the spinal column, spinal cord, brain, nervous system and peripheral nerves.

**Congress of Neurological Surgeons**: Established in 1951, the Congress of Neurological Surgeons ("CNS") exists to enhance health and improve lives

through the advancement of neurosurgical education and scientific exchange. With over 10,000 neurosurgical professionals from more than 90 countries, the CNS advances the practice of neurosurgery globally by inspiring and facilitating scientific discovery and its translation to clinical practice. Quality neurosurgical care is essential to the health and well-being of society. As such, the CNS, together with the AANS, support a Washington Office that carries out their missions by promoting sound health policy and advocating before the courts, regulatory bodies, state and federal legislatures, and other stakeholders.

**American Academy of Otolaryngology-Head and Neck Surgery:** The American Academy of Otolaryngology-Head and Neck Surgery ("AAO-HNS") was founded in 1896. The AAO-HNS serves its 12,000 United States members in many ways to ensure they are able to provide the highest quality care to all patients. Its Core Purpose states: "We engage our members and help them achieve excellence and provide high quality, evidence informed and equitable ear, nose, and throat care through professional and public education, research, and health policy advocacy."

**American Association of Orthopaedic Surgeons:** Representing more than 39,000 members, including Orthopaedic Surgeons and allied health care professionals in the musculoskeletal medicine specialty, the American Association of Orthopaedic Surgeons ("AAOS") promotes and advocates the viewpoint of

37

the orthopaedic community before federal and state legislative, regulatory, and executive agencies. On behalf of its members, AAOS identifies, analyzes, and directs all health policy activities and initiatives to position the AAOS as the trusted leader in advancing musculoskeletal health.

**American Osteopathic Association:** The American Osteopathic Association ("AOA") represents more than 186,000 osteopathic physicians (DOs) and osteopathic medical students; promotes public health; encourages scientific research; and serves as the primary board certification body for osteopathic physicians. As the primary board certification body for osteopathic physicians, the AOA works to accentuate the distinctiveness of osteopathic principles and the diversity of the profession. In addition to promoting public health and encouraging scientific research, the AOA advocates at the state and federal levels on issues that affect osteopathic physicians, osteopathic medical students, and patients.

**American Society of Plastic Surgeons:** The American Society of Plastic Surgeons ("ASPS") is the world's largest association of plastic surgeons. Its over 7,000 domestic members represent 93 percent of Board-Certified Plastic Surgeons in the United States. ASPS's mission is to promote the highest quality in professional and ethical standards, advance quality care for plastic surgery patients, and promote public policy that protects patient safety. ASPS's members are highly skilled surgeons who improve both the functional capacity and quality of life for

patients, including the reconstruction of defects caused by disease, congenital

anomalies, burn injuries, and traumatic injuries; the treatment of hand conditions;

and the provision of gender affirming care.

## CERTIFICATE OF COMPLIANCE

This brief contains 6,457 words, excluding the items exempted by rule 32(f) of the Federal Rules of Appellate Procedure ("FRAP"), and is in 14-point Times New Roman proportional font, except for footnotes in 12-point Times New Roman proportional font. This brief complies with the type-volume limitation set forth in FRAP rules 29(a)(5) and 32(a)(7)(B) and Fifth Circuit Rule 32.1.


Dated:  March 20, 2024                */s/ Long X. Do*
                                             Long X. Do

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that, on March 20, 2024, I served

the foregoing brief upon all counsel of record by filing a copy of the document

with the Clerk through the Court's electronic docketing system.

Dated:  March 20, 2024

/s/ Long X. Do
Long X. Do