**No. 23-40605**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

TEXAS MEDICAL ASSOCIATION, TYLER REGIONAL HOSPITAL, LLC.,
DOCTOR ADAM CORLEY,
*Plaintiffs-Appellees*,
v.
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
DEPARTMENT OF LABOR; DEPARTMENT OF THE TREASURY;
XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; JULIE A. SU, ACTING SECRETARY,
U.S. DEPARTMENT OF LABOR; JANET YELLEN, SECRETARY,
U.S. DEPARTMENT OF TREASURY,
*Defendants-Appellants*.

———————————————

LIFENET, INCORPORATED, EAST TEXAS AIR ONE, LLC,
*Plaintiffs-Appellees,*
v.
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
DEPARTMENT OF LABOR; DEPARTMENT OF THE TREASURY;
XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; JULIE A. SU, ACTING SECRETARY,
U.S. DEPARTMENT OF LABOR; JANET YELLEN, SECRETARY,
U.S. DEPARTMENT OF TREASURY,
*Defendants-Appellants*.

On Appeal from the United States District Court for the Eastern District of Texas
District Court Case Nos. 6:22-cv-00450-JDK, 6:22-cv-00453
The Honorable Jeremy D. Kernodle, Judge Presiding

### BRIEF AMICUS CURIAE OF
### THE EMERGENCY DEPARTMENT PRACTICE
### MANAGEMENT ASSOCIATION IN SUPPORT OF APPELLEES

[COUNSEL LISTED ON FOLLOWING PAGE]

Jack R. Bierig
ARENTFOX SCHIFF LLP
233 South Wacker Drive
Suite 7000
Chicago, IL 60606
Phone: (312) 258-5511
Fax:  (312) 258-5600
jack.bierig@afslaw.com

*Counsel for Amicus Curiae*
*The Emergency Department Practice*
  *Management Association*

## <u>SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Circuit Rules 28.2.1 and 29.2, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1, in addition to those listed in the parties' briefs, have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

*Amicus Curiae*: The Emergency Department Practice Management Association ("EDPMA") is a not-for-profit national trade association and a Section 501(c)(6) corporation. EDPMA has no parent corporation, and no publicly held company has an ownership interest in EDPMA.

*Counsel*: Jack R. Bierig, ArentFox Schiff LLP, Chicago, Illinois.

*/s/ Jack R. Bierig*
Jack R. Bierig

Counsel for *Amicus Curiae*
The Emergency Department Practice
Management Association

# TABLE OF CONTENTS

Page

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS.......................i

IDENTITY AND INTEREST OF *AMICUS CURIAE* ............................1

INTRODUCTION ...........................................................5

ARGUMENT ..............................................................10

I.    The Rule Directly Conflicts with the NSA's Clear and Unambiguous Language......................................................10

    A.    The Rule's Methodology for Determining the QPA Violates the NSA. ...................................................11

        1.    Inclusion of "Ghost Rates" and "Zero-Pay" Payments.....................................................12

        2.    Exclusion of Risk-Sharing, Bonus, and Other Retrospective Payments...................................15

    B.    The Rule Fails to Require Adequate Disclosure of the Basis for the Insurer's Calculation of the QPA. ......................16

II.    The Departments' Implementation of the NSA Has Resulted in Serious Adverse Consequences for the Delivery of Emergency Care to Patients......................................................17

    A.    Reimbursement Rates for Physicians—Particularly Emergency Physicians—Have Declined Dramatically Since the Departments' Implementation of the NSA. .............17

    B.    The Significantly Below-Market QPAs Calculated by Insurers Have Resulted in Enormous Backlogs in the IDR Process, Further Delaying Payments to Physicians.........21

    C.    The QPA Disclosure Provisions of the Rule Have Left Physicians Without Any Recourse, and the Departments Have Failed to Enforce the NSA's Disclosure Obligations. ............................................................22

    D.    The Departments' Implementation of the NSA Has Resulted in the Contraction of Provider Networks.................25

    E.    Contrary to Defendants' Contentions, Physicians Are Not Satisfied with the IDR Process. ...............................27

CONCLUSION ............................................................29

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF SERVICE ................................................................30

CERTIFICATE OF COMPLIANCE......................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*,
   587 F. Supp. 3d 528 (E.D. Tex. 2022) ("*TMA I*") ................................. 10

*Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*,
   654 F. Supp. 3d 575 (E.D. Tex. 2023) ("*TMA II*") ........... 1, 6, 10, 19, 28, 29

*Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 6:22-cv-450-JDK,
   2023 WL 5489028 (E.D. Tex. Aug. 24, 2023) ("*TMA IV*") ..................... 27

**Statutes**

42 U.S.C. § 300gg-11 l(a)(3)(H) ...................................................... 19

42 U.S.C. § 300gg-111 ................................................................... 2

42 U.S.C. § 300gg-111(a)(1)(C)(ii) ................................................. 10

42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II) ........................................... 10

42 U.S.C. § 300gg-111(a)(2) .................................................... 12, 24

42 U.S.C. § 300gg-111(a)(2)(B)(i) ................................................. 11

42 U.S.C. § 300gg-111(a)(2)(B)(ii) ................................................ 11

42 U.S.C. § 300gg-111(a)(2)(B)(iv) ............................................... 11

42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) ....................................... 11, 12, 15

42 U.S.C. § 300gg-111(a)(3)(E)(iii) ............................................... 12

42 U.S.C. § 300gg-111(a)(3)(K) .................................................... 10

42 U.S.C. § 300gg-111(b)(1)(A) .................................................... 10

42 U.S.C. § 300gg-111(b)(1)(D) .................................................... 10

42 U.S.C. §§ 300gg-111(c)(5)(C)(i)(I) ............................................ 10

42 U.S.C. §§ 300gg-111(c)(5)(C)(i)(II) ........................................... 10

Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd ........ 4

No Surprises Act, Pub. L. 116-260, div. BB, tit. I, 134 Stat. 1182, 2757-890 (2020) .......... 1

**Regulations**

45 C.F.R. § 149.140 ....................................................................... 2

45 C.F.R. § 149.140(a)(1) ............................................................. 13

45 C.F.R. § 149.140(b)(2)(iv) ....................................................... 15

45 C.F.R. § 149.140(d)(1) ............................................................ 16

86 Fed. Reg. 36,872 (July 13, 2021) ..................................... 2, 13, 15, 16

86 Fed. Reg. 55,980 (October 7, 2021).............................................................. 8, 9, 19

87 Fed. Reg. 52,618 (Aug. 26, 2022).................................................................. 2, 11, 18

## **Other Authorities**

"APP Is Latest Physician Staffing Firm to Fold — It follows Envision, and physicians consider further consequences of difficult market," MedPage Today (July 20, 2023), available at https://www.medpagetoday.com/special-reports/features/105562 ........................................... 22

"EDPMA Study Reveals 91% of Claims Filed through the Independent Dispute Resolution Process Remain Open and Unadjudicated Due to the Flawed Implementation of the No Surprises Act" (EDPMA Mar. 8, 2023), https://edpma.org/wp-content/uploads/2023/03/EDPMA-Presser-No-Surprises-Act-Independent-Dispute-Resolution-Process.pdf .................................................................................................. 22

"Independent Dispute Resolution in the No Surprises Act — Deficiencies and Compliance Failures" (EDPMA July 2023), at 1, https://edpma.org/wp-content/uploads/2023/08/IDR-in-NSA-Deficiencies-and-Compliance-Failures.pdf.................................................................... 28

"Qualifying Payment Amounts and Health Plan Compliance Under the No Surprises Act" (EDPMA 2023), at 1, https://edpma.org/wp-content/uploads/2023/02/EDPMA-Data-Data-Analysis-No-Suprises-Act-FINAL.pdf .................................................................. 18, 20, 21, 23

"Supplemental Background on Federal Independent Dispute Resolution Public Use Files" (CMS Feb. 2024), https://www.cms.gov/files/document/federal-idr-supplemental-background-2023-q1-2023-q2.pdf .............................................................................................................. 28

American Society of Anesthesiologists, "BlueCross BlueShield of North Carolina Abuses No Surprises Act Regulations to Manipulate the Market Before Law Takes Effect" (Nov. 22, 2021) (including link to sample letters), available at https://www.asahq.org/about-asa/newsroom/news-releases/2021/11/bcbs-abuses-no-surprises-act-regulations# / ............... 26

April 25, 2022 Letter from ACEP and EDPMA to Departments at 3-4, 7-9, https://www.acep.org/siteassets/new-pdfs/advocacy/acep-and-edpma-letter-on-no-surprises-act-billing-compliance-issues.pdf ................................................................................... 23

Becker's, "4 Disputes Involving UnitedHealth, Physician Staffing Firms" (July 22, 2020), https://www.beckershospitalreview.com/payer-issues/4-disputes-involving-unitedhealth-physician-staffing-firms.html ................................................................................ 26

FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55 (Aug. 19, 2022) at 16, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-55.pdf ................................................................... 14

Federal Independent Dispute Resolution (IDR) Process Guidance for Disputing Parties" (CMS March 2023), available at https://www.cms.gov/files/document/federal-idr-guidance-disputing-parties-march-2023.pdf........................................................................... 29

Federal Independent Dispute Resolution Process Status Update (CMS Aug. 19, 2022), https://www.cms.gov/files/document/federal-idr-process-status-update-august-2022.pdf ...... 21

Federal Independent Dispute Resolution Process—Status Update," at 2 (CMS Apr. 27, 2023),
available at https://www.cms.gov/files/document/federal-idr-processstatus-update-april-
2023.pdf ................................................................................................................ 28

GAO Report to Congressional Committees, "Private Health Insurance — Roll Out of
Independent Dispute Resolution Process for Out-of-Network Claims Has Been Challenging"
(Dec. 2023), at 17, https://www.gao.gov/products/gao-24-106335 ...................... 21, 24, 26, 27

January 19, 2023 Letter from ACEP and EDPMA to Departments  at 1-5, https://edpma.org/wp-
content/uploads/2023/01/ACEP-EDPMA-Follow-up-No-Surprises-Act-Implementation-
Letter-Final-Jan-17-2023.pdf.............................................................................................. 23

Letter from 152 Members of Congress to Defendant Departments (Nov. 5, 2021),
https://wenstrup.house.gov/uploadedfiles/2021.11.05_no_surprises_act_letter.pdf ................. 9

Letter from EDPMA to Sec'y Becerra (Sept. 14, 2023), https://edpma.org/wp-
content/uploads/2023/09/EDPMA-Recommendations-To-Fix-The-NSA.pdf .................. 18, 26

Neal Opening Statement at Markup of Surprise Medical Billing, Hospice, and Health Care
Investment Transparency Legislation (Feb. 12, 2020), https://democrats-
waysandmeans.house.gov/media-center/press-releases/neal-opening-statement-markup-
surprise-medical-billing-hospice-and ...................................................................................... 17

Technical Guidance No. 2021-01, Calendar Year 2022 Fee Guidance For The Federal
Independent Dispute Resolution Process Under The No Surprises Act (CMS Sept. 30, 2021),
https://www.cms.gov/cciio/resources/regulations-and-guidance/downloads/technical-
guidance-cy2022-fee-guidance-federal-independent-dispute-resolution-process-nsa.pdf ....... 21

*The Evolving Role of Emergency Departments in the United States* (RAND Corp. 2013),
available at https://www.rand.org/pubs/research_reports/RR280.html ...................................... 4

*Unrelenting Pressure Pushes Rural Safety Net Crisis into Uncharted Territory* at 1 (Chartis
2024), https://www.chartis.com/insights/unrelenting-pressure-pushes-rural-safety-net-
uncharted-territory ...................................................................................................................... 4

## <u>IDENTITY AND INTEREST OF *AMICUS CURIAE*</u>[1]

The Emergency Department Practice Management Association ("EDPMA") is a physician trade association focused on the delivery of high-quality, cost-effective care to patients in the emergency department.  EDPMA's membership includes emergency medicine physician groups of all sizes, as well as billing, coding, and other professional support organizations that assist physicians in our nation's emergency departments. EDPMA's members provide direct patient care and/or support the provision of care for approximately half of the 146 million patients that visit emergency departments each year.

For more than 25 years, EDPMA has advocated for the rights of emergency physicians and their patients at the federal and state levels, including with respect to the No Surprises Act, Pub. L. 116-260, div. BB, tit. I, 134 Stat. 1182, 2757-890 (2020) ("NSA"), and its implementing regulations.  Among other things, EDPMA has filed *amicus curiae* briefs in support of Plaintiffs in the "*TMA II*" case pending before this Court,[2] in the district court below, and in cases challenging other

---

[1] All parties have consented to the filing of this brief. No counsel for any party authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person or entity other than *Amicus Curiae*, its members, or its counsel contributed money intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(2), (4)(E).

[2] *Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 23-40217, Dkt. No. 100.

Department regulations implementing the NSA. EDPMA's members have been active participants in the NSA's Independent Dispute Resolution ("IDR") process.

The July 2021 Interim Final Rule (the "Rule") challenged in this case directly contravenes the NSA.[3] The district court correctly held that the Rule's methodology for calculating one component of the reimbursement rate to out-of-network physicians—the Qualifying Payment Amount, or "QPA"—conflicts with the NSA in several key respects, skewing the QPA unfairly downward and resulting in significantly below-market reimbursement rates for physicians. EDPMA also supports Plaintiffs' cross-appeal of the district court's ruling declining to vacate certain provisions of the Rule regarding insurers' disclosure and transparency obligations relating to their calculation of the QPA. The Rule violates these requirements by failing to require insurers to share with physicians material information regarding the calculation of QPAs, leaving physicians entirely in the dark about the amounts of the offers they should submit in the IDR process, or even whether to initiate the IDR process at all.

The Departments' implementation of the NSA has resulted in unfair and unwarranted decreases in payments for the services of out-of-network physicians— with a concomitant reduction in the ability of these physicians to care for patients.

---

[3] 42 U.S.C. § 300gg-111; 45 C.F.R. § 149.140; 86 Fed. Reg. 36,872 (July 13, 2021); 87 Fed. Reg. 52,618 (Aug. 26, 2022).

2

For example, post-NSA out-of-network payments to emergency physicians have actually *decreased* 92% of the time compared to pre-NSA rates, with an average decrease in payment of more than 32% for each emergency room visit. Thus, the Departments' suggestion that any increases in QPAs resulting from vacatur of the Rule will unfairly increase patients' payment obligations ignores the fact that, since the Departments' implementation of the NSA, payments to emergency physicians have substantially *decreased* compared to pre-NSA levels. This decrease is directly contrary to the NSA's purpose of ensuring fair reimbursement rates for out-of-network physicians.

Moreover, insurers have been using these manipulated QPAs as the pretext for either terminating physicians from longstanding network agreements, or requiring physicians to accept significantly reduced contract rates as a condition of network participation. Because physicians' only recourse for these significantly below-market reimbursement rates is the IDR process, IDR entities have been flooded with physician-initiated IDR requests, resulting in severe backlogs and further delays in physician reimbursement. Contrary to the assertions of the Departments and their *amici* that the supposed "business model" of emergency medicine practice groups is to "remain out of network," it is *insurers* that are forcing many emergency physicians and practice groups out of network. This network contraction, in turn, jeopardizes patient access to care.

All physicians are materially and adversely affected by the Rule, but emergency physicians particularly so. Under the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, emergency physicians are required to treat and stabilize all emergency room patients, regardless of their insurance status or ability to pay. Indeed, for some time, more than two-thirds of uncompensated medical care in this country has been provided in emergency rooms.[4]

The challenged Rule has exacerbated the existing crisis in the emergency medical delivery system and the availability of emergency medical physicians. Indeed, the situation has long since passed a crisis point. The burden of uncompensated and undercompensated care is growing, resulting in the closing of many emergency departments and hospitals and threatening the ability of emergency physicians and departments to care for all patients, including the indigent and rural populations, who rely on emergency departments as an important safety net.[5] If allowed to stand, the Rule will serve only to worsen this bleak situation, and the system will reach a breaking point that cannot readily be repaired.

EDPMA submits this brief to advise the Court how the Rule adversely affects

---

[4] *See The Evolving Role of Emergency Departments in the United States* (RAND Corp. 2013), https://www.rand.org/pubs/research_reports/RR280.html.

[5] *See id.* at 2; *Unrelenting Pressure Pushes Rural Safety Net Crisis into Uncharted Territory* at 1 (Chartis 2024), https://www.chartis.com/insights/unrelenting-pressure-pushes-rural-safety-net-uncharted-territory.

physicians and their patients—particularly in the emergency medicine arena—and to demonstrate how the IDR process has been functioning in the real world.

## <u>INTRODUCTION</u>

The goals of the NSA are to protect patients from "surprise" medical bills while at the same time providing fair reimbursement to out-of-network physicians. Although the Departments and their *amici* devote a good amount of space to decrying the problems of "balance-billing" patients, balance-billing is simply not at issue in this case. To the contrary, Plaintiffs and their *amici*—including EDPMA—strongly support the NSA's goal of protecting patients from surprise medical bills.

The problem here is that the Departments have ignored—indeed, have been actively working to subvert—the other policy underlying the NSA: ensuring fair reimbursement for physicians. In fact, the Departments themselves have acknowledged that lowering payments to out-of-network physicians was one of the goals of their regulations. During the years-long NSA legislative process, insurers vigorously lobbied Congress for legislation that would accomplish precisely this result. Those efforts were rejected by a strong bipartisan consensus. But what insurers failed to achieve during the legislative process, the Departments have provided to them through the regulations implementing the NSA.

The NSA was intended to accomplish its twin goals first by prohibiting insurers and out-of-network physicians from charging patients more than what they

would have paid had those services been furnished in-network. The NSA then establishes a process whereby physicians and insurers negotiate among themselves to arrive at a fair and reasonable payment by the insurer for the unreimbursed amounts. Should those negotiations fail, the parties may invoke IDR, a "baseball-style" arbitration process. The IDR entity must consider each of the statutory factors listed in the NSA and examine the particular facts of the claim to determine a reasonable out-of-network rate.

In *TMA II*, this Court is reviewing the district court's vacatur of the Departments' rule requiring IDR entities to exalt the QPA over all the other factors that the IDR entities are obligated to consider in arriving at an appropriate out-of-network reimbursement rate.[6] This case—"*TMA III*"—challenges another aspect of the Departments' NSA rulemaking: the Rule's provisions regarding calculation of the QPA, and the disclosures insurers must make to physicians to enable them to evaluate the insurer's QPA calculations.

As the district court correctly concluded, the Rule's methodology for calculating the QPA conflicts with the NSA in four key respects, skewing the QPA unfairly downward. ROA.13198–13215. In a footnote to their brief, the Departments announced that they are not appealing the vacatur of two of those four

---

[6] *Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, 654 F. Supp. 3d 575, 593 (E.D. Tex. 2023) ("*TMA II*").

6

provisions. (Dkt. 53 at 18 n.8.) Those provisions (1) wrongly permitted insurers to include in their calculation of the QPA out-of-specialty rates, notwithstanding the clear statutory language that only rates from the "same or similar specialty" be included, *see* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I); and (2) wrongly allowed a self-insured group health plan to calculate its QPAs using rates from the contracts of all self-insured group health plans administered by the same entity, which essentially allows the plan to cherrypick from a menu of third-party rates, rather than the rates specific to that particular plan.

The Departments have appealed the district court's vacatur of the remaining two provisions of the Rule. Those provisions unlawfully

(1)    allow insurers to calculate the QPA by including "ghost rates" and "zero-pay payments"—that is, non-negotiated, unreasonably low contracted rates for services that are not actually provided by the contracting physician; and

(2)    require insurers to exclude from the rates used to calculate the QPA supplemental payments such as risk-sharing, bonus, and other incentive-based or retrospective payments, which often form an essential and significant portion of the amount ultimately paid to the physician under the contract.

These provisions improperly allow insurers to manipulate the QPA downward and to reimburse physicians for out-of-network services at amounts that are grossly below-market. The inevitable result is that, unless vacated, these provisions will undermine the emergency medical delivery system for patients in this country.

The district court erred, however, in declining to vacate certain provisions of

the Rule regarding insurers' disclosure and transparency obligations relating to their calculation of the QPA. ROA.13217–13220. The QPA is calculated exclusively by the insurer, is consistently below market rates, and is not subject to scrutiny by the IDR entity[7] or meaningful oversight by the Departments. It has been the subject of widespread insurer noncompliance, and remains a "black box" for physicians. The Rule violates the NSA's disclosure and transparency requirements by failing to require insurers to share with physicians material information regarding their calculation of QPAs. As a result, physicians are unable to make informed decisions in the negotiation process and in the decision whether to initiate an IDR proceeding pursuant to the statutory process. The Rule thus effectively forecloses any meaningful review into whether the QPAs calculated by insurers comply with the NSA.

Fair reimbursement of physicians—a key purpose of the NSA—is critical to the viability of our healthcare system, particularly the delivery of emergency medical care. But implementation of the Rule has driven reimbursement down to artificially low, below-market rates—not only for out-of-network services, but for in-network services as well.

Key congressional architects of the NSA warned the Departments that their

---

[7] *See* 86 Fed. Reg. 55,980, 55,996 (October 7, 2021) ("[I]t is not the role of the certified IDR entity to determine whether the QPA has been calculated by the [insurer] correctly."

implementation of the NSA "could incentivize insurance companies to set artificially low payment rates, which could narrow networks and jeopardize patient access to care—the exact opposite of the goal of the law. It could also have a broad impact on reimbursement for in-network services, which could exacerbate existing health disparities and patient access issues in rural and urban underserved communities."[8] Indeed, the Departments themselves recognized the perils of physician undercompensation: "[U]ndercompensation could threaten the viability of these providers [and] facilities . . . . This, in turn, could lead to participants, beneficiaries and enrollees not receiving needed medical care, undermining the goals of the No Surprises Act." 86 Fed. Reg. at 56,044.

What members of Congress feared has already come true. EDPMA's members have received notices from insurers threatening to terminate their contracts (and in some cases terminating their contracts) unless they agree to substantial reductions to their contracted rates. Those notices often specifically cite the Departments' rules as the legal justification for their actions. Absent vacatur of the Rule, the situation will only deteriorate, with devastating consequences for patients and the emergency physicians who serve them.

---

[8] Letter from 152 Members of Congress to Defendant Departments (Nov. 5, 2021), https://wenstrup.house.gov/uploadedfiles/2021.11.05_no_surprises_act_letter.pdf.

## **ARGUMENT**

**I.    The Rule Directly Conflicts with the NSA's Clear and Unambiguous Language.**

The NSA prohibits balance-billing patients for emergency services in excess of their in-network cost-sharing. *See* 42 U.S.C. § 300gg-111(a)(1)(C)(ii), (b)(1)(A). Accordingly, out-of-network physicians must turn to the patient's insurer for reimbursement of these amounts.

Under the NSA, insurers are obligated to pay these physicians a reasonable fee, called the "out-of-network rate," less the patient's cost-sharing. *Id.* §§ 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D). For purposes of this appeal, the out-of-network rate is the amount determined through a 30-day open negotiation process culminating, if necessary, in IDR. *Id.* § 300gg-111(a)(3)(K).

Under the NSA, the IDR entity must consider a detailed list of factors in determining the out-of-network rate, including the QPA. 42 U.S.C. §§ 300gg-111(c)(5)(C)(i)(I)-(II). In "*TMA I,*" the district court held that the Departments' October 2021 rule conflicted with the NSA by treating the QPA as the default reimbursement amount. *Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.,* 587 F. Supp. 3d 528, 543 (E.D. Tex. 2022) ("*TMA I*"). The Departments' second attempt to regulate the IDR process did not cure these deficiencies, and is the subject of the *TMA II* case currently before this Court. Under the current IDR rule, arbitrators must consider the QPA first and may not give weight to any of the other

mandated factors unless other criteria are met—once again improperly making the QPA the benchmark for out-of-network rates. *See* 87 Fed. Reg. at 52,652.

Yet even if there were no such presumption in favor of the QPA, the IDR process would still result in out-of-network rates significantly below fair compensation due to the July 2021 Rule's requirements for calculation of the QPA. The NSA directed the Departments to promulgate rules establishing "the methodology" that insurers "shall use to determine" the QPA. 42 U.S.C. § 300gg-111(a)(2)(B)(i). Congress further charged the Departments with specifying the information that insurers "shall share" with providers when determining the QPA, as well as "a process to receive complaints of violations" of the QPA requirements. *Id.* § 300gg-111(a)(2)(B)(ii), (iv). The Rule fails to implement the NSA in all these respects.

### A.     The Rule's Methodology for Determining the QPA Violates the NSA.

The NSA defines the QPA as "the median of the contracted rates recognized by the plan or issuer . . . as the total maximum payment . . . for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished" as of 2019, adjusted for inflation. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). If the insurer "does not have sufficient information to calculate the median of the contracted rates," the QPA must be calculated by reference to an independent database that

reflects "allowed amounts paid to a health care provider or facility for relevant services furnished in the applicable geographic region." *Id*. § 300gg-111(a)(3)(E)(iii). Thus, insurers must calculate the QPA based on rates for services that are *actually provided* by physicians in the same specialty and in the same geographic region.

Furthermore, insurers calculate the QPA once, using rates from network contracts as of January 31, 2019. *Id.* § 300gg-111(a)(3)(E)(i)(I). Those QPAs are then supposed to be adjusted for inflation annually. *Id.* Once QPAs are calculated based on 2019 rates, therefore, the flaws inherent in those initial calculations are perpetuated, and remain in place unless corrected through Department audits. *See id.* § 300gg-111(a)(2). But to date there has been no meaningful agency action to correct widespread problems pervading insurer-calculated QPAs. To the contrary, soon after the district court's decision, the Departments exercised their "enforcement discretion" to allow insurers to continue using existing QPAs. *See infra* p.24.

The Rule violates the NSA's clear statutory directives, resulting in dramatically insufficient QPAs. EDPMA addresses below the two vacated provisions that the Departments appeal: the use of "ghost rates" and the exclusion of incentive payments in insurers' calculation of QPAs.

### 1.    Inclusion of "Ghost Rates" and "Zero-Pay" Payments

The Rule provides that contracted rates are the total amounts that the insurer "has contractually agreed to pay a participating provider." 45 C.F.R.

§ 149.140(a)(1). Thus, contrary to the NSA requirement that QPAs be based on services *actually provided*, the Rule allows insurers to include all "contracted" rates, regardless of whether the service was actually provided. *See* 86 Fed. Reg. at 36,889 (NSA "envisions that each contracted rate for a given item or service be treated as a single data point when calculating a median contracted rate . . . *regardless of the number of claims paid at that contracted rate*") (emphasis added).

The district court correctly held that the Rule unlawfully "allows insurers to include contracted rates for items or services that are not provided, never have been provided, and never will be provided." ROA.13208. The Rule allows for the inclusion of "ghost rates"—rates that are included in contracts, but that are for services not actually performed by the provider. Providers who do not perform a particular service have little to no incentive to negotiate a fair and reasonable reimbursement rate for that service. As a result, ghost rates are lower than they would have been had the rates been negotiated by providers who actually performed the service. Indeed, these ghost rates, combined with other disingenuous calculations like "zero-pay payments," can be as low as $0.

The Departments acknowledged that inclusion of these rates "may artificially lower the QPA, as these providers have little incentive to negotiate fair reimbursement rates" for these services and sometimes even accept "$0 as their

rate."[9] Yet while the Departments stated that "$0 amounts" should not be used in calculating the QPA, they did not prohibit altogether the use of non-negotiated rates, thereby allowing such rates in the amounts of even $1.[10]

The fact that the Departments do not challenge the vacatur of the Rule's "same or similar specialty" provision does not cure the Rule's flaws. The NSA requires not only that rates of the "same or similar specialty" be used to calculate the QPA, but also that the rates actually be "provided." The Departments do not dispute that their reading of the NSA allows insurers to include rates—even from physicians in the "same or similar specialty"—for services that are not actually provided. As TMA aptly explains, not all physicians in the same specialty provide the same services. (Dkt. 76 at 45-46.) If a physician does not actually *provide* a particular service, he or she may nominally agree to a lower contracted rate for that service. Inclusion of that rate, however—for a service that will not actually be "provided"— will drive down the QPA for physicians in the same specialty who *do* perform that procedure.

---

[9] FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55 (Aug. 19, 2022) at 16, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-55.pdf.

[10] *Id.* at 17 n.29.

### 2.    Exclusion of Risk-Sharing, Bonus, and Other Retrospective Payments

The Rule provides that insurers must exclude from rates used to calculate QPAs "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments."  45 C.F.R. § 149.140(b)(2)(iv).  The NSA, however, requires QPAs to be based on the "total maximum payment" recognized by the insurer.  42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).  These incentive and retrospective payments are often critical components of a contracted rate.  The district court correctly held that the Rule's exclusion of incentive payments from contracted rates conflicts with the NSA's requirement that insurers use the "maximum payment" a provider could receive for an item or service.  ROA.13212.

Indeed, the Departments recognized that insurers and providers sometimes agree that payments will be "reconciled retrospectively to account for utilization, value adjustments, or other weighting factors that can affect the final payment," and that insurers and providers will sometimes "agree to certain incentive payments during the contracting process." 86 Fed. Reg. at 36,894. In some contracts, risk-sharing amounts can total 10-15% of the total payments. The contracted rates are then adjusted *downward* to reflect the potential for receiving such bonuses or incentives.  But if providers do not believe that they will receive such additional payments, they will demand higher fixed rates for that service.

Thus, excluding these payments or payment adjustments from the QPA

calculation necessarily will result in a lower QPA. There is no statutory justification for excluding such payments from the rates used to calculate the QPA.

### B.    The Rule Fails to Require Adequate Disclosure of the Basis for the Insurer's Calculation of the QPA.

The district court erred in declining to vacate portions of the Rule that fail to implement the NSA's statutory directive that insurers provide meaningful disclosure of how the QPA was calculated.   The Departments acknowledged the need for "transparency" in this regard.   But again citing the Departments' goal of "minimizing administrative burdens on plans and issuers," 86 Fed. Reg. at 36,898, the Rule requires insurers initially to provide only the most minimal of information: the QPA itself and a statement certifying that the QPA was calculated in accordance with the NSA. 45 C.F.R. § 149.140(d)(1).

Only if the provider presses for more information is the insurer obligated to do so.   But even then, the insurer is required to provide only limited additional information.   *Id.* The Rule does not require insurers to disclose critical information underlying the calculation of the QPA, including the contracted rates used in determining the median rate; the specialties of the providers who contracted for those rates; whether the insurers used the rates of other plans administered by the same administrator; or the amounts of the incentive-based or retrospective payments the insurers excluded when calculating the QPA.   The Rule therefore leaves physicians entirely in the dark when it comes to assessing whether the QPA is consistent with

the NSA. *See infra* pp.24-27.

## II. The Departments' Implementation of the NSA Has Resulted in Serious Adverse Consequences for the Delivery of Emergency Care to Patients.

Key congressional architects of the NSA warned of the devastating consequences for this nation's healthcare system of inadequate physician reimbursement rates:

> [W]e already know insurers are looking for any way they can pay the least amount possible. They will work to push those rates down, regardless of what it means for community providers like physicians, hospitals, and our constituents who they employ. With no federal network adequacy standards, plans can push rates down and drop providers from networks with no consequences, leaving patients holding the bag.[11]

The predicted effects have already become reality.

### A. Reimbursement Rates for Physicians—Particularly Emergency Physicians—Have Declined Dramatically Since the Departments' Implementation of the NSA.

The reimbursement rates for physicians have seen steep declines since the Departments' implementation of the NSA. EDPMA has analyzed data from its members to ascertain the effects of the implementation of the NSA on emergency medicine. In a 2022 survey of its members, EDPMA compared pre-NSA (2021) out-of-network allowed amounts to post-NSA (2022) allowed amounts. EDPMA found that post-NSA out-of-network payments *decreased 92% of the time* compared

---

[11] Neal Opening Statement at Markup of Surprise Medical Billing, Hospice, and Health Care Investment Transparency Legislation (Feb. 12, 2020), https://democrats-waysandmeans.house.gov/media-center/press-releases/neal-opening-statement-markup-surprise-medical-billing-hospice-and.

to pre-NSA amounts, with an average decrease of 32% per emergency room visit.[12]

Furthermore, when insurers *do* disclose the QPA, it is equal to the insurers' allowed amount at least 93% of the time, demonstrating that insurers use problematic QPAs as the basis for reimbursement.[13] They do so notwithstanding the NSA's intent that the QPA should not be a "benchmark" payment standard.[14] *See* 87 Fed. Reg. at 52,625 n.29.[15] Moreover, EDPMA members report that 60% of payors are not updating the QPA amounts with the statutorily required inflationary update.[16]

There can be no serious doubt that lower physician reimbursement rates were precisely what the Departments intended. Indeed, the Departments themselves have acknowledged that lowering payments to out-of-network physicians was the intent

---

[12] *See* "Qualifying Payment Amounts and Health Plan Compliance Under the No Surprises Act" (EDPMA 2023), at 1, https://edpma.org/wp-content/uploads/2023/02/EDPMA-Data-Data-Analysis-No-Suprises-Act-FINAL.pdf (hereinafter "EDPMA 2023 Study"). Furthermore, the allowed amounts for emergency medicine services ranged from a weighted average of 126%-145% of Medicare rates. This represents cuts of at *least* 25-65% from pre-NSA average out-of-network reimbursement levels for emergency medicine. *Id.* at 2 n.4.

[13] *Id.* at 1.

[14] *Id.* at 2.

[15] Similarly, EDPMA found that, in 2022, the average initial payment and/or QPA for a local third-party administrator in downstate New York was less than 90% of Medicare rates for that locality, and nearly *three times less* than payments received in years prior to NSA implementation. *See* Letter from EDPMA to Sec'y Becerra (Sept. 14, 2023), https://edpma.org/wp-content/uploads/2023/09/EDPMA-Recommendations-To-Fix-The-NSA.pdf (hereinafter, "Becerra Letter").

[16] *Id.* at 5.

of their IDR rules. In drafting those regulations, the Departments had publicly expressed concern that arbitrators would select higher payment amounts favored by providers, resulting in higher healthcare costs. *See* 86 Fed. Reg. at 56,060.

Accordingly, the Departments determined to give undue preference to the QPA—which they acknowledged is "typically lower than billed charges"—to attempt to ensure that the arbitrators would routinely select the insurer's offer. *Id.* at 56,056-61. As the Departments explained, this would "have a downward impact on health care costs" by lowering payment amounts to providers. *Id.* at 56,060. As the district court found in *TMA II*: "[T]he Departments . . . have not relinquished their goal of privileging the QPA, tilting arbitrations in favor of insurers, and thereby lowering payments to providers." *TMA II*, 654 F. Supp. 3d at 593.

The Departments wrongly contend that any increases to QPAs will unfairly increase patients' payment obligations. The Departments ignore that payments to emergency physicians have substantially *decreased* compared to pre-NSA levels. Moreover, the NSA was intended to place patients who receive out-of-network services on a similar footing as if those services had been provided in-network.[17] It does not unfairly harm patients to pay what they would have paid had those services been provided in-network. The NSA was not intended to put patients who receive

---

[17] The NSA limits patient cost-sharing to the statutory "recognized amount," which generally is the QPA. *See* 42 U.S.C. § 300gg-11 l(a)(3)(H). Patients do not pay the full amount of the QPA—only the fraction attributable to patient cost-sharing.

out-of-network services in a *better* position than those receiving services in-network. But that is precisely what the systematic depression of the QPA does.

Unfairly depressed QPAs will result in reduced patient access to services. Out-of-network reimbursements by commercial payors historically have subsidized the free care that must be given to the indigent and uninsured under EMTALA. This subsidization has been essential to sustaining the emergency medical safety net delivery system.

Now, however, the dramatic reduction of commercial reimbursement and other sustaining sources of revenue has caused an enormous strain on this system. Continued degradation of QPAs and, consequently, commercial reimbursement of emergency physicians will further erode—and ultimately destroy—this safety net.

Hospitals—many of which are already in severe financial distress—have been forced to shoulder the brunt of these costs. Many have been forced to close or to downgrade the services provided in their emergency departments.[18] Moreover, emergency medicine groups are expected to see a reduction in commercial reimbursement of almost *$1 billion* annually.[19] If the Departments' implementation of the NSA is upheld, the current understaffing of emergency departments will only grow worse, reducing patient access to emergency care, particularly in underserved

---

[18] EDPMA 2023 Study, *supra* note 12, at 2.

[19] *See id.*

and rural communities.

**B.    The Significantly Below-Market QPAs Calculated by Insurers Have Resulted in Enormous Backlogs in the IDR Process, Further Delaying Payments to Physicians.**

The fact that QPAs are artificially low is evidenced by the enormous volume of IDR proceedings. The number of IDRs initiated by providers in the first five months of the program was more than the government anticipated for an entire year.[20]  Indeed, IDR requests have exceeded CMS's projections by more than 700%.[21]

According to the GAO, of the 488,922 disputes submitted to IDR from April 2022 through June 2023, 300,065 (61.4%) remained unresolved as of June 2023.[22] EDPMA members have reported that 91% of their claims remain open.[23]  These

---

[20] *See id.* at 2 & nn.2-3.

[21] Technical Guidance No. 2021-01, Calendar Year 2022 Fee Guidance For The Federal Independent Dispute Resolution Process Under The No Surprises Act (CMS Sept. 30, 2021), https://www.cms.gov/cciio/resources/regulations-and-guidance/downloads/technical-guidance-cy2022-fee-guidance-federal-independent-dispute-resolution-process-nsa.pdf; Federal Independent Dispute Resolution Process Status Update (CMS Aug. 19, 2022), https://www.cms.gov/files/document/federal-idr-process-status-update-august-2022.pdf.

[22] GAO Report to Congressional Committees, "Private Health Insurance — Roll Out of Independent Dispute Resolution Process for Out-of-Network Claims Has Been Challenging" (Dec. 2023), at 17, https://www.gao.gov/products/gao-24-106335 (hereinafter "GAO Report").

[23] "EDPMA Study Reveals 91% of Claims Filed through the Independent Dispute Resolution Process Remain Open and Unadjudicated Due to the Flawed

severe backlogs in IDR arbitrations and delays in resolutions have in turn have

resulted in negative cash flow for physician groups—resulting in layoffs,

downgrading of the scope of emergency department services, and hospital

closures—all to the detriment of patients.[24]

In addition, insurers' unwillingness to be transparent regarding their initial

payments has resulted in providers being unable to correctly decipher eligible claims

to pursue in IDR. This has compounded the backlogs, as IDR entities must now sort

through potentially thousands of ineligible claims that would not have been filed in

the first place had insurers provided the necessary information. *See infra* pp.22-25.

### C.     The QPA Disclosure Provisions of the Rule Have Left Physicians Without Any Recourse, and the Departments Have Failed to Enforce the NSA's Disclosure Obligations.

The Department's implementation of the NSA has left physicians with no

meaningful options for challenging—or even ascertaining the basis of—insurers'

reimbursements. For example, EDPMA has found that insurers routinely fail to

comply with the NSA's QPA disclosure requirements. Insurers often do not indicate

that the QPA applies for purposes of determining the patient's cost-sharing

---

Implementation of the No Surprises Act" (EDPMA Mar. 8, 2023), https://edpma.org/wp-content/uploads/2023/03/EDPMA-Presser-No-Surprises-Act-Independent-Dispute-Resolution-Process.pdf.

[24] *See, e.g.*, "APP Is Latest Physician Staffing Firm to Fold — It follows Envision, and physicians consider further consequences of difficult market," MedPage Today (July 20, 2023), https://www.medpagetoday.com/special-reports/features/105562.

amount.[25] When it is unclear whether the cost-sharing amount included in the remittance notice *is* the recognized amount, physicians cannot verify whether that amount is accurate, resulting in confusion for both patients and physicians, and sometimes resulting in patients being billed for incorrect amounts—putting patients right back into the middle of billing disputes. *See supra* notes 12, 25.

Furthermore, insurers fail to provide the QPA *at all* in 91% of their initial payments or notices of denial, often off-loading it onto separate portals or look-up tools, imposing unnecessary obligations on an already overburdened delivery system.[26] This dearth of information is particularly problematic in the emergency medicine context. Because of the realities of acute, non-scheduled care, emergency medicine providers often receive little to no information at the time the patient is treated. In fact, because of the unique requirements of EMTALA, emergency medicine groups do not collect billing or cost-sharing information before stabilizing the patient. *See supra* note 25. Instead, they must wait until after care has been rendered, and then wade through the staggering morass of individual policy benefits.

---

[25] January 19, 2023 Letter from ACEP and EDPMA to Departments  at 1-5, https://edpma.org/wp-content/uploads/2023/01/ACEP-EDPMA-Follow-up-No-Surprises-Act-Implementation-Letter-Final-Jan-17-2023.pdf; April 25, 2022 Letter from    ACEP    and    EDPMA    to    Departments    at    3-4,    7-9, https://www.acep.org/siteassets/new-pdfs/advocacy/acep-and-edpma-letter-on-no-surprises-act-billing-compliance-issues.pdf.

[26] EDPMA 2023 Study, *supra* note 12, at 1.

As the Departments themselves acknowledged, prompt and meaningful insurer disclosure of the QPA and the factors that went into calculating it is an essential component of the process. Without it, providers are unable accurately to assess patient responsibility for the charge, whether the allowed amount is subject to the IDR process at all (or if a specified state law applies instead), whether to initiate the IDR process, the type of offers they should submit, and whether to institute a complaint with the Departments. *See supra* notes 12, 25.

To make matters worse, while the Departments are authorized to audit insurers' QPA calculations, 42 U.S.C. § 300gg-111(a)(2), there has been no meaningful agency action on that front. For example, CMS has not issued any civil monetary penalties, and has initiated only 23 QPA audits.[27] Likewise, EDPMA members have reported that CMS has responded to their complaints regarding QPAs only about 14% of the time.[28] Nor is there any plan by the Departments to enhance these paltry enforcement efforts. To the contrary, the Departments announced that they would be invoking their "enforcement discretion" through at least May 2024 to not pursue enforcement actions against payors that do not update their QPAs.[29]

---

[27] *See* GAO Report, *supra* note 22, at 23.

[28] *See supra* note 25.

[29] "Biden Administration Releases New Guidance on QPA Calculations and Reopens the Portal for New Disputes" (MultiPlan Oct. 6, 2023),

The Departments' failure to engage in any meaningful enforcement of their own Rule has resulted in rampant payor noncompliance. EDPMA's members have reported that they often do not receive the amounts owed them under IDR determinations. Indeed, some payors are indicating that they are refusing to pay amounts owed as determined by the IDR entity because they do not agree with the decision, or do not believe that it is enforceable.

### D. The Departments' Implementation of the NSA Has Resulted in the Contraction of Provider Networks.

Underpayments to physicians have caused the contraction of provider networks and the narrowing of healthcare choices for patients. For emergency physicians, the problem is even more acute. In the experience of EDPMA and its members, the EMTALA requirements lead health plans to be even less inclined to maintain emergency physicians in-network. Insurers recognize that their policyholders are able to receive emergency care regardless of their insurance status or ability to pay. Insurers therefore have no incentive to enter into fair contracted rates with emergency physicians.

The Departments' implementation of the NSA already has had the effect of narrowing provider networks and thereby reducing the availability of healthcare to patients. Numerous studies have confirmed that, contrary to the intent of the NSA

---

https://www.multiplan.us/biden-administration-releases-new-guidance-on-qpa-calculations-and-reopens-the-portal-for-new-disputes/.

to encourage more in-network contracting, the IDR process—as implemented by the Departments—has had the *opposite* effect. *See* GAO Report, *supra* note 22, at 31 ("Disputing parties we interviewed told us the implementation of the IDR process has not resulted in or encouraged in-network contracting."). But the Departments' assertion that this is due to physicians' alleged "business models" to remain out of network is unsupported by the facts. It is *payors* who are walking away from their network agreements.

Physicians have noted an abrupt change in payor behavior since the NSA went into effect. *See* Becerra Letter, *supra* note 15. Many insurers lost interest in maintaining in-network status. Numerous physician practices have received from insurers termination notices of longstanding network agreements (including agreements that currently protect patients in rural and underserved communities) or threats to terminate existing agreements unless the physicians agree to substantial discounts from their contracted rates. Some of those termination letters even cited the Departments' regulations as justification.[30] Some insurers have simply walked away from active in-network negotiations.

---

[30] American Society of Anesthesiologists, "BlueCross BlueShield of North Carolina Abuses No Surprises Act Regulations to Manipulate the Market Before Law Takes Effect" (Nov. 22, 2021), https://www.asahq.org/about-asa/newsroom/news-releases/2021/11/bcbs-abuses-no-surprises-act-regulations#/; Becker's, "4 Disputes Involving UnitedHealth, Physician Staffing Firms" (July 22, 2020), https://www.beckershospitalreview.com/payer-issues/4-disputes-involving-unitedhealth-physician-staffing-firms.html.

### E.     Contrary to Defendants' Contentions, Physicians Are Not Satisfied with the IDR Process.

The Departments and their *amici* contend that there is "widespread acceptance" by most physicians of the QPAs as calculated by insurers, because only 3% of all out-of-network bills under the NSA wind up in IDR, while the rest "are resolved voluntarily in QPA-centered negotiations." They also assert that physicians are satisfied with the IDR process because they are winning 77% of the time. These conclusions are misleading.

First, many physicians do not initiate IDR proceedings because it would be cost-prohibitive and administratively burdensome to do so. As demonstrated in the "*TMA IV*" case,[31] Department regulations regarding the costs of arbitration and the "batching" of claims have rendered many physicians unable to participate in IDR. The costs of proceeding through IDR are simply higher than their claim amounts. *See* GAO Report, *supra* note 22, at 20. As a result, physicians are forced to accept insurers' "QPAs" that are significantly below a fair reimbursement rate. (The district court invalidated those regulations as well. *See TMA IV*, 2023 WL 4977746, at *6-12.) EDPMA members have a far higher rate of IDR initiation (60%), but even then, they are unable to submit to IDR all eligible underpaid claims due to insurer misconduct and the extraordinary costs and administrative burdens of IDR as

---

[31] *See Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 6:23-cv-59-JDK, 2023 WL 4977746 (E.D. Tex. Aug. 3, 2023) ("*TMA IV*").

currently implemented by the Departments.[32]

Second, the fact that QPAs are artificially low is evidenced by the enormous volume of IDR proceedings, initiated mostly by physicians—a fact that even the Departments and their *amici* acknowledge.

Third, although the IDR process is cost-prohibitive for many physicians, the physicians who have been able to invoke IDR have been prevailing in overwhelming numbers—approximately 77% of the time.[33]  But the physicians' high winning percentage does not show that physicians are not being harmed, as Defendants and their *amici* contend.  To the contrary, it demonstrates that insurers' calculations of the QPA are, in fact, significantly below fair and reasonable reimbursement facts—and that IDR entities recognize this.  Moreover, a key reason for this physician success rate in IDR is that the Departments' IDR rules at issue in *TMA II*, with their express and implied presumptions in favor of the QPA, have not been

---

[32] *See* "Independent Dispute Resolution in the No Surprises Act — Deficiencies and Compliance Failures" (EDPMA July 2023), at 1, https://edpma.org/wp-content/uploads/2023/08/IDR-in-NSA-Deficiencies-and-Compliance-Failures.pdf.

[33] CMS previously found that initiating parties prevail in IDR proceedings approximately 71% of the time.  *See* "Federal Independent Dispute Resolution Process—Status Update," at 2 (CMS Apr. 27, 2023), https://www.cms.gov/files/document/federal-idr-processstatus-update-april-2023.pdf.  For the first six months of 2023, that number increased to 77%.  *See* "Supplemental Background on Federal Independent Dispute Resolution Public Use Files" (CMS Feb. 2024), https://www.cms.gov/files/document/federal-idr-supplemental-background-2023-q1-2023-q2.pdf.

implemented. Instead, IDR entities have been operating under Guidance issued by the Departments that instructs IDR entities to consider all NSA statutory factors, and not to give the QPA predominance over the other factors.[34] If the district court's *TMA II* vacatur of those IDR rules is overturned, insurers' unfair and unreasonable QPAs will be given precedence as the Departments intended, with devastating results for physicians and their patients.

## CONCLUSION

EDPMA respectfully requests that the Court affirm the district court's vacatur of the challenged QPA methodology rules, and reverse the court's decision regarding the QPA disclosure provisions.

DATED:   March 20, 2024

Respectfully submitted,
*/s/Jack R. Bierig*
JACK R. BIERIG
**ARENTFOX SCHIFF LLP**
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Phone: (312) 258-5511
jack.bierig@afslaw.com

*Counsel for Amicus Curiae*
*The Emergency Department Practice*
*Management Association*

---

[34] *See, e.g.*, "Federal Independent Dispute Resolution (IDR) Process Guidance for Disputing Parties" (CMS March 2023), https://www.cms.gov/files/document/federal-idr-guidance-disputing-parties-march-2023.pdf.

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2024, a true and correct copy of the foregoing document was filed electronically using the Court's EM/ECF filing system, which served all counsel of record.

*/s/ Jack R. Bierig*
Jack R. Bierig

*Counsel for Amicus Curiae*
*The Emergency Department Practice*
 *Management Association*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,453 words, excluding the parts of the brief exempted by Rule 32(f).

This brief also complies with the typeface requirements of Rule 32(a)(5)(A) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Jack R. Bierig*
Jack R. Bierig

*Counsel for Amicus Curiae*
*The Emergency Department Practice*
 *Management Association*