No. 23-40605

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Texas Medical Association; Tyler Regional Hospital, L.L.C.; Dr. Adam Corley,

Plaintiffs-Appellees/Cross-Appellants,

v.

United States Department of Health and Human Services; Office of Personnel Management; United States Department of Labor; United States Department of Treasury; Xavier Becerra, Secretary, U.S. Department of Health and Human Services, in his official capacity; Kiran Ahuja, in her official capacity as the Director of the Office of Personnel Management; Janet Yellen, Secretary, U.S. Department of Treasury, in her official capacity; Julie A. Su, Acting Secretary, U.S. Department of Labor, in her official capacity,

Defendants-Appellants/Cross-Appellees.

LifeNet, Incorporated; Air Methods Corporation; Rocky Mountain Holdings, L.L.C.; East Texas Air One, L.L.C.,

Plaintiffs-Appellees/Cross-Appellants,

v.

United States Department of Health and Human Services; Office of Personnel Management; United States Department of Labor; United States Department of Treasury; Xavier Becerra, Secretary, U.S. Department of Health and Human Services, in his official capacity; Kiran Ahuja, in her official capacity as the Director of the Office of Personnel Management; Janet Yellen, Secretary, U.S. Department of Treasury, in her official capacity; Julie A. Su, Acting Secretary, U.S. Department of Labor, in her official capacity,

Defendants-Appellants/Cross-Appellees.

On Appeal from the United States District Court
for the Eastern District of Texas

## RESPONSE AND REPLY BRIEF FOR APPELLANTS-CROSS-APPELLEES

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*
DAMIEN M. DIGGS
*United States Attorney*
JOSHUA M. SALZMAN
LEIF OVERVOLD
KEVIN B. SOTER
*Attorneys, Appellate Staff*
*Civil Division, Room 7226*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ........................................................................................................ 3

I.      The Rule's Reasonable Methodology for Calculating the QPA Comports
        with the No Surprises Act. ...................................................................... 3

        A.      The Rule Permissibly Directed Health Plans to Calculate QPAs
                Based on their Contracted Rates, Rather Than the Specifics of
                How Often a Given Provider Provided an Item or Service at that
                Rate. ................................................................................................... 5

        B.      The Rule Permissibly Directed Health Plans to Exclude Case-
                Specific Agreements from the QPA Calculation. ....................... 14

        C.      The Rule Permissibly Directed Health Plans to Exclude Bonus
                and Incentive Payments from the QPA Calculation. ................. 22

II.     The Rule Permissibly Interpreted the No Surprises Act's Statutory
        Deadline for Health Plans to Make an Initial Payment or Notice of
        Denial of Payment. .................................................................................. 29

III.    At a Minimum, the District Court Erred in Issuing Overbroad Relief. ............. 33

IV.     Plaintiffs' Cross-Appeal Challenging the Rule's Requirements Regarding
        the Information That Plans Must Disclose About Their QPA
        Calculations Is Meritless. ....................................................................... 36

        A.      The Departments Adopted Reasonable Disclosure Requirements
                Pursuant to the No Surprises Act's Grant of Broad Discretion to
                Promulgate Rules in This Area. ................................................... 37

        B.      Plaintiffs' Challenges to the Rule's Disclosure Requirements All
                Fail. ................................................................................................... 39

CONCLUSION .................................................................................................. 43

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Ardestani v. INS,*
   502 U.S. 129 (1991) ................................................................ 17, 18

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) .........................................................35

*Association of Air Med. Servs. v. HHS,*
   No. CV 21-3031 (RJL), 2023 WL 5094881 (D.D.C. Aug. 9, 2023) ..................... 17, 19

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,*
   566 U.S. 399 (2012) ....................................................................7

*Central & S. W. Servs., Inc. v. EPA,*
   220 F.3d 683 (5th Cir. 2000) ..........................................................34

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ....................................................................4

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) ...................................................................33

*City of Dallas v. FCC,*
   118 F.3d 393 (5th Cir. 1997) ....................................................... 26, 32

*Cuozzo Speed Techs., LLC v. Lee,*
   579 U.S. 261 (2016) ....................................................................4

*Easom v. US Well Servs., Inc.,*
   37 F.4th 238 (5th Cir. 2022) ...........................................................4

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ............................................................... 12, 16, 42

*Luminant Generation Co. v. EPA,*
   714 F.3d 841 (5th Cir. 2013) ..........................................................42

*Mansourian v. Regents of the Univ. of Cal.*,
   602 F.3d 957 (9th Cir. 2010) ................................................................18

*Marx v. General Revenue Corp.*,
   568 U.S. 371 (2013) ............................................................................7

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ..........................................................................36

*Ross v. Midwest Comm'ns, Inc.*,
   870 F.2d 271 (5th Cir. 1989) ............................................................18

*Seago v. O'Malley*,
   91 F.4th 386 (5th Cir. 2024), *reh'g denied* ......................................6

*Southwestern Elec. Power Co. v. EPA*,
   920 F.3d 999 (5th Cir. 2019) ......................................................29, 40

*Texas v. United States*,
   497 F.3d 491 (5th Cir. 2007) ............................................................41

*United States v. Texas*,
   599 U.S. 670 (2023) ....................................................................34, 35

**Statutes:**

5 U.S.C. § 703 ......................................................................................36

26 U.S.C. § 9833 ..................................................................................32

29 U.S.C. § 1104(a)(1)(A) ....................................................................18

29 U.S.C. § 1104(a)(1)(D) ....................................................................18

29 U.S.C. § 1133 ..................................................................................31

29 U.S.C. § 1191c ................................................................................32

42 U.S.C. § 300gg-22 ..........................................................................41

42 U.S.C. § 300gg-92 ..........................................................................32

42 U.S.C. § 300gg-111(a)(1) ...........................................................29

42 U.S.C. § 300gg-111(a)(2)(A)(i)(II) .........................................41

42 U.S.C. § 300gg-111(a)(2)(A)(ii) ..............................................41

42 U.S.C. § 300gg-111(a)(2)(B) .....................................................24

42 U.S.C. § 300gg-111(a)(2)(B)(i) .......................................... 1, 4

42 U.S.C. § 300gg-111(a)(2)(B)(ii) ........................................ 3, 37

42 U.S.C. § 300gg-111(a)(2)(B)(iv) ..............................................41

42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) .................. 3, 4, 5, 6, 8, 13, 22, 23

42 U.S.C. § 300gg-111(a)(3)(F)(ii) ...............................................21

42 U.S.C. § 300gg-111(b)(2)(A)(i) ......................................... 21, 22

42 U.S.C. § 300gg-111(c)(5)(C)(ii) ...............................................28

42 U.S.C. § 300gg-112(a)(1) ...........................................................29

42 U.S.C. § 300gg-112(a)(3)(A) .....................................................29

**Regulations:**

29 C.F.R. § 2560.503-1(f) ...............................................................31

45 C.F.R. § 149.30 ..............................................................................21

45 C.F.R. § 149.130(b)(4)(i) ............................................................29

45 C.F.R. § 149.140(a)(12) ...............................................................11

45 C.F.R. § 149.140(a)(18) ...............................................................38

45 C.F.R. § 149.140(d)(1)(ii) ..........................................................38

45 C.F.R. § 149.140(d)(2)(iv) .........................................................27

45 C.F.R. § 150.301 ........................................................................41

**Legislative Material:**

H.R. Rep. No. 116-615, pt. 1 (2020) ...............................................20

**Other Authorities:**

*Rate*, Oxford English Dictionary (online ed.)...............................15, 16

*Requirements Related to Surprise Billing,*
    87 Fed. Reg. 52,618 (Aug. 26, 2022)..........................................38

*Requirements Related to Surprise Billing; Part I,*
    86 Fed. Reg. 36,872 (July 13, 2021) ...................................5, 12, 16, 19, 20, 21, 23, 24,
                                                                      25, 27, 34, 37, 38, 39, 40, 42

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress enacted the No Surprises Act (Act) to shield patients from the often-crippling effects of surprise medical bills. To do so, it established a system that caps a patient's potential liability for certain care provided by out-of-network providers while allowing providers to obtain additional compensation from the patient's health plan without the market-distorting effects of being able to surprise bill the patient directly. Congress articulated the general framework for the Act's operation but entrusted the Department of Health and Human Services, the Department of Labor, and the Department of the Treasury (the Departments) with responsibility for fleshing out several critical aspects of the scheme through implementing regulations. Among other things, Congress tasked the Departments with establishing the methodology for determining the "qualifying payment amount" or "QPA," a figure that often determines the maximum amount that a patient can be required to pay for covered items and services, and which is also a relevant factor in assessing how much additional compensation a provider should receive from the patient's health plan. *See* 42 U.S.C. § 300gg-111(a)(2)(B)(i) (setting a deadline by which the Departments must "establish through rulemaking" the "methodology" for "determin[ing] the qualifying payment amount").

In discharging their responsibility to implement the Act, the Departments made the types of methodological determinations assigned to them by Congress. In doing so, they drew on their expertise concerning the operation of and customary practice

within the health insurance market. They took proper account of the comparative administrative burdens associated with alternative approaches to implementing the statute. And they gave due weight to the Act's purpose of eliminating the deleterious effects of surprise medical billing on individual patients and the health care system as a whole. Accordingly, the Departments determined that the QPA should be computed using an administrable methodology that enables the QPA to serve as a fair proxy for the market value of a given service, without diluting the Act's protections by artificially inflating the QPA and thereby exposing patients to higher bills. Similarly, the Departments determined that a key statutory deadline for making initial payment determinations should not be triggered prematurely in a manner that would be inconsistent with normal industry practice and that would increase the likelihood that patients would receive surprise bills.

Plaintiffs' response briefs repeat the district court's mistake of assuming that Congress answered questions that the Act instead assigned to the Departments to resolve. Plaintiffs are thus wrong to assert that the Departments' reasonable methodological judgments are inconsistent with the plain terms of the Act. And their alternative arguments that the challenged provisions are arbitrary and capricious are equally without merit. No remedy—let alone universal vacatur—was appropriate as to the provisions at issue in the Departments' appeal.

Plaintiffs also cross-appeal to renew a challenge to the Departments' regulation governing the disclosures that plans must make to providers regarding their QPA

calculations.  Here, again, plaintiffs' position cannot be reconciled with an express statutory delegation of rulemaking authority, which charges the Departments with determining "the information" plans are required to share with providers.  42 U.S.C. § 300gg-111(a)(2)(B)(ii).  Plaintiffs fail to demonstrate any error in the district court's determination that the Departments were not required to adopt plaintiffs' preferred balancing of their desire for certain information against the burdens plaintiffs' favored disclosure requirements would impose.

## ARGUMENT

### I.    The Rule's Reasonable Methodology for Calculating the QPA Comports with the No Surprises Act.

Much of this appeal centers on the Departments' regulations governing the methodology for computing the QPA, which, as we have explained, is a rough proxy for the rate that in-network providers receive for furnishing a given item or service for a patient enrolled in a given health plan.  Congress specified certain requirements as to how the QPA is to be calculated.  The calculation must generally be based on "the median of the contracted rates recognized by [a given] plan . . . on January 31, 2019," adjusted for inflation.  42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).  It reflects "the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively)." *Id.*  The QPA for a given service should consider only the contracted rates "for the same or a similar item or service that is provided by a provider in the same or similar specialty and

provided in the geographic region in which the item or service is furnished." *Id.* And it must be computed "consistent with the methodology established by the Secretary." *Id.*; *see also id.* § 300gg-111(a)(2)(B)(i) (requiring the Departments to establish a methodology for computing the QPA).

The three provisions at issue in this appeal that relate to the QPA calculation methodology are consistent with the text and purpose of the No Surprises Act. As the Departments' opening brief demonstrates, those provisions are—at a minimum—"reasonable in light of the text, nature, and purpose of the statute." *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 276-77 (2016). In light of Congress's express grant of rulemaking authority to the Departments, that fact is sufficient to resolve this appeal. Plaintiffs fail to show otherwise.[1]

---

[1] Plaintiffs assert that the government "forfeited" *Chevron* deference in this case, TMA Br. 31 n.7; Air Ambulance Br. 23 n.9, seemingly because the Departments' brief did not cite the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), itself. But the Standard of Review section of the Departments' brief identified the applicable standard as coming from this Court's decision in *Easom v. US Well Services, Inc.*, 37 F.4th 238 (5th Cir. 2022), which applied *Chevron* and recognized that an agency action taken pursuant to an express delegation of authority, like the one here, must be upheld unless "arbitrary, capricious, or manifestly contrary to the statute," *id.* at 245 (quotation marks omitted). The Departments also cited *Cuozzo*, as again quoted in the text above (*see* Opening Br. 27). Plaintiffs, by contrast, never address these cases explicating the relevant standards or otherwise engage with the applicable framework.

A.   **The Rule Permissibly Directed Health Plans to Calculate QPAs Based on their Contracted Rates, Rather Than the Specifics of How Often a Given Provider Provided an Item or Service at that Rate.**

1.  As the Departments demonstrated in their opening brief (at 27-31), the rule reasonably interprets the statutory requirement that the QPA be based on the "median of the contracted rates recognized by the plan or issuer" for a particular service to mean that the calculation should look to the rates appearing on the face of a health plan's contracts that were in force on January 31, 2019, "regardless of the number of claims paid at that contracted rate." *Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36,872, 36,888-89 (July 13, 2021). The plain language of the statute focuses on the rates that a plan has "contracted" to pay, not the frequency with which a provider has utilized a given rate. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Yet plaintiffs insist that the Departments were statutorily required to direct health plans to look beyond the four corners of their contracts and exclude a subset of their contracted rates from their calculations—namely, those associated with a service that a given provider happened not to provide pursuant to that contract over an unspecified time frame.

There is no merit to this contention. The Departments' approach reflects a reasonable—and thus permissible—interpretation of the statutory text and is consistent with both industry practice and sound and efficient administration. The Departments' approach is administrable, directing plans to use readily available

5

information within their possession.  And it tracks insurance industry contracting

practice, where rates are normally negotiated on a prospective basis.  Thus, when a

provider and a plan agree to a particular rate for a particular service, neither party

knows with certainty how many times, if at all, that provider will actually provide that

service to the plan's participants over the course of the contract.  But both sides

accept that the agreed-to rate will govern whenever the service is furnished.  The

Departments' approach to the QPA calculation, which focuses on the rates agreed to

by the parties ex ante, thus mirrors the way rates are negotiated in the market.

Plaintiffs insist that this approach is foreclosed by the statutory requirement

that the QPA be based on the contracted rates "for the same or a similar item or

service *that is provided by a provider* in the same or similar specialty and provided in the

geographic region in which the item or service is furnished."  42 U.S.C. § 300gg-

111(a)(3)(E)(i)(I) (emphasis added).  Plaintiffs pluck the italicized phrase from its

context, insisting that it should be read in isolation to bar the inclusion of a rate unless

the relevant item or service was "provided by a provider" during some unspecified

period before or after the contracted rate was recognized.  But a statutory term "must

be understood in the context of the phrase in which it appears."  *Seago v. O'Malley*, 91

F.4th 386, 392 (5th Cir. 2024), *reh'g denied*.  Here, the relevant provision, taken as a

whole, makes clear that Congress was requiring QPAs to be separately derived based

on the specialty of the provider and the geographic region in which the service is

furnished. The truncated phrase repeatedly quoted by plaintiffs (*see* TMA Br. 6, 12, 25) fails to accurately reflect the entire provision's natural meaning.

Plaintiffs suggest that if Congress had intended to allow the Departments to direct that QPAs should be calculated based only on contracted rates, it would have excluded the words "is provided." But Congress in fact chose a natural phrase to encompass rates for services that are contracted to be provided in the same region and by a provider in the same or similar specialty. "[T]he mere possibility of clearer phrasing cannot defeat the most natural reading of a statute." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 416 (2012). And in any event, "[t]he canon against surplusage is not an absolute rule." *Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013). And surely if Congress had intended to create a substantial exception to the statute's otherwise exclusive focus on "contracted rates," it would have done so more expressly. This is particularly true because, had Congress intended plaintiffs' meaning, it could easily have selected clearer language to articulate that a rate should only be included if it was actually used to pay a provider for having provided the specific item or service. *See* Opening Br. 30. And contrary to plaintiffs' argument, the government's reading of this statute does not read "provided" to mean the same thing as "recognized" (TMA Br. 34-35), where the statute looks both to whether the rate is "recognized" in a contract between a plan and a provider and whether a service will be "provided" in the same region by a provider in the same or similar specialty.

If that were not enough, plaintiffs fail to explain how their reading makes sense in light of the surrounding statutory context. As the Departments noted, the statute directs that QPAs be based not on rates paid over a specified period but rather the contracted rates recognized on a specific date, January 31, 2019, demonstrating that Congress intended that the plans take a snapshot of the contracts as they existed on that date to calculate QPAs for future use. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Plaintiffs argue (TMA Br. 35-36) that that statutory date is relevant to when a given rate must be "recognized" in a contract but that the statute also contemplates an inquiry into whether a claim has been paid pursuant to that rate over some period left entirely unspecified. While they suggest that the Departments may be able to determine a reasonable period to look back or forward in implementing the statute, they cannot point to anything in the statute that might guide this inquiry or any indication why Congress would have omitted any mention of this period if Congress had actually contemplated the inquiry that plaintiffs claim is required.

And even if such a period could be determined, the administrability considerations here are substantial. At a minimum, plaintiffs' approach would require plans to look beyond their contracted rates and cross-check every single rate against claims data. But even this likely understates the problems associated with such an approach. Plaintiffs suggest (TMA Br. 37-38) that plans maintain the data necessary to determine whether a provider has submitted a claim for a given service over a particular period. But a plan's claims data only reveal what services were provided to

8

the plan's own participants or beneficiaries—plans have no source of information as to what services a provider may have provided to patients covered by other plans or issuers. A heart surgeon who performed a particular heart surgery on 10 Aetna patients may have never performed that particular surgery on a Blue Cross patient. If Blue Cross has a contract with that provider that includes a contracted rate for that particular heart surgery, the plan would have no way of knowing whether that rate could be included in the QPA under plaintiffs' interpretation.

Plaintiffs further argue (TMA Br. 36) that policy concerns regarding the burdens that their approach would impose on the QPA calculation process should not permit departure from the terms Congress chose. But the Departments' rule does not depart from the statutory text. And to the extent plaintiffs assert that any consideration of the burden imposed by the rule is improper, it would be unusual for Congress to task an agency with crafting a regulatory mandate applicable to private companies (here, the private health plans responsible for computing QPAs) and expect the agencies to ignore the feasibility and the relative burdens associated with various alternative approaches to implementing the statute. Plaintiffs identify nothing in the statute or its legislative history that suggests Congress intended to deny the Departments the authority to account for administrability when developing a methodology for computing QPAs.

In any case, it is plaintiffs' reading that imports an atextual limitation into the text of the statute based on a purported policy concern. Plaintiffs insist that their

reading is necessary to prevent the incorporation of so-called "ghost rates" into the calculation. As plaintiffs acknowledge, however, such policy concerns are not a basis for failing to give a statute its natural reading. And in any event, as the Departments indicated (*see* Opening Br. 30-31), the statute separately addresses those concerns through the requirement that the QPA calculation be based on the rates from providers in the same or similar specialty. Plaintiffs wrongly suggest (TMA Br. 45) that this is a post hoc justification. But the Departments specifically noted the concern that certain specialties may not have an incentive to aggressively negotiate rates for services they do not provide regularly and noted that, where that occurs, the lower rates agreed to by out-of-specialty providers would not be included in the QPA applicable to in-specialty providers. *See* FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55, at 16-17, 17 n.29 (Aug. 19, 2022) (Aug. FAQs) (ROA.413-14). Thus, for example, if a dermatologist's contract with a plan happened to contain an artificially low rate for performing heart surgery, that rate would have no effect on the QPA that would govern for heart surgeries performed by heart surgeons. In addition, the Departments have not challenged the district court's conclusion that the statute requires calculating rates by specialty even when there is no indication that they differ materially across specialties.[2]

---

[2] As noted in the opening brief (at 18 n.8), the Departments' rule had initially defined "[p]rovider in the same or similar specialty" as the practice specialty of a provider, as identified by the plan or issuer consistent with its usual business practice,

As a result, it is now even less likely that the concern plaintiffs raise about "ghost rates" could result in lower QPAs for providers who regularly provide a particular service.[3]

2. Plaintiffs argue as an alternative ground for affirming the district court's judgment that the Departments' treatment of this issue was arbitrary and capricious. To the extent this argument just repackages their misreading of the statutory language, it fails for the reasons discussed above. Plaintiffs also reiterate (TMA Br. 44-46) their concern that certain rates may not reflect the actual market rate for a particular service given a purported lack of incentive for a provider to negotiate the rates for certain services based on that provider's expectations of how often he or she will provide those services. But as noted above, whatever a provider's expectations at the time a contract is entered into, the agreed-to rate will govern any provision of a particular service to a plan member over the course of a contract, and it is reasonable for the

---

while specifying that, if a plan or issuer has contracted rates for a service code that vary based on provider specialty, the median contracted rate is calculated separately for each specialty. 45 C.F.R. § 149.140(a)(12). The district court concluded that the No Surprises Act requires that a plan calculate separate QPAs for separate specialties even if it did not vary its contracted rates based on provider specialty, *see* ROA.13209-11, and the Departments do not challenge that holding except to the extent that the district court ordered universal vacatur as a remedy.

[3] The air ambulance plaintiffs also suggest (Air Ambulance Br. 33) that QPAs for air ambulance services include artificially low rates from providers who do not provide air ambulance services, but they do not address whether any such rates would be excluded by the requirement that a provider be in the same or similar specialty as an air ambulance provider (or, to the extent they are being offered by in-specialty providers, why such a provider would not expect to provide air ambulance services).

Departments to conclude that all such rates should be included in the QPA calculation. That is all the more true given the recognized variability in whether a provider that may very well expect to provide a service in fact happens to do so in the particular period of time that a contract covers. *See* Blue Cross Blue Shield Ass'n Amicus Br. 10-11 (documenting data reflecting variation in whether providers that have submitted claims for providing a particular service happen to do so in a particular calendar year).

Plaintiffs suggest (TMA Br. 47) that the Departments' argument that it is reasonable to direct plans simply to look to rates reflected on the face of their contracts in calculating QPAs represents a post hoc rationalization as well. But that cannot be squared with the repeated references in the rule's preamble to basing the QPA on a plan's contracts themselves, rather than on an analysis of past services provided. *See* 86 Fed. Reg. at 36,889 (explaining that the QPA is calculated by "arranging in order from least to greatest the contracted rates of all plans of the plan sponsor" and "the rate negotiated under a contract constitutes a single contracted rate regardless of the number of claims paid at that contracted rate"). At the very least, "the agency's path may reasonably be discerned" from that explanation. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quotation marks omitted).

Plaintiffs also assert (TMA Br. 47-48) that the requirement that QPAs be calculated based on provider specialty affords insufficient protection against artificially low QPAs because, even within a specialty, providers may have different expectations

regarding their likelihood of performing particular services. It is unclear how much that concern applies to the emergency medicine context, for example, where it is in a provider's interest to negotiate rates even for services that he or she will not provide to most patients treated in the emergency room. *See* Blue Cross Blue Shield Ass'n Amicus Br. 8-9. And in any event, plaintiffs' example, suggesting that heart surgeons whose practices differ slightly in terms of the services that they typically provide are not appropriate comparators whose rates should be included in the QPA for heart surgery services, demonstrates how unworkable and atextual their reading of the statute is. On plaintiffs' view, even with respect to a heart surgeon agreeing to rates for providing heart surgery, a plan would not be able to calculate a QPA based on such rates unless it had some indication that the providers really meant to provide the item or service at the agreed-to rate when they agreed to the rate; they suggest no basis on which a plan is to make such a determination, other than the happenstance of whether a particular provider has provided such a service over a statutorily undefined period. The statute, however, requires no such thing, instead simply specifying that the QPA is to be calculated based on the rates of "a provider in the same or similar specialty," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).

Finally, while plaintiffs fault (TMA Br. 47) the Departments for excluding $0 rates from the QPA calculation but not other supposedly too low rates, the Departments appropriately recognized that, where a $0 amount is included in a fee schedule as a placeholder for a covered item or service that a provider does not

provide, the $0 placeholder "does not represent a contracted rate."  Aug. FAQs 17 &

n.29 (ROA.414).  The same cannot be said of other rates that plaintiffs simply think

are below the market rate notwithstanding Congress's determination that plan

contracts are the best proxy for negotiated market rates.

> **B.  The Rule Permissibly Directed Health Plans to Exclude
> Case-Specific Agreements from the QPA Calculation.**

1. The Departments explained in their opening brief (at 31-37) that the district

court further erred in concluding that the QPA calculation must include amounts

reflected in case-specific agreements used to resolve payment for one-off provisions

of medical services, often after the care has already been provided by an out-of-

network provider.  As the Departments recognized, statutory text and structure make

clear that the QPA calculation should be based on rates recognized under a plan's

generally applicable terms, which further serves the statutory purpose of having the

QPA track in-network rates.

In defending the district court's holding on this point, the air ambulance

plaintiffs frankly concede that the amounts reflected in the case-specific agreements

they seek to include in the QPA calculation represent the higher amounts they were

able to charge for out-of-network transports prior to the No Surprises Act's taking

effect.  *See* Air Ambulance Br. 32 (noting that case-specific agreements, "by definition,

occur only in out-of-network transports"); *see also id.* at 31-32 (arguing that the QPA

should be based on the higher out-of-network rates air ambulance providers were able

to charge prior to the Act's taking effect). While Congress enacted the Act to address the precise market failure reflected in the inflated amounts air ambulance providers were able to extract in such after-the-fact agreements, *see* Opening Br. 36-37, plaintiffs argue that that distortion must be locked into the rates patients pay for such services indefinitely through their inclusion in the QPA. But plaintiffs can establish neither that the Departments were statutorily required to include such amounts in the QPA calculation nor that the Departments acted unreasonably in omitting these amounts from a calculation designed to track in-network rates.

In arguing that inclusion of these rates was statutorily compelled, plaintiffs reiterate (Air Ambulance Br. 23-26) the district court's reasoning that case-specific agreements must be included because such agreements are contracts. But the relevant question is whether these agreements establish "contracted rates" for services "under" a plan or policy. As the Departments explained in their opening brief, a one-off payment to an out-of-network provider that settles an individual claim but does not establish a set rate of payment available to all plan participants for a given period of time fails to meet that definition.

Plaintiffs suggest that "rate" may mean a "[p]rice" or "sum paid or asked for a single thing" in a one-off situation. *See* Air Ambulance Br. 26 (quoting *Rate*, Oxford English Dictionary (online ed.)). But the Oxford English Dictionary, which they cite for this definition, makes clear that the definition that the government cited—defining rate as "[a] fixed charge or payment applicable to each individual instance of a set of

15

similar cases; esp. the amount paid or asked for a certain quantity of a particular commodity, service"—is "now much the more common" and "implies that the same price or sum applies to a number of similar cases and is in some way fixed or standardized." *Rate*, Oxford English Dictionary (online ed.).

Plaintiffs assert that the Departments' reliance on the natural understanding of "rate" represents a post hoc justification and that the Departments simply "declared by fiat (without any explanation)," Air Ambulance Br. 27, that case-specific agreements would be excluded from the QPA calculation. But the Departments did explain why such agreements should be excluded, noting that the term "contracted rate" applies "only to the rate negotiated with providers and facilities that are contracted to participate in any of the networks of the plan or issuer *under generally applicable* terms of the plan or coverage." 86 Fed. Reg. at 36,889 (emphasis added). While the Departments did not cite the dictionary definitions that make clear this understanding is correct, the agency's underlying rationale is the same and again its "path may reasonably be discerned." *Fox*, 556 U.S. at 513-14 (quotation marks omitted).

Plaintiffs miss the point in suggesting (Air Ambulance Br. 39-40) that there is some inconsistency between the Departments' treatment of case-specific agreements and the conclusion that an amount a provider and a plan have agreed on for a particular service represents the "rate" for that service no matter how many times that rate is paid. In the latter case, the amount is a "rate" because it is the generally

applicable fixed amount that will be charged each time a particular item or service is provided by a given provider, and that remains true even if a provider does not end up providing that item or service over a given period.  By contrast, a one-off amount reflected in a case-specific agreement is by definition applicable only to the particular patient and the particular provision of care covered by the agreement.

As the Departments also explained in their opening brief (at 33-34), the district court's interpretation of this provision similarly did not take into account the fact that, to be included in the QPA, a rate must be "under" a plan or coverage, which is naturally understood to mean that the payment is "subject or pursuant to," "governed by," or owed "by reason of the authority of" the terms of the plan or policy.  *See Ardestani v. INS*, 502 U.S. 129, 135 (1991) (discussing meaning of "under").  A payment under a case-specific agreement, which plaintiffs concede is necessarily made to an out-of-network provider without a preexisting agreement with the plan, is not dictated by the generally applicable terms of a plan or policy.  As a result, as the district court in *Association of Air Medical Services v. HHS*, No. CV 21-3031 (RJL), 2023 WL 5094881 (D.D.C. Aug. 9, 2023), recognized, in a decision plaintiffs do not address, such agreements fall outside the plain terms of the Act.  *See id.* at *4.

Plaintiffs suggest (Air Ambulance Br. 41-42) that case-specific agreements must be made "under" the terms of the plan or coverage, or else any such payments would violate fiduciary duty obligations imposed by the Employee Retirement Income Security Act (ERISA), which prohibit dissipating the plan's assets for a purpose other

17

than providing benefits to participants and beneficiaries.  *See* 29 U.S.C.

§ 1104(a)(1)(A).  But plans and issuers have a valid reason to pay providers for out-of-network services to avoid at least some of the negative consequences that would result if their customers or participants were routinely denied any assistance with expensive surprise medical bills.  Thus, although payments made in case-specific agreements are payments for the general purpose of providing a benefit to plan participants and beneficiaries (and consequently would not necessarily breach a fiduciary duty under ERISA), they are not payments that are dictated "by reason of the authority of" the plan or policy documents themselves.  *See Ardestani*, 502 U.S. at 135.  As a result, nothing about the ERISA requirement plaintiffs cite transforms such a payment into a contracted rate recognized "under" the terms of a given plan or coverage.  Payments for in-network services, at rates that are negotiated in advance, are such payments, and so the contracted rates for those in-network services are properly included in the QPA.[4]

---

[4] To the extent plaintiffs suggest that it is sufficient that the case-specific agreement must be "in accordance with" a plan's documents under 29 U.S.C. § 1104(a)(1)(D) in the sense that the plan documents do not forbid the one-off payment, they did not make this argument in the district court, and it is consequently forfeited.  *See Ross v. Midwest Commc'ns, Inc.*, 870 F.2d 271, 272 (5th Cir. 1989) (noting that the Court is "free to affirm the district court's decision on alternative grounds, *if those grounds have been properly preserved*" (emphasis added)); *see also, e.g., Mansourian v. Regents of the Univ. of Cal.*, 602 F.3d 957, 974 (9th Cir. 2010) (declining to consider argument not raised before the district court as alternative ground for affirmance).  In any event, that would not in any meaningful sense mean that such payments are "governed by" the plan in a way that the plain language of the Act indicates is

And while plaintiffs try to dismiss (Air Ambulance Br. 40) the Departments'
reliance on the requirement that a rate be recognized "under" a plan as a post hoc
justification as well, they again simply ignore the Departments' explanation that case-
specific agreements are excluded because "[t]he term 'contracted rate' refers only to
the rate negotiated with providers and facilities that are contracted to participate in
any of the networks of the plan or issuer under generally applicable terms of the plan
or coverage." 86 Fed. Reg. at 36,889. That is the same reasoning provided here.

Plaintiffs also have no explanation of how their argument can be squared with
the statutory specification that the QPA be based on rates recognized on a particular
day (January 31, 2019). As the government noted (Opening Br. 34), the Departments'
exclusion of one-off agreements is sensible in light of the fact that the Act specifies a
particular date on which a rate must be recognized, such that if the provision is read
to cover case-specific agreements it could only be read to encompass such agreements
that happened to be in place on that particular day. Plaintiffs now term (Air
Ambulance Br. 43) this argument too a post hoc justification. As noted, however, the
Departments reasoned that "contracted rates" encompass only rates contracted for
under a plan's generally applicable terms, and the statute's inclusion of a specific date

---

required. *See Association of Air Med. Servs.*, 2023 WL 5094881, at *4. Plaintiffs also cite
a number of provisions of the Public Health Service Act and the Internal Revenue
Code, but the cited provisions simply require that plans subject to those provisions
comply with claims and appeals provisions established under ERISA and have no
obvious relevance to whether any one-off payments are necessarily made "under" the
relevant plans or coverage.

on which to assess what such rates exist only bolsters the force of that reasoning. Indeed, on the substance, plaintiffs can muster as a response only that the Departments may be able to establish a period before January 31, 2019, for which case-specific agreements should be included in the QPA calculation.  *See* Air Ambulance Br. 43.  But there is no basis for reading any such period into a statute that provides only a single date on which to assess the rates recognized.

2.  Plaintiffs argue as an alternative ground to affirm the district court's judgment that the Departments' treatment of case-specific agreements was arbitrary and capricious, because it purportedly did not serve the purpose of having the QPA approximate rates that are the product of "typical market negotiations."  Air Ambulance Br. 30 (quoting 86 Fed. Reg. 36,895).  Because one-off agreements to address services provided by out-of-network providers were common in the air ambulance industry, plaintiffs argue (Air Ambulance Br. 32) that these agreements should be considered to set the relevant market rates.  But they ignore that this is precisely the problem that the No Surprises Act was designed to address.  As noted, the Act was designed to eliminate the market distortion caused by surprise billing, including its particularly pronounced effect on the air ambulance industry.  *See* Opening Br. 35-37; *see also, e.g.*, H.R. Rep. No. 116-615, pt. 1, at 52-53 (2020) (ROA.933-34) (recognizing market distortion caused by surprise billing and the fact that air ambulance rates were particularly inflated as a result).  The QPA is designed not to lock in those inflated rates but rather, as even the district court recognized, to

approximate the rate a provider would have received for a given service had the provider been in-network for the relevant plan. *See, e.g.*, ROA.13197. That goal is furthered by the Departments' determination that the QPA must be calculated based on a plan's generally applicable pre-negotiated rates, and it is plaintiffs' reading that cannot be squared with the statute's purpose.

Plaintiffs similarly miss the mark in arguing that the rule interprets "similar statutory language to mean two *different* things," Air Ambulance Br. 34, insofar as it excludes case-specific agreements from the QPA, while treating such agreements as creating a "contractual relationship" that could render a facility a "participating" emergency or health care facility for certain purposes under the Act. *See* 42 U.S.C. § 300gg-111(a)(3)(F)(ii), (b)(2)(A)(i); 45 C.F.R. § 149.30. But there is no contradiction because these different phrases mean different things and serve different purposes. As the Departments explained, *see* 86 Fed. Reg. at 36,882, 36,889 n.48, 36,931, the "contractual relationship" provision, pursuant to which a health care facility is "participating" for purposes of a given medical item or service—such that the Act's surprise-billing protections for non-emergency services provided by a nonparticipating provider at a participating health care facility will apply—is met when the facility "has a direct or indirect contractual relationship . . . with respect to the furnishing of such an item or service at the facility," 42 U.S.C. § 300gg-111(b)(2)(A)(i). It is entirely reasonable that a facility would be understood to have a "direct or indirect contractual relationship with" a plan pursuant to a case-specific agreement,

but that conclusion has no bearing on whether an amount agreed to in that context represents a contracted "rate" recognized "under" the plan such that it should be included in the QPA. *Compare id.* § 300gg-111(a)(3)(E)(i)(I), *with id.* § 300gg-111(b)(2)(A)(i).

### C.    The Rule Permissibly Directed Health Plans to Exclude Bonus and Incentive Payments from the QPA Calculation.

1. As the Departments also explained (Opening Br. 37-41), the rule reasonably excluded from the QPA calculation various incentive-based or retrospective payments or payment adjustments, including bonuses or penalties. Such retrospective adjustments are rarely tied to a particular item or service, but rather are generally based on other metrics, such as quality or other performance standards, assessed at an aggregate level. As the Departments noted, moreover, calculating the QPA without reference to such adjustments is consistent with the manner in which a patient's cost-sharing amount is customarily determined at or near the time a service is furnished. In other words, payment adjustments are not normally relevant to the determination of how much a patient is expected to pay. A patient with a 20% co-insurance obligation will typically pay $200 on a provider's $1,000 base contracted rate, even if the provider ultimately also earns a further bonus that could be attributable, at least in part, to the provider's care for that patient. Because a key function of the QPA is to serve as the metric for determining the maximum amount a patient can be required to pay for a service covered by the Act (*see* Opening Br. 11), the Department acted

22

reasonably in requiring that the QPA be determined in a manner that mimics typical industry practice for determining patient cost-sharing responsibilities.

Plaintiffs assert (TMA Br. 38) that the Departments' interpretation is inconsistent with the statute's directive that the QPA for a particular item or service be based on the rates recognized by a health plan as "the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) . . . for the same or a similar item or service." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). But, as the Departments made clear in their opening brief (at 38-39), the "total maximum payment" for a given "item or service" is naturally understood to mean the highest value a plan has contracted to pay for that particular item or service, including both any cost-sharing amount paid by the patient and the amount paid by the plan. It does not naturally include bonus and incentive payments rarely tied to a rate for a particular service. *See* 86 Fed. Reg. at 36,893-94.

Amicus briefs filed by America's Health Insurance Plans and Blue Cross Blue Shield Association outline the common forms these various alternative payment models may take, and across the models, retrospective payments or adjustments are made in such a way that cannot be naturally linked to a particular service so as to be considered part of the "total maximum payment" for that service. *See* America's Health Ins. Plans Amicus Br. 11-15 (noting that such models may encompass things like adjustments based on a provider group's overall performance or savings

generated across multiple patients and services); Blue Cross Blue Shield Ass'n Amicus
Br. 18-22 (similarly noting that alternative payment models often incorporate
performance-based payments tied to outcomes across a number of patients and
services as well as payments for things like general infrastructure investments or
performing data-reporting services). These features underscore that the Departments
acted reasonably in determining that such payments were properly not included in the
rate for a particular service and consequently should be excluded from the QPA
calculation. While here too plaintiffs suggest (TMA Br. 41) that the Departments are
offering a post hoc rationalization, they simply ignore the relevant discussion in the
rule's preamble. As the Departments explained, bonus and incentive payments are
rarely tied to specific contracted rates for particular items and services; rather, these
payments often arise in situations in which plans are paying providers a bundled
payment for multiple services or a fixed fee per plan member or they are paying a
lump sum to promote certain benefits over time. *See* 86 Fed. Reg. at 36,893-94.

Plaintiffs argue (TMA Br. 42) that a payment need not be directly linked to a
service to be included in the QPA calculation, citing the Departments' authority to
account through rulemaking for "payments that are made by [a] plan . . . that are not
on a fee-for-service basis." 42 U.S.C. § 300gg-111(a)(2)(B). But that provision
highlights that Congress conferred discretion on the Departments in determining how
to account for such payments, and the Departments reasonably exercised that
authority in determining that plans employing a non-fee-for-service model should

24

generally calculate QPAs based on an underlying fee schedule rate or similar "derived amount" that a health plan may have established for cost-sharing or other internal accounting purposes.  86 Fed. Reg. at 36,893.  Bonus payments fall outside that approach for the same reason that they cannot naturally be linked to a particular service under a fee-for-service model.  And while plaintiffs posit (TMA Br. 40-41) hypothetical examples in which they assert that a particular bonus could be linked to a particular service, it is unclear on their examples' own terms whether a bonus for providing a certain service a specified number of times represents a payment for providing that service in a particular instance, even assuming that an incentive payment takes this form.  In any event, the Departments did not act unreasonably in using their express authority under the No Surprises Act to establish a QPA-calculation methodology that comports with the general manner in which both fee-for-service and non-fee-for-service payment models treat retrospective adjustments notwithstanding the hypothetical rare exceptions plaintiffs posit.[5]

The Departments' interpretation of what it means for a payment to be for a particular item or service is bolstered by the industry practice regarding the calculation

---

[5] Similarly, even if a comment plaintiffs highlight, *see* ROA.5917, in fact suggests that a particular plan's payment model is set up in such a manner that an incentive-based component of a payment to a particular provider "cannot be separately parsed" from the amount otherwise paid for a service, that rare situation could be addressed through future guidance, and the Departments did not act unreasonably in declining to deviate from normal industry practice in order to tailor the rule's entire methodology around uncommon, outlier arrangements.

of cost-sharing payments discussed in the opening brief (at 40), where such payments are generally calculated around the time a service is provided and not subsequently altered on the basis of any retrospective payments. Plaintiffs argue that the industry practice cannot be considered where a statutory term is clear, but as discussed, the Departments are reasonably interpreting what constitutes the total maximum payment for a particular service. Industry practice represents a "prime source[]" for determining what interpretation best comports with congressional intent in this regard, *City of Dallas v. FCC*, 118 F.3d 393, 395 (5th Cir. 1997), and it was reasonable for the Departments to align their understanding of this provision with the manner in which cost-sharing payments are determined generally, particularly given the QPA's determinative role in setting cost-sharing responsibilities under the Act.

2. Plaintiffs again argue (TMA Br. 48) as an alternative ground for affirmance that the Departments' decision was arbitrary and capricious. They maintain that excluding bonus payments results in non-market rates because a provider would have asked for a higher fixed per-service rate in the absence of a bonus. But as the discussion above reflects, such retrospective payments are not generally offered as a concession for adopting lower fixed per-service rates but rather are associated with a provider group's overall performance across a number of patients or services or in connection with providing other services like data reporting. Especially given the broad discretion Congress gave the Departments to determine how to address non-fee-for-service payment models, their choices in this regard were reasonable.

Moreover, as noted, those amounts are generally obtained on the back end from *plans*, not directly from *patients*. The Act, as implemented under the challenged regulations, is faithful to that structure. As noted, in many circumstances, the QPA is dispositive of a patient's maximum cost-sharing obligation and, thus, excluding bonus payments from the QPA shields patients from responsibility for paying any portion of them. But in the dispute resolution process between providers and plans, the QPA is just one of several factors that are to be considered in determining the value of the service and, accordingly, the amount the plan can be required to pay. *See* Opening Br. 12-13. Notably, providers are free to point to bonus and incentive payments, which are not incorporated into the QPA, as a reason why the QPA does not reflect the full value of their services. And the Departments have accordingly specified that, upon a provider's request, a plan must inform the provider whether the QPA includes contracted rates not set on a fee-for-service basis and whether the plan's rates include incentive-based or retrospective payments or payment adjustments that were excluded in calculating the QPA. *See* 45 C.F.R. § 149.140(d)(2)(iv); 86 Fed. Reg. at 36,899. That approach reasonably allows providers to use such information to advocate for a higher payment amount in negotiations with the plans or in any dispute resolution process, while avoiding imposing additional cost-sharing expenses on patients at odds with current industry practice and the congressional purpose in enacting the No Surprises Act. And, as the government noted in its opening brief, it further tracks the express contemplation in the statute that a provider's "quality and outcomes

measurements" is a factor to be considered separately from the QPA. *See* Opening

Br. 41 (quoting 42 U.S.C. § 300gg-111(c)(5)(C)(ii)).

Plaintiffs assert (TMA Br. 50) that more disclosures could have been required

regarding excluded bonus payments, but, as discussed *infra* pp. 36-43, they do not

provide a basis for concluding that the Departments acted unreasonably in not

requiring plans to provide even more information on this point. And plaintiffs do not

dispute that having the arbitrator consider incentive payments in the independent

dispute resolution (IDR) process is consistent with the statutory direction to consider

a provider's quality and outcomes measurements at that stage. They argue (TMA Br.

50) that not all incentive payments are based on such considerations, but, even

assuming there are a meaningful number of such non-quality-based payments that

could even plausibly be termed a payment for a particular service, the existence of this

statutory provision nonetheless makes clear that locating consideration of such factors

in the dispute resolution process is consistent with the structure that the No Surprises

Act established.

Finally, plaintiffs, as well as certain amici, express a general concern that out-of-

network providers may be insufficiently compensated if they are paid amounts

approximating the QPAs. *See* TMA Br. 51; *see also* Am. Soc'y of Anesthesiologists

Amicus Br. 26-29; Physicians Advocacy Inst. Amicus Br. 18-24; Emergency Dep't

Practice Mgmt. Ass'n Amicus Br. 17-21. But such a concern provides no reason to

stray from Congress's directive that the QPA be based on the rates charged for a

particular item or service by inflating QPAs to incorporate payments not tied to any

service that an out-of-network provider actually provided.  And it would be

particularly inappropriate to interpret the Act to increase patients' cost-sharing

responsibilities in this way, where the principal purpose of the statute (albeit one only

glancingly acknowledged by plaintiffs) is to ameliorate the serious effects that surprise

billing had on patients and ensure that covered out-of-network care would generally

not cost more for patients than if the same care had been provided in-network.  *See* 42

U.S.C. §§ 300gg-111(a)(1), 300gg-112(a)(1); *see also, e.g.*, *Southwestern Elec. Power Co. v.*

*EPA*, 920 F.3d 999, 1028 (5th Cir. 2019) (explaining that courts should not adopt an

interpretation that "is contrary to clear congressional intent or frustrates the policy

Congress sought to implement" (quotation marks omitted)).

## II.    The Rule Permissibly Interpreted the No Surprises Act's Statutory Deadline for Health Plans to Make an Initial Payment or Notice of Denial of Payment.

1.  As the government's opening brief also explained (at 41-47), the district

court further erred in invalidating a provision of the rule that specified that the

statutory 30-day period for plans to submit an initial payment or notice of denial of

payment is triggered when the plans receive "the information necessary to decide a

claim for payment for the services."  45 C.F.R. § 149.130(b)(4)(i).  The Departments'

interpretation reasonably supplies meaning to the otherwise undefined statutory term

"bill for such services."  42 U.S.C. § 300gg-112(a)(3)(A).  In adopting the challenged

definition, the Departments sensibly determined that plans should not be required to

act on a claim for payment before they have sufficient information to determine whether a furnished service is a covered benefit under the terms of the plan or coverage. That information is essential to determine whether the No Surprises Act's protections apply in the first place, and without it, a plan may have no choice but to deny a claim, leading to confusion as to whether the service in question is subject to the Act's protections against surprise billing. This approach also aligns practice under the No Surprises Act with general industry practice governing medical billing.

Plaintiffs argue (Air Ambulance Br. 48) that the statutory term "bill" is unambiguous, but they do not supply a definition of the term, much less suggest that the purportedly non-technical definitions offered by the district court are workable, where they may require a plan to make a determination as to whether a claim will be covered before the provider submits the information necessary to that analysis. Plaintiffs suggest (Air Ambulance Br. 44-45) that the Departments' interpretation is itself unworkable by granting plans unilateral authority to determine when they have the information necessary to decide a claim, but that is simply not what the rule provides. Consistent with established industry practice, a provider must give a plan the information necessary to decide a claim, but if that provider has done so, a plan may not, consistent with the regulations, claim that some additional information is necessary, whether from the provider or a third party. To the extent that plaintiffs are arguing that plans are not complying with this directive or are interpreting it unreasonably in practice, the Departments have made clear that providers may

contact the No Surprises Help Desk or file a complaint, which can then result in the relevant federal or state entity investigating the plan in question. ROA.416. Plaintiffs' asserted concerns regarding the manner in which providers comply with this regulatory directive consequently provide no basis for invalidating the Departments' reasonable interpretation of this ambiguous statutory term.

Like the district court, plaintiffs place heavy weight on the fact that other provisions in title 42 use the term "clean claim," but also like the district court they point to no evidence that Congress made a "deliberate choice to use the term 'bill' rather than 'clean claim.'" Air Ambulance Br. 49. Nor do they have a response to the government's point in its opening brief (at 45-46) that the regulatory definition adopted by the Departments of "bill" is not identical to the statutory definitions of "clean claim" offered in a number of the statutes plaintiffs cite. Even further afield, plaintiffs argue (Air Ambulance Br. 52-53) that there is an inconsistency between the Departments' interpretation of the 30-day deadline in the No Surprises Act and ERISA's requirements that group health plans "provide adequate notice" of any denial of a claim and "a reasonable opportunity . . . for a full and fair review" of the denial. 29 U.S.C. § 1133. But there is no dispute that the No Surprises Act imposed a specific statutory deadline on making an initial payment determination for certain covered services that was not present previously, even if the Departments had adopted via rulemaking a somewhat similar deadline for making benefit determinations. *See, e.g.*, 29 C.F.R. § 2560.503-1(f) (setting out timing of notification

of benefit determinations). And the fact that, in previously addressing such questions, the Departments had also recognized that it is unworkable to require a benefits determination be made before a plan has the information required to decide the claim only underscores that the Departments' interpretation is consistent with established industry practice in this area. *See City of Dallas*, 118 F.3d at 395. These provisions provide no basis for concluding that Congress rejected this approach in the No Surprises Act either.

Plaintiffs also suggest that the Departments lack rulemaking authority with respect to this provision of the No Surprises Act and fault the government for not addressing this "threshold issue." Air Ambulance Br. 54. But the district court did not hold that the Departments lacked rulemaking authority as to this provision and for good reason. While the No Surprises Act did not specifically require the Departments to issue rules relating to the statutory deadline for making a payment determination, the Act amended the Public Health Service Act, ERISA, and the Internal Revenue Code to add this provision along with the other provisions of the Act. Each of these statutes authorizes the Secretary of the relevant Department administering the statute to "promulgate such regulations as may be necessary or appropriate to carry out the provisions of this subchapter," 42 U.S.C. § 300gg-92; *see also* 26 U.S.C. § 9833; 29 U.S.C. § 1191c. That Congress recognized in the No Surprises Act specific areas as to which the Departments were directed to conduct rulemaking by a statutorily specified deadline provides no basis to conclude that it was

thereby depriving the Departments of authority to interpret ambiguous statutory terms in statutes over which the agencies had broad general rulemaking authority. *See City of Arlington v. FCC*, 569 U.S. 290, 296-301 (2013) ("Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency.").

2. Finally, as to this provision too, plaintiffs argue as an alternative ground for affirmance that the Departments' interpretation of this provision is arbitrary and capricious. But here, too, they largely repackage their statutory arguments, and those arguments are no more availing in this context. As discussed above, the rule's regulatory requirement is not unenforceable, and to the extent plaintiffs or other providers believe they have provided a plan with the necessary information to decide a claim for a covered item or service and the plan has failed to issue an initial payment determination within the requisite period, they may contact the Help Desk or file a complaint, as the Departments expressly suggested. This argument provides no basis to invalidate this provision in this context either.

## III.    At a Minimum, the District Court Erred in Issuing Overbroad Relief.

As explained (Opening Br. 47-50), the district court's universal vacatur with respect to the provisions it concluded were inconsistent with the No Surprises Act was erroneous.

Even assuming vacatur were an available remedy for a successful Administrative Procedure Act (APA) challenge to a regulation, *but see United States v. Texas*, 599 U.S. 670, 693-702 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment), it does not follow that plaintiffs justified that equitable remedy in the circumstances of this case.  Instead, the matter should have been remanded to the Departments without vacatur of the challenged provisions in light of the "disruptive" consequences of vacatur.  *See, e.g., Central & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (remanding without vacatur).  Consistent with Congress's intent, the district court should have preserved these provisions rather than imposing the significant disruption occasioned by vacating the QPA calculation methodology given the important role these calculations play across a number of statutory contexts.  That also could have avoided imposing on plans the costs of undertaking multiple rounds of QPA calculations (costs that plans are continuing to incur), which are in turn passed on to insured consumers, as the Departments determined how to respond to the district court's decision.  *See* 86 Fed. Reg. at 36,927-28 (estimating costs associated with calculating QPAs).

In any event, even assuming vacatur was an appropriate remedy here, the district court erred by extending relief beyond the parties, in contravention of constitutional and equitable principles.  Regardless of whether courts may vacate agency action universally, they "should 'think twice—and perhaps twice again— before granting' such sweeping relief."  *Texas*, 599 U.S. at 702 (Gorsuch, J., joined by

Thomas and Barrett, JJ., concurring in the judgment) (quoting *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring)). If "party-specific relief can adequately protect the plaintiff's interests," then "an appellate court should not hesitate to hold that broader relief is an abuse of discretion." *Id.* at 703. That is the case here because nothing about the injuries plaintiffs claim required extending the equitable relief they sought to non-parties, and it is particularly inequitable for the court to have ordered universal vacatur here where it resulted in the effective nullification of the judgment of another district court that had rejected a challenge brought by a large industry group to one of the same provisions invalidated by the district court here. Plaintiffs note (TMA Br. 68) that the requirements challenged here are imposed on plans, rather than the plaintiffs themselves, but nothing about that fact would preclude the court from limiting the scope of any vacatur ordered to the rule's application in a situation in which it might conceivably injure the plaintiffs. At the very least, the court should have considered whether such a tailoring of the remedy was feasible before ordering a universal vacatur. *See Texas*, 599 U.S. at 701-02 (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment).

Plaintiffs contend (TMA Br. 67) that vacatur under the APA inherently operates universally and cannot be limited to specific parties. But no such prohibition on tailored relief appears in the text of the APA or the No Surprises Act, and plaintiffs' position would require a radical departure from "the bedrock practice of case-by-case judgments with respect to the parties in each case." *Arizona*, 40 F.4th at

396 (Sutton, C.J., concurring). Regardless, if plaintiffs were correct that vacatur must operate universally, that would only underscore that the district court should have forgone vacatur in favor of party-specific equitable remedies. *See* 5 U.S.C. § 703 (authorizing courts reviewing agency action to consider, among other things, "declaratory judgments" or "injunction[s]"). Plaintiffs strain credulity in contending that universal vacatur of the challenged regulatory provisions was somehow "a less drastic remedy" than party-specific relief. TMA Br. 67 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). Plaintiffs' authority referred to vacatur as "a less drastic remedy" when compared with the remedy of vacatur paired with the "additional" relief of a redundant nationwide injunction. *Monsanto*, 561 U.S. at 165-66.

## IV.    Plaintiffs' Cross-Appeal Challenging the Rule's Requirements Regarding the Information That Plans Must Disclose About Their QPA Calculations Is Meritless.

Plaintiffs also cross-appeal from the district court's rejection of their challenge to a regulatory provision that directs plans to disclose to the provider certain information regarding the QPA calculation. Plaintiffs do not dispute that Congress tasked the Departments with responsibility for issuing disclosure regulations but argue that the Departments should have imposed disclosure requirements that were even more rigorous. Notably, in marked contrast to their arguments elsewhere, plaintiffs ground their arguments here not in any statutory text but rather in purported practicalities and in their conception of the aims and purposes of the Act. While the Departments agree that these are valid considerations—and that plaintiffs are

36

accordingly wrong to give them such short shrift in the context of the Departments'

own appeal—plaintiffs are wrong in arguing that the Departments acted unreasonably

here.

### A. The Departments Adopted Reasonable Disclosure Requirements Pursuant to the No Surprises Act's Grant of Broad Discretion to Promulgate Rules in This Area.

The No Surprises Act directed the Departments to determine through

rulemaking "the information" that a plan "shall share with the nonparticipating

provider or nonparticipating facility" when determining the QPA pursuant to the

methodology established under the Act.  42 U.S.C. § 300gg-111(a)(2)(B)(ii).  In

granting this rulemaking authority to the Departments, the statute does not specify

the type of information that should be shared or require the disclosure of any category

of information in particular.

Pursuant to this directive, the Departments required that health plans must

submit to providers "the QPA for each item or service involved" and "a statement

certifying that[] . . . [t]he QPA applies for purposes of the recognized amount (or, in

the case of air ambulance services, for calculating the participant's, beneficiary's, or

enrollee's cost sharing), and [that] each QPA shared with the provider or facility was

determined in compliance with the methodology outlined in these interim final rules."

86 Fed. Reg. at 36,898.  Upon request of the provider, plans must further provide

"information about whether the QPA includes contracted rates that were not set on a

fee-for-service basis" for the items or services at issue and "whether the QPA for

those items and services was determined using underlying fee schedule rates or a derived amount." *Id.* at 36,899. If a related service code was used to determine the QPA for a new service code, the plan must provide "information to identify which related service code was used," and "if an eligible database was used to determine the QPA," the plan must provide "information to identify which database was used to determine the QPA." *Id.* A plan may also be required upon request to provide "a statement that the plan's or issuer's contracted rates include risk-sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments for the items and services involved that were excluded for purposes of calculating the QPA." *Id.* And in a provision added in a subsequent rule following public comment, the Departments have required that, if the QPA was based on a downcoded service code or modifier, plans disclose that the code was downcoded, provide an explanation as to why, and disclose the amount the QPA would have been had the code not been downcoded. 45 C.F.R. § 149.140(d)(1)(ii); *see Requirements Related to Surprise Billing*, 87 Fed. Reg. 52,618, 52,625-26 (Aug. 26, 2022) (explaining decision to adopt new disclosure requirement).[6]

The Departments explained that the disclosure requirements balance the importance of transparency with reducing burdens on plans and issuers by minimizing

---

[6] The rules define a "downcode" as "the alteration by a plan or issuer of a service code to another service code" or change to a code modifier, where "the changed code or modifier is associated with a lower qualifying payment amount than the service code or modifier billed by" the provider. 45 C.F.R. § 149.140(a)(18).

potentially voluminous disclosure requirements. *See* 86 Fed. Reg. at 36,898 ("The Departments seek to ensure transparent and meaningful disclosure about the calculation of the QPA while minimizing administrative burdens on plans and issuers."). And they explained that they required certain information to be disclosed to allow plans and providers to negotiate and arbitrate via the IDR process. For example, the discussion of the disclosure requirement regarding bonus and other incentive payments specifies that "[h]aving information about whether the median contracted rate excludes these types of payment adjustments" was included because it "will better inform the open negotiation and IDR process." *Id.* at 36,899. The district court upheld these regulations against plaintiffs' challenge, concluding that the statute "gives the Departments wide latitude in issuing a disclosure rule, and the Departments have shown that their rule is the result of reasoned decision making." ROA.13217.

### B. Plaintiffs' Challenges to the Rule's Disclosure Requirements All Fail.

In their cross-appeal, plaintiffs challenge the district court's upholding of the rule's disclosure requirements but provide no basis for concluding that the Departments acted unreasonably in exercising the broad discretion granted to them under the statute to promulgate disclosure requirements. There is no possible argument here that the Departments failed to require the disclosure of information that the statute itself commands be produced. Congress indeed did not specify the

disclosure of any particular information but committed to the Departments the task of determining what information would need to be disclosed.

Plaintiffs nonetheless argue that the rule's disclosure requirements do not permit "meaningful insight" into the QPA's calculations and suggest that the Departments should have required disclosure of such items as the number of contracted rates used by the plan to calculate the QPA, the number of times each rate was paid, and the types of providers that agreed to each rate. TMA Br. 53. But the statute does not require disclosure of these categories of information, and mandating this level of disclosure could be extremely burdensome on plans and issuers. Such disclosure is particularly unnecessary, moreover, where the Departments have laid out in detail the manner in which the QPA must be calculated in the rule, *see* 86 Fed. Reg. at 36,889, and required that plans certify that the QPAs provided were calculated in compliance with the rule. The QPA calculation is thus not the "black box" that plaintiffs assert, TMA Br. 56, and, while they may wish that additional information were required to be disclosed, that does not make the disclosures that the Departments did require unreasonable. *See Southwestern Elec.*, 920 F.3d at 1028-29 (explaining that a regulation is not arbitrary and capricious even if it is not the only possible version of the regulation that an agency could have written and even if it is not the court's preferred version). Nor does it make the Departments' claim that they balanced transparency against the burden imposed on plans "paradoxical," even if the

plaintiffs would have set that balance differently.  TMA Br. 56 (quotation marks omitted).

Plaintiffs also suggest that they must have information sufficient to verify a plan's calculations in order to be able to submit a complaint under the statute.  But again, nothing in the statute establishes providers like plaintiffs as the auditors of QPA calculations in this regard.  To the contrary, it confers the responsibility to conduct audits on the relevant Secretaries, providing that they will establish a process to audit a sample of plans each year and may additionally audit any plan "if the Secretary has received any complaint" or information involving lack of compliance with the Act's QPA calculation rules.  42 U.S.C. § 300gg-111(a)(2)(A)(ii). Plans found to be operating in violation of the regulations are subject to fines and penalties.  *Id.* § 300gg-22; 45 C.F.R. § 150.301 (authorizing civil money penalties).  To the extent plaintiffs have reason to believe that a plan is not complying with the No Surprises Act or the rule, they certainly may bring that to the Departments' attention, along with any other instances of statutory or regulatory noncompliance, under the complaint process established under the statute.  *See* 42 U.S.C. § 300gg-111(a)(2)(B)(iv); *see also id.* § 300gg-111(a)(2)(A)(i)(II).  But nothing in the establishment of that process requires providers to be permitted to recalculate every QPA that a plan submits or otherwise suggests that the Departments acted unreasonably in setting a different balance in the disclosure rules they promulgated. This case is thus nothing like *Texas v. United States*, 497 F.3d 491 (5th Cir. 2007), on

which plaintiffs rely, where this Court concluded that an agency's regulations bypassed various prerequisites of the Indian Gaming Regulatory Act and disrupted a "finely-tuned balance," *id.* at 506 (quotation marks omitted) that Congress had established between tribal and State interests in this area. *Id.* at 506-09; *see also id.* at 512 (King, J., concurring in part and in the judgment) (concluding that the challenged rule had set up procedures that omitted certain statutory prerequisites).

While plaintiffs also term the Departments' explanation of the disclosure rules "paltry," TMA Br. 56, the rule plainly sets forth the Departments' explanation that they were trying to strike a balance between transparency and the burden imposed by voluminous disclosure requirements, 86 Fed. Reg. at 36,898. That is far more than the "ipse dixit" plaintiffs describe. TMA Br. 57 (quotation marks omitted). And here too, at the very least, "the agency's path may reasonably be discerned," *Fox*, 556 U.S. at 513-14 (quotation marks omitted), and the reasons offered "conform to minimal standards of rationality," *Luminant Generation Co. v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013) (quotation marks omitted). Nor were the Departments required to expressly consider plaintiffs' alternative disclosure requirements or the "maximum transparency" alternative plaintiffs posit "requiring insurers to disclose everything (or virtually everything) underlying their calculations." TMA Br. 57. The Departments explained that they were achieving a balance between the information conveyed and the burden imposed by the disclosure requirements, and they adequately considered and rejected additional disclosure requirements that, whatever added transparency

42

benefits they might be thought to achieve, would have plainly increased the burden on plans.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed insofar as it concluded that four provisions of the Departments' rule were invalid and issued a nationwide vacatur. The district court's grant of partial summary judgment to the Departments should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

DAMIEN M. DIGGS
*United States Attorney*

JOSHUA M. SALZMAN

*s/ Leif Overvold*

LEIF OVERVOLD
KEVIN B. SOTER
*Attorneys, Appellate Staff*
*Civil Division, Room 7226*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*
*leif.overvold2@usdoj.gov*

May 2024

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Leif Overvold*
Leif Overvold

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(e)(2)(A) because it contains 11,246 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Leif Overvold*
Leif Overvold