No. 23-40605

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL, L.L.C.;
DOCTOR ADAM CORLEY,

*Plaintiffs-Appellees/Cross-Appellants,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA,
SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES
DEPARTMENT OF THE TREASURY; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF
TREASURY; UNITED STATES DEPARTMENT OF LABOR; JULIE A. SU, ACTING SECRETARY,
U.S. DEPARTMENT OF LABOR; UNITED STATES OFFICE OF PERSONNEL MANAGEMENT;
KIRAN AHUJA,

*Defendants-Appellants/Cross-Appellees.*

---

LIFENET, INCORPORATED; EAST TEXAS AIR ONE, L.L.C.; ROCKY MOUNTAIN HOLDINGS
L.L.C.; AIR METHODS CORPORATION, L.L.C.,

*Plaintiffs-Appellees/Cross-Appellants,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA,
SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES
DEPARTMENT OF THE TREASURY; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF
TREASURY; UNITED STATES DEPARTMENT OF LABOR; JULIE A. SU, ACTING SECRETARY,
U.S. DEPARTMENT OF LABOR; UNITED STATES OFFICE OF PERSONNEL MANAGEMENT;
KIRAN AHUJA,

*Defendants-Appellants/Cross-Appellees.*

---

On Appeal from the United States District Court
for the Eastern District of Texas (Kernodle, J.)
Nos. 6:22-cv-450 and 6:22-cv-453

---

## REPLY BRIEF OF APPELLEES/CROSS-APPELLANTS TEXAS MEDICAL ASSOCIATION, TYLER REGIONAL HOSPITAL, AND DR. ADAM CORLEY

COUNSEL LISTED ON INSIDE COVER

ERIC D. MCARTHUR
    *Counsel of Record*
BRENNA E. JENNY
JILLIAN STONECIPHER
CODY M. AKINS
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8011
Email: emcarthur@sidley.com

JAIME L.M. JONES
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-0751
Fax: (312) 853-7036
Email: jaime.jones@sidley.com

**Counsel for Plaintiffs-Appellees/
Cross-Appellants**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... iv

INTRODUCTION ................................................................................... 1

ARGUMENT .......................................................................................... 2

I.    The QPA Disclosure Rule Is Arbitrary And Capricious. ................. 2

    A.    The disclosure rule is not reasonably explained. ................... 2

    B.    The disclosure rule is not reasonable. ................................... 8

CONCLUSION ...................................................................................... 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Big Time Vapes, Inc. v. FDA,*
   963 F.3d 436 (5th Cir. 2020)............................................................. 13

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
   419 U.S. 281 (1974).......................................................................... 5

*DHS v. Regents of Univ. of Cal.,*
   140 S. Ct. 1891 (2020)..................................................................... 6

*Dish Network Corp. v. NLRB,*
   953 F.3d 370 (5th Cir. 2020)............................................................ 11

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009)...................................................................... 7, 8

*FCC v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021)..................................................................... 1

*Garland v. Ming Dai,*
   141 S. Ct. 1669 (2021)..................................................................... 5

*In re MCP No. 165,*
   21 F.4th 357 (6th Cir. 2021) ............................................................ 6

*Mo. Pub. Serv. Comm'n v. FERC,*
   234 F.3d 36 (D.C. Cir. 2000) ........................................................... 4

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto.*
   *Ins. Co.,*
   463 U.S. 29 (1983).............................................................. 2, 3, 6, 7

*Texas v. Biden,*
   20 F.4th 928 (5th Cir. 2021), *rev'd on other grounds*, 142
   S. Ct. 2528 (2022).......................................................................... 4, 6

*United Distrib. Cos. v. FERC*,
  88 F.3d 1105 (D.C. Cir. 1996) ................................................ 5

*Wages & White Lion Invs., LLC v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) ................................. 1, 3, 8, 13

*Wages & White Lion Invs., LLC v. FDA*,
  90 F.4th 357 (5th Cir. 2024), *petition for cert. filed* (U.S.
  Mar. 19, 2024) (No. 23-1038) ................................................ 7

## Statutes and Regulations

42 U.S.C. § 300gg-111(a)(2)(A)(ii) ..........................................9

42 U.S.C. § 300gg-111(a)(2)(A)(ii)(II) ....................................9

42 U.S.C. § 300gg-111(a)(2)(B)(iv) ......................................3, 8

45 C.F.R. § 149.140(d)(1)(i) ...................................................10

45 C.F.R. § 149.140(d)(1)(iii) .................................................10

45 C.F.R. § 149.140(d)(1)(iii)–(iv)..........................................10

45 C.F.R. § 149.140(d)(2)(i) ...................................................10

45 C.F.R. § 149.140(d)(2)(ii) ....................................................9

45 C.F.R. § 149.140(d)(2)(iii) .................................................10

86 Fed. Reg. 36,872 (July 13, 2021) ............................... *passim*

## Other Authorities

Am. Med. Ass'n, *AMA Releases the CPT 2024 Code Set* (Sept.
  8, 2023), tinyurl.com/2tkm8evu.......................................... 10

## <u>INTRODUCTION</u>

Meaningful disclosures about insurers' QPA calculations are critical to the NSA's complaint, negotiation, and arbitration processes. The Departments hardly dispute this. Nor do they dispute that, as a result, the APA demands that they take those processes into account when promulgating a disclosure rule. The questions before the Court, then, are whether the Departments sufficiently explained how they took those processes into account in adopting the disclosure rule, and whether the minimal disclosures they required achieve the transparency that all agree the law demands. Because the answer to both questions is "no," the rule is arbitrary and capricious.

The Departments' responses are unpersuasive. They rely primarily on the statute's broad grant of discretion to them to decide what information insurers must disclose. But that discretion does not excuse the Departments from complying with the APA's requirements of reasoned decisionmaking, which exist precisely to ensure that agencies reasonably exercise the discretion Congress granted them. And while the NSA does not mandate any particular disclosures, it does require the Departments to promulgate a disclosure rule that reasonably implements the statute. Because the Departments

did not do so here, the Court should declare the rule unlawful and remand it for further rulemaking consistent with the requirements of the APA.

## ARGUMENT

## I.    The QPA Disclosure Rule Is Arbitrary And Capricious.

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). That standard "is not toothless. … In fact, … it has serious bite." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) (*Wages I*). The Departments' disclosure rule is neither reasonably explained nor reasonable, and is thus unlawful.

### A.    The disclosure rule is not reasonably explained.

To survive arbitrary-and-capricious review, an agency must have "reasonably considered the relevant issues and reasonably explained the decision." *Id.* The Departments did neither here—not surprisingly, given that they issued the disclosure rule without notice and comment and therefore without giving providers the opportunity to weigh in on the importance of robust disclosures and the types of disclosures that would be meaningful.

To begin with, the Departments entirely ignored the statutory complaint process. The Departments do not dispute that the complaint process is an "important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v.*

2

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). How could they? Just two provisions after directing the Departments to promulgate a rule requiring insurers to make disclosures when making QPA determinations, Congress told the Departments to establish a process to "receive complaints" regarding improperly calculated QPAs. 42 U.S.C. § 300gg-111(a)(2)(B)(iv). Ensuring providers have enough information about insurers' secret QPA calculations to craft such complaints, then, is surely an important aspect of deciding on a disclosure rule. And it is an aspect the Departments "simply ignored." *Wages I*, 16 F.4th at 1137. "Not one sentence"—indeed, not one word—"of [the Departments'] rulemaking statement discusses" the complaint process or the effect the rule would have on that process. *State Farm*, 463 U.S. at 48; *see* 86 Fed. Reg. 36,872, 36,898–99 (July 13, 2021) (ROA.794–795). This deficiency alone renders the rule arbitrary and capricious.

The Departments at least acknowledged another important aspect of the problem: that meaningful disclosures are necessary for providers to effectively utilize the NSA's negotiation and IDR processes. But they failed to reasonably explain how the barebones disclosures they mandated could achieve these statutory objectives. Here's the sum-total of what the Departments had to say about the basis for their chosen disclosure rule: "The

Departments seek to ensure transparent and meaningful disclosure about the calculation of the QPA while minimizing administrative burdens on plans and issuers." 86 Fed. Reg. at 36,898 (ROA.794). This one-sentence explanation does no more than identify two considerations to be weighed.

That is not enough. A mere "passing reference to relevant factors … is not sufficient to satisfy [the Departments'] obligation to carry out 'reasoned' and 'principled' decisionmaking." *Mo. Pub. Serv. Comm'n v. FERC*, 234 F.3d 36, 41 (D.C. Cir. 2000) (cleaned up) (holding that agency's single sentence identifying two relevant factors failed to sufficiently "articulate the basis for its decision"). Rather, the Departments must "sho[w] [their] work and actually conside[r] the factor[s] on paper." *Texas v. Biden*, 20 F.4th 928, 993 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022). The Departments' bare incantation of the need to balance "transparency" and "burden" is no substitute for showing *how* their rule strikes the appropriate balance. *See id.* The Departments did not explain, for example, how providers would be able to effectively advocate for themselves in negotiation and IDR armed only with the limited information the Departments required insurers to disclose about their QPA calculations, or why additional information would be unduly burdensome for insurers to share. Without notice and comment, in fact,

the Departments never heard from insurers about what burden would be associated with what meaningful disclosure, making rational balancing, much less explaining that balancing, impossible. The Departments simply identified two factors they were weighing and announced the required disclosures, with no reasoning or explanation in between.

The Departments are wrong that this is merely a "decision of less than ideal clarity" whose path can nevertheless "reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); Dep'ts' Br. 42. The problem is not that the Departments failed to "follow a particular formula" or "use any particular words" in explaining themselves. *Garland v. Ming Dai*, 141 S. Ct. 1669, 1679 (2021). It's that the Departments followed *no* formula and used *no* words to explain how they moved from the general need to "ensure transparent and meaningful disclosure … while minimizing administrative burdens," 86 Fed. Reg. at 36,898 (ROA.794), to deciding upon the disclosure rule's specific balance of those factors, *see United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1187 (D.C. Cir. 1996) (agency's path could not be discerned where, although the agency explained why certain customers should bear *some* costs, it failed to explain "why it chose 10% rather than 5% or 15%"). This Court "should not attempt itself to make up

5

for such deficiencies: [it] 'may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *State Farm*, 463 U.S. at 43.

The Departments also "insufficiently addressed alternatives." *Texas*, 20 F.4th at 992. Indeed, the Departments did not address alternatives *at all*. *Cf.* 86 Fed. Reg. at 36,930–32 (ROA.826–828) (considering alternatives for many aspects of the July Rule, but not the disclosure rule). Ordinarily, of course, the Departments would have needed to consider and address alternative disclosure requirements proposed by commenters as part of the agencies' obligation to respond to comments. Here, however, providers had no opportunity to propose alternatives before the disclosure rule was issued because the Departments invoked the "good cause" exception to proceed without notice and comment. *Id.* at 36,917–18 (ROA.813–814). But the lack of notice and comment does not absolve the Departments from considering alternatives, which is "a quintessential aspect of reasoned decisionmaking" that "[e]mergency decisionmaking may lessen, but does not relieve." *In re MCP No. 165*, 21 F.4th 357, 393 (6th Cir. 2021) (Larsen, J., dissenting) (alteration omitted); *see also DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1912–13 (2020) (holding agency decision that was issued without notice and comment arbitrary and capricious for failure to consider obvious alternative).

The Departments offer just two rejoinders: They first posit that they did not need to "expressly consider" any "alternative disclosure requirements." Dep'ts' Br. 42. That position is foreclosed by "the most significant case ever to elucidate the arbitrary-and-capricious standard," *State Farm*, which held agency action unlawful because "[a]t no point in the administrative record … did the agency even consider" an alternative approach. *Wages & White Lion Invs., LLC v. FDA*, 90 F.4th 357, 371–72 (5th Cir. 2024) (en banc) (*Wages II*), *petition for cert. filed* (U.S. Mar. 19, 2024) (No. 23-1038). Second, the Departments contend that, despite saying nothing about it at the time, they in fact did "adequately conside[r] and rejec[t]" alternative disclosures as too burdensome. Dep'ts' Br. 42–43. Again, that cannot be squared with *State Farm*: "The short—and sufficient—answer to [the Departments'] submission is that the courts may not accept appellate counsel's *post hoc* rationalizations for agency action." 463 U.S. at 50.

The Departments cannot justify these failures of reasoned decisionmaking by pointing to "the broad discretion granted to them under the statute to promulgate disclosure requirements." Dep'ts' Br. 39. "Congress passed the Administrative Procedure Act (APA) to ensure that agencies follow constraints even as they exercise their powers." *FCC v. Fox Television*

7

*Stations, Inc.*, 556 U.S. 502, 537 (2009) (Kennedy, J., concurring). Far from being relaxed when dealing with "broad delegations of discretion," the APA's "extensive procedural safeguards" are especially important in such cases, to ensure the discretion is not abused. *Id.* (quoting Stewart & Sunstein, *Public Programs and Private Rights*, 95 Harv. L. Rev. 1193, 1248 (1982)). Here, the Departments' cursory treatment of the important interests at stake in deciding what information insurers must share about their QPA calculations failed to comply with the procedural safeguards Congress imposed in the APA to ensure that agencies exercise their discretion responsibly.

## B.    The disclosure rule is not reasonable.

The disclosure rule is also unlawful because it lies beyond the "zone of reasonableness." *Wages I*, 16 F.4th at 1136. That is so for two reasons.

*First*, the disclosure rule all but nullifies the NSA's complaint process. The Departments do not dispute that their rule makes it nearly impossible for providers to spot improperly calculated QPAs. *See* TMA Br. 54–55. Instead, the Departments retort that the NSA makes them, not providers, the "auditors of QPA calculations." Dep'ts' Br. 41. That's true, but Congress also directed the Departments to "receive complaints" about improperly calculated QPAs, 42 U.S.C. § 300gg-111(a)(2)(B)(iv), and that such complaints can

be the reason for an audit, *id.* § 300gg-111(a)(2)(A)(ii)(II). The statute thus plainly contemplates a world in which complainants will have enough information to identify potential QPA-calculation errors and alert the Departments. The audits the Departments conduct under the NSA are not a substitute for a functional complaint process; they are another reason that the complaint process Congress established needs to be effective. Without effective complaints, the Departments are hamstrung in their ability to conduct the contemplated audits. *See id.* § 300gg-111(a)(2)(A)(ii).

*Second*, the minimal disclosures mandated by the rule frustrate the NSA's negotiation and IDR processes. *See* TMA Br. 52–53, 55–56. The Departments agree that meaningful "transparency" into insurers' QPA calculations is "important" to these processes. 86 Fed. Reg. at 36,898 (ROA.794). Yet the Departments' disclosure rule ensures that providers will not have the information reasonably necessary to effectuate them.

The disclosure rule requires no meaningful disclosures whatsoever in all but limited circumstances. The rule requires, for example, insurers to make a disclosure if they used a "database" in calculating the QPA. 45 C.F.R. § 149.140(d)(2)(ii). But the Departments themselves have stated that databases will be used in only "limited circumstances." 86 Fed. Reg. at 36,888

(ROA.784). Similarly, the rule requires insurers to disclose (if asked) whether they used non-fee-for-service rates, 45 C.F.R. § 149.140(d)(2)(i), but such rates are called "alternative" payment models for a reason, 86 Fed. Reg. at 36,893 (ROA.789). Another disclosure is triggered only when a provider bills "a new service code," 45 C.F.R. § 149.140(d)(2)(iii), yet only a small fraction of codes are added or revised each year, and an even smaller fraction of those will pertain to the kind of care subject to the NSA, *see, e.g.*, Am. Med. Ass'n, *AMA Releases the CPT 2024 Code Set* (Sept. 8, 2023), tinyurl.com/2tkm8evu ("230 additions … and 70 revisions" among 11,163 total codes for 2024). A fourth disclosure occurs only "[i]f" the insurer excluded bonus or other incentive-based payments from its rates when calculating the QPA—which the statute does not even permit. *See* TMA Br. 38–43, 48–51.

The rest of the mandated disclosures give providers next to nothing about the QPA. True, insurers must share the QPA itself, but that's the bare minimum by any measure. 45 C.F.R. § 149.140(d)(1)(i). They must share some basic information unrelated to the QPA. *See id.* § 149.140(d)(1)(iii)–(iv) (contact information and statement parroting the NSA's open-negotiation instructions). Last, insurers must provide a "statement to certify" that the QPA was properly calculated, *id.* § 149.140(d)(1)(iii)—a useless disclosure if there

ever was one. *Contra* Dep'ts' Br. 40. Would any rational litigant think that an adversary's "statement" "certify[ing]" that it has no inculpatory documents is an acceptable substitute for discovery? In sum, the disclosure rule guarantees providers a few scraps of substantive information in a few limited cases, and a few bits of useless information in the remainder. In many cases, providers will receive nothing more than the insurer's certification (*i.e.*, unaudited assertion) that it calculated the QPA in compliance with the rules. That is not a reasonable implementation of the statute's disclosure provision.

The Departments complain that disclosing any more "*could* be extremely burdensome" to insurers. Dep'ts' Br. 40 (emphasis added). Of course, when promulgating the rule the Departments did not say additional disclosure *would* be overly burdensome or, for that matter, anything at all about alternative disclosures. *See supra* at 6–7. Not having identified any potential additional disclosures in the rule or explained why they would be unduly burdensome, the Departments cannot now justify their minimalist rule on that basis. *See Dish Network Corp. v. NLRB*, 953 F.3d 370, 379–80 (5th Cir. 2020) ("[W]e look to what the agency said, not what it might have said.").

The Departments' late-breaking objection fails on its own terms, too. There are plenty of additional disclosures the Departments could have

11

mandated that would have provided valuable information to providers while imposing little burden on insurers. Consider just one: the number of rates used. Insurers already know that information from having calculated the QPA, so it would take little additional effort to share that information with providers. Yet it would be very useful information. An IDR arbitrator, for example, might rationally give less weight to a QPA calculated from just 3 contracted rates than to one calculated from 300 contracted rates. Or, to take another example, insurers could easily identify the specialty, geographic location, experience level, and other characteristics of the median provider whose rate is selected as the QPA. And armed with that information, providers could explain how their own circumstances differ from the median provider's such that the QPA does not represent a fair reimbursement rate for them. Those understandings would, in turn, encourage the kind of accurate IDR determinations and efficient settlements Congress hoped to realize.

In the end, the Departments seek refuge in the fact that the NSA's text does not mandate any particular disclosures. *E.g.*, Dep't's Br. 39. No one is saying that it does; plaintiffs do not dispute that the NSA grants the Departments discretion in crafting a disclosure rule. But agency actions under even broad delegations are not insulated from arbitrary-and-capricious review.

12

This Court's decision in *Wages & White Lion* proves the point. The statute at issue there empowered the Food and Drug Administration to "'deem' which tobacco products should be subject to the Act's mandates," with only the general goals of "protecting public health" and preventing youth tobacco addiction to guide its decisions. *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 443–44 (5th Cir. 2020). Despite that capacious delegation, this Court had no problem concluding that the agency had acted arbitrarily and capriciously because it had failed to engage in "reasoned decisionmaking." *Wages I*, 16 F.4th at 1136. That's because even when agencies exercise raw "policy judgment," courts "must ensure that 'the agency has acted within a zone of reasonableness.'" *Id.* The Departments did not do so here.

## CONCLUSION

The Court should reverse the district court's decision upholding the QPA disclosure rule, declare the rule unlawful, and remand it to the Departments for further rulemaking consistent with the requirements of the APA.

Respectfully submitted,

Dated: June 3, 2024

*/s/ Eric D. McArthur*

ERIC D. MCARTHUR
   *Counsel of Record*
BRENNA E. JENNY
JILLIAN STONECIPHER
CODY M. AKINS
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8011
Email: emcarthur@sidley.com

JAIME L.M. JONES
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-0751
Fax: (312) 853-7036
Email: jaime.jones@sidley.com

**Counsel for Plaintiffs-Appellees/Cross-Appellants**

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2024, a copy of the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Eric D. McArthur*
Eric D. McArthur

## CERTIFICATE OF COMPLIANCE

This document complies with this Rule 28.1 of the Federal Rules of Appellate Procedure because it contains 2,692 words, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and Fifth Circuit Rule 32.2.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.

Dated: June 3, 2024                         */s/ Eric D. McArthur*
                                            Eric D. McArthur