No. 23-40605

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL, L.L.C.;
DR. ADAM CORLEY,

*Plaintiffs-Appellees/Cross-Appellants,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; OFFICE OF
PERSONNEL MANAGEMENT; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES
DEPARTMENT OF TREASURY; XAVIER BECERRA, Secretary, U.S. Department of Health
and Human Services, in his official capacity; KIRAN AHUJA, in her official capacity as
the Director of the Office of Personnel Management; JANET YELLEN, Secretary, U.S.
Department of Treasury, in her official capacity; JULIE A. SU, Acting Secretary, U.S.
Department of Labor, in her official capacity,

*Defendants-Appellants/Cross-Appellees.*

---

LIFENET, INCORPORATED; AIR METHODS CORPORATION; ROCKY MOUNTAIN HOLDINGS,
L.L.C.; EAST TEXAS AIR ONE, L.L.C.,

*Plaintiffs-Appellees/Cross-Appellants,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; OFFICE OF
PERSONNEL MANAGEMENT; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES
DEPARTMENT OF TREASURY; XAVIER BECERRA, Secretary, U.S. Department of Health
and Human Services, in his official capacity; KIRAN AHUJA, in her official capacity as
the Director of the Office of Personnel Management; JANET YELLEN, Secretary, U.S.
Department of Treasury, in her official capacity; JULIE A. SU, Acting Secretary, U.S.
Department of Labor, in her official capacity,

*Defendants-Appellants/Cross-Appellees.*

---

On Appeal from the United States District Court
for the Eastern District of Texas (Kernodle, J.)
Nos. 6:22-cv-450 and 6:22-cv-453

## PETITION FOR REHEARING *EN BANC*

COUNSEL LISTED ON INSIDE COVER

Eric D. McArthur
   *Counsel of Record*
Brenna E. Jenny
Jillian Stonecipher
Cody M. Akins
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8011
Email: emcarthur@sidley.com

Jaime L.M. Jones
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Tel: (312) 853-0751
Fax: (312) 853-7036
Email: jaime.jones@sidley.com

***Counsel for Plaintiffs-Appellees/Cross-Appellants Texas Medical Association, Tyler Regional Hospital, LLC, and Doctor Adam Corley***

Steven M. Shepard
   *Counsel of Record*
Stephen Shackelford, Jr.
Max Isaac Straus
James Craig Smyser
Susman Godfrey LLP
One Manhattan West, Fl. 50
New York, NY 10001
Tel: (212) 336-8330
Fax: (212) 336-8340
Email: sshepard@susmangodfrey.com

***Counsel for Plaintiffs-Appellees LifeNet, Inc. and East Texas Air One, LLC***

Joshua D. Arters
   *Counsel of Record*
David A. King
Polsinelli PC
501 Commerce Street, Suite 1300
Nashville, TN 37203
Tel: (615) 252-3923
Fax: (615) 259-1573
Email: jarters@polsinelli.com

***Counsel for Plaintiffs-Appellees, Air Methods Corporation and Rocky Mountain Holdings, LLC***

# CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**A. Plaintiffs-Appellees/Cross-Appellants**

1. Texas Medical Association
2. Tyler Regional Hospital, LLC
3. Doctor Adam Corley
4. LifeNet, Incorporated
5. East Texas Air One, LLC
6. Rocky Mountain Holdings LLC
7. Air Methods Corporation

**B. Attorneys for Plaintiffs-Appellees/Cross-Appellants**

1. For Texas Medical Association, Tyler Regional Hospital, LLC, and Doctor Adam Corley:

    Sidley Austin LLP
    Eric D. McArthur
    emcarthur@sidley.com
    Brenna E. Jenny
    bjenny@sidley.com
    Jillian Stonecipher
    jstonecipher@sidley.com
    Madeleine Joseph
    mjoseph@sidley.com
    Cody M. Akins
    cakins@sidley.com
    SIDLEY AUSTIN LLP
    1501 K Street, NW

Washington, DC 20005
Telephone: (202)736-8000
Facsimile: (202) 736-8111

Jaime L.M. Jones
jaime.jones@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-0751
Facsimile: (312) 853-7036

Penny Packard Reid
preid@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: (214) 981-3413
Facsimile: (214) 981-3400

2. For LifeNet, Inc. and East Texas Air One, LLC:

Susman Godfrey LLP
Stephen Shackelford, Jr.
sshackelford@susmangodfrey.com
Steven M. Shepard
sshepard@susmangodfrey.com
James Craig Smyser
csmyser@susmangodfrey.com
Max Isaac Straus
mstraus@susmangodfrey.com
SUSMAN GODFREY LLP
One Manhattan West, Fl. 50
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

3. For Air Methods Corporation and Rocky Mountain Holdings, LLC:

Polsinelli PC
David A. King
dking@polsinelli.com
Joshua D. Arters
jarters@polsinelli.com
POLSINELLI PC
501 Commerce Street, Suite 1300
Nashville, TN 37203
Telephone: (615) 259-1510
Facsimile: (615) 259-1573

**C.**  *Amici Curiae*

1. American Society of Anesthesiologists
2. American College of Emergency Physicians
3. American College of Radiology
4. American Medical Association
5. The Emergency Department Practice Management Association
6. American Benefits Council
7. Business Group on Health
8. Council of Insurance Agents and Brokers
9. DFW Business Group on Health
10. ERISA Industry Committee
11. Houston Business Coalition on Health
12. HR Policy Association
13. National Alliance of Health Care Purchaser Coalitions
14. National Retail Federation
15. Purchaser Business Group on Health
16. Self-Insurance Institute of America
17. Texas Business Group on Health
18. Texas Employers for Affordable Healthcare
19. Leukemia & Lymphoma Society
20. The ALS Association
21. Cancer Support Community

22. CancerCare
23. Epilepsy Foundation
24. Families USA Action
25. Hemophilia Federation of America
26. The Mended Hearts, Incorporated
27. National Multiple Sclerosis Society
28. National Patient Advocate Foundation
29. U.S. PIRG
30. America's Health Insurance Plans, Inc.
31. Blue Cross Blue Shield Association
32. Physicians Advocacy Institute
33. American Association of Neurological Surgeons
34. Congress of Neurological Surgeons
35. American Academy of Otolaryngology-Head and Neck Surgery
36. American Association of Orthopaedic Surgeons
37. American Osteopathic Association
38. American Society of Plastic Surgeons
39. Mississippi State Medical Association
40. California Medical Association
41. Connecticut State Medical Society
42. Florida Medical Association
43. Medical Association of Georgia
44. Kentucky Medical Association
45. Massachusetts Medical Society
46. Nebraska Medical Association
47. Medical Society of New Jersey
48. Medical Society of the State of New York
49. North Carolina Medical Society
50. Oregon Medical Association
51. South Carolina Medical Association
52. Tennessee Medical Association
53. Washington State Medical Association

**D.   Attorneys for *Amici Curiae***

1. For American Society of Anesthesiologists, American College of Emergency Physicians, and American College of Radiology:

Powers Pyles Sutter & Verville PC
Ronald S. Connelly
Ron.Connelly@PowersLaw.com
Jeremy Lewin
Leela Baggett
Fernando Montoya
Allyn N. Rosenberger
POWERS PYLES SUTTER & VERVILLE PC
1501 M Street NW
Seventh Floor
Washington, DC 20005
Telephone: (202) 872-6762
Facsimile: (202) 785-1756

2. For American Medical Association:

Akin Gump Strauss Hauer & Feld LLP
James Tysse
jtysse@akingump.com
Kelly M. Cleary
kcleary@akingump.com
Kristen E. Loveland
kloveland@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Telephone: (202) 887-4000

3. For The Emergency Department Practice Management Association:

ArentFox Schiff LLP
Jack R. Bierig
jack.bierig@afslaw.com
ARENTFOX SCHIFF LLP
233 South Wacker Drive
Suite 7100

Chicago, IL 60606
Telephone: (312) 258-5511
Facsimile: (312) 258-5600

The Stafford Davis Firm, PC
Catherine Susan Bartles
cbartles@stafforddavisfirm.com
Stafford Davis
sdavis@stafforddavisfirm.com
THE STAFFORD DAVIS FIRM, PC
815 S Broadway Ave
Tyler, TX 75701
Telephone: (903) 593-7000
Facsimile: (903) 705-7369

4. For American Benefits Council, Business Group on Health Council of Insurance Agents and Brokers, DFW Business Group on Health, ERISA Industry Committee, Houston Business Coalition on Health, HR Policy Association, National Alliance of Health Care Purchaser Coalitions, National Retail Federation, Purchaser Business Group on Health, Self-Insurance Institute of America, Texas Business Group on Health, and Texas Employers for Affordable Healthcare:

Groom Law Group
Seth T. Perretta
sperretta@groom.com
Ryan Temme
rtemme@groom.com
Matthew W. Lanahan
mlanahan@groom.com
GROOM LAW GROUP
1701 Pennsylvania Ave NW
Washington, DC 20006
Telephone: (202) 867-0620
Facsimile: (202) 659-4503

5. For Leukemia & Lymphoma Society, The ALS Association Cancer Support Community, CancerCare, Epilepsy Foundation, Families USA Action, Hemophilia Federation of America, The Mended Hearts, Incorporated, National Multiple Sclerosis Society, National Patient Advocate Foundation, and U.S. PIRG:

> Wardenski P.C.
> Joseph J. Wardenski
> joe@wardenskilaw.com
> WARDENSKI P.C.
> 134 West 29th Street, Suite 709
> New York, NY 10001
> Telephone: (347) 913-3311

6. For America's Health Insurance Plans, Inc.:

> Deutsch Hunt PLLC
> Hyland Hunt
> hhunt@deutschhunt.com
> Ruthanne M. Deutsch
> DEUTSCH HUNT PLLC
> 300 New Jersey Ave., Suite 900
> Washington, DC 20001
> Telephone: (202) 868-6915
> Facsimile: (202) 609-8410

> America's Health Insurance Plans
> Michael Spector
> Thomas M. Palumbo
> AMERICA'S HEALTH INSURANCE PLANS
> 601 Pennsylvania Ave. NW
> South Building, Suite 500
> Washington, DC 20004

7. For Blue Cross Blue Shield Association:

> O'Melveny & Myers, L.L.P.
> K. Lee Blalack, II

lblalack@omm.com
Andrew R. Hellman
andrewhellman@omm.com
O'MELVENY & MYERS, L.L.P.
1625 Eye Street, N.W.
Washington, DC 20006
Telephone: (202) 383-5300

8. For Physicians Advocacy Institute, American Association of Neurological Surgeons, Congress of Neurological Surgeons, American Academy of Otolaryngology-Head and Neck Surgery, American Association of Orthopaedic Surgeons, American Osteopathic Association, American Society of Plastic Surgeons, Mississippi State Medical Association, California Medical Association, Connecticut State Medical Society, Florida Medical Association, Medical Association of Georgia, Kentucky Medical Association, Massachusetts Medical Society, Nebraska Medical Association, Medical Society of New Jersey, Medical Society of the State of New York, North Carolina Medical Society, Oregon Medical Association, South Carolina Medical Association, Tennessee Medical Association, Washington State Medical Association

Athene Law, LLP
long@athenelaw.com
Long X. Do
ATHENE LAW, LLP
5432 Geary Blvd. #200
San Francisco, CA 94121
Telephone: (415) 722-5351

Eric D. Chan
eric@athenelaw.com
ATHENE LAW, LLP
10866 Washington Blvd., #142
Culver City, CA 90232-3610
Telephone: (310) 913-4013

**E.     Entities with a Financial Interest:**

The following additional persons may have a financial interest in the outcome of the litigation.

1.  Texas Medical Association Library dba TMA Knowledge Center
2.  Texas Medical Association Special Funds Foundation
3.  Texas Medical Association Foundation
4.  TMF Health Quality Institute
5.  Texas Medical Association Alliance
6.  Texas Medical Association Political Action Committee
7.  TMA Practice Management Holdings, LLC
8.  TMA Specialty Services, LLC
9.  PSO Services, LLC
10. Physicians Benevolent Fund
11. Improving The Health Of All Texans
12. TMA Insurance Trust
13. Texas Medical Liability Trust
14. Annie Lee Thompson Library Trust Fund
15. Dr. S. E. Thompson Scholarship Fund
16. May Owen Irrevocable Trust
17. East Texas Health System, LLC
18. AHS East Texas Health System, LLC
19. The University of Texas Health Sciences Center at Tyler

**F.     <u>Federal Rule of Appellate Procedure 26.1</u>:**

1. Texas Medical Association has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2. Tyler Regional Hospital, LLC is part of East Texas Health System, LLC, which is a joint venture between AHS East Texas Health System, LLC (the majority owner) and University of Texas Health Sciences Center at Tyler. No publicly held corporation owns 10% or more of Tyler Regional Hospital, LLC's stock.

3. Doctor Adam Corley is a natural person.

4. LifeNet, Inc. has no parent corporation, subsidiaries, and/or affiliates, and no publicly held corporation owns 10% or more of its stock.

5. East Texas Air One, LLC is wholly-owned by AHS East Texas Health System, LLC.  No publicly held corporation owns more than 10% of East Texas Air One, LLC.

6. Air Methods Corporation has no parent corporation and no publicly held corporation owns 10% or more of its stock.

7. Rocky Mountain Holdings, LLC is a wholly owned subsidiary of Air Methods Corporation and no publicly held corporation owns more than 10% of its stock.

Dated: December 16, 2024

_/s/ Eric D. McArthur_
Eric D. McArthur

**_Counsel of Record for Plaintiffs-Appellees/Cross-Appellants Texas Medical Association, Tyler Regional Hospital, LLC, and Doctor Adam Corley_**

_/s/ Steven Shepard_
Steven Shepard

**_Counsel of Record for Plaintiffs-Appellees LifeNet, Inc. and East Texas Air One, LLC_**

_/s/ Joshua D. Arters_
Joshua D. Arters

**_Counsel of Record for Plaintiffs-Appellees Air Methods Corporation and Rocky Mountain Holdings, LLC_**

## RULE 40(b)(2) STATEMENT

This case involves questions of exceptional importance warranting *en banc* review. The Panel decision badly misinterpreted the No Surprises Act (NSA), the most important statute regulating the healthcare industry since the Affordable Care Act. If allowed to stand, the decision will permanently skew the arbitration process Congress created for healthcare providers to obtain reimbursement for their out-of-network services, to the detriment of healthcare providers and, ultimately, the patients they serve.

The NSA specifies how insurers must reimburse healthcare providers for certain out-of-network services. It is crucial to the proper continued functioning of the U.S. healthcare system that the federal Departments tasked with implementing the NSA respect Congress's choices and abide by the NSA's text. Instead, the Departments have repeatedly abandoned the NSA's directives in an effort to tilt the process in favor of insurers.

Here, the Departments promulgated rules that insurers must follow in calculating their median in-network rate for a service. This "qualifying payment amount" (QPA) is a factor arbitrators must consider in deciding reimbursement disputes. As the district court held, the Departments' rules violate the NSA's plain text and artificially deflate QPAs by requiring

insurers to (i) include rates agreed to by providers who do not provide the relevant service and (ii) exclude contracted-for incentive payments.

The Panel decision revived the Departments' unlawful rules with minimal analysis, largely ignoring the NSA's text and misconstruing plaintiffs' arguments. Absent intervention by the full Court, the decision will result in perpetual underpayments to healthcare providers, undermining the NSA and jeopardizing the functioning of the U.S. healthcare system.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................ i

RULE 40(b)(2) STATEMENT ................................................. xii

TABLE OF AUTHORITIES ................................................... xv

INTRODUCTION .............................................................. 1

ISSUES FOR *EN BANC* CONSIDERATION ........................................ 4

SUMMARY OF PROCEEDINGS AND DISPOSITION .......................... 5

STATEMENT OF FACTS ....................................................... 5

    A.    The NSA's Independent Resolution Process ......................... 5

    B.    QPA Definition and Calculation ............................................ 6

    C.    The July Interim Final Rule .................................................. 6

        1.    Including "ghost rates" in QPAs ................................. 6

        2.    Excluding incentive payments from QPAs ................... 7

    D.    The Decision Below ............................................................ 8

    E.    The Panel Decision .............................................................. 8

REASONS FOR GRANTING *EN BANC* REVIEW .............................. 11

I.    The Panel Badly Misinterpreted The NSA .................................. 11

    A.    Including ghost rates violates the Act. ............................... 11

    B.    Excluding incentive payments violates the Act. ................. 14

II.    The Issue Presented Is Exceptionally Important. ......................... 16

CONCLUSION ............................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Corner Post, Inc. v. Bd. of Governors*,
  144 S. Ct. 2440 (2024)............................................................ 13

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024)......................................................... 8, 13

*MCI Telecomms. Corp. v. AT&T*,
  512 U.S. 218 (1994)............................................................. 14

*Tex. Med. Ass'n v. HHS*,
  654 F. Supp. 3d 575 (E.D. Tex. 2023).................................... 2

*Tex. Med. Ass'n v. HHS*,
  587 F. Supp. 3d 528 (E.D. Tex. 2022).................................... 2

*Tex. Med. Ass'n v. HHS*,
  2023 WL 4977746 (E.D. Tex. Aug. 3, 2023) ......................... 2

*Tex. Med. Ass'n v. HHS*,
  110 F.4th 762 (5th Cir. 2024) .............................................. 2

*United States v. Williams*,
  400 F.3d 277 (5th Cir. 2005) ............................................... 15

**Statutes and Regulations**

42 U.S.C. § 300gg-111(a)(1).................................................... 5

42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I)..................................... 5

42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II) .................................... 5

42 U.S.C. § 300gg-111(a)(2)(B)(i).................................... 6, 13

42 U.S.C. § 300gg-111(a)(2)(B)................................... 10, 15, 16

42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) .......... 6, 7, 11, 12, 14, 16

[42 U.S.C. § 300gg-111(b)(1)](#)...............................................5

[42 U.S.C. § 300gg-111(b)(1)(C)](#)........................................5

[42 U.S.C. § 300gg-111(b)(1)(D)](#)........................................5

[42 U.S.C. § 300gg-111(c)(1)(A)–(B)](#)................................5

[42 U.S.C. § 300gg-111(c)(5)(B)](#)........................................6

[42 U.S.C. § 300gg-111(c)(5)(C)(i)](#)....................................6

[45 C.F.R. § 149.140(a)–(c)](#)...............................................6

[45 C.F.R. § 149.140(b)(2)(iv)](#)......................................7, 14

[45 C.F.R. § 149.140(d)(2)(iv)](#)............................................14

[86 Fed. Reg. 36,872](#) (July 13, 2021).......................2, 6, 16

[86 Fed. Reg. 55,980](#) (Oct. 7, 2021)...............................17

[87 Fed. Reg. 52,618](#) (Aug. 26, 2022).............................17

**Other Authorities**

*Oxford Eng. Dictionary Online* (Sept. 2023 ed.).....................14

# INTRODUCTION

In the No Surprises Act (NSA), Congress transformed how healthcare providers are compensated for out-of-network services. Previously, when an out-of-network provider furnished medical care to a patient, the patient's insurer could refuse to pay. This sometimes left patients responsible for "balance" bills. The NSA changed that by prohibiting balance-billing and instead requiring insurers to reimburse out-of-network providers at a rate determined through the NSA's independent dispute-resolution process.

One important factor considered in that process is the "qualifying payment amount," or QPA. Congress defined the QPA as the median of the insurer's contracted rates for a given service, and charged the Departments with establishing a methodology for calculating QPAs consistent with the statute. Using that methodology, insurers calculate QPAs just once, based on a single year's data. Each year thereafter, QPAs are adjusted only for inflation. Once calculated, therefore, QPAs become a data point used in determining provider reimbursement under the NSA forever.

The Departments have issued several rules implementing the NSA. As the district court found in a series of cases, the Departments have repeatedly departed from the NSA's text to advance "their goal of privileging the QPA,

tilting arbitrations in favor of insurers, and thereby lowering payments to providers." *Tex. Med. Ass'n v. HHS*, 654 F. Supp. 3d 575, 593 (E.D. Tex. 2023); *see also Tex. Med. Ass'n v. HHS*, 587 F. Supp. 3d 528 (E.D. Tex. 2022); *Tex. Med. Ass'n v. HHS*, 2023 WL 4977746 (E.D. Tex. Aug. 3, 2023). In the only prior appeal, this Court affirmed, finding the Departments had adopted a "skewed interpretation … inconsistent with the evenhandedness embodied in the [NSA]." *Tex. Med. Ass'n v. HHS*, 110 F.4th 762, 779 (5th Cir. 2024).

The Departments' QPA-calculation methodology is of a piece: it too conflicts with the NSA's plain text and biases results in insurers' favor. The Departments themselves recognize that the QPA is meant to approximate "market rates under typical contract negotiations." 86 Fed. Reg. 36,872, 36,889 (July 13, 2021) (ROA.785). Yet they adopted a QPA-calculation methodology that artificially deflates QPAs below negotiated market rates.

First, the NSA defines the QPA as the "median of the contracted rates" for a service "that is provided" by an in-specialty provider in the geographic region. But the Departments require insurers to include rates for services that are not "provided"—in any sense of the word. Providers typically "agree" to such rates simply by not striking from the insurer's standard form contract the prices for services they do not provide. But since the providers

do not provide those services (and in many cases are not even qualified to provide them), they have no incentive to negotiate the rate. Including these non-negotiated rates deflates the QPA. And it violates Congress's clear instruction that a service must be "provided" for the rate to be included.

The Panel acknowledged that the service must be "provided." But the Panel upheld the Departments' approach anyway, even though it gives no effect to the word "provided." Rather than address plaintiffs' actual argument—that the Departments have read the word "provided" out of the statute—the Panel knocked down a straw man by holding that services need not have historically been performed, so long as the provider makes the service "available." Plaintiffs agree with that interpretation. The problem is the Departments don't. Under their interpretation, a rate agreed to by a provider must be included even if the provider does not make the service available. On the Panel's own interpretation, it should have affirmed.

Second, even though the NSA requires insurers to calculate the QPA using the "rates recognized … as the total maximum payment" for the service at issue, the Departments require insurers to exclude contracted-for bonuses and incentive payments when determining the "total maximum payment." The Panel upheld the Departments' categorical exclusion, engaging

in zero analysis of the words "total" or "maximum." The Panel pointed exclusively to a separate portion of the NSA that not only does not support its decision—it further confirms that bonuses must be taken into account.

The Departments' QPA-calculation rules are immensely important to implementing the NSA, as evidenced by the 53 *amici curiae* that participated in this case, including the American Medical Association and 15 state medical associations. The Departments' departure from the NSA's text depresses QPAs below negotiated market rates, leading to dramatic declines in reimbursement rates for physicians. *See* Amicus Br. of The Emergency Dep't Prac. Mgmt. Ass'n (EDPMA), Dkt. 89 at 12, 17–21. Absent *en banc* review, these declines will be permanent, and emergency physicians may be "'unable to afford to continue to operate in the areas where patients need them most,' leaving millions with 'less access to the lifesaving emergency care they need.'" Amicus Br. of the Am. Med. Ass'n (AMA), Dkt. 82 at 19–20.

## ISSUES FOR *EN BANC* CONSIDERATION

Whether the Departments' QPA-calculation rules are unlawful because they require insurers to (i) include rates agreed to by providers for services they do not "provide"; and (ii) exclude incentive payments from the "total maximum payment" used to calculate the QPA.

## SUMMARY OF PROCEEDINGS AND DISPOSITION

Plaintiffs sued the Departments under the Administrative Procedure Act, arguing that the Departments' QPA-calculation methodology violates the NSA. The district court agreed and vacated the challenged rules. The Departments timely appealed, and plaintiffs cross-appealed. The Panel reversed in part and affirmed in part on October 30, 2024. Op. 2.

## STATEMENT OF FACTS

### A.     The NSA's Independent Resolution Process

The NSA caps patients' liability for emergency and certain other services furnished by an out-of-network provider at the cost-sharing amount that would apply if the services had been furnished in-network. *See* 42 U.S.C. § 300gg-111(a)(1), (b)(1). Given this cap, Congress understood that providers would need to look to insurers to cover the fair value of the providers' services. The NSA therefore obligates insurers to reimburse providers at an "out-of-network rate." *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D). Specifically, the Act requires insurers to make an initial payment (or denial), *id.* § 300gg-111(a)(1)(C)(iv)(I), (b)(1)(C), then channels disputes into a process of negotiation, followed, if necessary, by arbitration, *id.* § 300gg-111(c)(1)(A)–(B).

The arbitration is a "baseball-style" arbitration in which the provider and insurer submit their best and final offers to an independent private

arbitrator. *Id*. § 300gg-111(c)(5)(B). The statute prescribes the factors the arbitrator "shall consider," including the QPA. *Id*. § 300gg-111(c)(5)(C)(i).

## B.     QPA Definition and Calculation

Congress carefully defined the QPA as:

> the median of the contracted rates recognized by the plan or issuer, respectively … as the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) under such plans or coverage, respectively, on January 31, 2019, for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished,

with annual inflation adjustments. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).

Congress directed the Departments to promulgate rules establishing "the methodology" that insurers "shall use to determine the [QPA]." *Id*. § 300gg-111(a)(2)(B)(i).

## C.     The July Interim Final Rule

On July 13, 2021, the Departments promulgated the rule at issue. 86 Fed. Reg. 36,872 (ROA.768). The July Rule sets forth the methodology for insurers to calculate QPAs. 45 C.F.R. § 149.140(a)–(c).

### 1.     Including "ghost rates" in QPAs

In the July Rule, the Departments did not directly address the statute's "provided" requirement. Then in August 2022 they issued Frequently

Asked Questions (FAQs) clarifying that insurers must include rates for services that "providers do not provide." August 2022 FAQs at 17 (ROA.11469).

Such "ghost rates" appear in contracts because insurers often present providers with form contracts that include a fee schedule for all services, then leave it to providers to negotiate rates for the services they provide. *See id.* at 16 (ROA.11468). Contracts thus often include non-negotiated rates for services that no provider covered by the contract provides.

The Departments did not explain their choice to include ghost rates. They did, however, recognize how ghost rates skew QPAs: because providers who do not provide a service have little incentive to negotiate the rate for that service, ghost rates are generally lower than they would be under a motivated, arms-length negotiation. *See id.* (ROA.11468).

## 2. Excluding incentive payments from QPAs

Congress required the QPA to be calculated using the "total maximum payment." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). But the July Rule requires insurers to "[e]xclude" from QPA calculations "bonus[es]" and "other incentive-based … payments or payment adjustments." 45 C.F.R. § 149.140(b)(2)(iv). The Departments offered no textual basis for excluding these payments.

The Departments' decision again drives QPAs below typical contracted rates. When a contract provides for incentive payments, the provider typically accepts a *lower* fixed rate as partial compensation, with the expectation that it will earn the incentive payment. Incentive payments "can total 10 to 15 percent of total payments" under some contracts. ROA.2805.

### D.    The Decision Below

The district court (Judge Kernodle) held that the challenged QPA-calculation rules "violate the plain text of the [NSA]." ROA.13198. First, including ghost rates "allows insurers to include contracted rates for items or services that are not provided, never have been provided, and never will be provided." ROA.13208. Second, excluding incentive payments "conflicts" with the NSA's mandate that insurers use the "maximum payment" a provider could receive under its contract with the insurer. ROA.13212.

### E.    The Panel Decision

The Panel reversed in relevant part. Ostensibly applying *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), the Panel found that the NSA includes a "fairly broad delegation of authority" to the Departments. Op. 9. But "because the Act contains a definition of QPA, the Departments' methodology must be consistent with that definition." *Id.* Nevertheless, paying only lip service to "that definition," the Panel upheld the challenged rules.

8

As to ghost rates, the Panel rejected the Departments' argument that "there is no 'is provided' requirement" in the NSA. Oral Arg. (20:30–34). The Panel reasoned that while "the Act contains no requirement that a service must previously have been performed by a provider," the NSA *does* "requir[e] … that a given service be 'available.'" Op. 10. But the Panel failed to explain how the Departments' approach could be squared with that requirement. As the district court found and the Departments themselves recognize, their rule requires insurers to include rates agreed to by providers who *do not* make the service available. *See* August 2022 FAQs at 17 (ROA.11469).

The Panel went on to conclude that "the Act reasonably addresses concerns about the QPA's inclusion of rates for services that a given provider would never perform" by "exclud[ing] rates from providers outside of the same specialty and geographic area." Op. 10–11. The Panel faulted plaintiffs for "not suggest[ing] how to otherwise draw and police the line separating the within-specialty services each provider might perform sometime in the future from those that they would never perform." *Id.* at 11.

As to incentive payments, the Panel did not explain what "total maximum" means or analyze that language at all. It asserted that "[t]he Act itself grants the Departments discretion on whether to include such adjustments."

*Id.* at 14–15. In support, it pointed to a separate provision that it said "delegates rulemaking authority regarding how to treat 'account payments that … are not on a fee-for-service basis.'" *Id.* at 15 (quoting 42 U.S.C. § 300gg-111(a)(2)(B)). The Panel did not quote the full provision, which in fact says the Departments' rulemaking "*shall take into* account payments … that are not on a fee-for-service basis." 42 U.S.C. § 300gg-111(a)(2)(B) (emphasis added). The full quotation shows the Panel turned this requirement on its head, converting a congressional command that the Departments "shall" take these payments "into account" into the opposite—a grant of "discretion" to ignore them entirely. The Panel also ignored that the rule excludes even those incentive payments that *are* on a fee-for-service basis.

The Panel then emphasized that the quoted provision later states that the "QPA calculation methodology '*may* account for relevant payment adjustments that take into account quality or facility type … that are otherwise taken into account for purposes of determining payment amounts with respect to participating facilities.'" Op. 15 (quoting 42 U.S.C. § 300gg-111(a)(2)(B)). The Panel did not explain why this language regarding facility-based payment adjustments was relevant to provider incentive payments. It isn't relevant; this part of the statute addresses an entirely separate issue.

## REASONS FOR GRANTING *EN BANC* REVIEW

### I. The Panel Badly Misinterpreted The NSA.

#### A. Including ghost rates violates the Act.

The NSA requires QPAs to be derived from rates for services that are "*provided* by a provider" and "*provided* in the geographic region." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphases added). Yet the "July Rule allows insurers to include rates for services that 'providers do not provide' in calculating the QPA." ROA.13202 (quoting August 2022 FAQs at 17 (ROA.11469)). As the district court held, "this interpretation is unlawful." ROA.13208.

The Departments defended their choice not to give effect to the statute's "provided" language by asserting "there is no 'is provided' requirement in the [NSA]." Oral Arg. (20:30–34). The Panel correctly rejected that argument when it concluded that the NSA "requires … that a given service be 'available.'" Op. 10. That alone means the Departments' approach is unlawful. The Departments have never disputed that they require insurers to include rates for services that appear in a contract even if those services are not "provided"—*i.e.*, made "available"—by any provider under the contract.

The Panel should have followed the straight line from the NSA's plain text to affirmance. Instead, it acted as though plaintiffs and the district court believed that rates could be included in QPA calculations only if the provider

11

had performed the service in the past. Plaintiffs in fact took the opposite position—that the "provided" language does "*not*" create "a historical-provision test." Oral Arg. (22:11–13). And the district court found that the Departments unlawfully required rates to be included for services that "*are not* provided … and *never will be* provided." ROA.13208 (emphases added).

The Departments' view is incompatible with the NSA, as plaintiffs argued, because the Departments require insurers to include rates for a service that is "not provided *under any understanding of the word*," even when the provider "is not even qualified to provide it, [and] would not provide it if asked." Oral Arg. (19:56–59, 20:05–07); *see also* TMA Br. 32. That impermissibly "read[s] out of the statute the term 'provided' altogether." ROA.13208.

That the rates must be agreed to by providers in the "same or similar specialty" and "geographic region" does not erase the "provided" requirement. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The Panel thought that limiting rates to "those *agreed upon by* providers in the same specialty and geographic area is a reasonable way of ensuring that services that a provider is unlikely to provide are not included." Op. 11 (emphasis added). But Congress did not say "*agreed upon by* providers … in the same or similar specialty and the same geographic region." *Id.* (emphasis added). Congress said "provided

by" and "provided in." That controls. *See Corner Post, Inc. v. Bd. of Governors*, 144 S. Ct. 2440, 2454 (2024). After *Loper Bright*, courts may not defer to an agency's view—even a "reasonable" one—if it is not the "single, best meaning" of the statutory text. 144 S. Ct. at 2266.

The Panel apparently believed it did not need to give full effect to the statute's "provided" requirement because the same-specialty requirement will exclude some ghost rates. But it will not exclude *all* ghost rates, because providers in the "same or similar specialties often do not provide overlapping services." AMA Br. 10–11. For example, "an obstetrician-gynecologist's contract will likely include rates for delivery services, regardless of whether she ever performs deliveries." *Id.* at 11. These specialists and others are therefore likely to have contracted rates for services they do not make available.

Nor is it plaintiffs' job to "draw and police the line" Congress drew. Op. 11. Congress required the Departments to implement the "provided" requirement. 42 U.S.C. § 300gg-111(a)(2)(B)(i). The Departments cannot choose to take a different path simply because it may impose burdens on insurers. Congress had a good reason for requiring insurers to expend the resources necessary to get these permanent reference points right. Regardless, the

Panel's administrability concerns do not and cannot justify rewriting clear statutory text. *See MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 234 (1994).

### B.    Excluding incentive payments violates the Act.

The NSA requires that each contracted rate in the QPA calculation be based on "the total maximum payment … under such plans or coverage" for the item or service. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The July Rule, however, directs insurers to subtract incentive payments from contracted rates. 45 C.F.R. § 149.140(b)(2)(iv); *see id.* § 149.140(d)(2)(iv).

"Total" means "[c]onstituting or comprising a whole; whole, entire." *Oxford Eng. Dictionary Online* (Sept. 2023 ed.). And "maximum" means "the "highest possible magnitude or quantity of something which is attained, attainable, or customary." *Id.* The "Act thus plainly requires insurers to calculate QPAs using the 'entire,' 'highest possible' payment that a provider could receive for an item or service under the contracted rate." ROA.13212.

The Panel did not even try to reconcile the July Rule with the NSA's command to use the "total maximum" payment. Instead, it looked exclusively to a separate provision that says the Departments (i) "shall take into account payments … that are not on a fee-for-service basis," and (ii) "may" account for certain payment adjustments based on "quality or facility type"

that are "otherwise taken into account … with respect to participating facilities." 42 U.S.C. § 300gg-111(a)(2)(B); *see* Op. 15.

This provision does not support the Panel's conclusion. As to the language concerning non-fee-for-service payments, the words the Panel excluded—"shall take into"—change the meaning of the sentence. The sentence must be read in full, and together with the "total maximum" language. *See United States v. Williams*, 400 F.3d 277, 282 (5th Cir. 2005). So read, the sentence reinforces that the QPA methodology "shall" provide for including non-fee-for-service incentive payments in the "total maximum payment."

Even more fundamentally, there is no reading of this provision, which relates only to *non*-fee-for-service payments, that could permit the Departments to exclude incentive payments that *are* on a fee-for-service basis. The Departments do not dispute that such incentive payments exist, or that under their rule insurers must exclude them. The Panel said not a word to explain why such payments do not fit squarely within the "total maximum payment" on which the NSA says QPA calculations must be based.

As for the "may account for" sentence, it is not even relevant here. The Departments never argued that it is—quoting the provision only in a "see also" citation without argument. Dep'ts Br. 39. This is not surprising,

because the sentence is not about provider incentive payments. It addresses "payment adjustments" based on the nature of the facility in which a provider works, such as whether the facility is a "higher acuity settin[g]." 42 U.S.C. § 300gg-111(a)(2)(B). The sentence clarifies that facility-based payment adjustments can be taken into account even when the insurer already "otherwise take[s]" the nature of the facility into account when determining payment. *See id.* The Panel's reliance on this provision was in error.

## II. The Issue Presented Is Exceptionally Important.

The Departments' departures from the NSA's text have serious consequences. QPAs are calculated just once, then factor into what providers are paid every year. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). For the NSA's negotiation and arbitration processes to function as Congress intended, it is critical that insurers calculate these permanent reference points correctly.

The July Rule ensures QPAs are calculated *incorrectly*, artificially depressing them. Providers do not negotiate rates for services they do not provide; they do negotiate for incentive payments. Including ghost rates and excluding incentive payments therefore drives down QPAs below "market rates under typical contract negotiations"—contrary to the Departments' own understanding of the QPA's purpose. 86 Fed. Reg. at 36,889 (ROA.785).

The Departments' deflated QPAs significantly affect the NSA's dispute-resolution process. Insurers often submit the QPA as both their initial payment and their offer in the arbitration process. *See* 87 Fed. Reg. 52,618, 52,625 n.29 (Aug. 26, 2022); EDPMA Br. 17–21. And arbitrators must consider the QPA in determining which offer to select.

But QPAs do not just impact payments for out-of-network services. When QPAs are below-market, providers can be paid less for out-of-network services than for in-network services, distorting incentives in the healthcare market. Insurers have no reason to agree to fair market rates and instead can simply force providers out of network, relegating them to arbitrations infected by deflated QPAs. *See* EDPMA Br. 25–26; AMA Br. 12–15.

Nor will the harms be confined to providers. As the Departments once recognized, when out-of-network providers are not adequately compensated, that "undercompensation could threaten the viability of these providers," which "could lead to participants, beneficiaries and enrollees not receiving needed medical care, undermining the goals of the [NSA]." 86 Fed. Reg. 55,980, 56,044 (Oct. 7, 2021). The Departments' failure to follow Congress's commands has led to the predicted result: providers are undercompensated,

which "threaten[s] serious harm to patients," ROA.288, and exacerbates the "crisis in the emergency medical delivery system," ROA.353.

Finally, the July Rule is an interim final rule. The Departments did not appeal portions of the district court's decision that vacated other aspects of the QPA-calculation methodology, so they will in all events need to go back to the drawing board in crafting the final rule. *En banc* review is necessary to ensure that, when they do, they correct all the July Rule's errors.

## CONCLUSION

For these reasons, the Court should grant *en banc* review.

Respectfully submitted,

Dated: December 16, 2024

*/s/ Eric D. McArthur*

ERIC D. MCARTHUR
  *Counsel of Record*
BRENNA E. JENNY
JILLIAN STONECIPHER
CODY M. AKINS
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8011
Email: emcarthur@sidley.com

JAIME L.M. JONES
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Tel: (312) 853-0751
Fax: (312) 853-7036
Email: jaime.jones@sidley.com

***Counsel for Plaintiffs-Appel-***
***lees/Cross-Appellants***

STEVEN M. SHEPARD
  *Counsel of Record*
STEPHEN SHACKELFORD, JR.
MAX ISAAC STRAUS
JAMES CRAIG SMYSER
SUSMAN GODFREY LLP
One Manhattan West, Fl. 50
New York, NY 10001
Tel: (212) 336-8330
Fax: (212) 336-8340
Email: sshepard@susmangod-
frey.com

19

***Counsel for Plaintiffs-Appellees
LifeNet, Inc. and East Texas Air
One, LLC***

JOSHUA D. ARTERS
   *Counsel of Record*
DAVID A. KING
POLSINELLI PC
501 Commerce Street, Suite 1300
Nashville, TN 37203
Tel: (615) 252-3923
Fax: (615) 259-1573
Email: jarters@polsinelli.com

***Counsel for Plaintiffs-Appel-
lees, Air Methods Corporation
and Rocky Mountain Holdings,
LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2024, a copy of the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Eric D. McArthur*
Eric D. McArthur

## CERTIFICATE OF COMPLIANCE

This document complies with Rule 40(d)(3)(A) of the Federal Rules of Appellate Procedure because it contains 3,896 words, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and Fifth Circuit Rules 32.2 and 40.2.5.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.

Dated: December 16, 2024          */s/ Eric D. McArthur*
                                   Eric D. McArthur

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
October 30, 2024
Lyle W. Cayce
Clerk

————————

No. 23-40605

————————

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL,
L.L.C.; DR. ADAM CORLEY,

*Plaintiffs—Appellees/Cross-Appellants*,

*versus*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES; OFFICE OF PERSONNEL MANAGEMENT; UNITED
STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT
OF TREASURY; XAVIER BECERRA, *Secretary, U.S. Department of
Health and Human Services, in his official capacity*; KIRAN AHUJA, *in her
official capacity as the Director of the Office of Personnel Management*; JANET
YELLEN, *Secretary, U.S. Department of Treasury, in her official capacity*;
JULIE A. SU, *Acting Secretary, U.S. Department of Labor, in her official
capacity*,

*Defendants—Appellants/Cross-Appellees*,

————————————————————

LIFENET, INCORPORATED; AIR METHODS CORPORATION;
ROCKY MOUNTAIN HOLDINGS, L.L.C.; EAST TEXAS AIR ONE,
L.L.C.,

*Plaintiffs—Appellees/Cross-Appellants*,

*versus*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES; OFFICE OF PERSONNEL MANAGEMENT; UNITED

STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF TREASURY; XAVIER BECERRA, *Secretary, U.S. Department of Health and Human Services, in his official capacity*; KIRAN AHUJA, *in her official capacity as the Director of the Office of Personnel Management*; JANET YELLEN, *Secretary, U.S. Department of Treasury, in her official capacity*; JULIE A. SU, *Acting Secretary, U.S. Department of Labor, in her official capacity*,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Eastern District of Texas
USDC Nos. 6:22-CV-450, 6:22-CV-453

---

Before SOUTHWICK, HAYNES, and DOUGLAS, *Circuit Judges*.

HAYNES, *Circuit Judge*:

A group of healthcare providers and air-ambulance providers challenge certain agency rules regarding the No Surprises Act (the "Act"), which Congress enacted to protect patients from surprise medical bills.[1] The majority of provisions at issue concern how to calculate the "qualifying payment amount" or "QPA," which helps to determine patients' and insurers' obligations to out-of-network providers under the Act. The others involve deadlines and disclosure requirements.

The district court held several provisions unlawful and vacated them. The defendant agencies appealed as to only certain provisions. They also contend that the district court erred by vacating, rather than remanding, the

---

[1] In a related appeal before this court, the same Plaintiffs challenged the same district court's vacatur of other rules promulgated by the Departments related to the Act. *See generally Tex. Med. Ass'n v. HHS*, 110 F.4th 762 (5th Cir. 2024). That case affirmed, but it addressed different issues.

No. 23-40605

provisions that it held unlawful.  Plaintiffs challenged the district court's holding that the disclosure provisions are not arbitrary and capricious.

For the reasons that follow, we REVERSE the district court's vacatur of the QPA-calculation provisions, AFFIRM the district court's vacatur of the deadline provision, and AFFIRM the district court's holding that the disclosure requirements are not arbitrary and capricious.

## I.    Background

We begin by providing relevant information about the Act; then we turn to the procedural history of this case.

### A. Statutory Background

Congress passed the Act to protect patients from surprise medical bills in situations where they have no choice over whether their provider is in-network.  *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 2758–890 (2020).[2]  Before the Act, when an out-of-network healthcare provider furnished medical care to a patient, the patient's insurer could refuse to pay or unilaterally determine what amount to pay. This sometimes left patients responsible for so-called "balance bills," the amounts of which could be staggering.  For example, Air Methods Corp., a Plaintiff in this case, charged an average price of $49,800 per air-ambulance transport in 2016, an increase of 283 percent from a decade earlier.  But even less extreme examples can be devastating.   The House Committee on

---

[2] The relevant statutory provisions are codified in three places: (1) the Public Health Services Act, enforced by the Department of Health and Human Services ("HHS"); (2) the Internal Revenue Code, enforced by the Department of the Treasury; and (3) the Employee Retirement Income Security Act ("ERISA"), enforced by the Department of Labor.  To be consistent with the Parties' briefs and a related decision by a panel of this court, we cite to the Public Health Services Act provisions.  The parallel statutory codifications are found at I.R.C. § 9816(c) and 29 U.S.C. § 1185e (ERISA).

No. 23-40605

Education and Labor found that nearly 40 percent of adults "are unable to cover a $400 emergency expense, yet the average surprise balance bill by emergency physicians in 2014 and 2015 was an estimated $620 *greater* than the Medicare rate for the same service." H.R. REP. NO. 116-615, pt. 1, at 52 (2020) (emphasis added) (footnote omitted). Therefore, in circumstances where a patient has no choice over his or her provider,[3] the Act aims to cap the patient's share of liability to out-of-network providers at an amount comparable to what the patient would have owed had the patient received care from an in-network provider.

The Act also permits the provider to seek further compensation from the patient's health plan. Congress determined that a relevant consideration in calculating both the patient's and the health plan's liability would be the QPA. 42 U.S.C. § 300gg-111(a)(3)(E)(i). The Act defines the QPA as

> the median of the contracted rates recognized by the plan or issuer, respectively (determined with respect to all such plans of such sponsor or all such coverage offered by such issuer that are offered within the same insurance market . . . as the plan or coverage) as the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) under such plans or coverage, respectively, on January 31, 2019, for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished.

---

[3] The Act applies in the following circumstances: (1) when an insured patient receives emergency care from an out-of-network provider, *see* 42 U.S.C. § 300gg-131; (2) when an insured patient receives certain nonemergency services at an in-network facility but is nevertheless treated by an out-of-network provider, such as an anesthesiologist or radiologist, *see id.* § 300gg-132; and (3) when an insured patient is transported by an out-of-network air-ambulance provider, *see id.* § 300gg-135.

No. 23-40605

*Id.* § 300gg-111(a)(3)(E)(i)(I).  The definition also incorporates adjustments for inflation each year.  *Id.* § 300gg-111(a)(3)(E)(i)(II).

Although the QPA is a factor in determining the respective payment obligations of both patients and health plans, it is used differently in these two determinations.  For patients, the QPA plays a primary role in determining the cost-sharing responsibility.  A patient's responsibility is calculated as if the total cost of the service was no greater than the QPA, and as if the services had been provided by an in-network provider.  *Id.* § 300gg-111(a)(1)(C)(ii)–(iii), (3)(H)(ii), (b)(1)(A)–(B).[4]  For example, if the QPA for a given service is $1,000 and the patient's plan requires a coinsurance payment of 20 percent for that service, the patient's responsibility would be capped at $200 (if the deductible had been met).

For health plans, the QPA factors into their payment obligations as follows.  When a provider submits a bill for an out-of-network service to the health plan, the plan must respond within thirty days by issuing either an initial payment or a notice of denial of payment; if the provider is dissatisfied with the plan's response, the provider may initiate a thirty-day period of open negotiation.  *Id.* § 300gg-111(a)(1)(C)(iv), (b)(1)(C), (c)(1)(A).  If the dispute remains unresolved, the plan and provider may proceed to an independent dispute resolution process ("IDR"), where an arbitrator determines how much the plan is required to pay the provider.  *Id.* § 300gg-111(c)(1)(B), (4)(A).  The Act uses "baseball-style" arbitration, meaning the provider and the health plan each offer a payment amount, along with their justification, and the arbitrator is required to select one of the two offers.  *Id.* § 300gg-111(c)(5)(A)(i).  The QPA is one factor that the arbitrator is to consider when

---

[4] Separate provisions of the Act create a parallel process applicable to air-ambulance providers.  *See* 42 U.S.C. § 300gg-112.

choosing an offer. *Id.* § 300gg-111(c)(5)(B)(i)(II), (B)(ii), (C)(i)–(ii). The arbitrator's decision is binding on the parties and not subject to judicial review, except under circumstances described in the Federal Arbitration Act. *Id.* §§ 300gg-111(c)(5)(E)(i), 300gg-112(b)(5)(D). Once a final amount has been identified, the health plan must pay the provider that amount, offset by the patient's cost-sharing obligation and any amounts already paid by the plan. *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D).

The Act directs the Departments[5] to establish through rulemaking the methodology for health plans to determine the QPA and the information health plans must share with providers regarding QPA determinations. *Id.* § 300gg-111(a)(2)(B). In July 2021, the Departments promulgated an interim final rule (the "Rule"). Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872 (July 13, 2021).[6] As relevant here, the Rule set the methodology for determining the QPA, *id.* at 36,888–98, and the information insurers must disclose to providers about their QPA calculations, *id.* at 36,898–99. The Rule also added that the thirty-day statutory deadline for health plans to provide an initial payment or notice of denial "begins on the date the plan or issuer receives the information necessary to decide a claim for payment for such services." *Id.* at 36,900.

The Departments invoked § 553(b) of the Administrative Procedure Act ("APA"), *see* 5 U.S.C. §§ 551–59, which permits an agency to bypass the APA's notice and comment procedures for good cause. 86 Fed. Reg. at

---

[5] The "Departments" include HHS, the Office of Personnel Management, the Department of Labor, and the Department of the Treasury. We use "Departments" interchangeably with Defendants in this opinion. The other Defendants are the respective secretaries of each Department in their official capacities.

[6] The Rule has been codified in part at 45 C.F.R. § 149.140 (HHS regulations), 26 C.F.R. § 54.9816-1T (tax regulations), and 29 C.F.R. § 2590.716-1 (ERISA regulations).

36,917.  They explained that "it would be impracticable and contrary to the public interest to delay putting the provisions in these interim final rules in place until after a full public notice and comment process has been completed." *Id.*

## B. Procedural Background

Plaintiffs[7] sued the Departments under the APA, alleging that provisions of the Rule violated the Act's unambiguous terms and were arbitrary and capricious.  The district court consolidated the lawsuits.

Both sides moved for summary judgment.  The district court held certain provisions of the Rule lawful and others unlawful.  The district court vacated the provisions of the Rule that it held unlawful and entered final judgment.  Shortly after the district court's decision, the Departments exercised their enforcement discretion to permit insurers to temporarily continue using their existing QPAs. *FAQs about Consolidated Appropriations Act, 2021 Implementation Part 62* at 6–7 (Oct. 6, 2023).  The Departments timely appealed the district court's judgment as to certain QPA calculation provisions and the thirty-day deadline provision.  Plaintiffs timely cross-appealed the district court's judgment upholding the disclosure provision.

## II.    Jurisdiction & Standard of Review

The district court had jurisdiction over this APA suit under 28 U.S.C. § 1331.  We have jurisdiction over the district court's final judgment under 28 U.S.C. § 1291.

---

[7] Plaintiffs include Texas Medical Association, Tyler Regional Hospital, L.L.C., Dr. Adam Corley, LifeNet, Incorporated, Air Methods Corp., Rocky Mountain Holdings, L.L.C., and East Texas Air One, L.L.C.

No. 23-40605

We review a district court's grant or denial of summary judgment de novo, *Data Mktg. P'ship, LP v. Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022), and its vacatur of a challenged rule for abuse of discretion, *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022).

## III.     Discussion

We first address the various challenges to the Rule before turning to the question of the proper remedy.

Pursuant to the APA, the Departments' Rule must be "set aside" if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2262 (2024), the Supreme Court overturned *Chevron*[8] and held that the APA "incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions." The Court recognized, however, that the "statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* at 2263. "[S]ome statutes expressly delegate to an agency the authority to give meaning to a particular statutory term," while "[o]thers empower an agency to prescribe rules to fill up the details of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility." *Id.* (internal quotation marks and citations omitted). "When the best reading of a statute is that it delegates discretionary authority to an agency," the reviewing court fulfills its role "by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has

---

[8] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

engaged in reasoned decisionmaking within those boundaries." *Id.* (alterations adopted) (internal quotation marks and citations omitted).

On the question of reasoned decision-making, "[t]he petitioner has the burden of proving that the agency's determination was arbitrary and capricious." *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* Although the reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given," courts are to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983) (quotations omitted).

## A. The QPA Calculation Provisions

We first address Plaintiffs' challenges to the provisions concerning how to calculate the QPA. Pursuant to *Loper Bright*, we must first determine the boundaries of the Departments' delegated authority in this area. 144 S. Ct. at 2263. The Act directs the Departments to "establish through rulemaking . . . the methodology the group health plan or health insurance issuer offering group or individual health insurance coverage shall use to determine the qualifying payment amount." 42 U.S.C. § 300gg-111(a)(2)(B)(i). That is a fairly broad delegation of authority. But because the Act contains a definition of QPA, the Departments' methodology must be consistent with that definition. In the subsections below, we consider whether the Rule's QPA calculation provisions operate within those bounds.

No. 23-40605

### 1.  *Including rates regardless of the number of claims paid at that rate*

The Rule instructs that "the rate negotiated under a contract constitutes a . . . contracted rate regardless of the number of claims paid at that contracted rate."  86 Fed. Reg. at 36,889.

The district court held that this provision conflicts with the Act because the Act requires insurers to include in the QPA calculation rates for services that are "provided by a provider."  *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).  According to the district court, the Rule permits insurers to include rates for services that certain providers have never performed and never would perform.  At the heart of this issue is Plaintiffs' concern that because they are not incentivized to negotiate rates for services they will not perform, unnegotiated rates will result in an inaccurate QPA.

Based on the plain meaning of "provide," the Act contains no requirement that a service must previously have been performed by a provider for that rate to be included in the QPA calculation.  As we have previously explained, "[t]o 'provide' ordinarily means 'to make available,' 'furnish,' or 'to supply something needed or desired.'"  *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 476 (5th Cir. 2020) (en banc) (quoting *Provide*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=available (last visited Nov. 26, 2019)).  Accordingly, the Act requires only that a given service be "available," *id.* (quotation omitted), regardless of whether, or how many times, it has actually been performed.

Additionally, the Act reasonably addresses concerns about the QPA's inclusion of rates for services that a given provider would never perform.  It states that the QPA is "the median of the contracted rates recognized by the plan or issuer . . . for the same or a similar item or service that is provided *in the same or similar specialty and provided in the geographic region in which the item*

No. 23-40605

*is furnished.*"  42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added).[9]  This ensures that the QPA for a given service excludes rates from providers outside of the same specialty and geographic area.[10]

Plaintiffs argue that even providers in the same or similar specialty might not provide the same services.  But Plaintiffs do not suggest how to otherwise draw and police the line separating the within-specialty services each provider might perform sometime in the future from those that they would never perform.  Limiting the field of comparison rates to those agreed upon by providers in the same specialty and geographic area is a reasonable way of ensuring that services that a provider is unlikely to provide are not included in the QPA calculation.

For these reasons, we conclude that this provision is neither inconsistent with the Act nor arbitrary and capricious.  We therefore REVERSE the district court's vacatur of this provision.

## *2. Excluding case-specific agreements*

The next provision of the Rule that Plaintiffs challenge is the exclusion from the QPA calculation of ad hoc, case-specific agreements.

The Rule recognizes "that plans and issuers sometimes enter into special agreements with providers and facilities that generally are not

---

[9] Plaintiffs argue that this is an impermissible post-hoc justification raised for the first time in litigation.  But we can "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43.  Here, we can reasonably discernable the Departments' path from the text of the Act itself.

[10] Also, after being "informed that some plans and issuers enter $0 into their fee schedule for covered items and services that a provider or facility is not equipped to furnish," the Departments clarified that "plans and issuers should not include $0 amounts" when calculating QPAs.  *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* at 17 n.29 (Aug. 19, 2022).

otherwise contracted to participate in any of the networks of the plan or issuer." 86 Fed. Reg. at 36,889. It clarifies that "solely for purposes of the definition of contracted rate, a single case agreement, letter of agreement, or other similar arrangement . . . does not constitute a contract, and the rate paid under such agreement should not be counted among the plan's or issuer's contracted rates." *Id.* Rather, "[t]he term 'contracted rate' refers only to the rate negotiated with providers and facilities that are contracted to participate in any of the networks of the plan or issuer under generally applicable terms of the plan or coverage and excludes rates negotiated with other providers and facilities." *Id.* The Departments stated that such an approach "most closely aligns with the statutory intent of ensuring that the QPA reflects market rates under typical contract negotiations." *Id.*

The district court concluded that this provision conflicts with the Act's definition of QPA. It reasoned that case-specific agreements are "'contracted rates recognized by' an insurer 'under such plans or coverage' . . . because they are contracts to pay a specific rate for an air ambulance transport for the insurers' beneficiaries, participants, or enrollees" (quoting 24 U.S.C. § 300gg-111(a)(3)(E)(i)(I)).

We disagree and hold that this provision of the Rule does not conflict with the Act. Even assuming arguendo that case-specific agreements constitute "contracted rates," as Plaintiffs contend, that does not end the matter. To be included in the QPA calculation, the Act requires that "contracted rates" must be "recognized by the plan or issuer . . . *under such plans or coverage* . . . on January 31, 2019." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added).[11] The most natural reading of that

---

[11] Plaintiffs assert that case-specific agreements are necessarily made "under" an insurer's plan because if the plan did not authorize such agreements, the insurers would be violating ERISA. Under ERISA, plan administrators are allowed to make payments only

No. 23-40605

language is that it excludes rates *not* previously agreed to under a plan. So, at the very least, we cannot say that the Departments' choice to exclude such agreements *conflicts* with the Act.

Plaintiffs next argue that the Rule's exclusion of single-case agreements is arbitrary and capricious because of an alleged inconsistency regarding what constitutes a contractual relationship. They argue that the Act defines "participating emergency facilit[ies]" and "participating health care facilit[ies]" to mean facilities that have "a contractual relationship with" the insurer. 42 U.S.C. § 300gg-111(a)(3)(F)(ii), (b)(2)(A)(i). Under the Rule, "a single case agreement between a health care facility and a plan or issuer . . . constitutes a contractual relationship." 86 Fed. Reg. at 36,882. According to Plaintiffs, if a single-case agreement constitutes a contractual relationship in *that* context, case-specific agreements must constitute contracted rates in the QPA context.

We do not agree. The definition of "contractual relationship" is used to determine whether the Act's surprise billing protections apply to a given facility in the first place. When a facility has a "contractual relationship" with an insurer, whether through a single case agreement or otherwise, the Act's surprise billing protections apply. That inquiry is wholly separate from whether a "contracted rate[]" was "recognized by the plan or issuer . . . under such plans or coverage . . . on January 31, 2019," and therefore must be included in the QPA calculation. 42 U.S.C. § 300gg-

---

"in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). But whether a plan *permits* case-specific agreements is a separate question from whether a "contracted rate[]" was "recognized by the plan or issuer . . . under such plans or coverage . . . on January 31, 2019," such that it should be included in the QPA calculation. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).

No. 23-40605

111(a)(3)(E)(i).      Accordingly, we disagree that there is an internal inconsistency that renders this provision arbitrary and capricious.

We also conclude that the Departments reasonably explained their approach to case-specific agreements. The Departments stated in the Rule that their approach "most closely aligns with the statutory intent of ensuring that the QPA reflects market rates under typical contract negotiations." 86 Fed. Reg. at 36,889. Including in the QPA calculation one-off rates agreed to by insurers and out-of-network providers would preserve the very market distortion that the Act seeks to cure.

We therefore conclude that this provision is neither inconsistent with the Act nor arbitrary and capricious. Accordingly, we REVERSE the district court's vacatur of this provision.

### 3. Excluding bonus and incentive payments

The next provision of the Rule at issue is its instruction to "exclude" from rates used to calculate the QPA "risk sharing, bonus, or penalty, and other incentive-based and retrospective payments or payment adjustments." 86 Fed. Reg. at 36,894. The Departments explained that doing so would be

> consistent with how cost sharing is typically calculated for in-network items and services, where the cost-sharing amount is customarily determined at or near the time an item or service is furnished, and is not subject to adjustment based on changes in the amount ultimately paid to the provider or facility as a result of any incentives or reconciliation process.

86 Fed. Reg. at 36,894.

The district court held that this provision of the Rule conflicts with the Act. It reasoned that the phrase "total maximum payment," as used in the definition of QPA, 42 U.S.C. § 300gg-111(a)(3)(E)(i), "requires insurers

No. 23-40605

to calculate QPAs using the 'entire,' 'highest possible' payment that a provider could receive for an item or service under the contract rate."

Again, we disagree. The Act itself grants the Departments discretion on whether to include such adjustments. For example, it expressly delegates rulemaking authority regarding how to treat "account payments that are made by such plan or issuer, respectively, that are not on a fee-for-service basis." 42 U.S.C. § 300gg-111(a)(2)(B). It further states that the QPA calculation methodology "*may* account for relevant payment adjustments that take into account quality or facility type . . . that are otherwise taken into account for purposes of determining payment amounts with respect to participating facilities." *Id.* (emphasis added).

We therefore conclude that this provision is neither inconsistent with the Act nor arbitrary and capricious. Accordingly, we REVERSE the district court's vacatur of this provision.

## B. The Deadline Provision

Moving on from the QPA-calculation provisions, we turn now to the Rule's deadline provision.

The Act states that the insurers shall send to the provider either an initial payment or notice of denial of payment "not later than 30 calendar days after the bill for such services is transmitted by such provider." 42 U.S.C. § 300gg-112(a)(3)(A). The Rule, however, states that the thirty-day clock starts on the date that the plan or issuer receives "the information necessary to decide a claim for payment for such services, commonly known as a 'clean claim' under many existing state laws." 86 Fed. Reg. at 36,900.

The district court held unlawful this provision of the Rule on the basis that it contradicts the Act's unambiguous terms. The district court also

No. 23-40605

noted that this provision "turns a firm 30-day deadline essential to an efficient process into an indefinite delay at the mercy of the insurer."

We agree that this provision of the Rule conflicts with the Act. First, it is important to note that the Act does not expressly delegate to the Departments rulemaking authority over the Act's deadlines, unlike it does for setting the methods of calculating the QPA. *See* 42 U.S.C. §§ 300gg-111(a)(2)(B); 300gg-112(a)(3)(A). Instead, the Departments support this provision by pointing to the statute's general delegation of authority to "promulgate such regulations as may be necessary or appropriate to carry out the provisions of this subchapter." 42 U.S.C. § 300gg-92.

That general delegation of authority does not give the Departments license to alter the Act's unambiguous terms. It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

The Departments argue that the Rule's deadline provision is lawful because its additional requirements align with the industry's understanding of "bill." But imposing additional requirements on the term "bill" is not the only way in which the Rule's deadline provision departs from the plain language of the Act. It also changes the event that starts the thirty-day clock from when the *provider transmits* the bill, 42 U.S.C. § 300gg-112(a)(3)(A), to when the "*plan or issuer receives* the information necessary," 86 Fed. Reg. at

No. 23-40605

36,900 (emphasis added).[12]   The Departments' argument about industry practice cannot cure such a blatant departure from the Act's plain language.[13]

We therefore conclude that the Rule's deadline provision conflicts with the Act and AFFIRM the district court's vacatur of this provision.

### C. Disclosure Requirements

Plaintiffs briefed the district court's upholding of the Rule's disclosure requirements, with which they disagree.[14]   They argue that this provision is neither reasonable nor reasonably explained.   In their view, the Rule should also require insurers to disclose information such as the number of contracted rates used to calculate the QPA, the number of times each rate was paid, and the types of providers that agreed to each rate.

The Act grants the Departments considerable discretion in this area. It states that the Departments "shall establish . . . the information [an insurer] . . . shall share with" a provider.   42 U.S.C. § 300gg-111(a)(2)(b)(ii).

The Rule requires insurers to provide, among other things: (1) "a statement certifying that . . . each QPA shared with the provider or facility was determined in compliance with" the Rule; (2) upon request, "whether the QPA includes contracted rates that were not set on a fee-for-service

---

[12] That distinction is significant here.  As Plaintiffs point out, the Rule does not require the plan or issuer to inform the provider of the date on which it receives the necessary amount of information (nor does it meaningfully define what constitutes the necessary amount of information).  As a result, providers would have no guaranteed way of knowing when the thirty-day clock started, and by extension, whether the plan or issuer has complied with the deadline.

[13] We express no opinion on the merits of the Departments' industry practice argument as to the meaning of "bill."

[14] While they called themselves cross-appellants, they did not even call any portion of their briefing the cross-appeal, which is a questionable approach.  We will, nonetheless, address it.

basis . . . and whether the QPA . . . was determined using underlying fee schedule rates or a derived amount"; (3) "if a related service code was used to determine the QPA for a new service code . . . which related service code was used"; (4) "if an eligible database was used to determine the QPA . . . which database was used"; and (5) upon request, whether the contracted rates "include risk-sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 86 Fed. Reg. at 36,898–99.

The Rule also provides the following explanation for requiring these specific disclosure requirements:

> The Departments recognize that providers, emergency facilities, and air ambulance providers subject to the surprise billing rules need transparency regarding how the QPA was determined. This information is also important in informing the negotiation process. In addition, IDR entities are directed by statute to consider the QPA when selecting an offer submitted by the parties through the IDR process. Therefore, to decide whether to initiate the IDR process and what offer to submit, a provider, emergency facility, or provider of air ambulance services must know not only the value of the QPA, but also certain information on how it was calculated.

86 Fed. Reg. at 36,898. It further explains that "[t]he Departments seek to ensure transparent and meaningful disclosure about the calculation of the QPA while minimizing administrative burdens on plans and issuers." *Id.* The Departments therefore require "that plans and issuers make certain disclosures with each initial payment or notice of denial of payment, and . . . provide additional information upon request." *Id.* Finally, despite invoking the good cause exception to the notice and comment requirements,

the Rule states that the Departments "seek comment on these disclosure requirements and on what additional information a plan or issuer should be required to share with a provider or facility about the QPA." *Id.* at 36,899.

Plaintiffs offer multiple theories for why the Rule's disclosure requirements are arbitrary and capricious. First, they argue that the lack of additional disclosure requirements dooms the complaint process by which providers can notify the Departments that an insurer's QPA may not satisfy the Act's definition of QPA. But the Act places the responsibility for auditing QPA calculations on the Departments rather than the providers. It requires the Departments to establish a process to audit a sample of plans each year and adds that the Departments *may* conduct an audit upon receipt of a "complaint or other information . . . that involves the compliance of the plan or coverage." 42 U.S.C. § 300gg-111(a)(2)(A)(ii)(II). The permissive language regarding the Departments' response to such complaints undercuts Plaintiffs' argument that the disclosure provision is arbitrary and capricious on this basis. We therefore agree with the district court's conclusion that "it is the permissive language of the Act rather than the [] Rule causing Plaintiffs the alleged harm here."

Second, Plaintiffs assert that the lack of additional disclosure requirements hinders the purpose of the Act's IDR process and is therefore unreasonable. The Departments clearly recognized the relevance to the IDR process of "certain information on how [the QPA] was calculated." 86 Fed. Reg. 36,898. They therefore sought "to ensure transparent and meaningful disclosure about the calculation of the QPA" while also balancing the need for disclosures against "the administrative burdens on plans and issuers." *Id.* That Plaintiffs would balance those competing aims differently than the Departments does not mean the Departments acted unreasonably in selecting which information must be disclosed. The Departments acted "within a zone of reasonableness," and it is not the duty of a court to

No. 23-40605

"substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423.

Finally, Plaintiffs contend that the Departments' "paltry explanation" of the disclosure requirements makes them arbitrary and capricious. Plaintiffs fault the Departments for failing to consider a disclosure system under which insurers would be required "to disclose everything (or virtually everything) underlying their calculations." But, as discussed above, the Departments reasonably explained that they sought to balance the benefits of disclosure against its administrative burdens. We therefore conclude that the Departments' explanation "conform[s] to minimal standards of rationality." *Luminant Generation Co. v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013) (quotation omitted).

For these reasons, we hold that the Rule's disclosure requirements are not arbitrary and capricious and AFFIRM the district court's decision to uphold them.

*      *      *

Our holdings on Plaintiffs' various challenges to the Rule are summarized as follows. We conclude that the provisions of the Rule related to QPA calculations are lawful and therefore REVERSE the district court's holdings as to those provisions. We further conclude that the Rule's deadline provision is unlawful and therefore AFFIRM the district court's holding as to that provision. Finally, we conclude that the Rule's disclosure requirements are lawful and therefore AFFIRM the district court's holding as to those provisions.

No. 23-40605

### D. The Proper Remedy

We now turn to the proper remedy for the unlawful deadline provision. The Departments argue that remand, rather than vacatur, is the proper remedy for any provisions of the Rule that we hold unlawful.

We have previously explained that remand is the proper remedy for unlawful agency action when two conditions are met: (1) there is a "serious possibility that the agency will be able to correct the rule's defects on remand," and (2) "vacating the challenged action would produce disruptive consequences." *Chamber of Com. of U.S. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023) (internal quotation marks and citation omitted); *see also Tex. Med. Ass'n v. HHS*, 110 F.4th 762, 779 (5th Cir. 2024).

The first condition has not been met. The Departments do not explain how they would correct the deadline provision's defects on remand, let alone contend that they even could. Regardless, we fail to see how they would be able to do so. The Rule's deadline provision is defective because it is an impermissible attempt to "rewrite clear statutory terms to suit [the Departments'] own sense of how the statute should operate." *Util. Air Regul. Grp.*, 573 U.S. at 328.

But even if the first condition could be satisfied, the second cannot. Vacating the deadline provision of the Rule will not produce disruptive consequences; rather, it will retain the Act's more workable statutory deadline. *See supra* at 17 n.11 (explaining logistical difficulties with the Rule's deadline).

Finally, the Departments argue that any relief should apply only to Plaintiffs. While party-specific vacatur is definitely appropriate in other situations, we conclude it is not the appropriate thing to do in this case. As Plaintiffs point out, party-specific vacatur would result in one deadline for Plaintiffs and another (unlawful) deadline for all other entities. That would

No. 23-40605

conflict with Congress's instruction to establish "one" IDR process for all participants.  42 U.S.C. § 300gg-111(c)(2)(A); *see also Tex. Med. Ass'n*, 110 F.4th at 780 (rejecting party-specific vacatur for same reason).

We therefore hold that the district court did not abuse its discretion by vacating the Rule's deadline provision.

## IV.     Conclusion

For the reasons explained, we REVERSE the district court's vacatur of the QPA calculation provisions, AFFIRM the district court's vacatur of the deadline provision, and AFFIRM the district court's holding as to the disclosure provisions.