No. 23-40605

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Texas Medical Association; Tyler Regional Hospital, L.L.C.; Dr. Adam Corley,
*Plaintiffs-Appellees,*

v.

United States Department of Health and Human Services; Office of Personnel Management; United States Department of Labor; United States Department of Treasury; Robert F. Kennedy, Jr., Secretary, U.S. Department of Health and Human Services, in his official capacity; Scott Kupor, in his official capacity as the Director of the Office of Personnel Management; Scott Bessent, Secretary, U.S. Department of Treasury, in his official capacity; Lori Chavez-DeRemer, Secretary, U.S. Department of Labor, in her official capacity,
*Defendants-Appellants.*

LifeNet, Incorporated; Air Methods Corporation; Rocky Mountain Holdings, L.L.C.; East Texas Air One, L.L.C.
*Plaintiffs-Appellees,*

v.

United States Department of Health and Human Services; Office of Personnel Management; United States Department of Labor; United States Department of Treasury; Robert F. Kennedy, Jr, Secretary, U.S. Department of Health and Human Services, in his official capacity; Scott Kupor, in his official capacity as the Director of the Office of Personnel Management; Scott Bessent, Secretary, U.S. Department of Treasury, in his official capacity; Lori Chavez-DeRemer, Secretary, U.S. Department of Labor, in her official capacity,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Texas

### EN BANC BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

JAY R. COMBS
*Acting United States Attorney*

COURTNEY L. DIXON
KEVIN B. SOTER
*Attorneys, Appellate Staff*
*Civil Division, Room 7222*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-

appellants/cross-appellees are all governmental parties.  5th Cir. R. 28.2.1.


*s/ Kevin B. Soter*
Kevin B. Soter

## STATEMENT REGARDING ORAL ARGUMENT

In its order granting the petition for rehearing en banc, the Court directed that this case will be reheard with oral argument.  The Court has scheduled the oral argument for September 24, 2025.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICTION ....................................................................2

STATEMENT OF THE ISSUES..........................................................................3

STATEMENT OF THE CASE .............................................................................3

      A.     Statutory Background......................................................................3

      B.     Regulatory Background.................................................................10

      C.     Prior Proceedings.........................................................................12

SUMMARY OF ARGUMENT........................................................................... 15

STANDARD OF REVIEW ............................................................................... 16

ARGUMENT ...................................................................................................... 17

I.      Each of the relevant aspects of the rule's QPA methodology comports
      with the No Surprises Act. ...................................................................... 17

      A.     The rule permissibly directs health plans to include contracted
              rates in the QPA calculation regardless of the number of claims
              paid at that contracted rate. ...........................................................19

      B.     The rule permissibly directs health plans to exclude bonus and
              incentive payments from the QPA calculation. ...........................24

      C.     The rule permissibly directs health plans to exclude one-off, case-
              specific agreements from the QPA calculation.............................28

II.     The district court erred in granting universal relief................................ 33

      A.     The APA does not authorize courts to depart from traditional
              principles of equity jurisdiction, which limit courts to party-
              specific relief. .................................................................................34

1.    The APA does not authorize vacatur...............................................36

2.    Even if vacatur is an available remedy under the APA, it is subject to traditional equitable principles. ........................................39

B.    This case illustrates the numerous constitutional, legal, and practical problems with awarding universal relief under the APA..........43

CONCLUSION ............................................................................................. 50

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                      **Page(s)**

*American Sch. of Magnetic Healing v. McAnnulty*,
   187 U.S. 94 (1902) .......................................................... 37

*Ardestani v. INS*,
   502 U.S. 129 (1991) ........................................................ 30

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ................................... 13, 39, 40, 44, 45

*Association of Air Med. Servs. v. HHS*,
   No. 21-cv-3031, 2023 WL 5094881 (D.D.C. Aug. 9, 2023) ............ 28, 30, 33, 44, 45

*Baeder v. Heckler*,
   768 F.2d 547 (3d Cir. 1985) ................................................ 39

*California v. Texas*,
   593 U.S. 659 (2021) ........................................................ 40

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ..................................................... 34, 40

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023) .......................................... 13, 33, 43

*Central & S.W. Servs., Inc. v. EPA*,
   220 F.3d 683 (5th Cir. 2000) ............................................... 43

*Chamber of Com. of the U.S. v. SEC*,
   88 F.4th 1115 (5th Cir. 2023) ......................................... 42-43, 43

*City of Dallas v. FCC*,
   118 F.3d 393 (5th Cir. 1997) ........................................... 20, 27

*Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.*,
   603 U.S. 799 (2024) ........................................................ 36

*Dennis Melancon, Inc. v. City of New Orleans*,
   703 F.3d 262 (5th Cir. 2012) ............................................... 42

*Doran v. Salem Inn, Inc.*,
   422 U.S. 922 (1975) ........................................................ 38

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ................................................................ 41

*Gill v. Whitford*,
  585 U.S. 48 (2018) .................................................................. 35

*Green Valley Special Util. Dist. v. City of Schertz*,
  969 F.3d 460 (5th Cir. 2020) ..................................................21

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999) ................................................................34

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944) ................................................................ 35

*Kirtsaeng v. John Wiley & Sons, Inc.*,
  568 U.S. 519 (2013) ................................................................ 30

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ..................................................... 13, 17, 18

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ................................................................ 38

*Nebraska Dep't of Health & Human Servs. v. Department of Health & Human Servs.*,
  435 F.3d 326 (D.C. Cir. 2006) ................................................ 39

*Norton v. Southern Utah Wilderness All.*,
  542 U.S. 55 (2004) .................................................................. 37

*OnPath Fed. Credit Union v. U.S. Dep't of Treasury, Cmty. Dev. Fin. Insts. Fund*,
  73 F.4th 291 (5th Cir. 2023) ............................................... 16-17

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
  145 S. Ct. 1497 (2025) ........................................................ 18-19

*Sierra Club v. U.S. Dep't of Interior*,
  990 F.3d 909 (5th Cir. 2021) .................................................. 17

*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024) ................................................................ 35

*Taylor, In re*,
  655 F.3d 274 (3d Cir. 2011) .................................................... 42

*Tompkins v. Cyr*,
202 F.3d 770 (5th Cir. 2000) ......................................................... 42

*Trump v. CASA, Inc.*,
No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) ..................... 2, 16, 34, 38, 40,
43-44, 46, 47, 48

*United States v. Lumbermens Mut. Cas. Co.*,
917 F.2d 654 (1st Cir. 1990) ......................................................... 42

*United States v. Texas*,
599 U.S. 670 (2023) ........................................................ 2, 12-13, 35, 36, 37,
38, 39, 40, 43, 44, 45

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ...................................................... 35, 41

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2009) ......................................................... 41

**Statutes:**

Administrative Procedure Act (APA):
5 U.S.C. § 551(13) ......................................................... 40
5 U.S.C. §§ 701-706 ......................................................... 2
5 U.S.C. § 702 ......................................................... 36
5 U.S.C. § 702(1) ......................................................... 40
5 U.S.C. § 703 ......................................................... 36, 39
5 U.S.C. § 706(2) ......................................................... 38
5 U.S.C. § 706(2)(A) ......................................................... 17

Consolidated Appropriations Act, 2021,
Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2757-2890 (2020)
(codified in relevant part at 42 U.S.C. § 300gg-111 *et seq.*) .........................................6
42 U.S.C. § 300gg-111(a)(1)(C)(ii)-(iii) ...............................................7-8
42 U.S.C. § 300gg-111(a)(1)(C)(iv) ...............................................8
42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II) ...............................................9
42 U.S.C. § 300gg-111(a)(2)(B) ............................................... 25-26
42 U.S.C. § 300gg-111(a)(2)(B)(i) ............................................... 1, 10, 13, 18
42 U.S.C. § 300gg-111(a)(3)(E)(i) ........ 1, 6, 7, 10, 11, 18, 19, 21, 22, 23, 27, 29, 30
42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) ............................................... 20, 21, 32
42 U.S.C. § 300gg-111(a)(3)(H)(i) ...............................................7
42 U.S.C. § 300gg-111(a)(3)(H)(ii) ...............................................7-8
42 U.S.C. § 300gg-111(a)(3)(H)(iii) ...............................................7

42 U.S.C. § 300gg-111(a)(3)(K)(i) ........................................ 7
42 U.S.C. § 300gg-111(a)(3)(K)(iii) ....................................... 7
42 U.S.C. § 300gg-111(b)(1)(A)-(B) ................................... 7-8
42 U.S.C. § 300gg-111(b)(1)(C) .......................................... 8
42 U.S.C. § 300gg-111(c)(1)(A) .......................................... 8
42 U.S.C. § 300gg-111(c)(1)(B) .......................................... 8
42 U.S.C. § 300gg-111(c)(4)(A) .......................................... 8
42 U.S.C. § 300gg-111(c)(5)(A)(i) ....................................... 9
42 U.S.C. § 300gg-111(c)(5)(B)(i)(II) ................................... 9
42 U.S.C. § 300gg-111(c)(5)(B)(ii) ...................................... 9
42 U.S.C. § 300gg-111(c)(5)(C)(i)-(ii) .................................. 9
42 U.S.C. § 300gg-111(c)(5)(C)(ii) .................................. 9, 26
42 U.S.C. § 300gg-111(c)(5)(E)(i) ....................................... 9
42 U.S.C. § 300gg-112 ...................................................... 8
42 U.S.C. § 300gg-112(a)(1) .............................................. 8
42 U.S.C. § 300gg-112(a)(3)(A) ........................................ 46
42 U.S.C. § 300gg-112(b)(1)(D) ......................................... 9
42 U.S.C. § 300gg-112(b)(5)(D) ......................................... 9
42 U.S.C. § 300gg-112(c)(2)) .......................................... 19
42 U.S.C. § 300gg-131 ...................................................... 6
42 U.S.C. § 300gg-132 ...................................................... 6
42 U.S.C. § 300gg-135 ...................................................... 6

28 U.S.C. § 1291 ............................................................. 3

28 U.S.C. § 1331 ............................................................. 2

28 U.S.C. § 1346(a) ......................................................... 2

28 U.S.C. §§ 2201-2202 ................................................... 2

42 U.S.C. § 1315a ........................................................... 7

**Regulations:**

45 C.F.R. § 149.130(b)(2) ................................................. 8

45 C.F.R. § 149.130(b)(4)(i) ............................................. 46

45 C.F.R. § 149.140(a)(1) ............................................. 12, 28

45 C.F.R. § 149.140(a)(12) .............................................. 23

45 C.F.R. § 149.140(b)(2)(ii) ......................................................... 11

45 C.F.R. § 149.140(b)(2)(iv) .................................................. 11, 24

45 C.F.R. § 149.140(d)(2)(iv) ......................................................... 26

## Legislative Materials:

*Administrative Procedure Act*,
    S. Doc. No. 79-248 (1946) ...................................................... 36

92 Cong. Rec. 2159 (1946) ............................................................ 36

H.R. Rep. No. 116-615, pt. 1 (2020) ........................... 5, 6, 32, 48

S. Rep. No. 79-752 (1945) ............................................................ 37

## Other Authorities:

Aditya Bamzai, *The Path of Administrative Law Remedies*,
    98 Notre Dame L. Rev. 2037 (2023) ....................................... 37

Loren Adler et al., *High Air Ambulance Charges Concentrated in Private Equity-
    Owned Carriers*, USC-Brookings Schaeffer on Health Policy (Oct. 13, 2020) .............. 5

Erin C. Fuse Brown et al., *The Unfinished Business of Air Ambulance Bills*,
    Health Affairs Forefront (Mar. 26, 2021) ................................. 4, 5

Zack Cooper et al., *Surprise! Out-of-Network Billing for Emergency Care in the
    United States*, 128 J. Pol. Econ. 3626 (2020) .............................. 31

*FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021
    Implementation Part 55* (Aug. 19, 2022) ............................. 23, 24

*Rate*:
    Merriam-Webster's Collegiate Dictionary 1032 (11th ed. 2005) ............................. 29
    Oxford English Dictionary,
    https://www.oed.com/dictionary/rate_n1?tab=meaning_and_use#26707259 (last
    visited July 21, 2025) ......................................................... 29-30
    Webster's Third New International Dictionary (2002) ............................... 29

*Requirements Related to Surprise Billing; Part I*,
    86 Fed. Reg. 36,872 (July 13, 2021) ......................... 3, 4, 5, 10, 11, 12, 14,

19, 24, 25, 26, 29, 31, 48

*Under*, Webster's Third New International Dictionary (2002) ........................................30

U.S. Dep't of Justice:

    *Attorney General's Manual on the Administrative Procedure Act* (1947) ............................37

    *Final Report of the Attorney General's Committee on Administrative Procedure* (1941).........37

15A Wright & Miller, Federal Practice & Procedure § 3904 (3d ed.),
    Westlaw (database updated May 21, 2025) ..................................................................42

## INTRODUCTION

Congress enacted the No Surprises Act (the Act) to shield patients from the often-crippling effects of common types of surprise medical bills. The "qualifying payment amount," or "QPA," is a key figure under the Act that must be computed by health plans. It is designed to approximate the total amount that a medical provider would have received for a particular service under the terms of a patient's health plan had the provider been in-network. The QPA can determine the maximum liability a patient can face for medical services, and it is a factor that is also considered in determining the amount of compensation providers receive from the patient's health plan. The Act includes a definition of the QPA. But Congress understood that this definition does not address every nuance that a health plan might confront when calculating the figure, and it set a deadline by which the Department of Health and Human Services (HHS), the Department of Labor, and the Department of the Treasury (the Departments) were to "establish through rulemaking" the "methodology" that plans "shall use to determine the qualifying payment amount." 42 U.S.C. § 300gg-111(a)(2)(B)(i). Congress then expressly incorporated that "methodology" into the statutory definition of the QPA. *Id.* § 300gg-111(a)(3)(E)(i).

This case arises from a challenge to the July 2021 interim final rule through which the Departments fulfilled this rulemaking mandate. Plaintiffs, who are medical and air ambulance providers, disagree with an array of methodological determinations made by the Departments regarding how the QPA should be computed. As relevant

here, the district court agreed with plaintiffs, but a unanimous panel of this Court

correctly held that these methodological determinations fall well within the bounds set

forth by the statute. The district court should be reversed on each of the QPA

methodology issues that remain before this Court.

This Court should also reverse the district court's grant of universal vacatur.

Primarily relying on this Court's prior statements that universal vacatur is the

"default" remedy under the Administrative Procedure Act (APA), ROA.13235

(quotation marks omitted), the district court determined that every provision plaintiffs

had successfully challenged must be universally vacated. But that is an "extraordinary

remedy" that defies traditional equitable principles and disrupts orderly judicial

review. *See United States v. Texas*, 599 U.S. 670, 702 (2023) (Gorsuch, J., joined by

Thomas and Barrett, JJ., concurring in the judgment). "[F]ederal courts do not

exercise general oversight of the Executive Branch," *Trump v. CASA, Inc.*, No.

24A884, 2025 WL 1773631, at *15 (U.S. June 27, 2025), and this Court should hold

that the APA does not give every district judge in the country unilateral power to veto

executive action nationwide.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331,

1346(a), 2201-2202 and 5 U.S.C. §§ 701-706. ROA.33, ¶ 33; ROA.13369, ¶ 18. The

district court entered judgment for plaintiffs in part and for the government in part on

August 24, 2023. ROA.13241-43, 13479-81. The government timely appealed on

October 20, 2023.  ROA.13244-45, 13482-83.  This Court has jurisdiction under 28
U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in invalidating certain provisions of the
Departments' regulations establishing a methodology for determining QPAs.

2.  Whether the district court erred in entering a universal vacatur of the
challenged provisions.

## STATEMENT OF THE CASE

### A.  Statutory Background

**1.**  Medical services are not provided under uniform pricing models, and
different providers may charge a given patient significantly different amounts for the
same service.  While health plans and providers commonly pre-negotiate rates, if a
patient receives care from a provider outside a plan's "network," the provider
generally will not have agreed to accept a particular negotiated rate, and the patient's
plan may decline to pay the provider or may pay an amount lower than the provider's
billed charges.  *See Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36,872,
36,874 (July 13, 2021) (ROA.768-881).[1]  In that circumstance, the patient may be
personally responsible for the balance of the bill, which may represent a sum that is

---

[1] For ease of reference, this brief generally uses "health plans" or "plans" to
refer to both group health plans and health insurance issuers, and generally uses
"providers" to refer to providers (including providers of air ambulance services) and
health care facilities.

immensely more than the cost-sharing amount based on a pre-negotiated rate that would have applied if the same service had been in-network. *See id.*

"A balance bill may come as a surprise for the individual." 86 Fed. Reg. at 36,874. Surprise billing may occur when a patient receives care from a provider whom the patient could not have chosen in advance, or whom the patient did not have reason to believe would be outside the network of the patient's plan. For example, a patient in an emergency will often be unable to choose which emergency department she goes to (or is taken to) or whether to receive care from an in-network provider even if the emergency department happens to be in-network. *Id.* This situation arises frequently in connection with air ambulance providers, as individuals generally do not have the ability to select an air ambulance provider and consequently have little to no control over whether the provider is in-network. As a result, surprise billing concerns have been particularly evident in this context. *See id.*; *see also* Erin C. Fuse Brown et al., *The Unfinished Business of Air Ambulance Bills*, Health Affairs Forefront (Mar. 26, 2021) (*Unfinished Business*) (ROA.3448-50). Likewise, even patients who try to receive non-emergency services at an in-network facility (like a hospital) will sometimes nonetheless receive care from an out-of-network provider (such as a radiologist or anesthesiologist). *See* 86 Fed. Reg. at 36,874.

In such circumstances, a patient's inability to choose an in-network provider created a pronounced market distortion: these providers had little incentive to join health plan or insurance networks, negotiate fair prices in advance for their services,

or moderate their charges for out-of-network care. These circumstances led to the widespread phenomenon of surprise billing, a problem that was becoming more common and more costly for patients before Congress acted. *See* 86 Fed. Reg. at 36,874. "The financial liability imposed on patients by surprise medical bills can be staggering." H.R. Rep. No. 116-615, pt. 1, at 52 (2020) (ROA.933); *see also, e.g., id.* (referring to a "shocking" example of "a spinal surgery patient who received a bill of $101,000 despite having confirmed that her surgeon was in-network"); *Unfinished Business* (ROA.3449) (noting that "[m]edian charges for a rotary-wing air ambulance transport spiked over the past decade, nearly tripling from $12,500 to $35,900 between 2008 and 2017"). Air Methods Corporation, a plaintiff here, took particular advantage of the market distortion giving rise to surprise billing, increasing its prices for medical transports by 283% from 2007 to 2016, with an average price of $49,800 charged per transport in 2016. Loren Adler et al., *High Air Ambulance Charges Concentrated in Private Equity-Owned Carriers*, USC-Brookings Schaeffer on Health Policy (Oct. 13, 2020) (ROA.5378).

The leverage offered by a provider's ability to surprise bill could also induce a plan to agree to cover, on a case-specific basis, the potentially exorbitant cost of a service already provided by an out-of-network provider. For air ambulance providers in particular, "many insurers appear to place a high value on preventing enrollee surprise bills," given the infrequency with which the services are provided and their very high costs. *Unfinished Business* (ROA.3449).

5

**2.** In 2020, Congress enacted the No Surprises Act to combat the growing crisis of surprise medical bills. Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2757-2890 (2020) (codified in relevant part at 42 U.S.C. § 300gg-111 *et seq.*).[2] The Act protects insured patients from unexpected liabilities arising from common forms of surprise billing. As described further below, in circumstances where it applies, the Act caps an individual patient's share of liability to an out-of-network provider at an amount comparable to what the individual would have owed had she received care from an in-network provider.[3] The Act also creates procedures that allow the provider to seek further compensation from the patient's health plan. Those separate procedures further Congress's goal of "taking the consumer out of the middle" of billing disputes. *See* H.R. Rep. No. 116-615, pt. 1, at 55 (ROA.936) (quotation marks omitted).

Because provider rates are usually not standardized, and because the Act specifically addresses circumstances in which the provider and health plan have not

---

[2] Although the Act made parallel amendments to multiple statutes, for ease of reference, this brief cites the Act's amendments to the Public Health Service Act and the regulations implemented by HHS.

[3] The circumstances where these protections apply include: (1) when an insured patient receives emergency care from an out-of-network provider, *see* 42 U.S.C. § 300gg-131; (2) when an insured patient receives certain non-emergency services at an in-network facility but is nevertheless treated by an out-of-network provider, such as an anesthesiologist or radiologist, *see id.* § 300gg-132; and (3) when an insured patient is transported by an out-of-network air ambulance provider, *see id.* § 300gg-135.

pre-negotiated the applicable rates, Congress devised distinct means for establishing

the amounts that could be recovered by the provider from the individual patient and

the health plan, respectively.[4]  Congress determined that a relevant consideration in

calculating both the patient's and health plan's liability would be the "QPA," which is

generally "the median of the contracted rates recognized by" a health plan on January

31, 2019 (before the Act was enacted) for a particular item or service "that is provided

by a provider in the same or similar specialty and provided in the geographic region in

which the item or service is furnished," adjusted for inflation.  42 U.S.C. § 300gg-

111(a)(3)(E)(i).  The QPA essentially approximates the total amount that the provider

would have received under the terms of the patient's health plan had the provider

been in-network.

The QPA is generally a factor in determining the respective payment

obligations of both patients and health plans under the Act, but it is used differently

in these two determinations.  For patients, the QPA plays a dispositive role in

determining the patient's cost-sharing responsibility.  A patient's cost-sharing

requirement must be calculated as if the total charge was no greater than the QPA,

and the patient's cost-sharing requirement cannot exceed the requirement that would

apply if the services had been provided by an in-network provider.  42 U.S.C. § 300gg-

---

[4] In some circumstances, the No Surprises Act looks to applicable state law or to a state All-Payer Model Agreement under 42 U.S.C. § 1315a to supply the relevant payment rates.  *See* 42 U.S.C. § 300gg-111(a)(3)(H)(i), (iii), (K)(i), (iii).

111(a)(1)(C)(ii)-(iii), (3)(H)(ii), (b)(1)(A)-(B).[5]  For example, if the QPA for a given service is $1,000 and the patient's plan would have required her to pay a coinsurance of 20% for receiving that service in-network, the patient's responsibility would be capped at $200, assuming she had met any applicable deductible.

The Act's procedures for determining a health plan's payment obligation include additional steps, while also using the QPA as a required consideration.  After a provider transmits a bill for a covered out-of-network service to the health plan, the plan must respond within 30 days by either issuing an initial payment or a notice of denial of payment; if the provider is dissatisfied with the plan's response, the provider may initiate a "30-day period" of "open negotiation."  42 U.S.C. § 300gg-111(a)(1)(C)(iv), (b)(1)(C), (c)(1)(A).  If the dispute remains unresolved, the parties may proceed to an independent dispute resolution (IDR) process, where an arbitrator working for an entity certified under a government-established process will determine the appropriate out-of-network rate.  *Id.* § 300gg-111(c)(1)(B), (4)(A).  The Act relies on "baseball-style" arbitration:  the provider and the health plan each offer a payment

---

[5] Separate provisions of the Act create a parallel process applicable to air ambulance providers.  42 U.S.C. § 300gg-112.  Many of the parallel statutory requirements are identical in relevant part.  For air ambulance services, the Act specifies that a patient's cost-sharing responsibilities are calculated based on the rates "that would apply" to in-network air ambulance services, *id.* § 300gg-112(a)(1), and the Departments have specified by regulation that the maximum rate that would apply when determining the patient's responsibility for air ambulance services cannot exceed the QPA, 45 C.F.R. § 149.130(b)(2).

amount, and the arbitrator is required to select one of the two offers. *Id.* § 300gg-111(c)(5)(A)(i). In determining which offer to select, arbitrators "shall consider— (I) the [QPAs] for the applicable year for items or services that are comparable" to the item or service at issue; "and (II) . . . information on any circumstance described in" a list of "[a]dditional circumstances," as well as any information "relating to" a party's offer that is either requested by the arbitrator or submitted by the party. *Id.* § 300gg-111(c)(5)(B)(i)(II), (B)(ii), (C)(i)-(ii). The list of "[a]dditional circumstances" for arbitrators to consider includes, for example, the provider's level of training and experience, measurements of the quality and outcomes achieved by the provider or facility, and the acuity of the patient or complexity of the procedure. *Id.* § 300gg-111(c)(5)(C)(ii). The arbitrator's decision is binding on the parties and not subject to judicial review except under circumstances described in the Federal Arbitration Act. *Id.* §§ 300gg-111(c)(5)(E)(i), 300gg-112(b)(5)(D). Once a final amount has been identified, the health plan must pay the provider that amount, offset by the patient's cost-sharing obligation and any amounts already paid by the plan. *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D).

Because of these ways in which the QPA factors into the amount paid by patients and plans to providers, in general, patients and plans would prefer lower QPAs, whereas providers would prefer higher QPAs.

### B.    Regulatory Background

The Act directs the Departments to issue a variety of implementing regulations. With respect to the QPA, Congress directed the Departments to "establish through rulemaking . . . the methodology" that plans must use "to determine the [QPA]."  42 U.S.C. § 300gg-111(a)(2)(B)(i).  Pursuant to that statutory directive, the Departments promulgated an interim final rule in July 2021 that includes a QPA calculation methodology.  *See* 86 Fed. Reg. 36,872.

As noted, the Act specifies that, in general, the QPA is "the median of the contracted rates recognized by" the health plan on January 31, 2019, adjusted for inflation.  42 U.S.C. § 300gg-111(a)(3)(E)(i).  The statutory definition does not, however, include every methodological detail that health plans would need to know so that they can determine, in a consistent manner, what universe of 2019 contracted rates they must include when calculating the median.  Recognizing that health plans would need to invest significant time and resources to calculate QPAs, Congress directed the Departments to establish the QPA methodology by July 1, 2021— providing health plans six months to make the required calculations before the Act's effective date of January 1, 2022.  *Id.* § 300gg-111(a)(2)(B)(i).

As relevant here, the July 2021 rule resolved three methodological issues regarding the universe of contracted rates that plans must include when determining the median contracted rate, as of January 31, 2019, for a given service.  *First*, the Departments concluded that, in determining the rates that a plan has contracted to

accept, plans should treat each rate negotiated under a contract as a single contracted rate "regardless of the number of claims paid at that contracted rate." 86 Fed. Reg. at 36,889 (preamble). Thus, in determining which rates count toward the median for this purpose, health plans can consider only the four corners of a plan's 2019 contracts, with each contracted rate receiving equal weight; health plans are not required to scour data beyond their plan contracts to attempt to determine how many claims a given provider may have submitted for that particular service over the course of any given period of time (where no such period of time is specified in the statute). Health plans are, however, required to calculate a separate QPA for each provider specialty and for each geographic region. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i).

*Second*, the Departments directed health plans to consider the "full contracted rate applicable" to the relevant service code, but to exclude from the QPA calculation "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 45 C.F.R. § 149.140(b)(2)(ii), (iv). The Departments explained that this approach was "consistent with how cost sharing is typically calculated for in-network items and services, where the cost-sharing amount is customarily determined at or near the time an item or service is furnished" and not subject to retrospective adjustment based on such payments. 86 Fed. Reg. at 36,894.

*Third*, the Departments concluded that, in determining which rates are included in the QPA calculation, health plans should not include "a single case agreement, letter of agreement, or other similar arrangement" between a provider and plan that is

11

"used to supplement the network of the plan or coverage for a specific participant, beneficiary, or enrollee in unique circumstances." 45 C.F.R. § 149.140(a)(1). The Departments determined that these one-off payments to out-of-network providers should be excluded because Congress had devised the QPA as a figure to be calculated based on generally applicable rates that have been negotiated between plans and their in-network providers. *See* 86 Fed. Reg. at 36,889.

## C.    Prior Proceedings

**1.** Two sets of plaintiffs, comprising a trade association of Texas medical providers, two medical providers, and four air ambulance providers, brought suit under the APA challenging numerous provisions of the rule. ROA.49-55, 13401-06. The parties cross-moved for summary judgment. *See* ROA.13196-13240.

With respect to the three provisions discussed above, the district court granted summary judgment to plaintiffs, concluding that each of them conflicts with the Act. ROA.13206-09, 13211-13214, 13227-13230. Plaintiffs had also challenged a variety of additional regulatory provisions and sub-regulatory guidance; the district court agreed with plaintiffs' challenges to some (but not all) of these provisions. ROA.13209-11, 13214-76, 13230-33.

After addressing the merits of each of plaintiffs' challenges, the district court turned to "the proper remedy." ROA.13234-37. The court recognized that several jurists have questioned whether the APA authorizes district courts to universally "vacate" regulations. ROA.13235 n.5 (citing *United States v. Texas*, 599 U.S. 670, 695

12

(2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment); and then citing *Arizona v. Biden*, 40 F.4th 375, 395 (6th Cir. 2022) (Sutton, C.J., concurring)). But largely relying on this Court's precedents describing vacatur as "'the default rule in this Circuit'" for APA cases, the district court granted universal vacatur after concluding that the Departments had not met their burden to show that the "'default'" rule should be "bypass[ed]" in this case. ROA.13235-37 (quoting *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc)).

**2.** The government appealed, and a unanimous panel of this Court reversed the district court's merits rulings regarding the three QPA methodology issues described above. The panel explained that, under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), a court's role is to "determine the boundaries of the Departments' delegated authority," and here, Congress explicitly directed the Departments to "'establish through rulemaking . . . the methodology the group health plan or health insurance issuer offering group or individual health insurance coverage shall use to determine the [QPA].'" Op. 9 (first alteration in original) (quoting 42 U.S.C. § 300gg-111(a)(2)(B)(i)). The panel concluded that each of the QPA calculation instructions at issue on appeal "operate[s] within" the bounds of this explicitly delegated authority. *Id.* The Court explained that instructing plans to include contracted rates in the QPA calculation "'regardless of the number of claims paid'" at each rate comports with the plain meaning of the terms Congress used when defining the QPA, and Congress addressed plaintiffs' concerns regarding the potential

13

inclusion of "unnegotiated rates" in QPAs by requiring plans to calculate separate QPAs by provider specialty and geographic area, Op. 10-11 (quoting 86 Fed. Reg. at 36,899). The Court further recognized that it similarly comports with the Act to direct plans to exclude bonus and incentive payments from their QPA calculations, Op. 14-15, and to exclude one-off, case-specific agreements from their QPA calculations, Op. 11-14.

The panel affirmed the district court's ruling with respect to a separate provision that plaintiffs challenged implementing a statutory deadline for plans to send providers either an initial payment or a notice of denial of payment. *See* Op. 15-17. Addressing the appropriate remedy, the panel agreed with the district court that universal vacatur of the deadline provision was appropriate. Op. 21-22. The panel rejected the government's arguments that remand without vacatur was the proper remedy and further disagreed with the government's arguments that any vacatur should be "party-specific." Op. 21. In particular, the panel expressed concern that party-specific relief "would result in one deadline for Plaintiffs and another (unlawful) deadline for all other entities." Op. 21-22.

**3.** Plaintiffs sought en banc review on the first two of these QPA calculation issues. This Court granted the rehearing petition and vacated the panel opinion pursuant to 5th Circuit Rule 41.3. The parties have since conferred about the scope of the issues they intend to address in their en banc briefs, as set forth in the parties' Joint Motion to Reset the En Banc Briefing Schedule. As relevant to this opening

brief, the Departments have agreed that they will not continue pressing their challenge to the district court's conclusion as to the deadline provision, *see* Op. 15-17, except to the extent the district court granted universal vacatur as a remedy. *See* Joint Mot. to Reset En Banc Briefing Schedule at 2-3, July 9, 2025.

## SUMMARY OF ARGUMENT

**I.** The No Surprises Act creates protections for patients against potentially staggering surprise medical bills and sets up a framework for providers and health plans to resolve certain payment disputes without the market-distorting effects of providers being able to surprise bill patients directly. The QPA—a statutorily defined term that serves as a rough proxy for the amount a provider would have received for a given service if a provider had been in a health plan's network—is relevant to many aspects of the statute and, in enacting the Act, Congress expressly charged the Departments with the responsibility to establish through rulemaking the methodology for calculating the QPA. In the provisions of the rule that remain at issue, the Departments appropriately exercised this expressly delegated rulemaking authority to establish a methodology that falls well within the bounds set by the Act.

The district court erred in invalidating the three provisions at issue here as inconsistent with the statute. First, the Departments did not contradict the statute when they determined that, when Congress defined the QPA by reference to "contracted rates" for medical services as of a specific date in 2019, Congress was not dictating a methodology under which health plans would need to estimate how

15

frequently providers might ultimately perform the covered services over some unspecified period.  Second, nothing in the statute requires a methodology under which health plans would include retrospective payment adjustments that are often made on a lump-sum basis, for overall performance, when calculating the QPA—a figure that approximates costs on a per-service basis.  Finally, the Departments did not contradict the statute when they directed health plans to omit their case-specific agreements with out-of-network providers when calculating the QPA—a figure that is supposed to be a rough proxy for the cost of *in*-network medical services.

**II.**  The district court independently erred in reflexively granting universal relief.  The district court's understanding of universal vacatur as the "default" remedy for an APA violation defies traditional equitable principles and finds no footing in the APA.  The APA does not authorize vacatur and, even if it did, that remedy would still be subject to traditional equitable considerations, including the principle of party-specific relief.  *See Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025).  The en banc Court should provide clarity on these important and recurring issues regarding remedies under the APA and remand to the district court to conduct a proper remedial analysis in the first instance.

## STANDARD OF REVIEW

In challenges to agency action, this Court reviews the district court's grant of summary judgment de novo, applying the standards of the APA.  *OnPath Fed. Credit Union v. U.S. Dep't of Treasury, Cmty. Dev. Fin. Insts. Fund*, 73 F.4th 291, 296 (5th Cir.

16

2023).  A court will uphold an agency's action unless it finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see, e.g.*, *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021).  "When the best reading of a statute is that it delegates discretionary authority to an agency," the reviewing court fulfills its role under the APA by "recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (alterations, quotation marks, and citation omitted).

## ARGUMENT

### I.  Each of the relevant aspects of the rule's QPA methodology comports with the No Surprises Act.

The No Surprises Act creates a framework for protecting patients from the ruinous effects of surprise medical bills.  Congress devised the QPA as a central figure in the statutory scheme, affecting the payment amounts made by both patients and health plans and therefore, in turn, the amount of compensation providers ultimately receive for medical services covered by the Act.

The Act's definition of the QPA specifies that, in general, it is "the median of the contracted rates recognized by" a health plan on January 31, 2019, for a particular item or service "that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished," adjusted

for inflation. 42 U.S.C. § 300gg-111(a)(3)(E)(i). Congress recognized, however, that the statutory definition does not address a variety of technical details that would need to be fleshed out so that health plans could calculate QPAs in a consistent, workable manner that is fair to everyone affected by these calculations, including plans, patients, and providers. Congress therefore expressly directed the Departments to "establish through rulemaking . . . the methodology" that health plans "shall use to determine the qualifying payment amount," *id.* § 300gg-111(a)(2)(B)(i). The Act then incorporates this "methodology established by the [Departments]" into the statutory definition, specifying that the QPAs calculated by health plans must be "consistent with" the Departments' regulatory methodology. *Id.* § 300gg-111(a)(3)(E)(i).

As the Supreme Court explained in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), where, as here, the "best reading of a statute" is that it "expressly delegate[s]" authority to an agency to promulgate rules "to give meaning to a particular statutory term" or "fill up the details of a statutory scheme," the court fulfills its role under the APA "by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* at 394-96 (alterations, quotation marks, and citation omitted). Indeed, the Court recently reiterated that, "when an agency exercises discretion granted by statute," judicial review is "deferential": "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty.*

18

*Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1511 (2025).  As the panel correctly recognized, the Departments acted well within the bounds of Congress's express delegation by promulgating the three aspects of the rule at issue here.

A.    **The rule permissibly directs health plans to include contracted rates in the QPA calculation regardless of the number of claims paid at that contracted rate.**

The Act defines the QPA in relevant part as "the median of the contracted rates recognized by the plan or issuer . . . for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished" as of January 31, 2019, subject to an inflation adjustment.  42 U.S.C. § 300gg-111(a)(3)(E)(i); *see also id.* § 300gg-112(c)(2).  In specifying what it means for "contracted rates" to be "recognized" by a plan as of a specific date in 2019, the Departments determined that this analysis should be based on the rates appearing on the face of a health plan's network contracts.  Thus, plans would not need to look beyond those contracts in an effort to link contracted rates to providers' subsequently submitted claims for reimbursement for particular services.  As the Departments explained, "the rate negotiated under a contract constitutes a . . . contracted rate regardless of the number of claims paid at that contracted rate."  86 Fed. Reg. at 36,889.

That straightforward approach is consistent with the ordinary practice in the insurance market, where contracted rates are generally negotiated prospectively, with a provider and a plan typically agreeing in advance to the prices that will be paid by the

plan for various items and services that might be furnished during a specified period of time. *See City of Dallas v. FCC*, 118 F.3d 393, 395 (5th Cir. 1997) (recognizing that "industry practice" is a "prime source[]" for determining Congress's intent in using particular statutory language). At the time the contracts are negotiated, neither a provider nor a plan can know for certain how many times a particular service will be performed, or a particular contracted rate paid, but they agree that, any time that service is performed under the contract, the contracted rate will be paid. A provider and a plan may agree to a rate for a service the provider does not anticipate performing but nonetheless ends up doing so several times over the course of the contract. Likewise, a provider may negotiate a rate for a given service in the hope or expectation of performing that service frequently, yet may ultimately do so rarely or never. In both cases, the provider would be paid based on the rate recognized in the contract.

Accordingly, the Act does not impose any minimum number of times a service must be performed under a contract for the rates agreed to in that contract to be considered the "contracted rates." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). By basing the QPA calculation on the median of the contracted rates recognized under the plan or coverage, Congress designed a sensible and administrable mechanism for calculating the QPA that can be based entirely on information contained within the four corners of the contracts themselves. *See id.* (contracted rates "determined with respect to all such plans of such sponsor or all such coverage offered by such issuer"). That

20

understanding of the statutory language is underscored by the fact that the statute directs that the QPA be based not on rates paid over a specified period but rather the contracted rates recognized at a particular date in time, January 31, 2019.  *See id.*  That Congress chose a single date for calculating the QPA demonstrates that it intended to take a snapshot of the contracts as they existed on that date to calculate the QPA for future use (adjusted for inflation).

The district court nonetheless concluded that the QPA calculation must exclude any contracted rates for services that a provider has not actually performed. Under that interpretation, health plans must look beyond their contracts, potentially digging through troves of data to determine whether a provider had performed a given service or would do so in the future.  The court believed this conclusion was compelled by the statute's direction that the QPA should be based on rates for services "*provided* by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished."  42 U.S.C. § 300gg-111(a)(3)(E)(i) (emphasis added).  But as the panel recognized, that statutory language supports the methodology adopted by the Departments.  "[T]he plain meaning of 'provide'" includes to "'make available.'"  Op. 10 (quoting *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 476 (5th Cir. 2020) (en banc), in turn relying on dictionary definition of "provide").  The Act therefore "requires only that a given service be *available*" at a specified rate, as reflected within the four corners of a plan's pre-negotiated plan contract. *Id.* (emphasis added) (quotation marks omitted).  There

is no basis to conclude that in using the term "provided," Congress instead intended to require health plans to somehow determine which services "each provider might perform sometime in the future," Op. 11, without any statutory direction as to what that time period may be, and without any statutory guidance as to how plans should determine whether to exclude a particular rate even though it reflects the amount a provider agreed to accept.

Congress could have written the statute differently—it could have required, for example, that the QPA be based on services that "have been performed" or rates that "have been paid" over the course of a given period of time. But Congress instead chose to focus on the "contracted rates" that the parties have agreed in advance will apply to an "item or service that is provided" under the terms of the contracts as those contracts existed on a specific date, January 31, 2019. 42 U.S.C. § 300gg-111(a)(3)(E)(i). As discussed above, the inclusion of that specific date further belies the interpretation that Congress intended to require a given provider to have performed a specific service at some statutorily undefined point before or after January 31, 2019, rather than look to the four corners of the contracts as they existed on that date.

To the extent the district court further grounded its interpretation in a policy concern that a provider might agree to an artificially low contracted rate for an out-of-specialty service that the provider did not expect to perform, *see* ROA.13208, both the Act and the Departments' implementation of it address that concern separately. As

the statute makes clear, when calculating QPAs, health plans must use contracted rates for providers in the same or similar specialty. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i).[6] Thus, if a health plan incorporates rates for dermatological services into its contracts with anesthesiologists (who may agree to below-market rates because they never expect to perform those services), the health plan cannot include these rates when calculating its QPA for a dermatology procedure provided by dermatologists (who are not in the same or similar specialty as anesthesiologists and who have every incentive to negotiate for higher compensation for the applicable service). So when an out-of-network dermatologist performs a dermatology procedure covered by the Act, the applicable QPA will be based on the rates that dermatologists had negotiated with the plan for that procedure, without regard to whatever rates (if any) providers in other specialties may have agreed to accept for that dermatology procedure. And, as a further safeguard against artificially depressed

---

[6] In implementing this provision, the Departments initially allowed health plans to treat providers as falling within the "same or similar specialty" if their "median contracted rates for a service code are not materially different," even if those providers might in fact have "different specialties." *FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55*, at 17 (Aug. 19, 2022) (Aug. FAQs) (ROA.414); *see also* 45 C.F.R. § 149.140(a)(12) (allowing health plans to determine whether a provider is in the "same or similar specialty" for purposes of the QPA in a manner "consistent with the plan's or issuer's usual business practice"). Under that approach, plans were essentially permitted to take a shortcut for the sake of administrative convenience in a circumstance where it seemed unlikely that the resulting QPA calculation would be meaningfully affected. The district court held that this approach was inconsistent with the Act and that the error was not harmless, ROA.13209-11, and the Departments do not challenge that holding here (except to the extent the district court ordered universal vacatur as a remedy, *see infra* Part II).

QPAs, the Departments clarified that a zero-dollar figure included as a placeholder in a fee schedule for a service a provider is not actually equipped to furnish does not represent a contracted rate that could be included in the QPA calculation. *See* Aug. FAQs at 17 n.29 (ROA.414); Op. 11 n.10.[7]

The Departments' methodology is thus entirely consistent with the statutory text, and there is no basis for adopting an atextual and unworkable limitation on the Act's terms.

## B.    The rule permissibly directs health plans to exclude bonus and incentive payments from the QPA calculation.

The Departments also appropriately addressed how plans should account for bonus and incentive payments. The Departments determined that, in calculating the QPA, plans should "[e]xclude risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 45 C.F.R. § 149.140(b)(2)(iv). The Departments explained that excluding these payments and payment adjustments from the QPA is "consistent with how cost sharing is typically calculated for in-network items and services." 86 Fed. Reg. at 36,894. The "cost-sharing amount is customarily determined at or near the time an item or service is furnished, and is not subject to adjustment based on changes in the amount ultimately paid to the provider or facility

---

[7] The district court vacated this portion of the cited guidance document on other grounds, *see* ROA.13240; *see also supra* n.6, but nothing in its decision calls into question the Departments' instruction—consistent with concerns voiced by plaintiffs and other providers—regarding the appropriate treatment of "$0" placeholder rates.

24

as a result of any incentives or reconciliation process." *Id.* The Departments reasonably aligned their methodology with the manner in which cost-sharing amounts are determined generally, particularly given the QPA's determinative role in setting patient cost-sharing responsibilities under the Act. *Id.*

As the rule also explained, bonus and incentive payments are rarely tied to specific contracted rates for particular items and services; they are more often paid in the context of a non-fee-for-service payment model as an annual lump sum, based on the overall performance of a provider or a facility over time. 86 Fed. Reg. at 36,893-94. It is unclear how it would be possible to calculate the impact of bonus and incentive payments on the rate for a particular item or service when the provider and plan have agreed to rates established on a fee-for-service model. Fortunately, the Act does not require this unworkable exercise, and the Departments reasonably applied the discretion the Act gave them in excluding those payments from the QPA methodology.

Moreover, as the rule notes, "many types of alternative reimbursement models exist that are not standard fee-for-service arrangements." 86 Fed. Reg. at 36,893. The Act expressly directs the Departments to establish a QPA methodology that "take[s] into account payments . . . that are not on a fee-for-service basis" and provides that the Departments "*may* account for relevant payment adjustments that take into account quality or facility type . . . that are otherwise taken into account for purposes of determining payment amounts with respect to participating facilities." 42 U.S.C.

§ 300gg-111(a)(2)(B) (emphasis added).  The Departments exercised this expressly delegated authority to adopt an approach—which looks to a health plan's underlying fee schedule rate or, if there is no such rate, the "derived amount" that the plan treats as the rate in other contexts such as internal accounting —again excluding retrospective adjustments that cannot naturally be tied to a particular service.  86 Fed. Reg. at 36,893-94; *see* Op. 15.

The reasonableness of this approach is bolstered, moreover, by the Departments' recognition that the QPA may be used not just to determine cost-sharing but as a data point in the open negotiation period between plans and providers or as a factor in any subsequent arbitration.  The rule thus requires that a plan must, upon a provider's request, inform the provider whether the QPA includes contracted rates not set on a fee-for-service basis for the service at issue and whether the health plan's rates include incentive-based or retrospective payments or payment adjustments that were excluded in calculating the QPA.  *See* 45 C.F.R. § 149.140(d)(2)(iv); 86 Fed. Reg. at 36,899.  That information can then inform the negotiation and arbitration process that determines the amount a provider may ultimately receive from a health plan.  Providing for the consideration of incentive payments in that context is consistent with the scheme Congress established.  Indeed, the statute specifically directs arbitrators to consider, in addition to the QPA, "quality and outcomes measurements" of a given provider or facility among the "[a]dditional circumstances" that may be relevant.  *See* 42 U.S.C. § 300gg-111(c)(5)(C)(ii).

26

In holding otherwise, the district court relied on language in the Act's definition of the QPA referring to the median of "contracted rates recognized . . . as the total maximum payment (including the cost-sharing amount [paid by the patient] . . . and the amount to be paid by the plan or issuer, respectively) . . . for the same or a similar item or service." 42 U.S.C. § 300gg-111(a)(3)(E)(i). The district court believed that the statute's reference to "the total maximum payment" requires the QPA to include any bonuses that a provider might be able to obtain and that the Departments could not exclude retrospective adjustments that could raise the provider's compensation— even though the Departments also excluded penalties that could lower the provider's compensation.

But for the reasons just explained, this analysis is contrary to both statutory text and the realities of the health care market. In context, the "total maximum payment" is the highest value the plan has contracted to pay for a given "item or service," including both the cost sharing amount to be paid by the patient and the amount to be paid by the plan. 42 U.S.C. § 300gg-111(a)(3)(E)(i). The statute does not require the Departments to devise a methodology for attributing some additional portion of a separate payment (often made on a lump-sum basis) to a specific item or service. The district court's constrained interpretation ignores the discretion that Congress explicitly granted to the Departments to apply their expertise and establish a workable methodology in light of industry practice. *See City of Dallas*, 118 F.3d at 395.

27

**C.    The rule permissibly directs health plans to exclude one-off, case-specific agreements from the QPA calculation.**

The district court committed similar error in accepting the air ambulance plaintiffs' argument that the QPA calculation must include one-off, case-specific payments not made under a plan's generally applicable terms, as the panel correctly recognized.  *See* Op. 11-15; *see also Association of Air Med. Servs. v. HHS*, No. 21-cv-3031, 2023 WL 5094881, at *3-5 (D.D.C. Aug. 9, 2023) (rejecting an identical challenge).  Indeed, plaintiffs' rehearing petition did not seek further review of the panel's resolution of this issue.  *See* Op. 11-15; Pet. 4 ("Issues for *En Banc* Consideration" (formatting altered)); Pet. 11-16.

If plaintiffs now seek to persuade this Court to affirm the district court's ruling on this issue, which is currently operative due to the vacatur of the panel opinion, the Court should reject that request.  In carrying out Congress's express directive to establish a QPA methodology consistent with this statutory definition, the Departments issued a regulation stating that a "[c]ontracted rate" for purposes of the QPA does not include a payment set forth in "a single case agreement, letter of agreement, or other similar arrangement between a provider . . . and a plan or issuer" that is "used to supplement the network of the plan or coverage for a specific participant, beneficiary, or enrollee in unique circumstances."  45 C.F.R. § 149.140(a)(1).

28

As the rule's preamble explains, the regulatory definition of "contracted rate" ensures that the QPA is based only on "the rate negotiated with providers and facilities that are contracted to participate in any of the networks of the plan or issuer under generally applicable terms of the plan or coverage." 86 Fed. Reg. at 36,889. That does not encompass case-specific agreements between a health plan and a provider not otherwise generally contracted to participate in any of the plan's networks, such as "an ad hoc arrangement" with a nonparticipating provider "to supplement the network of the plan or coverage for a specific participant, beneficiary, or enrollee in unique circumstances." *Id.*

The Departments' determination that such agreements should not be included in the QPA calculation is consistent with the text and purpose of the Act. The statute specifies that the calculation be based on the "contracted rates" recognized by a health plan "under such plans or coverage" offered within an insurance market. 42 U.S.C. § 300gg-111(a)(3)(E)(i). As the Departments reasoned, that language encompasses rates negotiated in advance with providers contracted to participate in an insurer's network under generally applicable terms. That understanding fits neatly with the dictionary definition of a "rate" as a "a charge, payment, or price fixed according to a ratio, scale, or standard." *Rate*, Webster's Third New International Dictionary 1884 (2002) (Webster's Third); *see also Rate*, Merriam-Webster's Collegiate Dictionary 1032 (11th ed. 2005) (same); *Rate*, Oxford English Dictionary, https://www.oed.com/dictionary/rate_n1?tab=meaning_and_use#26707259 (last

visited July 21, 2025) (similar).  A one-off agreement to pay for a given service cannot similarly be said to establish a recognized rate in this way.

Moreover, as the panel explained, "[e]ven assuming arguendo that case-specific agreements constitute 'contracted rates,' as Plaintiffs contend, that does not end the matter."  Op. 12.  The Act specifies that a "contracted rate[]" should only be included in the QPA calculation if the rate is "recognized" "under" an insurer's plan or coverage.  42 U.S.C. § 300gg-111(a)(3)(E)(i).  And payment arises "under" a plan or coverage if it is "subject or pursuant to," "governed by," or owed "by reason of the authority of" the terms of the plan or policy.  *See Ardestani v. INS*, 502 U.S. 129, 135 (1991) (alteration and quotation marks omitted) (defining "under" in an analogous context); *see also, e.g., Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 530-31 (2013); *Under*, Webster's Third 2487.

A payment made pursuant to a case-specific ad hoc agreement regarding services provided to a particular patient, by contrast, is not dictated by the generally applicable terms of a plan or policy.  *See Association of Air Med. Servs.*, 2023 WL 5094881, at *3-5.  As the panel explained, "[t]he most natural reading" of the Act's definition of the QPA "is that it excludes rates *not* previously agreed to under a plan"—that is, the statute is most naturally read to preclude plaintiffs' interpretation and to instead require the interpretation set forth in the regulation.  Op. 12-13; *see also Association of Air Med. Servs.*, 2023 WL 5094881, at *3 (reasoning that "[t]he plain text of the No Surprises Act itself *requires* the [Departments] to exclude single case

30

agreements from the QPA calculations" (emphasis added)). "[A]t the very least," there is no basis for concluding that a regulatory provision instructing plans to omit these ad hoc, one-off payment amounts "*conflicts* with the Act." Op. 13. If a payment were in fact "recognized" "under" the health plan, that would mean the provider is in-network such that no case-specific agreement would be necessary. But the reason why plans enter into the case-specific agreements addressed in this regulation is that they have made a business decision that it is a better practice to spare their members, at least some of the time, from the cost of an out-of-network bill, and to pay providers at times exceedingly high rates for out-of-network services, even in the absence of a contractual arrangement providing a legal compulsion to do so. *See* Zack Cooper et al., *Surprise! Out-of-Network Billing for Emergency Care in the United States*, 128 J. Pol. Econ. 3626, 3633 (2020) (ROA.1677).

For similar reasons, the regulation also "most closely aligns with the statutory intent of ensuring that the QPA reflects market rates under typical contract negotiations." 86 Fed. Reg. at 36,889. The basic function served by the QPA—as even the district court acknowledged, *see, e.g.*, ROA.13197—is to approximate the rate a provider would have received for a given service had the provider been in-network. Basing the QPA on the plan's pre-negotiated rates of general applicability does just that. By contrast, prior to the Act, ad hoc, case-specific agreements would often be entered into after a service had been provided, and a patient was facing a surprise medical bill that could be financially devastating to the patient and reputationally

harmful to the health plan. *See* H.R. Rep. No. 116-615, pt. 1 at 52-53 (ROA.933-34) (discussing a "market failure" in air ambulance services as prompting Congress to take action). To incorporate into the QPA the rates that health plans agreed to pay under those circumstances would carry forward precisely the market distortion that Congress sought to eliminate through the Act, resulting in QPAs based not on market rates but rather on rates that may be inflated based on the exercise of leverage by air ambulance providers in the past.

As to this provision too, the Departments' interpretation makes sense of the fact that the Act directs health plans to look at rates recognized on a single specified date: January 31, 2019. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). That language naturally encompasses contracted rates a health plan may have with providers offering services under a plan's generally applicable terms—it does not encompass a rate for a one-off service provided at some point in the past, nor could Congress sensibly have intended to require plans to include in their QPA calculations just the case-specific agreements that happened to be in place on that particular day.

The district court concluded that case-specific agreements for air ambulance services are contracted rates recognized under an insurer's plans or coverage because they are "contracts between insurers and providers under a plan or policy providing coverage for air ambulance transports." ROA.13229. But that reasoning fails to comport with the text of the Act for the two independent reasons identified above. First, the fact that such an agreement may represent a contract or that a plan may

32

include benefits for air ambulance transports does not mean that a one-off agreement to pay an out-of-network provider for such services establishes a "contracted rate[]" for the service. Second, even if these agreements did reflect "contracted rates," they would not be rates "under" the plan or policy, where the payment is not fixed according to that policy or otherwise made pursuant to it but rather set only on an ad hoc basis, in some cases after the service has already been provided. The district court, meanwhile, provided no basis to square its interpretation of the Act with either the requirement that health plans calculate the QPA based on the rates recognized on a specific date or the Act's purpose to address the market distortion caused by providers using the leverage of balance billing to force health plans to agree to higher payment amounts after the fact. Relying on this reasoning, the district court universally vacated the challenged provision, even though this had the practical effect of nullifying another district court's rejection of an identical challenge. *See Association of Air Med. Servs.*, 2023 WL 5094881, at *3-5; *see also infra* pp. 44-45.

## II.    The district court erred in granting universal relief.

The district court independently erred in ordering universal vacatur of each of the provisions plaintiffs had successfully challenged. ROA.13234-37. The district court understood vacatur to be "'the default rule in this Circuit'" for APA cases, and granted that extraordinary relief based on its conclusion that the relevant provisions were unlawful and its belief that vacatur would not be "unduly disruptive." ROA.13235-26 (quoting *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc)).

That analysis is incompatible with traditional limits on courts' equitable jurisdiction, as the Supreme Court's recent decision in *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025), confirms. Nothing in the APA authorizes a departure from those traditional equitable principles. The en banc Court should clarify that the APA does not authorize vacatur, or, at a minimum, that such relief is subject to traditional equitable principles—including the principle that relief should ordinarily be party-specific, not universal by "default." ROA.13235 (quotation marks omitted).

### A. The APA does not authorize courts to depart from traditional principles of equity jurisdiction, which limit courts to party-specific relief.

As the Supreme Court recently recognized, "[t]raditionally, courts issued injunctions prohibiting executive officials from enforcing a challenged law or policy only against the plaintiffs in the lawsuit." *CASA*, 2025 WL 1773631, at *4. Thus, in *CASA*, the Supreme Court held that the "more recent development" of "universal injunctions"—through which district courts "assert[] the power to prohibit enforcement of a law or policy against *anyone*"—"lacks a historical pedigree" and "falls outside the bounds of a federal court's equitable authority under the Judiciary Act" of 1789. *Id.* at *4, *8 (citing *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999)). A court sitting in equity must tailor relief to "'be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*.'" *Id.* at *11 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). That principle also "ensures that federal courts respect the limits of their Article III

authority," *United States v. Texas*, 599 U.S. 670, 693-94 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment), which likewise requires that "a plaintiff's remedy" "be limited to the inadequacy that produced his injury," *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (alterations and quotation marks omitted).

Despite these principles, in cases under the APA, district courts in this Circuit have routinely granted universal vacatur of challenged agency action after finding that action unlawful—granting universal relief intended to render the challenged action "inoperable with respect to any person anywhere." *See Texas*, 599 U.S. at 695 (Gorsuch, J., concurring). Indeed, district courts have understood this to be the "default" remedy under the APA that follows as the "ordinary result" of holding the challenged agency action unlawful. ROA.13235 (quotation marks omitted). But courts "do not lightly assume that Congress has intended to depart from established principles" of equity, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), and ordinarily courts expect that Congress will make "an unequivocal statement of its purpose" if it intends to make "a drastic departure from the traditions of equity practice," *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944); *accord Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) ("When Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity."). Nothing in the APA authorizes courts to depart from traditional equitable principles and grant universal relief as a matter of course.

35

### 1.    The APA does not authorize vacatur.

In APA challenges, as in any other case involving non-monetary relief, federal courts are authorized to award traditional party-centered remedies such as declaratory judgments and, where necessary, appropriately tailored injunctions.  But the APA does not authorize courts to radically depart from those traditional remedies, let alone to do so by default.  *See Texas*, 599 U.S. at 693-703 (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment); *but cf. Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826-43 (2024) (Kavanaugh, J., concurring) (expressing a contrary view).  Under Section 702 of the APA, judicial review is available only to "person[s]" who have "suffer[ed] legal wrong because of agency action, or [been] adversely affected or aggrieved by agency action." 5 U.S.C. § 702.  Aggrieved persons may seek remedies as set forth in the succeeding section, 5 U.S.C. § 703.   Section 703 specifies that where, as here, there is no "special statutory review proceeding" applicable to the matter, the plaintiff may bring "any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." *Id.* § 703; *see also, e.g.*, *Administrative Procedure Act*, S. Doc. No. 79-248, at 36-37 (1946) (referring to Section 703 as governing remedies); 92 Cong. Rec. 2159 (1946) (similar).

"Conspicuously missing from [this list of remedies] is vacatur." *Texas*, 599 U.S. at 698 (Gorsuch, J., concurring).  Instead, Section 703's formulation of remedies makes clear that, rather than itself creating new remedies, the APA looks to pre-

existing remedies available in the "form[s] of legal action" known at the time of the APA's enactment.  As described in the Attorney General's Manual on the APA—"a document whose reasoning [the Supreme Court has] often found persuasive," *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 63 (2004)—the APA "constitute[s] a general restatement of the principles of judicial review embodied in many statutes and judicial decisions."  U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* 93 (1947); *see also* S. Rep. No. 79-752, at 44 (1945); Aditya Bamzai, *The Path of Administrative Law Remedies*, 98 Notre Dame L. Rev. 2037 (2023).  And in the absence of a special review statute, the ordinary method of review before the APA was a suit in equity against a federal official, typically seeking a prohibitory injunction.  *See, e.g., American Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902); *see also* U.S. Dep't of Justice, *Final Report of the Attorney General's Committee on Administrative Procedure* 81 (1941) (noting that "the injunction is the remedy normally used" in nonstatutory suits "for the protection of the individual against illegal official action" but that courts also employed remedies such as "habeas corpus, certiorari, mandamus, [and] prohibition" and could issue "declaratory judgments").

In granting vacatur, the district court invoked § 706(2) of the APA.  ROA.13234.  Many other courts, particularly in the D.C. Circuit, have long done the same.  *See Texas*, 599 U.S. at 701 (Gorsuch, J., concurring).  Those precedents are not probative of § 706(2)'s meaning since venue rules may give the D.C. Circuit's administrative-law precedents nationwide effect in many contexts.  Regardless, they

37

do not meaningfully grapple with § 706(2)'s text, which states that, in certain circumstances, a reviewing court "shall . . . hold unlawful and set aside agency action." 5 U.S.C. § 706(2). As discussed, remedies under the APA are governed by Section 703. Section 706, by contrast, is "titled 'Scope of review,'" and addresses "the court's decisional process" leading up to its judgment, not "the remedies the court may authorize after reaching its judgment on the merits." *Texas*, 599 U.S. at 696 (Gorsuch, J., concurring).

In this context, the APA's direction to a reviewing court to "set aside" unlawful agency action means to disregard that unlawful action—to set it to the side—in resolving the case before the court, in the same way a court would set aside and disregard an unconstitutional statute. It is well settled that courts "have no power per se to review and annul acts of Congress on the ground that they are unconstitutional." *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923); *see also CASA*, 2025 WL 1773631, at *7 (explaining that a court considering declaratory or injunctive relief from the operation of a statute lacks the authority to "'directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs'" (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975))). Instead, judicial review "amounts to little more than the negative power to disregard an unconstitutional enactment." *Mellon*, 262 U.S. at 488. Judicial review of agency rules under Section 706 should function the same way. *See Texas*, 599 U.S. at 695-99

(Gorsuch, J., concurring); *Arizona v. Biden*, 40 F.4th 375, 397 (6th Cir. 2022) (Sutton, C.J., concurring).

This usage also makes sense of the phrase "set aside" in all settings where Section 706(2) applies. The APA expressly permits, for example, challenges to agency action to be raised in "actions for declaratory judgment[]" or "habeas corpus" actions, 5 U.S.C. § 703, but "no one thinks a court adjudicating a declaratory action or a habeas petition 'vacates' agency action along the way," *Texas*, 599 U.S. at 699 (Gorsuch, J., concurring). The same principle holds in judicial review of agency adjudications, which are party-specific actions that may rely on an agency rule, but that would not provide any occasion for a reviewing court to vacate the underlying rule. *See Nebraska Dep't of Health & Human Servs. v. Department of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006); *Baeder v. Heckler*, 768 F.2d 547, 553 (3d Cir. 1985). And the same is true for the APA's instruction that a court should disregard unfounded agency "findings" or "conclusions"; it makes little sense to say that a court "vacates" those findings or conclusions as opposed to simply disregarding them for purposes of resolving the case before it. *Texas*, 599 U.S. at 697-98 (Gorsuch, J., concurring).

> **2.    Even if vacatur is an available remedy under the APA, it is subject to traditional equitable principles.**

Even if vacatur were a permissible remedy under the APA, it is an equitable remedy subject to ordinary equitable principles. Nothing about the term "set aside"

suggests that Congress intended to "overthrow the 'bedrock practice of case-by-case judgments with respect to the parties in each case'" and authorize sweeping relief as a matter of course. *See Texas*, 599 U.S. at 695, 702 (2023) (Gorsuch, J., concurring) (quoting *Arizona*, 40 F.4th at 396 (Sutton, C.J., concurring)). To the contrary, the APA expressly states that "[n]othing" in the statute "affects . . . the power or duty of the court to . . . deny relief on any . . . equitable ground." 5 U.S.C. § 702(1). Courts should accordingly consider whether declaratory or injunctive relief in lieu of vacatur is appropriate and, if not, whether any vacatur remedy should be tailored rather than universal.

Three ordinary equitable principles are particularly relevant in considering the appropriate relief in an APA challenge to a rule. *First*, remedies "ordinarily operate with respect to specific parties," rather than "on legal rules in the abstract," *California v. Texas*, 593 U.S. 659, 672 (2021) (quotation marks omitted). Equitable remedies are no exception. As *CASA* confirms, equitable relief should "'be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*.'" *CASA*, 2025 WL 1773631, at *11 (quoting *Califano*, 442 U.S. at 702). The APA does not compel any different result. As noted above, the APA expressly preserves a court's "power or duty" to "deny relief" on any equitable ground. 5 U.S.C. § 702(1). And even if "set[ting] aside agency action" under Section 706(2) of the APA meant vacating it, "agency action" is in turn defined to include "the whole *or a part* of an agency rule," *id.* § 551(13) (emphasis added), which readily encompasses relief directed

40

to only certain applications of the rule at issue, including those applications that affect the plaintiffs to the lawsuit.

*Second*, in fashioning equitable relief, courts ordinarily weigh equitable considerations that may make any particular relief inappropriate. This includes the power to withhold relief altogether even after success on the merits has been conclusively shown. *See, e.g., Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2009) ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."); *Romero-Barcelo*, 456 U.S. at 313 ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."). There is thus no obligation to resort to the remedy of vacatur where other remedies (such as a declaratory judgment or a tailored, party-specific injunction) would provide adequate relief to the plaintiff, assuming the plaintiff establishes its entitlement to such relief.

*Third*, the party seeking equitable relief bears the burden of demonstrating that several factors are satisfied. Under "well-established principles of equity," a party seeking a permanent injunction must affirmatively "demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved" by the relief requested. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Like injunctive

41

relief, vacatur should be treated as "an extraordinary remedy that should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012) (quotation marks omitted).

For these reasons, even if a court wishes to issue an order styled as a "vacatur," that order should be evaluated in accordance with traditional equitable principles. Indeed, in other circumstances, courts recognize that the scope of a vacatur is subject to equitable considerations. For example, the general practice is to vacate a district court judgment only as to the party or parties that appeal, not as to non-appealing parties (though that rule is subject to relaxation based on equitable considerations). *See, e.g.*, *Tompkins v. Cyr*, 202 F.3d 770, 786-87 (5th Cir. 2000) (vacating erroneous damages calculation only as to "the losing defendants who have appealed" and declining to "vacate the damage award against the non-appealing defendants"); *In re Taylor*, 655 F.3d 274, 287 (3d Cir. 2011); *United States v. Lumbermens Mut. Cas. Co.*, 917 F.2d 654, 662 (1st Cir. 1990); *see also* 15A Wright & Miller, Federal Practice & Procedure § 3904 (3d ed.), Westlaw (database updated May 21, 2025) (describing the question as whether "exceptional circumstances" justify "relief in favor of a nonappealing party").

Construing the APA to permit, but not require, universal vacatur would be consistent with this Court's recognition of the availability of so-called "[r]emand without vacatur." *Chamber of Com. of the U.S. v. SEC*, 88 F.4th 1115, 1118 (5th Cir.

2023); *see, e.g., Central & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000).

For instance, in *Cargill*, a plurality of the en banc Court concluded without

contradiction from any other member of the Court that the district court could

consider on remand "a more limited remedy" than universal vacatur of the final rule

and instructed the district court to "determine what remedy—injunctive, declarative,

or otherwise—is appropriate to effectuate [the] judgment." 57 F.4th at 472. To the

extent this Court has previously indicated that an agency defending a challenge to an

APA rule must justify a "depart[ure]" from a "default rule" of universal vacatur, and

to the extent this Court has countenanced reflexive universal vacatur by stating that

such departures are warranted only in "rare cases," *Chamber of Com.*, 88 F.4th at 1118

(quotation marks omitted), the Court should revisit the issue and recognize that

ordinary principles of equity demand a different inquiry.

> **B.    This case illustrates the numerous constitutional, legal, and practical problems with awarding universal relief under the APA.**

**1.** Universal relief in APA lawsuits creates a variety of constitutional, legal, and

practical problems. In addition to the problems already discussed, regardless of

whether a party seeks to proceed "by way of injunction or vacatur," universal relief

"strains our separation of powers" by "allowing individual judges to act more like a

legislature by decreeing the rights and duties of people nationwide." *Texas*, 599 U.S.

at 703 (Gorsuch, J., concurring). Universal relief circumvents the procedural rules

governing joinder and class actions. *See id.; cf. CASA*, 2025 WL 1773631, at *9-10

(explaining that the historical "bill of peace" has "evolved into the modern class action" and that "Rule 23's limits on class actions underscore a significant problem with universal injunctions").  Universal relief encourages forum shopping by empowering a single district judge to nullify the decisions of other courts upholding the challenged agency action. *See Texas*, 599 U.S. at 703 (Gorsuch, J., concurring).  And universal relief operates asymmetrically: "The effect" is "to prevent the National Government from enforcing a rule . . . without (potentially) having to prevail in all 94 district courts and all 12 regional courts of appeals." *Arizona*, 40 F.4th at 396 (Sutton, C.J., concurring).  This "short-circuit[s] the decisionmaking benefits of having different courts weigh in on vexing questions of law and allowing the best ideas to percolate to the top." *Id.*; *see also Texas*, 599 U.S. at 694 (Gorsuch, J., concurring) (stating that universal relief "deprive[s] other lower courts of the chance to weigh in on important questions before [the Supreme] Court has to decide them").

This case vividly illustrates those problems.  Well before this case was filed, a trade association representing more than 93% of the U.S. air ambulance industry filed a case raising several identical claims in federal district court in Washington, D.C.  *See Association of Air Med. Servs.*, 2023 WL 5094881, at *1.  After the D.C. district court conducted a hearing on fully briefed cross-motions for summary judgment, members and close affiliates of the trade association filed one of the underlying complaints at

issue here.[8]  The Chief Financial Officer for one of the plaintiffs here had even submitted a declaration in the D.C. case.  *See* Declaration of David Portugal, *Association of Air Med. Servs. v. HHS*, No. 1:21-cv-3031 (D.D.C. Nov. 16, 2021), Dkt. No. 1-7.  The D.C. district court upheld each of the challenged regulations.  *Association of Air Med. Servs.*, 2023 WL 5094881, at *3-7.  In this case, however, the district court deemed that decision "unpersuasive" as to one of the overlapping issues and universally vacated the regulation.  ROA.13230, 13234-40.  Regardless of which of these courts reached the correct result on the merits of this issue, *see supra* Part I.C; Op. 11-14, the district court's remedy effectively countermanded the decision of the D.C. district court.  In effect, the district court claimed a veto power over all other federal judges in the country.  And of course, by the same logic, every district judge in the country would have the same authority to override not just the Executive Branch but also their fellow judges spread throughout the 94 district courts and 12 regional courts of appeals.  That potent remedy is not available under the APA, and even if it were, "a district court should 'think twice—and perhaps twice again—before granting' such sweeping relief."  *Texas*, 599 U.S. at 702 (Gorsuch, J, concurring) (quoting *Arizona*, 40 F.4th at 396 (Sutton, C.J., concurring)).

---

[8] There are four air ambulance plaintiffs in this lawsuit.  Two of them—Air Methods Corporation and East Texas Air One, L.L.C.—are members of the trade association that brought the D.C. lawsuit.  ROA.13115.  The other two are close affiliates: Rocky Mountain Holdings is a wholly owned subsidiary of Air Methods Corporation, and LifeNet, Inc. relies on a contract with Air Methods Corporation as the basis for its financial stake in this litigation.  ROA.13368, 13398-400.

**2.** The district court's decision also underscores the problems with courts treating universal vacatur as the "default" approach, rather than an extraordinary remedy that should be carefully considered. The district court made no finding that plaintiffs had shown that universal vacatur was necessary to provide them relief or that it was consistent with more general equitable principles. There are strong reasons why no such findings would be warranted as to the numerous regulatory provisions and statements in sub-regulatory guidance that the district court vacated. Consider, for example, the challenge to the Departments' regulation implementing the Act's 30-day deadline for a health plan to send a provider either an initial payment or notice of denial of payment "after the bill for such services is transmitted" by the provider. 42 U.S.C. § 300gg-112(a)(3)(A).[9] Four specific parties—the air ambulance provider plaintiffs—challenged the Departments' implementing regulation, which stated, based on the Departments' interpretation of what it means to "transmit[]" a "bill" under the statute, that the 30-day clock starts once the plan "receives the information necessary to decide a claim for payment for the services." 45 C.F.R. § 149.130(b)(4)(i); *see*

---

[9] Throughout this appeal, the Departments have challenged the district court's remedy of universal vacatur in its entirety, including as to issues for which the Departments elected not to seek the Court's review on the merits. *See* Gov't Panel Br. 18 n.8, 47-50; Joint Motion to Reset En Banc Briefing Schedule at 2 (July 9, 2025); *cf. CASA*, 2025 WL 1773631, at *5 (addressing an issue "of remedy" when the government did "not raise," and the Court therefore did "not address," the underlying merits). The panel opinion appears to have overlooked this aspect of the Departments' challenge, as it only addressed the district court's remedy as it related to the deadline provision. *See* Op. 21-22.

ROA.13223 (reflecting that this challenge was raised only by the "Air Ambulance Plaintiffs"). Even though only four specific providers had challenged the regulation, the district court directed that the regulation be "vacated" universally. ROA.13239.

That remedy goes well beyond "the complete-relief principle," under which injunctive relief can extend no further than providing "complete relief *to the plaintiffs before the court.*" *CASA*, 2025 WL 1773631, at *11. Complete relief for each of the air ambulance plaintiffs would mean that, when one of these four providers submits a document to a health plan purporting to be a bill for services covered by the Act, the health plan would disregard the regulatory definition of what it means to "transmit[]" a "bill" and would instead rely solely on the statutory text. Yet the district court did not consider tailoring its remedy to these four providers, even though the complete-relief principle "operates as a ceiling," not a floor. *Id.* at *16 (Thomas, J., joined by Gorsuch, J., concurring); *see id.* at *12 (majority opinion) ("After all, to say that a court *can* award complete relief is not to say that it *should* do so. Complete relief is not a guarantee—it is the maximum a court can provide."). And the panel affirmed the district court's universal remedy on the theory that courts should not countenance "one deadline for Plaintiffs and another (unlawful) deadline for all other entities." Op. 21. But the potential application of a duly promulgated regulation to other air ambulance providers who did not participate in this lawsuit is a feature, not a bug, of the Constitution's separation of powers. Federal courts resolve cases or controversies; they exceed their authority when they enter an "award of relief to

47

nonparties." *CASA*, 2025 WL 1773631, at *10. Once a federal court deems a rule unlawful in the context of a specific case or controversy, it is up to the Executive Branch to determine how to proceed in circumstances where the rule does not affect the plaintiffs to the litigation.

The district court likewise erred in its remedial analysis of the other challenged provisions. For example, in considering whether to vacate the challenged aspects of the QPA methodology, the district court should have applied the complete-relief principle and the traditional four-factor test for equitable relief. Under those principles, it would be highly relevant that universal vacatur of the regulations would not only provide relief to numerous nonparties but would also leave health plans scrambling to engage in costly new rounds of calculations. That consequence would follow for every health plan across the country even though the costs of calculating the QPA were supposed to be "one-time" costs absent further rulemaking changing the methodology, 86 Fed. Reg. at 36,927-28 (estimating costs associated with calculating QPAs)—and even though Congress specifically directed the Departments to establish the operative methodology six months before the statute went into effect in recognition of the resources and costs necessary to calculate QPAs before they could be used. It would likewise be relevant under a traditional equitable analysis that these costs could ultimately be passed along to insured consumers in the form of higher premiums, frustrating Congress's goal of protecting patients and lowering health care costs. *See* H.R. Rep. No. 116-615, pt. 1, at 55, 57 n.48 (ROA.936, 938).

The district court has not adequately considered whether plaintiffs demonstrated that the burdensome relief they sought is necessary to remedy their specific asserted injuries and comports with the other requirements for equitable relief. Under traditional equitable principles, a declaratory judgment may well have sufficed. If the district court were to conclude otherwise, it could consider an alternative such as a party-specific injunction. And if vacatur were an available remedy, nothing would preclude the district court from relying on similar equitable considerations to either decline to award that remedy (whether under the label of "remand without vacatur" or otherwise) or to craft an appropriately limited party-specific vacatur.

While a proper remedial analysis would not support the district court's judgment, the Departments do not ask this Court to perform the necessary provision-by-provision analysis. Instead, the Court should resolve the merits issues addressed above in Part I, clarify the applicable legal principles regarding remedial relief in APA cases as set forth here, and remand to the district court for application of those remedial principles in the first instance. Both the district court and the panel analyzed the deadline regulation in a manner inconsistent with the complete-relief principle for the reasons discussed. No court has yet applied the appropriate legal standards in determining what remedy, if any, to award plaintiffs in connection with the three QPA calculation issues whose merits are discussed above: the district court reflexively vacated every provision for which it ruled in plaintiffs' favor on the merits, and the

49

panel had no occasion to consider a remedy for these issues because it upheld the

provisions on the merits. And the district court erroneously ordered universal vacatur

of a range of additional regulatory provisions and statements in sub-regulatory

guidance whose merits are not before this Court. In the circumstances of this case,

once the governing legal standards are clarified, the district court should apply them in

the first instance.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

JAY R. COMBS
  *Acting United States Attorney*

COURTNEY L. DIXON

 *s/ Kevin B. Soter*
KEVIN B. SOTER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7222*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *kevin.b.soter@usdoj.gov*

July 2025

50

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Kevin B. Soter*
Kevin B. Soter

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,934 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Kevin B. Soter*
Kevin B. Soter