**No. 23-40605**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Texas Medical Association; Tyler Regional Hospital, LLC; Doctor Adam Corley,
Plaintiffs – Appellees,

v.

United States Department of Health and Human Services; Office of Personnel
Management; United States Department of Labor; United States Department of
Treasury; Robert F. Kennedy, Jr., Secretary, U.S. Department of Health and
Human Services, in his official capacity; Scott Kupor, in his official capacity as the
Director of the Office of Personnel Management; Scott Bessent, Secretary, U.S.
Department of Treasury, in his official capacity; Lori Chavez-DeRemer, Secretary,
U.S. Department of Labor, in her official capacity,
Defendants – Appellants.

LifeNet, Inc.; Air Methods Corp.; Rocky Mountain Holdings, LLC; East Texas Air
One, LLC,
Plaintiffs – Appellees,

v.

United States Department of Health and Human Services; Office of Personnel
Management; United States Department of Labor; United States Department of
Treasury; Robert F. Kennedy, Jr., Secretary, U.S. Department of Health and
Human Services, in his official capacity; Scott Kupor, in his official capacity as the
Director of the Office of Personnel Management; Scott Bessent, Secretary, U.S.
Department of Treasury, in his official capacity; Lori Chavez-DeRemer, Secretary,
U.S. Department of Labor, in her official capacity,
Defendants – Appellants.

*On Appeal from the United States District Court for the Eastern District of Texas
District Court No. 6:22-CV-450-JDK*

**BRIEF OF AMERICA'S HEALTH INSURANCE PLANS
AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS**

Michael Spector
Thomas M. Palumbo
AMERICA'S HEALTH INSURANCE PLANS
601 Pennsylvania Ave. NW
South Building, Suite 500
Washington, DC 20004

Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 300
Washington, DC 20001
Tel.: 202-868-6915
Fax: 202-609-8410
Email: hhunt@deutschhunt.com

*Counsel for America's Health Insurance Plans*

# CERTIFICATE OF INTERESTED PARTIES

*Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 23-40605

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Texas Medical Association
Tyler Regional Hospital, LLC
East Texas Health System, LLC
AHS East Texas Health System, LLC
University of Texas Health Sciences
   Center at Tyler
Dr. Adam Corley

*TMA Plaintiffs – Appellees and Their Affiliated Entities*

Cody Matthew Akins
Jaime L.M. Jones
Penny Packer Reid
Jillian Stonecipher
(Sidley Austin LLP)

*Counsel for TMA Plaintiffs – Appellees*

LifeNet, Inc.
Air Methods Corp.
Rocky Mountain Holdings, LLC
East Texas Air One, LLC
AHS East Texas Health System, LLC

*Air Ambulance Plaintiffs – Appellees and Their Affiliated Entities*

Steven Shepard
Stephen Lee Shackelford, Jr.
James Craig Smyser
(Susman Godfrey LLP)

David Alan King
Joshua Arters
(Polsinelli, P.C.)

*Counsel for Air Ambulance Plaintiffs – Appellees*

i

U.S. Department of Health and Human Services
Robert F. Kennedy, Jr., Secretary, U.S. Department
   of Health and Human Services
U.S. Department of the Treasury
Scott Bessent, Secretary, U.S. Department of Treasury
U.S. Department of Labor
Lori Chavez-DeRemer, Secretary, U.S. Department of
   Labor
U.S. Office of Personnel Management
Scott Kupor, Director of the Office of Personnel
   Management
*Defendants-Appellants*

Leif Eric Overvold
Courtney Dixon
Kevin B. Soter
(U.S. Department of
   Justice)

*Counsel for
Defendants-
Appellants*

America's Health Insurance Plans, Inc.
(AHIP)

*Amicus Curiae*

Hyland Hunt
Ruthanne M. Deutsch
(Deutsch Hunt PLLC)

Michael Sector
Thomas M. Palumbo
(America's Health Insurance Plans)

*Counsel for Amicus Curiae AHIP*

Blue Cross Blue Shield Association
(BCBSA)

*Amicus Curiae*

K. Lee Blalack, II
(O'Melveny & Myers L.L.P.)

Andrew Robert Hellman
(Morgan, Lewis & Bockius, L.L.P.)

*Counsel for Amicus Curiae BCBSA*

American Medical Association (AMA)

*Amicus Curiae*

James Tysse
(Akin Gump Strauss Hauer & Feld,
L.L.P.)

*Counsel for Amicus Curiae AMA*

ii

The Leukemia and Lymphoma Society
The ALS Association
CancerCare
Epilepsy Foundation
Families USA Action
Hemophilia Federation of America
The Mended Hearts, Incorporated
National Multiple Sclerosis Society
National Patient Advocate Foundation
U.S. PIRG

*Amici Curiae Patient Advocacy Organizations*

Physicians Advocacy Institute
American Association of Neurological Surgeons
Congress of Neurological Surgeons
American Academy of Otolaryngology-Head
    and Neck Surgery
American Association of Orthopaedic Surgeons
American Osteopathic Association
American Society of Plastic Surgeons
Mississippi State Medical Association
California Medical Association
Connecticut State Medical Society
Florida Medical Association
Medical Association of Georgia
Kentucky Medical Association
Massachusetts Medical Society
Nebraska Medical Association
Medical Society of New Jersey
Medical Society of the State of New York
North Carolina Medical Society
Oregon Medical Association
South Carolina Medical Association
Tennessee Medical Association
Washington State Medical Association

*Amici Curiae Physician Associations*

Joseph J. Wardenski
(Wardenski, P.C.)

*Counsel for Amici Curiae Patient Advocacy Organizations*

Long Xuan Do
Eric D. Chan
(Athene Law, L.L.P.)

*Counsel for Amici Curiae Physician Associations*

American Society of Anesthesiologists

American College of Emergency
    Physicians

American College of Radiology

*Amici Curiae ASA, ACEP, ACR*

Aaron D. Lindstrom

(Barnes & Thornburg, L.L.P.)


*Counsel for Amicus Curiae ASA, ACEP, ACR*

Emergency Department Practice
    Management Association (EDPMA)

*Amicus Curiae EDPMA*

Jack R. Bierig

(ArentFox Schiff, L.L.P.)


*Counsel for Amicus Curiae EDPMA*


Under <u>Federal Rules of Appellate Procedure 26.1</u> and 29(a)(4)(A), America's Health Insurance Plans, Inc. states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

<div align="center" style="text-align:right">

<u>s/Hyland Hunt</u>              
Hyland Hunt

</div>

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ........................................................i

TABLE OF CONTENTS....................................................................................v

TABLE OF AUTHORITIES ..............................................................................vi

STATEMENT OF INTEREST OF *AMICUS CURIAE*...........................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................3

ARGUMENT ....................................................................................................6

I.   QPA-Based Payments Calculated per the Challenged Rules Are Widely
Accepted by Providers as Reflecting Reasonable, Market-Based Rates..................6

II.   The District Court's Decision Reduces the QPA's Market Fidelity................11

    A.   The QPA Properly Excludes Value-Based Payments. ............................12

        *1.   Background.* ...................................................................................12

        *2.   The rules reasonably address value-based payments.* ....................15

        *3.   The district court's one-sided mandate to include the "highest
possible" payment in the QPA defies market reality*.......................17

        *4.   The district court's rewrite erodes stability and predictability
for patients.* ......................................................................................18

    B.   The QPA Rightly Excludes Post-Hoc Single Case Agreements..............19

    C.   The QPA Properly Reflects All Negotiated Network Rates,
Regardless of How Often a Claim Has Been Paid at that Rate. ..............21

III.  Stable Rules Are Essential for the QPA to Serve Its Key Functions under
the No Surprises Act. ..............................................................................24

CONCLUSION ...............................................................................................27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .......................................11

*Texas v. U.S. EPA*, 132 F.4th 808 (5th Cir. 2025)...................................................26

**Statutes**

42 U.S.C.
      § 300gg-111 .......................................................... 6, 11, 15, 18
      § 300gg-131 ...............................................................................6

**Regulations**

86 Fed. Reg. 36,872 (July 13, 2021)............................... 16, 17, 19, 20, 24

86 Fed. Reg. 55,980 (Oct. 7, 2021)........................................................6

**Other Authorities**

Loren Adler et al., *High air ambulance charges concentrated in private equity-owned carriers*, Brookings Inst. (Oct. 13, 2020) ..................................................10

America's Health Insurance Plans & Blue Cross Blue Shield Ass'n, *No Surprises Act Continues to Prevent More than 1 Million Surprise Bills Per Month, While Provider Networks Grow* (Jan. 2024)....................................................................7

Blue Cross Blue Shield of Michigan, *Physician Group Incentive Program*...........13

Erin C. Fuse Brown et al., *The Unfinished Business of Air Ambulance Bills*, Health Affairs Forefront (Mar. 26, 2021) .........................................................19

CMS, Supplemental Background on Federal Independent Dispute Resolution Public Use Files July 1, 2024 – December 31, 2024 (May 28, 2025) ........ 7, 9, 10

CMS, Supplemental Background on Federal Independent Dispute Resolution Public Use Files July 1, 2023 – December 31, 2023 (June 13, 2024) ...................9

CMS, Federal IDR Supplemental Tables for 2024 (Mar. 18 and May 28, 2025)...10

Zack Cooper et al., *Surprise! Out-of-Network Billing for Emergency Care in the United States*, 128 J. Pol. Econ. 362 (2020).........................................................10

Matthew Fiedler & Loren Adler, *A first look at outcomes under the No Surprises Act arbitration process*, Brookings Inst. (Mar. 27, 2024).....................................9

Health Care Payment Learning & Action Network, *APM Measurement Effort* (2021).............................................................................................................16

Morgan A. Henderson & Morgan C. Mouslim, *Facts About Hospital-Insurer Contracting*, 30 Am. J. Managed Care e59 (2024) ...................................... 22, 23

Jack Hoadley et al., *Independent Dispute Resolution Process 2024 Data*, Health Affairs (June 11, 2025).................................................................................. 9, 10

Corinne Lewis et al., *Value-Based Care: What It Is, and Why It's Needed*, Commonwealth Fund (Feb. 7, 2023)......................................................................12

Anne M. Lockner, *The Healthcare Industry's Shift from Fee-for-Service to Value-Based Reimbursement*, Bloomberg Law (Sept. 26, 2018) ...................................12

MGMA, *Patient Access and Value-Based Outcomes Amid the Great Attrition* (2022).............................................................................................................13

*Understanding the Value-Based Reimbursement Model Landscape*, Revcycle Intelligence (Dec. 11, 2023) ......................................................................... 13, 14

U.S. Census Bureau, *Quick Facts*.........................................................................10

U.S. Dep't of Labor, *FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* (Aug. 19, 2022) ............ 22, 23

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

America's Health Insurance Plans, Inc. (AHIP) is the national trade association representing the health insurance industry. AHIP is committed to market-based solutions and public-private partnerships that make high-quality coverage and care more affordable, accessible and equitable for everyone. AHIP's members provide health care coverage, services, and solutions to more than 200 million Americans. That experience gives AHIP broad first-hand knowledge and a deep understanding of how the nation's health care and health insurance systems work.

AHIP's members strive to reach agreements with health care providers to offer Americans affordable quality networks where they can then choose from a trusted selection of providers to best meet their individual medical needs. Networks are a common feature of nearly all health plans. They offer patients peace of mind that their financial responsibility will be limited to either a flat copayment or a coinsurance amount based on a negotiated rate. For certain specialties, however, network agreements may not be in place—particularly when patients have no time

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than *amicus*, its members, or its counsel made a monetary contribution intended to fund the brief's preparation or submission. This brief is accompanied by a motion for leave to file; no party has objected to the filing of this brief, but the Texas Medical Association Plaintiffs-Appellees take no position on the motion. *See* Fed. R. App. P. 29(a)(2)-(4).

1

to research and choose a provider, like emergency care or air ambulance services. Those specialties frequently attract private equity investors given their business model of remaining out-of-network as a means of extracting higher reimbursement rates.

When services are provided by out-of-network providers, health plans still try to negotiate reasonable out-of-network payments *after* treatment to protect patients from surprise medical bills. Despite these efforts, before the No Surprises Act, out-of-network providers often sent surprise bills to patients to collect any portion of their billed charge above the amount paid by the patient's health plan. By leveraging such "balance bills," out-of-network providers managed to obtain significantly higher payments from health plans. This practice subjected Americans to an ever-present threat of receiving a surprise medical bill and the prospect of crushing medical debt.

Congress, after significant debate, ultimately arrived at a bipartisan solution to protect patients from out-of-network payment disputes and surprise bills. Specifically, Congress established a system in the No Surprises Act to compensate providers at fair market rates, while providing stability and predictability for patients. The cornerstone of the Act is the Qualifying Payment Amount (QPA)—a key measure designed to approximate what the parties would have reasonably agreed to, under competitive market conditions, had they reached a network agreement in

advance. Recognizing the complexity of health care contracting, Congress did not spell out the details of the QPA calculation methodology. Instead, Congress expressly delegated that function to the implementing Departments.

Given the QPA's central purpose and functions under the Act, the Departments' implementing rules aim to ensure that it accurately reflects negotiated market rates. AHIP agrees with the Departments' legal arguments that the challenged rules are consistent with the Act and fall well within the Departments' delegated authority. Based on its members' experience with health care contracting, AHIP writes separately to emphasize how the rules enhance the market fidelity of the QPA, consistent with Congress's intent.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As the cornerstone of the No Surprises Act, Congress intended the QPA to approximate, as closely as possible, negotiated market rates. This point is undisputed. The Act delegated to the Departments the authority to develop a methodology to do so, also undisputed. Where the parties diverge is whether the Departments' methodology generates QPAs that accurately reflect market rates. Experience proves that it does.

More than three years into the Act's implementation, payment for the vast majority of out-of-network services is resolved by QPA-based payments. This widespread acceptance of QPA-based payments demonstrates the QPA's market

fidelity. Providers who might have sent surprise bills before passage of the Act now generally accept payments based on QPAs calculated under the Departments' methodology, underscoring the reasonableness of the Department's QPA methodology and its effectiveness in reflecting market rates.

True, providers have initiated far more payment disputes in the dispute resolution system established by the Act—Independent Dispute Resolution (IDR)—than Congress ever intended. But the data show that a significant portion of IDR volume is driven by a narrow subset of investment-backed firms representing providers in a handful of specialties in just a few states. This fractious minority represents the lingering effects of a business model that Congress aimed to prevent with the No Surprises Act: one that relies on the excessive out-of-network payments formerly generated by leveraging surprise bills. The majority of IDR disputes are thus led by a small number of opportunistic actors in highly concentrated sectors, and do not reflect widespread dissatisfaction with the QPA's market-rate accuracy. This exploitative strategy, arguably designed and intended to overwhelm the IDR process, has yielded awards above the QPA. And it risks carrying forward the very market dysfunction that Congress sought to mitigate by structuring out-of-network payments around the QPA.

In contrast to the Departments' reasonable and proven methodology, the district court's decision divorces the QPA from market reality and undermines the

QPA's accuracy and intended function. The district court's rewrite of three specific provisions would distort the QPA and undermine the Act's patient-protection functions, including by:

- Requiring value-based bonuses (but not penalties) to be added to per-service QPA rates, which defies contracting reality and will work as a one-way ratchet to drive up patient cost-sharing;

- Requiring the QPA to include ad hoc agreements resolving pre-Act payment disputes—agreements where health plans paid post-treatment supracompetitive charges to protect patients from surprise bills—even though doing so reintroduces the market distortion that the Act is designed to fix; and

- Excluding from the QPA rates agreed in arms-length negotiations based on how frequently services have been provided at those rates, even though the rates are valid and highly probative of reasonable market rates.

The upshot of these holdings and the district court's disruptive vacatur is a QPA that is now more variable, less comprehensible, and unwieldly to calculate. And the effect is to disrupt a carefully calibrated system that depends upon clear and stable rules. The district court's unwarranted QPA methodology re-write contravenes Congress's intent to protect patients by delivering predictable health care expenses with minimal administrative costs.

## ARGUMENT

I. **QPA-Based Payments Calculated per the Challenged Rules Are Widely Accepted by Providers as Reflecting Reasonable, Market-Based Rates.**

The QPA is designed to "reflect standard market rates arrived at through typical contract negotiations." 86 Fed. Reg. 55,980, 55,996 (Oct. 7, 2021). It is typically the median in-network rate. ROA.13200; *see* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). This lynchpin measure protects patients by generally limiting their cost-sharing to a percentage of the QPA and barring any balance bills. *E.g.*, 42 U.S.C. §§ 300gg-111(a)(1)(C), (3)(H), 300gg-131. So long as the QPA is implemented as intended—*i.e.*, consistently with negotiated contract rates—this means that patients' cost-sharing is materially the same whether they receive care in- or out-of-network, enhancing cost stability and predictability.

As for providers, when case-specific disputes about compensation arise in the absence of a network agreement, the Act establishes IDR as a streamlined arbitration process to conclusively resolve such disputes. IDR entities must, at a minimum, consider the QPA when making payment determinations. *Id.* § 300gg-111(c).

The drumbeat of Plaintiffs' claims is that the challenged rules artificially deflate the QPA below market levels. *See, e.g.*, ROA.13206, ROA.13210, ROA.13212. Under Plaintiffs' theory, one would expect to see widespread rejection of QPA-based payments. But experience shows the opposite. An AHIP analysis indicates that payment for the vast majority of out-of-network services is resolved

without challenge, most of the time via medical providers' acceptance of payments at or around the QPA, with no need for IDR. Yes, IDR volume is very high—too high for a system that Congress intended to address rare, unique circumstances. But this volume is due to a handful of mostly investment-backed firms representing a minority of providers in just a few states, in a narrow range of specialties—those that relied the most on surprise billing before the Act.

Throughout 2023 (the latest year for which this data is available), patients were protected by the Act from receiving surprise medical bills that otherwise could have resulted from about 13.5 million claims. America's Health Insurance Plans & Blue Cross Blue Shield Ass'n (BCBSA), *No Surprises Act Continues to Prevent More than 1 Million Surprise Bills Per Month, While Provider Networks Grow* (Jan. 2024), http://tinyurl.com/4majdzam (finding more than 10 million claims were subject to the Act's protections between January 1 and September 30, 2023). Per AHIP/BCBSA research, for more than three-quarters of items or services covered by the Act and not subject to state dispute resolution processes, initial payments for those services—generally centering around the QPA—were accepted without any dispute. *See id.* Of the 24% that enter open negotiations, nearly three in four (73%) are resolved by settlement. *Id.* Thus, fewer than 7% of out-of-network claims subject to the Act even enter IDR. *Id.* And the parties sometimes settle even after entering IDR. *See* CMS, Supplemental Background on Federal Independent Dispute

Resolution Public Use Files July 1, 2024 – December 31, 2024, at 3 (May 28, 2025), https://tinyurl.com/38d3kazs (2024 IDR Report).

As depicted below, the upshot is that—consistent with congressional design—more than 93% of out-of-network claims from 2023 subject to the Act were resolved voluntarily in QPA-centered negotiations.



Seven percent of claims entering IDR may seem small. But given the universe, it represents a large volume of claims in absolute numbers, and is still far more than Congress intended. In addition, IDR volume has continued to grow, with over 1.4

million IDR proceedings initiated in 2024, more than double the about 679,000 proceedings initiated in 2023. 2024 IDR Report at 2; CMS, Supplemental Background on Federal Independent Dispute Resolution Public Use Files July 1, 2023 – December 31, 2023, at 2 (June 13, 2024), https://tinyurl.com/p9f6x856. Yet closer examination shows that growing IDR numbers do not indicate that QPA-based payments are generally divorced from reasonable negotiated rates. On the contrary, IDR volume is driven by a handful of investment-backed provider firms that have engaged in concentrated exploitation of the IDR system.

Just four "[l]arge investor-backed provider groups … have accounted for a large and disproportionate share of IDR cases." Matthew Fiedler & Loren Adler, *A first look at outcomes under the No Surprises Act arbitration process*, fig. 1, Brookings Inst. (Mar. 27, 2024), https://tinyurl.com/ub6hutwb (2023 data); Jack Hoadley et al., *Independent Dispute Resolution Process 2024 Data*, Health Affairs (June 11, 2025), https://tinyurl.com/436rpfys (In 2024, "resolved IDR cases were predominantly from a few large provider organizations – mostly backed by private equity"). These firms are largely pushing disputes from just two specialties. Emergency services and radiology accounted for nearly two-thirds of all IDR determinations in 2024. 2024 IDR Report at 4. Disputes are also concentrated in just a few states. In every quarter in 2024, three states making up less than one-fifth of the population generated more than half of all IDR disputes (Texas, Arizona, and

Florida). *See* CMS, Federal IDR Supplemental Tables for 2024, tbl. 7 (Mar. 18 and May 28, 2025), https://tinyurl.com/b9m4ynaz; U.S. Census Bureau, *Quick Facts* (population estimates for July 1, 2024), https://tinyurl.com/2vtzfc3j.

And while certain providers' exploitation of the IDR process has resulted in awards above the QPA, this does not mean that QPAs (and plans' related IDR offers) are below reasonable market rates. Rather, providers' prevailing offers were often "benchmarked … to past [out-of-network] payment amounts." 2024 IDR Report at 4. Those rates do not reflect market-based negotiated rates. Rather, "historical benchmarks may reflect circumstances before passage of the [Act] when some plans paid full billed charges to ensure that costs were not passed along to consumers." Hoadley, *supra*. In other words, for the few firms exploiting IDR as a business model, the results carry forward the surprise-billing-based market distortion that the Act was designed to ameliorate. *See* Gov. En Banc Br. 4-5. That is, those IDR awards do not reflect reasonable negotiated rates, but rather the payments that some specialties—especially emergency care and air ambulance services—used to be able to obtain through balance billing, which far exceeded rates for other specialties less able to balance bill. *See* Loren Adler et al., *High air ambulance charges concentrated in private equity-owned carriers*, Brookings Inst. (Oct. 13, 2020), https://tinyurl.com/3dbyn523; Zack Cooper et al., *Surprise! Out-of-Network Billing for Emergency Care in the United States*, 128 J. Pol. Econ. 3626, 3629, 3631 (2020).

Payments based on QPAs calculated in accordance with the challenged rules, on the other hand, are based on rates that are negotiated at arms length between plans and insurers outside the shadow of threats to surprise bill. Such payments are widely accepted without dispute—apart from a few firms—precisely because they reflect market reality. The widespread acceptance of payments around the QPA strongly suggests that the Departments' rules yield a QPA that accurately reflects reasonable negotiated market rates, supporting patients and providers alike.

## II.     The District Court's Decision Reduces the QPA's Market Fidelity.

Given the complexity and variety of medical contracting, Congress expressly delegated rulemaking authority to the Departments to establish "the methodology … to determine the [QPA]." 42 U.S.C. § 300gg-111(a)(2)(B)(i). Despite this express delegation, the district court flyspecked the Departments' QPA methodology by identifying purported conflicts with fragments of statutory text. This analysis missed the forest for the trees. The conflicts are illusory, and the government's choices on technical details are well within "the boundaries of the delegated authority" that Congress expressly provided to the Departments to develop a QPA methodology. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024); Gov. En Banc Br. 17-19. Moreover, the practical implications of the district court's ruling underscore how its grab bag of atextual holdings distorts the QPA. In each context where the district court displaced the Departments' well-reasoned judgment, the district court's

rewrite makes the QPA less accurate. None of the district court's rulings are required by the statute, and all frustrate Congress's goal of protecting patients through reasonable and predictable out-of-network rates.

### A. The QPA Properly Excludes Value-Based Payments.

#### 1. Background.

Health care contracting is complex. Fee-for-service payments remain the dominant underlying approach, but many alternative payment models exist. *See* Anne M. Lockner, *The Healthcare Industry's Shift from Fee-for-Service to Value-Based Reimbursement*, Bloomberg Law (Sept. 26, 2018), https://tinyurl.com/5n6wd26t. In these alternative models, health plans go beyond setting specific fees for specific medical services and partner in innovative ways with medical providers to achieve goals related to the "results [physicians] deliver for their patients, such as the quality, equity, and cost of care." *See* Corinne Lewis et al., *Value-Based Care: What It Is, and Why It's Needed*, Commonwealth Fund (Feb. 7, 2023), https://tinyurl.com/48dxak6a.

Alternative payment models aim to reward (or disincentivize) system-wide results. Although details vary, a common thread in alternative payment models is that retrospective bonuses or penalties are not tied to a specific service delivered to a specific patient. Rather, they depend on a provider group's or facility's overall performance over an extended timeframe, covering multiple providers, multiple

patients, and multiple encounters. *See Understanding the Value-Based Reimbursement Model Landscape*, Revcycle Intelligence (Dec. 11, 2023), https://tinyurl.com/yr76k7ny (*Understanding Value-Based*). Three common forms of alternative payment models illustrate how these value-based performance payments cannot be shoe-horned into mere per-service add-ons.

***Pay-for-performance contracts*** provide a retrospective bonus or penalty linked to quality of outcomes. *Id*. For example, a practice group (or facility) might receive a bonus or pay a penalty based on how many hospital re-admissions that facility's patients experienced, or how many of that group's patients experienced post-operative infections. *See* MGMA, *Patient Access and Value-Based Outcomes Amid the Great Attrition*, at 3 (2022), https://tinyurl.com/y6ufbjwp (listing common quality measures). Such programs are typically customized for each practice group, rewarding performance of the entire practice, not individual-provider or single-service outcomes. *See, e.g.*, Blue Cross Blue Shield of Michigan, *Physician Group Incentive Program*, https://tinyurl.com/2rzxd2tv.

***A shared savings model*** is another form of value-based model. There, a benchmark of projected total costs for a group of patients is derived from historical data. Actual costs are then aggregated over a year—for a provider's entire patient population—and compared to the benchmark. Providers who avoid unnecessary costs through more efficient care delivery or improved patient outcomes across their

entire patient group share in the savings that their better care generates. *Understanding Value-Based*, *supra.* If the contract provides for two-sided value arrangements, providers whose costs exceed the benchmark are responsible for paying a portion of those excess costs. *See id.*

With this model, payments are made (or penalties incurred) based on a total-cost-of-care budget covering many services and many patients. These payments are not bonuses for particular services; rather, they account for services that are *not* provided—because quality care obviated the need for patients to receive them.

***Bundled payment arrangements***—another variety of value-based model—are also a far cry from fee-for-service rates. With bundled payments, rather than pay separately for each service provided to treat a given illness, a single, fixed, prospective payment is made to a group of network providers for a particular diagnosis based on a defined set of expected services. For example, in the case of a breast cancer diagnosis, the bundled payment might cover oncology, radiation, surgical, and post-surgical services for a period spanning the initial cancer diagnosis through a certain number of days post-surgery.

This flat-fee prospective payment does not change based on the actual services furnished or costs incurred. Instead, providers are rewarded if they are efficient and coordinate or innovate to improve outcomes. If costs exceed the benchmark, providers absorb the financial loss; if costs are below the benchmark, they retain a

portion of the savings. Because payment is prospective, providers never even submit fee-for-service claims.

This handful of examples is not exhaustive, as alternative payment models continue to evolve and can be structured in a near-endless number of ways. But this handful of non-exhaustive examples is enough to show that it is simply wrong (and practically distorting) to characterize value-based payments—which are generally lump sum payments—as components (whether add-ons or subtractions) of per-service rates. Value-based payments hinge not on a specific negotiated fee for a specific service, but on quality-of-care outcomes across groups of patients and providers and a variety of services. Value-based payments are overall performance incentives, reflecting long-term relationships between insurance providers and physicians, spanning multiple services, providers, and patients.

### 2. *The rules reasonably address value-based payments.*

Congress sensibly steered clear of dictating how to navigate this evolving complexity. Although tasking the Departments with accounting for non-fee-for-service payments, Congress declined to micromanage. 42 U.S.C. § 300gg-111(a)(2)(B). The Departments reasonably implemented Congress's broad directive by requiring health plans to use the "underlying fee schedule rate" or similar "derived amount" for the QPA while excluding retrospective quality bonuses and

15

penalties or similar value-based payments. *See* 86 Fed. Reg. 36,872, 36,893-94 (July 13, 2021); Gov. En Banc Br. 25-26.

This approach matches contracting reality. Although the retrospective value-based payments themselves are not tied to particular services, many alternative payment models include a per-service component. *See* Health Care Payment Learning & Action Network, *APM Measurement Effort*, at 2 (2021), https://tinyurl.com/uu3csy8j. Any distinct per-service fee is typically paid based on when a service was furnished, and that per-service rate also generally forms the basis for calculating patients' cost-sharing. But periodic upward retrospective value-based payments for providers who meet quality metrics or who furnish cost-effective care—or penalties for those who fail to meet those targets—are neither tied to a particular service, nor included in patients' cost-sharing.

Defining the QPA by only the per-service amount, and excluding value-based payments, thus best serves the QPA's market-rate objective for two main reasons. First, the per-service "fee" component of alternative payments is the contracted per-service rate that reflects the overall market value for a given service. Performance payments are tied to overall quality of care, meant to encourage longer-term cost savings and reward positive outcomes. They say nothing about the market value of a particular service. Second, it is essential to match the QPA to the contracted rate

16

that health plans use for patient cost-sharing, and that rate excludes retrospective value-based payments. 86 Fed. Reg. at 36,894.

### 3. The district court's one-sided mandate to include the "highest possible" payment in the QPA defies market reality.

Ignoring the critical fact that value-based payments are not per-service add-ons, the district court rewrote the QPA methodology to include the highest possible value-based bonuses in the QPA (regardless of whether, how often, or why those bonuses are paid)—but *not* any potential penalties. The district court's rewrite thus creates a QPA that treats all out-of-network providers as if they are the very best-performing in-network providers. This one-way ratchet cannot be justified by the statute's use of the phrase "total maximum payment," which refers to the total per-service payment (including both cost-sharing and the portion paid by the health plan), but not to non-service-specific quality payments. *See* Gov. En Banc Br. 27. It also contravenes market reality and will inexorably drive up patients' costs, contrary to congressional intent.

Adding the maximum possible aggregate bonus from a value-based contract to every per-service rate listed within it will distort the QPA. Take for example a shared savings contract for a group of surgical providers, including anesthesiologists—a specialty historically likely to be out-of-network. Suppose the provider group could receive a 5% to 10% bonus if their coordinated care reduced readmissions and other complications, and thus reduced costs for their entire patient

17

population compared to the benchmark. If instead post-surgery complications caused excessive costs, they could absorb a 5% loss. Potentially, by the district court's logic, the QPA input for anesthesiology services from that contract would not simply be the underlying per-service amount for an anesthesiologist, but that amount *plus* 10%, regardless of how often providers achieve the highest bonus level and how little anesthesiologist services may contribute to the overall savings, while ignoring the possibility of a 5% penalty, too. Bottom line: including non-service-specific value-based payments (and only the positive ones, at that) will artificially inflate the QPA and move it further from, not closer to, actual market-based service-specific rates.

### 4. *The district court's rewrite erodes stability and predictability for patients.*

The district court's approach will also harm patients because it vitiates the parity that Congress mandated between in-network and out-of-network cost-sharing. *See* 42 U.S.C. § 300gg-111(a)(1)(C). The patient's share of costs is meant to stay constant whether or not the provider participates in a network. For example, if cost sharing for a certain service is 20% in-network, then the same percentage must apply out-of-network. *See id.* For in-network services, the Departments rightly found— and no one disputes—that the cost-sharing percentage is generally applied to a per-service amount that excludes value-based payments (or penalties). So, a 20% cost-share would be calculated based only on the per-service rate, *excluding* any multi-

18

service, multi-payment performance bonus that provider may receive (which could be determined much later).

The Departments rightly harmonized in-network and out-of-network cost-sharing by specifying that value-based payments and penalties must similarly be excluded from the QPA. 86 Fed. Reg. at 36,894. This ensured (as Congress intended) that patients' cost-sharing was consistent, whether they receive services in- or out-of-network. But if (upward-only) value-based payments must be included in the QPA, as the district court held, that same patient's 20% cost-sharing obligation will necessarily be higher when the service is out-of-network than in-network due to the artificially inflated QPA. This will cause patients' out-of-pocket costs to go up under the Act, not down, which is flatly contrary to the Act's design.

**B. The QPA Rightly Excludes Post-Hoc Single Case Agreements.**

Before the Act, "avoidance of insurance network participation combined with aggressive collection" on surprise bills sent to patients who had no choice whether to use an air ambulance was "a business strategy of some providers of air ambulance services." 86 Fed. Reg. at 36,923. Under that strategy, charges soared, nearly tripling over ten years. Erin C. Fuse Brown et al., *The Unfinished Business of Air Ambulance Bills*, Health Affairs Forefront (Mar. 26, 2021), https://tinyurl.com/yxbzfpb7.

To protect beneficiaries, health plans "place[d] a high value on preventing enrollee surprise bills." *Id*. As a result, health plans often agreed, *after* a service was

19

provided, to pay providers' full billed charges—not because they were reasonable market rates, but to avoid saddling their beneficiaries with surprise bills and to prevent debt collection suits. *See* 86 Fed. Reg. at 36,923. One study of data from 2014 to 2017 concluded that health plans paid full (and exorbitant) billed charges for about half of out-of-network air ambulance transports. *Id.*

These ad hoc post-service agreements between health plans and providers served to resolve case-by-case payment disputes under surprise-billing threat. *Id.* at 36,889. But such "single case agreements" are nothing like network contracts, where health plans and medical providers negotiate in advance and contract for reasonable market rates. *Id.* The Departments thus sensibly excluded from the QPA "ad hoc arrangement[s] with a nonparticipating provider" that cover "a specific … beneficiary … in unique circumstances." *Id*.

Perhaps because they stand to gain the most, only air ambulance providers challenged this aspect of the rule, but the district court's vacatur applies across the board. *See* ROA.13227-28. Here again, that vacatur takes the QPA farther from reasonable, negotiated market rates, with a one-way ratchet that harms patients by unnecessarily driving up costs. Effectively, the district court's ruling allows the surprise bills that the "No Surprises Act" aimed to abolish to instead serve as a primary input to the QPA, especially for air ambulance services where such one-off agreements were prevalent. 86 Fed. Reg. at 36,923. Far from protecting patients

from unpredictable and uncontrolled health care costs, the district court's methodology would incorporate and lock in the market dysfunction generated by the balance-billing that Congress prohibited in the Act.

### C. The QPA Properly Reflects All Negotiated Network Rates, Regardless of How Often a Claim Has Been Paid at that Rate.

Under the Departments' rules, the QPA includes all negotiated rates recognized in verifiable contracts. Those rates should and do count. Rates contracted for within a network agreement are the result of competitive bargaining in the marketplace, regardless of whether a provider happened to provide that service in some prior (undefined) time period. If any guardrail against the QPA including rates for rarely provided services were needed, the Departments' rules already provide it by requiring different QPAs whenever rates for a given service vary by specialty.

The district court, however, held that the statute requires services to be or to have been "provided" under a contract for a rate agreed to in that contract to count. ROA.13208. As the government explains, however, the statutory text refers to rates "recognized" within the corners of prospectively negotiated contracts on a particular date (January 31, 2019), not rates paid over a specified period. *See* Gov. En Banc Br. 19-21.

The district court's analysis hinged on an atextual policy concern that if a given rate has not been paid (in some unspecified timeframe), a provider must not perform that service and therefore was likely to agree to a below-market rate. *See*

ROA.13206. But even for services performed infrequently, providers have every incentive to negotiate reasonable rates. The industry practice is to negotiate rates prospectively; no party knows for certain how often any given service will be provided to any given health plan's beneficiaries in the future. Moreover, the district court's policy concern stems from a mistaken understanding of health care contracting. Starting from the premise that health plans offer all providers, regardless of specialty, the same fee schedule—*i.e.*, a fee schedule that potentially includes services a provider will never provide—the gravamen of the district court's reasoning is that providers will not bother to negotiate up the rates for services outside their specialty. That is error twice over.

For starters, although general fee schedules are occasionally used, *see* U.S. Dep't of Labor, *FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55*, at 16 (Aug. 19, 2022) (August FAQs), http://tinyurl.com/3j67zunu, they are far from the norm. Specialty-specific fee schedules are just as, if not more, common. Real-world health care contracting, as already discussed, is highly variable and complex. One study examined contracts for ten different hospitals and found six different methodologies for fee-for-service rates alone, including fixed-dollar rates and rates based on several different benchmarks (*e.g.*, relative to Medicare rates). Morgan A. Henderson & Morgan C. Mouslim, *Facts About Hospital-Insurer Contracting*, 30 Am. J. Managed Care e59, e61

22

(2024), https://tinyurl.com/2s4dbvdn. More than half of the contracts used two or more rate methods within the same contract. *Id.* Moreover, each contract specified rates for as few as one or two services to as many as over 63,000 services. *Id.* at e60-e61. This complexity belies the notion that health plans routinely send the same generic schedule with artificially low rates across the board to provider groups of all different types and specialties, with only the providers' negotiating interest and prowess driving certain rates to market levels.

In any event, if rate differentials exist between providers who often perform a service and those who don't, the Departments have already addressed that issue. Separate QPAs must be calculated whenever there is a material difference in the median rate between a specialty that regularly bills for a service and all others. August FAQs at 16-17. The Departments' methodology thus resolves any concern about artificially deflated rates.

Ultimately, the district court's artificial exclusion of some negotiated rates from the QPA will only magnify the burden of calculating the QPA while decreasing its market fidelity by narrowing the scope of agreed market rates that can be considered. The district court does not explain what it means for a service to be "provided"—paid in the prior year? By that health plan or by any health plan? Reasonably expected to be provided within the year for which the contract is negotiated? This approach is utterly unworkable. Health plans have no crystal ball

to know which services a physician will provide in the future, or what the physician provided before they started working with the plan. The district court's rewrite makes the QPA infinitely harder to calculate with at *best* zero effect on the market fidelity of the QPA—given that the Departments' per-specialty rule already accounts for situations where service frequency makes a material difference to rates. It will also decrease accuracy by excluding valid negotiated rates.

### III.   Stable Rules Are Essential for the QPA to Serve Its Key Functions under the No Surprises Act.

As the "No Surprises" name indicates, the overriding goal of the Act is to support predictability and stability for Americans' medical costs. Besides being wrong on the merits, the district court's disruptive remedy undercuts this congressional objective. The serious costs occasioned by vacatur—including potentially multiple rounds of QPA calculations under ever-shifting rules—support at most a remand remedy, if the Court finds any remedy is warranted. *See* Gov. En Banc Br. 48-49.

Implementing the Act necessitated the calculation of millions of QPAs for each billing code. While the impact varies across plans, AHIP estimates that on average health plans needed eight months to calculate QPAs in 2021, with costs per plan exceeding $1 million. Multiplied by the approximately 1,758 entities obligated to calculate QPAs, 86 Fed. Reg. at 36,927, the total cost for initial QPA calculation likely exceeded $1.7 billion. If the vacatur is affirmed, health plans will be required

24

to start that process anew, except that the time and cost required will be substantially greater. Implementing the district court's decision would not simply be a re-run of prior calculations under slightly different rules. It will require major system modifications, addressing substantial unknowns, and gathering and manipulating new data. Why so much additional work? Precisely because the district court's re-write of QPA methodology is—unlike the Departments' rules—completely divorced from contracting reality.

First, because value-based payments are fundamentally not per-service rates, they do not readily translate to the billing codes for which QPAs are calculated. Under the district court's approach, health plans would have to develop an entirely new methodology—one never used in the standard contracting process the QPA is meant to mirror—to account for widely varied value-based payments in myriad per-service QPAs. Forcing a value-based model to fit in a QPA framework is akin to trying to hammer a square peg into a round hole. And even for the payment models which might allow allocating certain bonuses to per-service billing codes, the process will require manual review of the terms of countless different alternative payment contracts. All of this is extraordinarily costly and generates administrative costs that Congress sought to minimize and patients will ultimately be forced to bear.

The district court's decision on case-specific rates raises similar concerns. Records of such one-off agreements are not stored with negotiated rates in health

plan systems. The district court's mandate that such agreements be included in the QPA would require a detailed manual review of archived agreements from more than five years ago (as the QPA is based on contracted rates in 2019).

Moreover, the district court's decision raises more questions than it (wrongly) answers, for example rejecting the Departments' clear rule including all recognized rates in favor of an undefined command to include only rates for "provided" services over some undefined timeframe. Because there is no uniform way to account for this complexity, the vacatur will result in QPAs that vary substantially from plan to plan and for different types of services and providers, based on artificial factors that have no relation to market rates—and all of which might change, and require yet more calculations, if and when the Departments issue essential clarifying guidance.

Consistent, predictable QPA calculations—as the Departments' current rules foster—underpin the stability of cost-sharing for patients and lead to fewer expensive IDR disputes. Vacatur would disrupt that clarity and stability—all in the service of QPAs that do not reflect market rates and are costlier to calculate. If the Court orders any remedy at all—and it shouldn't—only remand without vacatur balances the equities, given the "disruptive consequences of the vacatur." *See Texas v. U.S. EPA*, 132 F.4th 808, 862 (5th Cir. 2025) (identifying disruptiveness as a factor in determining whether remand without vacatur is warranted).

*     *     *

The district court's QPA re-write divorces that lynchpin metric from contracting and market reality. There is no reason to disturb the Departments' well-founded choices made within Congress's express grant of rulemaking authority to develop QPA methodology. The Act works as Congress intended. Patients are protected from surprise bills and providers are fairly compensated at a QPA that reflects market rates, largely without disputes. Affirming the district court's piecemeal dismantling of this process, in disregard of congressional intent, will serve only to revive some of the very problems that Congress meant to solve.

## CONCLUSION

The judgment of the district court should be reversed insofar as it vacated portions of the challenged rules, and otherwise affirmed.

July 28, 2025

Michael Spector
Thomas M. Palumbo
AMERICA'S HEALTH INSURANCE PLANS
601 Pennsylvania Ave. NW
South Building, Suite 500
Washington, DC 20004

Respectfully submitted,

s/Hyland Hunt
 Hyland Hunt
 Ruthanne M. Deutsch
 DEUTSCH HUNT PLLC
 300 New Jersey Ave. NW, Suite 300
 Washington, DC 20001
 Tel.: 202-868-6915
 Fax: 202-609-8410
 Email: hhunt@deutschhunt.com

*Counsel for America's Health Insurance Plans*

**CERTIFICATE OF COMPLIANCE**

The foregoing brief is in 14-point Times New Roman proportional font and contains 5,877 words, and thus complies with the type-volume limitation set forth in Rules 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

s/Hyland Hunt
Hyland Hunt

July 28, 2025

## CERTIFICATE OF SERVICE

I hereby certify that, on July 28, 2025, I served the foregoing brief upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.


s/Hyland Hunt_____
Hyland Hunt