No. 23-40605

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

TEXAS MEDICAL ASSOCIATION, ET AL.,

*Plaintiffs-Appellees/Cross-Appellants,*

v.

UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, ET AL.,

*Defendants-Appellants/Cross-Appellees.*

———————————

On Appeal from the United States District Court
for the Eastern District of Texas, Tyler Division
Civil Action No. 6:22-cv-450

*En Banc*

———————————

**BRIEF OF BLUE CROSS BLUE SHIELD
ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF
DEFENDANTS-APPELLANTS/CROSS-APPELLEES
IN *EN BANC* PROCEEDINGS**

———————————

K. LEE BLALACK, II
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

JENNIFER B. SOKOLER
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, 17th Fl.
New York, NY 10019
(212) 326-2000

EVAN HINDMAN
O'MELVENY & MYERS LLP
Two Embarcadero Ctr., 28th Fl.
San Francisco, CA 94111

*Counsel for Amicus Curiae*

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities, in addition to those listed in the parties' briefs, have an interest in the outcome of this case.  These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

*Amicus curiae*:  Blue Cross Blue Shield Association is a non-profit entity with no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

*Counsel:*  K. Lee Blalack, II, Jennifer B. Sokoler, and Evan Hindman of O'Melveny & Myers LLP.


*/s/ Jennifer B. Sokoler*
Jennifer B. Sokoler
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE*.............................................................1

INTRODUCTION ....................................................................................2

ARGUMENT ...........................................................................................6

I.     ALL CONTRACTED RATES FOR INDIVIDUAL ITEMS AND SERVICES FOR NETWORK PROVIDERS ARE RELEVANT TO THE FAIR MARKET VALUE OF HEALTHCARE ITEMS AND SERVICES........................................6

II.    INCENTIVE-BASED COMPENSATION AND RETROSPECTIVE PAYMENTS OR ADJUSTMENTS ARE NOT COMPONENTS OF CONTRACTED RATES FOR PARTICULAR ITEMS OR SERVICES. ..........................................14

III.   OTHER PROVISIONS INVALIDATED BY THE DISTRICT COURT SIMILARLY MAKE CALCULATING THE QPA MORE BURDENSOME WITHOUT IMPROVING ACCURACY.....................................................................20

CONCLUSION .....................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am.'s Health Ins. Plans v. Hudgens*,
  742 F.3d 1319 (11th Cir. 2014) ............................................................25

*Health Care Serv. Corp. v. Methodist Hosps. of Dallas*,
  814 F.3d 242 (5th Cir. 2016) ...............................................................26

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ...........................................................................27

*Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*,
  66 F.4th 307 (1st Cir. 2023) ...............................................................26

*N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*,
  898 F.3d 461 (5th Cir. 2018) ......................................................... 24, 26

*Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*,
  967 F.3d 218 (3d Cir. 2020) .................................................................8

*Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*,
  2023 WL 5489028 (E.D. Tex. Aug. 24, 2023)........................... passim

**Statutes**

42 U.S.C. § 300gg-111 ................................................................. passim

42 U.S.C. § 300gg-131 ..........................................................................2

42 U.S.C. § 300gg-132 ..........................................................................2

42 U.S.C. § 300gg-135 ..........................................................................2

**Regulations**

45 C.F.R. § 149.140 ...................................................... 14, 20, 24

*Requirements Related to Surprise Billing: Part I*, 86 Fed. Reg. 36,872
  (July 13, 2021)....................................................................... passim

**Other Authorities**

Cong. Rsch. Serv., *Federal Requirements on Private Health
  Insurance Plans* (Mar. 9, 2023).........................................................25

Cong. Rsch. Serv., *Health Insurance: A Primer* (Jan. 8, 2015) ...........................25

H.R. Rep. No. 116-615, pt. I (Dec. 20, 2020)........................ 2, 3, 4

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

HCP LAN, *APM Framework* (2017) ........................................................... 16, 17, 18

KFF, *Employer Health Benefits: 2024 Annual Survey* (Oct. 2024) ................. 24, 25

Peter R. Kongstvedt, *Essentials of Managed Care* (6th ed. 2013) ...........................8

U.S. Dep't of Labor, *FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* (Aug. 19, 2022) ............................................................................................ 12, 20

## INTEREST OF *AMICUS CURIAE*[1]

The Blue Cross Blue Shield Association ("BCBSA") is the non-profit association that promotes the national interests of thirty-three independent, community-based, and locally operated Blue Cross Blue Shield health insurance companies ("Blue Plans").  Together, the Blue Plans provide health insurance for over 118 million people—one in three Americans—in every zip code in all fifty states, the District of Columbia, and Puerto Rico.  Blue Plans offer a variety of health insurance products to all segments of the population, including federal employees, large employer groups, small businesses, and individuals.  As leaders in the healthcare community for more than eighty years, Blue Plans have extensive knowledge of and experience with the health insurance marketplace.

BCBSA supports Congress's efforts to remedy distortions in the market for healthcare services and restrain costs for patients through the No Surprises Act (the "Act").  BCBSA has an interest in advising the Court regarding the operational and practical benefits of the interim final rule issued in July 2021 (the "July Rule") and certain subsequent guidance.  BCBSA also has an interest in sharing with the Court the expertise of Blue Plans regarding the disruptive implications of the district court's flawed ruling below.

---

[1] No counsel for a party authored any part of this brief.  No party, party's counsel, or any person other than *amicus curiae*, its members, or its counsel contributed money intended to finance the preparation or submission of this brief.

**INTRODUCTION**

Congress passed the Act to end so-called "surprise billing," which occurs "when a consumer covered by a health plan is unexpectedly treated by an out-of-network provider and is required to pay the difference between what the plan pays and the provider's charge," often amounting "to thousands of dollars of unforeseen medical costs."  H.R. Rep. No. 116-615, pt. I, at 47 (Dec. 20, 2020).  The Act applies (1) when patients receive emergency medical care from out-of-network providers; and (2) when patients receive ancillary medical care from out-of-network physicians at a facility, such as a hospital, that participates in the provider network of the patients' health plan.  *See* 42 U.S.C. §§ 300gg-131, 300gg-132.[2]

Congress recognized that surprise billing was becoming an increasingly common practice in the healthcare market and that *all* patients were paying the price.  *See* H.R. Rep. No. 116-615, pt. I, at 53-55.  A minority of emergency medical providers and hospital-based physicians unfairly leveraged their patients' inability to choose which providers render care in these settings to charge exorbitant out-of-network rates.  For example, when Congress passed the Act, "in comparison to the amount paid by Medicare for similar items or services, the median billed charge for emergency medicine [was] 465 percent of the Medicare

---

[2] The Act also applies when patients are transported by air ambulance providers that do not participate in the provider network of the patient's health plan.  *See* 42 U.S.C. § 300gg-135.

rate," and the median billed charge for anesthesiology was "551 percent" of the Medicare rate. *Id.* at 53.

In the Act, Congress carefully considered the interests of healthcare providers, health plans, and, above all, patients. Congress balanced those interests in seeking to "correct the market failure associated with surprise billing." *Id.* at 56-58. In addition to prohibiting the balance billing of patients by these out-of-network providers, the Act creates an independent dispute resolution ("IDR") process to resolve payor-provider disputes over the payment owed to the provider if a dispute cannot be resolved through open negotiation, and it designates the qualifying payment amount ("QPA") as a central consideration in that IDR process. *Id.* The QPA is the median payment rate allowed by the health insurer or health plan for the same service to its network of contracted providers—in short, a "market-based price" that "reflects negotiations between providers and insurers in a local health care market." *Id.* at 57. By giving the QPA a central role in the IDR process, Congress "ensure[d] that an efficient, market-based payment benchmark [would be] employed" to keep the IDR process "noninflationary" and accomplish Congress's broader goal "to reduce premiums and the deficit." *Id.* at 58.

Congress instructed the Departments[3] to promulgate regulations

---

[3] As used herein, the "Departments" collectively refers to the institutional defendant-appellants in this action.

3

implementing the Act, including by establishing "the methodology" that health plans "shall use to determine the [QPA]." 42 U.S.C. § 300gg-111(a)(2)(B)(i). The July Rule and certain subsequent guidance reflect the Departments' efforts to achieve Congress's goal of "reduc[ing] premiums and the deficit," H.R. Rep. No. 116-615, pt. I, at 58, by creating an administratively and financially feasible process for calculating the QPA.

The plaintiffs in this case challenged various aspects of the regulations governing the methodology for calculating the QPA, and the district court sustained most of those challenges. *See Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.* ("*TMA III*"), 2023 WL 5489028 (E.D. Tex. Aug. 24, 2023). As the Departments have explained, and as a panel of this Court correctly recognized, the district court erred on numerous grounds. BCBSA writes separately to emphasize that the district court's decision would render the QPA less reliable as an indicator of fair market value, and would make calculating the QPA—and accordingly the entire IDR process—substantially more burdensome, complicated, and expensive.

Plaintiffs demand burdens without benefits, and their arguments, if accepted, would affirmatively undermine the proper function of the QPA. In the challenges now before the *en banc* Court, plaintiffs contend that the QPA calculation should exclude many bargained-for rates based on plaintiffs' assumption that providers would not actually "provide" some of those services. But plaintiffs' argument for

4

discarding information relevant to the fair market value of services finds no support in the Act's plain text, and would make calculating the QPA substantially more complicated and less accurate. Plaintiffs also defy the Act's text by demanding that the QPA include incentive and value-based payments to providers. Converting those global or retrospective payments into prospective rates for particular items and services rendered to patients, however, would be illogical and impractical, if not impossible. While only those two issues are before the *en banc* Court, the district court also misconstrued the Act and imposed unjustified burdens by sustaining challenges to other facets of the QPA regulations. For instance, the district court vacated provisions of the regulations that permitted the QPA to be calculated across provider specialties when payment rates do not vary by specialty, and allowed third-party administrators ("TPAs") to calculate the QPA once on behalf of all health plans that use the TPA's network.[4] Eliminating these efficiency- and accuracy-promoting measures would not make the QPA more reliable.

---

[4] The Departments elected not to appeal the district court's interpretive rulings on these points, *see* Appellants' Panel Br. at 17-18 & n.8, but to the extent the Court agrees with the Departments' arguments about the improper scope of the district court's remedy, *see* Appellants' *En Banc* Br. at 33-50, reversing the district court's universal vacatur of these provisions would at least cabin the harm of the district court's erroneous rulings on these provisions.

The Panel recognized that the Act's plain text delegated to the Departments the authority necessary to promulgate an accurate and workable methodology for calculating the QPA.  Plaintiffs seek to achieve the opposite objective—to prevent the Act from functioning properly.  And they have succeeded to date by dismantling core underpinnings of the IDR process to make it less attractive to health plans, and by entangling the Departments in protracted litigation.  The *en banc* Court should restore certainty, efficiency, and accuracy to QPA calculations by following the Panel's decision and vindicating the Act's plain text.

## ARGUMENT

I.  **ALL CONTRACTED RATES FOR INDIVIDUAL ITEMS AND SERVICES FOR NETWORK PROVIDERS ARE RELEVANT TO THE FAIR MARKET VALUE OF HEALTHCARE ITEMS AND SERVICES.**

The Act defines the QPA in relevant part as "the median of the contracted rates recognized by the plan or issuer … for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).  By defining the QPA as the median *contracted rate* for healthcare providers participating in a health plan's network, the Act's plain text contemplates that the QPA will be calculated not based on whether a provider supplies an item or service in a given time-period, but on each *rate* that a provider and health plan have negotiated and memorialized in a network contract.  *See*

*Requirements Related to Surprise Billing: Part I*, 86 Fed. Reg. 36,872, 36,889
(July 13, 2021) ("The No Surprises Act envisions that each contracted rate for a
given item or service be treated as a single data point when calculating a median
contracted rate. … [T]he rate negotiated under a contract constitutes a single
contracted rate regardless of the number of claims paid at that contracted rate.").
The Departments thus followed the Act's plain text in instructing health plans to
calculate the QPA based on negotiated fee schedules—"the contracted rates"
referenced in the statute—without regard to how often healthcare providers
ultimately supplied the relevant item or service listed on the fee schedules. *See*
Appellants' *En Banc* Br. at 19-24.

The Panel similarly recognized that the "plain meaning of 'provide'" does
not incorporate a requirement that a given provider has historically performed a
particular service, and that the Departments adopted a reasonable methodology to
address plaintiffs' concerns about the inclusion of services that a "given provider
would never perform." Panel Op. at 10-11.  The Act, along with the Departments'
regulatory guidance, already contains features that ensure that the services
considered in QPA calculations are ones that specialists in a given geographical
region are truly "available" to perform. *Id.*  For instance, QPA calculations
necessarily "exclude[] rates from providers outside of the same specialty and
geographic area," and the Departments' guidance reasonably excluded certain "$0

7

amounts" listed on fee schedules from QPA calculations because they do not reflect bargained-for rates.  *Id.* at 11.

The Departments' guidance is consistent with not only the statutory text but also the market reality:  All negotiated rates for network providers are relevant to the fair market value of covered healthcare items and services—and thus should be included in the QPA—because they reflect the payment that a willing buyer would pay and a willing seller would accept for the items and services before they are actually supplied.  The basic premise of a health plan network is that network providers "agree by contract to accept a specific amount for their services" *before* providing them.  86 Fed. Reg. at 36,874; *see Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 227 (3d Cir. 2020).  In addition to fair reimbursement, set fee schedules offer payors and providers alike predictability and efficiency; a payor can process a provider's claim promptly and efficiently when the parties have already agreed on the payment rate for the billed service.  *See* Peter R. Kongstvedt, *Essentials of Managed Care* chs. 4-5 (6th ed. 2013) (describing benefits of network contracting for payors and healthcare providers).

The rationale for negotiating rates in advance applies to the full range of services a provider *may* render to members of a health plan—not just the services the provider is *certain* to render.  Emergency medicine providers, for example, render evaluation and management services to most emergency-room patients, and

their fee schedules thus include negotiated payment rates for those common services.  But these providers also routinely render services beyond these specialized emergency department services, including more generic services, such as initial observation and care, and services associated with other specialties, such as sedation.

To accommodate this expectation, fee schedules for these providers include payment rates for services beyond those a provider renders most frequently to ensure that the reimbursement system works promptly and smoothly for whatever services a patient needs.  In the emergency medicine example, it is in the provider's interest to include in the negotiated fee schedule the payment rates for treating a broken bone because it allows the emergency medicine provider to be expeditiously reimbursed when she does so, even though she will not render that service to most patients she treats in the emergency room and may not render the service on a predictable, periodic basis.  It thus benefits both health plans and providers to agree to fee schedules that include rates for all the services within a provider's expected scope of practice, even services the provider supplies infrequently.  All payment rates in a fee schedule reflect an agreement between a willing buyer and willing seller in a free market, neither acting under compulsion, so filtering out certain payment rates based on how often the provider ultimately supplied the service would improperly exclude information relevant to how market

9

participants assess the fair market value of the service in question.  It would

therefore bias the QPA calculations because not all providers bill services to the

same degree depending on the patient populations they serve, the conditions they

treat in a given period, and the scale of their patient load.  Accounting for those

variations ensures that the QPA reflects fair value across the full relevant market,

as Congress intended.

Data from Blue Health Intelligence ("BHI"),[5] which is one of the largest

commercial datasets available today and reflects 150 million Blue Plan members,

illustrates that providers often do not bill every service within their scope of

practice every year, and thus limiting the QPA to rates for services ultimately

provided within a limited period of time would exclude many negotiated rates—for

some services, vast swaths of relevant information—based on happenstance.  From

2019 through mid-2023, for instance, 57% percent of providers submitted claims

for administering anesthesia for cataract surgery over that coverage period,

compared to just 24% of providers in 2019 alone.  Among emergency medicine

providers in the dataset, 95% submitted claims for high-complexity medical

---

[5] BHI is a data analytics company privately owned by BCBSA and 17 Blue Plans.  BHI's function is to leverage its comprehensive database and powerful analytic tools to help healthcare organizations improve quality, reduce costs, optimize performance, and drive innovation.  The BHI analysis discussed here and elsewhere in this brief includes commercial claims data for approximately 150 million members of Blue Plans who had coverage during the period from January 2019 through June 2023.

decision-making across the coverage period—the most commonly billed service code in the dataset—but only 76% did so in 2019 alone.  While 20% of these providers rendered hyperbaric oxygen therapy at some point during the coverage period, only 1% of providers rendered the same therapy in 2019.  Providers have incentives to negotiate rates for all the services they *may* offer.  As this data shows, providers predictably will not offer every one of those services every year, but the previously negotiated contracted rates continue to reflect fair market value for the item or service regardless of whether a provider ultimately supplies a particular service in a particular period of time.

Data from individual providers further proves the point.  One large anesthesiology provider did not submit any claims for "anesthesia procedures on the mouth" in 2019, but submitted 24 such claims from 2020 through 2023.  The same provider did not submit any claims under the procedure codes for "head and neck anesthesia" in 2019 or 2023, but submitted between three and seven claims for this service each year in between.  A large emergency medicine provider similarly did not submit any claims for initial treatment of burns in 2019 or 2021, but submitted such claims in 2020, 2022, and 2023.  These providers had the same market incentives to negotiate contracted rates for these services as they did every other year in the period, yet plaintiffs question whether these providers were truly "available" to provide these services because they did not happen to provide them

11

in 2019, the base year when the QPA is to be calculated under the Act. The district court's order would thus produce a QPA that is the product of happenstance, not relevant market conditions, and would likely bias the QPA values.

The district court erroneously thought that the Departments had "acknowledge[d] that at least some contracted rates should be excluded from the QPA calculation—$0 rates, for example," *TMA III*, 2023 WL 5489028, at *6, but the Departments excluded "$0 rates" precisely because they are *not* actually contracted rates. As the Departments explained, "some plans and issuers enter $0 in their fee schedules for covered items and services that a provider or facility is not equipped to furnish," and the Departments clarified that "$0 does not represent a contracted rate in these cases." U.S. Dep't of Labor, *FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55*, at 17 n.29 (Aug. 19, 2022).[6] These "$0 rates" thus do not represent amounts that payors and providers have negotiated and valued as worthless—no one expects these providers to supply these items and services gratis, as the district court's misunderstanding would suggest—but rather are effectively placeholders for items and services that are present in a fee schedule but that the provider is not actually "available" to render. The Departments logically excluded these placeholders because they are not relevant to assessing the fair market value of the item or

---

[6] http://tinyurl.com/y8kfmuth.

service.  But genuinely negotiated network rates for items or services that are not

ultimately supplied within a given period still reflect fair market value, and

excluding them undermines the purpose of the QPA.

Plaintiffs insist that there is "likely" a subset of services for which providers

have negotiated non-zero rates, but that they would never actually provide.  Pet. for

Rh'g at 13.  Plaintiffs, however, offer no evidence to substantiate that assertion.

Nor do they establish that these so-called "ghost rates" are not *actually* negotiated

or that they "artificially depress[]" QPA values.  *Id.* at 7, 16.  Moreover, if "ghost

rates" were to exist, plaintiffs do not explain how the Departments could possibly

devise a methodology that would accurately determine whether providers are

*really* available to provide the services included in their negotiated rate schedules.[7]

Nonetheless, plaintiffs insist that health plans filter out large swaths of relevant

market information—a solution in search of a problem that contravenes statutory

text and intent, needlessly complicates the process of calculating the QPA, and

renders the outcome less reliable.[8]  As the Panel understood, the Act "requires only

---

[7] Plaintiffs previously suggested that the Departments' methodology could determine whether a provider is available to provide a given service by looking to the "items and services providers have provided" in the past, Pls.' Panel Br. (ECF 76) at 37.  Plaintiffs now disclaim any "historical-provision test," Pls.' Pet. for Rh'g at 12, while offering no alternative.

[8] Any fear of intentional manipulation by plan sponsors would be baseless because the Act requires the QPA to be calculated based on 2019 contracted rates. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).  Thus, the QPA will be calculated based on

that a given service be 'available,'" and the Departments' guidance was neither "inconsistent with the Act nor arbitrary and capricious." Panel Op. at 10-11 (internal quotation omitted). The *en banc* Court should affirm the Panel's conclusions on this issue.

## II.    INCENTIVE-BASED COMPENSATION AND RETROSPECTIVE PAYMENTS OR ADJUSTMENTS ARE NOT COMPONENTS OF CONTRACTED RATES FOR PARTICULAR ITEMS OR SERVICES.

The Act in pertinent part defines the QPA as "the median of the contracted rates recognized by the plan or issuer … as the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) … for the same or a similar ***item or service***." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). In keeping with this statutory language, the Departments properly instructed that a health plan calculating the median contracted rate must "[e]xclude risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 45 C.F.R. § 149.140(b)(2)(iv). Plaintiffs argued that this regulation was contrary to law, and the district court agreed, reasoning that the statutory phrase "total maximum payment" "plainly requires insurers to calculate QPAs using the 'entire,' 'highest possible' payment that a provider could receive for an item or service

---

contracted rates that existed long before the July Rule was published; indeed, long before Congress even passed the Act.

under the contracted rate," which the district court surmised included any and all "bonus and incentive payments."  *TMA III*, 2023 WL 5489028, at *8.

The flaw in that reasoning is that the Act defines the QPA as the median of the contracted rates *for a particular item or service*.  Moreover, the Act explicitly delegated "fairly broad" authority to determine how those lines ought to be drawn.  Panel Op. at 9.  The Departments reasonably instructed health plans to include in QPA calculations both contracted rates for items and services reimbursed through traditional fee-for-service models and underlying fee schedule rates or similar "derived amounts" for particular items or services reimbursed through alternative payment models.  *See* Appellants' *En Banc* Br. at 25-26.  The incentive compensation and retrospective payment adjustments excluded from the QPA calculation, however, are *not* components of contracted rates for particular items or services, which is the relevant metric under the plain language of the Act.  *See id.* The Departments' guidance is thus consistent with both law—the statutory definition of the QPA—and logic—because those payments cannot be naturally translated into components of fee-for-service payment rates.

The Health Care Payment Learning & Action Network ("HCP LAN") is a public-private partnership that offers strategy and thought leadership related to the healthcare system's use of alternative payment models.  HCP LAN has developed a set of common definitions for value-based payments, which is the standard for

describing alternative payment models across the industry. *See* HCP LAN, *APM Framework* 19 (2017).[9] HCP LAN's framework comprises four general categories, including traditional fee-for-service payments for specific items and services; as detailed *infra* at 18-20, it would neither be practicable nor prudent to attempt to convert the other three categories into fee-for-service payment rates.

  *Category 1: Fee for Service — No Link to Quality & Value.* Under the traditional fee-for-service payment model, payors compensate providers with a fixed payment for each unit of service provided. HCP LAN, *supra*, at 21.

  *Category 2: Fee for Service — Link to Quality & Value.* The most straightforward alternative payment models start from traditional fee-for-service payments, then add or subtract. Some models make additional payments to providers "for infrastructure investments that can improve the quality of patient care," such as "payments designated for staffing a care coordination nurse or upgrading to electronic health records." *Id.* This category also includes "pay-for-reporting" models, which "provide positive or negative incentives to report quality data to the health plan and—preferably—to the public." *Id.* A third subcategory of this kind of compensation model rewards providers for good performance on quality metrics, penalizes providers for poor performance, or both. *Id.* at 22.

---

[9] https://tinyurl.com/37bcrnnm.

***Category 3: Alternative Payment Models Built on Fee-for-Service***

***Architecture.***  This category also starts from fee-for-service payments, but unlike

Category 2 payments, "Category 3 payments are based on cost (and occasionally

utilization) performance against a target" and "are structure[d] to encourage

providers to deliver effective and efficient care."  *Id.*  These payments also account

for a longer time frame of care, focusing on "the effective management of a set of

procedures, an episode of care, or all health services provided for individuals," all

of which may involve services supplied by multiple providers.  *Id.*  All payments

in this category afford providers "the opportunity to share in a portion of the

savings they generate against a cost target or by meeting utilization targets, if

quality targets are met"; some but not all models in this category also penalize

providers for not meeting such targets by allowing payors to "recoup from

providers a portion of the losses that result."  *Id.* at 23.  Category 3 payments by

their nature must be made retrospectively, after providers supply services and the

results can be measured by reference to historical data.

***Category 4: Population-Based Payment.***  This final category includes

payment models that "involve prospective, population-based payments, structured

in a manner that encourages providers to deliver well-coordinated, high-quality,

person-centered care."  *Id.* at 24.  Category 4 "includes bundled payments for the

comprehensive treatment of specific conditions," such as global payments to

17

providers responsible for all aspects of a patient's oncology care rather than payments for chemotherapy alone. *Id.* at 25. Other payments in this category "cover all [of] an individual's health care needs," where the payor "compensate[s] providers for maintaining health and managing illness of an entire population," instead of paying for treatments of "distinct conditions." *Id.*

Blue Plans have considerable experience with alternative payment models. The BlueCard preferred provider organization network, for example, contracts with over 716,000 healthcare providers who are engaged in value-based programs and earn compensation through alternative payment models. More than 85% of such value-based programs compensate providers through so-called "shared savings" arrangements on a retrospective basis, informed by actual cost savings.

Though alternative payment models vary considerably, a common thread across categories 2-4 is how difficult it would be to translate alternative payments not tied to particular items or services into traditional fee-for-service payments, as the district court's order requires. Even the simplest value-based payments raise difficult questions: How would a bonus awarded—or penalty deducted—based on the *results* of a provider's services for a particular patient population translate into an agreed-upon rate for the *act* of providing a given service itself? It is similarly difficult to imagine how a payor would be expected to allocate Category 3 payments that reward performance across multiple services, often supplied by

18

multiple providers, into discrete rates for a particular provider supplying a particular service.  The task becomes still more daunting for Category 4 payment models, the very premise of which is to compensate providers for comprehensive care, whether of a condition or of an individual's overall health; there is no agreed or obvious way to subdivide these purposefully global prospective payments into payment rates for individual healthcare items or services.  This translation exercise would be a veritable pandora's box.

Even if it were technically possible to square this circle, this aspect of the district court's ruling, like the others, would make calculating the QPA substantially more burdensome for health plans without any corresponding benefit to calculating a QPA that more accurately reflects fair market value.  Translating these alternative compensation models into fee schedule rates for particular items or services would inevitably be complicated, expensive, and time-consuming; health plans would have to evaluate hundreds of thousands of distinct arrangements and would each construct their own unique means of performing that translation.  The resulting variation by health plan, and possibly even within a plan, would produce even more confusion among providers and unduly complicate the IDR process.  And this convoluted process would not make the QPA better reflect market rates *for items and services*, as Congress intended, *see* 42 U.S.C. § 300gg-

111(a)(3)(E)(i), given that these bonus payments serve purposes entirely distinct from compensating providers for units of service rendered to individual patients.

## III.  OTHER PROVISIONS INVALIDATED BY THE DISTRICT COURT SIMILARLY MAKE CALCULATING THE QPA MORE BURDENSOME WITHOUT IMPROVING ACCURACY.

Two other aspects of the district court's decision make calculating QPAs more burdensome without any justification, worsening the impact of the district court's vacatur of key provisions of the Act.  Though the Departments chose not to appeal these errors, the district court was wrong to impose additional bureaucratic hurdles that fail to serve the Act's goals.

*Specialty-Specific Calculations.*  The Act limits the QPA to "the median of the contracted rates recognized by the plan or issuer … for the same or a similar item or service that is provided by a provider *in the same or similar specialty.*"  42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added).  Consistent with that definition, the Departments directed that whenever "a plan or issuer has contracted rates that vary based on provider specialty for a service code," the QPA for that service code must be "calculated separately for each provider specialty."  45 C.F.R. § 149.140(b)(3)(i).  The Departments also required health plans to calculate the QPA by specialty even when they do not intentionally vary rates by specialty if "the contracting process otherwise results in different rates for different specialties."  U.S. Dep't of Labor, *supra*, at 16.  For many service codes, however,

"not all plans or issuers vary contracted rates by provider specialty, in which case requiring plans and issuers to calculate separate median contracted rates for each provider specialty would increase the burden associated with calculating the QPA without adding specificity to the QPA." 86 Fed. Reg. at 36,891. The Departments understandably did not require the QPA to be calculated separately by specialty when contracted rates do not vary by specialty, as such a mandate would make calculating the QPA more burdensome without any corresponding benefits.

Plaintiffs argued, and the district court agreed, that this methodology is impermissible because the Act mandates specialty-specific calculations without exception. *TMA III*, 2023 WL 5489028, at *7. But when contracted rates for a particular healthcare service do not vary by specialty, the median contracted rate across specialties *is also* the median contracted rate in the same or a similar specialty as well. The district court thus invalidated this aspect of the July Rule based on a purported textual conflict that does not actually exist.

The BHI analysis described *supra* at 10 n.5, which tracked the service codes that radiologists, pathologists, hospitalists, emergency medicine providers, and anesthesiologists billed across the 2019 through mid-2023 coverage period, shows that out-of-specialty billing is common. For instance, hospitalists submitted the majority of claims for "observation care discharge," generating 388,165 claims out of 508,480 total, but emergency medicine providers submitted another 119,021

claims for this service.  Likewise, the distribution of claims under the service code for the initial 15 minutes of moderate sedation services provided to patients older than four years old reached across multiple specialty groups, with radiologists submitting 332,982 such claims, anesthesiologists 104,589 claims, and emergency medicine providers 64,014 claims.  Radiologists predictably submitted the most claims under the service code for ultrasound guide for vascular access, at 162,566 in total, but anesthesiologists submitted nearly as many, with 159,127 for this service.  Even service codes predominantly billed by healthcare providers within one specialty are frequently billed by providers in other specialties.  The data shows that emergency medicine providers billed 3,997,216 claims for electrocardiogram reports, representing nearly 97% of the 4,129,163 total claims for that service, but providers in each of the other four specialties submitted claims in substantial numbers as well: hospitalists submitted 71,151 claims; pathologists submitted 37,047 claims; anesthesiologists submitted 19,146 claims; and radiologists submitted 4,603 claims.

This data confirms that specialty providers frequently supply non-specialty or out-of-specialty services.  For the sensible reasons discussed *supra* at 8-10, the fee schedules that network providers negotiate with health plans typically include contracted rates for healthcare services, even when those services are outside the traditional scope of a provider's primary practice area.  If health plans varied these

contracted rates by specialty, the July Rule required them to calculate the QPA by specialty. But when health plans did not vary contracted rates by specialty, they have no reason to differentiate contracted rates by specialty in their systems, and there is no evidence that they do so. Requiring health plans to retroactively tease out 2019 contracted rates by specialty for each and every healthcare service creates a significant new administrative burden on health plans that will do nothing to render the QPA a more accurate reflection of the fair market value of those services. Indeed, this change threatens the reliability of the QPA, since requiring QPA calculations to be performed on smaller datasets introduces additional variability.

***Requiring Duplicative QPA Calculations for Individual Health Plan Sponsors.*** The Act in relevant part defines the QPA as "the median of the contracted rates recognized by the plan or issuer," "determined with respect to all such plans of such sponsor or all such coverage offered by such issuer that are offered within the same insurance market … as the plan or coverage." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The statute further defines the "insurance market" for self-insured group health plans as "other self-insured group health plans." *Id.* § 300gg-111(a)(3)(E)(iv). Thus, by its own terms, the Act contemplates that the QPA for a self-insured group health plan may be calculated with reference to other such plans. The district court therefore erred in concluding that the Departments

23

unlawfully departed from the Act in permitting "sponsors of self-insured group health plans to allow their third-party administrators to determine the QPA for the sponsor by calculating the median contracted rates recognized by all self-insured group health plans administered by the third-party administrator (not only those of the particular plan sponsor)." 86 Fed. Reg. at 36,890; *see* 45 C.F.R. § 149.140(a)(8)(iv). These regulations not only comport with the Act but also drastically reduce the burden of calculating the QPA for self-insured group health plans without making the results any less reliable.

A brief background on how the health insurance market operates illustrates why the decision below would create massive burdens without any demonstrable impact on the QPA. Employers provide health benefits for most Americans under age 65—154 million people in total. KFF, *Employer Health Benefits: 2024 Annual Survey* 64 (Oct. 2024).[10] Employer-sponsored health insurance "plans generally fall under one of two categories: 'fully insured' or 'self-funded.'" *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*, 898 F.3d 461, 468 (5th Cir. 2018). Under "fully insured" plans, an employer pays an insurance carrier a fixed monthly premium for covered employees, and the carrier then "acts as a direct insurer," meaning that the insurer "bears the financial risk of paying claims" for covered employees' health benefits. *Id.* By contrast, under "self-funded"—also known as

---

[10] https://tinyurl.com/yjdueswt.

"self-insured"—plans, the employer pays for covered employees' medical claims from the employer's own assets and bears the financial risk for covering medical expenses under the plan.  Cong. Rsch. Serv., *Health Insurance: A Primer* 4 (Jan. 8, 2015).[11]  Sixty-three percent of workers who receive employer-sponsored health benefits are enrolled in self-funded plans.  KFF, *supra*, at 166.  Self-funded or self-insured plans include private employers but also many government employers and unions.  *See* Cong. Rsch. Serv., *Federal Requirements on Private Health Insurance Plans* 1-2 (Mar. 9, 2023).[12]  Self-funded plans often help employers save money, in part because sponsors of fully insured plans must prepay insurance carriers for medical expenses covered employees may incur, while self-funded plan sponsors pay only for medical expenses covered employees ultimately do incur.

Though many employers prefer self-funded plans, most employers do not have the expertise, capacity, or desire to manage all aspects of operating a health benefit plan themselves and instead contract with a TPA to manage the plan's day-to-day operations.  "A TPA's administrative duties might include processing claims, paying claims, and managing the everyday functioning of a plan."  *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1324 (11th Cir. 2014).  The contract between the plan sponsor and TPA, usually called an administrative services only

---

[11] http://tinyurl.com/36yf6ydb.
[12] http://tinyurl.com/yc69zkaj.

("ASO") agreement, specifies the services the TPA will perform, which in addition to processing and paying claims may include "providing customer service, linking beneficiaries to providers, and making medical-necessity determinations." *Health Care Serv. Corp. v. Methodist Hosps. of Dallas*, 814 F.3d 242, 246 (5th Cir. 2016). Blue Plans collectively serve approximately 79,000 unique self-funded accounts.

    One of the most important services that TPAs offer self-funded plans is that the TPA typically "organizes [the] network of providers and negotiates rates for health care services." *N. Cypress*, 898 F.3d at 469.  "In-network providers contract with" the TPA "to provide services at pre-arranged reimbursement rates in exchange for access" to members of the self-funded plans that the TPA administers.  *Id.*  A plan sponsor's arrangement with a TPA, including how much the sponsor pays the TPA and the specific services the TPA offers, may vary from plan to plan.  But, given that access to a TPA's provider network is a key reason self-funded plan sponsors contract with TPAs in the first place, the provider network offered by the TPA typically does *not* vary between plan sponsors.  *See, e.g.*, *id.* (describing "Aetna's network"—singular—for both the fully insured plans for which Aetna acts as a direct insurer and the self-funded plans for which Aetna acts as a TPA); *Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*, 66 F.4th 307, 310 (1st Cir. 2023).  Because the TPA's provider network usually does not vary between self-funded plans, neither do contracted rates.  The

26

QPA accordingly will look the same regardless of whether each plan sponsor bears the burden of calculating the QPA separately or the TPA more efficiently calculates the QPA once for all the self-funded plans it administers.

Plaintiffs have not shown otherwise and thus lack standing to challenge this aspect of the regulations.  The district court ruled that plaintiffs had standing because they purportedly "submitted evidence that self-funded plans," if given the option of using the QPA that their TPA calculates across the many plans it administers, are "likely to calculate alternative QPAs and choose the lower amount if available."  *TMA III*, 2023 WL 5489028, at *9 (citing TMA Pls.' Mot. Summ. J., ECF No. 25, at Ex. A ¶ 20, Ex. B ¶ 21, Ex. D ¶ 19).  But plaintiffs did not submit any evidence that allowing TPAs to calculate the QPA would lead to different results, much less a systematically lower QPA that self-funded plan sponsors would then exploit.  The "evidence" the district court cited was one identical paragraph of unsupported speculation copied and pasted into three declarations—two submitted by members of plaintiff Texas Medical Association, and the third submitted by individual plaintiff Dr. Adam Corley.  But "conclusory allegations of an affidavit" do not suffice to establish standing at summary judgment, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990), and plaintiffs' self-serving affidavits do not even attempt to explain why a cross-sponsor QPA would look any

different from sponsor-specific QPAs calculated *based on the same provider network.*

As the Departments understood, a TPA typically offers one provider network to all the sponsors of self-insured group health plans that contract with that TPA; plan sponsors' contractual arrangements with the TPA vary, but the network itself and contracted rates normally do not. The challenged regulations thus "reduce the burden imposed on sponsors of self-insured group health plans," 86 Fed. Reg. at 36,890, by allowing a TPA to calculate the QPA once for all the plans the TPA administers rather than forcing each plan sponsor—including all ~79,000 plans that Blue Plans collectively serve—to separately perform what is likely the same calculation because they rely on the same provider network. Plaintiffs prefer the latter approach precisely because it is more burdensome, but they have not shown that it would affect the ultimate calculation of the QPA.

## CONCLUSION

For the foregoing reasons, the Court should affirm the Panel's reversal of the district court's order below.

Dated:  July 28, 2025                  Respectfully submitted,

                                       /s/ Jennifer B. Sokoler
                                       Jennifer B. Sokoler
                                       O'Melveny & Myers LLP
                                       1301 Avenue of the Americas, 17th Fl.
                                       New York, NY 10019
                                       (212) 326-2000
                                       jsokoler@omm.com

                                       K. Lee Blalack, II
                                       O'Melveny & Myers LLP
                                       1625 Eye Street NW
                                       Washington, D.C. 20006

                                       Evan Hindman
                                       O'Melveny & Myers LLP
                                       Two Embarcadero Ctr., 28th Fl.
                                       San Francisco, CA 94111

                                       Counsel for *Amicus Curiae*
                                       Blue Cross Blue Shield Association

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025, a true and correct copy of the foregoing was filed electronically using the CM/ ECF system, which served counsel for the parties.


*/s/ Jennifer B. Sokoler*
Jennifer B. Sokoler

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 6,488 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Jennifer B. Sokoler*
Jennifer B. Sokoler