No. 23-40605

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL, L.L.C.;
DR. ADAM CORLEY,
*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY,
JR., SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES
DEPARTMENT OF THE TREASURY; SCOTT BESSENT, SECRETARY, U.S. DEPARTMENT OF
TREASURY; UNITED STATES DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER,
SECRETARY, U.S. DEPARTMENT OF LABOR; UNITED STATES OFFICE OF PERSONNEL
MANAGEMENT; SCOTT KUPOR,
*Defendants-Appellants.*

_____

LIFENET, INCORPORATED; EAST TEXAS AIR ONE, L.L.C.; ROCKY MOUNTAIN HOLDINGS
L.L.C.; AIR METHODS CORPORATION, L.L.C.,
*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY,
JR., SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES
DEPARTMENT OF THE TREASURY; SCOTT BESSENT, SECRETARY, U.S. DEPARTMENT OF
TREASURY; UNITED STATES DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER,
SECRETARY, U.S. DEPARTMENT OF LABOR; UNITED STATES OFFICE OF PERSONNEL
MANAGEMENT; SCOTT KUPOR,
*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the Eastern District of Texas (Kernodle, J.)
Nos. 6:22-cv-450 and 6:22-cv-453

_____

## EN BANC BRIEF OF APPELLEES
## TEXAS MEDICAL ASSOCIATION, TYLER REGIONAL
## HOSPITAL, AND DR. ADAM CORLEY

_____

COUNSEL LISTED ON INSIDE COVER

JILLIAN SHERIDAN STONECIPHER
   *Counsel of Record*
MADELEINE JOSEPH
CODY M. AKINS
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8711
Email: jstonecipher@sidley.com

JAIME L.M. JONES
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Tel: (312) 853-0751
Fax: (312) 853-7036
Email: jaime.jones@sidley.com

**Counsel for Plaintiffs-Appellees**

## CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**A.    Plaintiffs-Appellees**

> 1. Texas Medical Association
> 2. Tyler Regional Hospital, LLC
> 3. Dr. Adam Corley
> 4. LifeNet, Incorporated
> 5. East Texas Air One, LLC
> 6. Rocky Mountain Holdings LLC
> 7. Air Methods Corporation, LLC

**B.    Attorneys for Plaintiffs-Appellees**

> 1. For Texas Medical Association, Tyler Regional Hospital, LLC, and Dr. Adam Corley:
>
>> Sidley Austin LLP
>> Jillian Sheridan Stonecipher
>> jstonecipher@sidley.com
>> Madeleine Joseph
>> mjoseph@sidley.com
>> Cody M. Akins
>> cakins@sidley.com
>> SIDLEY AUSTIN LLP
>> 1501 K Street, NW
>> Washington, DC 20005
>> Telephone: (202)736-8000
>> Facsimile: (202) 736-8711

Jaime L.M. Jones
jaime.jones@sidley.com
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-0751
Facsimile: (312) 853-7036

Penny Packard Reid
preid@sidley.com
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: (214) 981-3413
Facsimile: (214) 981-3400

2. For LifeNet, Inc. and East Texas Air One, LLC:

Susman Godfrey LLP
Stephen Shackelford, Jr.
sshackelford@susmangodfrey.com
Steven M. Shepard
sshepard@susmangodfrey.com
James Craig Smyser
csmyser@susmangodfrey.com
Max Isaac Straus
mstraus@susmangodfrey.com
Susman Godfrey LLP
1301 Ave. of the Americas, Fl. 32
New York, NY 10019
Telephone: (212) 336-8340
Facsimile: (212) 336-8340

3. For Air Methods Corporation and Rocky Mountain Holdings, LLC:

Polsinelli PC
David A. King

dking@polsinelli.com
Joshua D. Arters
jarters@polsinelli.com
POLSINELLI PC
501 Commerce Street, Suite 1300
Nashville, TN 37203
Telephone: (615) 259-1510
Facsimile: (615) 259-1573

**C.**   ***Amici Curiae***

1. American Society of Anesthesiologists
2. American College of Emergency Physicians
3. American College of Radiology
4. American Medical Association
5. The Emergency Department Practice Management Association
6. American Benefits Council
7. Business Group on Health
8. Council of Insurance Agents and Brokers
9. DFW Business Group on Health
10. ERISA Industry Committee
11. Houston Business Coalition on Health
12. HR Policy Association
13. National Alliance of Health Care Purchaser Coalitions
14. National Retail Federation
15. Purchaser Business Group on Health
16. Self-Insurance Institute of America
17. Texas Business Group on Health
18. Texas Employers for Affordable Healthcare
19. Leukemia & Lymphoma Society
20. The ALS Association
21. Cancer Support Community
22. CancerCare
23. Epilepsy Foundation
24. Families USA Action
25. Hemophilia Federation of America
26. The Mended Hearts, Incorporated

27. National Multiple Sclerosis Society
28. National Patient Advocate Foundation
29. U.S. PIRG
30. America's Health Insurance Plans, Inc.
31. Blue Cross Blue Shield Association

**D.    Attorneys for *Amici Curiae***

1. For American Society of Anesthesiologists, American College of Emergency Physicians, and American College of Radiology:

> Powers Pyles Sutter & Verville PC
> Ronald S. Connelly
> Ron.Connelly@PowersLaw.com
> Jeremy Lewin
> Leela Baggett
> Fernando Montoya
> Allyn N. Rosenberger
> POWERS PYLES SUTTER & VERVILLE PC
> 1501 M Street NW
> Seventh Floor
> Washington, DC 20005
> Telephone: (202) 872-6762
> Facsimile: (202) 785-1756

2. For American Medical Association:

> Akin Gump Strauss Hauer & Feld LLP
> James Tysse
> jtysse@akingump.com
> Kelly M. Cleary
> kcleary@akingump.com
> Kristen E. Loveland
> kloveland@akingump.com
> AKIN GUMP STRAUSS HAUER & FELD LLP
> 2001 K Street NW
> Washington, DC 20006
> Telephone: (202) 887-4000

3. For The Emergency Department Practice Management Association:

> ArentFox Schiff LLP
> Jack R. Bierig
> jack.bierig@afslaw.com
> ARENTFOX SCHIFF LLP
> 233 South Wacker Drive
> Suite 7100
> Chicago, IL 60606
> Telephone: (312) 258-5511
> Facsimile: (312) 258-5600
>
> The Stafford Davis Firm, PC
> Catherine Susan Bartles
> cbartles@stafforddavisfirm.com
> Stafford Davis
> sdavis@stafforddavisfirm.com
> THE STAFFORD DAVIS FIRM, PC
> 815 S Broadway Ave
> Tyler, TX 75701
> Telephone: (903) 593-7000
> Facsimile: (903) 705-7369

4. For American Benefits Council, Business Group on Health Council of Insurance Agents and Brokers, DFW Business Group on Health, ERISA Industry Committee, Houston Business Coalition on Health, HR Policy Association, National Alliance of Health Care Purchaser Coalitions, National Retail Federation, Purchaser Business Group on Health, Self-Insurance Institute of America, Texas Business Group on Health, and Texas Employers for Affordable Healthcare:

> Groom Law Group
> Seth T. Perretta
> sperretta@groom.com
> Ryan Temme

rtemme@groom.com
Matthew W. Lanahan
mlanahan@groom.com
GROOM LAW GROUP
1701 Pennsylvania Ave NW
Washington, DC 20006
Telephone: (202) 867-0620
Facsimile: (202) 659-4503

5. For Leukemia & Lymphoma Society, The ALS Association Cancer Support Community, CancerCare, Epilepsy Foundation, Families USA Action, Hemophilia Federation of America, The Mended Hearts, Incorporated, National Multiple Sclerosis Society, National Patient Advocate Foundation, and U.S. PIRG:

Wardenski P.C.
Joseph J. Wardenski
joe@wardenskilaw.com
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, New York 10001
Telephone: (347) 913-3311

6. For America's Health Insurance Plans, Inc.:

Deutsch Hunt PLLC
Hyland Hunt
hhunt@deutschhunt.com
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave., Suite 900
Washington, DC 20001
Telephone: (202) 868-6915
Facsimile: (202) 609-8410

America's Health Insurance Plans
Michael Spector
Thomas M. Palumbo

AMERICA'S HEALTH INSURANCE PLANS
601 Pennsylvania Ave. NW
South Building, Suite 500
Washington, DC 20004

7. For Blue Cross Blue Shield Association:

O'Melveny & Myers, L.L.P.
K. Lee Blalack, II
lblalack@omm.com
O'MELVENY & MYERS, L.L.P.
1625 Eye Street, N.W.
Washington, DC 20006
Telephone: (202) 383-5300

Jennifer B. Sokoler
O'MELVENY & MYERS, L.L.P.
1301 Avenue of the Americas, 17th Fl.
New York, NY 10019
(212) 326-2000

Evan Hindman
O'MELVENY & MYERS, L.L.P.
Two Embarcadero Ctr., 28th Fl.
San Francisco, CA 94111

## E.    Entities with a Financial Interest:

The following additional persons may have a financial interest in the outcome of the litigation.

1.    Texas Medical Association Library dba TMA Knowledge Center
2.    Texas Medical Association Special Funds Foundation
3.    Texas Medical Association Foundation
4.    TMF Health Quality Institute
5.    Texas Medical Association Alliance
6.    Texas Medical Association Political Action Committee

vii

7.   TMA Practice Management Holdings, LLC
8.   TMA Specialty Services, LLC
9.   PSO Services, LLC
10.  Physicians Benevolent Fund
11.  Improving The Health Of All Texans
12.  TMA Insurance Trust
13.  Texas Medical Liability Trust
14.  Annie Lee Thompson Library Trust Fund
15.  Dr. S. E. Thompson Scholarship Fund
16.  May Owen Irrevocable Trust
17.  East Texas Health System, LLC
18.  AHS East Texas Health System, LLC
19.  The University of Texas Health Sciences Center at Tyler

## F.   Federal Rule of Appellate Procedure 26.1:

1. Texas Medical Association has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2. Tyler Regional Hospital, LLC is part of East Texas Health System, LLC, which is a joint venture between AHS East Texas Health System, LLC (the majority owner) and University of Texas Health Sciences Center at Tyler. No publicly held corporation owns 10% or more of Tyler Regional Hospital, LLC's stock.

3. Dr. Adam Corley is a natural person.

Dated: August 18, 2025

*/s/ Jillian Sheridan Stonecipher*
Jillian Sheridan Stonecipher

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................. i

TABLE OF AUTHORITIES ..................................................................... xi

INTRODUCTION ..................................................................................... 1

STATEMENT OF ISSUES ........................................................................ 5

STATEMENT OF THE CASE ................................................................... 7

    A.    The No Surprises Act ................................................................. 7

    B.    The Independent Dispute Resolution Process ........................ 9

    C.    QPA Definition and Calculation ............................................ 10

    D.    The July Interim Final Rule .................................................... 11

        1.    Including "ghost rates" in QPAs .................................... 12

        2.    Excluding incentive payments from QPAs .................. 14

        3.    Including out-of-specialty rates in QPAs ..................... 15

        4.    Including other plan sponsors' rates in QPAs ............. 16

    E.    The Decision Below ................................................................. 17

    F.    The Panel Opinion .................................................................. 19

STANDARD OF REVIEW ....................................................................... 22

SUMMARY OF ARGUMENT ................................................................. 23

ARGUMENT ........................................................................................... 27

I.    Including Ghost Rates In QPA Calculations Is
Unlawful. ............................................................................................ 27

    A.    Including ghost rates violates the NSA's text. ...................... 27

B.     Including ghost rates is unreasonable. ................................. 31

II.    Excluding Incentive Payments Is Unlawful. ................................ 36

    A.     Excluding incentive payments violates the NSA's
           text. ..................................................................... 36

    B.     Excluding incentive payments is unreasonable. .................. 42

III.   Vacatur Of The Unlawful QPA Methodology Rules Was
      The Proper Remedy. ........................................................... 44

    A.     The APA authorizes vacatur. ............................................... 45

          1.     This Court's precedents correctly hold that
               the APA authorizes vacatur. ....................................... 45

          2.     The Departments' contrary view is wrong................... 48

    B.     The district court did not abuse its discretion in
           deciding vacatur was the appropriate remedy. .................... 53

          1.     Universal vacatur is the appropriate
               remedy here under the Court's longstanding
               precedents. ................................................................. 53

          2.     In all events, vacatur is the appropriate
               remedy because it is the only way to provide
               plaintiffs complete relief.............................................. 57

CONCLUSION ...................................................................... 62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Hippocratic Med. v. FDA*,
　78 F.4th 210 (5th Cir. 2023) ........................................................... 53, 58

*Aragon v. Tillerson*,
　240 F. Supp. 3d 99 (D.D.C. 2017) ......................................................... 52

*Argosy Ltd. v. Hennigan*,
　404 F.2d 14 (5th Cir. 1968) ................................................................. 49

*Bethlehem Steel Corp. v. EPA*,
　638 F.2d 994 (7th Cir. 1980) ................................................................ 47

*Braidwood Mgmt., Inc. v. Becerra*,
　104 F.4th 930 (5th Cir. 2024) ............................................. 48, 53, 55, 57

*Cal. Wilderness Coal. v. Dep't of Energy*,
　631 F.3d 1072 (9th Cir. 2011) .............................................................. 47

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*,
　98 F.4th 220 (5th Cir. 2024) ............................................................... 55

*Cargill v. Garland*,
　57 F.4th 447 (5th Cir. 2023) (*en banc*) ....................................... 5, 46, 54

*Casa De Maryland v. DHS*,
　924 F.3d 684 (4th Cir. 2019) ............................................................... 47

*CBS Corp. v. FCC*,
　663 F.3d 122 (3d Cir. 2011) ................................................................ 47

*Chamber of Com. v. SEC*,
　88 F.4th 1115 (5th Cir. 2023) ................................................... 53, 54, 62

*City of Dallas v. FCC*,
　118 F.3d 393 (5th Cir. 1997) ............................................................... 38

*Corner Post, Inc. v. Bd. of Governors,*
603 U.S. 799 (2024) ...................................................... 46, 48, 49, 51, 52

*Data Mktg. P'ship, LP v. Dep't of Lab.,*
45 F.4th 846 (5th Cir. 2022) ............... 22, 32, 45, 46, 47, 53, 54, 55, 56

*Dine Citizens Against Ruining Our Env't v. Bernhardt,*
923 F.3d 831 (10th Cir. 2019) .................................................. 47

*Downs v. Hubbard,*
123 U.S. 189 (1887) ................................................................. 58

*El Paso Elec. Co. v. FERC,*
832 F.3d 495 (5th Cir. 2016) .................................................. 48

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ............................................................... 42

*First Nat'l Bank at Lubbock v. United States,*
463 F.2d 716 (5th Cir. 1972) .................................................. 54

*Fogo De Chao (Holdings), Inc. v. DHS,*
211 F. Supp. 3d 31 (D.D.C. 2016) ........................................... 52

*Franciscan All., Inc. v. Becerra,*
47 F.4th 368 (5th Cir. 2022) .......................................... 46, 54

*Friedman v. Sebelius,*
686 F.3d 813 (D.C. Cir. 2012) ................................................ 54

*Hansberry v. Lee,*
311 U.S. 32 (1940) ................................................................. 58

*Harrington v. Chao,*
280 F.3d 50 (1st Cir. 2002) ................................................... 46

*Hibbs v. Winn,*
542 U.S. 88 (2004) ................................................................. 29

*Ins. Mktg. Coal. Ltd. v. FCC,*
127 F.4th 303 (11th Cir. 2025) ............................................... 47

*ITServe All., Inc. v. DHS,*
    71 F.4th 1028 (D.C. Cir. 2023) ...................................................... 55, 56

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) ....................................................... 4, 23, 30, 31

*Louisiana v. Dep't of Energy,*
    90 F.4th 461 (5th Cir. 2024) ........................................................ 32, 42

*Mann Constr., Inc. v. United States,*
    27 F.4th 1138 (6th Cir. 2022) ............................................................. 47

*Marbury v. Madison,*
    1 Cranch 137 (1803) .......................................................................... 56

*MCI Telecomms. Corp. v. AT&T Co.,*
    512 U.S. 218 (1994) ........................................................................... 33

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ........................................................................... 58

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.,*
    894 F.3d 95 (2d Cir. 2018) ................................................................. 47

*Nat'l Auto. Dealers Ass'n v. FTC,*
    127 F.4th 549 (5th Cir. 2025) ............................................................ 47

*Nat'l Religious Broads. v. FCC,*
    138 F.4th 282 (5th Cir. 2025) ............................................................ 47

*Nielsen v. Preap,*
    586 U.S. 392 (2019) ........................................................................... 28

*Nike, Inc. v. Adidas AG,*
    955 F.3d 45 (Fed. Cir. 2020) ............................................................. 47

*Ohio v. EPA,*
    144 S. Ct. 2040 (2024) ....................................................................... 43

*Pulsifer v. United States,*
    144 S. Ct. 718 (2024) ......................................................................... 30

*Rest. L. Ctr. v. Dep't of Lab.*,
  120 F.4th 163 (5th Cir. 2024) ........................................ 48, 53

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) .............................................. 32, 34, 38

*SEC v. Forex Asset Mgmt. LLC*,
  242 F.3d 325 (5th Cir. 2001) .................................... 53

*Silva v. Sec'y of Lab.*,
  518 F.2d 301 (1st Cir. 1975) ................................... 52

*Stanley v. City of Sanford*,
  145 S. Ct. 2058 (2025) ......................................... 60

*Sw. Elec. Power Co. v. EPA*,
  920 F.3d 999 (5th Cir. 2019) ................................... 47

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) ............................................ 56

*Tex. Med. Ass'n v. HHS*,
  587 F. Supp. 3d 528 (E.D. Tex. 2022) (*TMA I*) ................. 3, 8

*Tex. Med. Ass'n v. HHS*,
  654 F. Supp. 3d 575 (E.D. Tex. 2023) (*TMA II*) ............... 3, 8

*Tex. Med. Ass'n v. HHS*,
  2023 WL 4977746 (E.D. Tex. Aug. 3, 2023) (*TMA IV*) .......... 3, 8

*Tex. Med. Ass'n v. HHS*,
  110 F.4th 762 (5th Cir. 2024) (*TMA V*) ..... 3, 8, 9, 46, 47, 53, 59

*Tex. Corn Producers v. EPA*,
  141 F.4th 687 (5th Cir. 2025) .............................. 47, 53, 58

*Texas v. Biden*,
  20 F.4th 928 (5th Cir. 2021) .............................. 35, 48, 54, 58

*Texas v. EPA*,
  132 F.4th 808 (5th Cir. 2025) ................................ 47, 53

*Texas v. United States,*
   50 F.4th 498 (5th Cir. 2022) ........................................ 23, 53

*Texas v. United States*
   497 F.3d 491 (5th Cir. 2007) ........................................ 32, 42

*Trump v. CASA, Inc.,*
   145 S. Ct. 2540 (2025) ........................................ 48, 49, 57

*United States v. Gomez,*
   960 F.3d 173 (5th Cir. 2020) ........................................ 50

*United Steel v. Mine Safety & Health Admin.,*
   925 F.3d 1279 (D.C. Cir. 2019) ........................................ 46, 53

*UARG v. EPA,*
   573 U.S. 302 (2014) ........................................ 31

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) ........................................ 56

*Zimmer Radio of Mid-Missouri, Inc. v. FCC,*
   2025 WL 2056854 (8th Cir. July 23, 2025) ........................................ 47

## Statutes and Regulations

Pub. L. No. 116-260, div. BB, tit. I,
   134 Stat. 1182 (2020) ........................................ 7

5 U.S.C. § 551(4) ........................................ 55

5 U.S.C. § 551(6) ........................................ 56

5 U.S.C. § 551(13) ........................................ 45, 55

5 U.S.C. § 553(c) ........................................ 31

5 U.S.C. § 702 ........................................ 54

5 U.S.C. § 703 ........................................ 49

5 U.S.C. § 706(2) ........................................ 45, 48, 52

28 U.S.C. § 1295(a) ............................................................. 61

42 U.S.C. § 300gg-111(a)(1) ............................................... 7

42 U.S.C. § 300gg-111(a)(7)(C)(ii) ..................................... 7

42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II) ............................... 8

42 U.S.C. § 300gg-111(a)(2)(B).......................... 11, 21, 25, 40, 41

42 U.S.C. § 300gg-111(a)(2)(B)(i) ................................. 11, 31

42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) ............... 2, 10, 12, 14, 15, 17, 23, 25
27, 28, 29, 34, 35, 36, 59

42 U.S.C. § 300gg-111(a)(3)(H) ...................................... 43

42 U.S.C. § 300gg-111(a)(3)(K) ........................................ 8

42 U.S.C. § 300gg-111(b)(1) ............................................. 7

42 U.S.C. § 300gg-111(b)(1)(A) ........................................ 7

42 U.S.C. § 300gg-111(b)(1)(D) ........................................ 8

42 U.S.C. § 300gg-111(c)(1)(A)–(B) .................................. 8

42 U.S.C. § 300gg-111(c)(2)(A) ...................................... 59

42 U.S.C. § 300gg-111(c)(5)(B) ........................................ 9

42 U.S.C. § 300gg-111(c)(5)(C) ..................................... 9, 43

42 U.S.C. § 300gg-111(c)(5)(C)(i)(I) .............................. 9, 43

42 U.S.C. § 300gg-111(c)(5)(F) ...................................... 10

45 C.F.R. § 149.140(a)–(c)............................................... 12

45 C.F.R. § 149.140(a)(8)(iv) ......................................... 16

45 C.F.R. § 149.140(a)(12) ........................................ 15, 32

45 C.F.R. § 149.140(b)(2)(iv) ..................................... 14, 36

45 C.F.R. § 149.140(d)(1) ................................................... 11

45 C.F.R. § 149.140(d)(2) ................................................... 11

87 Fed. Reg. 52,618 (Aug. 26, 2022) ........................................ 9

**Rules**

Fed. R. Civ. P. 2 ....................................................... 49, 50

**Legislative Materials**

S. Doc. No. 79-248 (1946) ................................................ 56

**Scholarly Authorities**

Nicholas Bagley, *Remedial Restraint in Administrative Law*,
    117 Colum. L. Rev. 253 (2017) ........................................ 51

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*,
    104 Va. L. Rev. 933 (2018) ........................................ 45, 51

Mila Sohoni, *The Past and Future of Universal Vacatur*,
    133 Yale L.J. 2304 (2024) ............................................ 50

Mila Sohoni, *The Power to Vacate A Rule*,
    88 Geo. Wash. L. Rev. 1121 (2020) ........................... 46, 50, 55

**Other Authorities**

*Black's Law Dictionary* 1612 (3d ed. 1933) ............................ 45

CMS, *FAQs about Consolidated Appropriations Act, 2021
    Implementation Part 62* (Oct. 6, 2023) ........................... 19, 61

CMS, *FAQs About Consolidated Appropriations Act, 2021
    and Affordable Care Act Implementation Part 71*
    (July 30, 2025), tinyurl.com/4h4va8z3 ............................ 19, 61

CMS, *List of certified IDR entities*,
    tinyurl.com/372hefjn ................................................ 10

Departments, *Supplemental Background on Federal IDR
   Public Use Files* (2024), tinyurl.com/mr62ej2x ............................... 9, 10

Koch & Murphy, 3 Admin. L. & Prac. (3d ed.) ....................................... 50

*Maximum*, Oxford Eng. Dictionary Online (Sept. 2023 ed.) .................. 36

*Total*, Oxford Eng. Dictionary Online (Sept. 2023 ed.) ........................... 36

**INTRODUCTION**

In the No Surprises Act (NSA), Congress transformed how healthcare providers are compensated for certain out-of-network services. Previously, when an out-of-network provider furnished medical care to a patient, the patient's insurer could refuse to pay or unilaterally opt to pay only part of the provider's charge. This sometimes left the patient responsible for a "balance" bill. The NSA requires insurers to reimburse out-of-network providers of emergency and certain other services at a rate determined through the NSA's negotiation and independent dispute-resolution process, so that bills are not passed on to patients. Now, if an insurer will not pay at an appropriate rate, the provider may start a period of negotiation. If negotiations fail, either party may initiate an arbitration at which an independent arbitrator determines the amount the insurer must pay after considering a list of factors Congress required the arbitrator to take into account.

The NSA's dispute resolution process is not working as expected. The agencies responsible for implementing the NSA originally estimated that there would be around 17,000 arbitrations each year. More than *eighty times* that number were initiated in 2024—the vast majority by providers who chose the delay, cost, and hassle of arbitration over accepting the insurer's

offer during negotiations. Providers are winning about 80% of arbitrations, having convinced independent arbitrators that insurers' offers are too low.

Providers are initiating, and winning, so many arbitrations for a reason: the Departments' unlawful methodology for calculating a key statutory data point considered in negotiations and arbitrations—the "qualifying payment amount," or QPA. The QPA impacts what insurers offer during negotiations and must be considered in arbitration.

Congress carefully defined the QPA in the NSA as the median of the "total maximum rate[s]" in each insurer's contracts for an item or service "provided by a provider in the same or similar specialty and provided in the geographic region." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Congress then charged the Departments with establishing a methodology for calculating QPAs consistent with the statute. Using that methodology, insurers calculate QPAs once, and those QPAs (adjusted for inflation) become a data point used in determining provider reimbursement under the NSA forever.

The Departments have gotten the methodology for this key data point wrong. As the district court found in a series of cases, the Departments have repeatedly departed from the NSA's text to advance "their goal of privileging the QPA, tilting arbitrations in favor of insurers, and thereby lowering

payments to providers." *Tex. Med. Ass'n v. HHS*, 654 F. Supp. 3d 575, 593 (E.D. Tex. 2023) (*TMA II*); *see also Tex. Med. Ass'n v. HHS*, 587 F. Supp. 3d 528 (E.D. Tex. 2022) (*TMA I*); *Tex. Med. Ass'n v. HHS*, 2023 WL 4977746 (E.D. Tex. Aug. 3, 2023) (*TMA IV*). In a prior appeal relating to one such rule, this Court affirmed, finding the Departments had adopted a "skewed interpretation … inconsistent with the evenhandedness embodied in the [NSA]." *Tex. Med. Ass'n v. HHS* (*TMA V*), 110 F.4th 762, 779 (5th Cir. 2024).

The regulations at issue continue that trend by instructing insurers to miscalculate QPAs. First, the NSA says that only rates for "provided" items and services factor into QPAs. But the Departments require inclusion of rates for items and services that are *not* provided. Second, Congress specified that rates in QPA calculations must be the "total maximum payment" recognized in contracts. Yet the Departments have required insurers to "[e]xclude" from such rates "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." The rules cannot be squared with the Act.

In addition to departing from the statutory text, the rules unreasonably undermine what the Departments themselves acknowledge was Congress's objective. The Departments stated in their rulemaking that QPAs are

meant to approximate "market rates under typical contract negotiations." 86 Fed. Reg. 36,872, 36,889 (July 13, 2021) (ROA.785). QPAs, they say, are intended to indicate what "a medical provider would have received" had the provider and insurer pre-negotiated rates. Br. 1.

The Departments' methodology ensures QPAs do no such thing. Including rates for services providers do *not* provide drives down QPAs, because providers do not negotiate rates for services they do not provide—they simply accept the low, default rates insurers list in their form contracts. Providers do, by contrast, negotiate for incentive payments, which form an important component of providers' compensation. Excluding these negotiated-for payments makes QPAs artificially low.

Aware that they cannot defend their rules with reference to the NSA's text, the Departments claim "discretion" to address "technical details" not spelled out in the NSA. Br. 18. But that discretion has clear "boundaries"— Congress's careful QPA definition. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). Otherwise, the Departments rest largely on policy concerns that cannot permit the Departments to override Congress's judgment. And those concerns are misplaced. The NSA will protect patients from balance bills no matter the outcome here. Plus, patients have an interest in

fair compensation for providers. As the Departments once recognized, "undercompensation could threaten the viability of these providers," which "could lead to participants, beneficiaries and enrollees not receiving needed medical care, undermining the goals of the [NSA]." 86 Fed. Reg. 55,980, 56,044 (Oct. 7, 2021) (ROA.669).

Without strong arguments on the merits, the Departments spend much of their brief disputing the remedy of vacatur. The *en banc* Court reiterated just two years ago this Court's (and every other court's) longstanding view that the Administrative Procedure Act (APA) authorizes vacatur of agency rules. *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (*en banc*). And the Supreme Court and this Court regularly affirm decisions vacating agency rules. Nothing has unsettled this established law. In any event, the Court need not revisit the precise scope of vacatur permissible under the APA here. Vacatur is the only remedy that can provide plaintiffs complete relief in this case.

## STATEMENT OF ISSUES

I.A. Whether the Departments unlawfully departed from the NSA by requiring insurers to include rates for items and services that are *not* provided by a provider and *not* provided in a geographic region in calculating

QPAs, when the NSA defines the QPA as the "median of the contracted rates" for an item or service "that is provided by a provider" and "provided in the [same] geographic region."

I.B. Whether it was arbitrary and capricious for the Departments to include rates for services not provided in QPA calculations despite acknowledging that QPAs are supposed to reflect negotiated rates.

II.A. Whether the Departments unlawfully departed from the NSA by requiring insurers to *exclude* contracted-for incentive payments from the "contracted rates" they use to calculate QPAs, when the NSA requires that insurers, when calculating the median of their "contracted rates," use the "rate recognized … as the total maximum payment" under the contract for the item or service at issue.

II.B. Whether it was arbitrary and capricious for the Departments to exclude negotiated-for incentive payments from rates used in QPA calculations, despite recognizing that QPAs should reflect negotiated rates.

III. Whether the district court acted within its discretion by vacating rules that violate the NSA, including rules the Departments no longer defend.

## STATEMENT OF THE CASE

### A.    The No Surprises Act

Congress enacted the NSA to address the problem of unanticipated balance billing for certain healthcare services. *See* Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758–890 (2020). Historically, when a patient with health insurance received services from a provider outside of their insurer's network, the provider would submit the bill to the patient's group health plan or health insurance issuer. (For simplicity, this brief refers to such plans and issuers collectively as "insurers.") Because an out-of-network provider does not have a contract with the insurer specifying its rates, the insurer would unilaterally determine how much to pay. The patient could remain liable for the remaining balance.

The NSA prohibits balance billing in certain circumstances and removes patients from reimbursement disputes. It does so by capping patients' liability for emergency services furnished by an out-of-network provider or non-emergency services furnished by an out-of-network provider at an in-network facility. *See* 42 U.S.C. § 300gg-111(a)(1), (b)(1). For such services, patients cannot be required to pay more than the cost-sharing amount (*e.g.*, copay, deductible, and coinsurance) that would apply if the services had been furnished by an in-network provider. *Id.* § 300gg-111(a)(1)(C)(ii), (b)(1)(A).

Because the NSA's ban on balance billing limits the amount patients can be required to pay, Congress understood that providers would need to look to insurers to cover the fair value of their services. The NSA therefore obligates covered insurers to reimburse providers at an "out-of-network rate." *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D). Unless a state law or All-Payer Model Agreement applies, the "out-of-network" rate is determined through a dispute resolution process between the provider and insurer. *See id.* § 300gg-111(a)(3)(K). Specifically, the Act requires insurers to make an initial payment (or denial of payment) to the provider, *id.* § 300gg-111(a)(1)(C)(iv)(I), (b)(1)(C), then channels disputes about the sufficiency of that payment into a process of negotiation, followed, if necessary, by arbitration, *id.* § 300gg-111(c)(1)(A)–(B).

The Departments have issued a series of rules implementing the NSA. Those rules have often "tilt[ed] arbitrations in favor of insurers, and thereby lower[ed] payments to providers." *TMA II*, 654 F. Supp. 3d at 593. Through litigation involving many of the same plaintiffs here, several of the Departments' rules have been vacated because they violated the NSA's plain text and were issued in violation of the APA's procedures. *See TMA V*, 110 F.4th at 780; *TMA I*, 587 F. Supp. 3d at 543; *TMA IV*, 2023 WL 4977746, at *15.

**B.    The Independent Dispute Resolution Process**

The NSA's independent dispute resolution (IDR) process is a "baseball-style" arbitration in which the provider and insurer submit their best and final offers for the reimbursement amount to an independent private arbitrator certified by the Departments. 42 U.S.C. § 300gg-111(c)(5)(B); *TMA V*, 110 F.4th at 768. The statute prescribes the factors the arbitrator "shall consider" in choosing between the two offers. 42 U.S.C. § 300gg-111(c)(5)(C). One of those factors is the QPA "as defined" by the NSA "for the applicable year for items or services that are comparable to the qualified IDR item or service and that are furnished in the same geographic region." *Id.* § 300gg-111(c)(5)(C)(i)(I).

Despite being just one of the statutory factors, the QPA often plays an outsized role in IDR. Insurers often submit the QPA as both their initial payment to providers and their offer in the IDR process. *See* 87 Fed. Reg. 52,618, 52,625 n.29 (Aug. 26, 2022); Departments, *Supplemental Background on Federal IDR Public Use Files* 3 (2024), tinyurl.com/mr62ej2x.

Because of the Departments' deflationary QPA-calculation rules, this process is not functioning as intended. The Departments estimated that there would be 17,435 arbitrations each year. 87 Fed. Reg. at 52,640. Instead,

1,463,872 were initiated in 2024—nearly 84 times as many as anticipated. *See Supplemental Background*, *supra*, at 2. These arbitrations are costly and time consuming. *See* 42 U.S.C. § 300gg-111(c)(5)(F), (c)(8); CMS, *List of Certified IDR Entities*, tinyurl.com/372hefjn (listing arbitration fees). The vast majority of arbitrations are initiated by providers, who prevail over 80% of the time; and the offer selected by the arbitrator is higher than the QPA in approximately 85% of IDRs. *Supplemental Background*, *supra*, at 4.

## C.   QPA Definition and Calculation

Congress carefully defined the term QPA. The NSA generally defines "[t]he term 'qualifying payment amount' [to] mea[n]":

> the median of the contracted rates recognized by the plan or issuer, respectively (determined with respect to all such plans of such sponsor or all such coverage offered by such issuer that are offered within the same insurance market …) as the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) under such plans or coverage, respectively, on January 31, 2019, for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished … ,

with annual inflation adjustments. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).

Congress directed the Departments to promulgate rules establishing "the methodology" that insurers "shall use to determine the [QPA]." *Id.*

10

§ 300gg-111(a)(2)(B)(i). Congress commanded that "[s]uch rulemaking shall take into account payments that are made by such plan or issuer, respectively, that are not on a fee-for-service basis." *Id.* § 300gg-111(a)(2)(B).

Providers have little insight into an insurer's QPA calculations. When an insurer sends a provider an initial payment or notice of denial of payment, the insurer must disclose what it has calculated as the QPA and certify that the QPA was "determined in compliance" with the Departments' rules. 45 C.F.R. § 149.140(d)(1). Upon request, the insurer must also disclose, among other things, whether the QPA was based on non-fee-for-service rates and whether the insurer excluded incentive payments from its rates. *Id.* § 149.140(d)(2). That is all. At no time does the provider know other critical information, including how many rates went into the QPA calculation; the experience, specialty, or credentials of the provider commanding those rates; or the amounts of or basis for any excluded incentive payments.

### D.    The July Interim Final Rule

On July 13, 2021, the Departments promulgated the rule at issue here. 86 Fed. Reg. 36,872 (ROA.768). The July Rule is an interim final rule, and the Departments issued it without providing notice or an opportunity for comment. As relevant here, the July Rule sets forth the methodology for

11

insurers to calculate QPAs. 45 C.F.R. § 149.140(a)–(c); *see* 86 Fed. Reg. at 36,888–98 (ROA.784–94). This case involves four aspects of the methodology, two of which the Departments abandoned on appeal.

### 1.    Including "ghost rates" in QPAs

Although the NSA defines the QPA as the "median of the contracted rates" for an item or service "that is *provided* by a provider" and "*provided* in the [same] geographic region," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphases added), the Departments instructed insurers to include in QPA calculations rates for items and services that are *not* provided.

In the July Rule, the Departments did not grapple directly with the statute's "provided" requirement. They stated only that "each contracted rate for a given item or service" should "be treated as a single data point when calculating a median contracted rate ... regardless of the number of claims paid at that contracted rate." 86 Fed. Reg. at 36,889 (ROA.785).

Then in August 2022, the Departments issued a set of Frequently Asked Questions (FAQs), which stated that the July Rule allows insurers to include rates for services that "providers do not provide." August 2022 FAQs at 17 (ROA.11469). Such rates—known in the industry as "ghost rates"— appear in contracts, the Departments explained, because insurers often

present providers with form contracts that include a default fee schedule for all services covered by the insurer, and then leave it to providers to negotiate the rates for services they provide. *See id.* at 16 (ROA.11468). As a result, the final contract often includes non-negotiated rates for services that no provider covered by the contract provides. In neither the July Rule nor the August FAQs did the Departments explain their choice to include these ghost rates in QPA calculations, or explain how including them can be reconciled with the statutory text.

The Departments have, however, recognized how including ghost rates in QPA calculations skews QPAs. In the July Rule, the Departments concluded that Congress intended QPAs to "reflec[t] market rates under typical contract negotiations." 86 Fed. Reg. at 36,889 (ROA.785). Yet in the August FAQs, the Departments admitted that because providers who do not provide a service have little incentive to negotiate the rate for that service, ghost rates are generally lower than they would be under a motivated, arms-length negotiation. August 2022 FAQs at 16 (ROA.11468). In practice, ghost rates can be as low as $0. *Id.* (ROA.11468). The Departments stated in the August FAQs that $0 rates must be excluded from QPA calculations. *Id.* at 17 n.29 (ROA.11469). But they did not exclude other, non-$0, rates that are

artificially low. Including artificially low rates in QPA calculations drives down the median, depressing QPAs.

### 2. Excluding incentive payments from QPAs

Although Congress specified that QPAs must be calculated using the "total maximum payment" recognized by the insurer, 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), the July Rule requires insurers to "[e]xclude" from rates used to calculate QPAs "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments," 45 C.F.R. § 149.140(b)(2)(iv). The Departments offered no textual basis for excluding these payments. Instead, they contended that excluding such payments is "consistent with how cost sharing is typically calculated for in-network items and services, where the cost-sharing amount is customarily determined at or near the time an item or service is furnished, and is not subject to adjustment based on changes in the amount ultimately paid to the provider or facility as a result of any incentives or reconciliation process." 86 Fed. Reg. at 36,894 (ROA.790). The Departments did not explain why typical cost-sharing calculation practice is relevant to the "total maximum payment" under a contract.

Here too, the Departments' decision to depart from the statutory text reduces QPAs below negotiated contracted rates. As the Departments noted,

insurers and providers sometimes agree that payments to providers will be "reconciled retrospectively to account for utilization, value adjustments, or other weighting factors that can affect the final payment." *Id.* (ROA.790). In these arrangements, the provider typically accepts a lower fixed rate as partial compensation for services, with the expectation that it will earn additional, incentive payments, which "can total 10 to 15 percent of total payments" under some contracts. ROA.2805. The Departments' decision to exclude these incentive payments from QPA calculations therefore tends to depress QPAs.

### 3.     Including out-of-specialty rates in QPAs

In a portion of the July Rule the Departments no longer defend on the merits, the Departments defined "same or similar specialty," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), to mean "the practice specialty of a provider, as identified by the plan or issuer consistent with the plan's or issuer's usual business practice," 45 C.F.R. § 149.140(a)(12). Under this rule, insurers must "calculate median contracted rates separately by provider specialty *only* where the [insurer] otherwise varies its contracted rates based on provider specialty." 86 Fed. Reg. at 36,891 (ROA.787) (emphasis added). Otherwise,

insurers may include rates from providers with a different specialty in QPA calculations. *See* August 2022 FAQs at 16–17 (ROA.11469).

The Departments "considered," but rejected, requiring insurers to calculate median contracted rates "for every provider specialty." 86 Fed. Reg. at 36,891 (ROA.787). They instead departed from the NSA's text to provide insurers "flexibility" and to reduce the "burden" on insurers. *Id.* at 36,888, 36,891 (ROA.784, 787). As the Departments put it here, they gave insurers a "shortcut for the sake of administrative convenience." Br. 23 n.6. The Departments did not explain how convenience could override the statute's command that QPAs must *always* be based on rates for providers of the same or similar specialty.

### 4. Including other plan sponsors' rates in QPAs

Finally, in another portion of the July Rule that the Departments no longer defend, the Departments permitted self-insured group health plans to calculate QPAs using rates from the contracts of "all self-insured group health plans administered by the same entity." 45 C.F.R. § 149.140(a)(8)(iv). This provision means that if a plan sponsor (*e.g.*, an individual's employer) uses a third-party administrator, as is common, the sponsor may include in

its QPA calculations the contracted rates of *other* sponsors that use the same administrator. *See* 86 Fed. Reg. at 36,890 (ROA.786).

The Departments permitted this approach despite the NSA's requirement that QPAs must be "determined with respect to all such plans *of such sponsor*." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). The Departments again did not attempt to reconcile the rule with the NSA's text, instead justifying their choice largely based on the "reduce[d] … burden" on sponsors. 86 Fed. Reg. at 36,890 (ROA.786).

## E.   The Decision Below

Plaintiffs Texas Medical Association, Tyler Regional Hospital, and Dr. Adam Corley sued the Departments under the APA, claiming that these provisions of the July Rule violate the NSA's terms and are arbitrary and capricious. ROA.13203.

The district court agreed that the challenged rules "violate the plain text of the [NSA]." ROA.13198. First, the court held that including ghost rates in QPA calculations "allows insurers to include contracted rates for items or services that are not provided, never have been provided, and never will be provided," in violation of the NSA. ROA.13208. Second, the court concluded that the rule's treatment of provider specialties "deviate[d] from the

plain text of the Act by allowing insurers to include out-of-specialty rates in calculating the QPA." ROA.13210. Third, the court determined that excluding bonus payments from contracted rates "conflicts" with the NSA's mandate that insurers use the "total maximum payment" a provider could contractually receive for an item or service. ROA.13212. Finally, the court held that permitting group health plans to include contracted rates from other plan sponsors that share the same administrator unlawfully "allow[ed] these self-insured plan sponsors to do what the Act prohibits." ROA.13215.[1]

The district court vacated these unlawful rules. ROA.13235–37. The court rejected the Departments' request for party-specific relief, noting "'vacatur of an agency action is the default rule in this Circuit.'" ROA.13235 (quoting *Cargill*, 57 F.4th at 472). The court declined to remand without vacatur, explaining that—because the rules conflict with the statutory text— there is "nothing the Departments can do on remand to rehabilitate or justify the challenged portions of the Rule," and beyond a single "conclusory sentence," the Departments had "offer[ed] nothing to demonstrate" that vacatur would cause "undue disruption." ROA.13236. And no disruption was

---

[1] The district court did not reach plaintiffs' argument that the rules are also arbitrary and capricious. ROA.13216 n.5.

necessary because the Departments could "exercise their enforcement discretion to allow insurers to continue using their existing QPAs until the new QPAs are calculated consistent with the Act," while "offers of payment and IDR proceedings" could "continue in the absence of properly calculated QPAs." ROA.13236.

The Departments soon did what the district court contemplated: exercised their enforcement discretion to allow insurers to continue using existing QPAs for purposes of patient cost-sharing and to continue submitting existing QPAs in IDR proceedings, which arbitrators may "consider … in light of" the district court's decision. CMS, *FAQs about Consolidated Appropriations Act, 2021 Implementation Part 62* at 5, 7 (Oct. 6, 2023) (October 2023 FAQs), tinyurl.com/44u28cvb. The Departments' exercise of enforcement discretion continues to this day. *CMS, FAQs About Consolidated Appropriations Act, 2021 and Affordable Care Act Implementation Part 71* (July 30, 2025), tinyurl.com/4h4va8z3.

## F.    The Panel Opinion

The Departments appealed the district court's decision on ghost rates and incentive payments. They abandoned any defense of the same-specialty

and third party–administrator rules, although they disputed the remedy of vacatur for all challenged rules. The Panel reversed in relevant part.

As to ghost rates, the Panel concluded that while "the Act contains no requirement that a service must previously have been performed by a provider," the NSA *does* "requir[e] … that a given service be 'available.'" Op. 10. While this should have led to affirmance, the Panel reversed, without explaining how the Departments' rule requires that a service be "available." As the district court found and the Departments recognize, their rule requires insurers to include rates agreed to by providers that *do not* make the service available. *See* August 2022 FAQs at 17 (ROA.11469).

The Panel went on to state that "the Act reasonably addresses concerns about the QPA's inclusion of rates for services that a given provider would never perform" by "exclud[ing] rates from providers outside of the same specialty and geographic area." Op. 10–11. The Panel faulted plaintiffs for "not suggest[ing] how to otherwise draw and police the line separating the within-specialty services each provider might perform sometime in the future from those that they would never perform." *Id.*

As to incentive payments, the Panel did not explain what "total maximum payment" means. It instead asserted that the NSA "grants the

Departments discretion" to exclude incentive payments because it "delegates rulemaking authority regarding how to treat 'account payments that … are not on a fee-for-service basis.'" *Id.* at 14–15. (quoting 42 U.S.C. § 300gg-111(a)(2)(B)). The full statutory provision, however, states that the Departments' rulemaking "*shall take into* account payments … that are not on a fee-for-service basis." 42 U.S.C. § 300gg-111(a)(2)(B) (emphasis added). The Panel also did not address the undisputed fact that the July Rule requires insurers to exclude incentive payments that *are* on a fee-for-service basis— for example, payments that increase the amount an insurer pays for a service if the provider performs it a certain number of times.

The Panel emphasized that the NSA also states that the "QPA calculation methodology '*may* account for relevant payment adjustments that take into account quality or facility type … that are otherwise taken into account for purposes of determining payment amounts with respect to participating [*i.e.*, in-network] facilities.'" Op. 15 (quoting 42 U.S.C. § 300gg-111(a)(2)(B)). The Panel did not explain why this language regarding facility-based payments was relevant to provider incentive payments.

The Panel affirmed the district court's vacatur of a provision of the July Rule, challenged only by the air-ambulance plaintiffs, which concerned the

deadline for insurers to make an initial payment (or provide a notice of denial of payment). Op. 21. In doing so, the Panel held that party-specific relief was "not the appropriate thing to do in this case," because party-specific relief would result in different rules for plaintiffs and for all other entities, which "would conflict with Congress's instruction to establish 'one' IDR process for all participants." Op. 21–22. The Panel never questioned whether the APA authorizes vacatur.

Plaintiffs petitioned for rehearing *en banc*, identifying two issues for *en banc* rehearing: "Whether the Departments' QPA-calculation rules are unlawful because they require insurers to (i) include rates agreed to by providers for services they do not 'provide'; and (ii) exclude incentive payments from the 'total maximum payment' used to calculate the QPA." Pet. 4. The Departments did not petition for rehearing on any aspect of the Panel's decision. The Court granted *en banc* rehearing. The parties agreed to limit the issues before the *en banc* court by not challenging certain aspects of the district court decision. Doc. 205.

## <u>STANDARD OF REVIEW</u>

This Court reviews the district court's decision on summary judgment de novo, *Data Mktg. P'ship, LP v. Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir.

2022), and the district court's decision to vacate for abuse of discretion, *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022). This Court must "exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright*, 144 S. Ct. at 2273.

## SUMMARY OF ARGUMENT

The Court should affirm the district court's vacatur of the challenged QPA methodology rules, which conflict with the NSA's plain terms and unreasonably depress QPAs below negotiated market rates.

**I.** The July Rule's inclusion of ghost rates is unlawful.

**A.** The NSA requires each QPA to be derived from "contracted rates" for only those items and services that are "*provided* by a provider" and "*provided* in the geographic region." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphases added). The July Rule, as interpreted by the Departments, violates this command by instructing insurers to include rates for items and services that are not "provided"—in any sense of the word. No matter what the Departments say, no one is arguing that the NSA requires insurers to "estimate how frequently providers might ultimately perform" a service. Br. 15–16. The problem is that the Departments have read "provided" out of the statute entirely. Neither administrative convenience nor the phrases "contracted

rates recognized" as of "January 31, 2019" can justify failing to give any independent meaning to the term "provided."

**B.** Including ghost rates in QPA calculations is also arbitrary and capricious. The Departments recognize both that it was Congress's intent for QPAs to reflect negotiated market rates and that including ghost rates in QPA calculations undermines that goal. The Departments required ghost rates to be included anyway, without explanation. That is not rational decisionmaking.

**II.** The July Rule's exclusion of incentive payments also conflicts with the NSA's plain text and unreasonably depresses QPAs.

**A.** The NSA requires that the "contracted rates" used to calculate the QPA must be "the *total maximum* payment … under such plans or coverage … for the same or a similar item or service." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). The July Rule violates this command by directing insurers not to use the total maximum payment when that total maximum payment includes an incentive-based component. Instead, insurers are required to subtract incentive payments, creating an unlawful exception to the NSA's unqualified command. The Departments' chief justification here—that incentive payments are supposedly "rarely tied to specific" items

and services, Br. 25—is an impermissible *post hoc* rationalization. In any event, it cannot support the Departments' categorical exclusion of all incentive payments, even those it concedes are for a specific item or service.

The two provisions of the NSA on which the Panel relied do not change the analysis. The NSA's mandate that the Departments "*shall* take into account" non-fee-for-service payments, 42 U.S.C. § 300gg-111(a)(2)(B), *reinforces* that incentive payments must be included in the rates used in QPA calculations, even those not explicitly tied to a particular service. And the Departments' discretion to "account for relevant payment adjustments that take into account quality or facility type," *id.*, does not apply to contracted-for provider incentive payments.

**B.** The Departments' decision to exclude incentive payments is also arbitrary and capricious because it depresses QPAs below negotiated market rates. It does not matter if patient cost-sharing is typically calculated without reference to retrospective incentive payments, because it would be irrational to consider only how QPAs may impact patient cost-sharing and not QPAs' significant role in determining provider reimbursement.

**III.** The district court did not abuse its discretion by vacating the challenged portions of the July Rule.

**A.** It is well established that the APA authorizes vacatur. Countless precedents of this Court (and other courts) have relied on the APA's instruction that courts "set aside" unlawful agency action to hold that vacatur is not only authorized but the default remedy under the APA. Neither the Supreme Court's recent decision in *Trump v. CASA* nor the Departments' other arguments warrant upsetting that settled understanding.

**B.** The district court was well within its remedial discretion in deciding that vacatur was the appropriate remedy here. To start, the Departments identify no reason to depart from the APA's default remedy. In any event, the Court need not wade into the Departments' arguments about equity and vacatur, because vacatur is the only way to provide complete relief to plaintiffs in this case. Plaintiffs are harmed by the way non-parties (insurers) apply the Departments' rules to calculate a single set of data points that insurers then submit in each arbitration under the NSA's "one" IDR process. The NSA does not permit use of two sets of QPAs—one lawful (for plaintiffs) and one unlawful (for everyone else). Nor would submission of higher, correctly calculated QPAs in only arbitrations initiated by plaintiffs cure the harm to plaintiffs by submission of lower, unlawful QPAs in every other arbitration

for the very same services before the very same arbitrators. There is no other, "party-specific" remedy that could provide complete relief.

## ARGUMENT

## I.   Including Ghost Rates In QPA Calculations Is Unlawful.

Including ghost rates in QPA calculations is unlawful because it conflicts with the NSA's text and unreasonably depresses QPAs below negotiated market rates.

### A.   Including ghost rates violates the NSA's text.

A rate included in a QPA calculation must be for an item or service "that is *provided* by a provider in the same or similar specialty and *provided* in the geographic region." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphases added). Yet the Departments have "acknowledged that the July Rule allows insurers to include rates for services that 'providers do not provide' in calculating the QPA." ROA.13202 (quoting August 2022 FAQs at 17 (ROA.11469)). As the district court held, "[t]his interpretation is unlawful." ROA.13208.

**1.** "To 'provide' ordinarily means 'to make available,' 'furnish,' or 'to supply something needed or desired.'" ROA.13207 (quoting *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 476 (5th Cir. 2020)). Under this ordinary understanding, therefore, a "service that is provided,"

42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), is a service that is made available, furnished, or supplied. *See* Op. 10 (recognizing the NSA does "requir[e] … that a given service be 'available'").

Yet the July Rule and the August FAQs give *no* effect to the term "provided." Instead, the Departments direct insurers to include rates for items or services that were neither "furnish[ed]," "suppl[ied]," nor "ma[d]e available." *See* ROA.13208 (holding "[t]he Departments' interpretation" simply "allows insurers to include contracted rates for items or services that are not provided, never have been provided, and never will be provided").

The Departments cannot dispute that their rule requires insurers to include rates for items and services that are not "provided." Rather than give effect to the "provided" requirement, the Departments have adopted the position that "there is no 'is provided' requirement in the [NSA]." Panel Oral Arg. (20:30–34). That concession is fatal: "Whatever 'is provided' means … it cannot justify including rates for items or services that are not provided and never will be provided." ROA.13208. "To rule otherwise would read out of the statute the term 'provided' altogether." ROA.13208. That, courts and agencies cannot do. "[E]very word and every provision" in a statute "is to be given effect." *Nielsen v. Preap*, 586 U.S. 392, 414 (2019).

**2.** The Departments cannot save their rule by looking to a different statutory term: "contracted rates." They say that by using that term, Congress provided that QPAs are to be based on rates that appear in contracts, without regard to what services are provided. *See* Br. 19–20. But Congress did not say that *every* "contracted rat[e] recognized by the plan or issuer" should be included in the QPA. The Act's text explicitly excludes some of those rates. Rates in contracts with providers who are not in the "same or similar specialty" or "geographic region" must be excluded from the "contracted rates" used to calculate the QPA. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). And so must rates for items or services that are not "provided" at all. *Id.* Put differently, for an item or service to be "provided by a provider in the same or similar specialty and provided in the geographic region," the item or service must, at a minimum, be "provided." And that a rate for a service is listed in a contract does not mean that the service is "provided," or, in the Panel's words, "available." August 2022 FAQs at 17 (ROA.11469); *contra* Br. 21.

If all rates recognized in a contract go into QPA calculations—whether or not the services are provided—the NSA "would not need" the word "provided." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004). The phrase "contracted rates recognized" "alone would do all the necessary work." *Id.* The NSA does not

say that the QPA is the "median of the contracted rates recognized by the plan or issuer … for the same or similar item or service that is *recognized in a contract with* a provider in the same or similar specialty" or "*recognized* in the geographic region." Congress chose a different term—"provided"—"and different terms usually have different meanings." *Pulsifer v. United States*, 144 S. Ct. 718, 735 (2024).

Nor does it matter that the NSA limits the contracted rates included in QPA calculations to those recognized on January 31, 2019. Br. 20–21. That limitation undisputedly identifies which contracts count. *See* 86 Fed. Reg. at 36,895 (ROA.791). But identifying the relevant contracts is only the first step. Rates must be "recognized" on that date, but they also must be for items or services that are "provided" by a covered provider.

Finally, the Departments say that "provided" cannot mean "provided" because the Act does not specify that rates included in QPA calculations must have been paid any minimum number of times or prescribe a window of time during which the item or service must have been provided. Br. 21–22. Certainly, there may be a range of reasonable ways to implement the "provided" requirement in the methodology the Departments adopt. Congress left it to the Departments—not plaintiffs—to "establish through

rulemaking" a "methodology" implementing the statute. 42 U.S.C. § 300gg-111(a)(2)(B)(i); *contra* Panel Op. 11 (faulting plaintiffs for not "suggest[ing] how to otherwise draw and police the line"). The Departments can consider, for example, setting a time frame during which a provider must have furnished the item or service. If the Departments proceed through notice-and-comment rulemaking (as they did not in issuing the July Rule), they will have the benefit of "data, views, or arguments" from providers and insurers. 5 U.S.C. § 553(c). What the Departments cannot do is what they did here: fail to give any independent meaning or effect to the term "provided" at all. *See UARG v. EPA*, 573 U.S. 302, 326 (2014).

## B.    Including ghost rates is unreasonable.

Even if the Departments' decision to include ghost rates did not exceed "the boundaries" of the Departments' "delegated authority," it would still be unlawful because it is not an exercise of "'reasoned decisionmaking' within those boundaries." *Loper Bright*, 144 S. Ct. at 2263.

**1.** The Departments determined that Congress intended QPAs to "reflec[t] market rates under typical contract negotiations." 86 Fed. Reg. at 36,889 (ROA.785). Yet their methodology ensures that QPAs do *not* reflect negotiated market rates, because providers who do not provide a given

service lack an incentive to negotiate a reimbursement rate for that service. August 2022 FAQs at 16 (ROA.11468). It was unreasonable for the Departments to create a methodology that undermines the very purpose they believe Congress intended the methodology to achieve. *See Texas v. United States*, 497 F.3d 491, 506 (5th Cir. 2007); *Louisiana v. Dep't of Energy*, 90 F.4th 461, 472–73 (5th Cir. 2024) (arbitrary and capricious for agency to adopt rule that will "likely do the opposite" of what the agency intends).

**2.** The Departments now claim that including ghost rates will not drive down QPAs because the NSA's separate requirement to include only rates of providers in the "same or similar specialty" excludes non-negotiated rates. Br. 22–23. But the Departments cannot rely on this reasoning—which they raised for the first time in this litigation—to justify their position. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Data Mktg.*, 45 F.4th at 856.

Even if this justification were fair game, it cannot save the Departments. They originally defined "same or similar specialty" broadly, allowing insurers to include out-of-specialty rates in QPA calculations if "consistent with the [insurer's] usual business practice." 45 C.F.R. § 149.140(a)(12). The district court vacated that rule, and the Departments did not appeal, but they have not issued a new rule. Instead, they are asking this Court to undo

32

vacatur of the unlawful rule. In any event, there is no rule under which the same-specialty requirement eliminates the ghost rates problem.

Even if implemented strictly, the same-specialty requirement alone will not exclude all ghost rates because providers in the "same or similar specialties often do not provide overlapping services." Br. of Amicus Curiae Am. Med. Ass'n 10–11 (Dkt. 82). For example, "an obstetrician-gynecologist's contract will likely include rates for delivery services, regardless of whether she ever performs deliveries." *Id.* at 11. These specialists and others therefore have contracted rates for services they never make available. Including ghost rates thus leads to artificially depressed QPAs in ways that even a rule faithfully implementing the "same or similar specialty" requirement would not address.

**3.** The Departments also cannot salvage the rule by complaining that giving effect to the NSA's "provided" requirement would be too burdensome for insurers—another justification the Departments did not raise until litigation. *See* Br. 19–21. Concerns about burdens on insurers "address themselves to Congress, not to the courts." *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 234 (1994). Agencies cannot "shortcut" a statutory requirement for "administrative convenience." *Contra* Br. 23 n.6.

Congress had a good reason for the balance it struck. Under the NSA, the contracted rates that are included in QPA calculations will only be determined by insurers once, but the resulting QPA, adjusted only for inflation, will factor into what providers are paid forever. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Getting these permanent reference points right might take work, but Congress determined that work was worthwhile. And regardless, the relevant burden is likely to be low, because insurers have access to databases showing, among other things, what items and services were furnished. *See, e.g.*, Br. of Amicus Curiae Blue Cross Blue Shield Ass'n 10 & n.5 (Dkt. 242-1) (discussing insurer's access to claims data for 150 million individuals).

**4.** The Departments next assert that they "determined that [the QPA] analysis should be based on the rates appearing on the face of a health plan's contracts" because when "contracts are negotiated" the parties cannot "know for certain" whether the service will be provided. Br. 19–20. But neither the July Rule nor the August FAQs includes this reasoning, so the Departments cannot rely on it here. *See Chenery*, 318 U.S. at 87. Regardless, as the Departments have recognized, insurers often present providers with form contracts that include rates "for service codes that … are not utilized" by the provider. August 2022 FAQs at 16 (ROA.11468). In other words, it is not

unusual for providers to know, "[a]t the time the contracts are negotiated," that they do not and will not provide an item or service in the contract. They may not even be "equipped to furnish" it. August 2022 FAQs at 17 n.29 (ROA.11469). That is precisely the problem Congress's "provided" requirement addresses.

**5.** Finally, the rule is arbitrary and capricious because the Departments made no contemporaneous effort to defend their decision. Agencies always have an obligation to provide an adequate explanation for their actions. Yet the Departments failed to even acknowledge the statutory text stating that QPAs are the median of rates for an item or service that is "provided," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), much less explain how incorporating ghost rates into QPAs could "compor[t] with" that statutory command, *Texas v. Biden*, 20 F.4th 928, 992 (5th Cir. 2021) (*MPP*). The Departments' belated decision in the August FAQs to exclude only $0 rates merely highlights the unreasonableness of including all other ghost rates.

*        *        *

In issuing a new rule, the Departments can assess and balance the burdens and interests at play—ideally with the informed comments of the regulated public. But whatever methodology the Departments choose, it

must give effect to the Act's "provided" requirement and must respect Congress's goal of having QPAs that reflect negotiated market rates.

## II.    Excluding Incentive Payments Is Unlawful.

The Departments' rule excluding incentive payments from contracted rates in QPA calculations is equally unlawful. The rule conflicts with the NSA's plain text and irrationally deflates QPAs.

### A.    Excluding incentive payments violates the NSA's text.

Under the NSA, each rate included in QPA calculations must be the "total maximum payment" recognized by the insurer. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Yet the July Rule requires insurers to "[e]xclude" from that "total maximum payment" any rates used to calculate QPAs "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments" under a provider's contract. 45 C.F.R. § 149.140(b)(2)(iv).

**1.** That exclusion flouts the NSA's plain text. "Total" means "[c]onstituting or comprising a whole; whole, entire." *Total*, Oxford Eng. Dictionary Online (Sept. 2023 ed.). And "maximum" means the "highest value or extreme limit" or the "highest possible magnitude or quantity of something which is attained, attainable, or customary." *Maximum*, Oxford Eng. Dictionary Online (Sept. 2023 ed.). "The Act thus plainly requires insurers to calculate QPAs using the 'entire,' 'highest possible' payment that a provider

could receive for an item or service under the contracted rate." ROA.13212. The Departments' rule is facially inconsistent with that command.

The Departments barely address the meaning of "total maximum payment." In a single sentence, they claim the phrase means the sum of the cost-sharing amount and the amount paid by the insurer. Br. 27. But an incentive payment is part of the "amount to be paid by the [insurer]." 42 U.S.C. § 300gg-111(a)(3)(E)(i). And "total maximum" requires the rate included in a QPA calculation to include *all* amounts to be paid by an insurer under a contract for an item or service. The statute does not exclude from the "total maximum" amounts made in a "separate payment" or "lump sum." Br. 27. If a contracted-for payment is "for the same or a similar item or service," it must be included in the "total maximum" rate for that item or service. 42 U.S.C. § 300gg-111(a)(3)(E)(i).

**2.** The atextual rationale the Departments articulated in the July Rule cannot withstand scrutiny. Ignoring entirely Congress's command to use the "total maximum payment," the Departments reasoned that excluding incentive payments was "consistent with how cost sharing is typically calculated for in-network items and services"—*i.e.*, "at or near the time an item or service is furnished, and … not subject to adjustment based on" later incentive

payments to the provider. 86 Fed. Reg. at 36,894 (ROA.790). But Congress did not instruct the Departments to look to "how cost sharing is typically calculated." Congress specified in plain language to use the "total maximum payment" provided in the contract. That QPAs sometimes impact a patient's cost-sharing amount does not undo the clear language Congress chose.

The only case the Departments cite—*City of Dallas v. FCC*, 118 F.3d 393 (5th Cir. 1997)—does not say otherwise. *See* Br. 27. It says that courts should give "technical terms" their "industry" meaning. 118 F.3d at 395. But Congress used no term of art here. It created a new statutory term—"qualifying payment amount"—and required that it be calculated based on the "total maximum payment." That phrase is also not a term of art, so it has its "normal, ordinary, and common meaning." *Id.* at 397.

**3.** The Departments now argue that incentive payments should be excluded because they "are rarely tied to specific contracted rates for particular items and services" and "are more often paid as an annual lump sum." Br. 25. Like the Departments' eleventh-hour ghost-rates justifications, this is a prohibited *post hoc* rationale. *Chenery*, 318 U.S. at 87. No wonder, then, that the *Federal Register* pages cited by the Departments say nothing about how

"rarely" incentive payments are tied to particular items or services. *See* Br. 25 (citing ROA.789).

Even if the Departments' supposition had record support, "rarely" is not "never," and the Departments nowhere explain why incentive payments that *are* directly tied to specific items and services are not part of the "total maximum payment." Providers and insurers can and do structure contracts to tie an incentive to a particular item or service. For example, an insurer may incentivize providers to administer a particular vaccine by agreeing to pay a bonus of X amount for each vaccine administered if the provider administers at least Y vaccines to its insureds. The X amount is for a particular item—a vaccine—even though the amount is paid only after a minimum number of vaccines is administered. Or, a provider may receive a productivity bonus; if the provider performs a particular service X times, she will get a bonus of Y amount. Dividing Y by X gives a per-service bonus amount that can be added to the base rate to derive the "total maximum payment" the contract recognizes for the service. Indeed, insurers themselves explained that some incentive payments "cannot be separately parsed" from other amounts. ROA.5917. The Departments have no argument for why such payments are not part of the "total maximum payment."

In any event, payments need not be directly linked to a particular item or service to be included in the "total maximum payment" for an item or service. Congress ordered that the Departments "shall take into account payments that … are *not* on a fee-for-service basis" in establishing the QPA methodology. 42 U.S.C. § 300gg-111(a)(2)(B) (emphasis added).

The Departments failed to take into account non-fee-for-service incentive payments. They took *some* non-fee-for-service payments into account. The July Rule recognized that there are "many types of alternative reimbursement models … that are not standard fee-for-service arrangements" and decided that rates under certain contracts in which no part of a payment is fee-for-service should be included in QPA calculations. 86 Fed. Reg. at 36,893 (ROA.789). But some contracts take a hybrid approach in which a portion of the rate paid to the provider is fee-for-service and the remainder of the rate consists of incentive payments. The Departments chose not to "take into account payments … not on a fee-for-service basis" in such contracts, instead ordering insurers to exclude all such payments. The Departments were required to account for these incentive payments in QPA calculations both because Congress told them to treat the "total maximum payment" under each contract as the recognized rate and because Congress was

clear that the Departments "shall take into account" non-fee-for-service payments in establishing the QPA methodology.

**4.** Finally, taking a cue from the Panel and for the first time in this litigation, the Departments lean on a separate provision that says the Departments "may" account for certain payment adjustments based on "quality or facility type (including higher acuity settings and the case-mix of various facility types)" that are "otherwise taken into account for purposes of determining payment amounts with respect to participating facilities." Br. 25–26 (quoting 42 U.S.C. § 300gg-111(a)(2)(B)); *see* Panel Op. 15.

This provision does not address contracted-for provider incentive payments. It addresses something else: the higher rates insurers agree to pay certain types of in-network facilities for the same service. For example, contracts with hospital emergency rooms may include a different rate for a service than contracts with urgent care centers. As a result, when an out-of-network facility seeks payment under the NSA, including contracted rates for all in-network facilities in the QPA calculation may result in a QPA that does not reflect the market rate for that type of facility. The Departments understood this in the July Rule. 86 Fed. Reg. at 36,890–91 (ROA.787–78) (determining QPAs should be calculated separately by facility type because

of "differences in the case-mix and level of patient acuity"). They cannot now flip to a different (and incorrect) interpretation favorable to their litigation position. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

## B.    Excluding incentive payments is unreasonable.

The Departments' decision to exclude incentive payments is also arbitrary and capricious. Excluding incentive payments conflicts with the NSA's goal, as understood by the Departments, that QPAs should "reflec[t] market rates under typical contract negotiations." 86 Fed. Reg. at 36,889 (ROA.785). In a "typical contract negotiation," a provider would demand higher fixed per-service rates if the provider understood that it would not receive incentive payments. *See* ROA.2805 (such payments can be "10 to 15 percent of total payments" under a contract). The Departments ignored this market reality, instead pretending that providers would have forgone incentive payments without demanding higher fixed per-service rates in return. That is not a rational analysis. *See Texas*, 497 F.3d at 506; *Louisiana*, 90 F.4th at 472–73.

The only justification the Departments gave in the July Rule for excluding incentive payments was that the QPA sometimes determines a patient's cost sharing, and cost sharing is generally not affected by incentive

payments. 86 Fed. Reg. at 36,894 (ROA.790). This rationale is incomplete at best. The QPA is sometimes an input in determining a patient's cost sharing. *See* 42 U.S.C. § 300gg-111(a)(3)(H)(i)–(iii). It always plays a role in determining provider compensation. *Id.* § 300gg-111(c)(5)(C). Undercompensating providers, in turn, "could lead to participants, beneficiaries and enrollees not receiving needed medical care, undermining the goals of the No Surprises Act." 86 Fed. Reg. at 56,044 (ROA.669). So the Departments' gesture at cost-sharing requirements "did not address" the deflationary consequences of excluding incentive payments "so much as sidestep [them]." *Ohio v. EPA*, 144 S. Ct. 2040, 2055 (2024).

Nor is it enough that insurers must, upon request, disclose to providers whether they excluded incentive payments in calculating a QPA. *See* Br. 26. Disclosures, of course, do not change what goes into the QPA calculation itself. And because insurers do not have to disclose the amount of any excluded payment, providers cannot use the disclosures to correct deflated QPAs. Likewise, it is not enough that the statute directs arbitrators to consider the out-of-network provider's "quality and outcomes measurements." *See id.* (citing 42 U.S.C. § 300gg-111(c)(5)(C)(ii)). The arbitrator must also consider the QPA, 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I), which is based on contracted rates

with other providers. Information about the quality of the provider seeking payment is no substitute for a properly calculated QPA.

*    *    *

The Departments' decision to exclude incentive payments from QPA calculations cannot be squared with the NSA's text and unreasonably depresses QPAs below negotiated market rates. The rule is unlawful.

## III. Vacatur Of The Unlawful QPA Methodology Rules Was The Proper Remedy.

The Departments devote much of their argument to an attack on the judicial power to vacate unlawful agency actions like the QPA methodology rules. Indeed, the Departments ask this Court to undo the district court's vacatur even of the same-specialty and third-party-administrator rules, so that the Departments may continue enforcing rules they themselves no longer defend as lawful.

The Departments urge this Court to upend how every court (including this one) has long remedied unlawful agency action. The Fifth Circuit has recognized on countless occasions that the APA authorizes vacatur of unlawful agency actions. Those decisions are right as a matter of the APA's text, structure, and history. And there is no good reason for the *en banc* Court to disturb them. There is certainly no good reason to overturn that

44

longstanding precedent and practice in this case, where—regardless of the framework governing the remedy analysis—vacatur of the unlawful rules is the only remedy that makes sense, and the only way to afford complete relief to the plaintiffs.

### A.    The APA authorizes vacatur.

#### 1.    This Court's precedents correctly hold that the APA authorizes vacatur.

Section 706 of the APA commands that "[t]he reviewing court shall … hold unlawful and *set aside* agency action … found to be" unlawful. 5 U.S.C. § 706(2) (emphasis added). This language "empowers courts to 'set aside'— *i.e.*, formally nullify and revoke—an unlawful agency action," *Data Mktg.*, 45 F.4th at 859–60 (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950 (2018)), including an agency "rule," *see* 5 U.S.C. § 551(13) (defining "agency action" to "include[] the whole or a part of an agency *rule*, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act" (emphasis added)).

The key phrase is "set aside." *Id.* § 706(2). When the APA was enacted in 1946, that phrase meant "to cancel, annul, or revoke." *Black's Law Dictionary* 1612 (3d ed. 1933). At the time, the phrase was commonly used by appellate courts that reversed decisions of lower courts and then directed

that a lower court's "judgment" be "set aside"—that is, vacated. *See Corner Post, Inc. v. Bd. of Governors*, 603 U.S. 799, 830 (2024) (Kavanaugh, J., concurring). And just before the APA's passage, Congress "used 'set aside'" in other statutes granting courts jurisdiction to invalidate Acts of Congress or agency regulations. Mila Sohoni, *The Power to Vacate A Rule*, 88 Geo. Wash. L. Rev. 1121, 1171–73 (2020) (giving examples). The APA adopted this "common and contemporaneous meaning of 'set aside.'" *Corner Post*, 603 U.S. at 830 (Kavanaugh, J., concurring).

Interpreting this statutory text, numerous Fifth Circuit decisions hold that "the APA 'empowers and commands courts to "set aside" unlawful agency actions,' allowing a district court's vacatur to render a challenged agency action 'void.'" *TMA V*, 110 F.4th at 779 (quoting *MPP*, 20 F.4th at 957); *see also, e.g.*, *Data Mktg.*, 45 F.4th at 859–60; *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation."). This Court, sitting *en banc*, recently affirmed that "vacatur of an agency action is the default rule in this Circuit." *Cargill*, 57 F.4th at 472.[2]

---

[2] The other courts of appeals agree that the APA authorizes courts to vacate agency action. *See, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019); *Harrington v. Chao*, 280 F.3d

No surprise, then, that this Court routinely affirms district court decisions vacating agency actions and itself vacates agency actions, including rules. So far this year alone, this Court has vacated or affirmed the vacatur of multiple rules or generally applicable agency orders, *see, e.g.*, *Tex. Corn Producers v. EPA*, 141 F.4th 687, 711–12 (5th Cir. 2025); *Nat'l Religious Broads. v. FCC*, 138 F.4th 282, 296 (5th Cir. 2025); *Nat'l Auto. Dealers Ass'n v. FTC*, 127 F.4th 549, 561 (5th Cir. 2025)—not to mention other sorts of agency actions, *see, e.g.*, *Texas v. EPA*, 132 F.4th 808, 863 (5th Cir. 2025) (vacating EPA refusal to approve state pollution plan under the Clean Air Act). And over the years, every member of this *en banc* Court has authored or joined a decision vacating an agency rule or recognizing that the APA authorizes vacatur.[3] The Supreme Court, too, "has affirmed countless decisions

---

50, 52 (1st Cir. 2002); *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018); *CBS Corp. v. FCC*, 663 F.3d 122, 152 (3d Cir. 2011); *Casa De Maryland v. DHS*, 924 F.3d 684, 706 (4th Cir. 2019); *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022); *Bethlehem Steel Corp. v. EPA*, 638 F.2d 994, 1010 (7th Cir. 1980); *Zimmer Radio of Mid-Missouri, Inc. v. FCC*, 2025 WL 2056854, at *19 (8th Cir. July 23, 2025); *Cal. Wilderness Coal. v. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011); *Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 859 (10th Cir. 2019); *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, 317 (11th Cir. 2025); *Nike, Inc. v. Adidas AG*, 955 F.3d 45, 55 (Fed. Cir. 2020).

[3] *See Data Mktg.*, 45 F.4th at 859–60; *TMA V*, 110 F.4th at 779; *Texas*, 132 F.4th at 863; Panel Op. at 22; *Sw. Elec. Power Co. v. EPA*, 920 F.3d

that vacated agency actions, including agency rules." *Corner Post*, 603 U.S. at 830–31 (citing *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 36 & n.7 (2020); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 486 (2001); *Bd. of Governors, FRS v. Dimension Fin. Corp.*, 474 U.S. 361, 364–365 (1986)). In short, the APA grants this Court the power—which it has routinely exercised—to vacate unlawful agency actions.

### 2.    The Departments' contrary view is wrong.

The Departments argue that the "APA does not authorize vacatur." Br. 36. No court has ever adopted that position. The Departments' arguments are wrong and cannot justify remaking eighty years of administrative law.

The Departments invoke the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2554 (2025). But the Court there was clear that "[n]othing" it "sa[id] … resolves the distinct question whether the [APA] authorizes federal courts to vacate federal agency action. *See* 5 U.S.C. § 706(2) (authorizing courts to 'hold unlawful and set aside agency action')."

---

999, 1033 (5th Cir. 2019); *Rest. L. Ctr. v. Dep't of Lab.*, 120 F.4th 163, 177 (5th Cir. 2024); *El Paso Elec. Co. v. FERC*, 832 F.3d 495, 510–11 (5th Cir. 2016); *MPP*, 20 F.4th at 960–61; *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024).

145 S. Ct. at 2554 n.10. The longstanding precedent of the Supreme Court and this Court is undisturbed.

The Departments insist that this "distinct question," *id.*, is "governed by Section 703," not section 706(2), of the APA. Br. 36–38. "That argument is weak." *Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring). Section 703 speaks to the "[f]orm and venue of proceeding"—not to remedies. And even if it did speak to remedies, section 703 does not foreclose vacatur simply because it does not expressly include vacatur in its *nonexhaustive* list of "form[s] of legal action." 5 U.S.C. § 703 (authorizing "*any* applicable form of legal action, *including* actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus" (emphasis added)); *Argosy Ltd. v. Hennigan*, 404 F.2d 14, 20 (5th Cir. 1968) ( "includes" usually means "there are other items includable, though not specifically enumerated"). Section 703 allows a plaintiff to bring "any applicable form of legal action" against an agency, *id.*, including the "one form of action" recognized by the Federal Rules—"a civil action," Fed. R. Civ. P. 2. "The types of remedies available in such a suit are" not detailed in section 703 but are "left to be determined by other sources of law, including, as relevant here,"

section 706.[4] Mila Sohoni, *The Past and Future of Universal Vacatur*, 133 Yale L.J. 2304, 2337 (2024).

The historical backdrop of the APA confirms that vacatur is available. *Contra* Br. 36–37. Pre-APA, federal courts remedying unlawful agency action granted injunctions that "extended beyond just the plaintiffs." Sohoni, *Power to Vacate*, *supra*, at 1142–46 (cleaned up). Even more to the point, before the APA, federal courts invalidated high-profile agency rules under statutes authorizing courts to "set aside" unlawful agency actions. *See id.* at 1146 & n.121. Far from being "new," the "set aside" remedy was "known at the time of the APA's enactment." Br. 37.

When the Departments finally turn to section 706, they make two unconvincing arguments. Pointing first to the provision's title ("Scope of review"), the Departments claim that section 706 lays out rules of decision, not remedies. But "the heading of a section cannot limit the plain meaning of the text." *United States v. Gomez*, 960 F.3d 173, 178 (5th Cir. 2020). And the text

---

[4] Although the listed "forms [of actions] are couched in remedy-sounding language," Koch & Murphy, 3 Administrative Law & Practice § 8.30 (3d ed.), they are all ultimately forms of "civil actions," Fed. R. Civ. P. 2. Even when an action is "begun by asking for one of these remedies," the plaintiff's request for a particular form of relief does not limit a court's authority to fashion the remedy. Koch & Murphy § 8.31; *see also* Sohoni, *Past and Future*, *supra*, at 2337.

plainly addresses remedies: Not only does section 706 tell courts to "set aside agency action … found to be" unlawful, but it also instructs them to "compel agency action unlawfully withheld or unreasonably delayed"—which is "unmistakably a remedy," *Corner Post*, 603 U.S. at 839 (Kavanaugh, J., concurring).

The Departments' reading of "set aside" as "disregard" fails on multiple levels. Br. 38. It is incompatible with the phrase's ordinary meaning. *See supra* at 45–46. And it rests on an inapt analogy to judicial review of "unconstitutional statute[s]," Br. 38, "in which courts enter judgments and decrees only against litigants," Mitchell, *Writ-of-Erasure*, *supra*, at 1012. Judicial review under the APA, however, "go[es] further by empowering the judiciary to act directly against the challenged agency action." *Id.* The better analogy is appellate review: "in the same way that an appellate court formally revokes an erroneous trial-court judgment," courts in APA suits can "formally revoke an agency's" actions. *Id.*; *see also* Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L. Rev. 253, 258 (2017) (The APA "reflected a consensus that judicial review of agency action should be modeled on appellate review of trial court judgments.").

The Departments finally insist that their reading is better because section 706(2) covers not only "agency action" but also "findings" and "conclusions," and "it makes little sense to say that a court 'vacates' … findings and conclusions." Br. 39. But courts *do* "vacat[e] … finding[s]," *Fogo De Chao (Holdings), Inc. v. DHS*, 211 F. Supp. 3d 31, 41–42 (D.D.C. 2016); *Silva v. Sec'y of Lab.*, 518 F.2d 301, 310 (1st Cir. 1975), and conclusions, *e.g.*, *Aragon v. Tillerson*, 240 F. Supp. 3d 99, 120 (D.D.C. 2017) (granting "vacat[ur] with respect to [an agency] conclusion"). Meanwhile, reading "set aside" as "disregard" creates the inverse problem: While it may make sense to "disregard" a rule in an enforcement action, it makes no sense to "disregard" a rule in a pre-enforcement challenge to the rule itself. *See Corner Post*, 603 U.S. at 840–41 (Kavanaugh, J., concurring) (reading "set aside" to mean "disregard" "would *de facto* overrule *Abbott Laboratories* [*v. Gardner*, 387 U.S. 136 (1967)]," which approved "facial, pre-enforcement review of agency rules"). The Departments' reading creates another problem too: It renders section 706(2)'s "hold unlawful" instruction superfluous. There would be no need to tell courts to "hold unlawful *and* set aside agency action" if courts could "set aside" action just by "disregard[ing]" it in "the case before the court." Br. 38. This Court's precedents correctly read the APA to mean what

it plainly says: that courts may "'set aside'—*i.e.,* formally nullify and revoke—an unlawful agency action." *Data Mktg.*, 45 F.4th at 859.

## B. The district court did not abuse its discretion in deciding vacatur was the appropriate remedy.

Because the APA authorizes vacatur, the Departments must demonstrate that the district court's decision to grant that relief was outside its "broad discretio[n]" to craft an appropriate remedy. *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331–32 (5th Cir. 2001); *see Texas*, 50 F.4th at 529. The Departments cannot carry that heavy burden.

### 1. Universal vacatur is the appropriate remedy here under the Court's longstanding precedents.

**a.** The district court followed the instruction of this *en banc* Court that "vacatur of an agency action is the default rule in this Circuit." ROA.13235 (quoting *Cargill*, 57 F.4th at 472). That rule flows from the APA's text: "Section 706, after all, provides that a 'reviewing court *shall*' set aside unlawful agency action." *Braidwood*, 104 F.4th at 952; *accord United Steel*, 925 F.3d at 1287. This Court has deemed vacatur the "default" APA remedy nearly a dozen times.[5]

---

[5] *See Tex. Corn*, 141 F.4th at 710; *Texas*, 132 F.4th at 862; *Rest. L. Ctr.*, 120 F.4th at 177; *TMA V*, 110 F.4th at 779; *Braidwood*, 104 F.4th at 952; *Chamber of Com. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023); *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 254 (5th Cir. 2023); *Cargill*, 57

True, the APA authorizes a reviewing court to "deny relief on any …
appropriate legal or equitable ground." 5 U.S.C. § 702; *see* Br. 40. Vacatur
therefore is not *mandatory*, but it remains the default. Read together, sec-
tions 702 and 706 provide that a reviewing court "shall" vacate unlawful
agency action *unless* "appropriate legal or equitable grounds" counsel
"deny[ing] relief." That sort of linguistic structure creates a "statutory pre-
sumption," *First Nat'l Bank at Lubbock v. United States*, 463 F.2d 716, 718
(5th Cir. 1972), or "presumptive baseline," *Friedman v. Sebelius*, 686 F.3d
813, 824–25 (D.C. Cir. 2012). In a word: a "default."

This Court has given effect to section 702's discretionary "deny relief"
language by permitting courts to remand without vacatur when the agency
likely can fix the defect and vacatur would be disruptive. *E.g.*, *Chamber of
Com.*, 88 F.4th at 1118. Because the government does not articulate an ar-
gument under that test, vacatur is the appropriate remedy under the Court's
longstanding view. *Data Mktg.*, 45 F.4th at 860.

**b.** Vacatur is by nature not party-specific. That's because "unlike an
injunction, which operates *in personam*, vacatur operates on the status of

F.4th at 472; *Franciscan All.*, 47 F.4th at 374–75; *Data Mktg.*, 45 F.4th
at 856; *MPP*, 20 F.4th at 1000.

agency action in the abstract." *Braidwood*, 104 F.4th at 951. Upon vacatur, "the disapproved agency action"—here, a rule—"is treated as though it had never happened." *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (quoting Mitchell, *Writ-of-Erasure*, *supra*, at 1012–13). Put differently, because "[t]he term 'set aside' means invalidation," the "invalid rule" that results from vacatur "may not be applied to anyone." *Id.* (quoting Sohoni, *Power to Vacate*, *supra*, at 1173).

The Departments contend that because the APA permits vacating "part of an agency rule," 5 U.S.C. § 551(13), a court must be able to vacate "only certain applications of the rule." Br. 40–41. The conclusion does not follow from the premise. "Applications" of an agency rule—*i.e.*, discrete past or present events—are not part of the "rule" itself. A "rule" by definition is "an agency statement of … future effect," 5 U.S.C. § 551(4), and typically "announces 'generally applicable' legal principles," *ITServe All., Inc. v. DHS*, 71 F.4th 1028, 1035 (D.C. Cir. 2023). Vacating a "rule" is not vacating an "application" of that rule. *See* Sohoni, *Power to Vacate*, *supra*, at 1169–75.

The nature of reviewing a "rule" also defeats the Departments' analogy to an appellate court's vacatur of a judgment "only as to the party or parties to that appeal." Br. 42. The federal judicial power necessarily involves

"appl[ying a] rule to particular cases," *Marbury v. Madison*, 1 Cranch 137, 177 (1803), so a federal court judgment looks more like a party-specific agency "order"—"a final disposition … in a matter other than rule making," 5 U.S.C. § 551(6). But when a court is reviewing an agency's "generally applicable" rule, *ITServe*, 71 F.4th at 1035, it makes no sense to speak of vacating an "application" of the rule.

**c.** The Departments are also wrong that APA plaintiffs seeking vacatur bear the burden of satisfying the traditional four-factor test for an injunction, and that, otherwise, a court may "withhold relief altogether." Br. 41–42. Because the Departments failed to raise this argument until now, it is forfeited. *See Data Mktg.*, 45 F.4th at 860. Further, even assuming vacatur is an equitable remedy, the four-factor test does not apply where Congress has "intervened" to "guide or control" the court's discretion. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982); *see, e.g., Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 172–73 (1978). In the APA, Congress "set[] forth a simplified statement of judicial review designed to afford a remedy for every legal wrong," S. Doc. No. 79-248, at 193 (1946), and provided that courts "shall" set aside unlawful agency action. This Court has therefore rejected prior attempts by the government to "require consideration of the various equities

at stake before determining whether a party is entitled to vacatur." *Braid-wood*, 104 F.4th at 952.

### 2. In all events, vacatur is the appropriate remedy because it is the only way to provide plaintiffs complete relief.

**a.** Regardless of whether plaintiffs must show that the equities favor vacatur, the district court chose the right remedy because vacatur is the only way to provide complete relief to the plaintiffs. "The equitable tradition has long embraced the rule that courts generally 'may administer complete relief between the parties,'" even if doing so "incidental[ly]" benefits nonparties. *CASA*, 145 S. Ct. at 2557. Whether it's abating a nuisance or redrawing a gerrymandered congressional map, there are some cases in which "it is all but impossible for courts to craft relief that is complete *and* benefits only the named plaintiffs." *Id.* at 2557 & n.12.

This is one of those cases. The challenged rules injure plaintiffs by causing insurers to calculate artificially low QPAs, which, when deployed in negotiation and arbitration, will predictably result in lower reimbursement rates for providers. ROA.13210, 13215. Because the insurers are not parties in this case, there is no *in personam* order that could remedy plaintiffs' injury. Rather, as in "most APA litigation brought by unregulated but

57

adversely affected parties," plaintiffs here "can obtain relief only through vacatur of the adverse agency action" causing their harm. *Corner Post*, 144 S. Ct. at 2463 (Kavanaugh, J., concurring); *see, e.g.*, *Tex. Corn*, 141 F.4th at 695, 710–12 (vacating vehicle fuel economy rule in case brought by agricultural organizations "harmed when the demand for gasoline decreases"); *MPP*, 20 F.4th at 1000 (affirming vacatur of immigration rule in case brought by Texas).

The Departments do not seriously suggest any other remedial option. They repeatedly hint at the possibility of a "party-specific injunction," Br. 41, 49, but the district court of course could not have enjoined the nonparty insurers at all. *Hansberry v. Lee*, 311 U.S. 32, 40 (1940). And it's safe to assume the Departments would prefer the "less drastic remedy" of vacatur over an injunction compelling them to initiate enforcement actions against insurers who use the unlawful QPA calculation rules. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010); *see All. for Hippocratic Med.*, 78 F.4th at 254. The Departments also surmise that a declaratory judgment might work, Br. 41, but that fails for the same reason—it's useless against the Departments, who do not apply the rules to plaintiffs, and it has no binding effect on insurers, *see Downs v. Hubbard*, 123 U.S. 189, 208 (1887).

Later, the Departments suggest that "complete relief" here means that when dealing with one of the plaintiffs, an insurer "would disregard" the challenged regulation "and would instead rely solely on the statutory text." Even if this approach could work in the mine run of administrative-law cases, it cannot work under the statutory scheme here. The Departments apparently envision insurers calculating, maintaining, and using in IDR two entirely separate sets of QPAs (one for plaintiffs, one for everyone else). That vision cannot be squared with the NSA's command that the Departments establish "one [IDR] process." 42 U.S.C. § 300gg-111(c)(2)(A); *see TMA V*, 110 F.4th at 780. Nor does it work under the NSA's definition of QPAs. The NSA instructs the Departments to establish a methodology by which insurers calculate QPAs, then defines QPA as a figure calculated according to the statute and "consistent with th[at] methodology." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). So long as the unlawful rules remain in effect, it is therefore impossible for insurers to calculate lawful QPAs to use in arbitrations involving plaintiffs.

Nor could the Departments' preferred remedy provide complete relief as a practical matter. In the Departments' world, the vast majority of QPAs arbitrators see for a given item or service would be the lower, unlawful QPAs.

59

It is fantastical to think arbitrators could mechanically set aside that pattern when occasionally presented with a higher QPA for the same service, solely because the case happens to involve one of the plaintiffs here. Further, there is no way for plaintiffs to ensure that insurers use correctly calculated QPAs in interactions with plaintiffs. Insurers calculate QPAs in private, and providers and arbitrators have virtually no insight into what goes into those calculations. *See supra* at 11. The Departments, for their part, plan to conduct just nine audits per year to look behind insurers' QPA calculations. 86 Fed. Reg. at 36,935 (ROA.831).

**b.** The Departments are also wrong that this case "vividly illustrates" how universal vacatur prevents the percolation of issues among courts because a trade association of air ambulance providers lost a challenge to some of the same regulations in an earlier case. Br. 44–45. There are ways to prevent the abuses the Departments fear, as the Departments know: They raised a claim-splitting defense against the air-ambulance providers below, but the district court rejected their argument and the Departments chose not to appeal that decision. *See* ROA.13221–23. In any event, in making vacatur the default remedy under the APA, Congress showed that it does not pursue percolation "at all costs." *Stanley v. City of Sanford*, 145 S. Ct. 2058, 2067

(2025); *cf.* 28 U.S.C. § 1295(a) (granting the Federal Circuit exclusive jurisdiction). And besides, "federal law already gives the Government tools to mitigate" the stagnating effects of an erroneous vacatur: take an appeal or seek a stay. *Corner Post*, 144 S. Ct. at 2469 (Kavanaugh, J., concurring). If anything, this case illustrates the dangers of the Departments' view: By declining to appeal certain of the district court's holdings, the Departments hope to avoid a precedential opinion on the merits, allowing them to continue broadly enforcing rules even they do not claim are lawful.

**c.** Finally, the Departments overstate any concerns about vacatur "leav[ing] health plans scrambling to engage in a costly new round of calculations." Br. 48–49. Apart from "conclusory" assertions, "the Departments offer[ed] nothing [below] to demonstrate undue disruption" from vacatur. ROA.13236. Nor have they done anything to fill that gap in the nearly two years this case has been pending before this Court.

The truth is that vacatur did not and will not cause any "scrambling." As the district court predicted, the Departments have exercised enforcement discretion with respect to patient cost sharing, and insurers continue to use unlawfully calculated QPAs in IDR. *See* ROA.13236; *July 2025 FAQs* at 5; *October 2023 FAQs* at 7. The Departments have not even addressed the

61

district court's reasoning, let alone identified any flaw in it. In any event, even under the Departments' unspecified "party-specific" remedy, insurers will have to recalculate QPAs.

*     *     *

The Departments' position has a disturbing implication: If an agency's unlawful action hurts only parties that are not directly regulated, courts may be powerless to remedy the harm. That has never been the law. Even when remanding without vacatur, courts demand that the agency fix illegal regulations on remand. *E.g., Chamber of Com.*, 88 F.4th at 1118. The Court should reject the Departments' radical view.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should affirm.

Respectfully submitted,

Dated: August 18, 2025

/s/ *Jillian Sheridan Stonecipher*

JILLIAN SHERIDAN STONECIPHER
   *Counsel of Record*
MADELEINE JOSEPH
CODY M. AKINS
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8711
Email: jstonecipher@sidley.com

JAIME L.M. JONES
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Tel: (312) 853-0751
Fax: (312) 853-7036
Email: jaime.jones@sidley.com

**Counsel for Plaintiffs-Appellees**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 18, 2025, a copy of the above and fore-going was electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

/s/ *Jillian Sheridan Stonecipher*
Jillian Sheridan Stonecipher

## CERTIFICATE OF COMPLIANCE

This document complies with Rule 28.1 of the Federal Rules of Appellate Procedure because it contains 12,990 words, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and Fifth Circuit Rule 32.2.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.


Dated: August 18, 2024                    */s/ Jillian Sheridan Stonecipher*
                                          Jillian Sheridan Stonecipher