No. 23-40605

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

LIFENET, INCORPORATED; EAST TEXAS AIR ONE, L.L.C.; ROCKY MOUNTAIN HOLDINGS L.L.C.; AIR METHODS CORPORATION, L.L.C.,
*Plaintiffs-Appellees/Cross-Appellants,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT BESSENT, SECRETARY, U.S. DEPARTMENT OF TREASURY; UNITED STATES DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, SECRETARY, U.S. DEPARTMENT OF LABOR; UNITED STATES OFFICE OF PERSONNEL MANAGEMENT; SCOTT KUPOR, DIRECTOR, U.S. OFFICE OF PERSONNEL MANAGEMENT,
*Defendants-Appellants/Cross-Appellees.*

_____

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL, L.L.C.; DOCTOR ADAM CORLEY,
*Plaintiffs-Appellees/Cross-Appellants,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT BESSENT, SECRETARY, U.S. DEPARTMENT OF TREASURY; UNITED STATES DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, SECRETARY, U.S. DEPARTMENT OF LABOR; UNITED STATES OFFICE OF PERSONNEL MANAGEMENT; SCOTT KUPOR, DIRECTOR, U.S. OFFICE OF PERSONNEL MANAGEMENT,
*Defendants-Appellants/Cross-Appellees.*

_____

On Appeal from the United States District Court
for the Eastern District of Texas (Kernodle, J.)
Nos. 6:22-cv-450 and 6:22-cv-453

_____

## *EN BANC* BRIEF OF APPELLEES/CROSS-APPELLANTS LIFENET, INC., EAST TEXAS AIR ONE LLC, ROCKY MOUNTAIN HOLDINGS LLC, AND AIR METHODS CORPORATION LLC

_____

COUNSEL LISTED ON INSIDE COVER

STEVEN M. SHEPARD
    *Counsel of Record*
STEPHEN SHACKELFORD, JR.
MAX ISAAC STRAUS
JAMES CRAIG SMYSER
SUSMAN GODFREY LLP
1301 Ave. of the Americas, Fl. 32
New York, NY 10019
Tel: (212) 336-8340
Fax: (212) 336-8340
Email:
sshepard@susmangodfrey.com

***Counsel for Plaintiffs-Appellees LifeNet, Inc. and East Texas Air One, LLC***

JOSHUA D. ARTERS
    *Counsel of Record*
DAVID A. KING
POLSINELLI PC
501 Commerce Street, Suite 1300
Nashville, TN 37203
Tel: (615) 259-1510
Fax: (615) 259-1573
Email: jarters@polsinelli.com

***Counsel for Plaintiffs-Appellees, Air Methods Corporation and Rocky Mountain Holdings, LLC***

## CERTIFICATE OF INTERESTED PERSONS

Number and Style of Case: 23-40605, *Texas Medical Association, et al. v. United States Dep't of Health and Human Services et al.*; *LifeNet, Inc. et al. v. United States Dep't of Health and Human Services et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Undersigned counsel respectfully incorporates, here, the list of interested persons and entities provided in the principal brief of the Texas Medical Association.

In addition, undersigned counsel also provides the following list:

* All providers of emergency healthcare medical services in the United States. These providers benefit from the District Court's ruling under review.

* All group health plans and individual health insurance plans in the United States. These entities benefited from the agencies' regulations which the District Court vacated.

**Federal Rule of Appellate Procedure 26.1:**

1. LifeNet, Inc. has no parent corporation, subsidiaries, and/or affiliates, and no publicly held corporation owns 10% or more of its stock.

2. East Texas Air One, LLC, is wholly owned by AHS East Texas Health System, LLC, which is wholly owned by AHS Texas, LLC, which is wholly owned by Ardent Legacy Holdings, LLC, which is wholly owned by AHP Health Partners, Inc., which is wholly owned by Ardent Health, Inc. Ardent Health, Inc. is a publicly held corporation.

3. Air Methods Corporation, which has reorganized since this litigation commenced as Air Methods, LLC, hereby certifies that it is a wholly owned subsidiary of ASP AMC Intermediate Holdings, LLC. ASP AMC Intermediate Holdings, LLC is a wholly owned subsidiary of CHPPR AcquisitionCo, Inc. No publicly held corporation owns 10% or more of Air Methods, LLC's stock.

4. Rocky Mountain Holdings, LLC hereby certifies that it is a wholly owned subsidiary of Air Methods Corporation and no publicly held corporation owns more than 10% of its stock.

Dated: August 18, 2025

*/s/ Steven Shepard*
Steven Shepard
**Counsel of Record for Plaintiffs-Appellees LifeNet, Inc. and East Texas Air One, LLC**

*/s/ Joshua D. Arters*
Joshua D. Arters
**Counsel of Record for Plaintiffs-Appellees Air Methods Corporation and Rocky Mountain Holdings, LLC**

## STATEMENT REGARDING ORAL ARGUMENT

In its order granting Plaintiffs-Appellees' Petition for Rehearing En Banc, the Court ordered oral argument. The Court scheduled tthat argument for September 24, 2025.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS........................................III

STATEMENT REGARDING ORAL ARGUMENT................................ VI

TABLE OF CONTENTS ........................................................VII

TABLE OF AUTHORITIES.................................................... IX

INTRODUCTION ............................................................... 1

JURISDICTIONAL STATEMENT.............................................. 4

STATEMENT OF ISSUES ...................................................... 4

STATEMENT OF THE CASE ................................................... 5

    A.   The Air Ambulance Plaintiffs ....................................... 5

    B.   Single-Case Agreements............................................ 6

    C.   The IDR Process.................................................... 7

    D.   The NSA Requires Insurers to Calculate the QPA Based on Their "Contracted Rates".................... 10

    E.   The July Rule Excludes Rates in Single-Case Agreements from the "Contracted Rates" Used to Determine the QPA ................................ 12

    F.   The Decision Below.................................................... 15

    G.   The Panel Decision ..................................................... 17

    H.   Petition for Rehearing *En Banc* ................................. 19

STANDARD OF REVIEW ..................................................... 19

SUMMARY OF ARGUMENT................................................... 19

ARGUMENT...................................................................... 21

I.    The Departments' Exclusion of Single-Case Agreements Contravenes the Unambiguous Meaning of "Contracted Rates" ............................................................ 22

    A.    Single-Case Agreements Set Contracted Rates .......... 22

    B.    The Departments' *Post Hoc* Justifications Fail ........... 27

        1.    Single-Case Agreements Set Payment "Rates" ................................................................ 28

        2.    Case-Specific Agreements Set Rates Paid "Under Such Plan or Coverage" .......................... 31

        3.    Any Ambiguity Concerning the Dates of the Single-Case Agreements Included in the QPA Does Not Justify Excluding These Agreements Entirely ............................... 36

II.    The July Rule's QPA Calculation Methodology Unlawfully and Arbitrarily Excludes Case-Specific Contracted Rates from the QPA ........................................... 37

    A.    Excluding the Single-Case Agreements from QPA Calculations Cannot Achieve the Agencies' Stated Goal of Approximating Market Rates .............. 38

    B.    The Departments Acted Arbitrarily by Treating Single-Case Agreements Inconsistently in the July Rule ...................................................................... 44

III.    The Air Ambulance Plaintiffs Incorporate the TMA's Arguments, Which Apply to Air Ambulance Providers Notwithstanding Minor Differences ...................................... 47

CONCLUSION ............................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Butterbaugh v. Dep't of Just.*,
   336 F.3d 1332 (Fed. Cir. 2003) ........................................... 44

*Chamber of Com. of United States v. United States Sec. &*
   *Exch. Comm'n*, 88 F.4th 1115 (5th Cir. 2023) .................................... 50

*Chem. Mfrs. Ass'n v. Env't Prot. Agency*,
   899 F.2d 344 (5th Cir. 1990) ................................................. 27

*In re: Deepwater Horizon*,
   48 F.4th 378 (5th Cir. 2022) ............................................... 37

*Lexon Ins. Co., Inc. v. Fed. Deposit Ins. Corp.*,
   7 F.4th 315 (5th Cir. 2021) ........................................... 23, 24

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ................................................. 22, 23, 27

*Louisiana v. DOE*,
   90 F.4th 461 (5th Cir. 2024) ......................................... 39, 42

*MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*,
   512 U.S. 218 (1994) ......................................................... 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
   *Auto. Ins. Co.*, 463 U.S. 29 (1983) ..................................... 27, 38, 43, 46

*Ne. Hosp. Corp. v. Sebelius*,
   699 F. Supp. 2d 81 (D.D.C. 2010) ....................................... 44

*Petit v. U.S. Dep't of Educ.*,
   675 F.3d 769 (D.C. Cir. 2012) ........................................... 23

*Rest. L. Ctr. v. United States Dep't of Lab.*,
   120 F.4th 163 (5th Cir. 2024) ......................................... 23, 24

ix

*Robert O. v. Harvard Pilgrim Health Care, Inc.*,
No. 2:17-CV-1251-TC, 2019 WL 3358706 (D. Utah July
25, 2019) ..................................................................................... 25

*Texas Med. Ass'n v. United States Dep't of Health & Hum.
Servs.*, 110 F.4th 762 (5th Cir. 2024) ............................... 3, 41

*Van Loon v. Dep't of the Treasury*,
122 F.4th 549 (5th Cir. 2024) ...................................... 22, 23

*Wages & White Lion Invs., L.L.C. v. United States Food &
Drug Admin.*, 16 F.4th 1130 (5th Cir. 2021) ............... 28, 43

**Statutes**

5 U.S.C. § 8902(p) ...................................................................... 7

26 U.S.C. § 9815(a)(1) .......................................................... 7, 34

26 U.S.C. § 9816(c). ................................................................... 7

29 U.S.C. § 1102(a)(1), (b)(4) ................................................. 33

29 U.S.C. § 1104(a)(1) .............................................................. 33

29 U.S.C. § 1185e(c) ................................................. 7, 33, 34, 35

42 U.S.C. § 300gg-19(a)(2)(A) ................................................. 34

42 U.S.C. § 300gg-19(a)(2)(B) ................................................. 34

42 U.S.C. § 300gg-111 .............................................................. 49

42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II) ...................................... 8

42 U.S.C. § 300gg-111(a)(2)(B)(i) ............................................ 12

42 U.S.C. § 300gg-111(a)(3) ..................................................... 10

42 U.S.C. § 300gg-111(a)(3)(E) .......................................... 21, 49

42 U.S.C. § 300gg-111(a)(3)(E)(i) ............................................ 32

42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) ............................................ 10, 11, 31

42 U.S.C. § 300gg-111(a)(3)(E)(ii)(I) ........................................... 11

42 U.S.C. § 300gg-111(a)(3)(F)(ii) ............................................... 45

42 U.S.C. § 300gg-111 (b)(2)(A)(i) .............................................. 45

42 U.S.C. § 300gg-111(c)(4) ........................................................ 8

42 U.S.C. § 300gg-111(c)(4)(A) ................................................... 9

42 U.S.C. § 300gg-111(c)(4)(A)(i) ................................................ 9

42 U.S.C. § 300gg-111(c)(4)(B) ................................................... 9

42 U.S.C. § 300gg-111(c)(4)(E)(i) ................................................ 9

42 U.S.C. § 300gg-111(c)(5) ........................................................ 8

42 U.S.C. § 300gg-111(c)(5)(A)(i) ................................................ 9

42 U.S.C. § 300gg-112 ................................................................ 49

42 U.S.C. § 300gg-112(a)(3) ........................................................ 8

42 U.S.C. § 300gg-112(b)(5)(B) ................................................... 9

42 U.S.C. § 300gg-112(b)(5)(C) ................................................... 11

42 U.S.C. § 300gg-112(b)(5)(C)(i) ............................................... 10

42 U.S.C. § 300gg-112(c)(2) ....................................................... 10, 49

42 U.S.C § 300gg-131 ................................................................. 8

42 U.S.C. § 300gg-135 ................................................................ 7

**Regulations**

5 C.F.R. § 890.114 ...................................................................... 7

26 C.F.R. § 54.9815-2719T(b)(2)(i) ............................................. 34

26 C.F.R. § 54.9815-2719(b)(2)(i) ............................................... 34

26 C.F.R. § 54.9816-1T. ............................................................. 7

29 C.F.R. § 2560.503-1 .............................................................. 34

29 C.F.R. § 2560.503-1(b)(5) ................................................. 33, 34

29 C.F.R. § 2590.716-1. ............................................................. 7

42 C.F.R. § 149.510(c)(4)(vii)(A) ............................................... 9

45 C.F.R. § 147.136(b)(2)(i) ..................................................... 34

45 C.F.R. § 147.136(b)(3)(i) ..................................................... 34

45 C.F.R. § 149.30 ................................................... 14, 25, 27, 45

45 C.F.R. § 149.140 ............................................................. 12, 48

45 C.F.R. § 149.140(a)(1) ................................................... *passim*

45 C.F.R. § 149.140(c)(3) ......................................................... 10

45 C.F.R. § 149.140(d)(1) ......................................................... 11

45 C.F.R. § 149.510 ............................................................. 49, 50

45 C.F.R. § 149.510(b)(2)(iii)(A)(7) ........................................... 11

45 C.F.R. § 149.520 ................................................................. 49

45 C.F.R. § 149.520(a) ............................................................. 49

45 C.F.R. § 149.520(b)(1) ......................................................... 11

45 C.F.R. § 149.140(a)(1) ......................................................... 45

86 Fed. Reg. 36,872 ................................................................. 12

86 Fed. Reg. at 36,882 ............................................................. 45

86 Fed. Reg. at 36,889 ...................................................... *passim*

86 Fed. Reg. at 36,895 §§ 149.140(c)(1)(v) ............................................... 48

86 Fed. Reg. at 36,895 §§ 149.140(c)(1)(vi) .............................................. 48

86 Fed. Reg. at 36,896 ...................................................................... 20, 39

86 Fed. Reg. at 36,901 ............................................................................. 8

86 Fed. Reg. at 36,923 ......................................................... 6, 13, 40, 41

86 Fed. Reg. 55,980, 55,996 ................................................................. 40

## Other Authorities

Black's Law Dictionary, the Restatement ............................. 23, 24, 25, 29

Merriam-Webster's Collegiate Dictionary 1032 (11th ed.
    2005) ........................................................................................ 29, 30

Oxford English Dictionary (online ed.) ...................................... 24, 25, 29

Restatement (Second) of Contracts § 1 (1981) ...................................... 24

Webster's Third New International Dictionary ............................... 29, 30

Williston on Contracts § 1:1 (4th ed.) ...................................................... 24

## **INTRODUCTION**

The Air Ambulance Plaintiffs[1] join the En Banc Brief filed by the Texas Medical Association (the "TMA") as to all common issues. This separate brief defends an additional ruling by the District Court that TMA's brief does not address.

The District Court correctly vacated the July Rule's definition of the statutory term "contracted rates." This term plays a critical role in defining the Qualified Payment Amount ("QPA"). The plain meaning of that term includes rates of payment agreed to between payors and *out-of-network providers* in what are called single-case agreements. A single-case agreement, just as its name implies, is a contract setting forth the agreed rate of payment for a single transport. These contracts are common in the air ambulance industry, where *in-network* agreements are comparatively rare.

The July Rule improperly rewrites the statutory term "contracted rates" by declaring, through administrative fiat, that insurers, when determining their QPA, should *exclude* all the rates they have contracted

---

[1] The Air Ambulance Plaintiffs are Plaintiffs-Appellees/Cross-Appellants LifeNet, Inc., East Texas Air One, LLC, Air Methods Corporation, and Rocky Mountain Holdings, LLC.

1

to pay in single-case agreements. The District Court correctly vacated that part of the July Rule because it conflicts with the statute's plain and ordinary meaning.

Single-case agreements are "contracts." In a single-case agreement, an insurer promises to pay an agreed rate for a healthcare provider's services in exchange for the healthcare provider's promise to accept that rate as payment. Elsewhere in the July Rule, even the Defendant Departments acknowledge that single-case agreements are contracts. These contracts contain the "rate" of payment agreed to by both the payor and the provider. The District Court thus correctly held that July Rule's exclusion of single-case agreement unlawfully contradicts the plain and ordinary meaning of "contracted rate."

Even if the July Rule's rewrite of "contracted rates" didn't conflict with the statutory text (and it does) the District Court's decision should be affirmed for another reason: the Departments' exclusion of single-case agreements was arbitrary and capricious. The District Court agreed. The Departments justified the exclusion on the ground that the QPA is intended to approximate the market rate for the medical service in question. But excluding single-case agreements does just the opposite.

Single-case agreements are common in the air ambulance industry. The rates they contain are thus strong evidence of the market rate for emergency air transports. By excluding these rates from the QPA, the July Rule skews the QPAs downward, benefiting insurers but harming providers. That was the Departments' true (and improper) purpose in the July Rule, as this Court previously found when vacating other provisions of this rulemaking that concerned the QPA. The Departments again have "place[d] a thumb on the scale" in favor of insurers that "distort[s] the statutory scheme." *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, 110 F.4th 762, 777 (5th Cir. 2024).

The July Rule is also arbitrary and capricious because it is inconsistent. On the one hand, it declares that single-case agreements are not "contracts" for purposes of the term "contracted rates." But on the other hand, the July Rule asserts that those same single-case agreements create a "contractual relationship" for purposes of identifying a participating (*i.e.*, in-network) facility. The Departments cannot have it both ways. Single-case agreements are contracts and should be uniformly treated as such.

The Air Ambulance Plaintiffs also challenged, in the District Court, certain of the provisions of the July Rule that are addressed in the TMA's brief. As to those provisions, the TMA's arguments apply in full to the Air Ambulance Plaintiffs, notwithstanding minor differences in certain statutory and regulatory provisions that are explained at the end of this brief.

## JURISDICTIONAL STATEMENT

The Air Ambulance Plaintiffs respectfully incorporate the TMA's jurisdictional statement.

## STATEMENT OF ISSUES

This brief addresses:

I.    Whether the July Rule's exclusion from the QPA of rates set forth in single-case agreements must be set aside as contrary to the plain text of the NSA, the text of which requires the QPA to be calculated using the insurer's "contracted rates."

II.   Whether the July Rule's exclusion must be set aside as arbitrary and capricious because (a) it defeats, rather than furthers, the Departments' stated purpose of using the QPA to approximate market rates and because (b) it is inconsistent

with the July Rule's treatment of single-case agreements as constituting "contracts" for other purposes.

The Air Ambulance Plaintiffs respectfully adopt the TMA's statement of issues regarding all issues addressed in the TMA's brief.

## STATEMENT OF THE CASE

The Air Ambulance Plaintiffs respectfully incorporate the TMA's statement of the case. In addition, the Air Ambulance Plaintiffs add the following background and context relating to air ambulances, the No Surprises Act ("NSA"), and the July Rule.

### A.    The Air Ambulance Plaintiffs

Air ambulances provide critical and lifesaving services in medical emergencies. When air ambulances respond to a dispatch calling for their assistance, they typically have little information regarding the patient, including the patient's insurance or whether the patient has insurance at all.

More than 85 million Americans—over a quarter of the U.S. population—live farther than a one-hour drive from a Level 1 or Level 2 trauma center. *See* ROA.821, 2274. Without air ambulances, many critically ill and injured patients—particularly in rural areas—would not

have timely access to necessary medical care. *See* ROA.821, 2274. The Air Ambulance Plaintiffs' planes and helicopters serve their communities by transporting thousands of critically ill and injured patients each year. *See* ROA.2271-85.

### B.   Single-Case Agreements

Single-case agreements are common in the air ambulance industry, where in-network contracts have been comparatively rare. As the Departments recognized in the July Rule, air ambulance providers had a "low" level of network participation. 86 Fed. Reg. at 36,923 (ROA.819). The Departments reported that out-of-network transports constituted 69% of all emergency medical transports in 2012, rising to 77% of such transports by 2017. *Id*. Out-of-network rates are much higher than in-network rates. *E.g.*, *id*. (noting insurers paid the entirety of billed charges in 48% of out-of-network transports, but they paid the entirety of billed charges in just 7% of in-network transports).

The declaration of Air Methods confirms that out-of-network transports were common before the NSA took effect, and many of them resulted in "single-case agreements" in which providers and insurers set a negotiated payment rate for the transport at issue. ROA.13127-28 ¶ 3

(Declaration of Sandra Copenhaver) (81% of transports of patients with commercial insurance were performed out-of-network by Air Methods in 2018); ROA.13129 ¶ 8 (in 2018, approximately 25% of commercially insured transports by Air Methods resulted in a single case agreement).

## C.    The IDR Process

The NSA forbids out-of-network emergency healthcare providers from sending "balance bills" to their patients—meaning bills for the "balance" of the provider's charges that the patient's insurer has refused to pay.[2] *E.g.*, 42 U.S.C. § 300gg-135.[3] The Air Ambulance Plaintiffs do not challenge that beneficial patient protection.

---

[2] The NSA uses the term "group health plan" or "health insurance issuer" when referring to health insurers. Except when quoting directly from the statute, this brief uses the term "insurer(s)" to refer collectively to both "group health plans" and "health insurance issuers."

[3] The relevant statutory and regulatory provisions are codified in three places—the Public Health Service Act, enforced by the Department of Health and Human Services ("HHS"); the Internal Revenue Code ("IRC"), enforced by the Department of the Treasury; and the Employee Retirement Income Security Act ("ERISA"), enforced by the Department of Labor. For ease of reference, this brief—like the TMA's brief—cites the PHS Act provisions. The parallel statutory codifications are found at 26 U.S.C. § 9816(c) *et seq.* (IRC), and 29 U.S.C. § 1185e(c) *et seq.* (ERISA). The parallel regulations are codified at 26 C.F.R. § 54.9816-1T *et seq.* (IRC) and 29 C.F.R. § 2590.716-1 *et seq.* (ERISA). The Federal Employee Health Benefits Program must comply with the relevant provisions of those other three statutes and their implementing regulations. *See* 5 U.S.C. § 8902(p) and 5 C.F.R. § 890.114.

Because emergency providers can no longer bill their patients for the "balance" owed, the NSA created the Independent Dispute Resolution ("IDR") process to ensure that the patients' insurers fairly compensate those providers. The IDR process is, in essence, an arbitration system that providers may use to challenge inadequate payments by insurers. Although the statute permits an insurer to start an IDR process, the provider almost always initiates the process because—absent a ruling from an IDR entity— the insurer determines the payment amount. *See* 42 U.S.C. § 300gg-112(a)(3) (requiring the insurer to provide an initial payment or notice of denial to the provider); 86 Fed. Reg. at 36,901 (ROA.797) ("These interim final rules do not require plans and issuers, when making an initial payment to providers or facilities, to make any specific amount of minimum initial payment.").

IDR is a "baseball-style" arbitration in which the provider and insurer submit simultaneous offers for the out-of-network rate to a private, independent entity—the "certified IDR entity." *See* 42 U.S.C. § 300gg-111(c)(4). The out-of-network rate is the total compensation that the provider will receive for its services. *See e.g.*, 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II); 42 U.S.C § 300gg-131. Each party is permitted just one written submission, which includes its offer for the out-of-network rate. 42 U.S.C. § 300gg-

111(c)(5); 42 U.S.C. § 300gg-112(b)(5)(B). The arbitration is conducted on the papers. There is no hearing. Neither side is given the right to see its counterparty's offer or written submission to the arbitrator.

The IDR entity must select one party's offer. 42 U.S.C. § 300gg-111(c)(5)(A)(i). That IDR entity's judgment is final and binding. 42 U.S.C. § 300gg-111(c)(4)(E)(i); *see also* 42 C.F.R. § 149.510(c)(4)(vii)(A). There is no opportunity for appeal—not to the Departments, not to the Secretaries, not to the Courts. 42 U.S.C. § 300gg-111(c)(4)(E)(i); 42 C.F.R. § 149.510(c)(4)(vii)(A).

The "IDR entities" are private firms that apply to the Departments for certification. 42 U.S.C. § 300gg-111(c)(4)(A). To be qualified to serve as an IDR entity, the firm must demonstrate that it has relevant medical and legal expertise. 42 U.S.C. § 300gg-111(c)(4)(A)(i). A certification is valid for five years unless revoked by the Departments for good cause. 42 U.S.C. § 300gg-111(c)(4)(B). There are currently 15 IDR entities, of which 13 entities are accepting new disputes. CMS.gov, *List of certified independent dispute resolution entities* (last visited August 18, 2024), https://perma.cc/22MM-5R5L; ROA.11663-65. These firms charge between $388 and $800 for a single-dispute IDR. *Id.*

9

### D.    The NSA Requires Insurers to Calculate the QPA Based on Their "Contracted Rates"

In "determining which offer" to select as the out-of-network rate, the arbitrator "shall" consider certain factors that are set forth in the statute. 42 U.S.C. § 300gg-112(b)(5)(C)(i). One of those factors is the "Qualifying Payment Amount" ("QPA").

Congress defined the QPA as the "the median of the *contracted rates* recognized by the plan or issuer . . . as the total maximum payment . . . under such plans or coverage, respectively, on January 31, 2019, for the same or a similar" service. *Id.* § 300gg-111(a)(3)(E)(i)(I) (emphasis added); *see id.* § 300gg-112(c)(2) (stating that the QPA for air ambulance IDRs has the meaning set forth in 42 U.S.C. § 300gg-111(a)(3)).

Each insurer is responsible for calculating the QPA for each NSA-covered emergency service provided to its beneficiaries. The insurer does this in secret, based on its own "contracted rate" data.[4] The insurer must then send the QPA to the provider as part of the insurer's initial "Explanation of

---

[4] If the insurer lacks three rates (the minimum necessary to calculate a median) for the relevant service in the relevant geographic region, then the insurer may instead use a third-party database. *See* 45 C.F.R. § 149.140(c)(3).

Benefits" ("EOB"). 45 C.F.R. § 149.140(d)(1). Both parties then send the QPA to the arbitrator for consideration.[5]

An insurer only determines the QPA once for each service, based on the contracted rates "recognized . . . on" January 31, 2019. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).[6] Although the insurer must then adjust the QPA annually for inflation, *see id.* § 300gg-111(a)(3)(E)(i)(II), the underlying calculation based on "contracted rates" never changes. A decade from now, insurers will still determine the QPA using 2019 "contracted rates," which they then will adjust mechanically based on the change in the consumer price index since 2019. *Id.*

---

[5] 42 U.S.C. § 300gg-112(b)(5)(C); 45 C.F.R. § 149.510(b)(2)(iii)(A)(7) (requiring parties to include the QPA in their notice of IDR initiation); 45 C.F.R. § 149.520(b)(1) (incorporating this requirement for air ambulance IDRs).

[6] If the insurer did not cover the service in 2019, the QPA instead is determined based on the median contracted rate as of the "first year" in which the insurer covered the service. 42 U.S.C. § 300gg-111(a)(3)(E)(ii)(I). But that QPA is still only determined one time and is not subsequently recalculated. *Id.* § 300gg-111(a)(3)(E)(ii)(II).

### E.    The July Rule Excludes Rates in Single-Case Agreements from the "Contracted Rates" Used to Determine the QPA

Congress required the Departments to establish, no later than July 1, 2021, "the methodology" that insurers "shall use to determine the qualifying payment amount." 42 U.S.C. § 300gg-111(a)(2)(B)(i).

On July 13, 2021, the Departments promulgated the July Rule, Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872 (July 13, 2021) (ROA.768). The Departments skipped notice and comment procedures. *Id.* at 36,917 (ROA.813). The Rule's provisions regarding how to calculate the QPA are now codified at 45 C.F.R. § 149.140.

The July Rule excludes single-case agreements from the set of contracted rates used to determine the QPA. It does this by redefining the word "contract" to exclude single-case agreements. *Id.* § 149.140(a)(1). The July Rule states: "Solely for purposes of this definition, a single case agreement . . . does not constitute a contract." *Id.*

In the preamble to the July Rule, the Departments repeatedly stated that the QPA's purpose is to "reflect[] market rates under typical contract negotiations. 86 Fed. Reg. at 36,889 (ROA.785); *see also, e.g.*, *id.*

at 36,896 (ROA.792) ("[F]or a database to be used to calculate the QPA, the database should contain sufficient data to reflect the true market dynamics in a given geographic region."); *id.* ("[T]hree contracted rates . . . represents the minimum number of contracts necessary to reasonably reflect typical market negotiations.").

The Departments' preamble also recognized that the great majority of air ambulance transports are provided by *out-of-network* providers. *See* 86 Fed. Reg. at 36,923 (ROA.819) (noting that, "in 2012, 75 percent of [air ambulance] transports were out-of-network and in 2017, 69 percent were out-of-network"). These out-of-network air transports often resulted in "single-case" agreements negotiated between the air ambulance provider and the insurer. *See id.* at 36,882 (ROA.778) (describing a "single case agreement" as an agreement "between a health care facility and a plan or issuer, used to address unique situations in which a participant, beneficiary, or enrollee requires services that typically occur out-of-network . . .").

Elsewhere in the July Rule, the Departments considered the use of single-case agreements in the course of defining the statutory terms "participating emergency facility" and "participating health care facility."

45 C.F.R. § 149.30. A "participating" facility is one that has a "contractual relationship" with the insurer "setting forth the terms and conditions on which" the relevant service "is provided" to the patient. *Id.* (defining "participating emergency facility" and "participating health care facility"). The July Rule provides that an otherwise *non*-participating facility is to be considered a "participating" facility in the case of any patient for whom the facility has a single-case agreement with the insurer. *Id.* The Departments explained that decision in the Preamble by stating (correctly) that a single-case agreement "constitutes a contractual relationship" between the facility and the insurer. *See id.* at 36,882 (ROA.778).

But when it came to implementing Congress's definition of the QPA, the Departments defined the statutory term "contracted rate" to mean only the insurer's *in-network* rates. Specifically, the July Rule expressly removes, from the QPA calculation, any "single case agreement, letter of agreement, or other similar arrangement." 45 C.F.R. § 149.140(a)(1). According to the Departments, these agreements "do[] not constitute a contract" and therefore do not count as "contracted rates"

that the insurer must include when calculating the QPA as the median of its "contracted rates." *Id.*

The Departments' re-interpretation of the statutory term "contracted rates" had the intended effect of excluding, from the QPA calculation, the vast majority of market rates for emergency air-ambulance services which were documented in single-case agreements between the insurer and out-of-network air ambulance providers.

## F.    The Decision Below

In December 2022, the Air Ambulance Plaintiffs sued the Departments under the APA, arguing that the challenged provisions of the July Rule violated the NSA's unambiguous terms and were arbitrary and capricious. The District Court consolidated the Air Ambulance Plaintiffs' suit with the TMA's challenge. ROA.128. On August 24, 2023, the District Court ruled in favor of both sets of plaintiffs in a consolidated opinion and order. *See* ROA.13196.

The District Court struck down the July Rule's exclusion of rates set forth in single-case agreements from the "contracted rates" that insurers must include in the QPA. The District Court held that "case-specific or single-case agreements are contracts between insurers and

providers under a plan or policy providing coverage for air ambulance transports" and therefore these agreements' rates are included in the plain meaning of the statutory term "contracted rates." ROA.13229.

The District Court rejected the Departments' arguments that such rates were excluded from the QPA because they were "not 'contracted for under the generally applicable terms of a health plan or health insurance policy.'" ROA.13228-29. As the District Court explained, "the Act does not say to include only rates 'contracted for under the generally applicable terms of a health plan or health insurance policy,'" rather "[t]he Act says to include 'contracted rates recognized by [the insurer] . . . under the plans or coverage.'" *Id.* (quoting 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)).

The District Court similarly rejected the Departments' arguments that the statutory term "contracted rates" is limited solely to those rates agreed to "in advance" of the provider's service to the patient. ROA.13229-30. The District Court explained that "the Act does not say anything about when the rates are negotiated, providing instead that the QPA should include all 'contracted rates recognized by [an insurer under its] plans or coverage.'" ROA.13229 (quoting 42 U.S.C. § 300gg-111(a)(3)(E)(i)). Because the July Rule's exclusion of such rates from the

QPA calculation "conflict[ed] with the Act," the Court held that it "must be set aside." ROA.13230.

The District Court's other holdings are either addressed in the TMA's brief (which brief the Air Ambulance Plaintiffs join) or else are no longer at issue in this appeal.[7]

### G.    The Panel Decision

The Panel affirmed the District Court's vacatur of one provision of the July Rule (regarding the deadline by which an insurer must make an initial payment or send a notice of denial) but otherwise reversed. Op.22.

---

[7] The TMA's brief describes the District Court's rulings regarding three issues common to both the TMA and the Air Ambulance Plaintiffs: (1) the July Rule's inclusion of "ghost rates" in the QPA; (2) its exclusion of bonus/incentive payments from the QPA; and (3) the July Rule's improper re-writing of the statutory deadline for insurers to provide an initial payment or notice of denial of payment to the provider. In addition to those common issues, the District Court also ruled in favor of the Air Ambulance Plaintiffs regarding (1) whether a single air ambulance transport constituted a single "item or service" for IDR purposes, ROA.13225-27, and (2) the July Rule's extension of the deadline for insurers to provide an initial payment or notice of denial of payment to the provider, ROA.13238. The Departments did not challenge the first holding on appeal; and, on rehearing *en banc*, the Departments have dropped their challenge to the merits of the second ruling, reserving only their general challenge to vacatur as the appropriate remedy. En Banc Br. at 13. The District Court upheld the July Rule's definitions of the "geographic regions" used to determine the QPA. ROA.13230-33. The Air Ambulance Plaintiffs did not appeal the District Court's geographic-regions ruling.

The TMA's brief describes the Panel's holdings regarding the three common issues.

As for the July Rule's redefining of the statutory term "contracted rates," the Panel reversed the District Court. According to the Panel, excluding case-specific agreements from the QPA determination does not conflict with the NSA's text. Op.12-13. The Panel provided three brief justifications for its holding.

First, the Act requires using "contracted rates" that were "recognized by the plan or issuer ... *under such plans or coverage* ... on January 31, 2019." *Id.* (quoting 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)). According to the Panel, the "most natural reading of that language is that it excludes rates *not* previously agreed to under a plan." *Id.*

Second, the Panel held that the Departments did not act arbitrarily and capriciously by interpreting the statutory term "contractual relationship" to include a single-case agreement, while at the same time excluding single-case agreements from their interpretation of "contracted rates." *Id.* According to the Panel, that inconsistency is not arbitrary or capricious because the two terms ("contractual relationship" and "contracted rate") are used to make "separate" determinations. *Id.*

18

Third, the Panel held that the Departments "reasonably explained their approach" by "stat[ing] . . . that their approach 'most closely aligns with the statutory intent of ensuring that the QPA reflects market rates under typical contract negotiations.'" *Id* (quoting 86 Fed. Reg. at 36,889 (ROA.785)). According to the Panel, including single-case agreements would have "preserve[d] the very market distortion that the Act seeks to cure." *Id.*

## H.    Petition for Rehearing *En Banc*

Plaintiffs jointly petitioned for *en banc* rehearing. Pet. for Reh'g En Banc, Dec. 16, 2024. The Court granted that that petition and vacated the Panel decision. Order Granting Pet. for Reh'g En Banc, May 30, 2025, at 2.

## STANDARD OF REVIEW

The Air Ambulance Plaintiffs respectfully incorporate the TMA's statement of the standard of review.

## SUMMARY OF ARGUMENT

The District Court correctly held that "single-case agreements" are contracts and therefore the rates set forth in those contracts are "contracted rates" as that term is used in the statutory definition of the

QPA. The July Rule's exclusion of these rates from the QPA calculation must therefore be set aside because it is contrary to the plain meaning of the statutory text.

Even if the July Rule's treatment of "contracted rates" were permitted by the statutory text (and it is not), this Court should still affirm because the Departments acted arbitrarily and capriciously for two reasons. First, excluding these rates from the QPA is contrary to the QPA's purpose as the Departments understood it, namely, to approximate "typical market negotiations" and "true market dynamics" for the item or service at issue. *See, e.g.,* 86 Fed. Reg. at 36,896 (ROA.792). That is especially true for air ambulance rates, the vast majority of which are set forth in single-case agreements. Nowhere in the July Rule did the Departments explain how their exclusion of single-case agreements from the QPA was consistent with their own stated goal of approximating "typical market" rates.

Second, the arbitrary and capricious nature of the July Rule is also demonstrated by its internal inconsistency. Single-case agreements *are* to be considered for *other* purposes because they are (as the July Rule concedes) "contracts." But the July Rule decrees that the rates set forth

20

in those contracts do not count as "contracted rates." The Departments cannot have it both ways.

The July Rule's exclusion of single-case agreements from the QPA defeated, rather than furthered, the Departments' own goal for the QPA and in so doing contradicted the Rule's treatment of single-case agreements as "contracts" for other purposes. Both of those failings are separate and independent alternative bases to affirm the District Court's order setting aside the July Rule's exclusion of single-case agreements from the QPA.

The Air Ambulance Plaintiffs incorporate the TMA's arguments as to all other issues, including with respect to the remedy of vacatur.

## **ARGUMENT**

The No Surprises Act requires insurers to determine the QPA using the "median of *the contracted rates* recognized by the plan or issuer . . . as the total maximum payment . . . under such plan or coverage, respectively, on January 31, 2019, for the same or a similar item or service." 42 U.S.C. § 300gg-111(a)(3)(E) (emphasis added). A single-case agreement is a contract in which an insurer recognizes the rate to be paid

to an out-of-network provider for a service under the patient's plan or coverage. Single-case agreements thus set "contracted rates."

The July Rule's exclusion of single-case agreements from the QPA is unlawful and must be set aside. It is contrary to the plain meaning of the statutory term "contracted rate" and is also arbitrary and capricious.

## I.    The Departments' Exclusion of Single-Case Agreements Contravenes the Unambiguous Meaning of "Contracted Rates"

### A.    Single-Case Agreements Set Contracted Rates

The District Court correctly held that case-specific rates, agreed to in single-case agreements, come within the plain meaning of the statutory term "contracted rates" "because they are contracts to pay a specific rate for an air ambulance transport for the insurers' beneficiaries, participants, or enrollees." ROA.13228.

The Departments' "interpretation" of the statutory term "contracted rates" is "*not* entitled to deference." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024). Rather, the Court "must exercise independent judgment in determining the meaning of" the term. *Id.* at 394; *see also Van Loon v. Dep't of the Treasury*, 122 F.4th 549, 563 (5th Cir. 2024) ("[W]e must 'determine the best reading of a statute; a merely

permissible' reading is not enough.'" (quoting *Mayfield v. United States Dep't of Lab.*, 117 F.4th 611, 617 (5th Cir. 2024)). Applying *Loper Bright*, the Court vacated the Department of Labor's "tipped employee" regulation, holding that an agency's interpretation of the terms "engaged in an occupation" and "occupation" were neither "the best one" nor consistent with the FLSA's text. *Rest. L. Ctr. v. United States Dep't of Lab.*, 120 F.4th 163, 171-74 (5th Cir. 2024). The Court similarly rejected the Department of the Treasury's interpretation of "property" to include cryptocurrency "smart contracts" because that interpretation conflicted with the underlying statutory text. *Van Loon*, 122 F.4th at 563-65.

In the absence of a statutory definition of "contracted rate," the "ordinary meaning" of the term "controls." *Rest. L. Ctr.*, 120 F.4th at 171; *see also Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012) ("[W]e must give [the] term its ordinary meaning." (citing *FCC v. AT&T, Inc.*, 562 U.S. 397, 403 (2011)).

This Court recently interpreted the word "contract" to include a "letter of agreement." *Lexon Ins. Co., Inc. v. Fed. Deposit Ins. Corp.*, 7 F.4th 315, 322-24 (5th Cir. 2021). The Court did so by relying on the definitions of "contract" contained in Black's Law Dictionary, the

Restatement (Second) of Contracts, comments to the Uniform Commercial Code, and the Williston on Contracts treatise. *Id.*; *see also Rest. L. Ctr.*, 120 F.4th at 171 ("turn[ing] first to contemporary dictionary definitions" to interpret undefined statutory terms). "[A]bsent contrary indications, Congress intends to adopt the common law definition of statutory terms." *Lexon Ins. Co., Inc.*, 7 F.4th at 323 (quoting *United States v. Shabani*, 513 U.S. 10, 13 (1994)).

A single-case agreement is a "contract." Each is "[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law." *Contract*, Black's Law Dictionary (11th ed. 2019); *Lexon*, 7 F.4th at 323 (citing 5th ed. of Black's Law Dictionary).[8] A single-case agreement contains a promise by the insurer to pay, and a promise by the provider to accept, an agreed amount for the provider's

---

[8] *See also Contract*, n., Oxford English Dictionary (online ed.) ("An agreement enforceable by law"); Restatement (Second) of Contracts § 1 (1981) ("A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."); Williston on Contracts § 1:1 (4th ed.) ("The traditional definition of the term 'contract' is 'a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.' ... As commonly used, and as here defined, 'contract' includes varieties described as voidable, unenforceable, formal, informal, express, implied, unilateral, bilateral.")

services. *Cf. Robert O. v. Harvard Pilgrim Health Care, Inc.*, No. 2:17-CV-1251-TC, 2019 WL 3358706, at *3 n.5 (D. Utah July 25, 2019) ("Single case agreements are contracts between the insurer and the out-of-network provider . . . ." (citation omitted)). The Departments even admitted, elsewhere in the July Rule, that "a ***single case agreement*** between a health care facility and a plan or issuer . . . ***constitutes a contractual relationship***." 45 C.F.R. § 149.30 (defining "participating health care facility" and "participating emergency facility") (emphasis added). (That contradiction within the July Rule also means that the exclusion of single-case agreement rates from the set of "contracted rates" is arbitrary and capricious. *See infra* Part II.B.)

A "rate" is "[a]n amount paid or charged for a good or service." *Rate*, Black's Law Dictionary (11th ed. 2019); *see also Rate*, n., I.3 Oxford English Dictionary (online ed.) ("Price, cost; the sum paid or asked for a single thing"). A single-case agreement sets the "amount" to be "paid" by the insurer for the provider's services. Therefore, the amount agreed to in a single-case agreement is a "rate."

Congress combined these two unambiguous terms—"contract" and "rate"—into the statutory phrase "contracted rate." The meaning of that

combined phrase is also unambiguous. A "contracted rate" is simply the "amount paid" pursuant to a contract. The Departments admitted in the July Rule that the phrase, "contracted rate," means "the total amount" that "an [insurer] has contractually agreed to pay." 45 C.F.R. § 149.140(a)(1) (emphasis added).

Because a "single-case agreement" qualifies as a "contracted rate" under that definition, the July Rule contradicts the plain meaning of the statute when it excludes the rates set in single-case agreements. The Departments declared by fiat (without any explanation) that "solely for purposes of the definition of contracted rate, a single case agreement, letter of agreement, or other similar arrangement … does not constitute a contract." 86 Fed. Reg. at 36,889 (ROA.785).

The Departments have never disputed that an insurer, when entering into a single-case agreement, has "contractually agreed to pay" the "total amount" that is set forth in that agreement. 45 C.F.R. § 149.140(a)(1). Thus, absent the July Rule's redefinition of the term "contract," a single-case agreement would give rise to a "contracted rate," as the Defendants have defined the latter term: "the total amount (including cost sharing) that" an insurer "has contractually agreed to pay

a . . . provider of air ambulance services for covered items and services." 45 C.F.R. § 149.30.

## B.     The Departments' *Post Hoc* Justifications Fail

"[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Chem. Mfrs. Ass'n v. Env't Prot. Agency*, 899 F.2d 344, 356 (5th Cir. 1990). "Post hoc explanations" are "simply . . . inadequate." *Id.* (rejecting an agency's "post hoc" interpretation of the statute because "nothing" in the rule "indicat[es] that the [agency] did in fact apply" that interpretation of the statute when promulgating the rule at issue); *see also State Farm*, 463 U.S. at 50 ("It is well-established that an agency's action must be upheld . . . on the basis articulated by the agency itself," and not "counsel's post hoc rationalizations."). Because counsel's new justifications were absent from the Departments' published rulemaking, the Court must disregard them.

Although the Supreme Court's decision in *Loper Bright*, 603 U.S. 369, requires the Court to resolve statutory ambiguities, it does not override doctrines of waiver, and it does not relieve the Departments of their distinct obligation to provide a contemporaneous, reasoned basis for

27

their decision-making. *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1136, 1140 (5th Cir. 2021).

As before the Panel, the Departments' counsel advances three *post hoc* rationales for excluding single-case agreements. Even if the Court were to consider these rationalizations, each one fails.

### 1. Single-Case Agreements Set Payment "Rates"

The Departments' first *post hoc* rationalization asserts that only network agreements—and not single-case agreements—can set "rates." En Banc Br. at 29-30. But the Departments said just the opposite in the July Rule. Back then, the Departments described single-case agreements as setting a payment "rate":

> [S]olely for purposes of the definition of contracted rate, a single case agreement, letter of agreement, or other similar arrangement … does not constitute a contract, and ***the <u>rate paid under such an agreement</u>*** should not be counted among the plan's or issuer's contracted rates.

86 Fed. Reg. at 36,889 (ROA.785) (emphasis added). Yet now, the Departments reverse course. Now, the Departments' counsel insists that a rate must be "negotiated in advance with providers contracted to participate in an insurer's network under generally applicable terms." The Air Ambulance Plaintiffs highlighted the Departments'

inconsistency before the Panel. Br. of Air Ambulance Plaintiffs, Mar. 13, 2024, at 37. The Departments still have not attempted to explain their own inconsistency.

Defendants point to dictionaries as the only support for their contention that a "one-off agreement" cannot establish a "rate." En Banc Br. at 29-30. Not only did Defendants fail to rely on such definitions during their rulemaking, but dictionary definitions also do not help them. As discussed above, a "rate" is the "price" of a good or service." *Rate*, Black's Law Dictionary (11th ed. 2019) ("[a]n amount paid or charged for a good or service"); *Rate*, n., Oxford English Dictionary (online ed.) ("Price, cost; the sum paid or asked for a single thing"). The Departments say the Oxford English Dictionary is on their side, but they do not quote a definition from it; and they do not acknowledge its just-quoted definition—even though the Air Ambulance Plaintiffs included it in their Panel brief. Br. of Air Ambulance Plaintiffs, Mar. 13, 2024, at 26. Instead, the Departments quote from Webster's Third New International Dictionary and Merriam-Webster's Collegiate Dictionary 1032 (11th ed. 2005), which define "rate" as "a charge, payment, or price fixed according

to a ratio, scale, or standard." En Banc Br. at 29.[9] But a single-case

agreements sets such a rate, too, by specifying the sum to be paid for a

transport.

The Departments' own *en banc* brief, like their Panel brief,

continues to demonstrate that the Departments do not believe that the

word "rate" excludes "one-off" payments. Elsewhere in their *en banc* brief,

the Departments use the word "rate" to refer to an amount of money that

will *never* be paid. When defending the decision to include, in the QPA,

"ghost rates" in the QPA calculation (that is, "contracted rates for items

or services that a provider has not provided"), the Departments argue

that an in-network contract sets a "rate" *regardless of how frequently (or*

*whether) that rate is ever paid.* En Banc Br. at 19-24. According to the

Departments, the word "rate" must *exclude* amounts agreed to in single-

case agreements (because those amounts are only paid once) but must

---

[9] The Department's ability to cite the same definition in two titles by the same publisher hardly gives that definition added weight. *See MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 at n.2 (1994) ("The Webster's New Collegiate Dictionaries, published by G. & C. Merriam Company of Springfield, Massachusetts, are essentially abridgments of that company's Webster's New International Dictionaries, and recite that they are based upon those lengthier work"). Webster's Third International Dictionary has been "widely criticized for its portrayal of common error as proper usage." *Id.* at 218 n.3.

*include* amounts agreed to by providers who never perform the service (even though those amounts will never be paid). (Remarkably, the Departments persevere in their inconsistency, even though the Air Ambulance Plaintiffs noted it to the Panel. Br. of Air Ambulance Plaintiffs, Mar. 13, 2024, at 39).

In defense of their inclusion of "ghost rates" in the QPA, the Departments give away their game. They write: "[T]he Act *does not impose any minimum number of times* an item or service must be provided under a contract for the *rates* agreed to in that contract to be considered the '*contracted rates*.'" En Banc Br. at 20 (quoting 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added)). Exactly.[10]

### 2. *Case-Specific Agreements Set Rates Paid "Under Such Plan or Coverage"*

The Departments' second *post hoc* rationalization asserts that only rates set through network agreements can reflect a payment "under" a

---

[10] For a "contracted rate" to be included in the QPA determination, that rate must still be "provided" by the provider at least once; however, that limitation is not imposed by the meaning of the term "contracted rate," but rather is imposed by the additional statutory requirement that the insurer only consider contracted rates for a service that is actually in fact "provided by a provider." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). This point is elaborated further in the TMA's brief.

group health plan or health insurance policy. *See* En Banc Br. at 29-31; 42 U.S.C. § 300gg-111(a)(3)(E)(i) (requiring the QPA to reflect the "median of the contracted rates recognized by the plan or issuer . . . as the total maximum payment . . . *under* such plans or coverage" (emphasis added). The Panel agreed that, by requiring contracted rates to be recognized "*under such plans or coverage*," the NSA "excludes rates *not* previously agreed to under a plan." Op.12-13.

But the Panel offered no explanation for that decision. And the Departments' explanation doesn't make sense. The Departments contend that when insurers agreed to the case-specific rates contained in single-case agreements, they did not do so "under" the "plans or coverage," but instead did so as a "business decision" to "spare their members" from out-of-network charges. *Id.* at 34. The distinction drawn by the insurers makes no linguistic sense; it finds no support in the statute; and the Departments did not mention it during their rulemaking.

The Departments' interpretation does unacceptable violence to the plain meaning of the word "under." As the Departments concede, that word can mean "by reasons of the authority of," "in accordance with," "in compliance with," or "required by" the plan or coverage. En Banc Br. at

30. Under those definitions, an insurer *does* act "under" the "plan or coverage" when the insurer enters a binding single-case agreement to pay for a patient's air ambulance transport. By entering into that single-case contract, the insurer necessarily acts "by reasons of the authority of," "in accordance with," "in compliance with," or as "required by" the group health plan or insurance policy—just as it does when it agrees to an in-network agreement.

If the Departments were correct that group health plans, by entering into single-case agreements, were acting outside of the "authority" granted to them by the terms of those plans, then this would mean that these group health plans were in violation of their fiduciary duties to all the other plan beneficiaries. A group health plan is only allowed to make payments that are authorized by the plan terms. An ERISA plan must be "established and maintained pursuant to a written instrument" that "specif[ies] the basis on which payments are made to and from the plan." 29 U.S.C. § 1102(a)(1), (b)(4). Plan administrators are only allowed to make payments "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1) (emphasis added); *see also* 29 C.F.R. § 2560.503-1(b)(5) (requiring that

33

administrators make benefits determinations "in accordance with governing plan documents").[11]

If this Court were to accept the Departments' argument that single-case agreements are not made "under" the plan documents, then the Court would also be holding that this very common practice (of entering into single-case agreements) is a violation of plan administrators' ERISA duties. Indeed, adopting the Departments' view would mean that, for medical services to which the No Surprises Act does not apply (for example, planned cancer treatments, organ transplants, or joint

---

[11] Plans that are subject to the No Surprises Act via its incorporation in the Public Health Services Act or Internal Revenue Code must also make benefits determinations "in accordance with governing plan documents" as required by 29 C.F.R. § 2560.503-1(b)(5).

The Public Health Services Act and its implementing regulations directly incorporate the requirements of 29 C.F.R. § 2560.503-1. *See, e.g.*, 42 U.S.C. § 300gg-19(a)(2)(A) & 45 C.F.R. § 147.136(b)(2)(i) (requiring group health plans and issuers offering group health insurance coverage to comply with 29 C.F.R. § 2560.503-1); 42 U.S.C. § 300gg-19(a)(2)(B) & 45 C.F.R. § 147.136(b)(3)(i) (same for individual coverage).

The Internal Revenue Code and its implementing regulations either incorporate the requirements of 29 C.F.R. § 2560.503-1 directly, *see, e.g.*, 26 C.F.R. § 54.9815-2719(b)(2)(i) & 26 C.F.R. § 54.9815-2719T(b)(2)(i) (requiring group health plans and issuers offering group health insurance coverage to comply with 29 C.F.R. § 2560.503-1), or indirectly by incorporating provisions of the Public Health Services Act, *see, e.g.*, 26 U.S.C. § 9815(a)(1) (requiring group health plans and group health insurance coverage to comply with 42 U.S.C. § 300gg-19(a)(2)(A), which requires compliance with 29 C.F.R. § 2560.503-1).

replacements), an ERISA plan could never pay out-of-network providers to care for its beneficiaries.

The Air Ambulance Plaintiffs pointed this out in their briefing below and before the Panel. The Departments still have nothing to say about the serious legal consequences that their made-for-litigation argument would have on the administrators of ERISA plans. The Panel sought to avoid the question, too, asserting that "whether a plan *permits* case-specific agreements is a separate question from whether a 'contracted rate[ ]' was 'recognized by the plan or issuer ... under such plans or coverage ... on January 31, 2019.'" Op.12-13 n.11. But whether a plan document "permits" the plan to enter a case-specific agreement is the precise issue here: If the plan document does not permit such agreements, then single-case agreements can be used *neither* to determine the QPA *nor* to pay for patients' out-of-network care. If the plan permits entering single-case agreement, then the plan administrator acts under—*i.e.*, "by reasons of the authority of," "in accordance with," "in compliance with," or as "required by"—the plan when contracting with out-of-network providers, and the agreement gives rise to a contracted rate under the NSA.

*3. Any Ambiguity Concerning the Dates of the Single-Case Agreements Included in the QPA Does Not Justify Excluding These Agreements Entirely*

The Departments offer, as their last the *post hoc* justification, that excluding single-case agreements "makes sense" because "the Act directs health plans to look at rates recognized on a single specified date: January 31, 2019." En Banc Br. at 34. But this is hardly a justification for excluding *all* case-specific rates. The statute's reference to January 31, 2019, does not introduce ambiguity about the threshold question of whether case-specific rates are included in the plain meaning of the phrase "contracted rates." They are.

At most, the inclusion of this date might require the Departments to exercise their rule-making authority to clarify *which* case-specific rates count as being "recognized" on that date. They have not yet done so; rather, they have excluded *all* contracted rates contained in single-case agreements from the QPA calculation. That is contrary to the statute, which is all the Court need hold at this juncture. After vacatur, upon remand, the Departments may—through notice-and-comment rulemaking—consider *which* single-case-agreement rates should be included.

\*     \*     \*

The rates set by single-case agreements are unambiguously "contracted rates" according to both the plain and ordinary meanings of "contract" and "rate" and also according to the Department's own interpretation of the combined phrase in the July Rule. Even if the Departments were permitted to trot out new statutory arguments now, none of those arguments are persuasive. Because the July Rule contradicts the plain meaning of the statute, the District Court properly vacated it for that reason.

## II. The July Rule's QPA Calculation Methodology Unlawfully and Arbitrarily Excludes Case-Specific Contracted Rates from the QPA

Even if the term "contracted rates" were ambiguous, the Court should still affirm for a separate and independent reason: the Departments' exclusion of single-case agreement rates from the QPA was arbitrary and capricious. Although the District Court did not reach plaintiffs' arbitrary-and-capricious challenge to the methodology rules, ROA.13216, this Court can "affirm on any basis supported by the record," *see In re: Deepwater Horizon*, 48 F.4th 378, 385 (5th Cir. 2022).

Here, the exclusion of single-case agreements from the QPA has no "rational connection" to the agency's stated goal for the QPA, which was to approximate market rates. And the exclusion is inconsistent with the Departments' reading of the NSA's very similar phrase "contractual relationship," which the Departments (correctly) interpreted to *include* single-case agreements.

## A.   Excluding the Single-Case Agreements from QPA Calculations Cannot Achieve the Agencies' Stated Goal of Approximating Market Rates

An agency's interpretation is arbitrary and capricious where it lacks any "rational connection" to the agency's stated goal. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 52-57 (1983). An agency must provide a "reasoned basis" for its decision. *Id.* at 43. When an agency fails to consider important alternatives or fails to provide an adequate justification for its decisions, the agency thereby acts arbitrarily and capriciously. *Id.*

This Court recently applied *State Farm* to invalidate the Department of Energy's appliance efficiency standards because that agency failed to grapple with evidence that those standards would "likely do the opposite" of achieving DOE's stated goal of conserving water and

energy. *Louisiana v. DOE*, 90 F.4th 461, 472 (5th Cir. 2024). In *Louisiana*, "the administrative record contain[ed] ample evidence" that appliances that complied with the regulations would be ineffective, which would drive an offsetting increase in handwashing that would *waste* water and energy. *Id.* at 472. Because the DOE did not explain how its regulation could nonetheless achieve its stated goals of conserving water and energy, this Court held that the DOE had failed to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 473 (quoting *State Farm*, 463 U.S. at 43).

Here, the Departments repeatedly stated, throughout the July Rule, that the purpose of the QPA was to approximate the "rates" reflecting "typical market negotiations" and "true market dynamics" for the item or service at issue. *See, e.g.*, 86 Fed. Reg. at 36,896 (ROA.792) ("[F]or a database to be used to calculate the QPA, the database should contain sufficient data to reflect the true market dynamics in a given geographic region."); 86 Fed. Reg. at 36,896 (ROA.792) ("[T]hree contracted rates … represents the minimum number of contracts necessary to reasonably reflect typical market negotiations."). The

Departments later repeated this point in another rule, issued in October 2021, which concerned other aspects of implementing the NSA. 86 Fed. Reg. 55,980, 55,996, "Requirements Related to Surprise Billing; Part II," (Oct. 7, 2021) (ROA.621) ("Generally, the QPA should reflect standard market rates arrived at through typical contract negotiations"); *id.* at 56,060 (ROA.685) ("The QPA generally is based on the median of contracted rates, which are the product of contract negotiations between providers and facilities and plans (and their service providers) and issuers, and therefore generally reflect market rates.").

The administrative record demonstrates that excluding case-specific rates from the QPA *defeats* the Departments' stated goal of making the QPA an approximation of the market rate in the air ambulance industry. In the air ambulance industry, *in-network* rates are comparatively rare. The Departments conceded, in their rulemaking, that the vast majority (69%) of air-ambulance transports are *out-of-network*. 86 Fed. Reg. at 36,923 (ROA.819) (admitting that just 25% of air ambulance transports in 2012, and just 31% air ambulance transports in 2017, were paid under traditional in-network contracts). The Departments also concede this point in their Panel brief, when they

acknowledge that "a substantial majority" of air ambulance transports, prior to the passage of the No Surprises Act in 2019, were "furnished by out-of-network providers." Br. for Appellants, Jan. 12, 2024, at 36.

The exclusion makes a real difference. In-network rates are consistently much lower than out-of-network rates. E.g., 86 Fed. Reg. at 36,923 (ROA.819) (noting insurers paid the entirety of billed charges in 48% of out-of-network transports, but they paid the entirety of billed charges in just 7% of in-network transports). And single-case agreements, by definition, are agreed to between insurers and *out-of-network* providers. So by excluding single-case agreement rates from the QPA, the Departments have skewed the QPA downward, thus favoring insurers. That was the Departments' goal throughout the July Rule and October Rule. As this Court previously found when vacating other provisions of this rulemaking that concerned the QPA, the Departments' "skewed interpretation is inconsistent with the evenhandedness embodied in the Act." *Texas Med. Ass'n*, 110 F.4th at 779.

Because out-of-network transports were so common prior to the NSA's enactment, a QPA that is based solely on the relatively few in-network transports will be just the *opposite of* an approximation of

market rates. The QPA would be a much better approximation of the true market rate if the Departments had done as Congress directed and had included the case-specific rates from single-case agreements—which, by definition, occur only in out-of-network transports. The July Rule does not address the contradiction between the Departments' stated purpose of approximating market rates and their exclusion of the market rates captured by single-case agreements. The Departments' failure to chart a "rational connection" between their exclusion of single-case agreements from the QPA and their stated goal of making the QPA an approximation of a market rate means that the exclusion must be struck down as arbitrary and capricious. *Louisiana*, 90 F.4th at 473 (quoting *State Farm*, 463 U.S. at 43).

The arbitrariness of the Departments' exclusion of case-specific rates is underscored by their decision to *include* in the QPA the "ghost rates" agreed to by in-network providers who *do not even provide air ambulance services*. *See* TMA En Banc Br. at Argument § I. The Departments concede that their July Rule requires insurers to include rates agreed to by providers who do not "anticipate ever providing" the service at issue. En Banc Br. at 28 (emphasis added). There is no rational

basis for concluding that a "ghost" rate for air ambulance services that was agreed to by a psychiatrist's office that does not even operate air ambulances, while at the same time excluding the case-specific rates agreed to by actual air ambulance providers in single-case agreements. The Departments' exclusion of far more probative case-specific rates is all the more irrational because of the Departments' decision to include, in the QPA, the junk "ghost rate" data.

The Departments now claim that the purpose of the QPA was to approximate *in-network* rates. The Panel accepted this explanation, reasoning that including single-case agreements in the QPA "would preserve the very market distortion that the Act seeks to cure." Op.14. But a *post-hoc* rationalization cannot overcome arbitrary-and-capricious review. *State Farm*, 463 U.S. at 50; *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1136, 1140. Nothing in the July Rule contains any finding of "market distortion." The only contemporaneous support that the Panel or the Departments can identify is a statement that the QPA should reflect "market rates under typical contract negotiations." Op.14 (citing 86 Fed. Reg. at 36,889 (ROA.785)); En Banc Br. at 31 (same). But approximating "market rates under typical *contract* negotiations" is not equivalent to

approximating "market rates under typical *in-network contract* negotiations." Not even close. Not when the majority of contracts are single-case agreements.

## B. The Departments Acted Arbitrarily by Treating Single-Case Agreements Inconsistently in the July Rule

The Departments' inconsistent definition of the term "contract" also makes their definition of "contracted rate" arbitrary and capricious. When an agency interprets the same or similar statutory terms to mean two different things, that inconsistent interpretation renders the agency's rulemaking arbitrary and capricious. *Butterbaugh v. Dep't of Just.*, 336 F.3d 1332, 1339 (Fed. Cir. 2003) (describing inconsistent interpretation of "day" to exclude non-workdays as arbitrary and capricious); *Ne. Hosp. Corp. v. Sebelius*, 699 F. Supp. 2d 81, 95 (D.D.C. 2010) (failure to justify inconsistent interpretation of statutory term held to be arbitrary and capricious). The Departments' July Rule reveals just this kind of inconsistency.

Elsewhere in the NSA, Congress provided separate rules for "participating emergency facilit[ies]" and "participating health care facilit[ies]." 42 U.S.C. § 300gg-111(a)(3)(F)(ii), (b)(2)(A)(i). Congress defined those terms to mean facilities that have "a contractual

44

relationship with" the insurer. *Id.* The Departments interpreted that statutory term—"contractual relationship"—to *include* a facility that has *a single-case agreement* with the insurer. 86 Fed. Reg. at 36,882 (ROA.778) ("*[A] single case agreement* between a health care facility and a plan or issuer . . . *constitutes a contractual relationship.*"); 42 C.F.R. § 149.30 (same). Yet when it came time to define "contracted rates," the Departments declared that a single-case agreement "does not constitute a contract." 45 C.F.R. § 149.140(a)(1)

If a single-case agreement "constitutes a contractual relationship" for purposes of the NSA, then such an agreement must also constitute a "contract" for purposes of calculating the QPA. The July Rule's exclusion of single-case agreements from QPA calculations contradicts the Departments' interpretation of the phrase "contractual relationship" in the statutory definition of "participating facility." The Departments admit—but do not explain or justify—this inconsistency in a footnote to the July Rule. 86 Fed. Reg. at 36,882 n.32 (ROA.778) (noting the "contrast" between these approaches). Here again, the failure to even attempt to explain the inconsistency is unmistakable proof of arbitrary and capricious action. *See State Farm*, 463 U.S. at 56-57.

The Departments do not address this inconsistency in their en banc brief. Before the Panel, they conceded that it was "entirely reasonable" that a single-case agreement could create a "contractual relationship." Br. for Appellants, Jan. 12, 2024, at 21. Yet they claimed this concession had "no bearing" on whether single-case agreements count as contracts when determining the QPA because the terms "contractual relationship" and "contracted rate" "mean different things and serve different purposes." *Id*. The Panel adopted the Departments' logic: It reasoned that the term "'contractual relationship' is used to determine whether the Act's surprise billing protections apply," whereas the term "contracted rate" is used to determine what rates "must be included in the QPA calculation." Op.13.

But the Panel and Departments' shared logic does not justify the July Rule. The question is not whether the terms "contractual relationship" and "contracted rate" have different meanings or uses; they obviously do. Rather, the question is why a single-case agreement is a "contract" in one situation but *not* a "contract" in the other. As to *that* question, neither the Panel nor the Departments gave any explanation.

The Departments cannot have it both ways. They must consistently apply the plain and ordinary meaning of the statutory term "contract." Their failure to do so—coupled with their failure to even attempt to explain their inconsistency—is a separate and independent reason why the exclusion of case-specific rates is arbitrary and capricious.

## III.  The Air Ambulance Plaintiffs Incorporate the TMA's Arguments, Which Apply to Air Ambulance Providers Notwithstanding Minor Differences

The Air Ambulance Plaintiffs respectfully incorporate the arguments in the TMA's brief as to (1) the inclusion of "ghost rates" in the "contracted rates" used to calculate the QPA; (2) the exclusion of "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments," from the "contracted rates" used to calculate the QPAs; and (3) the District Court's vacatur of the relevant provisions of the July Rule as the appropriate remedy under the APA. However, minor adjustments to the statutory and regulatory citations are necessary in order apply the TMA brief's arguments to air ambulance providers. Explaining those adjustments is the purpose of this part of the brief.

Many of the citations in the TMA's brief apply in full to air ambulance providers. One principal regulation is 45 C.F.R. § 149.140, which contains the QPA calculation methodology. This regulation applies equally to all emergency healthcare services—including air ambulances.[12] Similarly, the Departments' August 2022 Frequently Asked Questions ("FAQs")—which supported the inclusion of so-called "ghost rates" into the QPA calculation—also applies to air ambulance providers. *See* ROA.398, 413-14 (August 2022 FAQs at 1, 16-18).

However, the statutory and regulatory provisions governing the *procedure* for conducting IDRs are codified separately. The TMA's brief cites 42 U.S.C. § 300gg-*111*, which governs the IDR process for *non*-air ambulance providers. A separate section governs the IDR process for air

---

[12] *See, e.g.,* 45 C.F.R. § 149.140(a)(1) (defining "contracted rate" for QPA calculation purposes as "the total amount (including cost sharing) that a group health plan or health insurance issuer has contractually agreed to pay a participating provider, facility, or *provider of air ambulance services* . . ." (emphasis added)); *id.* § 149.140(b)(1) (setting out the calculation methodology for the "median contracted rate" for all "item[s] or service[s]"); *id.* § 149.140(c) (setting out the calculation methodology for the QPA for all "item[s] or service[s]"); *id.* § 149.140(d) (requiring insurers to make disclosures to, *inter alia,* "provider[s] of air ambulance services . . ."). Although the July Rule sets forth air-ambulance specific rules concerning the inflation adjustments made to QPAs for air ambulance services, those differences are not at issue in this case. *See* 45 C.F.R. §§ 149.140(c)(1)(v), (vi); 86 Fed. Reg. at 36,895 (ROA.791).

ambulance providers: 42 U.S.C. § 300gg-*112*. The slight differences between those procedures are not germane to this appeal. As to all the *relevant* provisions, the air ambulance statute (Section 300gg-112) either copies near-verbatim, or else incorporates by reference, the non-air-ambulance statute cited by the TMA's brief (Section 300gg-111). Critically, the "QPA" is defined in the same way, and plays the same role, in all IDRs. *Compare* 42 U.S.C. § 300gg-111(a)(3)(E) (defining the QPA), *with* 42 U.S.C. § 300gg-112(c)(2) (stating that "the term 'qualifying payment amount' has the meaning given such term in section 300gg–111(a)(3) of this title").

Like the statute, the July Rule contains a separate provision governing procedures in an air ambulance IDR: 45 C.F.R. § 149.*520*. The TMA's brief cites 45 C.F.R. § 149.*510*, which governs the process in *non*-air ambulance IDRs. Those *non*-air ambulance rules are incorporated by reference into the air-ambulance-specific 45 C.F.R. § 149.*520*.[13]

---

[13] *See* 45 C.F.R. § 149.520(a) (definitions applicable to non-air ambulance IDRs apply to air ambulance IDRs); *id.* § (b)(1) (noting that "[e]xcept as provided in paragraphs (b)(2) and (3) of this section [dealing with the differing statutory factors in air ambulance IDRs], in determining the out-of-network rate to be paid by group health plans and health insurance issuers . . . plans and issuers must comply with the requirements of § 149.510 . . .").

49

Finally, the Air Ambulance Plaintiffs respectfully incorporate the arguments in the TMA's brief demonstrating that the District Court did not abuse its discretion by vacating the challenged provisions of the July Rule. These arguments apply with equal force to the challenge to the definition of "contracted rates" addressed in this brief.

As the TMA's brief persuasively argues, vacatur and not remand to the Departments is the appropriate remedy if this Court affirms the air-ambulance-specific challenges on the alternative ground that the rules are arbitrary and capricious. The Departments failed to grapple with how their rules artificially depress QPAs—contrary to the Departments' own insistence that QPAs should approximate typical market rates—and that failure raises "serious doubt over the substantive correctness" of the rules and the Departments' ability to rehabilitate them on remand. *Chamber of Com. of United States v. United States Sec. & Exch. Comm'n,* 88 F.4th 1115, 1118 n.2 (5th Cir. 2023).

## <u>CONCLUSION</u>

This Court should affirm the District Court's judgment vacating the July Rule's impermissible exclusion of single-case agreements from the "contracted rates" used to calculate the QPA. For the reasons set forth in

the TMA's brief, this Court should also (1) affirm the District Court's holding regarding the impermissible inclusion of "ghost-rates" in the QPA, and (2) affirm the District Court's holding regarding the impermissible exclusion of bonus or incentive payments from the QPA. The District Court correctly vacated all these provisions, which is the appropriate remedy under the APA.

Respectfully submitted,

Dated: August 18, 2025

/s/ Steven M. Shepard
STEVEN M. SHEPARD
    *Lead Counsel*
STEPHEN SHACKELFORD, JR.
MAX ISAAC STRAUS
JAMES CRAIG SMYSER
SUSMAN GODFREY LLP
One Manhattan West, 50th Floor
New York, NY 10001
Tel: (212) 336-8340
Fax: (212) 336-8340
Email:
sshepard@susmangodfrey.com

**Counsel for Plaintiffs-Appellees LifeNet, Inc. and East Texas Air One, LLC**

/s/ Joshua D. Arters
JOSHUA D. ARTERS
    *Counsel of Record*
DAVID A. KING

POLSINELLI PC
501 Commerce Street, Suite 1300
Nashville, TN 37203
Tel: (615) 259-1510
Fax: (615) 259-1573
Email: jarters@polsinelli.com

***Counsel for Plaintiffs-Appellees, Air Methods Corporation and Rocky Mountain Holdings, LLC***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 18, 2025, a copy of the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Steven Shepard*
Steven Shepard

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and Fifth Circuit Rule 32.2, this document contains 10,048 words.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: August 18, 2025

*/s/ Steven Shepard*
Steven Shepard