No. 23-40605

## IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

Texas Medical Association; Tyler Regional Hospital, L.L.C.; Dr. Adam Corley,

*Plaintiffs-Appellees,*

*v.*

United States Department of Health and Human Services; Office of Personnel Management; United States Department of Labor; United States Department of Treasury; Robert F. Kennedy, Jr., Secretary, U.S. Department of Health and Human Services, in his official capacity; Charles Ezell,, in his official capacity as the Acting Director of the Office of Personnel Management; Scott Bessent, Secretary, U.S. Department of Treasury, in his official capacity; Lori Chavez-DeRemer, Acting Secretary, U.S. Department of Labor, in her official capacity,

*Defendants-Appellants.*

LifeNet, Incorporated; Air Methods Corporation; Rocky Mountain Holdings, L.L.C.; East Texas Air One, L.L.C.,

*Plaintiffs-Appellees,*

*v.*

United States Department of Health and Human Services; Office of Personnel Management; United States Department of Labor; United States Department of Treasury; Robert F. Kennedy, Jr., Secretary, U.S. Department of Health and Human Services, in his official capacity; Charles Ezell, in his official capacity as the Acting Director of the Office of Personnel Management; Scott Bessent, Secretary, U.S. Department of Treasury, in his official capacity; Lori Chavez-DeRemer, Acting Secretary, U.S. Department of Labor, in her official capacity,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Eastern District of Texas

## BRIEF OF AMERICAN MEDICAL ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

James E. Tysse
Kelly M. Cleary
Kristen E. Loveland
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street N.W.
Washington, D.C. 20006
202-887-4000
jtysse@akingump.com

*Counsel for American Medical Association*

## CERTIFICATE OF INTERESTED PERSONS

*Texas Medical Association, et al. v. United States Department of Health and Human Services, et al.* (No. 23-40605)

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities, in addition to those listed in the briefs of the parties and other *amici curiae*, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Amicus curiae*: The American Medical Association is a non-profit entity with no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

*Counsel*: James E. Tysse, Kelly M. Cleary, and Kristen E. Loveland of Akin Gump Strauss Hauer & Feld LLP.

*s/James E. Tysse*
James E. Tysse

*Counsel of record for* Amicus Curiae
*American Medical Association*

i

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................i

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF INTEREST OF *AMICUS CURIAE*.............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

ARGUMENT ...........................................................................5

I.     THE RULE DEPRESSES THE QPA BELOW MARKET RATES IN CONTRAVENTION OF THE STATUTORY TEXT AND CONGRESSIONAL INTENT ................................................5

       A.     Congress Intended The QPA To Reflect Market Rates..............5

       B.     The Rule Impermissibly Allows "Contracted Rates *** Provided By A Provider" To Include Services That Are Never "Provided" .......................................................8

II.    THE RULE HARMS PATIENTS AND PHYSICIANS .............................12

CONCLUSION.......................................................................20

CERTIFICATE OF SERVICE ...............................................................22

CERTIFICATE OF COMPLIANCE...........................................................23

# TABLE OF AUTHORITIES

CASES:

*Estate of Cowart v. Nickols Drilling Co.*,
   505 U.S. 469 (1992)................................................................6

*Guardian Flight, L.L.C. v. Health Care Serv. Corp.*,
   140 F.4th 271 (5th Cir. 2025) ................................................18

*In re Benjamin*,
   932 F.3d 293 (5th Cir. 2019) ................................................9

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019)..........................................................10

*National Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012)................................................................5

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
   110 F.4th 762 (5th Cir. 2024) ................................................13

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
   No. 6:22-cv-450-JDK, 2023 WL 5489028 (E.D. Tex. Aug. 24,
   2023) ...........................................................................5, 12

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
   No. 6:23-cv-59-JDK, 2023 WL 4977746 (E.D. Tex., Aug. 3, 2023).................16

*Utility Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014)................................................................9

STATUTES:

42 U.S.C.
   § 300gg-111(a)(1)(C)(ii)........................................................6
   § 300gg-111(a)(3)(E)(i)(I)....................................................5, 6, 10
   § 300gg-111(a)(3)(E)(i)(II)...................................................5, 6
   § 300gg-111(a)(3)(E)(iv).......................................................6
   § 300gg-111(c)(5)(C)(ii)(II) .................................................7
   § 300gg-117(c)(1)(A) ..........................................................6

**RULES AND REGULATIONS:**

45 C.F.R.
§ 149.140(a)(1) ................................................................8

Fed. R. App. P. 29(a)(4)(E) ................................................1

Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872
(July 13, 2021) ..............................................................*passim*

Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980
(Oct. 7, 2021) ................................................................20

**OTHER AUTHORITIES:**

American Hospital Association, *Fact Sheet: Underpayment by
Medicare and Medicaid* (Feb. 2022) ................................15

Avalere Health, *PCP Contracting Practices and Qualified Payment
Amount Calculation Under the No Surprises Act* (Aug. 2, 2022) ......12

CMS, Supplemental Background on Federal Independent Dispute
Resolution Public Use Files July 1, 2024 – December 31, 2024
(May 28, 2025) ......................................................15, 16, 17

Emergency Department Practice Management Association, *Data
Analysis: No Surprises Act Independent Dispute Resolution
Effectiveness* (last visited Aug. 25, 2025) ..........................17

KaufmanHall, *Hospital Performance Showed Continued Stability in
2024* (2025) ................................................................19

KaufmanHall, *The Current State of Hospital Finances: Fall 2022
Update* (prepared at the request of Am. Hosp. Ass'n) (2022) ..........19

Letter from AMA to CMS (July 11, 2025) ..............................19

Letter from AMA to Senators Thune and Schumer (June 20, 2025) ......19

Letter from American College of Emergency Physicians to Members
of the North Carolina Congressional Delegation (Dec. 9, 2021) ......18

Letter from American Medical Association to Members of Congress
(May 16, 2023) ..............................................................16

iv

*Reduced Care for Patients: Fallout from Flawed Implementation of Surprise Medical Billing Protections:  Hearing Before the H. Comm. on Ways and Means*, 118th Cong. (2023) (statement of American Hospital Association) ................................................. 15, 17

*Reduced Care for Patients: Fallout from Flawed Implementation of Surprise Medical Billing Protections:  Hearing Before the H. Comm. on Ways and Means*, 118th Cong. (2023) (statement of Jim Budzinski, Exec. Vice President and Chief Fin. Officer, Wellstar Health System) ............................................................ 14, 18

*Reduced Care for Patients: Fallout from Flawed Implementation of Surprise Medical Billing Protections:  Hearing Before the H. Comm. on Ways and Means*, 118th Cong. (2023) (statement of Michael Champeau, President, American Society of Anesthesiologists) ............................................... 15

*Reduced Care for Patients: Fallout from Flawed Implementation of Surprise Medical Billing Protections:  Hearing Before the H. Comm. on Ways and Means*, 118th Cong. (2023) (statement of Seth Bleier, MD, FACEP, Vice President of Fin., Wake Emergency Physicians, PA) ............................................ 14, 16, 17, 20

Reed, Tina, *Doctors say insurers are ignoring orders to pay surprise billing disputes*, AXIOS (Aug. 3. 2023) ............................................. 17

Tepper, Nona, *Coming to a contract negotiation near you: the No Surprises Act*, MODERN HEALTHCARE, Aug. 3, 2022 ......................... 13

The AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2018) ....................................................................... 6

U.S. Departments of Labor, Health and Human Services, & Treasury, *FAQs About Affordable Care Act And Consolidated Appropriations Act, 2021* .......................................................... 9, 10, 12

U.S. GOV'T ACCOUNTABILITY OFF., GAO-24-106335, PRIVATE HEALTH INSURANCE: ROLL OUT OF INDEPENDENT DISPUTE RESOLUTION PROCESS FOR OUT-OF-NETWORK CLAIMS HAS BEEN CHALLENGING (2023) ...................................................... 13

WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2018) ........................... 6

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

The American Medical Association ("AMA") is the largest professional association of physicians, residents, and medical students in the United States. The AMA was founded in 1847 to promote the art and science of medicine and the betterment of public health, and these remain its core purposes. AMA members practice in every state and in every medical specialty. The AMA regularly files *amicus* briefs and engages in other advocacy efforts to support the interests of physicians nationwide. The AMA also submitted an amicus brief at the merits stage. *See* D.E. 82.[2]

The AMA and its members strongly support Congress's goal of protecting patients from "surprise billing." For years, the AMA has consistently advocated for a patient-first solution to surprise billing that would shield patients from unexpected medical bills, while enabling providers and insurers to determine fair payment among themselves and ensuring continued access to care. The AMA thus supports

---

[1] Plaintiffs and the Departments have consented to the filing of this brief. Pursuant to <u>Federal Rule of Appellate Procedure 29(a)(4)(E)</u>, *amicus* states that no party's counsel has authored this brief in whole or in part, and that no party, party's counsel, or person (other than *amicus*, its members, and its counsel) have contributed money to fund the preparation or submission of this brief.

[2] The AMA submits this brief on its own behalf and also as a representative of the Litigation Center of the AMA and the State Medical Associations. The Litigation Center is a coalition among the AMA and the state medical societies. Its purpose is to advance the interests of organized medicine and the policies of the AMA through the legal system.

the compromise set forth in the No Surprises Act, which both protects patients from surprise medical bills and establishes an independent dispute resolution ("IDR") process with an intentionally balanced approach that does not skew towards either providers or insurers.

Yet the Departments' Rule—titled Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872 (July 13, 2021) ("Rule")—upsets the balance that Congress struck and fails to achieve the goal of fair payment. The members of the AMA therefore agree with Plaintiffs that the rule is unlawful. The AMA submits this brief to emphasize why the Rule depresses payments to physicians below market rates, to rebut specific points made by *amici* supporting the Departments, and to explain the detrimental impact the Rule will have on the ability of physicians to provide the excellent care their patients deserve.

## INTRODUCTION AND SUMMARY OF ARGUMENT

All parties agree that, in enacting the No Surprises Act, Congress intended the Qualifying Payment Amount ("QPA")—a quantitative data point for payment negotiations and arbitrations under the Act—to reflect prevailing market rates. Yet the Departments' Rule defies both that intent and the Act's plain text by permitting and even encouraging insurers to set the QPA well below the market. Plaintiffs have already outlined the full scope of how the Departments' Rule deviates from the Act, as the district court held. The AMA files this brief to emphasize how the decision to permit calculation of the QPA based on contracted rates for services never actually "provided" to patients is particularly wrong—and particularly harmful to its members and the patients they serve.

Although the Act states that the QPA must be based on the median of the contracted rates for services actually "provided" to patients, the Departments allow insurers to calculate the QPA using contracted rates for services *never* provided—apparently so long as the contracted rate is somewhere (anywhere) above $0. The Departments even admit that insurer-provider contracts include non-negotiated rates for never-provided services as a matter of form. Yet their Rule permits insurers to include those rates in the QPA calculation, although doing so necessarily drags down the median and pushes the QPA below actual market rates.

As with other offending aspects of the Rule, this choice threatens serious harm to the provision of healthcare in this country. The QPA's below-market rate has become a lodestar for insurers. It has emboldened them to both force providers out of network and offer low initial out-of-network payments, knowing that providers who object will be forced to go through a cumbersome and costly arbitration process. At the end of that process, there is no guarantee that insurers will honor an award and no easy mechanism for enforcement if they do not. The severe rate cuts enabled by the Departments' insurer-friendly regulations threaten the viability of physician practices and the scope of medical services nationwide. Ultimately, the victims will be the patients who lose ready access to care.

The final language in the No Surprises Act was carefully crafted following months of bipartisan negotiation among congressional members and a broad representation of healthcare stakeholders. But the Departments' Rules—which have consistently depressed the QPA's value while elevating its centrality—have undermined the Act's compromises at every turn. The Departments should stop misusing their regulatory powers to pursue policy goals that diverge from Congress's, and instead hew to the statutory text and purpose. That is the best way to protect the health of both the patients under professional care and the healthcare delivery system as a whole.

# ARGUMENT

## I. THE RULE DEPRESSES THE QPA BELOW MARKET RATES IN CONTRAVENTION OF THE STATUTORY TEXT AND CONGRESSIONAL INTENT

### A. Congress Intended The QPA To Reflect Market Rates

Congress intended the QPA to reflect the prevailing market rate for the cost of a particular service or item—*i.e.*, rates for services actually provided to patients. It did not intend for the QPA to reflect rates for every service listed in a provider contract, regardless of whether the provider has ever provided (or even is capable of providing) such a service. *See Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:22-cv-450-JDK, 2023 WL 5489028, at *6 (E.D. Tex. Aug. 24, 2023) ("[N]othing in the Act permits including rates for services or items that are *not* 'provided.'").

"[T]he best evidence of Congress's intent is the statutory text." *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012). The Act states that the QPA is the "median of the contracted rates *** for the same or a similar item or service that is *provided by* a provider in the same or similar specialty." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)-(II) (emphasis added). Because the phrase "provided by a provider" modifies "item or service," the Act requires the QPA to be based on contracted rates for items or services that a provider in fact *provides*: that is, services that a provider "make[s] available" or "suppl[ies]" to the market. "Provide,"

WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2018); *see also* "Provide," THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2018) ("To make available (something needed or desired)"; "To supply something needed or desired to [someone]").   Where Congress employed the phrase "provided by" elsewhere, it plainly contemplated scenarios in which medical services were, in fact, supplied.   *See, e.g.*, 42 U.S.C. § 300gg-111(a)(1)(C)(ii) (patients' cost-sharing requirement should not be "greater than the requirement that would apply if such services were provided by a participating provider or a participating emergency facility"); *id.* § 300gg-117(c)(1)(A) (insurer may not require prior authorization for patient "who seeks coverage for obstetrical or gynecological care provided by a participating healthcare professional who specializes in obstetrics or gynecology"). Such "identical terms within [the] Act [should] bear the same meaning." *Estate of Cowart v. Nickols Drilling Co.*, 505 U.S. 469, 479 (1992).

Other provisions of the Act reinforce Congress's intent for the QPA to reflect the prevailing market rate for a medical service.   For one, QPAs are not set abstractly, but rather are defined with respect to a particular insurance market—with the Act specifying that different QPAs should be separately calculated for the individual, large-group, small-group, and self-insured markets.   *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)-(II), (a)(3)(E)(iv).   Moreover, an important quantitative data point that IDR arbitrators must consider in determining the appropriate payment

6

rate is the "market share held by the [provider or insurer] in the geographic region in which the item or service was provided." *Id.* § 300gg-111(c)(5)(C)(ii)(II). Knowing the respective market shares for a particular insurer and provider helps an arbitrator understand whether the prevailing market rate is truly a relevant data point for a particular payment dispute. But the only way to know the prevailing market rate is if the QPA reflects it.

The Departments themselves have emphasized, both in the Rule and elsewhere, that the Act's "statutory intent" is to "ensur[e] that the QPA reflects *market rates* under typical contract negotiations." 86 Fed. Reg. 36,872, 36,889 (July 13, 2021) (emphasis added). In an earlier lawsuit brought by Plaintiffs, the Departments specifically acknowledged that the QPA reflects "Congress's expectation that—in the ordinary case at least—the qualifying payment amount is a proxy for the in-network price that a given medical service would command in a functional health care market." Defs' Cross-Mot. for Summ. J. at 20, *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:21-cv-425 (E.D. Tex. Jan. 10, 2022), ECF No. 62. *Amici* supporting the Departments likewise agree that the QPA is intended "to approximate what the parties would have reasonably agreed to, under competitive market conditions, had they reached a network agreement in advance." Brief of America's Health Insurance Plans as *Amicus Curiae* in Support of Appellants at 2, *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,

7

No. 23-40605 (5th Cir. July 28, 2025), ECF No. 227-1 ("AHIP Br."); *see also* Brief of *Amicus Curiae* Blue Cross Blue Shield Association in Support of Appellants and Reversal at 3, *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 23-40605 (5th Cir. July 29, 2025), ECF No. 242-1 (agreeing the QPA is meant to be "a 'market-based price' that 'reflects negotiations between providers and insurers in a local health care market'"). The Departments and supporting *amici* should therefore agree that, because the QPA is meant to reflect actual, prevailing market rates, the factors that go into determining the QPA should help ascertain—and not devalue it below—market rates.

### B.     The Rule Impermissibly Allows "Contracted Rates *** Provided By A Provider" To Include Services That Are Never "Provided"

Despite their lip service to the idea that the QPA should reflect market rates, the Departments have flouted that intent and deviated from the Act's plain language—including by interpreting the key phrase "contracted rates *** provided by a provider" to encompass services that are, in fact, never "provided."

The Rule defines "contracted rate"—the underlying data point for the QPA—as encompassing *all* rates for every covered item and service found in a provider contract, not just rates for items or services that are actually "provided by a provider." *See* 45 C.F.R. § 149.140(a)(1) ("Contracted rate means the total amount (including cost sharing) that a group health plan or health insurance issuer has contractually agreed to pay a participating provider, facility, or provider of air

ambulance services for covered items and services[.]"). This was not an oversight. The Departments explained that in their view, "each contracted rate for a given item or service" should "be treated as a single data point when calculating a median contracted rate," and that "the rate negotiated under a contract constitutes a single contracted rate *regardless of the number of claims paid at that contracted rate*"— including, apparently, if the number of paid claims is zero. 86 Fed. Reg. at 36,889 (emphasis added). The Rule thus permits insurers to include "ghost rates"—rates for services that are listed in a provider contract even though they are never (or almost never) provided, and therefore not negotiated—in their calculation of the QPA. By permitting insurers to incorporate into the QPA contracted rates for items and services "regardless" of whether they are ever in fact "provided by a provider," *id.*, the Departments straightforwardly violate the plain text of the Act, *see In re Benjamin*, 932 F.3d 293, 300 (5th Cir. 2019) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." (quoting *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014))).

The Departments' August 2022 subregulatory guidance, "Frequently Asked Questions," does not cure this deficiency. *See* U.S. Departments of Labor, Health and Human Services, & Treasury, *FAQs About Affordable Care Act And Consolidated Appropriations Act, 2021 Implementation Part 55* (Aug. 19, 2022)

9

("August 2022 FAQs").[3]  Despite forthrightly acknowledging that the Rule allows insurers to calculate the QPA based on rates for items and services that "providers do not provide," *id.* at 17 (FAQ 14), the Departments did nothing more than admonish insurers in a footnote that they "should not include *$0* amounts in calculating [the QPA]," *id.* at 17 n.29 (FAQ 14) (emphasis added).  Such guidance, however, "does not impose any legally binding requirements on private parties." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019) (plurality) (internal quotation marks omitted).  And regardless, the Departments gave insurers permission not only to continue to include rates for items and services that are never provided by providers (in contravention of the Act's text), but to do so even if the non-negotiated rates fall drastically below market rates—just so long as the rates are any amount, even just a cent, above $0.  Thus, the Departments' rule makes it easy for insurers to lower the QPA by simply manipulating their standard rate schedules.

Nor does the fact that the QPA is calculated based on rates for services provided "in the same or similar specialty," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), cure the regulatory defect.  *Contra* DOJ Supp. Br. 22-23.  For one thing, until this appeal the Departments took the position that they could largely ignore that mandate.  *See id.* at 23 n.6 (acknowledging that "plans were essentially permitted to take a

---

[3]    https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-55.pdf.

shortcut for the sake of administrative convenience," even if providers "in fact ha[d] 'different specialties'").  For another, that directive by itself cannot ensure market-based rates because even providers in the same or similar specialties often do not provide overlapping services—and hence will not negotiate the rate for every service offered by the specialty overall.  For instance, an obstetrician-gynecologist's contract will likely include rates for delivery services, regardless of whether she ever performs deliveries.  Specialists like orthopedists typically focus on only certain parts of the body—yet an orthopedist's contract will likely cover far more than that particular orthopedist's specialty.  In other words, the two requirements—that rates be calculated based on (i) services "in the same or similar specialty," and (ii) services that are actually "provided by a provider"—perform different functions in achieving a market-based rate.  While basing rates on services provided "in the same or similar specialty" ensures that the QPA is commensurate with what, for instance, an anesthesiologist versus a dermatologist would expect to receive for a particular service, *cf.* DOJ Supp. Br. 23, basing rates on services actually "provided by a provider" ensures the critical requirement that the rates are also *negotiated*.

The risk that non-negotiated rates will depress the QPA below market rates is real.  A 2022 survey found that of 75 primary care professionals surveyed, 68% had network contracts that included rates for services that they provide fewer than two times a year, while 57% had network contracts including rates for services that they

*never* provide. Avalere Health, *PCP Contracting Practices and Qualified Payment Amount Calculation Under the No Surprises Act* at 4 (Aug. 2, 2022).[4] As the Departments have themselves explained, "some plans and issuers establish contracted rates by offering most providers the same fee schedule for all covered services." August 2022 FAQS, at 16 (FAQ 14). It is then "*up to the providers* to negotiate increases to the rates for the services that they are most likely to bill," *id.* (emphasis added)—which, for never-provided services, is something they have no incentive to do. In the end, "the entire fee schedule may be included in the provider contract, with contracted rate modifications made *only* to certain service codes based on the negotiations." *Id.* (emphasis added). The below-market, non-negotiated rates thus remain in the contract, skewing the QPA downward under the Rule. Indeed, the Departments conceded as much at oral argument before the district court, allowing "that some providers have rates for services they do not and will never provide and that 'those artificially low out-of-specialty rates do sometimes appear in contracts.'" *Texas Med. Ass'n*, 2023 WL 5489028, at *6.

## II. THE RULE HARMS PATIENTS AND PHYSICIANS

Below-market QPAs lead to dramatic underpayments for both out-of-network and in-network care, threatening the viability of provider practices. The

---

[4] https://www.emergencyphysicians.org/globalassets/emphysicians/all-pdfs/2022-8-15-avalere-qpa-whitepaper_final.pdf.

12

Departments' attempt to unlawfully overweight the QPA in IDR arbitration—which this Court affirmed was unlawful—would have made the problem even more acute. *See Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, 110 F.4th 762, 767 (5th Cir. 2024). But even if the QPA is now fairly weighted, insurers can still manipulate the rate schedules included in provider contracts to achieve a below-market QPA, emboldening them to make extraordinarily low, take-it-or-leave-it offers in the knowledge that providers who object will be forced to go through a cumbersome and costly arbitration process. U.S. GOV'T ACCOUNTABILITY OFF., GAO-24-106335, PRIVATE HEALTH INSURANCE: ROLL OUT OF INDEPENDENT DISPUTE RESOLUTION PROCESS FOR OUT-OF-NETWORK CLAIMS HAS BEEN CHALLENGING 32 (2023). Indeed, physicians have seen abrupt demands from insurers for across-the-board rate reductions as high as 50% and rate schedules that coalesce around the QPA. Nona Tepper, *Coming to a contract negotiation near you: the No Surprises Act*, MODERN HEALTHCARE, Aug. 3, 2022.[5]

Providers have attested to the considerable rate cuts they experienced following implementation of the Departments' regulations. For example, the Chief Financial Officer of a not-for-profit, community-based health system described how a national insurer threatened to terminate a contract that had been in place for over

---

[5] https://www.modernhealthcare.com/insurance/no-surprises-act-influencing-insurers-rate-setting-plans.

twenty years unless the health system agreed to a 20 percent decrease in payment—representing a reimbursement loss of $4 billion over ten years.  *Reduced Care for Patients: Fallout from Flawed Implementation of Surprise Medical Billing Protections: Hearing Before the H. Comm. on Ways and Means*, 118th Cong. (2023) (statement of Jim Budzinski, Exec. Vice President and Chief Fin. Officer, Wellstar Health System) ("Budzinski Statement"), at 5.  Eventually, the health system was able to negotiate "only" $1 billion in cuts over the period.  *Id.*

A physician-owned practice group of emergency doctors was not so lucky: Following the No Surprises Act's implementation, two of its insurers unilaterally terminated the group's contracts, pushing a third of the group's commercial patients out of network and paying "up to 70 percent less than our previous contracts for what are now out of network services."  *Reduced Care for Patients: Fallout from Flawed Implementation of Surprise Medical Billing Protections:  Hearing Before the H. Comm. on Ways and Means*, 118th Cong. (2023) (statement of Seth Bleier, MD, FACEP, Vice President of Fin., Wake Emergency Physicians, PA) ("Bleier Statement"), at 2.  A national insurer similarly reduced out-of-network rates by nearly 50 percent—$50 million annually—for the community-based health system. Budzinski Statement 5.  And using the QPA as their measure, some out-of-network insurers have made initial payment offers lower than what even Medicare pays—

14

even though Medicare does not consistently pay above commercial rates and often pays less than the cost of care.[6]

Writing in support of the Departments, *amicus* America's Health Insurance Plans ("AHIP") wrongly infers that such low payment offers have been acceptable to providers because "most of the time" providers do not initiate the IDR process. AHIP Br. 7. Yet AHIP concedes that the flood of claims to the IDR portal from providers dissatisfied with insurers' offers has far outpaced the federal government's expectations. *Id.* Far from showing signs of dissipation, there has been an "increasingly large volume of disputes" submitted each quarter. CMS, Supplemental Background on Federal Independent Dispute Resolution Public Use Files July 1, 2024 – December 31, 2024 ("July-Dec 2024 CMS Report"), at 1 (May 28, 2025).[7] In just the six-month period from July 1, 2024, to December 31, 2024,

---

[6] *See Reduced Care for Patients: Fallout from Flawed Implementation of Surprise Medical Billing Protections: Hearing Before the H. Comm. on Ways and Means*, 118th Cong. (2023) (statement of American Hospital Association) ("AHA Statement"), at 4; *Reduced Care for Patients: Fallout from Flawed Implementation of Surprise Medical Billing Protections: Hearing Before the H. Comm. on Ways and Means*, 118th Cong. (2023) (statement of Michael Champeau, President, American Society of Anesthesiologists), at 3; American Hospital Association, *Fact Sheet: Underpayment by Medicare and Medicaid* (Feb. 2022), https://www.aha.org/fact-sheets/2020-01-07-fact-sheet-underpayment-medicare-and-medicaid.

[7] https://www.cms.gov/files/document/federal-idr-supplemental-background-2024-q3-2024-q4.pdf.

parties initiated *853,374* disputes, representing a *40% increase* over the first six months of 2024. *Id*. at 2.

And these extraordinary numbers do not even reflect the full extent of providers' dissatisfaction with QPA-based payments, as "[m]any smaller practices have been advised by their billing contractors to avoid going through IDR altogether as the costs outweigh any benefit." Bleier Statement 2. The Departments have in fact sought (albeit unsuccessfully) to impose burdensome nonrefundable administrative fees on providers who wish to utilize the IDR process, while restricting the ability of providers to efficiently "batch" claims for quicker and more cost-efficient resolution. *See Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:23-cv-59-JDK, 2023 WL 4977746, at *1 (E.D. Tex., Aug. 3, 2023) (enjoining the Departments' fee increases and batching restrictions). And insurers have habitually questioned the eligibility of claims for the federal IDR process as a tactic to delay or deter the resolution of disputes, without penalty. Letter from American Medical Association to Members of Congress at 4 (May 16, 2023).[8] As members of the AMA have experienced, these interlocking barriers have resulted in the IDR process being cost-prohibitive for many providers. *Id*. at 3-4. Physicians'

---

[8] https://searchlf.ama-assn.org/letter/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2Flf.zip%2F2023-5-16-Letter-to-Senate-HELP-Committee-re-Roundtable-NSA-v2.pdf.

decisions to accept the QPA and forgo IDR are therefore often driven by a desire to avoid a costly fight against better-resourced opponents, not satisfaction with the QPA.

Tellingly, the vast majority of providers *win* their disputes—and are thus awarded payments above the below-market QPA.  Between July and December, 2024, "[p]roviders, facilities, or air ambulance providers were the prevailing party in approximately *85%* of payment determinations," and "[t]he prevailing offer was higher than the *** [QPA] in approximately *85%* of payment determinations." July-Dec 2024 CMS Report 4 (emphases added).[9]  Yet even then, providers have not been guaranteed their at-market rates:  Insurers have refused to honor IDR awards on the ground that they are unenforceable.[10]  Indeed, one survey reported that 87% of payers did not pay in accordance with an IDR decision within the statutory 30-day deadline for complying with awards.  Emergency Department Practice Management Association, *Data Analysis: No Surprises Act Independent Dispute Resolution*

---

[9] https://www.cms.gov/files/document/federal-idr-supplemental-background-2024-q3-2024-q4.pdf.

[10] AHA Statement 6 ("[H]ospital members report they are not being paid in a timely manner—if ever—when IDR entities decide in their favor."); Bleier Statement 2; *see also* Tina Reed, *Doctors say insurers are ignoring orders to pay surprise billing disputes*, AXIOS (Aug. 3. 2023), https://www.axios.com/2023/08/03/insurers-refusing-pay-surprise-billing.

*Effectiveness*, at 2 (last visited Aug. 25, 2025).[11]   And this Court recently held that Congress gave providers no private right of action to enforce awards, leaving providers to the vagaries of administrative enforcement.   *See Guardian Flight, L.L.C. v. Health Care Serv. Corp.*, 140 F.4th 271, 277 (5th Cir. 2025) ("Understandably, Providers would prefer a different mechanism for resolving provider-insurer disputes.   But the wisdom of Congress's policy choice is beyond our judicial ken.").

Insurers' insistence on below-market QPA-based rates comes at a perilous time, threatening the scope of provider services (especially those that historically lose money) and the viability of provider practices (particularly small- and mid-sized physician groups that have operated under stable contracts for years).   *See, e.g.*, Letter from American College of Emergency Physicians to Members of the North Carolina Congressional Delegation (Dec. 9, 2021) ("ACEP Letter").[12]   After weathering a once-in-a-century global pandemic, providers have struggled with rising costs caused by inflation and labor shortages.   One health system's cost of care increased by over 25 percent due to the pandemic.   Budzinski Statement 5. Margins for all U.S. hospitals were "down 37% relative to pre-pandemic levels,"

---

[11]    https://edpma.org/wp-content/uploads/2023/04/EDPMA-Data-Analysis-No-Surprises-Act-Independent-Dispute-Resolution-Effectiveness-FINAL.pdf.

[12]    https://www.acep.org/globalassets/new-pdfs/advocacy/acep--nccep-insurer-cuts-letter-to-nc-delegation---12092021.pdf.

with "[m]ore than half of hospitals *** projected to have negative margins through 2022." KaufmanHall, *The Current State of Hospital Finances:  Fall 2022 Update* at 1 (prepared at the request of Am. Hosp. Ass'n) (2022).[13]  Just a few years later, providers are now staring down the barrel of more than $860 billion in reduced federal Medicaid spending over the next decade under the One Big Beautiful Bill Act.  *See* Letter from AMA to CMS at 2 (July 11, 2025).[14]  That is on top of the fact that physicians "are already dealing with a 2.83 percent cut to Medicare payment in 2025 and, since 2001, payment updates have fallen behind practice cost inflation by 33 percent."  Letter from AMA to Senators Thune and Schumer at 11 (June 20, 2025).[15]  And while in 2024, hospitals' financial and operational performance showed better stability, "historically slim margins indicate hospitals are not yet in a fully sustainable position." KaufmanHall, *Hospital Performance Showed Continued Stability in 2024* (2025).[16]

---

[13]  https://www.kaufmanhall.com/sites/default/files/2022-09/KH-Hospital_Finances_Report-Fall2022.pdf.

[14]  https://searchlf.ama-assn.org/letter/documentDownload?uri=/unstructured/binary/letter/LETTERS/lf.zip/lf/2025-7-11-Letter-to-Oz-re-Preserving-Medicaid-Funding-v2.pdf.

[15]  https://searchlf.ama-assn.org/letter/documentDownload?uri=/unstructured/binary/letter/LETTERS/lfb.zip/2025-6-20-Letter-to-Thune-and-Schumer-re-HR-1-One-Big-Beautiful-Bill-Act-v3.pdf.

[16]  https://www.kaufmanhall.com/news/hospital-performance-showed-continued-stability-2024.

Rural and other underserved patient populations will bear the brunt of this sea change, losing their access to readily available and personalized care.   Bleier Statement 2.  As the representative for an emergency physician group serving rural populations explained:  "If these conditions persist, we may be forced to *** reduce salaries, reduce physician and advanced practice provider staffing hours, cut positions, or make difficult decisions about what areas we can realistically serve." *Id.* at 3.  Emergency physician practices in rural and underserved areas may be "unable to afford to continue to operate in the areas where patients need them most," leaving millions with "less access to the lifesaving emergency care they need and deserve." *Id.* at 3-4.

The Departments previously recognized that significant reductions in provider rates could "threaten the viability of these providers [and] facilities," which "in turn, could lead to participants, beneficiaries and enrollees not receiving needed medical care, undermining the goals of the No Surprises Act."  Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980, 56,044 (Oct. 7, 2021).  Those concerns only reinforce why the Act's text, rather than the Departments' policy goals, must take priority.

## CONCLUSION

The AMA respectfully urges the Court to affirm the district court's decision.

Dated:  August 25, 2025                    Respectfully submitted,


                                           /s/ James E. Tysse
                                           James E. Tysse
                                           Kelly M. Cleary
                                           Kristen E. Loveland
                                           AKIN GUMP STRAUSS HAUER & FELD LLP
                                           2001 K Street, N.W.
                                           Washington, D.C. 20006
                                           Telephone: (202) 887-4000
                                           jtysse@akingump.com

                                           *Counsel to* Amicus Curiae *American Medical
                                           Association*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 25, 2025, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*/s/James E. Tysse*
James E. Tysse

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) because it contains 4,396 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word Version 2016, 14-point Times New Roman font.

*/s/James E. Tysse*
James E. Tysse

August 25, 2025