No. 23-40605

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**Texas Medical Association et al.,**
*Plaintiffs-Appellees,*
*v.*
**U.S. Department of Health and Human Services, et al.,**
*Defendants–Appellants.*

**LifeNet, Incorporated et al.,**
*Plaintiffs-Appellees,*
*v.*
**U.S. Department of Health and Human Services, et al.,**
*Defendants-Appellants.*

Appeal from the United States District Court for the
Eastern District of Texas

**Amici Curiae Brief of the American Society of Anesthesiologists,
the American College of Emergency Physicians,
and the American College of Radiology
in support of Plaintiffs-Appellees and Affirmance**

JEREMY LEWIN
**BARNES & THORNBURG LLP**
ONE N. WACKER DRIVE, SUITE 4400
CHICAGO, IL 60606-2833
312.214.8833
JEREMY.LEWIN@BTLAW.COM

AARON D. LINDSTROM
**BARNES & THORNBURG LLP**
171 MONROE AVE. NW, SUITE 1000
GRAND RAPIDS, MI 49503-2694
616.742.3931
AARON.LINDSTROM@BTLAW.COM

*Attorneys for Amici Curiae,*
*THE AMERICAN SOCIETY OF ANESTHESIOLOGISTS,*
*THE AMERICAN COLLEGE OF EMERGENCY PHYSICIANS, AND*
*THE AMERICAN COLLEGE OF RADIOLOGY*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Rule 29.2 of the Fifth Circuit Rules, the undersigned counsel of record certifies that the following listed persons and entities, in addition to those listed in the parties' briefs, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Amici curiae:**
American Society of Anesthesiologists
American College of Emergency Physicians,
American College of Radiology

**Attorneys for amicus curiae:**
Barnes & Thornburg LLP
Jeremy Lewin
Aaron D. Lindstrom

Dated: August 25, 2025          */s/ Aaron D. Lindstrom*

# Table of Contents

**Page**

Statement of amici curiae ........................................................ i

Introduction .................................................................... ii

Argument ....................................................................... vi

I.    The QPA does not reflect the fair market value of out-of-network items and services ........................................... vii

II.   The July rule incentivizes insurers to lower in-network rates, ultimately narrowing provider networks. ........................ xx

III.  The July rule will result in under-compensation of care, which may incentivize the consolidation of practices, undermining market competition. ........................................ xxiv

IV.   Market disruptions and narrower provider networks stemming from the July rule will harm patients in underserved areas struggling with accessibility. ..................... xxvi

Conclusion ..................................................................... xxix

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*United Tchrs. Assocs. Ins. Co. v. MacKeen & Bailey Inc.*,
  99 F.3d 645 (5th Cir. 1996) .................................................................. 14

**STATUTES**

Cal. Health & Safety Code § 1371.31 ...................................................... 24

No Surprises Act, Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 2757-890
  (2020) (codified at 42 U.S.C. §§ 300gg-111, 300gg-131 to 132; 29
  U.S.C. § 1185e; 26 U.S.C. § 9816) ................................................. passim

**OTHER AUTHORITIES**

Avalere Health, *PCP Contracting Practices and Qualified Payment
  Amount Calculation Under the No Surprises Act* (Aug. 2, 2022) 16, 18,
  19

Erin L. Duffy, *Influence of Out-of-Network Payment Standards on
  Insurer-Provider Bargaining: California's Experience*, 25 Am. J.
  Managed Care e243 (2019) .................................................................. 25

Simon F. Haeder, *Inadequate in the Best of Times: Reevaluating
  Provider Networks in Light of the Coronavirus Pandemic*, 12 World
  Med. & Health Pol'y 282 (2020) ........................................................... 26

**REGULATIONS**

45 C.F.R. § 149.140 ............................................................................ 7, 8

45 C.F.R. § 156.230 ............................................................................. 27

*Requirements Related to Surprise Billing; Part I*,
  86 Fed. Reg. 36,872 (July 13, 2021) ................................................ passim

## STATEMENT OF AMICI CURIAE

The American Society of Anesthesiologists, the American College of Emergency Physicians, and the American College of Radiology (collectively, "*Amici*") are voluntary, national professional associations that advocate for the interests of their respective members, including on matters concerning adequate and fair reimbursement for items and services provided out-of-network.

The American Society of Anesthesiologists is a professional association comprised of approximately 59,000 physician anesthesiologists and others involved in the medical specialty of anesthesiology, critical care, and pain medicine. The American College of Emergency Physicians is a professional association comprised of approximately 38,000 emergency physicians, residents, and medical students. The American College of Radiology is a professional association comprised of approximately 40,000 diagnostic radiologists, radiation oncologists, interventional radiologists, nuclear medicine physicians, and medical physicists.

*Amici* submit this brief on behalf of their members who provide patient-care items and services impacted by the No Surprises Act. All of the parties have consented to the filing of this brief.

## INTRODUCTION

In July 2021, the federal agencies who are appellants in this case—the Department of Health and Human Services, the Department of Labor, the Department of the Treasury, and the Office of Personnel Management—published an interim final rule under the No Surprises Act to implement the Act's independent dispute resolution (IDR) process. *Requirements Related to Surprise Billing; Part I*, <u>86 Fed. Reg. 36,872</u> (July 13, 2021). Specifically, the July rule adopted a methodology for calculating the qualifying payment amount (QPA), which is one of the factors used in the IDR process. While the Departments agree that this amount is supposed to reflect the median rate that the insurer would have paid if the service had been provided by an in-network provider, the methodology adopted by the Departments conflicts with the text of the No Surprises Act and leads to inaccurate rates for the QPA.

*Amici* submit this brief to explain to the Court how the July rule unlawfully depresses both in-network and out-of-network rates for physician services, which will force many physician practices to consolidate and which will harm patient care by narrowing provider networks, particularly in underserved communities.

The No Surprises Act addresses two interrelated problems with the private health insurance market. First, insurers demand low payment rates as a condition of physicians participating in their networks, a demand that forces many physicians to stay out-of-network to remain economically viable. Second, patients who unknowingly receive certain care from out-of-network providers were responsible for amounts not paid by their insurance companies, which is known as "surprise billing." No Surprises Act, Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 2757-890 (2020) (codified at 42 U.S.C. §§ 300gg-111, 300gg-131 to 132; 29 U.S.C. § 1185e; 26 U.S.C. § 9816). *Amici* support Congress's reforms, which, if properly implemented, will ensure fair reimbursement to providers and facilities and protect patient access to medical care.

Unfortunately, the Departments—HHS, the Department of Labor, the Department of Treasury, and the Office of Personnel Management—have shifted the balance that Congress struck in protecting both patients and providers into a system that favors the economic interests of private insurers and that will harm patients and providers. The July rule adopts a calculation methodology that conflicts with the statute's provisions about the qualifying payment amount, which is determined solely by the insurer and does not reflect the fair market value of physician services. For example, the QPA is the median of the contracted rates negotiated by the insurer, yet the methodology adopted by the Departments ignores the frequency with which those contracted rates are actually applied to patient claims. Instead, the Departments' methodology treats each contract as a single data point, regardless of how many times that rate is reflected in an actual claim by a patient. Additionally, the Departments' QPA methodology excludes bonuses and incentive payments, even though Congress instructed that contracted rates must be the total *maximum* payment, without exclusions or exceptions.

The Departments' methodology from the July rule and their other guidance will depress payments for the anesthesiology, radiology, and emergency services of *Amici*'s members by empowering insurers to lower in-network rates, which, in turn, will depress out-of-network rates. This under-compensation of care will threaten the viability of smaller and independent physician practices, and the inevitable result will be the consolidation or closure of these practices. Contrary to Congress's direction that the methodology must "tak[e] into account access to items and services in rural and underserved areas," 42 U.S.C. § 300gg-111(a)(2)(B)(iii), this will lead to fewer services in rural and other underserved communities, which ultimately will harm the care of patients in those areas struggling with accessibility to quality treatment.

For these reasons, and the reasons in the appellees' briefs, the Court should affirm the district court's judgment invalidating the final rule's provisions that incorrectly calculate the QPA when determining out-of-network payments.

## ARGUMENT

While the Departments argue that the QPA is supposed to approximate "the total amount that a medical provider would have received for a particular service under the terms of a patient's health plan had the provider been in-network" (Departments' En Banc Br. 1), and while they repeatedly warn about the risk of market distortion (*id.* 4, 5, 15, 32, & 33), it is the Departments' methodology for calculating the QPA that distorts the market. Their methodology excludes rates that should be included (such as rates that include incentives or bonuses) and uses the wrong approach to determining the median rate (by calculating based on the number of contracts, not based on the number of claims).

Under their rules, the QPA fails to reflect the fair market value of items and services furnished by out-of-network providers in the marketplace. These market distortions create a perverse incentive for insurers to significantly reduce their in-network rates or to refuse to enter into agreements with providers or facilities. If more providers or facilities are forced out-of-network due to the final rule, patients will lose access to in-network care. In addition, the final rule will undermine

the ability of providers and facilities to be reimbursed fairly for their out-of-network services, which will, in turn, threaten their ability to operate in the marketplace. If this occurs, small, independent practices may have no other choice but to consolidate or to cease operating. Patients will lose access to care, particularly in underserved areas.

## I.   The QPA does not reflect the fair market value of out-of-network items and services.

Under the methodology adopted by the Departments, the QPA does not accurately represent the fair, market-based payment rates for out-of-network services. (*See* Declaration of Dr. Nicola, No. 6:22-cv-372 (E.D. Tex.), Doc. 53-2; Declaration of Dr. Young, No. 6:22-cv-372, Doc. 53-3; Declaration of Dr. Raley, No. 6:22-cv-372, Doc. 53-4.) The July rule leads to artificially low QPA calculations in at least two distinct ways.

*First*, the Departments' QPA methodology excludes a number of arrangements under which providers and insurers agree to rates. Under their regulation, the definition of "contracted rate" excludes single case agreements, letters of agreement, or other similar arrangements between a provider and an insurer to supplement the network of the plan or coverage for a specific patient in unique circumstances. 45 C.F.R. § 149.140(a)(1). Further, in calculating the

median contracted rate, an insurer must "[e]xclude risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." *Id.* § 149.140(b)(2)(iv).

These exclusions result in QPAs that are lower than the full payment amount for the applicable item or service. Each of the *Amici* explained this problem to the Departments in comment letters. *See* Am. Coll. of Emergency Physicians Letter[1] at 14–15; Am. Soc'y of Anesthesiologists Letter[2] at 3; Am. Coll. of Radiology Letter[3] at 2. Given that the QPA thus focuses on just a subset of the market for the relevant services and excludes payment adjustments, it undervalues the payment amounts that would present fair, market-based values. It also penalizes providers who previously participated in alternative payment models and other value-based contracts.

One of the Departments' insurance-industry amici—America's Health Insurance Plans—argues that bonuses and incentive payments should not be included when calculating "the total maximum payment,"

---

[1] https://www.regulations.gov/comment/CMS-2021-0117-5695.

[2] https://www.regulations.gov/comment/CMS-2021-0117-7410.

[3] https://www.regulations.gov/comment/CMS-2021-0117-7239.

42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), because "it is simply wrong (and practically distorting) to characterize value-based adjustments—which are generally lump sum payments—*as add-ons (or subtractions)* to service-specific rates." (AHIP En Banc Amicus Br. 15 (emphasis added).) But another of the insurance-industry amici—Blue Cross Blue Shield—directly contradicts that point, recognizing that a number of value-based adjustments do exactly that: "The most straightforward alternative payment models start from traditional fee-for-service payments, *then add or subtract*." (Blue Cross En Banc Amicus Br. 16 (emphasis added); *see also* AHIP En Banc Br. 15 (acknowledging that it bases its argument on a "handful of non-exhaustive examples" of alternative payment models).)

As Blue Cross explains, there are at least three subcategories that fall within this approach of simply adding or subtracting from a standard fee-for-service model based on the quality and value of the service. In the first subcategory, "[s]ome models make additional payments to providers for infrastructure investments that can improve the quality of patient care, such as payments designated for staffing a care coordination nurse or upgrading to electronic health records." (Blue

Cross En Banc Amicus Br. 16 (quotations marks omitted).) The second subcategory is "'pay-for-reporting' models, which 'provide positive or negative incentives to report quality data to the health plan and—preferably—to the public." (*Id.* (some quotation marks omitted).) "A third subcategory of this kind of compensation model rewards providers for good performance on quality metrics, penalizes providers for poor performance, or both." (Blue Cross En Banc Amicus Br. 16.) In short, even the Departments' own amici recognize that a number of value-based models are directly linked to the fees for service. In any event, as the district court recognized, the plain meaning of "total maximum payment" includes bonuses. (ROA.13212–14.)

Even more importantly, Congress expressly directed that the Departments in their rulemaking "*shall* take into account payments that are made by such plan or issuer, respectively, that are *not on a fee-for-service basis*." 42 USCA 300gg-111(a)(2)(B) (emphasis added). So, the effort to exclude bonus and incentive payments on the ground that they are "not on a fee-for-service basis" is directly contrary to Congress's intent.

*Second*, the Departments' methodology for calculating the median rate focuses on the median contracted rate *in a contract*, rather than on the median contracted rate recognized *in a claim*. In calculating the median contracted rate, each contract setting out a rate for an item or service is treated as a single data point regardless of the total number of claims paid at that rate. 86 Fed. Reg. at 36,889 ("[T]he rate negotiated under a contract constitutes a single contracted rate regardless of the number of claims paid at that contracted rate."). In other words, if an insurer has a contract with a provider, the rate negotiated with that provider under the contract for a specific service or procedure is treated as a single contracted rate, regardless of the volume of individual claims for that service or procedure recognized and paid at that rate. In effect, the Departments' method for calculating the QPA ignores the frequency of use or applicability of those contracts in the market, which results in a distortion of the true market value of the out-of-network item or service. Am. Coll. of Emergency Physicians Letter at 11.

Consider, for example, a region with three in-network practice groups. Practice Group A performs a service 1,000 times and has

negotiated a contract rate of $550; Practice Group B has a contracted rate of $490 and performs the service only ten times; and Practice Group C performs the service twenty times at a contracted rate of $495. We would expect the QPA to be $550, since more than 97% of the services provided to actual patients in this region were paid at that contracted rate. But the Departments' methodology sets the QPA at $495, because that is the middle rate of the three contracts in the region. This result ignores the economic reality of the market (i.e., the contracted rate at which more than 97% of the services in the region were actually paid). As a result, the Departments' methodology does not accurately result in the rate for the service provided to the median patient.

The Departments' methodology also does not live up to their assertion that it counts all contracted rates "*regardless of* the number of claims paid at that contracted rate," 86 Fed. Reg. at 36,889 (emphasis added). Their methodology does not count two sets of contracted rates specifically *because of* the number of claims that would be made under those contracts. First, their methodology does not count contracted rates that are set at $0 a claim. (Departments' En Banc Br. 24 ("[A]

zero-dollar figure included as a placeholder in a fee schedule for a service a provider is not actually equipped to furnish does not represent a contracted rate that could be included in the QPA calculation.").) In short, they admit that a $0 contracted rate is not relevant, yet the reason it is not relevant in assessing the market rate is because it does not lead to any claims. Second, when a contract will result in exactly one claim—that is, when there is a case-specific agreement—they also refuse to consider that rate. (*See* Departments' En Banc Br. 12 ("The Departments determined that these one-off payments to out-of-network providers should be excluded").) Thus, their methodology does not count the number of contracts *regardless of the number of claims*, as they assert; it counts only contracts that have *at least two claims* under that contracted rate. This inconsistency undermines their contention that they are simply following the text of the statute.

Despite this inconsistency, the Departments argue that counting contracts instead of counting claims is appropriate because insurers should not have to look beyond "the face of a health plan's network contracts" to determine rates. (Departments' En Banc Br. 19.) Relying on "the ordinary practice in the insurance market" where "contracted

rates are generally negotiated prospectively," they argue that focusing on contracts instead of claims makes sense because the number of claims cannot be known "for certain" at the time when insurers and providers are negotiating contract rates. (Departments' En Banc Br. 19, 20.) But this argument rings hollow in the context of insurance companies, which base their entire business model on their ability to make highly educated estimates about the number of claims that will be asserted under their contracts—and so which keep detailed records of past claims. (*E.g.*, Blue Cross En Banc Br. 10 n.5 (citing "commercial claims data for approximately 150 million members of Blue Plans who had coverage during the period from January 2019 through June 2023").) The very reason insurance companies rely on actuaries is because "[a]ctuaries use mathematical means to generate *reliable predictions* regarding claims, losses, premiums, and other information in order to determine the appropriate level of reserves." *United Tchrs. Assocs. Ins. Co. v. MacKeen & Bailey Inc.*, 99 F.3d 645, 647 n.4 (5th Cir. 1996) (emphasis added). And insurance companies keep detailed records of the claims they have paid, so they have the ability to provide accurate numbers for the number of claims that were actually paid

under the contracts that were in place on January 31, 2019. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (defining "qualifying payment amount" as "the median of the contracted rates recognized by the plan or issuer, respectively . . . as the total maximum payment . . . under such plans or coverage, respectively, on January 31, 2019").

Relatedly, the Departments argue that "[t]he fact that Congress chose a single date for calculating the QPA demonstrates that it intended to take a snapshot of the contracts as they existed on that date to calculate the QPA for future use (adjusted for inflation)." (Departments' En Banc Br. 21.) But the idea of using a snapshot does not require counting contracts instead of counting claims. It is equally possible to take a snapshot of claims made under the contracts that existed on that same date, as insurance companies keep records of the number of claims they receive.

In addition to the two examples just provided, a third distortion existed under the July rule: ghost rates. Under the Departments' methodology before it was altered by the district court's decision, the Departments included rates for specialty services from providers who rarely or never actually perform those services, resulting in ghost rates

that lower the median rates. This concern highlights another reason that *claims*, rather than *contracts*, should be the focus when determining the median of the contracted rates—focusing on claims would prevent the inclusion of ghost rates that appeared in contracts but that were never actually provided and so never resulted in actual claims.

Under the ghost-rate practice, which was illuminated by an August 2022 study jointly commissioned by *Amici*, insurers include rates for certain specialty services in the contracts of different specialists who rarely or never bill for the service. Avalere Health, *PCP Contracting Practices and Qualified Payment Amount Calculation Under the No Surprises Act* (Aug. 2, 2022).[4] The Avalere study surveyed primary care physicians and found that 68% of the respondents contract for services they provide fewer than twice a year and that 57% of respondents contract for services they never provide. *Id.* at 4. Because these physicians rarely or never bill for the service, many of them do not negotiate the rate for these rarely or never-provided services in

---

[4] https://www.emergencyphysicians.org/siteassets/emphysicians/all-pdfs/2022-8-15-avalere-qpa-whitepaper_final.pdf.

their contracts; instead, they simply accept the low rate offered by the insurer. *Id.* Because the Department's method for calculating the median contracted rate fails to take into consideration the volume of the services billed, contracts for low-volume services artificially reduce the QPA. *See* Am. Coll. of Emergency Physicians Letter at 11; Am. Soc'y of Anesthesiologists Letter at 3; Am. Coll. of Radiology Letter at 2.

The Departments argue that the issue of ghost rates has been resolved. They maintain that ghost rates will not be included in QPA calculations because the district court invalidated the Departments' regulation that had allowed health plans to calculate QPAs across provider specialties, instead of calculating them separately by provider specialty, a ruling that the Departments are not challenging. (Departments' En Banc Br. 22–23 & n.6.) But as the appellees point out, this will not exclude all ghost rates because even providers in the same or similar specialties include rates for services they never provide. (TMA Appellees' Br. 32–33.)

In any event, an *amicus* supporting the Departments does defend using ghost rates. The Blue Cross Blue Shield Association contends that the appellees have offered "no evidence" to show that there really is "a

subset of services for which providers have negotiated non-zero rates, but that they would never actually provide." (Blue Cross En Banc Br. 13.) But the Avalere study shows just that: it found that 57% of the primary care physicians surveyed contracted for services that they never provide. Avalere Health, *PCP Contracting Practices* at 4.

Blue Cross also argues that ghost rates are not a significant issue because "out-of-specialty billing is common." (Blue Cross Br. 21.) Blue Cross supports this assertion by citing data showing that a certain subset of doctors—"radiologists, pathologists, hospitalists, emergency medicine providers, and anesthesiologists"—often bill for services outside their specialty (*id.*), suggesting that this data supports including out-of-specialty rates. But Blue Cross leaves the largest category of physicians out of this analysis: primary care physicians. As the following table from the Avalere study shows, primary care physicians significantly outnumber the types of providers highlighted by Blue Cross:

**Figure 1 — Total Number of Providers by Type**[13]

| Provider Type | Total Number of Providers |
|---|---|
| Primary Care Physicians | 496,065 |
| Anesthesiologists | 51,282 |
| Emergency Physicians | 60,204 |
| Radiologists | 48,823 |

Avalere Health, *PCP Contracting Practices* at 5 & n.13; *see also* https://www.kff.org/state-category/providers-service-use/physicians/ (providing current data for "Professionally Active Physicians" and "Professionally Active Specialist Physicians by Field"). Thus, even if emergency physicians, for example, submit claims outside their specialty, that does not justify relying on out-of-specialty rates in the numerous contracts for primary care physicians, where 57% of primary care physicians contract for services they never provide. Avalere Health, *PCP Contracting Practices* at 4.

As the examples from the Avalere Health study illustrate, the QPA simply does not reflect actual market conditions. *See* Declaration of Dr. Nicola, No. 6:22-cv-372, Doc. 53-2; Declaration of Dr. Young, No. 6:22-cv-372, Doc. 53-3; Declaration of Dr. Raley, No. 6:22-cv-372, Doc. 53-4; Am. Soc'y of Anesthesiologists Letter at 4. For these reasons, the

QPA does not reflect the true market value of items or services provided out of network.

Because the final rule will result in out-of-network payments that hew closely to the QPA, providers will not be fairly reimbursed for their out-of-network services under the methodology of the July rule.

## II.    The July rule incentivizes insurers to lower in-network rates, ultimately narrowing provider networks.

Because the July rule distorts the rates included in the QPA calculation, which is tied to the insurer's median in-network rates, the July rule inappropriately creates an incentive for insurers to reduce their in-network rates or to refuse to enter into agreements with providers.

Many members of Congress recognized this concern when addressing another one of the Departments' rules (the October 2021 interim final rule). In a letter dated November 5, 2021, 152 members of the U.S. House of Representatives criticized the Departments for "making the median in-network rate the default factor considered in the IDR process" and warned that this focus on the QPA "could incentivize insurance companies to set artificially low payment rates." Members of

Congress Letter.[5] The members of the U.S. House of Representatives stressed that tying out-of-network payments to the QPA could result in "narrow provider networks . . . jeopardiz[ing] patient access to care—the exact opposite of the goal of the [No Surprises Act]." *Id.* at 2. This concern is even more true in light of the July rule, which artificially lowers QPA calculations.

The concerns expressed by these 152 members of Congress unfortunately materialized. For instance, Blue Cross Blue Shield of North Carolina sent letters to providers demanding a reduction in contracted rates as a direct result of the Departments' October 2021 interim final rule. Declaration of Dr. Nicola ¶ 15 (stating that Blue Cross Blue Shield of North Carolina's "letter cites" the interim final rule "as justification to 'warrant a significant reduction in (our) contracted rates with Blue Cross NC' and warns of additional rate reductions once the qualifying payment amount is established"); Declaration of Dr. Raley ¶ 18 (noting that Blue Cross Blue Shield of North Carolina's letter states that the "IFR provides 'enough clarity to warrant a

---

[5] https://www.acep.org/globalassets/new-pdfs/advocacy/2021.11.05-no-surprises-act-letter.pdf.

significant reduction in [Wake Emergency Physicians, P.A.'s] contracted rate with Blue Cross NC'"). The letters from Blue Cross Blue Shield of North Carolina further state that if providers do not accept the rate reduction in light of the Departments' interim final rule, their contracts will be "quickly terminated." *See* Declaration of Dr. Nicola ¶ 15; Declaration of Dr. Raley ¶ 18.

The July rule is one of the factors leading to these rate reductions, as its calculation methodology decreases QPA amounts and so contributes to the downward pressure on rates. By empowering insurers to reduce in-network contracted rates, it threatens existing contractual arrangements with providers and facilities.

One of the Departments' insurance-industry amici argues that the challenged rules must not be artificially deflating the QPA below market levels because "payment for the vast majority of out-of-network services is resolved without challenge, most of the time via medical providers' acceptance of payments at or around the QPA, with no need for IDR." (AHIP En Banc Br. 6–7.) According to AHIP, "more than 93% of out-of-network claims from 2023 subject to the Act are resolved voluntarily in QPA-centered negotiations." (AHIP En Banc Br. 8.) But

in a study AHIP itself cites, it admits that "[t]he number of those claims disputed by providers or facilities continues to outpace estimates." America's Health Insurance Plans & Blue Cross Blue Shield Ass'n (BCBSA), *No Surprises Act Continues to Prevent More than 1 Million Surprise Bills Per Month*, While Provider Networks Grow (Jan. 2024), http://tinyurl.com/4majdzam. The AHIP and Blue Cross study admits that the number of IDR proceedings initiated between mid-April 2022 and June 2023 was "nearly fourteen times" greater than the agencies' original estimate of 17,000 proceedings annually. *Id.* at 1. In fact, "AHIP and BCBSA estimate there were almost 670,000 claims submitted to IDR between January 1st and September 30, 2023 alone, with no indication of having peaked." *Id.* That number for *nine months* in 2023 is *39 times* the *annual* estimate of 17,000 IDR proceedings. And the AHIP study indicates that even these numbers are undercounting the number of disputed claims, because "[a] single dispute . . . could represent a batched dispute of many claims or a group of several claims for a single visit." *Id.* Thus, contrary to AHIP's suggestion that the QPA calculations must be close to fair market rates because few providers

are disputing them, AHIP's own study shows that numerous providers are disputing QPA-based claims.

## III. The July rule will result in under-compensation of care, which may incentivize the consolidation of practices, undermining market competition.

Because providers will not be fairly reimbursed for their out-of-network services, the July rule will impose serious financial pressures on all providers that render items and services out-of-network. As the American Medical Association explained in its comment letter on a related interim final rule, the financial strain caused by decreasing the out-of-network rate will disproportionately affect small, independent practices and rural practices that are already reeling financially from the COVID-19 pandemic. *See* Am. Med. Ass'n Letter at 7–9.[6] These practices may have no choice but to sell their practices to larger corporate entities—a phenomenon that occurred in California after the State passed its surprise medical billing law. Cal. Health & Safety Code § 1371.31.

---

[6] https://downloads.regulations.gov/CMS-2021-0156-5178/attachment_1.pdf.

Like the No Surprises Act, California's surprise medical billing law requires insurers to make interim payments to out-of-network providers who could then begin the California IDR process if they felt the rate was inadequate. *See* Cal. Health & Safety Code § 1371.31. But the interim rate was chosen as the "reasonable rate" 98% of the time, essentially functioning as a benchmark rate. Letter from Cal. Med. Ass'n Letter at 10.[7] Thus, California's IDR process favors rates unilaterally set by insurers.

A RAND corporation study showed that the California law "changed the negotiation dynamics between hospital-based physicians and payers," resulting in leverage shifting "in favor of payers" and incentivizing them to "lower or cancel contracts with rates higher than their average as a means of suppressing [out-of-network] prices." Erin L. Duffy, *Influence of Out-of-Network Payment Standards on Insurer-Provider Bargaining: California's Experience*, 25 Am. J. Managed Care e243 (2019).[8] These drastic changes in negotiating power and lower

---

[7] https://downloads.regulations.gov/CMS-2021-0117-7408/attachment_1.pdf.

[8] https://www.ajmc.com/view/influence-of-outofnetwork-payment-standards-on-insurer-provider-bargaining-californias-experience.

rates accelerated "consolidation and exclusive contracting with facilities" among hospital-based specialists. *Id.* The California bill was cited by several healthcare stakeholders as the factor that "clearly put [consolidation efforts] over the edge." *Id.*

Routine under-compensation of out-of-network care as a result of the final rule similarly threatens the viability of many smaller and independent physician practices and incentivizes the consolidation of practices. This is particularly problematic in underserved areas already struggling with accessibility to care.

## IV. Market disruptions and narrower provider networks stemming from the July rule will harm patients in underserved areas struggling with accessibility.

In the No Surprises Act, Congress directed the Departments, in setting out geographic areas for this methodology, to take "into account access to items and services in rural and underserved areas . . . ." 42 U.S.C. § 300gg-111(a)(2)(B)(iii). But the Departments' methodology will harm these areas. The July rule will result in smaller provider networks and the consolidation of practices, which will adversely impact patients' access to care. Patients who are unable to access care from in-network providers incur significantly higher out-of-pocket costs and

therefore may delay care, seek care from an in-network provider in the wrong specialty, rely on emergency departments to receive care, or forgo care all together. Simon F. Haeder, *Inadequate in the Best of Times: Reevaluating Provider Networks in Light of the Coronavirus Pandemic*, 12 World Med. & Health Pol'y 282, 284 (2020) (noting how "[t]hese issues raise concerns, even under relatively normal circumstances" but become "exacerbated" when considering the effects of the COVID-19 pandemic).[9]

Underserved communities that are already struggling with access to care are disproportionally impacted by narrowing provider networks. In the previously referenced letter from 152 members of the U.S. House of Representatives, the Representatives warned that a rule favoring the QPA could "have a broad impact on reimbursement for in-network services, which could exacerbate existing health disparities and patient access issues in rural and urban underserved communities." Members of Congress Letter at 2. Because the Departments' July final rule will result in lower QPA calculations and so lower reimbursements to

---

[9] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7436480/ pdf/WMH3-12-282.pdf.

providers, the Members' concerns regarding access to care remain valid. Members of Congress Letter at 1–2.

Moreover, the July rule's adverse impact on networks is contrary to longstanding efforts by the Departments to preserve or bolster network adequacy. *See, e.g.*, <u>45 C.F.R. § 156.230</u> (requiring each qualified health plan issuer that uses a provider network to maintain "a network that is sufficient in number and types of providers, including providers that specialize in mental health and substance use disorder services, to ensure that all services will be accessible without unreasonable delay"). If aggressive actions like Blue Cross Blue Shield of North Carolina's become commonplace, Members' fears of insurers providing lower in-network payment rates will be realized and the IDR process will be skewed to undercompensate providers consistently. *See* Declaration of Dr. Nicola ¶ 15 (stating that Blue Cross Blue Shield of North Carolina's "letter cites the [interim final rule] as justification to 'warrant a significant reduction in (our) contracted rates with Blue Cross NC' and warns of additional rate reductions once the qualifying payment amount is established"); Declaration of Dr. Raley ¶ 18 (noting that Blue Cross Blue Shield of North Carolina's letter states that the

interim final rule "provides 'enough clarity to warrant a significant reduction in [Wake Emergency Physicians, P.A.'s] contracted rate with Blue Cross NC'").

Routine under-compensation will threaten the viability of many smaller and independent physician practices that provide care to underserved areas already struggling with accessibility to care. Ultimately, losing providers in these areas will significantly harm patients and actively work against the Departments' stated goals. The final rule, therefore, threatens the stability of the nation's already fragile health care system by empowering insurers to cut payments both to in-network and out-of-network providers, leading to decreased access to care.

## CONCLUSION

For these reasons, *Amici* respectfully ask that the Court affirm the decision of the district court.

Respectfully submitted,

Dated:  August 25, 2025

By  */s/ Aaron D. Lindstrom*

JEREMY LEWIN

**BARNES & THORNBURG LLP**

ONE N. WACKER DRIVE, SUITE 4400

CHICAGO, IL 60606-2833

312.214.8833

JEREMY.LEWIN@BTLAW.COM

AARON D. LINDSTROM

**BARNES & THORNBURG LLP**

171 MONROE AVE. NW, SUITE 1000

GRAND RAPIDS, MI 49503-2694

616.742.3931

AARON.LINDSTROM@BTLAW.COM

*ATTORNEYS FOR AMICI CURIAE,*
*THE AMERICAN SOCIETY OF*
*ANESTHESIOLOGISTS, THE AMERICAN*
*COLLEGE OF EMERGENCY*
*PHYSICIANS, AND THE AMERICAN*
*COLLEGE OF RADIOLOGY*

# CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Federal Rules of Appellate Procedure 32 (a)(7)(C) and 29(a)(5) and to Fifth Circuit Rule 29.3, the attached amici curiae brief is proportionately spaced, has a typeface of 14 points or more, and contains 5,118 words.


Dated:  August 25, 2025          **BARNES & THORNBURG LLP**

                                 BY  */s/ Aaron D. Lindstrom*

                                 AARON D. LINDSTROM
                                 **BARNES & THORNBURG LLP**
                                 171 MONROE AVE. NW, SUITE 1000
                                 GRAND RAPIDS, MI 49503-2694
                                 616.742.3931
                                 AARON.LINDSTROM@BTLAW.COM

                                 *ATTORNEYS FOR AMICI CURIAE,*
                                 *THE AMERICAN SOCIETY OF*
                                 *ANESTHESIOLOGISTS, THE AMERICAN*
                                 *COLLEGE OF EMERGENCY PHYSICIANS, AND*
                                 *THE AMERICAN COLLEGE OF RADIOLOGY*