No. 23-40605

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

Texas Medical Association; Tyler Regional Hospital, L.L.C.; Dr. Adam Corley,
Plaintiffs-Appellees,

v.

United States Department of Health and Human Services; Office of Personnel Management; United States Department of Labor; United States Department of Treasury; Robert F. Kennedy, Jr., Secretary, U.S. Department of Health and Human Services, in his official capacity; Scott Kupor, in his official capacity as the Director of the Office of Personnel Management; Scott Bessent, Secretary, U.S. Department of Treasury, in his official capacity; Lori Chavez-DeRemer, Secretary, U.S. Department of Labor, in her official capacity,
Defendants-Appellants.

LifeNet, Incorporated; Air Methods Corporation; Rocky Mountain Holdings, L.L.C.; East Texas Air One, L.L.C.
Plaintiffs-Appellees,

v.

United States Department of Health and Human Services; Office of Personnel Management; United States Department of Labor; United States Department of Treasury; Robert F. Kennedy, Jr, Secretary, U.S. Department of Health and Human Services, in his official capacity; Scott Kupor, in his official capacity as the Director of the Office of Personnel Management; Scott Bessent, Secretary, U.S. Department of Treasury, in his official capacity; Lori Chavez-DeRemer, Secretary, U.S. Department of Labor, in her official capacity,
Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Texas

## EN BANC REPLY BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

JAY R. COMBS
*Acting United States Attorney*

COURTNEY L. DIXON
KEVIN B. SOTER
*Attorneys, Appellate Staff*
*Civil Division, Room 7222*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

ARGUMENT ....................................................................................................... 3

I.    Each of the relevant aspects of the rule's QPA methodology comports with the No Surprises Act. ........................................................................ 3

    A.    The rule permissibly directs health plans to include contracted rates in the QPA calculation regardless of the number of claims paid at that contracted rate. ............................................................. 4

    B.    The rule permissibly directs health plans to exclude bonus and incentive payments from the QPA calculation. ........................... 13

    C.    The rule permissibly directs health plans to exclude one-off, case-specific agreements from the QPA calculation. ........................... 21

II.    The district court erred in granting universal relief. ................................. 29

    A.    The APA does not authorize courts to depart from traditional equitable principles. ........................................................................ 29

    B.    This Court should remand for the district court to conduct an appropriate remedial analysis in the first instance. ...................... 41

CONCLUSION ................................................................................................. 44

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) ...........30

*Association of Air Med. Servs. v. HHS,*
No. 21-cv-3031, 2023 WL 5094881 (D.D.C. Aug. 9, 2023) ............... 25, 40

*Braidwood Mgmt., Inc. v. Becerra,*
104 F.4th 930 (5th Cir. 2024),
*rev'd and remanded,* 145 S. Ct. 2427 (2025) ........ 37

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,*
566 U.S. 399 (2012) ............ 6-7

*Cargill v. Garland,*
57 F.4th 447 (5th Cir. 2023) ........ 37

*City of Dallas v. FCC,*
118 F.3d 393 (5th Cir. 1997) ........ 18

*Corner Post, Inc. v. Board of Governors of the Fed. Rsrv. Sys.,*
603 U.S. 799 (2024) ........ 37

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ........ 12

*General Land Office v. Biden,*
71 F.4th 264 (5th Cir. 2023) ........ 40

*Gill v. Whitford,*
585 U.S. 48 (2018) ........37

*Heckler v. Chaney,*
470 U.S. 821 (1985) ........ 38

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,*
572 U.S. 559 (2014) ........41

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ........ 4, 9

*Marx v. General Revenue Corp.,*
568 U.S. 371 (2013) ........ 7

*National Mining Ass'n v. U.S. Army Corps of Eng'rs*,
   145 F.3d 1399 (D.C. Cir. 1998) ................................................................. 34

*Seago v. O'Malley*,
   91 F.4th 386 (5th Cir. 2024), *reh'g denied* ........................................... 6

*Seven Cnty. Infrastructure Coal. v. Eagle County*,
   145 S. Ct. 1497 (2025) ...................................................................... 10-11

*Southwestern Elec. Power Co. v. EPA*,
   920 F.3d 999 (5th Cir. 2019) ................................................................... 21

*Taylor, In re*,
   655 F.3d 274 (3d Cir. 2011) ................................................................... 36

*Texas Med. Ass'n v. HHS*,
   110 F.4th 762 (5th Cir. 2024) ......................................................... 23, 25

*Tompkins v. Cyr*,
   202 F.3d 770 (5th Cir. 2000) ................................................................. 36

*Trump v. CASA, Inc.*,
   145 S. Ct. 2540 (2025) ............................................. 29-30, 33, 36, 37, 38

*United States v. Lumbermens Mut. Cas. Co.*,
   917 F.2d 654 (1st Cir. 1990) ................................................................. 36

*United States v. Texas*,
   599 U.S. 670 (2023) ........................................................... 30, 31, 32, 38

*Warner v. Talos ERT, L.L.C.*,
   133 F.4th 412 (5th Cir. 2025) ................................................................. 41

*Yee v. City of Escondido*,
   503 U.S. 519 (1992) ............................................................................... 35

**Statutes:**

Administrative Procedure Act (APA):
   5 U.S.C. § 551(6) ................................................................................... 36
   5 U.S.C. § 551(13) ................................................................................. 35
   5 U.S.C. § 702 ........................................................................................ 34
   5 U.S.C. § 703 ........................................................................... 30, 31, 32, 33
   5 U.S.C. § 706(2) ....................................................................... 30, 31, 32, 34

28 U.S.C. § 2342 ................................................................ 33

29 U.S.C. § 1104(a)(1)(A) ................................................. 25

42 U.S.C. § 300gg-111(a)(1) ............................................. 21

42 U.S.C. § 300gg-111(a)(2)(B) .................................... 16, 17

42 U.S.C. § 300gg-111(a)(2)(B)(i) .................................... 1, 4

42 U.S.C. § 300gg-111(a)(3)(E)(i) .................................... 1, 43

42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) ..................... 3, 4, 5, 6, 7, 9, 13, 14, 24, 29

42 U.S.C. § 300gg-111(a)(3)(F)(ii) .................................... 28

42 U.S.C. § 300gg-111(b)(2)(A)(i) .................................... 29

42 U.S.C. § 300gg-111(c)(5)(C)(ii) .................................... 20

42 U.S.C. § 300gg-111(c)(2)(A) ........................................ 43

42 U.S.C. § 300gg-111(c)(5)(D) ....................................... 24

42 U.S.C. § 300gg-112(a) .................................................. 21

42 U.S.C. § 300gg-112(b)(5)(C)(iii) .................................. 24

## Legislative Materials:

92 Cong. Rec. 2159 (1946) ...............................................32

H.R. Rep. No. 116-615, pt. 1 (2020) ............................. 23, 24

S. Doc. No. 79-248 (1946) ................................................31

## Other Authorities:

William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*,
    137 Harv. L. Rev. 153 (2023) ..................................... 35

John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*,
    40 Yale J. on Regul. Bull. 119, 120 (2023)........................32

*Rate*, Oxford English Dictionary,
  https://www.oed.com/dictionary/rate_n1?tab=meaning_and_
  use#26707259 (last visited Aug. 29, 2025) ...................................................25

*Requirements Related to Surprise Billing; Part I*,
  86 Fed. Reg. 36,872 (July 13, 2021) ..................................... 4, 12, 15, 16, 19, 26, 27, 28

Mila Sohoni, *The Past and Future of Universal Vacatur*,
  133 Yale L.J. 2305 (2024) ............................................................................. 32

U.S. Dep't of Just., *Attorney General's Manual on the Administrative
  Procedure Act* (1947) ...............................................................................32

15A *Wright & Miller's Federal Practice & Procedure* § 3904 (3d ed.),
  Westlaw (database updated May 21, 2025) ...............................................36

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress enacted the No Surprises Act (Act) to shield patients from the often-crippling effects of common types of surprise medical bills.  To do so, it established a system that caps a patient's potential liability for certain care provided by out-of-network providers while allowing providers to obtain additional compensation from the patient's health plan without the market-distorting effects of being able to surprise bill the patient directly.  Congress articulated the general framework for the Act's operation but entrusted the Department of Health and Human Services, the Department of Labor, and the Department of the Treasury (the Departments) with responsibility for fleshing out several critical aspects of the scheme through implementing regulations.  Among other things, Congress tasked the Departments with establishing the methodology for determining the "qualifying payment amount" or "QPA," a figure that often determines the maximum amount that a patient can be required to pay for covered items and services, and which is also a relevant factor in assessing how much additional compensation a provider should receive from the patient's health plan.  *See* 42 U.S.C. § 300gg-111(a)(2)(B)(i) (setting a deadline by which the Departments must "establish through rulemaking" the "methodology" for "determin[ing] the qualifying payment amount"); *id.* § 300gg-111(a)(3)(E)(i) (incorporating that "methodology" into the statutory definition of the QPA).

In discharging their responsibility to implement the Act, the Departments made the types of methodological determinations assigned to them by Congress.  The

challenged regulations adhere to the text of the statute, draw on the Departments' expertise concerning the operation of and customary practice within the health insurance market, take proper account of the comparative administrative burdens associated with alternative approaches to implementing the statute, and give due weight to the Act's purpose of eliminating the deleterious effects of surprise medical billing on patients and the health care system as a whole. The resulting methodology devised by the Departments is administrable and enables the QPA to fulfill its statutory function as a fair proxy for the negotiated market value of a given service, without diluting the Act's protections by artificially inflating the QPA and thereby exposing patients to higher bills. Plaintiffs' response briefs repeat the district court's mistake of misreading isolated words in the statute to require a QPA methodology that is unworkable and at odds with the very purpose for which the QPA was designed. Plaintiffs are wrong to assert that the Departments' reasonable methodological judgments fall outside the boundaries set by the Act, and their alternative arguments that the challenged provisions are arbitrary and capricious are equally without merit.

Independent of the merits, the district court's remedy of universal vacatur— across-the-board, for every provision plaintiffs successfully challenged—was erroneous. The text, structure, and contemporaneous understanding of the Administrative Procedure Act (APA) make clear that it does not authorize the radical departure from traditional equitable remedies that plaintiffs ascribe to it. Plaintiffs'

view of the APA encroaches on the separation of powers, invites forum shopping, and interferes with the thoughtful percolation of important questions of federal law. This case presents an ideal opportunity for the en banc Court to rein in the mistaken view that this form of sweeping relief is available by "default" in every case brought under the APA.

## ARGUMENT

## I.     Each of the relevant aspects of the rule's QPA methodology comports with the No Surprises Act.

The merits questions before the en banc Court concern the Departments' regulations governing the methodology for computing the QPA, which, as we have explained, is a rough proxy for the rate that in-network providers receive for furnishing a given item or service for a patient enrolled in a given health plan. Congress specified certain requirements as to how the QPA is to be calculated. The calculation must generally be based on "the median of the contracted rates recognized by [a given] plan . . . on January 31, 2019," adjusted for inflation. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). It reflects "the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) under [the] plan[] or coverage." *Id.* The QPA for a given service should consider only the contracted rates "for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished." *Id.* And it must be

3

computed "consistent with the methodology established by the Secretary." *Id.*; *see also id.* § 300gg-111(a)(2)(B)(i) (requiring the Departments to establish a methodology for computing the QPA).

The three aspects of the QPA calculation at issue in this appeal are consistent with the text and purpose of the No Surprises Act. As the Departments' opening brief demonstrates, those provisions fall well within "the boundaries of the delegated authority" that Congress expressly provided to the Departments. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (alterations and quotation marks omitted). Plaintiffs fail to show otherwise.

> **A.     The rule permissibly directs health plans to include contracted rates in the QPA calculation regardless of the number of claims paid at that contracted rate.**

1. As the Departments demonstrated in their opening en banc brief (at 19-25), the rule reasonably interprets the statutory requirement that the QPA be based on the "median of the contracted rates recognized by the plan or issuer" for a particular service to mean that the calculation should look to the rates appearing on the face of a health plan's contracts that were in force on January 31, 2019, "regardless of the number of claims paid at that contracted rate." *Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36,872, 36,888-89 (July 13, 2021). The plain language of the statute focuses on the rates that a plan has "contracted" to pay, not the frequency with which a provider has billed a given rate. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). That approach is also administrable, directing plans to use readily available

information within their possession. And it tracks insurance industry contracting practice, where rates are normally negotiated on a prospective basis. Thus, when a provider and a plan agree to a particular rate for a particular service, neither party knows with certainty how many times, if at all, that provider will actually perform that service over the course of the contract. But both sides accept that the agreed-to rate will govern whenever the service is furnished. The Departments' approach to the QPA calculation, which focuses on the rates agreed to by the parties ex ante, thus mirrors the way rates are negotiated in the market.

Plaintiffs insist that this approach is foreclosed by the statutory text and that the statute instead requires health plans to look beyond the four corners of their contracts and exclude a subset of their contracted rates from their calculations— namely, those associated with a service that a given provider happened not to perform pursuant to that contract over an unspecified time frame. There is no merit to that contention. Plaintiffs rely on the statutory requirement that the QPA be based on the contracted rates "for the same or a similar item or service *that is provided by a provider* in the same or similar specialty and provided in the geographic region in which the item or service is furnished." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). But as the panel explained, the "plain meaning of 'provide'" supports the Departments' approach. Op. 10. "[T]he Act requires only that a given service be 'available,' regardless of whether, or how many times, it has actually been performed." *Id.* (citation omitted). When a medical provider agrees to a contracted rate for a specified

5

service with a health plan, the provider is making that service "available" in the sense

relevant to the Act's QPA definition. *Contra* TMA Br. 29.

Moreover, a statutory term "must be understood in the context of the phrase in

which it appears." *Seago v. O'Malley*, 91 F.4th 386, 392 (5th Cir. 2024), *reh'g denied*.

Plaintiffs pluck the phrase "provided by a provider" from its context, but the relevant

provision appears in a phrase that, taken as a whole, makes clear that Congress was

requiring QPAs to be separately derived based on the specialty of the provider and

the geographic region in which the service is furnished. 42 U.S.C. § 300gg-

111(a)(3)(E)(i)(I) (referring to contracted rates "for the same or similar item or service

that is provided by a provider in the same or similar specialty and provided in the

geographic region in which the item or service is furnished"). The truncated phrase

repeatedly quoted by plaintiffs (*see* TMA Br. 2, 3, 5-6, 12, 23-24, 27-28) fails to

accurately reflect the entire provision's natural meaning.

Plaintiffs therefore err in suggesting (TMA Br. 29-30) that if Congress had

intended to allow the Departments to direct that QPAs should be calculated based

only on contracted rates, it would have excluded the words "is provided."

Considering the statutory provision as a whole, Congress in fact chose a natural

phrase to encompass rates for services that are contracted to be provided in the same

region and by a provider in the same or similar specialty. Plaintiffs posit other ways

that Congress might have drafted the statute, but "the mere possibility of clearer

phrasing cannot defeat the most natural reading of a statute." *Caraco Pharm. Labs.,*

*Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 416 (2012). And in any event, "[t]he canon against surplusage is not an absolute rule, *Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013), particularly where, as here, it is plaintiffs' interpretation that would be a far less natural way to understand the statutory text. If Congress had intended to create a substantial exception to the statute's otherwise exclusive focus on "contracted rates," it surely would have done so more expressly. Had Congress intended plaintiffs' meaning, it could easily have selected clearer language to articulate that a rate should be included only if it was actually used to pay a provider for having performed the specific item or service. *See* Opening Br. 22.

If that were not enough, plaintiffs fail to explain how their reading makes sense in light of the surrounding statutory context. As the Departments noted, the statute directs that QPAs be based not on rates paid over a specified period but rather the contracted rates recognized on a specific date, January 31, 2019, demonstrating that Congress intended that the plans take a snapshot of the contracts as they existed on that date to calculate QPAs for future use. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Plaintiffs argue (TMA Br. 30-31) that that statutory date is relevant to when a given rate must be "recognized" in a contract but that the statute also contemplates an inquiry into whether a claim has been paid pursuant to that rate over some period left entirely unspecified. While they suggest that the Departments may be able to determine a reasonable period to look back or forward in implementing the statute, they cannot point to anything in the statute that might guide this inquiry or any

7

indication why Congress would have omitted any mention of this period if Congress had actually contemplated the inquiry that plaintiffs assert is required.

And even if such a period could be determined, the administrability considerations here are substantial. At a minimum, plaintiffs' approach would seem to require plans to look beyond their contracted rates and cross-check every single rate against claims data. But even this likely understates the problems associated with such an approach. Plaintiffs suggest (TMA Br. 34) that plans maintain the data necessary to determine whether a provider has submitted a claim for a given service over a particular period. But a plan's claims data would not reveal whether the provider has submitted *any* claim for a given service over a particular period—only what services were performed for the plan's own participants or beneficiaries. A heart surgeon who performed a particular heart surgery on 10 Aetna patients during a given window may have never performed that particular surgery on a Blue Cross patient during the same window. Presumably, it is common ground that the heart surgeon in this hypothetical has "provided" the surgery. Yet under plaintiffs' interpretation, if Blue Cross has a contract with that provider that includes a contracted rate for that particular heart surgery, the plan would have no way of knowing whether that rate could be included in the QPA.

Plaintiffs further argue (TMA Br. 33-34) that policy concerns regarding the burdens that their approach would impose on the QPA calculation process should not permit departure from the terms Congress chose. But for the reasons explained, the

8

Departments' rule does not depart from the statutory text. And to the extent plaintiffs assert that any consideration of the burden imposed by the rule is improper, it would be unusual for Congress to task an agency with crafting a regulatory mandate applicable to private companies (here, the private health plans responsible for computing QPAs) and expect the agencies to ignore the feasibility and the relative burdens associated with various alternative approaches to implementing the statute. *See Loper Bright*, 603 U.S. at 394 (explaining that a "statute's meaning may well be that the agency is authorized to exercise a degree of discretion," such as when a statute "expressly delegate[s] to an agency the authority to give meaning to a particular statutory term" (quotation marks omitted)). Plaintiffs identify nothing in the statute or its legislative history that suggests Congress intended to deny the Departments the authority to account for administrability when developing a methodology for computing QPAs.

In any case, it is plaintiffs' reading that imports an atextual limitation into the text of the statute based on a purported policy concern. Plaintiffs insist that their reading is necessary to prevent the incorporation of so-called "ghost rates" into the calculation. As plaintiffs acknowledge, however, such policy concerns are not a basis for failing to give a statute its natural reading. And in any event, as the Departments explained (*see* Opening Br. 22-24), the statute separately addresses those concerns through the requirement that the QPA calculation be based on the rates from providers "in the same or similar specialty." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).

Plaintiffs wrongly suggest (TMA Br. 32) that this is a post hoc justification.  But the Departments specifically noted the concern that certain specialties may not have an incentive to aggressively negotiate rates for services they do not provide regularly and noted that, where that occurs, the lower rates agreed to by out-of-specialty providers would not be included in the QPA applicable to in-specialty providers.  *See* FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55, at 16-17, 17 n.29 (Aug. 19, 2022) (Aug. FAQs) (ROA.413-14).  Thus, for example, if a dermatologist's contract with a plan happened to contain an artificially low rate for performing heart surgery, that rate would not factor into the QPA for heart surgeries performed by heart surgeons.  And as the panel explained, this aspect of the rule is "reasonably discernible" from "the text of the Act itself." Op. 11 n.9.  In addition, the Departments have not challenged the district court's conclusion that the statute requires calculating rates by specialty even when there is no indication that they differ materially across specialties.  *See* Opening Br. 23 n.6.  As a result, it is now even less likely that the concern plaintiffs raise about "ghost rates" could result in lower QPAs for providers who regularly provide a particular service.

2.  Plaintiffs argue as an alternative ground for affirming the district court's judgment that the Departments' treatment of this issue was arbitrary and capricious. The Court's review of this argument is "deferential": when, as here, "an agency exercises discretion granted by a statute," "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and

reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle County*, 145 S. Ct. 1497, 1511 (2025). To the extent this argument just repackages plaintiffs' misreading of the statutory language, it fails for the reasons discussed above. Plaintiffs also reiterate (TMA Br. 31-32) their concern that certain rates may not reflect the actual market rate for a particular service given a purported lack of incentive for a provider to negotiate the rates for certain services based on that provider's expectations of how often he or she will perform those services. But as noted above, whatever a provider's expectations at the time a contract is entered into, the agreed-to rate will govern any provision of a particular service to a plan member over the course of a contract, and it is reasonable for the Departments to conclude that all such rates should be included in the QPA calculation. That is all the more true given the recognized variability in whether a provider that may very well expect to perform a service in fact happens to do so in the particular period of time that a contract covers. *See* Blue Cross Blue Shield Ass'n Amicus Br. 10-11 (documenting data reflecting variation in whether providers that have submitted claims for performing a particular service happen to do so in a particular calendar year).

Plaintiffs suggest (TMA Br. 34) that the Departments' argument that it is reasonable to direct plans simply to look to rates reflected on the face of their contracts in calculating QPAs represents a post hoc rationalization as well. But that cannot be squared with the repeated references in the rule's preamble to basing the QPA on a plan's contracts themselves, rather than on an analysis of services

11

performed in the past. *See* 86 Fed. Reg. at 36,889 (explaining that the QPA is calculated by "arranging in order from least to greatest the contracted rates of all plans of the plan sponsor" and "the rate negotiated under a contract constitutes a single contracted rate regardless of the number of claims paid at that contracted rate"). At the very least, "the agency's path may reasonably be discerned" from that explanation. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quotation marks omitted).

Plaintiffs also assert (TMA Br. 33) that the requirement that QPAs be calculated based on provider specialty affords insufficient protection against artificially low QPAs because, even within a specialty, providers may have different expectations regarding their likelihood of performing particular services. But that concern does not establish that the Departments' approach was unreasonable. Indeed, it is unclear how much that concern applies to the emergency medicine context, for example, where it is in a provider's interest to negotiate rates even for services that he or she does not anticipate performing for most patients treated in the emergency room. *See* Blue Cross Blue Shield Ass'n Amicus Br. 8-9. And in any event, plaintiffs' example—suggesting that obstetrician-gynecologists whose practices differ in terms of the services that they typically provide are not appropriate comparators whose rates should be included in a single QPA for delivery services—demonstrates how unworkable and atextual their reading of the statute is. On plaintiffs' view, even with respect to an obstetrician-gynecologist agreeing to rates for delivery services, a plan

12

would not be able to calculate a QPA based on such rates unless it had some indication that the provider really meant to perform the service at the agreed-to rate; they suggest no basis on which a plan is to make such a determination, other than the happenstance of whether a health plan's data suggests that a particular provider has performed such a service over a statutorily undefined period. The statute, however, requires no such thing. Instead, it simply specifies that the QPA is to be calculated based on the rates of "a provider in the same or similar specialty." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).

Finally, while plaintiffs fault (TMA Br. 35) the Departments for excluding $0 rates from the QPA calculation, but not other supposedly too low rates, the Departments appropriately recognized that, where a $0 amount is included in a fee schedule as a placeholder for a covered item or service that a provider does not provide, the $0 placeholder "does not represent a contracted rate." Aug. FAQs 17 & n.29 (ROA.414). The same cannot be said of other rates that plaintiffs simply think are below the market rate.

**B.    The rule permissibly directs health plans to exclude bonus and incentive payments from the QPA calculation.**

1. As the Departments also explained (Opening Br. 24-27), the rule reasonably excluded from the QPA calculation various incentive-based or retrospective payments or payment adjustments, including bonuses or penalties. Such retrospective adjustments are rarely tied to a particular item or service, but rather are generally

based on other metrics, such as quality or other performance standards, assessed at an aggregate level. As the Departments noted, moreover, calculating the QPA without taking such adjustments into account is consistent with the manner in which a patient's cost-sharing amount is customarily determined at or near the time a service is furnished. In other words, payment adjustments are not normally relevant to the determination of how much a patient is expected to pay. A patient with a 20% co-insurance obligation will typically pay $200 on a provider's $1,000 base contracted rate, even if the provider ultimately also earns a further bonus that could be attributable, at least in part, to the provider's care for that patient. Because a key function of the QPA is to serve as the metric for determining the maximum amount a patient can be required to pay for a service covered by the Act (*see* Opening Br. 7-8), the Department acted reasonably in requiring that the QPA be determined in a manner that mimics typical industry practice for determining patient cost-sharing responsibilities.

Plaintiffs assert (TMA Br. 36-37) that the Departments' interpretation is inconsistent with the statute's directive that the QPA for a particular item or service be based on the rates recognized by a health plan as "the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) . . . for the same or a similar item or service." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). But, as the Departments made clear in their opening brief (at 27), the "total maximum payment" for a given "item or

14

service" is naturally understood to mean the highest value a plan has contracted to pay for that particular item or service, including both any cost-sharing amount paid by the patient and the amount paid by the plan. It does not naturally include bonus and incentive payments rarely tied to a rate for a particular service. *See* 86 Fed. Reg. at 36,893-94.

Amicus briefs filed by America's Health Insurance Plans and Blue Cross Blue Shield Association outline the common forms these various alternative payment models may take, and across the models, retrospective payments or adjustments are made in such a way that cannot be naturally linked to a particular service so as to be considered part of the "total maximum payment" for that service. *See* America's Health Ins. Plans Amicus Br. 12-15 (noting that such models may encompass things like adjustments based on a provider group's overall performance or savings generated across multiple patients and services); Blue Cross Blue Shield Ass'n Amicus Br. 16-22 (similarly noting that alternative payment models often incorporate performance-based payments tied to outcomes across a number of patients and services as well as payments for things like general infrastructure investments or performing data-reporting services). These features underscore that the Departments acted reasonably in determining that such payments were properly excluded from the rate for a particular service and consequently should be excluded from the QPA calculation. While here too plaintiffs suggest (TMA Br. 38) that the Departments are offering a post hoc rationalization, they simply ignore the relevant discussion in the

15

rule's preamble. As the Departments explained, bonus and incentive payments are rarely tied to specific contracted rates for particular items and services; rather, these payments often arise in situations in which plans are paying providers a bundled payment for multiple services or a fixed fee per plan member, or when they are paying a lump sum to promote certain benefits over time. *See* 86 Fed. Reg. at 36,893-94.

Plaintiffs argue (TMA Br. 40-41) that a payment need not be directly linked to a service to be included in the QPA calculation, citing the Departments' authority to account through rulemaking for "payments that are made by [a] plan . . . that are not on a fee-for-service basis." 42 U.S.C. § 300gg-111(a)(2)(B). But, as the panel recognized (Op. 15), that provision highlights that Congress conferred discretion on the Departments in determining how to account for such payments: Congress said the Departments "shall take into account" such payments when crafting the QPA methodology, 42 U.S.C. § 300gg-111(a)(2)(B) and thereby left it to the Departments to determine precisely how such payments would be accounted for. The Departments then reasonably exercised this expressly delegated authority in determining that plans employing a non-fee-for-service model should generally calculate QPAs based on an underlying fee schedule rate or similar "derived amount" that a health plan may have established for cost-sharing or other internal accounting purposes. 86 Fed. Reg. at 36,893. Bonus payments fall outside that approach for the same reason that they cannot naturally be linked to a particular service under a fee-for-service model. And while plaintiffs posit (TMA Br. 39) hypothetical examples in

16

which they assert that a particular bonus could be linked to a particular service, it is unclear on their examples' own terms whether a bonus for providing a certain service a specified number of times represents a payment for providing that service in a particular instance, even assuming that an incentive payment takes this form. In any event, the Departments did not act unreasonably in using their express authority under the No Surprises Act to establish a QPA-calculation methodology that comports with the general manner in which both fee-for-service and non-fee-for-service payment models treat retrospective adjustments notwithstanding the hypothetical rare exceptions plaintiffs posit.

Plaintiffs take issue (TMA Br. 41-42) with the panel's and the Departments' reliance on the neighboring text indicating that the methodology adopted to address non-fee-for-service payments "*may* account for relevant payment adjustments that take into account quality or facility type . . . that are otherwise taken into account for purposes of determining payment amounts with respect to participating facilities." 42 U.S.C. § 300gg-111(a)(2)(B) (emphasis added). The relevant point is not that this provision directly "address[es] contracted-for provider incentive payments," TMA Br. 41, but rather that it sheds light on the degree of "discretion" that "[t]he Act itself grants the Departments" when it comes to accounting for payments that are not made on a fee-for-service basis. Op. 15.

The Departments' interpretation of what it means for a payment to be for a particular item or service is bolstered by the industry practice regarding the calculation

of cost-sharing amounts discussed in the opening brief (at 24-25), where such payments are generally calculated around the time a service is provided and not subsequently altered on the basis of any retrospective payments. Plaintiffs argue that the industry practice cannot be considered where a statutory term is clear, but as discussed, the Departments are reasonably interpreting what constitutes the "total maximum payment" for a particular service within the context of a provision addressing payments made to medical providers under health plans. Industry practice represents a "prime source[]" for determining what interpretation best comports with congressional intent in this regard, *City of Dallas v. FCC*, 118 F.3d 393, 395 (5th Cir. 1997), and it was reasonable for the Departments to align their understanding of this provision with the manner in which cost-sharing payments are determined generally, particularly given the QPA's determinative role in setting cost-sharing responsibilities under the Act.

2. Plaintiffs again argue (TMA Br. 42-44) as an alternative ground for affirmance that the Departments' decision was arbitrary and capricious. They maintain that excluding bonus payments results in non-market rates because a provider would have asked for a higher fixed per-service rate in the absence of a bonus. But as the discussion above reflects, such retrospective payments are not generally offered as a concession for adopting lower fixed per-service rates but rather are associated with a provider group's overall performance across a number of patients or services or in connection with providing other services like data reporting.

Especially given the broad discretion Congress gave the Departments to determine how to address non-fee-for-service payment models, their choices in this regard were reasonable. The panel therefore correctly rejected plaintiffs' argument for affirmance on alternate grounds. Op. 15.

Moreover, as noted, those amounts are generally obtained on the back end from *plans*, not directly from *patients*. The Act, as implemented under the challenged regulations, is consistent with that structure. As noted, in many circumstances, the QPA is dispositive of a patient's maximum cost-sharing obligation and, thus, excluding bonus payments from the QPA shields patients from responsibility for paying any portion of them. But in the independent dispute resolution (IDR) process between providers and plans, the QPA is just one of several factors that are to be considered in determining the value of the service and, accordingly, the amount the plan can be required to pay. *See* Opening Br. 7-9. Notably, providers are free to point to bonus and incentive payments, which are not incorporated into the QPA, as a reason why the QPA does not reflect the full value of their services. And the Departments have accordingly specified that, upon a provider's request, a plan must inform the provider whether the QPA includes contracted rates not set on a fee-for-service basis and whether the plan's rates include incentive-based or retrospective payments or payment adjustments that were excluded in calculating the QPA. *See* 45 C.F.R. § 149.140(d)(2)(iv); 86 Fed. Reg. at 36,899. That approach reasonably allows providers to use such information to advocate for a higher payment amount in

negotiations with the plans or in any IDR process, while avoiding imposing additional cost-sharing expenses on patients at odds with current industry practice and the congressional purpose in enacting the No Surprises Act. And, as the government noted in its opening brief (at 26), it further tracks the express contemplation in the statute that a provider's "quality and outcomes measurements" are factors to be considered separately from the QPA. 42 U.S.C. § 300gg-111(c)(5)(C)(ii).

Plaintiffs assert (TMA Br. 43-44) that more disclosures could have been required regarding excluded bonus payments, but, as the panel concluded in a portion of its opinion that plaintiffs no longer challenge, plaintiffs do not provide a basis for concluding that the Departments acted unreasonably in not requiring plans to provide even more information on this point. *See* Op. 17-20. And plaintiffs do not dispute that having the arbitrator consider incentive payments in the IDR process is consistent with the statutory direction to consider a provider's quality and outcomes measurements at that stage.

Finally, plaintiffs, as well as certain amici, express a general concern that out-of-network providers may be insufficiently compensated if they are paid amounts approximating the QPAs. *See* TMA Br. 43; *see also* Am. Soc'y of Anesthesiologists Amicus Br. 24-26; Physicians Advocacy Inst. Amicus Br. 19-26. But plaintiffs fail to show that Congress dictated a methodology under which the QPA for a particular service would be calculated based on payments that are not in fact tied to the provision of that specific service. And it would be particularly inappropriate to

interpret the Act to increase patients' cost-sharing responsibilities in this way, where the principal purpose of the statute (albeit one only glancingly acknowledged by plaintiffs) is to ameliorate the serious effects that surprise billing had on patients and ensure that covered out-of-network care would generally not cost more for patients than if the same care had been provided in-network—as the amicus brief filed by patient and consumer advocacy organizations explains. *See* Patient and Consumer Advocacy Amicus Br. 19-29; 42 U.S.C. §§ 300gg-111(a)(1), 300gg-112(a); *see also, e.g.*, *Southwestern Elec. Power Co. v. EPA*, 920 F.3d 999, 1028 (5th Cir. 2019) (explaining that courts should not adopt an interpretation that "is contrary to clear congressional intent or frustrates the policy Congress sought to implement" (quotation marks omitted)).

### C. The rule permissibly directs health plans to exclude one-off, case-specific agreements from the QPA calculation.

1. The Departments explained in their opening brief (at 28-33) that the district court further erred in concluding that the QPA calculation must include one-off, case-specific payments to out-of-network providers. As the Departments recognized, statutory text and structure make clear that the QPA calculation should be based on rates recognized under a plan's generally applicable terms, which further serves the statutory purpose of having the QPA track in-network rates. The panel agreed. Op. 11-14.

Despite having declined to seek rehearing on this issue, *see* Pet. 4, 11-16, the air ambulance plaintiffs now ask the en banc Court to affirm the district court's ruling on this issue, which is currently operative due to the vacatur of the panel opinion. *See* Air Ambulance Br. 22-47. But the panel got it right: "this provision of the Rule does not conflict with the Act." Op. 12.

In defending the district court's holding on this point, the air ambulance plaintiffs frankly concede that the amounts reflected in the case-specific agreements they seek to include in the QPA calculation represent the higher amounts they were able to charge for out-of-network transports prior to the No Surprises Act taking effect. *See* Air Ambulance Br. 42 (noting that case-specific agreements, "by definition, occur only in out-of-network transports"); *see also id.* at 40-42 (arguing that the QPA should be based on the higher out-of-network prices air ambulance providers were able to charge prior to the Act taking effect). While Congress enacted the Act in part to address the precise market failure reflected in the inflated amounts air ambulance providers were able to extract in such after-the-fact agreements, *see* Opening Br. 31-32, plaintiffs argue that that distortion must be locked into the rates patients pay for such services indefinitely through their inclusion in the QPA. But plaintiffs can establish neither that the Departments were statutorily required to include such amounts in the QPA calculation nor that the Departments acted unreasonably in omitting these amounts from a calculation designed to track in-network rates.

Plaintiffs' challenge to this provision cannot be squared with a key purpose of the Act that has been repeatedly recognized by both this Court and the district court: "to cap the patient's share of liability to out-of-network providers at an amount comparable to what the patient would have owed had the patient received care from an in-network provider." Op. 4; *see also Texas Med. Ass'n v. HHS*, 110 F.4th 762, 777 (5th Cir. 2024) (recognizing that the QPA "represents the typical payment amount that would reimburse in-network providers" (quotation marks omitted)); ROA.13197 (similar description in district court opinion). As a congressional report leading up to the enactment of the No Surprises Act reflects, in circumstances such as air ambulance transports where providers previously had "little or no incentive to contract to join a health plan's network," the result was a "financial opportunity from inflated out-of-network prices," which made "health care an attractive market for private equity firms, hedge funds, and venture capital firms." H.R. Rep. No. 116-615, pt. 1, at 53 (2020) (ROA.934). The QPA is designed to address that market failure because it is a "a market-derived price" calculated from "the median in-network rate"; unlike one-off agreements with out-of-network providers, in-network rates "reflect[] negotiations between providers and insurers" that are not tainted by the market failure that led Congress to step in. *Id.* at 57 (ROA.938). If Congress had intended to lock in the market distortion that plagued the air ambulance industry in the years leading up to the enactment of the No Surprises Act, it presumably would not have expressly forbidden arbitrators from considering "usual and customary charges" or "the amount

23

that would have been billed" in the absence of the protections codified in the Act. 42 U.S.C. § 300gg-112(b)(5)(C)(iii); *see also id.* § 300gg-111(c)(5)(D) (similar provision regarding non-air ambulance providers); H.R. Rep. No. 116-615, pt. 1, at 57 (ROA.938) (explaining that, if arbitrators were to "consider non-market-based rates such as providers' billed charges," that "may drive up consumer costs").

According to the air ambulance plaintiffs, Congress nonetheless baked one-off, out-of-network prices into the QPA by requiring health plans to calculate the median of "contracted rates recognized … under" the plan on January 31, 2019. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). But as the Departments explained in their opening brief (at 32-33), a one-off payment to an out-of-network provider that settles an individual claim is not a contracted rate and, even if it were, the rate is not paid "under" the plan.

Plaintiffs' word-by-word dissection of the statute is unavailing. The Departments do not dispute that case-specific agreements can be "contracts" (Air Ambulance Br. 23-25, 26-27), but these agreements do not reflect "contracted rates" of the sort that Congress directed health plans to include in their QPA calculations (Air Ambulance Br. 25-26). Plaintiffs' reliance on the Oxford English Dictionary is particularly unavailing, as that dictionary notes that it is "much … more common" for "rate" to mean "[a] fixed charge or payment applicable to each individual instance of a set of similar cases"—a usage that "implies that the same price or sum applies to a number of similar cases and is in some way fixed or standardized"—than for "rate" to

24

mean only the "[p]rice; cost; [or] sum paid or asked for a single thing." *Rate*, Oxford English Dictionary, https://www.oed.com/dictionary/rate_n1?tab=meaning_and_use#26707259 (last visited Aug. 29, 2025).

In any event, as the panel correctly recognized, plaintiffs' argument fails on the independent ground that the Act's directive to consider only those contracted rates that are recognized "under" a health plan is "most natural[ly] read[]" to "exclude[] rates *not* previously agreed to under a plan." Op. 12-13; *see also* Opening Br. 30-31; *Association of Air Med. Servs. v. HHS,* No. 21-cv-3031, 2023 WL 5094881, at *3-5 (D.D.C. Aug. 9, 2023) (rejecting an identical challenge). Plaintiffs argue that a payment is made "under" a plan whenever "the plan permits" the payment. Air Ambulance Br. 35. Relatedly, they suggest (Air Ambulance Br. 33-35) that case-specific agreements must be made "under" the terms of the plan or coverage, or else any such payments would violate fiduciary duty obligations imposed by the Employee Retirement Income Security Act (ERISA), which prohibit dissipating the plan's assets for a purpose other than providing benefits to participants and beneficiaries. *See* 29 U.S.C. § 1104(a)(1)(A). But as the panel recognized, "whether a plan *permits* case-specific agreements is a separate question from whether" the agreement is of the sort that Congress directed to be included "in the QPA calculation" when it used the word "under" in the statute. Op. 13 n.11. For the reasons discussed, when Congress devised the QPA to "represent[] the typical payment amount that would reimburse in-network providers," *Tex. Med. Ass'n*, 110 F.4th at 777 (quotation marks omitted), it

adopted statutory text that is best read as excluding these one-off out-of-network agreements from the calculation.

Plaintiffs try to dismiss (Air Ambulance Br. 27-28) the Departments' reliance on the requirement that a rate be recognized "under" a plan as a post hoc justification as well.  But they again simply ignore the Departments' explanation that case-specific agreements are excluded because "[t]he term 'contracted rate' refers only to the rate negotiated with providers and facilities that are contracted to participate in any of the networks of the plan or issuer under generally applicable terms of the plan or coverage."  86 Fed. Reg. at 36,889.  That is the same reasoning provided here.

Plaintiffs also have no explanation of how their argument can be squared with the statutory specification that the QPA be based on rates recognized on a particular day (January 31, 2019).  As the government noted (Opening Br. 32), the Departments' exclusion of one-off agreements is sensible in light of the fact that the Act specifies a particular date on which a rate must be recognized, such that if the provision is read to cover case-specific agreements it could be read to encompass only such agreements that happened to be in place on that particular day.  Plaintiffs now also term (Air Ambulance Br. 27-28) this argument a post hoc justification.  As noted, however, the Departments reasoned that "contracted rates" encompass only rates contracted for under a plan's generally applicable terms, and the statute's inclusion of a specific date on which to assess what such rates exist only bolsters the force of that reasoning. Indeed, on the substance, plaintiffs can muster as a response only that the

Departments may be able to "exercise their rule-making authority to clarify *which* case-specific rates count as being 'recognized' on that date." *See* Air Ambulance Br. 36. But plaintiffs do not appear to dispute that Congress could not have sensibly required plans to include in their QPA calculations only the case-specific agreements that happened to be in place on that particular day, and there is no basis for reading some other period into a statute that provides only a single date on which to assess the rates recognized.

2. Plaintiffs argue as an alternative ground to affirm the district court's judgment that the Departments' treatment of case-specific agreements was arbitrary and capricious, because it purportedly did not serve the purpose of having the QPA approximate rates that are the product of "typical market negotiations." Air Ambulance Br. 39; *see* 86 Fed. Reg. at 36,895-96.[1] Because one-off agreements to address services provided by out-of-network providers were common in the air ambulance industry, plaintiffs argue (Air Ambulance Br. 40-42) that these agreements should be considered to set the relevant market rates. But as already discussed, *see supra* pp. 22-24, plaintiffs' argument ignores that these one-off out-of-network

---

[1] In the introduction section of their brief, the Air Ambulance plaintiffs erroneously state that "[t]he District Court agreed" with their argument that "the Departments' exclusion of single-case agreements was arbitrary and capricious." Air Ambulance Br. 2. In the argument section, they correctly acknowledge that "the District Court did not reach plaintiffs' arbitrary-and-capricious challenge" and that they are therefore asking this Court to affirm on an alternative ground not addressed by the district court. Air Ambulance Br. 37; *see* ROA.13216 n.5.

agreements reflected precisely the market failure that the No Surprises Act was designed to address. The prices paid in connection with such agreements did not arise from the sort of arms-length market negotiations that Congress relied on when defining the QPA. And, contrary to plaintiffs' argument (Air Ambulance Br. 42-43), there is nothing "arbitrar[y]" about excluding one-off prices agreed to under these conditions from QPA calculations while declining to craft an additional, atextual exception based on the number of times an item or service was performed at a rate that a provider agreed to accept under an in-network agreement. As explained above, *see supra* Part I.A, the rule directs health plans to include agreed-to rates that will govern any provision of a particular service to a plan member; those rates reflect agreements reached as part of an arms-length negotiation process that was not subject to a market failure, unlike the one-off agreements plaintiffs seek to include.

Plaintiffs similarly miss the mark in arguing that the rule interprets "the same or similar statutory terms to mean two different things," Air Ambulance Br. 44, insofar as it excludes case-specific agreements from the QPA, while treating such agreements as creating a "contractual relationship" that could render a facility a "participating" emergency or health care facility for certain purposes under the Act. *See* 42 U.S.C. § 300gg-111(a)(3)(F)(ii), (b)(2)(A)(i); 45 C.F.R. § 149.30. As the panel recognized, there is no contradiction because these different phrases mean different things and serve different purposes. *See* Op. 13. As the Departments explained, *see* 86 Fed. Reg. at 36,882, 36,889 n.48, 36,931, the "contractual relationship" provision, pursuant to

which a health care facility is "participating" for purposes of a given medical item or service—such that the Act's surprise-billing protections for non-emergency services provided by a nonparticipating provider at a participating health care facility will apply—is met when the facility "has a direct or indirect contractual relationship . . . with respect to the furnishing of such an item or service at the facility," 42 U.S.C. § 300gg-111(b)(2)(A)(i).  It is entirely reasonable that, in that context, a facility would be understood to have a "direct or indirect contractual relationship with" a plan pursuant to a case-specific agreement—indeed, as noted above, the Departments do not dispute that case-specific agreements can be "contracts."  But that conclusion has no bearing on whether an amount agreed to in a one-off agreement with an out-of-network provider represents a contracted "rate" recognized "under" the plan such that it should be included in the QPA.  *Compare id.* § 300gg-111(a)(3)(E)(i)(I), *with id.* § 300gg-111(b)(2)(A)(i).

## II.    The district court erred in granting universal relief.

Independently, plaintiffs fail to justify the district court's reflexive grant of vacatur as the "default" remedy under the APA without regard to traditional limits on courts' equitable jurisdiction.

### A.    The APA does not authorize courts to depart from traditional equitable principles.

Plaintiffs cannot seriously dispute that traditional equitable principles require courts to tailor relief to the parties before them.  *See Trump v. CASA, Inc.*, 145 S. Ct.

2540, 2548 (2025). They nonetheless maintain that the APA radically departed from that tradition in directing reviewing courts to "set aside" unlawful agency actions. 5 U.S.C. § 706(2). Plaintiffs are correct to observe (TMA Br. 48-49) that the Supreme Court has expressly reserved this question. *CASA*, 145 S. Ct. at 2554 n.10. But the issue is squarely presented to this Court in these proceedings, and the Supreme Court's recent reasoning in *CASA* supports the Departments' arguments. Plaintiffs fail to show that "the Congress that unanimously passed the APA in 1946 meant to overthrow the 'bedrock practice of case-by-case judgments with respect to the parties in each case' and vest courts with a 'new and far-reaching' remedial power." *United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment) (quoting *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring)).

1. As the opening brief explains (at 36-39), the APA's remedial provision, § 703, looks to pre-existing remedies available in the "form[s] of legal action" known at the time of the APA's enactment and remits courts to traditional party-centered remedies such as declaratory judgments and, where necessary, appropriately tailored injunctions. Section 706, titled "Scope of review," does not authorize vacatur of an agency rule when it states that, in certain circumstances, a reviewing court "shall … hold unlawful and set aside agency action." 5 U.S.C. § 706(2). In this context, the APA's direction to a reviewing court to "set aside" unlawful agency action means to disregard that unlawful action—to set it to the side—in resolving the case before the

court, in the same way a court would set aside and disregard an unconstitutional statute.

As a textual matter, plaintiffs acknowledge that, at least in the context of an "enforcement action," this is an appropriate understanding of "set aside."  TMA Br. 52.  Plaintiffs do not appear to dispute, moreover, that the same would be true in the context of "a declaratory action or a habeas petition," both of which are expressly listed as forms that legal actions under the APA can take.  5 U.S.C. § 703; *Texas*, 599 U.S. at 699 (Gorsuch, J., concurring) ("[N]o one thinks a court adjudicating a declaratory action or a habeas petition 'vacates' agency action along the way.").  Plaintiffs' assertion (TMA Br. 52) that § 706(2)'s "set aside" language authorizes a far more potent remedy "in a pre-enforcement challenge to [a] rule itself" finds no grounding in the text, structure, or contemporaneous interpretation of the APA.  *See* Opening Br. 36-37.

Seeking to avoid this conclusion, plaintiffs assert (TMA Br. 49) that § 703 does not speak "to remedies."  But that argument is inconsistent with the statute's text and structure and would come as a surprise to the Congress that drafted the APA.  *See, e.g.*, S. Doc. No. 79-248, at 36-37 (1946) (referring to § 703 as governing remedies); 92 Cong. Rec. 2159 (1946) (similar).  Plaintiffs fall back on the assertion that, when § 703 lists "form[s] of legal action" as "including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus," 5 U.S.C. § 703, the word "including" leaves room for an additional remedy to be spelled out in § 706.  TMA Br.

49.  But plaintiffs offer no explanation for "why Congress would have listed most remedies in § 703 only to bury another (and arguably the most powerful one) in a later section addressed to the scope of review."  *Texas*, 599 U.S. at 698 (Gorsuch, J., concurring).

That is particularly implausible given that, at the time of its enactment, the APA was universally understood to codify, not upend, traditional remedies.  *See* U.S. Dep't of Just., *Attorney General's Manual on the Administrative Procedure Act* 93 (1947). Consistent with that understanding, "vacatur of rules as today understood" was "unknown when the APA was adopted and for at least two decades afterward."  John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 Yale J. on Regul. Bull. 119, 120 (2023).  Plaintiffs assert that, "before the APA, federal courts invalidated high-profile agency rules under statutes authorizing courts to 'set aside' unlawful agency actions."  TMA Br. 50.  But, as the source plaintiffs cite for this proposition reflects, such pre-APA lawsuits occurred "pursuant to various special statutory review provisions."  Mila Sohoni, *The Past and Future of Universal Vacatur*, 133 Yale L.J. 2305, 2329 (2024).  The government acknowledges that such special review provisions can authorize courts to vacate a rule.  *See* 5 U.S.C. § 703 (setting forth APA remedies where there is no such "special statutory review proceeding").  But the fact that Congress has enacted statutes authorizing courts of appeals to enter such relief in specific contexts further undermines plaintiffs' assertion that § 706(2) implicitly authorizes every district court in the country to grant universal vacatur with respect to

every agency action.  The APA, like the Judiciary Act of 1789 construed in *CASA*, does not authorize such a substantial departure from an equitable tradition under which "[n]either the universal injunction nor any analogous form of relief was available."  *CASA*, 145 S. Ct. at 2551.

Lacking persuasive arguments tied to the APA's text, structure, and original understanding, plaintiffs rely heavily on what they portray (TMA Br. 45-48) as a longstanding interpretation of the APA among this Court and the other courts of appeals.  But the Supreme Court has never endorsed that understanding, and this case presents an ideal opportunity for the en banc Court to interpret the APA's text in a manner that properly accords with its original understanding and with the traditional limits on equity jurisdiction reflected in *CASA*.  Decisions postdating the APA by many decades are not probative of the statute's original meaning.  Many such decisions involved "special statutory review proceeding[s]," 5 U.S.C. § 703, authorizing the D.C. Circuit or another court of appeals to review and act directly upon agency actions. *See, e.g.*, 28 U.S.C. § 2342.  As explained above, those special review provisions present distinct remedial questions.  And as the Departments have explained (Opening Br. 37), the D.C. Circuit's vacatur practices also reflect its unique jurisdiction.  That court's leading decision on vacatur reasons that because any party challenging federal agency action can ordinarily "seek review in the district court for the District of Columbia," the precedential effect of a D.C. Circuit decision holding an agency action unlawful is effectively nationwide even if the judgment is limited to

33

the parties. *National Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). Whatever the merits of that logic as applied to the D.C. Circuit, it does not justify extending the same sweeping remedial authority to every district court judge in the Nation.

2. Regardless, even if vacatur were an available remedy under the APA, the Court should clarify that this powerful remedy is subject to traditional equitable principles—it is not a "default" to be awarded reflexively. As the Departments have explained (Opening Br. 39-43), in conducting this equitable inquiry, courts should recognize that the default rule is that remedies operate with respect to specific parties, not on legal rules in the abstract; that there is no obligation to resort to the remedy of vacatur when other remedies (such as a declaratory judgment or a tailored, party-specific injunction) would provide adequate relief to the plaintiff; and that the party seeking equitable relief bears the burden of affirmatively demonstrating that each of the four traditional requirements for injunctive relief are satisfied.

As the Departments have explained (Opening Br. 40), crafting APA relief in light of traditional equitable principles would comport with the statute's express preservation of a court's "power or duty" to "deny relief" on any "equitable ground." 5 U.S.C. § 702. Plaintiffs interpret § 702 as allowing for deviations from a "default" regime of universal vacatur established in § 706(2) (TMA Br. 54), but that is an odd way to interpret the provision given the historical backdrop of equity jurisdiction against which it was enacted. Rather, § 702's text is better understood to reinforce

34

that there is no sound reason to read into § 706's "set aside" language "a super-remedy that upends the traditional relationship between the federal courts and the executive branch" in the first place—let alone to hold that this "super-remedy" is a "default" rather than the exception to the norm.  William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 181-82 (2023).

Plaintiffs also ask this Court to ignore the traditional four-factor test for an injunction on the ground that "the Departments failed to raise this argument until now," so "it is forfeited."  TMA Br. 56.  But the Departments have consistently challenged the breadth of the district court's remedy, and "parties are not limited to the precise arguments they made" previously in presenting a particular legal claim.  *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992).  Avoiding the appropriate legal analysis on forfeiture grounds would be particularly unwarranted here, where the remedial issue the Departments have raised throughout this litigation should be assessed in light of an intervening Supreme Court decision and where certain arguments the Departments have advanced to the en banc Court would likely have been futile at earlier stages of the case given prior panel precedent.

Plaintiffs further contend that "[v]acatur is by nature not party-specific."  TMA Br. 54.  But the text of the APA itself suggests that a court need not set aside agency action universally, *see* 5 U.S.C. § 551(13), and the very analogy that plaintiffs urge the Court to look to in interpreting the APA—appellate court review of a lower court decision (TMA Br. 45-46, 51)—undermines plaintiffs' argument.  As the Departments

have explained (Opening Br. 42), the general practice is to vacate a district court judgment only as to the party or parties that appeal, not as to non-appealing parties (though that rule is subject to relaxation based on equitable considerations). *See, e.g.*, *Tompkins v. Cyr*, 202 F.3d 770, 786-87 (5th Cir. 2000); *In re Taylor*, 655 F.3d 274, 287 (3d Cir. 2011); *United States v. Lumbermens Mut. Cas. Co.*, 917 F.2d 654, 662 (1st Cir. 1990); *see also* 15A *Wright & Miller's Federal Practice & Procedure* § 3904 (3d ed.), Westlaw (database updated May 21, 2025). Similarly, here, when specific parties ask a court to "set aside" a rule, any relief they obtain should formally benefit only the parties before the court—the concept of judicial "relief to nonparties" is incompatible with "the party-specific principles that permeate our understanding of equity." *CASA*, 145 S. Ct. at 2552. Plaintiffs' only response is to attempt to cabin this analogy to an APA challenge to a "party-specific agency 'order,'" rather than a facial challenge to a generally applicable agency rule. TMA Br. 55-56 (quoting 5 U.S.C. § 551(6)). But there is no reason to treat remedies with respect to such facial challenges to rules any differently, and plaintiffs' argument that the assertion of a sweeping claim on the merits should necessarily trigger a sweeping remedy too only serves to underscore the remarkable breadth of the remedy plaintiffs are asking this Court to house in the APA.

For these reasons, to the extent this Court's precedents have previously "conceptualize[d]" vacatur as a "poten[t] and peculiarly broad" remedy that "operates on the status of agency action in the abstract" without regard for "the various equities

at stake" and potentially without determining whether party-specific relief would be appropriate, the Court should give fresh consideration to whether the APA contemplates any such remedy—which would not have been "familiar to courts sitting in equity" for reasons recently reaffirmed by the Supreme Court in *CASA*. *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 951-52 (5th Cir. 2024), *rev'd and remanded*, 145 S. Ct. 2427 (2025). Indeed, some of this Court's decisions have already recognized that "vacatur" need not be inherently universal. *See, e.g.*, Op. 21 (stating that "party-specific vacatur is definitely appropriate in other situations," though concluding that "it is not the appropriate thing to do in this case" with respect to the challenged regulation implementing a statutory deadline); *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (recognizing that "'[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury'" and remanding to the district court to consider a "more limited remedy" than universal vacatur (alteration in original) (quoting *Gill v. Whitford*, 585 U.S. 48, 73 (2018))).

Plaintiffs suggest that universal vacatur is necessary to afford complete relief in APA cases "'brought by unregulated but adversely affected parties.'" TMA Br. 57-58 (quoting *Corner Post, Inc. v. Board of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring)). Here, for instance, plaintiffs assert that "there is no *in personam* order that could remedy plaintiffs' injury" because the challenged regulatory provisions are applied by non-party health plans, with follow-on consequences for the plaintiff providers. TMA Br. 57. But as an initial matter, the

complete-relief principle on which plaintiffs rely "operates as a ceiling," not a floor; "[c]ourts therefore err insofar as they treat complete relief as a mandate." *CASA*, 145 S. Ct. at 2563 (Thomas, J., joined by Gorsuch, J., concurring). "After all, to say that a court *can* award complete relief is not to say that it *should* do so. Complete relief is not a guarantee—it is the maximum a court can provide." *Id.* at 2558 (majority opinion). Accordingly, even if plaintiffs could show that universal vacatur was "the only way to provide complete relief to the plaintiffs," TMA Br. 57—an analysis that no court has properly conducted, let alone with the benefit of *CASA*—that would be necessary, but not sufficient, to support the broad relief plaintiffs sought and obtained from the district court.

In any event, plaintiffs are mistaken as to how the complete-relief principle applies; just because traditional remedies would not formally bind nonparties to the case does not render a party-specific remedy "useless." TMA Br. 58. A party-specific judgment might, depending on its terms, require an executive agency to take appropriate steps to prevent a regulation from being applied in a manner that causes harm to the particular plaintiff who is the beneficiary of the judgment against the agency.[2] And if party-specific relief were issued indicating that a regulatory provision

---

[2] Plaintiffs suggest that a "party-specific injunction" would entail, for example, "an injunction compelling [the Departments] to initiate enforcement actions against insurers" who apply regulatory provisions that have been set aside by the district court. TMA Br. 58 (quotation marks omitted). Such an injunction would plainly be unwarranted, *see, e.g.*, *Texas*, 599 U.S. at 677-81; *Heckler v. Chaney*, 470 U.S. 821, 831

is invalid on its face, the agency defendant may well choose to modify the regulation as it applies to nonparties: in many circumstances an agency might determine that it is preferable to have a uniform regulatory landscape, that continuing to apply regulations that have been declared unlawful with respect to particular plaintiffs could risk a spate of follow-on lawsuits from new parties, or perhaps simply that it is persuaded by the court's legal analysis.  Importantly, however, under the Constitution's separation of powers, the assessment of what action to take as to nonparties is a task entrusted to the Executive Branch, not federal courts.

3.  As the Departments have also explained (Opening Br. 43-44), universal vacatur strains the separation of powers, circumvents procedural rules governing joinder and class actions, encourages forum shopping, and operates asymmetrically by preventing the federal government from enforcing a rule without potentially having to prevail in all 94 district courts and all 12 regional courts of appeals.  Indeed, this case provides a stark example of these problems, as the district court decision here effectively claimed a veto power over a different district court that had reached a different conclusion on an identical claim brought by a trade association some of

---

(1985), but that is hardly the only sort of remedy that could be entered in this case that could have the effect of inducing health plans to cease applying regulatory provisions that have been successfully challenged to the particular plaintiffs who brought the challenge.  As discussed below, the precise contours of any relief should be considered by the district court in the first instance after this Court clarifies the applicable legal principles.  *See infra* Part II.B.

whose members are plaintiffs here. *See Association of Air Med. Servs.*, 2023 WL 5094881, at *3-5.

Contrary to plaintiffs' suggestion (TMA Br. 60), the problems spawned by this understanding of the APA go far beyond the claim-splitting concern that the Departments had raised in district court. That doctrine implicates only the particularly egregious circumstance where the same parties (or ones in privity with them) bring claims arising from the same facts in multiple district courts. *See General Land Office v. Biden*, 71 F.4th 264, 269-70 (5th Cir. 2023). Even if the claim-splitting doctrine provided a sufficient mechanism to "prevent" such "abuses" from occurring at the behest of any given party, TMA Br. 60, that doctrine would not address the situation of different parties who are not in privity with each other bringing suit seriatim. Under plaintiffs' conception of the APA, every such party would be eligible for a universal remedy that would effectively nullify any decisions upholding the government action—no matter how much forum shopping it may take to find a district judge who regards the agency action as unlawful.

Plaintiffs assert that the Executive Branch's only tools to address "the stagnating effects of an erroneous vacatur" are to "take an appeal or seek a stay." TMA Br. 61. Certainly, the government is entitled to seek these forms of relief when necessary. But the widespread practice of reflexive, universal vacatur has made it necessary to secure appellate review, including from the Supreme Court—often without the benefit of full briefing and argument, let alone percolation among the

courts of appeals—far more often than would be necessary if district courts were required to evaluate traditional equitable criteria before entering sweeping relief.

### B.    This Court should remand for the district court to conduct an appropriate remedial analysis in the first instance.

As the Departments have explained (Opening Br. 49-50), a proper remedial analysis would not support the district court's judgment, but that court should have the opportunity to apply the correct remedial principles to this case in the first instance.  Plaintiffs assert that the district court's remedial conclusions fell within its "broad discretion," TMA Br. 53 (alteration and quotation marks omitted), but for the reasons already discussed, the district court's remedy was premised on the legally erroneous treatment of universal vacatur as the "default" APA remedy.  "'A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law . . . .'" *Warner v. Talos ERT, L.L.C.*, 133 F.4th 412, 428 n.12 (5th Cir. 2025) (quoting *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 n.2 (2014)).

Plaintiffs' efforts to align the district court's remedial conclusions with principles the district court did not apply are unavailing.  Plaintiffs assert that universal vacatur "is the only way to provide complete relief to the plaintiffs," TMA Br. 57.  But as explained, a plaintiff is not automatically entitled to complete relief.  And in any event, plaintiffs fail to substantiate this assertion.  As the Departments explained, for example, the district court clearly exceeded the complete-relief principle when it universally vacated a regulation implementing the statutory deadline for a health plan

41

to send a provider an initial payment or notice of denial of payment.  Opening Br. 46-47.  That regulation concerns an issue entirely separate from the calculation of QPAs, *contra* TMA Br. 59-60, and it was challenged only by the four specific air ambulance providers who are plaintiffs here.  There is no reason—let alone a reason offered by plaintiffs—why universal relief would be necessary to redress the harm asserted by those specific plaintiffs in connection with this particular regulation.  And while the panel upheld this remedy based on its view that courts should not allow "one deadline for Plaintiffs and another (unlawful) deadline for all other entities," Op. 21, that reasoning is flawed because it is for the Executive Branch, not the Judiciary, to determine how to proceed with respect to nonparties.  *See supra* p. 39.

Plaintiffs' complete-relief arguments specific to the challenged aspects of the QPA calculation methodology (TMA Br. 57-60) are likewise unpersuasive.  While the district court should address these issues in the first instance, it is noteworthy that plaintiffs acknowledge that "the vast majority of QPAs" apply to medical services that do not "involve one of the plaintiffs here."  TMA Br. 59-60.  Plaintiffs fail to support their speculative assertion that, if health plans were to set aside the challenged regulatory provisions when calculating QPAs for any case involving medical care provided by any provider plaintiff, those plaintiffs would nonetheless be harmed if plans were to continue applying the methodology set forth by duly promulgated regulation to cases in which no plaintiff is involved.  Absent a showing substantiating this claim, there is no basis for requiring health plans more broadly to use a QPA

methodology that differs from the one "established by the Secretary." 42 U.S.C. § 300gg-111(a)(3)(E)(i). And contrary to plaintiffs' assertions (TMA Br. 61-62), the district court's order purporting to require universal changes to the QPA methodology is plainly unduly disruptive, regardless of the Departments' exercise of enforcement discretion during the pendency of this appeal. Indeed, the amicus brief filed by America's Health Insurance Plans estimates that "the total cost for initial QPA calculation likely exceeded $1.7 billion" and explains that, if the district court's remedy is affirmed, "health plans will be required to start that process anew, except that the time and cost required will be substantially greater." *See* America's Health Ins. Plans Amicus Br. 24-25.

Finally, plaintiffs assert (TMA Br. 59)—and this Court has previously agreed— that universal relief is supported by the No Surprises Act's directive that the Departments "shall establish by regulation one independent dispute resolution process," 42 U.S.C. § 300gg-111(c)(2)(A). But this text only underscores that it is for the Departments, not the federal courts, to establish that process. A federal court has authority to determine that a particular aspect of the regulatory process must be set aside as to particular parties to a lawsuit—but its authority ends there. A party-specific court order may well supersede the Departments' otherwise uniform regulation in circumstances where the specific plaintiffs are affected, but that provides no basis for the court to arrogate to itself the authority to modify the regulation writ large, where doing so would be entirely for the benefit of nonparties.

43

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

JAY R. COMBS
  *Acting United States Attorney*

COURTNEY L. DIXON

  *s/ Kevin B. Soter*
KEVIN B. SOTER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7222*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *kevin.b.soter@usdoj.gov*

September 2025

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.


*s/ Kevin B. Soter*
Kevin B. Soter

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's August 28, 2025, Order because it contains 11,349 words, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface and type-style requirements of Rule 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Kevin B. Soter*

Kevin B. Soter