

**U.S. Department of Justice**
Civil Division, Appellate Staff
950 Pennsylvania Avenue NW
Washington, DC 20530

January 23, 2026

**By ECF**

Lyle W. Cayce, Clerk of Court
U.S. Court of Appeals for the Fifth Circuit
F. Edward Hebert Building
600 S. Maestri Place
New Orleans, LA 70130-3408

Re:  *Texas Medical Association v. HHS*, No. 23-40605 (en banc argument held September 24, 2025)

Dear Mr. Cayce:

The government respectfully responds below to the Court's December 12 order, which directs the parties to answer a series of questions posed by the Court after the case was argued and submitted to the en banc Court. First, this letter brief explains that the issues described in the Court's order are not "properly before [the Court]," Dec. 12 Order 2, for two independent reasons: the party-presentation principle precludes the Court from *sua sponte* invalidating agency actions for reasons not urged by any party, and plaintiffs in any event lack standing to raise any of the potential legal claims implicated by the Court's order. In short, plaintiffs may well have chosen not to bring these claims precisely because they lack a cognizable injury: it is to their *benefit* for $0 rates to be excluded from calculations of the qualifying payment amount (QPA), that is exactly what the applicable instructions already require, and nothing in the record indicates that insurers are ignoring those instructions—let alone that any such non-compliance would be remedied by a hypothetical judicial decision opining that the Departments "trie[d] to fix a substantive defect in a procedurally improper way," Dec. 12 Order 3.

Second, this letter brief then explains why, even if the Court were to address the issues described in the supplemental briefing order on the merits, the Department of Health and Human Services (HHS), the Department of Labor, and the Department of the Treasury (the Departments) addressed the issue of "$0 rates" in a manner that comports with the No Surprises Act and the Administrative Procedure Act (APA) at every turn. As the FAQ document cited in the supplemental briefing order reflects, the

Departments simply clarified how the statute and existing regulations should apply to a $0 entry in an insurer's rate table: rather than reflecting any highly counterintuitive agreement to provide medical services free of charge, any such entries in an insurer's rate tables are best understood as reflecting that the services at issue are plainly not ones the provider has actually made available and are therefore not "contracted rates" under the statute and implementing interim final rule. *See FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55*, at 17 n.29 (Aug. 19, 2022) (ROA.11469 n.29). Moreover, as the below response to the Court's fourth question reflects, even if the Court were to find both a substantive and procedural defect here, no judicial remedy would be warranted in these circumstances. The government therefore respectfully requests that the district court's judgment be reversed for the reasons stated in the government's previous briefing.

**Relevant Background**

As explained in further detail in the earlier briefing, this is a lawsuit brought under the APA by medical and air ambulance providers challenging an array of methodological determinations made by the Departments regarding calculation of a key figure under the No Surprises Act called the QPA. The basic function of the QPA is to approximate the rate a provider would have received for a given service had the provider been in-network. The Act defines the QPA in relevant part as "the median of the contracted rates recognized by the plan or issuer … on January 31, 2019, for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished," subject to an inflation adjustment. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I); *see also id.* § 300gg-112(c)(2). Congress also required QPAs to be calculated "consistent with the methodology established by the Secretary" pursuant to an express delegation of rulemaking authority. *Id.* § 300gg-111(a)(3)(E)(i)(I); *see id.* § 300gg-111(a)(2)(B)(i).[1]

Exercising this statutory mandate, the Departments issued an interim final rule in July 2021 that contains essentially identical language as appears in the statute, fleshed out to include an explanation of how to calculate a median among a set of numbers. *See* 45 C.F.R. § 149.140(b)(1) (stating that the QPA should be calculated "by arranging in order from least to greatest the contracted rates of all group health plans … for the

---

[1] For ease of reference, this brief generally uses "health plans," "plans," or "insurers" to refer to both group health plans and health insurance issuers and generally uses "providers" to refer to providers (including providers of air ambulance services) and health care facilities. And although the No Surprises Act made parallel amendments to multiple statutes, for ease of reference, this brief cites the Act's amendments to the Public Health Service Act and the regulations implemented by HHS.

same or similar item or service that is provided by a provider in the same or similar specialty … and provided in the geographic region in which the item or service is furnished and selecting the middle number"). As relevant to the supplemental briefing order, the July 2021 rule also contains a regulatory definition of a "contracted rate" for purposes of this calculation: "the total amount" a health plan has "contractually agreed to pay" for the relevant medical services. *Id.* § 149.140(a)(1). In the preamble to the rule, the Departments clarified that "the rate negotiated under a contract constitutes a single contracted rate regardless of the number of claims paid at that contracted rate." *See Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36,872, 36,889 (July 13, 2021) (ROA.785). In subsequent sub-regulatory guidance that predates the filing of this lawsuit, the Departments further clarified that it had come to their attention that some insurers "enter $0 in their fee schedule" as a placeholder for services that providers are not actually equipped to furnish to the plan's enrollees; the Departments explained that, unlike other rates appearing in plans' fee schedules, "$0 does not represent a contracted rate," ROA.11469 n.29—*i.e.*, it does not represent an amount that an insurer has "contractually agreed to pay" for that service, 45 C.F.R. § 149.140(a)(1)—and insurers therefore "should not include $0 amounts in calculating median contracted rates," ROA.11469 n.29.

Throughout this litigation, plaintiffs' lead merits argument has been that the regulatory definition of "contracted rate" conflicts with the Act's QPA definition because 45 C.F.R § 149.140(a)(1) does not include additional language directing health plans to attempt to ascertain how many times a medical provider performed a service during a statutorily undefined period of time and then exclude agreed-to rates from these calculations if the service was not in fact performed by that particular provider during such a period. *See, e.g.*, ROA.26-27, 50 (TMA plaintiffs' complaint); ROA.13379-13882 (air ambulance plaintiffs' complaint). The parties' dispute centers on whether the Act requires such a narrowing of contracted rates because it refers to rates that are "provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(i): plaintiffs effectively interpret the single word "provided" as carrying with it a requirement for insurers to determine whether a particular provider has performed the service over an unstated time period, whereas the Departments (and the unanimous panel) interpret this as referring to a rate at which a service is available as reflected in a plan contract, calculated separately based on the specialty of the provider and the geographic region in which the service is furnished. One point of common ground between the parties, however, has been that an insurer would not be properly applying the Departments' duly promulgated regulation if it were to treat a $0 entry in a fee schedule as reflecting an amount a health plan ever "contractually agreed to pay" for that service, 45 C.F.R. § 149.140(a)(1). *See, e.g.*, ROA.50 (TMA plaintiffs' complaint recognizing that the Departments' 2022 guidance document "clarif[ies]" that, under the regulations as written,

3

plans should "exclude $0 rates from their QPA calculations"); Gov't Opening En Banc Br. 23-24 (explaining that this clarification reflects just one of the "safeguard[s] against artificially depressed QPAs").

**A.   The issues identified in the supplemental briefing order are not properly before the Court.**

The series of questions posed by the Court begin with the premise that the July 2021 interim final rule "incorporated $0 rates into the QPA methodology." Dec. 12 Order 2. From there, the Court refers to several legal issues under the APA that could potentially be implicated if that premise were correct: whether the rule was "contrary to law" on that basis, *see* 5 U.S.C. § 706(2)(A), whether the Departments' subsequent guidance document addressing $0 rates "operat[ed] as a legislative rule that required notice and comment," whether the Departments complied with any such notice-and-comment requirement if one had attached to the guidance, and what remedy (if any) would be warranted under the APA "[i]f an agency tries to fix a substantive defect in a procedurally improper way." Dec. 12 Order 2-3. As explained below, the premise underpinning this series of questions is mistaken because the rule never instructed or permitted insurers to include $0 rates when calculating QPAs. But more fundamentally, the questions posed by the Court implicate distinct legal claims that no party to the case has brought and that the plaintiffs to this case lack standing to bring: whether the Departments issued a regulation that was "contrary to law on the day that it was issued" for reasons no party has asserted and whether, if so, the Departments subsequently failed to "comply with the notice-and-comment procedural requirements of § 553 of the APA" when they issued a guidance document whose bottom-line result operates to the benefit of the plaintiffs. *Id.* The party-presentation principle and Article III standing doctrine each independently bar the Court from opining on these issues.

**1.   The party-presentation principle precludes the Court from deciding these issues.**

As the Supreme Court has repeatedly made clear, "'[i]n our adversarial system of adjudication, we follow the principle of party presentation.'" *Clark v. Sweeney*, No. 25-52, 2025 WL 3260170, at *1 (U.S. Nov. 24, 2025) (per curiam) (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)). The key "'premise'" of this system is that "'[parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'" *Sineneng-Smith*, 590 U.S. at 375-76 (alterations in original) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment)). While this principle is "not ironclad," *id.* at 376, a court abuses its discretion if it "devise[s] a new" legal claim not advanced by a party to the case, *Sweeney*, 2025 WL 3260170, at *2.

4

Plaintiffs never raised the issues identified in the Court's supplemental briefing order, and for good reason. To begin, plaintiffs did not assert that the Departments' July 2021 rule is "contrary to law" for the reason suggested by the supplemental briefing order regarding "$0 rates." Dec. 12 Order 2. Rather, the parties have agreed throughout this case that the rule does not in fact "incorporate[] $0 rates into the QPA methodology"—not "on the day that it was issued" and certainly not once the Departments issued subsequent guidance (predating this litigation) clarifying that insurers should not include such rates in their calculations. Dec. 12 Order 2-3; *see, e.g.*, ROA.50 (TMA plaintiffs' complaint recognizing that the Departments' 2022 guidance document "clarif[ies]" that, under the regulations as written, plans should "exclude $0 rates from their QPA calculations"). As discussed below, that agreement reflects the correct understanding of the July 2021 rule. It also reflects an understanding of the July 2021 rule that operates in plaintiffs' favor. And it would not comport with the party-presentation principle for the Court to disregard that point of agreement and to then launch into a series of distinct APA claims not raised by plaintiffs.

While plaintiffs have argued that the Departments' actions were contrary to law because the rules do not direct insurers to "exclude other, non-$0, rates" in the QPA calculations, TMA Answering En Banc Br. 13; *see also id.* at 35, that is a distinct legal claim that does not implicate the issues identified in the supplemental briefing order. The question presented by the claim plaintiffs brought is whether insurers must be directed to exclude certain agreed-to payment rates even if these undisputedly reflect a rate that the provider has agreed to accept for that service and are therefore included within the QPA methodology set forth in the Departments' regulations. The distinct question presented by the "$0 rates" issue is whether a $0 figure appearing in a rate table constitutes an agreed-to rate in the first place; on that question, there has never been a dispute that the Departments adopted a methodology that requires the exclusion of the $0 figure. Plaintiffs refer in one of their briefs to what they deem "[t]he Departments' *belated* decision in the August FAQs to exclude only $0 rates." *Id.* at 35 (emphasis added). But this passing suggestion that the $0 exclusion was "belated" rather than baked into the July 2021 rule is incorrect for the reasons discussed further below, and plaintiffs never developed any argument to the contrary—let alone proceeding to develop the follow-on legal claims identified in the supplemental briefing order. Rather, as noted, plaintiffs in other filings have properly characterized the August FAQ document as providing clarifying guidance on what the July 2021 rules meant from the outset. *See* ROA.50 (recognizing in one of the operative complaints that "the August 2022 FAQs *clarify*" that $0 rates should be excluded from QPA calculations (emphasis added)).

The party-presentation principle likewise precludes the Court from addressing the second, third, and fourth questions raised in the supplemental briefing order. At a

5

minimum, that principle prevents a court of appeals from "itself present[ing] questions that no party wanted to present," *United Nat. Foods, Inc. v. NLRB*, 66 F.4th 536, 555 (5th Cir. 2023) (Oldham, J., dissenting), *cert. granted, judgment vacated*, 144 S. Ct. 2708 (2024). And the record makes quite clear that none of the questions presented in this appeal—indeed, in this litigation at any point—implicate the Departments' "compl[iance] with the notice-and-comment procedural requirements of § 553 of the APA" in any respect, let alone in the specific respect referenced in the Court's second through fourth questions.  Dec. 12 Order 3. *See generally* ROA.22-59 (TMA plaintiffs' complaint); ROA.13363-13407 (air ambulance plaintiffs' complaint); TMA Answering En Banc Br.; Air Ambulance Answering En Banc Br.  Plaintiffs know how to raise such a challenge when they believe it warranted, and their choice not to do so here should not be overridden.  *See Texas Med. Ass'n v. HHS*, 587 F. Supp. 3d 528, 543-48 (E.D. Tex. 2022) (addressing a notice-and-comment argument regarding a different rule implementing the No Surprises Act that was raised in an earlier lawsuit brought by the same lead plaintiffs), *appeal dismissed*, No. 22-40264, 2022 WL 15174345 (5th Cir. Oct. 24, 2022); *see also* ROA.26, 38, 13373-13377 (referring to the fact that the July 2021 rule at issue here was promulgated as an interim final rule without undergoing notice and comment but choosing to challenge the rule only on substantive rather than procedural grounds).

### 2. Plaintiffs would also lack standing to bring any legal claims premised on the issues in the supplemental briefing order.

The issues identified in the Court's supplemental briefing order are also not properly before the Court for a second and independent reason: plaintiffs lack Article III standing to raise these issues.

Like the party-presentation principle, "[s]tanding doctrine helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system." *United States v. Texas*, 599 U.S. 670, 675-76 (2023).  To invoke a federal court's jurisdiction, a plaintiff "must satisfy the familiar tripartite test for Article III standing: (A) an injury in fact; (B) that's fairly traceable to the defendant's conduct; and (C) that's likely redressable by a favorable decision." *E.T. v. Paxton*, 41 F.4th 709, 714 (5th Cir. 2022) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  "[S]tanding is not dispensed in gross; rather, [the] plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek … ." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

The government does not dispute that plaintiffs have standing to raise the specific legal issues that have been the subject of this appeal to date because, as to each issue, plaintiffs sufficiently established that their preferred methodology would result in higher QPAs, which would in turn provide a financial benefit to the plaintiff medical providers (while operating to the financial detriment of consumers and insurers).  By

6

contrast, plaintiffs would be unable to make any such showing—and have never attempted to do so—with respect to the issues identified in the supplemental briefing order.

As to the first issue, insurers were never required or permitted to "incorporate[] $0 rates into the QPA methodology." Dec. 12 Order 2. Even if the Court were to interpret the July 2021 rule differently (and it should not for the reasons discussed both above and below), the legal issue this implicates—whether a requirement to include such rates would have been "contrary to law," *id.*—was rendered academic once the Departments stated unambiguously in subsequent guidance that insurers "should not include $0 amounts" when calculating QPAs, ROA.11469 n.29. The relevant jurisdictional question when this suit was filed (after that clarifying guidance) is not whether plaintiffs could establish standing to challenge any hypothetical requirement that $0 rates be included in QPA calculations; instead, it is whether plaintiffs have a cognizable stake in obtaining a court order that would simply reinforce a methodological issue already resolved by the Departments' guidance document. They do not have such a stake because they have not attempted to show (and would be unable to show) that such a court order would provide them redress beyond what has already been provided via the guidance document.

To be clear, the government does not dispute that, if the Departments had directed insurers to include $0 rates in their QPA calculations and had never retracted any such hypothetical direction, these plaintiffs would presumably have standing to challenge such a requirement for the same reasons that give them standing to raise the arguments that are properly before the Court: setting aside a directive of this sort would tend to result in higher QPAs, providing a financial benefit to plaintiffs. But that is decidedly not the case here. Rather, the Departments made clear—before this suit was filed—that insurers should not be including any $0 rates in their QPA calculations. ROA.11469 n.29. Absent anything in the record to suggest that insurers ignored the Departments' instruction, there is no basis for a court to order relief that would in practical effect simply duplicate the directions already provided by the Departments. *Cf. FBI v. Fikre*, 601 U.S. 234, 240 (2024) ("Sometimes, events in the world overtake those in the courtroom, and a complaining party manages to secure outside of litigation all the relief he might have won in it. When that happens, a federal court must dismiss the case as moot.").

Plaintiffs also plainly lack standing to raise the remaining issues identified in the supplemental briefing order. Even if it could somehow be established that the Departments failed to "comply with the notice-and-comment procedural requirements of § 553 of the APA" when they issued guidance specifically instructing insurers not to

include $0 rates in their QPA calculations, Dec. 12 Order 3, any such procedural shortfall would have operated to the *benefit* of plaintiffs. As discussed already and as the arguments plaintiffs have chosen to raise make clear, it is in plaintiffs' financial interest to have a methodology that results in higher QPAs. By "telling insurers not to include $0 rates" through a guidance document, *id.*, the Departments took a step that would either have no meaningful impact (to the extent insurers were already correctly excluding $0 rates based on the plain text of the July 2021 rule and the statute) or one that would tend to operate to the financial benefit of providers like plaintiffs (to the extent any insurers were incorrectly including $0 rates before issuance of the guidance). A procedural notice-and-comment challenge of the sort referenced in the Court's second through fourth questions is not properly before the Court in this case, where the plaintiffs presumably would prefer for the guidance to be adhered to rather than having it held procedurally invalid.

**B.    In any event, the Departments' approach to "$0 rates" comports with the APA and the No Surprises Act.**

If the Court nonetheless reaches the merits of the issues described in the supplemental briefing order, it should resolve them as follows: (1) the July 2021 rule comports with the No Surprises Act because it did not direct insurers to include $0 rates into the QPA methodology; (2) the footnote in a subsequent FAQ document clarifying that insurers should not include $0 rates in their calculations was at most an interpretive rule, not a legislative rule; (3) the Departments therefore complied with the notice-and-comment procedural requirements of the APA because interpretive rules are exempt from those requirements; and (4) even if an agency were to "tr[y] to fix a substantive defect in a procedurally improper way," there would be no "proper remedy under the APA" for such claims in this case because these issues effectively cancel each other out without leaving anything of real-world consequence for a court to decide. Dec. 12 Order 3.

**1.**  The Court's first question is whether the July 2021 rule was "contrary to law on the day that it was issued because it incorporated $0 rates into the QPA methodology." Dec. 12 Order 2 (citing 86 Fed. Reg. at 36,889). The answer is "no" because the July 2021 rule did no such thing.

The July 2021 rule instructs insurers to calculate the QPA using a methodology derived directly from the text of the No Surprises Act, 45 C.F.R. § 149.140(b)(1), fleshing out the term "contracted rate" as meaning "the total amount" a health plan has "contractually agreed to pay" for the relevant medical services, *id.* § 149.140(a)(1). The supplemental briefing order refers to 86 Fed. Reg. at 36,889, presumably because that page from the preamble of this rule makes explicit what is already implicit in this regulatory definition: that, because the plain text of the No Surprises Act "envisions that

each contracted rate for a given item or service be treated as a single data point when calculating a median contracted rate," "the rate negotiated under a contract constitutes a single contracted rate regardless of the number of claims paid at that contracted rate."

As the Departments have explained in the FAQ document also referenced in the supplemental briefing order, to the extent some insurers apparently "enter $0 in their fee schedule" for certain services as placeholders for services the provider is not equipped to provide, the Departments do not believe this figure could properly be included in a QPA calculation because it "does not represent a contracted rate" under the definition already set forth in the regulation. ROA.11469 n.29. That is, in the Departments' view, the entry of $0 in a fee schedule does not reflect that an insurer has actually "contractually agreed to pay" $0 for a particular service such that it could properly be included in the calculation under the regulation. 45 C.F.R. § 149.140(a)(1). Rather than reflecting that a provider agreed to perform a particular service free of charge in contravention of common sense and basic economic principles (as the adage goes, "there's no such thing as a free lunch"), any such entries in an insurer's rate tables are best understood as reflecting that the services at issue are plainly not ones the provider is actually "equipped to furnish." ROA.11469 n.29. For that reason, a $0 rate on its face cannot be treated by an insurer as if it accurately reflects an amount that the insurer and provider have mutually agreed could be collected by the provider if it were to perform the service for one of the insurer's enrollees.

Consider the contrast between these "$0 rates" (which fall outside the regulatory definition set forth at 45 C.F.R. § 149.140(a)(1)) and the so-called "ghost rates" that are the focus of plaintiffs' challenge in this case. Plaintiffs' apparent concern with the Departments' regulation is that, for example, they believe an obstetrician-gynecologist may have agreed to accept an artificially low rate for delivery services in one of the contracts in effect on January 31, 2019, that form the basis for QPA calculations without really meaning to perform these services because this particular provider may have had a subspecialty that does not usually involve delivering babies. TMA Answering En Banc Br. 33.[2] In plaintiffs' view, even though the provider would have been entitled to reimbursement at the agreed-to rate if she had performed these within-specialty medical

---

[2] As the Departments have previously explained, to the extent the district court grounded its interpretation of the statute in a policy concern that a provider might agree to an artificially low rate for a service that falls *outside* the provider's specialty, *see* ROA.13208, the statute already addresses that concern through the requirement that the QPA calculation be based on the rates from providers "in the same or similar specialty," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). *See* Gov't Opening En Banc Br. 22-24; Gov't Reply En Banc Br. 9-10. Thus, if a contract in effect in 2019 were, for example, to include an agreed-to rate for delivery services performed by a dermatologist,

9

services under the contract, the No Surprises Act required the Departments to adopt a QPA methodology under which insurers would somehow figure out that a particular provider did not really intend to perform the service at the agreed-to rate when forming the contract that was in effect on January 31, 2019. *See id.* at 31-32. On plaintiffs' telling, insurers must somehow account for providers' 2019 expectations about performance of particular services when calculating all their QPAs even though the QPA is one of many factors that arbitrators consider when determining payment amounts under the No Surprises Act, and even though a provider is welcome to contend in any particular case arising under the Act that the QPA does not reflect the fair value of the services at issue for this or any other reason. The Departments' regulation does not include any such limitation because, for the reasons explained in the prior briefing, plaintiffs' reading of the statute imports an atextual and unworkable limitation on the universe of agreed-to rates that should be used in calculating the QPA. The Departments' regulation does, however, include the textually proper and readily administrable guardrail necessary to ensure the exclusion of so-called "$0 rates": that this particular figure cannot be properly used in calculating the QPA because it is obvious on its face that it serves as a placeholder or some other purpose, not an offer of free services or a rate providers could be held to if they performed that service.

To the extent the Court's question is whether a hypothetical regulation that *did* instruct insurers to incorporate $0 rates into their QPA calculations *would have been* contrary to law, that question is not presented here for the reasons already discussed. And as a general matter, courts should not reach out to decide whether a hypothetical regulation that has not been promulgated would fall outside the bounds of a statute. In this particular case, however, if the Court determines for whatever reason that it should decide for itself whether $0 entries in insurers' fee tables could properly be treated as "contracted rates" under the statute, the Departments' view is that the statute would preclude this for essentially the same reasons already discussed in the FAQ document referenced in the Court's order, which apply equally to the statutory text "contracted rates" (42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)) as to the regulatory definition of that term (45 C.F.R. § 149.140(a)(1)). *See* ROA.11469 n.29. Plaintiffs presumably would not take issue with this interpretation of the statute, which underscores the absence of a live case or controversy related to this issue.

**2.** The Court's second question is whether, "[b]y telling insurers not to include $0 rates," footnote 29 of the August 2022 document titled "Part 55" in a series of "Frequently Asked Questions" regarding implementation of the No Surprises Act was "operating as a legislative rule that required notice and comment." Dec. 12 Order 3

---

that rate would not affect the QPA that is separately calculated for delivery services performed by obstetrician-gynecologists.

10

(citing ROA.11469 n.29). The answer is "no" because the cited footnote of this guidance document was at most an interpretive rule and was therefore exempt from the APA's notice-and-comment requirements under 5 U.S.C. § 553(b)(A).[3]

The APA does not require notice and comment before an agency issues "interpretative rules," 5 U.S.C. § 553(b)(A), also known as "interpretive rules." Whereas a "legislative rule" subject to the APA's notice-and-comment requirements has the "force and effect of law" and "bind[s] the public and courts in a manner indistinguishable from a statute," "[a]n interpretive rule is one that clarifies, rather than creates, law." *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 240-41 (5th Cir. 2023) (quotation marks omitted). As the Supreme Court has explained, "the critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)). Thus, in contrast to a legislative rule—which "spawns from the agency's congressionally-delegated powers (if any) to create law"—a rule is interpretive and therefore "exempt from notice and comment if all that it does is interpret existing, substantive law." *Flight Training Int'l, Inc.*, 58 F.4th at 241 n.5 (alterations and quotation marks omitted).

Footnote 29 of the August 2022 FAQ document sets forth a classic interpretive rule, to the extent it sets forth a rule at all. The footnote states "the Departments' view" about how to understand a $0 entry in an insurer's fee schedule: that it "does not represent a contracted rate." ROA.11469 n.29. "Contracted rate" was a statutory term already further defined by the preexisting July 2021 interim final rule to mean "the total amount" a health plan has "contractually agreed to pay" for the relevant medical services, 45 C.F.R. § 149.140(a)(1). In the FAQ document, the Departments were simply "advis[ing] the public" of their "construction" of the existing substantive law set forth by the No Surprises Act and the July 2021 interim final rule, *Perez*, 575 U.S. at 97 (quotation marks omitted): namely, that the sorts of $0 entries in fee schedules that had been brought to the Departments' attention fall outside the existing regulation's definition of contracted rates because such entries do not reflect a price that is the object of a mutual contractual agreement between an insurer and provider, 45 C.F.R.

---

[3] It is a bit odd to think of this footnote in a sub-regulatory guidance document as a "rule" at all, rather than a recognition that the QPA methodology looks to actual agreed-to rates, not placeholders. Nonetheless, because the footnote's guidance regarding $0 entries could at least arguably be classified as a "rule" for purposes of the APA, 5 U.S.C. § 551(4), the Court could assume *arguendo* that the footnote sets forth a "rule" and hold that it is at most an interpretive one exempt from the APA's notice-and-comment requirements.

§ 149.140(a)(1).

This footnote does not fall within the category of rules that must go through notice and comment because they "repudiate[] or [are] irreconcilable with a prior legislative rule." *Flight Training Int'l, Inc.*, 58 F.4th at 241 (quotation marks omitted). This Court has found that circumstance present when, for example, a new rule would have changed the criteria for issuing a particular certificate by omitting one of the existing regulatory requirements for such issuance. *See id.* at 244. The footnote at issue here, however, is very different: as already explained, the footnote is entirely consistent with the preexisting regulatory definition because a $0 entry just reflects an example of a particular factual circumstance for which the Departments were articulating their interpretation of how best to apply the July 2021 regulation.

Additional characteristics commonly found in legislative rules are also not present here. As discussed, it is clear that this footnote did not reflect that the agency "intended to speak with the force of law." *Mock v. Garland*, 75 F.4th 563, 580 (5th Cir. 2023). That alone should provide a sufficient basis for resolving this issue because the bottom-line question that a court is answering when deciding whether a rule is legislative or interpretive is "whether the agency intended to speak with the force of law" by "exercis[ing] … delegated legislative power." *Guedes v. ATF*, 920 F.3d 1, 17-18 (D.C. Cir. 2019) (per curiam) (quotation marks omitted). To the extent this Court may look to additional "factors" to assist with this inquiry, each of those also indicates that the footnote at issue is interpretive: the FAQ document is not "published … in the Code of Regulations," the Departments did not "explicitly invoke[ their] general legislative authority" when announcing their view regarding the proper way for insurers to deal with $0 entries when calculating QPAs, the Departments did not "claim[] *Chevron* deference" (which had not yet been overruled at the time of the FAQ document), and there is no indication that the Departments' clarification as to how an existing rule applies to a particular scenario would "produce significant effects on private interests." *Mock*, 75 F.4th at 580 (alteration and quotation marks omitted).

**3.** The Court's third question applies by its terms only if the second question is answered affirmatively, in which case the Court has asked whether the Departments "compl[ied] with the notice-and-comment procedural requirements of § 553 of the APA" when issuing the August 2022 FAQ document. Dec. 12 Order 3. For the reasons already discussed, the answer to the Court's second question is "no," so the Court's third question is not implicated. That is, the Departments complied with the APA's notice-and-comment requirements because the statement at issue was at most an interpretive rule exempt from those requirements.

**4.** The Court's final question is: "If an agency tries to fix a substantive defect in a procedurally improper way, what is the proper remedy under the APA?" Dec. 12

Order 3. For the reasons already discussed, both premises of this question are inapplicable here: there was no substantive defect in the July 2021 rule's treatment of $0 entries in insurer fee tables, nor did the Departments do anything procedurally improper when they subsequently clarified how the existing rule applies to any such $0 entries.

Assuming *arguendo* that the Court concludes otherwise on both these issues and therefore reaches this final question, that would still not support a remedy here for reasons that overlap with the above discussion as to why plaintiffs lack standing to raise these claims in the first place. It is difficult to conceive of any plaintiff who could establish standing to raise challenges to administrative actions that cut in precisely opposite directions in the way hypothesized here. Rather, such actions would effectively cancel each other out: the rule posited by the question would be contrary to law in precisely the way the agency has already modified it, leaving no more work to be done by a judicial order that of course would effectively mandate the same result already set forth by the agency.

Suppose, for example, that these plaintiffs had properly placed before the Court the question whether the July 2021 rule unlawfully required insurers to include $0 entries in rate tables when calculating QPAs. If such an action had been taken in isolation and plaintiffs had raised a "contrary to law" challenge under the APA, that likely would have presented a live case or controversy for the same reasons that apply to the challenges plaintiffs did bring. But the subsequent FAQ document already redressed the precise injury that would have been at issue in such a challenge. To have standing to seek a court order that effectively duplicates the relief already provided by the FAQ document in this hypothetical scenario, plaintiffs would have needed to show that insurers were continuing to follow the methodology set forth in the preceding rule even though, by hypothesis, the rule's methodology conflicted with both the statute and the agency's subsequent instructions to the regulated public. And that is the only circumstance in which a court order addressing these issues could even theoretically make a practical difference sufficient to support standing.

As the Departments have explained at length in prior briefing, remedies under the APA must be understood in the context of traditional equitable principles. *See* Gov't Opening En Banc Br. 33-50; Gov't Reply En Banc Br. 29-43. The government reiterates that this case presents an ideal opportunity for the en banc Court to interpret the APA's text in a manner that properly accords with its original understanding and with the traditional limits on equity jurisdiction reflected in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), which preclude courts from entering the sort of universal relief awarded by the district court here.

Regardless of how this Court resolves the important and commonly recurring remedial issue that was discussed in the prior briefs, the Court must at a minimum

resolve this case consistent with the principle that "federal courts do not exercise general oversight of the Executive Branch; they resolve cases and controversies consistent with the authority Congress has given them." *CASA*, 606 U.S. at 861. Whatever other remedies the APA might authorize, bedrock principles of the federal judicial system certainly preclude the Court from awarding relief to these plaintiffs based on the series of issues identified in the supplemental briefing order for all the reasons discussed above.

    Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

JAY R. COMBS
  *Acting United States Attorney*

AUGUST FLENTJE

*s/ Kevin B. Soter*
KEVIN B. SOTER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7222*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *kevin.b.soter@usdoj.gov*

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Kevin B. Soter*
Kevin B. Soter

## CERTIFICATE OF COMPLIANCE

This letter brief complies with the Court's December 12, 2025, Order because it contains 14 pages, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Rule 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Kevin B. Soter*
Kevin B. Soter
