

SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, DC 20005
+1 202 736 8000

AMERICA • ASIA PACIFIC • EUROPE

+1 202 736 8148
JSTONECIPHER@SIDLEY.COM

January 23, 2026

**By CM/ECF**

Lyle W. Cayce
Clerk of Court
U.S. Court of Appeals
For the Fifth Circuit
600 S. Maestri Place, Suite 115
New Orleans, LA 70130

Re:   Case No. 23-40605, *Tex. Med. Ass'n v. HHS*

Dear Mr. Cayce:

Pursuant to the Court's December 12, 2025 order, plaintiff-appellees Texas Medical Association, Tyler Regional Hospital, LLC, and Dr. Adam Corley submit this letter brief addressing the Court's questions.

**I.   The Court should affirm because it is unlawful to include any ghost rates—whether $0 or not—in QPA calculations.**

As a threshold matter, Plaintiffs respectfully submit that the Court should affirm because including in QPA calculations *any* rates—whether $0 or otherwise—for items or services that a provider does not "provide" violates the No Surprises Act. The Court should therefore affirm regardless of the answers to its four questions, addressed in more detail below, which focus only on the subset of unlawful ghost rates that are $0 rates. *See infra*, Part II.

The Departments do not dispute that the July Rule and August FAQs require inclusion in the QPA calculation of any non-$0 ghost rates that appear in contracts. They concede that, because insurers use form contracts that include rates "for service codes that … are not utilized" by the contracting provider, those contracts include rates for services the provider does not make available and may not even be "equipped to furnish." ROA.11468–69; *see also* Oral Argument 1:03:45–1:04:08 (counsel for the Departments conceding that even within-specialty ghost rates sometimes occur). Yet the Departments say every rate that appears in a contract must go into the QPA calculation with "no further inquiry." Oral Argument 1:01:17–24. That is unlawful. *See* TMA En Banc Br. 27–31.

# SIDLEY

Lyle W. Cayce
January 23, 2026
Page 2

      Nor do the Departments dispute that non-$0 ghost rates exist. The Department recognized as much in the August FAQs, in which the Departments acknowledged that "providers accept contracted rates established by plans or issuers for service codes that they are not likely to bill," with "some" (but not all) "even accepting $0 as their rate for codes they do not utilize." ROA.11468. Uncontested declarations filed in this action confirm that such non-$0 ghost rates exist. *See* ROA.197 ("Not all [ghost] rates are $0 … ."); ROA.174 ("Ghost rates *can* be as low as $0 … ." (emphasis added)); ROA.185 (same); ROA.204 (same); *see* Oral Argument 35:55–36:02.

      The Departments' own data confirms the existence of non-$0 ghost rates: In the fourth quarter of 2024 alone, insurers reported QPAs of between one cent and $1 to arbitrators 81 times, and in many of those instances the arbitrator ultimately awarded the provider over $1,000, including one instance in which the arbitrator awarded $67,800. *See* CMS, *Independent Dispute Resolution Reports*, tinyurl.com/zbj4t63x.[1] The only plausible explanation for these not-quite-$0 QPAs, and the massive disparity between the QPAs and the ultimate awards, is that insurers included artificially low (but not-quite-$0) ghost rates when calculating the QPAs. Reported data for other quarters contain similar examples of particularly low non-$0 ghost rates infecting QPAs. *See id.*

      In three years of litigation the Departments have never disputed that ghost rates can be more than $0 dollars. Nor have the Departments attempted to defend the July Rule and August FAQs on the ground that excluding $0 rates cures the ghost-rates problem. Nor have any of the insurers participating as *amici* in this case disputed that non-$0 ghost rates exist. They would surely know: Insurers set the initial rates offered in fee schedules, *see* ROA.11468, and insurers alone calculate QPAs—in secret and without any review by providers or arbitrators, *cf.* 45 C.F.R. § 149.140(d); ROA.11468.

      These non-$0 ghost rates occur even in contracts with doctors in the same specialty as the out-of-network doctor seeking reimbursement. Counsel for the Departments argued that ghost rates are not an issue because doctors specializing in emergency medicine provide a wide variety of services. Oral Argument 1:04:28–44. But the NSA's definition of "emergency services" is broad, encompassing "stabiliz[ing]" treatment, 42 U.S.C. § 300gg-111(a)(3)(C), "regardless of the department of the hospital in which [it] is furnished," 86 Fed. Reg. 36872, 36879 (July 13, 2021). Thus, emergency services include an OB-GYN's services in a labor and delivery department. 42 U.S.C. § 300gg-111(a)(3)(J); *id.* § 1395dd(e)(3). And because fee schedules in form contracts with OB-GYNs often include rates for labor and delivery services even when the OB-GYN does not provide those services, QPAs for those services are based on ghost rates. *See*

---

[1] Download the "Federal IDR PUF for 2024 Q4" spreadsheet, navigate to the "QPA and Offers" tab, then filter the "QPA" column by $0.01 to $1.00.

# SIDLEY

Lyle W. Cayce
January 23, 2026
Page 3

Oral Argument 1:03:45–1:04:13 (counsel for the Departments not contesting that OB-GYN contracts can include rates for labor and delivery services the provider does not provide). Not to mention, the NSA applies in certain non-emergency contexts as well. *See* 42 U.S.C. § 300gg-111(b).

The bottom line is that both $0 ghost rates and non-$0 ghost rates are for items and services that are never "provided." Including either subset of ghost rates in calculating QPAs fails to give effect to that independent statutory requirement and arbitrarily and capriciously drives QPAs below the median negotiated rates they are supposed to reflect. So whatever the answers to the Court's questions focused on $0 rates, the Court should affirm.

**II.     The Departments' approach to $0 rates reinforces that the Court should affirm.**

    **A.     The July Rule was contrary to law on the day that it was issued because it incorporated $0 rates into the QPA methodology.**

The July Rule, as understood by the Departments, instructs insurers to include all ghost rates (including $0 rates) in QPAs. It was therefore contrary to law on the day that it was issued.

**1.** The July Rule requires insurers to include $0 rates in QPA calculations. The preamble to the July Rule was clear that "each contracted rate" should enter the QPA calculation. 86 Fed. Reg. at 36889. And the July Rule defined "contracted rate" as the "amount" (any amount) "that [an insurer] has contractually agreed to pay a participating provider, facility, or provider of air ambulance services for covered items and services." 45 C.F.R. § 149.140(a)(1). The July Rule did not discuss the independent "provided" requirement, and neither the preamble nor the regulation excluded $0 rates from the definition of "contracted rate." *See id.* The Departments have pressed the view throughout this litigation that, under the July Rule, "all" "agreed-to rate[s]" "should be included in the QPA calculation." *See* Dkt. 298-1 at 11; *id.* at 4 (arguing "the rule reasonably interprets the statutory requirement … to mean that the calculation should look to the rates appearing on the face of a health plan's contracts").

The August FAQs too make clear the Departments' view that the July Rule instructs insurers to include $0 rates in QPA calculations. The Departments write that the July Rule tells insurers to include rates for services that "providers do not provide." ROA.11469. The Departments did not present this instruction as a change in how the July Rule works. Rather, in their view, including contracted rates for services "that providers do not provide" was always what "the July 2021 interim final rules … require[d]." *Id.* And these "contracted rates" for service codes providers "do not utilize" included "$0 as [a] rate." ROA.11468. If one takes the Departments' view, the July Rule was therefore unlawful on the day it issued because it required insurers to include $0 ghost rates, along with all other ghost rates, in QPA calculations. If that were not the case, the Departments would not have needed to include a separate instruction in the

# SIDLEY

Lyle W. Cayce
January 23, 2026
Page 4

August FAQs telling insurers to exclude only $0 rates. Throughout this case, the Departments have cited the August FAQs—not the July Rule—as instructing insurers to exclude $0 rates from QPA calculations. *See, e.g.*, Dept's En Banc Br. 24; Dep'ts Opp. to Pet. for Rehr'g 6.[2]

    **2.** Plaintiffs have argued from the beginning of this litigation that it is unlawful to include in QPA calculations any ghost rates, including $0 rates. *See, e.g.*, TMA En Banc Br. 5–6 (framing the issue as "[w]hether the Departments unlawfully departed from the NSA by requiring insurers to include rates for items and services that are not provided"). And plaintiffs have challenged both the July Rule and the August FAQs on this ground. *See id.* at 13 ("[G]host rates can be as low as $0."); *id.* at 23 ("The July Rule's inclusion of ghost rates is unlawful."); *id.* at 28 ("[T]he July Rule and the August FAQs give no effect to the term 'provided.'"); *id.* at 33 ("The Departments' belated decision in the August FAQs to exclude only $0 rates merely highlights the unreasonableness of including all other ghost rates."); *see also* TMA Panel Br. 47 (same). So plaintiffs have squarely presented the issue of whether the Departments' inclusion of ghost rates—of any amount—in QPA calculations is contrary to law.

    The parties did not frame the ultimate issue as whether the July Rule would be contrary to law if it excluded $0 rates, but included all other ghost rates, for two reasons.[3] First, that is not what the July Rule does. The July Rule draws no distinction between $0 and non-$0 amounts "that [an insurer] has contractually agreed to pay" a provider. 45 C.F.R. § 149.140(a)(1). And there is no way to read the July Rule as excluding only $0 rates from QPA calculations. Second, the distinction between $0 ghost rates and non-$0 ghost rates makes no difference. Including in QPA calculations any rate—whether $0 or not—for an item or service that the provider does not provide violates the NSA.

---

[2] The July Rule parrots the statutory "provided" language. 45 C.F.R. § 149.140(b)(1). If, contrary to the Departments' view, the July Rule standing alone requires insurers to exclude all ghost rates from QPA calculations, it is consistent with the NSA in that respect. But if that is the case, and as explained below, the August FAQs conflict with both the NSA and the July Rule by instructing insurers to include in QPA calculations rates for items and services that "providers do not provide." ROA.11469.

[3] Nevertheless, the Court may hold that the July Rule is unlawful simply because it (1) is contrary to law for including $0 ghost rates in QPA calculations, or (2) is arbitrary and capricious for failing to consider and address ghost rates—of any amount—and their impact on QPAs. *See* TMA En Banc Br. 33. As to the latter ground, the Departments admitted in the August FAQs that they failed to consider ghost rates in issuing the July Rule. *See* ROA.11468. That "fail[ure] to consider an important aspect of the problem" is enough to render the rule unlawful. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

# SIDLEY

Lyle W. Cayce
January 23, 2026
Page 5

### B.   The FAQ document's instruction not to include $0 rates constituted a legislative rule that required notice and comment.

**1.** Under this Court's cases, "[t]he hallmark of a legislative rule is that it 'modifies or adds to a legal norm.'" *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 241 (5th Cir. 2023). An interpretive rule, by contrast, merely explains the content of "existing law." *Mock v. Garland*, 75 F.4th 563, 579 (5th Cir. 2023).

Under this test, the August FAQs' instruction to exclude $0 rates and no others is a legislative rule because it is the sort of "numerical limit[ ]" that "cannot readily be derived" from—and thus necessarily adds to or modifies—existing law. *Mo. Pub. Serv. Comm'n v. FERC*, 215 F.3d 1, 4 (D.C. Cir. 2000). "To fall within the category of interpretive, the rule must derive a proposition from an existing document whose meaning compels or logically justifies the proposition … ." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010). That's why "a specific numeric amount" usually does "not qualify as a mere 'interpretation' of general nonnumeric language." *United States v. Riccardi*, 989 F.3d 476, 487 (6th Cir. 2021). When an agency derives a numeric limit from nonnumeric language, "it is impossible to give a reasoned distinction between numbers just a hair on the OK side of the line and ones just a hair on the not-OK side." *Mo. Pub. Serv. Comm'n*, 215 F.3d at 4. So when "an agency wants to state a principle 'in numerical terms' … that cannot be derived from a particular record, the agency is legislating and should act through rulemaking." *Catholic Health*, 617 F.3d at 495.

The Departments' exclusion of $0 rates (and only $0 rates) from the QPA calculation satisfies that test for a legislative rule. Nothing about the statutory terms "rate" or "contracted rates," "compels or logically justifies" excluding only $0 rates. *Id.* at 494. The dictionary definition of "rate" refers merely to the "value" or "worth" of a thing; nowhere does it say that "value" or "worth" must be non-zero. *See Rate*, Oxford English Dictionary, tinyurl.com/42cb6svv. Legal and economic contexts are no different. When the IRS says certain individuals have a "capital gains [tax] rate of 0%," no one thinks the accountants have revolutionized language. IRS, *Topic no. 409, Capital gains and losses* (updated Jan. 5, 2026), tinyurl.com/2vspnnn4. Because nothing inherent in the statutory text "suppl[ies] substance from which" the Departments' $0-only exclusion "can be derived," their rule is necessarily legislative. *Catholic Health*, 617 F.3d at 495; *see also Mock*, 75 F.4th at 579.

**2.** This Court sometimes applies a five-factor balancing test in determining whether a rule is legislative or interpretive. *See Mock*, 75 F.4th at 580. Because the instruction to exclude $0 rates plainly modifies existing law, there is no need to resort to that test. *See Flight Training*, 58 F.4th at 243–46. But even if the five-factor test applied, the instruction to exclude $0 rates is a legislative rule.

# SIDLEY

Lyle W. Cayce
January 23, 2026
Page 6

First, the "language actually used" by the Departments shows that they "intended to speak with the force of law." *Mock*, 75 F.4th at 580. The FAQs leave no doubt that the Departments expected the regulated public to comply with the FAQs' instructions. The instruction to exclude $0 rates purports to tell insurers what they "should" do "in calculating median contracted rates." ROA.11469 n.29. On the same page on which the instruction to exclude $0 rates appears, the Departments even offered a 90-day exercise of enforcement discretion during which "the Departments will not require a plan or issuer … to calculate a QPA *as described in this guidance*." ROA.11469 (emphasis added). These statements "evince an effort to directly govern the conduct of members of the public, affecting individual rights and obligations." *Mock*, 75 F.4th at 581 (cleaned up).

Second, the rule "will produce significant effects on private interests." *Id.* at 580 (cleaned up). Once calculated, QPAs form the basis of provider reimbursement forever under the NSA. It is therefore critical that insurers get QPAs—and thus the inputs to QPA calculations—right. And that means an instruction by the Departments about what goes into this figure is "a rule of the type Congress thought appropriate for public participation." *Texas v. United States*, 787 F.3d 733, 765 (5th Cir. 2015).

The remaining factors are of minimal importance. Although the Departments did not "claim *Chevron* deference," *Mock*, 75 F.4th at 580, that factor is irrelevant now that *Chevron* has been overruled, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). And, while the Departments did not publish the FAQs in the Code of Federal Regulations or explicitly invoke their legislative authority, these factors should not move the needle since this Court is "not bound by an agency's classification of its action." *Mock*, 75 F.4th at 580. The FAQs' instruction to exclude $0 rates from QPA calculations was legislative by any measure.

**3.** Even if some portion of the FAQs were interpretive, the portion instructing insurers to include in QPA calculations rates for services that "providers do not provide" is unlawful. ROA.11469. "An interpretive rule may be sufficiently within the language of a legislative rule to be a genuine interpretation and not an amendment, while at the same time being an incorrect interpretation of the agency's statutory authority." *Am. Mining Cong. v. Mine Health & Safety Admin.*, 995 F.2d 1106, 1113 (D.C. Cir. 1993). By deleting the "provided" requirement from the statute, this instruction—interpretive or legislative—is contrary to law.

  C.  **The Departments did not comply with the notice-and-comment procedural requirements of § 553 of the APA.**

The Departments did not comply with the notice-and-comment procedural requirements of 5 U.S.C. § 553 when promulgating the August FAQs. Those requirements include publishing notice in the Federal Register, § 553(b), providing "an opportunity to participate in the rule

# SIDLEY

Lyle W. Cayce
January 23, 2026
Page 7

making" through submitting comments, § 553(c), and subsequently publishing the rule's "general statement" of "basis and purpose," *id.*; *see also Mock*, 75 F.4th at 583.

      The Departments took none of these steps. There was no notice published in the Federal Register; the final version of the FAQs simply appeared on the Centers for Medicare and Medicaid Services website without any warning. Nor was there opportunity for public comment.

      The only exception to these requirements for legislative rules does not apply here. Although an agency may skip notice and comment "for good cause," it must "incorporate the finding and a brief statement of reasons therefor in the rules issued." § 553(b). There is no published finding of "good cause" in the FAQs, so the exception cannot apply. *Id.*; *see N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 767–68 (4th Cir. 2012); *Texas v. Becerra*, 623 F. Supp. 3d 696, 735 (N.D. Tex. 2022).

    **D.**    **An agency cannot fix a substantive defect in a procedurally improper way, but the proper remedy depends on the relief sought by the plaintiff.**

      An agency cannot cure an unlawful rule with another unlawful rule. That is true whether the legal defect is substantive or procedural. The APA requires reviewing courts to "hold unlawful and set aside agency action" that is unlawful for any of six reasons. 5 U.S.C. § 706(2). The text makes no distinction between agency action that is "not in accordance with law" and agency action that was issued "without observance of procedure required by law"—either way, the action is "unlawful" and must be "set aside." *Id.*

      It follows that a procedurally flawed agency action, like the August FAQs, cannot cure a substantively flawed agency action, like the July Rule. "Set aside" means vacate, meaning the procedurally flawed agency action is "treated as though it had never happened," *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), and something that "never happened" cannot cure anything. Even if "set aside" means "disregard" (as the Departments wrongly say, En Banc Br. 38), then the procedurally flawed agency action is ignored for purposes of determining the parties' rights vis-à-vis the original, substantively flawed agency action, *see Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923). Either way, a procedurally flawed agency action cannot cure a prior, substantive legal defect.

      This Court's decision in *Texas v. Biden* illustrates the point.[4] At issue was the legality of the Department of Homeland Security's June 1, 2021 memorandum terminating an immigration program. 20 F.4th 928, 941 (5th Cir. 2021). The district court held the memorandum arbitrary

---

[4] Although *Texas* was reversed in part, *see* 142 S. Ct. 2528, we draw from the mootness portion of the opinion, which "remains binding." *Data Mktg. P'ship, LP v. Dep't of Labor*, 45 F.4th 846, 856 n.2 (5th Cir. 2022).

# SIDLEY

Lyle W. Cayce
January 23, 2026
Page 8

and capricious, the government appealed, and while the appeal was pending, DHS issued two more memoranda further explaining its termination decision. *Id.* at 944–46. The government then claimed that the whole case was moot because its later memoranda "cure[d] any legal defects in the June 1" decision. *Id.* at 956. This Court disagreed. The later memoranda had their own legal defects: They contained nothing "more than post hoc rationalizations of the Termination Decision." *Id.* at 961. And that made them "powerless to cure the June 1 Termination Decision's problems." *Id.* at 961.

The same is true here. Even assuming *arguendo* that the only problem with the July Rule were that it included $0 rates in QPAs, the instruction in the August FAQs to exclude those rates would be "powerless to cure" the July Rule's defect because that instruction was issued "without observance of procedure required by law." *Id.*; 5 U.S.C. § 706(2)(D); *cf. Elec. Power Supply Ass'n v. FERC*, 89 F.4th 546, 557 (6th Cir. 2023) (refusing to consider substantive validity of agency order that may have been issued without proper procedure). Because the defect in the July Rule could not have been and was not cured by the procedurally defective FAQs, the July Rule is unlawful, and the Court should hold as much.[5]

Plaintiffs respectfully request that the Court affirm.

---

[5] To be clear, while the procedurally defective August FAQs are no barrier to the Court ruling that the July Ruly is substantively flawed, the Court should not vacate the instruction in the August FAQs to exclude $0 rates from QPA calculations on the basis that the instruction was procedurally flawed. No party has asked for that, so ordering it would "transgress[ ] the party-presentation principle." *Clark v. Sweeney*, 607 U.S. —, — (2025) (slip op., at 2); *cf. Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952–53 (5th Cir. 2024), *rev'd on other grounds sub nom. Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427 (2025). The reality is that the exclusion of $0 ghost rates required by the August FAQs is better than no exclusion at all. So a decision holding that the FAQs' instruction to exclude $0 ghost rates is unlawful on procedural grounds could put plaintiffs in a worse position than if they had never sought relief at all. Accounting for risks like that is precisely why "the party who brings a suit is master to decide what law he will rely upon." *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913).

# SIDLEY

Lyle W. Cayce
January 23, 2026
Page 9

                              Respectfully submitted,

                              /s/ *Jillian Sheridan Stonecipher*

                              Jillian Sheridan Stonecipher
                              Sidley Austin LLP
                              1501 K Street, NW
                              Washington, D.C. 20005
                              (202) 736-8148
                              jstonecipher@sidley.com

                              *Counsel for Appellees Texas Medical Association, Tyler Regional Hospital, L.L.C., and Doctor Adam Corley*

cc: All counsel of record by CM/ECF