# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 11, 2026

Lyle W. Cayce
Clerk

———————

No. 23-40605

———————

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL, L.L.C.; DR. ADAM CORLEY,

*Plaintiffs—Appellees/Cross-Appellants*,

*versus*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; OFFICE OF PERSONNEL MANAGEMENT; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF TREASURY; ROBERT F. KENNEDY, JR., *Secretary, U.S. Department of Health and Human Services, in his official capacity*; SCOTT KUPOR, *Director of the Office of Personnel Management, in his official capacity*; SCOTT BESSENT, *Secretary, U.S. Department of Treasury, in his official capacity*; KEITH SONDERLING, *Acting Secretary, U.S. Department of Labor, in his official capacity*,

*Defendants—Appellants/Cross-Appellees*,

———————————————————————

LIFENET, INCORPORATED; AIR METHODS CORPORATION; ROCKY MOUNTAIN HOLDINGS, L.L.C.; EAST TEXAS AIR ONE, L.L.C.,

*Plaintiffs—Appellees/Cross-Appellants*,

*versus*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; OFFICE OF PERSONNEL MANAGEMENT; UNITED

STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF TREASURY; ROBERT F. KENNEDY, JR., *Secretary, U.S. Department of Health and Human Services, in his official capacity*; SCOTT KUPOR, *Director of the Office of Personnel Management, in his official capacity*; SCOTT BESSENT, *Secretary, U.S. Department of Treasury, in his official capacity*; KEITH SONDERLING, *Acting Secretary, U.S. Department of Labor, in his official capacity*,

*Defendants—Appellants/Cross-Appellees.*

———————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC Nos. 6:22-CV-450, 6:22-CV-453

———————————————————

Before ELROD, *Chief Judge*, JONES, SMITH, STEWART, RICHMAN, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, DOUGLAS, and RAMIREZ, *Circuit Judges*.

PER CURIAM:[*]

The No Surprises Act ("NSA" or "the Act") mitigates unexpected medical bills from out-of-network healthcare providers, especially in emergencies. The Act directs insurers and healthcare providers to negotiate reimbursement rates via an "independent dispute resolution process," 42 U.S.C. § 300gg-111(c), rather than leaving patients responsible for the (potentially staggering) full balance of their treatment. That negotiation process centers on the "qualifying payment amount," or QPA.

This case concerns the methods used to calculate the QPA. The Act provides that the QPA is "the median of the contracted rates recognized by"

———————————————————

[*] Joined by ELROD, *Chief Judge*, and JONES, SMITH, RICHMAN, WILLETT, HO, DUNCAN, ENGELHARDT, and WILSON, *Circuit Judges*. JUDGE SOUTHWICK concurs in Parts I and III. JUDGE OLDHAM concurs in part.

2

an insurance plan "as the total maximum payment . . . for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished." *Id.* § 300gg-111(a)(3)(E)(i)(I). Or, in plain English: The QPA is the median of the total maximum rates in an insurer's contract for an item or service that a provider provides and furnishes, sorted by specialty and geographic region. The NSA authorized the Departments of Health and Human Services, Labor, and Treasury ("the agencies") to refine the methods used to calculate the QPA via rulemaking. *Id.* § 300gg-111(a)(2)(B).

Plaintiffs[1] challenged three aspects of the agencies' rulemaking. Plaintiffs claimed that the agencies' rules were contrary to the NSA and arbitrary and capricious. The district court ruled for plaintiffs. A panel of our court reversed, and we granted en banc rehearing. *See Tex. Med. Ass'n v. HHS*, 120 F.4th 494 (5th Cir. 2024), *reh'g en banc granted, opinion vacated*, 138 F.4th 961 (5th Cir. 2025).

This opinion proceeds in four parts. Part I considers whether insurers can include so-called "ghost rates" in the QPA. Part II considers whether insurers may exclude bonus and incentive payments from the QPA. Part III discusses whether insurers may exclude from the QPA one-off agreements for things like air ambulances. A majority of the en banc court agrees with plaintiffs on the first two issues but disagrees on the third. Finally, Part IV discusses the proper remedy.

I

Plaintiffs' first argument concerns the rates included in the QPA calculation. We (A) discuss the relevant background, (B) show why the

---

[1] After en banc argument in this case, plaintiffs filed a suggestion of death as to Dr. Adam Corley. Unfortunately, he passed away on February 25, 2026.

agencies' rule contravenes the plain text of the NSA, and (C) respond to the agencies' counterarguments.

A

The NSA defines the QPA as the "median of the contracted rates" for an "item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). In July 2021, the agencies promulgated the so-called July Rule. *See* Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872 (July 13, 2021). The July Rule is an interim-final rule, meaning that the agencies promulgated it without notice and comment. *See id.* at 36,917–18. This rule required that insurers treat "each contracted rate for a given item or service" as a "single data point when calculating a median contracted rate . . . regardless of the number of claims paid at that contracted rate." *Id.* at 36,889. In other words, insurers were to include in the QPA calculation each rate that appeared on the face of their contracts with providers.

This instruction was critical. When insurers and providers negotiate reimbursement rates for various items or services, insurers often present providers with form contracts that include a default fee schedule for all covered services. From there, providers negotiate the rates for services that they plan to provide but leave untouched the rates for services they do not provide (or at least do not plan to provide). As a result, contracts between insurers and providers often include non-negotiated "ghost rates" for services that providers do not actually provide. For example, an OB/GYN might choose not to deliver babies. So that provider's fee schedule could include an unnegotiated ghost rate for various obstetrical services. Because providers have no economic incentive to negotiate rates for services they never plan to provide, the ghost rates can be quite low (in some cases, as low as $0).

No. 23-40605

A little over a year after the agencies promulgated the July Rule, in August 2022, the agencies released a set of Frequently Asked Questions ("August FAQs"). In FAQ 14, the agencies recognized that the July Rule had instructed insurers to factor "each contracted rate" into the QPA calculation. But the agencies now directed insurers to exclude one set of ghost rates: $0 rates. The agencies had been "informed" that some provider-insurer contracts contained $0 as a reimbursement rate for items and services that providers were "not equipped to furnish." So, the agencies directed that insurers "should not include $0 amounts in calculating median contracted rates." The August FAQ nonetheless allowed insurers to continue including non-$0 ghost rates in the QPA.

In sum, the NSA sets the QPA as the "median of contracted rates" for an "item or service that is provided by a provider." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The agencies' rules direct insurers to include all rates appearing on the face of provider-insurer contracts—except $0 rates.

B

The July 2021 Rule was contrary to law, and the purported correction in the August FAQs only underscores that conclusion.

The July Rule required that insurers treat "each contracted rate for a given item or service" as a "single data point when calculating a median contracted rate . . . *regardless of the number of claims paid at that contracted rate.*" 86 Fed. Reg. at 36,889 (emphasis added). By instructing insurers to use "each contracted rate," the Rule required insurers to count the rate for each service that appeared on the face of the default fee schedules— regardless of whether the provider negotiated for them and regardless of whether the provider ever provided or furnished that service. That renders the July Rule unlawful because the Act limits the QPA to an "item or service that *is provided* by a provider." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)

5

(emphasis added). Likewise, the statute limits the QPA to rates for items and services that are "provided in the geographic region in which the item or service *is furnished*." *Id.* (emphasis added). If the provider submitted no claims and received no payments for a particular item or service—say, obstetrics not performed by a gynecologist—then that item or service was neither "provided by a provider" nor "furnished."[2] Yet those items and services *were* included in the QPA under the July Rule.

Placeholder rates of $0 were the clearest example. Ghost rates of $0 were technically a "contracted rate"—they appeared in the form contracts, even though the parties did not negotiate them. But it is undisputed that no provider ever agreed to provide any item or service for $0. *See post*, at 41 (HAYNES, J., concurring in part and dissenting in part) (agreeing on this point). By requiring insurers to include $0 ghost rates in the QPA, the July Rule was arbitrary, capricious, and otherwise contrary to law.

The agencies' subsequent clarification that insurers exclude $0 rates only emphasizes that the July Rule was contrary to law. From the combination of the July Rule and August FAQs, $0 ghost rates must be excluded from the QPA—but below-market and concededly unnegotiated $1 ghost rates must be included. This distinction does not persuade. If a $0 ghost rate must be excluded because it's obvious that a particular provider did not contract to provide anything for free, the same must be true for a below-market non-$0 (*e.g.*, $1) ghost rate. Either the provider contracted for the rate, or he did not. If non-negotiated ghost rates must be excluded from

---

[2] "Provided by a provider" is the sort of phrase only a legislative staffer could love. It is reminiscent of the Americans with Disabilities Act, which defines an "employee" as "an individual employed by an employer": "That surely qualifies as a mere nominal definition that is completely circular and explains nothing." *Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 444 (2003) (quotation omitted).

the QPA, as the August FAQ appeared to concede, then all ghost rates must be excluded.[3]

The inclusion of ghost rates in the QPA calculation is no minor problem. One survey, for example, found that 68% of primary care professionals have contracts with rates for services they perform fewer than twice annually, and 57% of respondents had contracts with rates for services that they never provide. Indeed, even the agencies acknowledge this practice. In the August FAQs, they reported that some insurers "offer[] most providers the same fee schedule for all covered services, and then it is up to the providers to negotiate increases to the rates for the services that they are most likely to bill." Thus, the ultimate provider-insurer contract will contain "modifications made only to certain service codes based on the negotiations"—in other words, many non-negotiated ghost rates. Yet the whole point of the QPA is to generate a reimbursement rate that "reflects market rates under typical contract negotiations." 86 Fed. Reg. at 36,889. The July Rule and August FAQs, however, instruct insurers to calculate the QPA with non-negotiated ghost rates.

The agencies' error has upended the NSA's dispute-resolution process. Congress intended the QPA to serve as a focal point of provider-insurer negotiations as to which party would cover the balance of a patient's bill. *See* 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I). Because the agencies directed

---

[3] The agencies now insist that the July Rule excluded $0 rates all along. But the record belies that proposition. *See, e.g.*, 86 Fed. Reg. at 36,889 (July Rule mandating that "each contracted rate" factor into the QPA calculation); 45 C.F.R. § 149.140(a)(1) (defining "contracted rate" as the "amount" that an insurer "has contractually agreed to pay . . . for covered items and services"); ROA.11468 (August FAQs acknowledging that some providers "even accept[] $0 as their *rate* for codes they do not utilize" (emphasis added)). Regardless, it is undisputed that the agencies required insurers to include non-zero-dollar ghost rates (*e.g.*, $1) in the QPA calculation.

insurers to include non-negotiated ghost rates, the resulting QPAs were artificially low. How do we know? For one, the number of arbitrations dwarfed the agencies' expectations by a factor of *84*. For two, providers prevailed in over 80% of arbitrations. And for three, arbitrators selected a reimbursement rate higher than the QPA in a whopping 85% of arbitrations. These statistics underscore that the agency's inclusion of artificially low reimbursement rates is contrary to the statutory text.

## C

The agencies' counterarguments are unpersuasive.

As to statutory text, the agencies rely on the requirement that insurers use contracted rates for items or services "provided by a provider in the *same or similar specialty*." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). The same-or-similar-specialty qualifier, the agencies argue, eliminates non-negotiated ghost rates. But providers in the same or similar specialties may not (and in fact, often do not) provide overlapping services. For example, "an obstetrician-gynecologist's contract will likely include rates for delivery services, regardless of whether she ever performs deliveries." Am. Med. Ass'n Amicus Br. at 11; *see also id.* ("Specialists like orthopedists typically focus on only certain parts of the body—yet an orthopedist's contract will likely cover far more than that particular orthopedist's specialty."). So it is true that the same-or-similar-specialty requirement will eliminate *some* ghost rates—say, for a neurosurgeon who does not provide podiatry services. But the July Rule remains unlawful because it still includes rates for services that a provider does not provide.

The agencies also contend that providers need only make a service "available," and that they do so by contracting with insurers for the relevant rates. But the fact that a provider did not object to a ghost rate does not mean that ghost-rated service is "available." As the agencies acknowledge, many

fee schedules include non-negotiated rates for services that providers are "not equipped to furnish." That admission contradicts the plain language of the statute, which requires that "the item or service is furnished." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). So even if the NSA requires that providers only make a service "available," the July Rule and August FAQs still include rates for services that are indisputably unavailable.

The agencies next argue that the phrase "provided by a provider" cannot be limited to services that providers perform but rather encompasses items or services that providers could perform in the future. But this argument does not fix the fundamental problem with the agencies' action: The rules still require providers to include rates for items and services as low as $1. No provider would negotiate a reimbursement rate of $1 for, say, brain surgery that he has never provided but may happen to provide down the road. As the district court put it, the rules instruct insurers to include rates for items or services that "are not provided, never have been provided, and never will be provided." So even assuming that "provided by a provider" includes services a provider has never provided but could theoretically provide in the future, the agencies' rules still include rates that the statute precludes.

Relatedly, the agencies say it is impracticable to figure out whether a provider actually provides a service. What is the relevant time period, they ask, for whether a provider has provided or will provide a service? That is a fair question, and it is one the agencies could have answered had they sought notice and comment to "ensur[e] that the QPA reflect[ed] market rates under typical contract negotiations." *See* 86 Fed. Reg. at 36,889. Instead, the July Rule was an interim-final rule, meaning the agencies promulgated it without notice and comment. *Id.* at 36,917–18; *see* 5 U.S.C. § 553(b)(4)(B) (allowing agencies to eschew notice and comment upon a showing of "good

cause"). So it is awkward, to say the least, for the agencies now to complain that they do not have sufficient information from providers.

## II

Plaintiffs' next argument concerns whether insurers may exclude certain bonus and incentive payments from the QPA calculation. We (A) explain the agencies' error and then (B) address the agencies' counterarguments.

## A

The NSA requires that each contracted rate in the QPA calculation reflect the "total maximum payment" "under such plans or coverage" for an item or service. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Translated to plain English, that means that each contracted rate that factors into the QPA calculation is the highest possible amount in a provider-insurer contract for an item or service. In implementing this mandate, the July Rule required insurers to exclude "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 45 C.F.R. § 149.140(b)(2)(iv). Plaintiffs contend that this rule contravenes the plain text of the NSA and artificially deflates the QPA calculations.

We agree. The word "total" means "[o]f, pertaining to, or referring to the whole of a thing, specified or implied, or the entire number of things concerned; not partial." *Total*, WEBSTER'S NEW INTERNATIONAL DICTIONARY 2675 (2d ed. 1934; 1950) ("WEBSTER'S SECOND"); *see also id.* ("Comprising or constituting a whole or the sum of all parts, items, instances, etc.; entire[.]"). And "maximum" means "[t]he greatest quantity or value attainable in a given case" or "the highest point or degree." *Id.* at 1517. That means the "total maximum payment" specified by § 300gg-111(a)(3)(E)(i)(I) is the whole, entire payment and the sum of all payments from the insurer to the provider for the given item or service. If some of the

providers' payments come in the form of bonuses or incentives or other adjustments, they nonetheless must be included in the QPA for the relevant item or service. The agencies' decision to exclude these payments means that the providers are receiving less than the "total maximum payment" specified by the statute.

## B

Again, the agencies' counterarguments are unpersuasive.

The agencies first contend that excluding bonus and incentive payments makes the QPA better reflect the amount of money that an insurer reimburses a provider for a given item or service. As the agencies' brief put it, bonus and incentive payments "are rarely tied to specific contracted rates for particular items and services" and are usually paid "as an annual lump sum." *See also* 86 Fed. Reg. at 36,894 (making a similar point).

It might be true that bonus and incentive payments are sometimes unconnected to an item or service—but it's also true that such payments sometimes *are* connected. *See* TMA En Banc Br. at 39 (collecting examples). Moreover, in the statutory section describing the agencies' rulemaking authority, Congress instructed that the agencies "shall take into account payments that . . . are not on a fee-for-service basis." 42 U.S.C. § 300gg-111(a)(2)(B). Bonus and incentive payments fall within this text. So the agencies cannot ignore or exclude them. *Contra post*, at 42 (HAYNES, J., concurring in part and dissenting in part).

The agencies again complain that it is infeasible or impractical to include bonus and incentive payments in the QPA. To the agencies, "[i]t is unclear how it would be possible to calculate the impact of bonus and incentive payments on the rate for a particular item or service when the provider and plan have agreed to rates established on a fee-for-service model." And again, this is the sort of question that the agencies could have

figured out in notice and comment. If the providers were given a chance to explain whether and to what extent bonus and incentive payments could be tied to items and services, then the agencies could have made rational decisions to include or exclude such payments from the QPA. But the agencies cannot promulgate the July Rule without input from providers and then complain that "[i]t is unclear how it would be possible" to include the providers' total maximum payments in the QPA.

## III

Plaintiffs' third and final challenge relates to the agencies' exclusion of one-off, case-specific agreements from the "contracted rates" used for the QPA calculation. On this question, we agree with the agencies. We (A) discuss the statutory text and the July Rule, (B) explain why the former does not prohibit the latter, and (C) respond to plaintiffs' contrary arguments.

## A

The NSA requires that insurers calculate the QPA based on the "contracted rates recognized" by a health plan "under such plans or coverage" within an insurance market. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). In promulgating the July Rule, the agencies considered whether one-off, single-case agreements constitute "contracted rates" within the meaning of § 300gg-111(a)(3)(E)(i)(I). Single-case agreements between providers and insurers are prevalent in the air ambulance industry. Air ambulances assist critically ill patients who need emergency care and have few options. Air ambulance providers often fall outside a patient's insurance network and often bill insurers for one-off ambulance services.

The July Rule excised the rates used in one-off agreements from the QPA calculation: "[S]olely for purposes of the definition of contracted rate, a single case agreement, letter of agreement, or other similar arrangement . . . does not constitute a contract, and the rate paid under such

an agreement should not be counted among the plan's or issuer's contracted rates." 86 Fed. Reg. at 36,889. Or, put differently, "[t]he term 'contracted rate' refers only to the rate negotiated with providers and facilities that are contracted to participate in any of the networks of the plan or issuer under generally applicable terms of the plan or coverage and excludes rates negotiated with other providers and facilities." *Id.* To the agencies, this approach "most closely align[ed] with the statutory intent of ensuring that the QPA reflects market rates under typical contract negotiations." *Id.*

The panel decision rejected plaintiffs' challenges to this definition of "contracted rates." *Tex. Med. Ass'n*, 120 F.4th at 506. Plaintiffs did not seek en banc rehearing on the question in their joint en banc petition, and the agencies did not mention it in their response. Rather, the air ambulance plaintiffs raised it in their supplemental en banc brief. In their view, single-case agreements are contractual arrangements to pay an agreed rate for a provider's service, so they fall within the meaning of "contracted rate."

B

The NSA does plainly cover single-case agreements such as the bills sent by air ambulances. The statute applies to "contracted rates." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). As used in the context of a contract, a "rate" is "[a] fixed relation of quantity, amount, or degree between two things; a ratio; proportion; also, a charge, payment, or price fixed according to a ratio, scale, or standard; as, a *rate* of ten cents a yard for cloth; the *rate* of exchange; the control of railroad *rates*." WEBSTER'S SECOND, *supra*, at 2065.

That is, the word *rate* connotes a per-unit price for *multiple* units. It's possible for a car-buyer to walk into the dealership and ask, "what is the *rate* for new Ram 3500s?" But the more common way to ask that question—at least for someone who's buying one and only one pickup truck—is to say, "what is the *price* for a new Ram 3500?" The word *rate* does not most

naturally fit one-off, single-use agreements such as the bills associated with air ambulances.

Further, even if one-off agreements were somehow contracted rates, they are not rates "recognized" "under" an insurer's plan or coverage. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The whole reason for single-case, ad hoc agreements is that they arise in emergency situations when insurers pay out-of-network providers at exceedingly high rates apart from any generally applicable health plan; if the insurers were paying "under" the health plan, no single-case agreement would be necessary. Thus, the agencies' exclusion of single-case agreements from the rates contracted to under a health plan does not conflict with the statutory text.

This conclusion fits with the context and structure of the NSA. As the district court put it, the QPA serves to approximate the "median rate the insurer would have paid for the service if provided by an in-network provider or facility." But single-case agreements involve out-of-network providers' performing emergency services that result in exorbitant, "surprise" charges to unwitting patients. That the *No Surprises* Act would incorporate such surprise rates into the QPA makes little sense. The point of the QPA is to "reflect[] market rates under typical contract negotiations." 86 Fed. Reg. at 36,889; *see also supra*, Part I. Out-of-network charges for emergency care do not factor into this calculus.

What's more, Congress directed insurers to use rates recognized at a specific point in time: January 31, 2019. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). That directive is difficult to square with single-use agreements that apply to one and only air ambulance trip. Does the NSA apply only to air ambulance trips that occurred on January 31? Or what if the air ambulance trip occurred on December 1, but the provider sent the bill (read: contract) on January 31? Would everyone agree that air ambulance trips that were neither taken nor

billed on January 31, 2019, are excluded? The most logical answer is that "contracted rates" refers to generally applicable rates in provider-insurer contracts that existed on January 31, 2019.

C

The air ambulance plaintiffs raise several counterarguments. None is availing.

First, plaintiffs point to supposedly contradictory interpretations within the agencies' rulemaking. The agencies elsewhere recognize that a "single case agreement between a health care facility and a plan or issuer . . . constitutes a contractual relationship" for the purposes of defining participating emergency facilities and participating health care facilities under the Act. 45 C.F.R. § 149.30. But the "contractual relationship" provision defines which health care facilities are "participating" for the purposes of the Act. *See* 42 U.S.C. § 300gg-111(b)(2)(A)(i). Indeed, that whole subsection is concerned with the scope of the NSA's protections— "Coverage of non-emergency services performed by nonparticipating providers at certain participating facilities." *Id.* § 300gg-111(b). Whether a facility has a "contractual relationship" such that it is "participating" for the purposes of the Act says nothing about which "contracted rates" fit into the QPA calculation. *See id.* § 300gg-111(a)(3)(E)(i)(I).[4]

The air ambulance plaintiffs also accuse the agencies of engaging in *post hoc* rationalizations. Of course, agencies have long been forbidden from

---

[4] Likewise, plaintiffs point to an inherent contradiction in including rates for items or services regardless of the number of claims paid at that rate but excluding single-case agreements. We agree—and thus vacate the parts of the July Rule that require insurers to include ghost rates. *See* Part I, *supra.* In both contexts—rates for services that providers do not provide, and rates for single-case agreements—neither number represents the negotiated market transaction that the QPA is meant to approximate.

promulgating a rule on one basis and then defending it on another when haled into court. *See SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943). But the agencies did not do so here. They justified the exclusion of single-case agreements on the grounds that the term "contracted rate" refers only to rates negotiated with providers "under generally applicable terms" of an insurer's plan or coverage. 86 Fed. Reg. at 36,889. That is exactly the argument made here, which is that single-case agreements are neither generally applicable nor "under" the terms of a plan.

Plaintiffs also argue that the agencies' interpretation of "under" is wrong because if insurers are not paying providers "under" an insurance plan, then they are violating their fiduciary obligations to all other plan beneficiaries. But a plan may permit single-case agreements in the context of emergency care. That is a different question from whether an insurer's reimbursement to a provider in that context is a "contracted rate" "under" the plan. *See Tex. Med. Ass'n*, 120 F.4th at 506 n.11.

The air ambulance plaintiffs' arbitrary-and-capricious arguments likewise fail. While in-network rates for emergency services may be "comparatively rare," that does not mean high out-of-network rates fall within § 300gg-111(a)(3)(E)(i)(I). The whole point of the QPA is to approximate market rates for *in*-network services. "[M]any providers of air ambulance services . . . do not participate in insurer networks and have little incentive to do so." 86 Fed. Reg. at 36,923. In fact, "provider avoidance of insurance network participation combined with aggressive collection practices has been described as a business strategy of some providers of air ambulance services." *Id.* Because the air ambulance business model is built on avoiding in-network contracts, we cannot say it was arbitrary or capricious to exclude them from a scheme built on in-network contracts.

IV

Finally, the question of remedy. The Administrative Procedure Act ("APA") provides that the "reviewing court shall . . . hold unlawful and set aside agency action . . . not in accordance with law." 5 U.S.C. § 706. Our court has interpreted this text to make vacatur the APA's default remedy. *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc). "While vacatur does not fall in the standard list of remedies found in most casebooks . . ., vacatur fits the standard definition of a remedy, and the Supreme Court recognizes it as such." Benjamin B. Johnson, *A History of Vacatur*, 135 Yale L.J. 761, 771 (2026) (collecting examples). In accordance with our precedent, the district court appropriately vacated the agencies' actions.

In this case, however, the agencies and the insurers insist that vacatur will create a host of practical problems. Not least among them is the considerable time it will take insurers to calculate new QPAs. The agencies also contend that, while the new QPA process is ongoing, American citizens could lose the protection of the NSA's ban on balance billing.

The APA, however, does not embrace a too-big-to-vacate principle. And administrative agencies cannot survive judicial review simply by making mistakes that are so colossal that the sky will fall if a court reviews them.

Further, vacatur will not result in all-out chaos. As the district court observed, agencies "can exercise their enforcement discretion to allow insurers to continue using their existing QPAs until new QPAs are calculated consistent with the Act." That way, patients will not be saddled with the balance billing of pre-NSA times. Indeed, the agencies have been exercising enforcement discretion while their appeal from the district court has been pending, so they are more than capable of preventing immediate chaos.

17

No. 23-40605

\*      \*      \*

The judgment of the district court is AFFIRMED IN PART, REVERSED IN PART, and the case REMANDED for further proceedings consistent with this opinion.

No. 23-40605

JAMES C. HO, *Circuit Judge*, concurring:

I concur. I write separately because the Government has asked us to revisit whether the universal vacatur of an agency rule is even lawful—let alone the default rule—under the Administrative Procedure Act. *See*, *e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (plurality opinion) ("vacatur of an agency action is the default rule in this Circuit"); *Data Mktg. P'ship, LP v. U.S. Dept. of Labor*, 45 F.4th 846, 859 (5th Cir. 2022) (same).

**I.**

Vacatur of an agency order is uncontroversial. No one disputes our authority to relieve a party of the burdens of an adverse order. And such relief implicates none of the dangers typically associated with universal relief.

Universal vacatur of agency rules, by contrast, provides relief for non-parties as well as parties. And that challenges our basic conception of the judicial power under Article III of the Constitution.

"[F]ederal courts do not exercise general oversight of the Executive Branch." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). We "do not possess a roving commission to publicly opine on every legal question" or "exercise general legal oversight of the Legislative and Executive Branches, or of private entities." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021). "It is not the role of the judiciary to check the excesses of the other branches, any more than . . . the excesses of any other American citizen." *A.A.R.P. v. Trump*, 137 F.4th 391, 392 (5th Cir. 2025) (Ho, J., concurring).

Under a proper and limited understanding of the judicial power, it is nothing more than the authority to "determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction." *Muskrat v. United States*, 219 U.S. 346, 361 (1911). "[O]ur job is simply to

decide those legal disputes over which Congress has given us jurisdiction." *A.A.R.P.*, 137 F.4th at 392 (Ho, J., concurring).

Universal vacatur challenges this foundational vision of the judicial power. In fact, universal vacatur presents many of the same challenges as the universal injunctions condemned in *CASA*. *See*, *e.g.*, Ronald M. Levin, *Vacatur, Nationwide Injunctions, and the Evolving APA*, 98 Notre Dame L. Rev. 1997, 1999 (2023) ("In functional terms . . . a vacatur can have roughly the same effects as a nationwide injunction."); *United States v. Texas*, 599 U.S. 670, 694–95 (2023) (Gorsuch, J., concurring in the judgment) (same).

To begin with, universal remedies "take the judicial power beyond its traditionally understood uses" by "permitting district courts to order the government to act or refrain from acting toward nonparties." *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring). They "prevent[] legal questions from percolating through the federal courts, encourag[e] forum shopping, and mak[e] every case a national emergency." *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring). *See also CASA*, 606 U.S. at 855–56 (same). And they "operate asymmetrically: A plaintiff must win just one suit to secure sweeping relief. But to fend off such an injunction, the Government must win everywhere." *Id.* at 855.

## II.

Three members of the Supreme Court have made clear that the arguments against universal vacatur "warrant careful consideration." *Texas*, 599 U.S. at 693 (Gorsuch, J., concurring in the judgment).

The asserted authority for universal vacatur is section 706 of the APA. 5 U.S.C. § 706. But as a leading scholar has noted, "section 706 . . . does not direct courts to give universal remedies"—indeed, it "does not address remedies at all." John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37

Yale J. Reg. Bull. 37, 37 (2020). It says only that courts can "'hold unlawful and set aside' agency action," meaning that "courts are not to follow the agency action in deciding the case." *Id.* "The APA addresses remedies, not in section 706, but in section 703." *Id.* And section 703 includes "forms of action including habeas corpus, declaratory and injunctive proceedings, and civil or criminal enforcement proceedings"—not vacatur. *Id.* at 45.

Justice Gorsuch has similarly observed that "§ 706 . . . does not say anything about 'vacating' agency action ('wholesale' or otherwise)." *Texas*, 599 U.S. at 695 (Gorsuch, J., concurring in the judgment). Section 703— "where the APA most clearly discusses remedies"—only "authorizes aggrieved persons to bring 'any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus.' Conspicuously missing from the list is vacatur." *Id.* at 698 (Gorsuch, J., concurring in the judgment). It is not "apparent why Congress would have listed most remedies in § 703 only to bury another (and arguably the most powerful one) in a later section addressed to the scope of review." *Id.* If Congress "meant to overthrow the 'bedrock practice of case-by-case judgments with respect to the parties in each case' and vest courts with a 'new and far-reaching' remedial power, it surely chose an obscure way to do it." *Id.* at 695 (quoting *Arizona*, 40 F.4th at 396 (Sutton, C. J., concurring)).

* * *

That said, I recognize that our circuit precedent goes the other way, and that there is not presently interest to revisit that precedent. *See also*, *e.g.*, *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring) ("[T]he APA authorizes vacatur of agency rules."). I am accordingly content to concur.

No. 23-40605

Andrew S. Oldham, *Circuit Judge*, concurring in part:

The Administrative Procedure Act makes it difficult—some would say impossible—for agencies to make law without notice and comment. In this case, however, the defendant agencies skipped it and promulgated an interim-final rule without public input. When it turned out that the unnoticed rule had problems, the agencies tried to fix them through an informal FAQ document. That piled error on error. On these grounds, I concur that the agencies' actions were unlawful.

I

A

The No Surprises Act ("NSA" or "the Act") alleviates unexpected medical bills from out of-network healthcare providers. The Act directs insurers and healthcare providers to negotiate reimbursement rates via an "independent dispute resolution process," 42 U.S.C. § 300gg-111(c), rather than leaving patients responsible for the balance of their treatment. That negotiation process revolves around the "qualifying payment amount," or QPA. The QPA approximates the amount that the provider would have received from the patient's insurance plan had the provider been in-network. A patient's cost-sharing amount is calculated as a portion of the QPA. Then, the provider and insurer negotiate over the remainder.

This case is about the methods used to calculate the QPA. The NSA defines the QPA as "the median of the contracted rates recognized by" an insurance plan "as the total maximum payment . . . for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the [same] geographic region." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Or, as the per curiam puts it: "The QPA is the median of the total maximum rates in an insurer's contract for an item or service that a provider provides, sorted by specialty and geographic region." *Ante*, at 2–3.

The NSA authorized the Departments of Health and Human Services, Labor, and Treasury to establish a methodology for calculating the QPA via rulemaking. 42 U.S.C. § 300gg-111(a)(2)(B).

In July 2021, the agencies promulgated the so-called July Rule. *See* Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872 (July 13, 2021). Promulgated as an interim-final rule, the agencies enacted the July Rule without notice and comment. *See id.* at 36,917–18. The July Rule directed insurers to treat "each contracted rate for a given item or service" as a "single data point when calculating a median contracted rate . . . regardless of the number of claims paid at that contracted rate." *Id.* at 36,889. Thus, "insurers were to include in the QPA calculation each rate that appeared on the face of their contracts with providers." *Ante*, at 4.

This instruction had significant effect. When insurers and providers negotiate reimbursement rates for various items or services, insurers often present providers with form contracts that include a default fee schedule for all covered services. From there, providers negotiate the rates for services that they plan to provide but leave untouched the rates for services they do not provide (or at least plan to provide). As a result, contracts between insurers and providers often include non-negotiated "ghost rates" for services that providers do not actually provide. The per curiam provides a helpful example: an OB/GYN who chooses not to deliver babies. That provider's fee schedule could include unnegotiated ghost rates for various obstetrics services that could be provided by an OB/GYN, but are never provided by this OB/GYN. Because the OB/GYN in question did not negotiate such rates, they could be as low as $0. *Ante*, at 4.

Just over a year after promulgating the July Rule, the agencies in August 2022 released a set of Frequently Asked Questions ("August FAQs"). In FAQ 14, the agencies pointed out that the July Rule had

directed insurers to factor "each contracted rate" into the QPA calculation. *See* 86 Fed. Reg. at 36,889. But the agencies now instructed insurers to exclude $0 ghost rates. The agencies had been "informed" that some provider-insurer contracts contained $0 as a reimbursement rate for items and services that providers were "not equipped to furnish." ROA.11469 n.29. So, they directed that insurers "should not include $0 amounts in calculating median contracted rates." *Ibid.*

Even with $0 rates gone, the inclusion of other artificially low rates disrupted the NSA's statutory framework. The QPA serves as the linchpin of provider-insurer negotiations as to who must cover the balance of a patient's bill. *See* 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I). But including non-negotiated ghost rates made the resulting QPAs artificially low. The low QPAs gave providers a systemic advantage. Negotiations repeatedly failed; the number of arbitrations exceeded the agencies' expectations by a factor of 84; providers prevailed in over 80% of arbitrations; and arbitrators selected a reimbursement rate higher than the QPA in an astounding 85% of arbitrations. *Ante*, at 8.

B

Plaintiffs sued the agencies under the Administrative Procedure Act ("APA"). They claimed that the July Rule and August FAQs violated the NSA's terms and were arbitrary and capricious.

The district court agreed. While the NSA commanded that insurers include rates for services "provided by a provider," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), the July Rule "allows insurers to include contracted rates for items or services that are not provided, never have been provided, and never will be provided," ROA.13208. Thus, the district court vacated the July Rule and FAQ 14. A panel of our court reversed, and the full court granted rehearing. *See Tex. Med. Ass'n v. HHS*, 120 F.4th 494 (5th Cir.

No. 23-40605

2024), *reh'g en banc granted, opinion vacated*, 138 F.4th 961 (5th Cir. 2025). After oral argument, the court asked for supplemental briefing on the agencies' rulemaking procedure.

II

The agencies committed a series of errors in promulgating the July Rule and August FAQs. I (A) recount the substantive error in the July Rule and (B) explain why the agencies could not remedy the substantive error in the July Rule with an informal FAQ document. Then I (C) address the agencies' counterarguments.[1]

A

The agencies chose to promulgate the July Rule as an interim-final rule. That meant it was final on the day it was promulgated. *See* 5 U.S.C. §§ 553(b)(4)(B), 704. And as a legislative (or "substantive") rule, it constituted "final agency action" subject to judicial review under the APA. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Under the longstanding *Chenery* principle, the Rule must stand or fall on the grounds the agency gave for it in July 2021. *SEC v. Chenery*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). As the Supreme Court has explained, it is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015); *accord DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020).

---

[1] Two additional questions are before the en banc court: whether the agencies unlawfully directed insurers to exclude incentive payments from the "contracted rates" used to calculate QPAs, and whether the agencies unlawfully directed insurers to exclude single-case agreements. Resolving this case on procedural grounds would have obviated the need to address these challenges.

The grounds the agency gave for the July Rule were contrary to law. *See* 5 U.S.C. § 706(2)(A). The per curiam opinion correctly explains why. *Ante*, at 5–8. In short, because the July Rule told insurers to include $0 ghost rates in the QPA calculation, it was contrary to the NSA.

## B

That much is common ground. Even the agencies concede that the QPA cannot include $0 ghost rates. So, the simplest way to resolve this case is to ask: Could the agencies use the August FAQs to amend the July Rule and exclude $0 ghost rates?

The answer is a resounding "no." That's because an administrative agency cannot fix a substantive error in a formal legislative rule through an informal FAQ document. I (1) start with an overview of legislative and interpretive rules, and then (2) turn to this case.

## 1

Start with four uncontroversial legal premises.

First, the definition of a legislative rule. Legislative rules "bind[] the public and courts in a manner indistinguishable from a statute." Richard J. Pierce, Jr., *Distinguishing Legislative Rules from Interpretative Rules*, 52 ADMIN. L. REV. 547, 552 (2000) (citing KENNETH DAVIS & RICHARD PIERCE, ADMINISTRATIVE LAW TREATISE 233 (3d ed. 1994)). Legislative rules are "promulgated pursuant to legislative authority delegated to the agency by Congress." *St. Mary's Hosp., Inc. v. Harris*, 604 F.2d 407, 409 (5th Cir. 1979). And legislative rules carry the force and effect of law. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 301–03 (1979). A legislative rule "modifies or adds to a legal norm based on the agency's own authority." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997).

Second, labels do not matter. This court is "not bound by an agency's classification of its action." *Mock v. Garland*, 75 F.4th 563, 580 (5th Cir. 2023). That is, we do not care if the agency calls its legislative rule something like a "guidance document" or an "interpretative" rule or an FAQ document. If the agency issues any document—including the most informal-looking Word document that could have been drafted over a weekend on a laptop from the beach—it is still a legislative rule if it determines "rights and obligations" or has "legal consequences." *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 441, 451 (5th Cir. 2019) ("*EEOC*"); *see also United States v. Texas*, 809 F.3d 134, 171 (5th Cir. 2015), *aff'd by an equally divided Court*, 579 U.S. 547 (2016) (per curiam). For example, the Government in *EEOC* presented a document as mere "enforcement guidance." 933 F.3d at 437. And in the agency's defense, the "guidance" document did not look particularly formal; it wasn't promulgated in the Federal Register, and to the contrary, was just a Word document that had been printed to PDF. No matter—this court held it was a legislative rule. *See id.* at 442. Regardless of the label, the Word document bound the agency "and its staff to a legal position." *Id.* at 441.

Third, legislative rules by definition must meet the strictures of notice-and-comment rulemaking. *See* 5 U.S.C. § 553(b). As this court recently put it: "If a rule is legislative in nature, it must pass through notice and comment." *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 241 (5th Cir. 2023) ("*FTI*"). Or as the Supreme Court has explained, the process of notice and comment is what defines a legislative rule and gives it the force and effect of law. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

Fourth, and perhaps most relevant here, substantive changes to Legislative Rule A can be made only through a subsequent Legislative Rule B. As this court explained in *FTI*:

No. 23-40605

> "[I]f a second rule repudiates or is irreconcilable with a prior legislative rule, the second rule must be an amendment to the first; and, of course, an amendment to a legislative rule must itself be legislative." This is consistent with the approach recommended by Judge Williams of the D.C. Circuit, who stated that a rule is properly considered legislative when it "effectively amends a prior legislative rule."

58 F.4th at 241 (first quoting *Clean Water Action v. EPA*, 936 F.3d 308, 314 n.11 (5th Cir. 2019); then quoting *American Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993)). In *FTI*, for example, the FAA issued Legislative Rule A, which governed the standards pilots must meet to earn their airline transport pilot certificates. Then, the FAA issued a "policy memorandum" to amend the certificate standards. This court held that the FAA could not amend Legislative Rule A through anything other than a subsequent Legislative Rule B. *See id.* at 244. Because the "policy memo" did not meet the requirements for a legislative rule—most particularly, notice and comment under § 553—this court held it invalid and set it aside. *Id.* at 246.

Our sister circuits agree that substantive changes to a legislative rule require another legislative rule. Take the First Circuit's decision in *New Hampshire Hospital Ass'n v. Azar*, 887 F.3d 62 (1st Cir. 2018). There, HHS promulgated a legislative rule telling hospitals how to calculate the maximum reimbursement they could obtain if they treated certain low-income patients. *Id.* at 68. But HHS subsequently amended the methodology, this time in a "Frequently Asked Questions" document. *Ibid.* The FAQs told hospitals that a certain class of payments counted toward their reimbursement cap. *Ibid.* The First Circuit held that, because "the FAQs announced a new policy on a matter of some considerable import," they were a legislative rule that had to go through notice and comment. *Id.* at 74. What's more, two other circuits agreed that the FAQs' amendment to the reimbursement

28

methodology was a legislative rule that required notice and comment. *See Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 623 (4th Cir. 2018); *Children's Health Care v. Ctrs. for Medicare & Medicaid Servs.*, 900 F.3d 1022, 1027 (8th Cir. 2018).

All that is to say, it's black-letter law that if any agency is going to make substantive changes to a legislative rule, it must use notice-and-comment rulemaking to do so. *See also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995) (observing that "APA rulemaking would . . . be required if [the purported policy statement] adopted a new position inconsistent with any of the Secretary's existing regulations" because changes to legislative rules can be accomplished only through subsequent legislative rules); *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 753 (D.C. Cir. 2001) (emphasizing that an agency has the power to correct its mistakes "so long as it follows certain procedures" in § 553, since allowing "an agency [to] correct errors in rules merely by announcing a change would be inconsistent with" that statute).

2

It is undisputed that the July Rule was a legislative rule. That means the agencies could only amend it through another legislative rule. FAQ 14 purported to amend the July Rule. But because FAQ 14 did not go through notice and comment, FAQ 14 was a legal nullity. This conclusion rests on four points.

First, the July Rule is obviously a formal legislative rule. It was promulgated as an interim-final rule in the Federal Register. It purports to comply with 5 U.S.C. § 553(b)(4)(B). And it was final and binding—as a legislative rule that carried the force of law—on the day it was issued. All of that is undisputed.

Second, the legislative July Rule can be amended or changed only through another legislative rule. That is the teaching of *FTI*, our sister

circuits' precedents, and *Guernsey Hospital*. The parties cite no authority, and we are aware of none, that could allow an agency to amend a legislative rule through a non-legislative, informal, FAQ document.

Third, FAQ 14 is a legislative rule—even though it purported merely to answer frequently asked questions. Under *FTI*, FAQ 14 amended the July Legislative Rule—so it had to be a legislative rule. (FAQ 14 could not amend the July Legislative Rule otherwise.) And FAQ 14 spoke in binding, authoritative terms and required insurers to exclude $0 ghost rates notwithstanding the contrary instructions in the July Rule. Because the FAQ spoke in such force-of-law terms, we must treat FAQ 14 as a legislative rule—regardless of its FAQ label. *See EEOC*, 933 F.3d at 442.

Lest there be any doubt, consider the text and context of FAQ 14 itself. In the FAQ document, the agencies first identified an oversight in the legislative July Rule. The agencies had recently been "informed" that some provider-insurer contracts left $0 rates in the fee schedule for services or items that a provider did not (and in some circumstances *could not*) provide. ROA.11469 n.29. So, despite the July Rule directing insurers to calculate the QPA using all contracted-for ghost rates, *see* 86 Fed. Reg. at 36889, FAQ 14 instructed insurers to exclude $0 rates from their QPA calculations, ROA.11469 n.29. Here's that directive:

No. 23-40605

the contracted rates the plan or issuer has for the same anesthesia services with other providers in specialties that do not bill for those services. Similarly, an anesthesiologist's contract may also include contracted rates for other services the anesthesiologist does not provide (for example, dermatology services) that are identical to the contracted rates the plan or issuer has with other providers in specialties who similarly do not bill for those services.[29]

To the extent contracted rates for a service code vary based on only certain provider specialty types, the plan or issuer must calculate a separate median contracted rate for each provider specialty for which the rates differ. For example, if a plan's or issuer's contracted rates for a given anesthesia service are clustered at one rate for anesthesiologists and at another rate for all other provider specialties because those providers do not provide and bill for anesthesia services, the plan or issuer must calculate one median contracted rate for the anesthesia service code for anesthesiologists, and one separate median contracted rate for the same anesthesia service code for all other provider specialties. In this example, the plan or issuer would not be expected to calculate separate median contracted rates for the anesthesia service code for each of the other specialties, such as psychiatry or cardiology, because the plan or issuer does not have contracted rates for anesthesia services that vary based on those provider specialties.

The Departments understand that some natural variation in contracted rates is likely to occur as part of the contracting process. A plan or issuer may have established contracted rates for service codes that vary across providers for reasons that are not based on provider specialty. For the purpose of identifying provider specialties for which QPAs must be separately calculated, a plan's or issuer's contracted rates for an item or service are considered to vary based on provider specialty if there is a material difference in the median contracted rate for a service code between providers of different specialties, after accounting for variables other than provider specialty. Plans and issuers whose median contracted rates for a service code are not materially different between providers of different specialties are not required to calculate median contracted rates separately for each provider specialty when determining the QPA. For this purpose, whether a material difference exists depends on all the relevant facts and circumstances.

The Departments recognize that plans and issuers (reasonably and in good faith) may have not understood the July 2021 interim final rules to require the calculation of separate median contracted rates when the plan's or issuer's contracting process unintentionally results in contracted rates that vary based on provider specialty. Accordingly, the Departments will not require a plan or issuer (to the extent not already in compliance) to calculate a QPA as described in this guidance with respect to items and services furnished prior to the date that is 90 days after publication of these FAQs. HHS encourages states to take a similar approach to enforcement and will not consider a state to be failing to substantially enforce the requirements relating to the calculation of a QPA because the state takes such an approach. The Departments will monitor plans' issuers' compliance with the July 2021 interim final rules, as interpreted in this guidance, and are continuing to monitor contracting practices that affect the calculation of the QPA, to determine whether additional guidance is needed.

[29] The Departments have been informed that some plans and issuers enter $0 in their fee schedule for covered items and services that a provider or facility is not equipped to furnish. In the Departments' view, $0 does not represent a contracted rate in these cases. Therefore, plans and issuers should not include $0 amounts in calculating median contracted rates.

17

010861

23-40605.11469

There it is in black and white: the Federal Government identified an issue with the July Legislative Rule and then tried to "clarif[y]" it by countermanding the July Legislative Rule with a footnote in FAQ 14. HHS En Banc Br. at 24. Under *Guernsey Hospital*, *FTI*, *New Hampshire Hospital Ass'n*, *Syncor*, and *Clean Water Action*, the agencies' maneuver was invalid.

No. 23-40605

The only way to fix the $0 ghost rate problem was through another legislative rule that satisfied § 553.[2]

Fourth, the August FAQ did not even purport to satisfy § 553. It obviously did not go through notice and comment. And it identified no "good cause" for dispensing with notice and comment. 5 U.S.C. § 553(b)(4)(B). Thus, the agencies could not circumvent the APA's notice-and-comment procedure. *See Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012).

## C

The agencies' counterarguments are unavailing. The agencies (1) rewrite the history of this litigation and (2) argue that party-presentation principles preclude holding the August 2022 FAQ unlawful. I would reject both contentions.

## 1

After conceding—both in the text of FAQ 14 and in its submissions to the en banc court—that the July Rule erroneously required $0 ghost rates in the QPA, the agencies now want to backtrack from that candor. In supplemental briefing, the agencies now argue that the July Rule excluded ghost rates all along. That 180 is counterfactual, illogical, and otherwise unpersuasive.

---

[2] Moreover, FAQ 14 must be a legislative rule because it determined rights and obligations and bound the agencies to a new legal position. *See EEOC*, 933 F.3d at 442. Those instructions affected the rights of insurers and providers alike. After all, the QPA serves as a linchpin of the insurer-provider independent dispute resolution process. These determinations also were binding on the agencies. In telling insurers which rates to include and exclude, FAQ 14 foreclosed agency discretion. *See Texas*, 809 F.3d at 171. Thus, FAQ 14 amounted to a legislative rule—and it could be issued only in accordance with the APA. *See* 5 U.S.C. § 553.

First, the counterfactual. The July Rule mandated that "each contracted rate" factor into the QPA calculation. 86 Fed. Reg. at 36,889. The July Rule defined "each contracted rate" as the "amount" that an insurer "has contractually agreed to pay . . . for covered items and services." 45 C.F.R. § 149.140(a)(1). As the agency itself acknowledged, many of these "contracted rate[s]" include $0 ghost rates. *See* ROA.11468 (agencies acknowledging that some providers "even accept[] $0 as their *rate* for codes they do not utilize" (emphasis added)). The agencies have litigated this entire case on the ground that the July Rule required the QPA to include $0 ghost rates. *See, e.g.*, HHS En Banc Reply Br. at 4 (characterizing the July Rule as instructing insurers to "look to the rates appearing on the face of a health plan's contracts"); HHS En Banc Br. at 24 n.7 (citing the August FAQs—not the July Rule—as the "the Departments' instruction . . . regarding the appropriate treatment of '$0' placeholder rates"); *see also ante*, at 7 n.3 (sharing this understanding of the agencies' earlier position). So the agencies cannot now turn around and say that by *including* $0 ghost rates, the July Rule somehow *excluded* them. *See, e.g.*, *Michigan*, 576 U.S. at 758–59 (holding agency must defend its action on the ground it provided for the action in the first place).

Second, the illogical. The agencies try to manufacture a distinction between two different kinds of ghost rates. In the agencies' revisionist history, there is a meaningful distinction between $0 ghost rates and below-market, unnegotiated $1 ghost rates. On the agencies' telling, $0 ghost rates must be excluded from the QPA—but below-market and concededly unnegotiated $1 ghost rates must be included. The theory appears to be that it's "obvious" that the gynecologist did not negotiate for and agree to a $0 ghost rate for obstetrics, but the same provider *must* be held to a $1 "agreed-to rate" for obstetrics. HHS Supp. En Banc Br. at 10.

Respectfully, this distinction is untenable. The Act requires providers and insurers to consider their "contracted rates" in setting the QPA. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). If a $0 ghost rate is out because it's obvious that a particular provider did not contract for that rate, so too for a below-market non-$0 (*e.g.*, $1) ghost rate. "Either the provider contracted for the rate, or he did not." *Ante*, at 6. If the QPA must exclude ghost rates, as the agencies now appear to concede, then the agencies must exclude all ghost rates.[3]

Third, the otherwise unpersuasive. The agencies also resist the conclusion that FAQ 14 was a legislative rule at all. They instead claim that it was an interpretive rule "advising the public of [the agencies'] construction of the existing substantive law." HHS Supp. En Banc Br. at 11 (citation modified).

But again, that cannot be squared with what the agencies actually said. In the August FAQs, the agencies said they had been newly "informed" about the existence of $0 placeholder rates. *See* ROA.11469 n.29. The agencies recognized that the July Rule required those rates to be included in the QPA. Then the agencies changed the status quo and directed insurers to exclude ghost rates. So, it is inconceivable that FAQ 14 was clarifying the agencies' earlier rule; the agencies apparently were not even aware that the plain text of the July Rule encompassed $0 rates. And it is equally inconceivable that FAQ 14 did not "intend[] to speak with the force of law." HHS Supp. En Banc Br. at 12 (quotation omitted). FAQ 14 unequivocally

_____

[3] For the same reason, I would reject the agencies' contention that plaintiffs lack standing to bring a notice-and-comment challenge because FAQ 14 modified the QPA calculation to their benefit. True, FAQ 14 excludes $0 ghost rates, and that helps plaintiffs. But it's equally true that FAQ 14 harms plaintiffs by allowing or requiring insurers to include non-$0 ghost rates in the QPA.

stated that "plans and issuers should not include $0 amounts in calculating" the QPA. ROA.11469 n.29. That is undeniably mandatory language.

2

Perhaps recognizing their APA problems, the agencies pound the party-presentation table. This assertion misses the mark too.

First, the agencies argue that "the parties have agreed throughout this case that the [July Rule] does not in fact incorporate $0 rates into the QPA methodology." HHS Supp. En Banc Br. at 5 (citation modified). But plaintiffs have always argued that the July Rule's inclusion of all ghost rates, including $0 rates, was unlawful. In their complaint, for example, plaintiffs pointed out that the July Rule's definition of "contracted rates" artificially lowered the QPA because "contracted rates" included *all non-negotiated rates*, including when providers "sometimes accept '$0 as their rate.'" ROA.47 (quoting ROA.11468). Plaintiffs maintained this stance throughout the litigation. *See* TMA En Banc. Br. at 23 ("The July Rule's inclusion of ghost rates is unlawful."); *id.* at 35 ("The Departments' belated decision in the August FAQs to exclude only $0 rates merely highlights the unreasonableness of including all other ghost rates."); *see also* TMA Supp. En Banc Br. at 4 ("[P]laintiffs have squarely presented the issue of whether the Departments' inclusion of ghost rates—of any amount—in QPA calculations is contrary to law.").

Second, the agencies point out that plaintiffs' complaint did not mention "notice and comment." HHS Supp. En Banc Br. at 6. That is true but irrelevant. Party-presentation principles do not allow parties to stipulate to the law. *See, e.g.*, *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 19 n.6 (2024). And if the parties cannot bind us to a legal proposition by affirmatively stipulating to it, they certainly cannot bind us by omitting an antecedent legal argument through neglect or forfeiture.

No. 23-40605

To illustrate, imagine that a party sues to enjoin the enforcement of a congressional statute because it violates, say, the First Amendment. Could that party waive an argument that the statute failed to pass through bicameralism and presentment? *See* U.S. CONST. art. I § 7. Of course not. That's a legal argument—a procedural defect—fairly encompassed within the overarching substantive claim. Indeed, courts often raise non-jurisdictional, procedural defects *sua sponte. See Castro v. United States*, 30 F.4th 240, 245–46 (5th Cir. 2022) (collecting examples). Thus, we cannot duck an antecedent legal argument just because the parties did not brief it. Deciding the case otherwise would improperly allow the parties to stipulate to the law.

These principles demonstrate why the procedural deficiencies in FAQ 14 are properly before this court. Plaintiffs brought a claim for vacatur of the July Rule and August FAQ 14. To resolve that challenge to the substance of the agencies' actions, we would have to accept an antecedent point—that FAQ 14, which modified the July Rule, was validly promulgated. But plaintiffs cannot stipulate that the agency action promulgating FAQ 14 was permissible. And if plaintiffs could not affirmatively stipulate away the agencies' procedural violations, they certainly could not insulate those violations from judicial review by neglect or forfeiture.

What's more, even if plaintiffs' opening briefs didn't raise the procedural argument, their supplemental en banc brief sure does. That's ample grounds for this court to decide on the supplementally briefed issue. The Supreme Court often invites parties to file supplemental briefs on arguments that lurk within parties' claims. *See United States v. Sineneng-Smith*, 590 U.S. 371, 380–82 (2020) (collecting a slew of examples from 2015 to 2020 alone). And the Supreme Court has, for better or worse, spotted a supposedly "winning" issue, asked for supplemental briefing, and ruled on it, notwithstanding the fact that the prevailing party had advocated a

"contrary" position below and had waived its new position three times in the district court. *Trump v. Illinois*, 146 S. Ct. 432, 438 (2025) (ALITO, J., dissenting).[4] There are persuasive reasons to think the *Illinois* Court transgressed the limits on party presentation and reached an erroneous merits outcome to boot. *See id.* at 438–45 (ALITO, J., dissenting); *id.* at 445–46 (GORSUCH, J., dissenting). But given that the prevailing party advanced the opposite position below, the agencies' argument here easily fails: Plaintiffs have maintained that the July Rule unlawfully included $0 rates from the outset of this litigation. So the procedural issue is not just antecedent to the substantive argument plaintiffs first raised; it is entirely consistent with it.

Altogether different questions are presented when a court *sua sponte enlarges* the parties' claims. *See Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (per curiam) (reversing the Fourth Circuit because it "*sua sponte* addressed a much broader" question than the one presented); *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (per curiam) (reversing the Fourth Circuit for granting habeas relief "on a claim that [petitioner] never asserted and that the State never had the chance to address"); *Sineneng-Smith*, 590 U.S. at 378–79 (recounting that the Ninth Circuit "named three organizations" to file amicus briefs and permitted, but did not require, the parties to file briefs "limited to responding to any and all amicus/amici

---

[4] I can think of no principled reason for saying the party-presentation principle applies differently in the Supreme Court and the inferior federal courts. The adversarial requirements of a "Case" or "Controversy" do not loosen the higher up the Judicial Branch you go. U.S. CONST. art. III § 2. If anything, raising "new" legal arguments is "most justified at the circuit court level." Amanda Frost, *The Limits of Advocacy*, 59 DUKE L.J. 447, 512 (2009). Unlike the Supreme Court, the inferior federal courts do not have discretionary dockets; we cannot wait for the proper vehicle to tee up a legal argument. *See ibid.* Given plaintiffs' claim encompassed a notice-and-comment argument, and all parties have briefed it, this court may decide this case on those grounds.

briefs" (emphasis omitted)). But my would-be solution does the opposite. By holding FAQ 14 procedurally invalid, I would not reach plaintiffs' substantive challenges to the agencies' rulemaking.

*

Procedural checks are the principal barrier standing between the American people and the unelected bureaucrats of our Fourth Branch. The agencies in this case cast aside that barrier. So, I would hold their action was unlawful and remand with instructions to follow the APA's venerable notice-and-comment procedure. I respectfully concur in part.

No. 23-40605

Haynes, *Circuit Judge*, joined by Stewart, Graves, Higginson, Douglas, and Ramirez, *Circuit Judges*, concurring in part and dissenting in part:

I concur in the majority opinion's decision that the July Rule is not unlawful because it excludes from the "qualifying payment amount" (or "QPA") one-off, case-specific agreements. Then, to the extent the majority opinion concludes that provisions of the July Rule relating to the calculation of the QPA are unlawful, I agree that this case should be remanded to the district court, instead of vacating the July Rule.[1] However, I do respectfully dissent from the majority opinion's conclusions that the July Rule is unlawful because, when calculating the QPA, it includes contracted rates regardless of whether claims have been paid at that rate and excludes bonus or other incentive-based compensation. I would reach the opposite conclusion in both respects.

I discuss below, *first*, the inclusion of contracted rates regardless of payment at that rate and, *second*, the exclusion of bonus or other incentive-based compensation.

## I.

Plaintiffs challenge the July Rule's inclusion of contracted rates in the QPA calculation regardless of payment. Specifically, they challenge the requirement that "the rate negotiated under a contract constitutes a . . . contracted rate regardless of the number of claims paid at that contracted rate." Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872, 36,889 (July 13, 2021). They say that this provision conflicts with the No Surprises Act's requirement that insurers include in the QPA

---

[1] As well, anything in my panel opinion that is not discussed by the majority opinion should be considered correct.

calculation rates for services that are "provided by a provider." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). I disagree.

The July Rule does not conflict with the Act in this respect. By using the term "provided," *id.*, the Act requires only that a given service be available. Our court has explained that "[t]o 'provide' ordinarily means 'to make available,' 'furnish,' or 'to supply something needed or desired to.'" *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 476 (5th Cir. 2020) (en banc) (alterations adopted) (quoting *Provide*, AMERICAN HERITAGE DICTIONARY). So, the Act does not require that a service must have previously been performed by a provider to be included in the QPA calculation. This makes sense because, at the time contracts are negotiated, no one knows for certain how many times a particular service will be performed. A provider may not provide services that it did expect to provide, and, conversely, a provider may provide services that it did not expect to provide. Providers must only make services available, and it is of no moment that a provider may not have submitted claims nor received payments for a particular service. As a result, the July Rule's requirement that negotiated rates constitute contracted rates "regardless of the number of claims paid," 86 Fed. Reg. at 36,889, does not conflict with the Act's requirement that providers must make these services available, *see* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). That ends the matter, and Plaintiffs' challenge on this score should fail.

The July Rule reasonably attempts to include in the QPA calculation contracted rates only for services that providers make available. Consequently, Plaintiffs' remaining concerns about the possible inclusion of rates for services that a provider does not, and never intends to, provide are unfounded. As a preliminary matter, the Act itself requires that the QPA be calculated based on contract rates for services provided, not by just any provider, but "by a provider in the same or similar specialty." *Id.* So, the

rates agreed to by providers outside a particular specialty, who have no incentive to negotiate those rates, are irrelevant. As for the remaining concern that some providers within a particular specialty will not negotiate rates for services that they do not intend to provide, the agencies' subsequent guidance is significant. The agencies clarified in a set of Frequently Asked Questions that "plans and issuers should not include $0 amounts" when calculating QPAs. The reason for that is because the agencies learned that when "a provider or facility is not equipped to furnish" a particular service, the provider-insurer contracts will often include $0 as the reimbursement rate for that service. That exclusion essentially extinguishes the likelihood that a given QPA would include rates for services that a provider would never provide. Additionally, it is important to keep in mind the context in which the July Rule applies. In that vein, Plaintiffs fail to respond to the agencies' point that the risk of unnegotiated rates for services within a provider's specialty working their way into a contract is especially low in the emergency medical context at which the Act is directed.

Practical realities only reinforce the fact that Plaintiffs' challenge fails. Plaintiffs' reading of the Act is unworkable. For instance, they cannot explain how those responsible for calculating the QPA could accurately determine with certainty which in-specialty services the thousands of providers across the country would *never*—even in emergency circumstances—perform. Instead, to conduct the relevant inquiry, health plans need only to consider the four corners of a plan's 2019 contracts; they need not "scour data beyond their plan contracts to attempt to determine how many claims a given provider may have submitted for that particular service over the course of any given period of time (where no such period of time is specified in the statute)."

## II.

Plaintiffs next challenge the July Rule's exclusion of bonus and incentive-based compensation from the QPA calculation. The relevant provision instructs insurers to "exclude" from the QPA "risk sharing, bonus, or penalty, and other incentive-based and retrospective payments or payment adjustments." 86 Fed. Reg. at 36,894. Plaintiffs say that this conflicts with the Act's phrase "total maximum payment," as used in the definition of the QPA, 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Again, I disagree.

The July Rule's exclusion of bonus and incentive-based compensation does not conflict with the Act. In fact, there can be no conflict because the Act expressly provides the agencies with authority to determine how to handle these payment adjustments. The Act clarifies that the "*rulemaking* shall *take into account* payments that are made by such plan or issuer, respectively, that are not on a fee-for-service basis." *Id.* § 300gg-111(a)(2)(B)(iv) (emphasis added).[2] The Act directs the agencies to consider bonus or incentive-based compensation when engaging in rulemaking. Congress could have made the subject of the sentence "such methodology," rather than "such rulemaking," if it wanted to. But it did not. Instead, Congress simply told the agencies to figure out how to handle incentive payments. That they did. The agencies considered them and concluded that

_____

[2] I am unconvinced by Plaintiffs' alternative assertion that the delegation provision mentions only non-fee-for-service incentives and does not grant the agencies discretion to exclude fee-for-service incentives. What do they mean by fee-for-service incentives? Plaintiffs give an example: an insurer pays "a bonus of X amount per vaccine administered if the provider administers at least Y vaccines to its insureds." But such an incentive is not a pure "fee-for-service" payment because it is tied to factors unrelated to the administration of each particular service (i.e., whether the provider has performed that specific service Y number of other times to other patients).

they should not be a factor in the QPA calculation. If "total maximum payment" was read to mean that incentive-based payments must be included, the Act would contradict itself. That is not the best reading of the statute.

Once again, the practical realities simply reinforce this reading. Incentive payments serve purposes that are distinct from compensating providers for units of service rendered to individual patients. Including such payments in the QPA calculation would skew the calculation, making it less likely to reflect market rates for "item[s] or service[s]," as Congress intended. *See id.* § 300gg-111(a)(3)(E)(i)(I). But what is more, this process would inevitably be complicated, expensive, time-consuming, and lead to inconsistencies among plans. Then, on top of all that, Plaintiffs' theory fails to account for the fact that not all incentive adjustments *increase* payment amounts. Some decrease them (e.g., penalties).

*     *     *

In the end, when it comes to the inclusion of contracted rates regardless of payment at that rate and the exclusion of bonus or other incentive-based compensation, I would reverse the district court.